IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-157-KAJ |
| | ) | |
| ORLANDO J. GEORGE, JR., in both his | ) | Trial By Jury Demanded |
| official and personal capacities, and | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO
DEFENDANTS' OPENING BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

David H. Williams (#616)
dwilliams@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
Attorneys for Defendants

Dated: June 16, 2006

**TABLE OF CONTENTS**

**PAGE**

Excerpts from Deposition of Orlando J. George, Jr....................................................A-1-32

Exhibits from Deposition of Orlando J. George, Jr. ..............................................A-33-53

Supplemental Complaint.........................................................................................A-54-68

Excerpts from Deposition of Gerard M. McNesby.................................................A-69-75

Excerpts from Deposition of Hope Murray .............................................................A-76-94

Deposition of Marguerite A. Johnson .....................................................................A-95-127

Exhibits from Deposition of Marguerite A. Johnson...........................................A-128-143

Excerpts from Deposition of Peter D. Shoudy.....................................................A-144-146

Excerpts from Deposition of Dan Simpson ..........................................................A-147-159

Excerpts from Deposition of Connie Spampinato ...............................................A-160-162

Plaintiff's Supplemental Answers to Defendant's First Set
    of Interrogatories Directed to Plaintiff...............................................................A-163-168

Plaintiff's Responses to Defendants' First Request for Admissions
    Directed to Plaintiff............................................................................................A-169-170

Plaintiff's Responses to Defendants' Second Request for Admissions
    Directed to Plaintiff............................................................................................A-171-173

Defendants' Second Request for Admissions Directed to Plaintiff
    and Exhibits ......................................................................................................A-174-194

Defendants' First Request for Admissions Directed to Plaintiff
    and Exhibits ......................................................................................................A-195-200

Affidavit of Gerard M. McNesby .........................................................................A-201-219

Excerpts from Termination Hearing of Marguerite Johnson...............................A-220-223

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                    )
                                          )
            Plaintiff,                    )
                                          )   Civil Action
            vs.                           )   No. 05-157 (KAJ)
                                          )
ORLANDO J. GEORGE, JR., in both           )
his official and personal capacities,     )
and DELAWARE TECHNICAL AND COMMUNITY      )
COLLEGE,                                  )
                                          )
            Defendant                     )

            Deposition of ORLANDO J. GEORGE, JR., taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 29 N. State Street, Dover, Delaware,
beginning at 1:03 p.m. on Wednesday, November 30, 2005,
before Allen S. Blank, Registered Merit Reporter and Notary
Public.

APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER, GOLDLUST, BAKER & OVER
        702 King Street, Suite 600
        Wilmington, DE 19801

            For - Plaintiff

        DAVID H. WILLIAMS, ESQUIRE
        MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
        222 Delaware Avenue, 10th Floor
        Wilmington, DE 19801

            For - Defendants

ALSO PRESENT:

        MARGUERITE A. JOHNSON

            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A1

1     area.

2        Q       '83?

3        A       Approximately.

4              Later, my next position was assistant campus

5     director.   That would have been mid to late eighties.   And

6     then subsequent to that would have been vice-president and

7     campus director.

8        Q       That would be the position that Dr. Johnson had at

9     the Terry campus?

10       A       That is correct.

11       Q       And when did you get that position?

12       A       It would have been late eighties, early nineties.

13    And then in 1995, I was appointed president.

14       Q       When was the first time you applied to become

15    president?

16       A       In -- it was the early nineties.   I want to say '91.

17    '91.   Somewhere around there.

18       Q       And who was responsible for making that selection?

19       A       The Board of Trustees.

20       Q       And that was chaired by who?

21       A       At the time, it was chaired by Victor Battaglia.

22       Q       And can you tell me who was on the Board of Trustees

23    at the time?

24       A       John Maiorano, Chris Perry, Pete Shockley.   There

1    was a lady by the name of Maxine Lebey. And there were two

2    others. I'm just drawing a blank right now.

3       Q    Were there any persons not on the Board of Trustees

4    involved in the selection process?

5       A    I'm sorry? I didn't understand you.

6       Q    Let me try that again.

7              Were there any persons involved in selecting

8    who the president of the college would be, either the first

9    time you applied or the second time? Well, let's leave it

10   at the first time. Who were not members of the Board of

11   Trustees?

12      A    No. It's a decision made by the seven trustees.

13      Q    Okay. Were there any lawyers on the Board other

14   than Victor Battaglia?

15      A    I don't believe so.

16      Q    Okay. And I assume, as I understand it, you did not

17   receive the appointment the first time?

18      A    Correct.

19      Q    And you continued to be vice-president of the Terry

20   campus?

21      A    Vice-president of the Stanton/Wilmington.

22      Q    Excuse me. Okay. That's the one out in the county?

23      A    It is both in the City of Wilmington and at Stanton.

24      Q    You said the Stanton campus?

And she forwarded his response to me.

Q    She said she asked Dean Simpson to provide a written response. She didn't say she asked him to provide a written response to you, though, did she?

A    It says his report is enclosed.

Q    Right. The report is addressed to you, though, isn't it?

A    It is addressed to me.

Q    Okay. Normally when a superior asks somebody to provide a written response, it is addressed to superior, isn't it, not the superior's superior?

A    I don't know what happened after it left my --

Q    Am I correct that, once Mr. Simpson provided his report to you, the whole matter was dropped? I mean there was no further investigation or any other actions taken?

A    Yes, I would -- that is accurate. Dean Simpson's comments along with Dr. Johnson's comments, I moved on.

Q    Was there anything Mr. Simpson told you that was critical of Dr. Johnson?

A    In the memo?

Q    Anywhere concerning this incident. First let's say in the memo.

A    I doubt that I'll find any in here. No.

Q    And I think we started down this line of questioning



1    when I asked you if, prior to January of this year, you had

2    issued any written corrections to Dr. Johnson and you

3    related there were two incidents.  One was the incident

4    involving her sister and one was the craft festival.

5              Other than that, have you ever issued any

6    written criticism to Dr. Johnson?

7       A    No.  It's all been verbal.

8       Q    Okay.  While we are on the subject.  Are there any

9    other incidents of inappropriate conduct that you can

10   describe to me prior to November 18th, 2004?

11      A    Yes.  I would say that throughout '04, I heard from

12   her colleagues on the president's counsel, all

13   vice-presidents, indicating to me that all too often Peg's

14   behavior was out of control, abusive, that when people came

15   and met with my vice-presidents, which I allowed them to do,

16   to meet without me, that many times her behavior was abusive

17   to these people.  And I heard that from four of my six

18   vice-presidents.

19      Q    Okay.

20      A    So, yes.

21      Q    Who were your six vice-presidents?

22      A    At the time, it would have been Larry Miller, Jerry

23   McNesby, Hope Murray.

24      Q    Let's do this slowly.

1    A    Okay.  Sorry.

2    Q    Who else?

3    A    Larry Miller.

4    Q    Miller and McNesby I got.

5    A    Okay.  Hope Murray and Dan Simpson.

6    Q    And who are the other vice-presidents?

7    A    One of them would have been Dr. Johnson.  And the

8    sixth one would have been Dr. Ileana Smith, a new

9    vice-president.

10   Q    Let me just understand the job.  Dr. Miller was

11   Dr. Johnson's counterpart for the New Castle campus?

12   A    Mr. Miller, yes, that is correct.

13   Q    Dr. Smith was her counterpart for the Sussex campus?

14   A    Correct.

15   Q    Dr. Murray -- is it Dr. Murray or Ms. Murray?

16   A    Dr. Murray.

17   Q    She works in your office, is your assistant?

18   A    She is vice-president for human resources and

19   college relations.

20   Q    And works in your office?

21   A    Yes.

22   Q    So works day-to-day contact with you, I guess?

23   A    Not necessarily.

24   Q    Okay.

1      A      But has college-wide responsibility.

2      Q      Is it Mr. McNesby?

3      A      Mr. McNesby.

4      Q      He is the financial --

5      A      Vice-president for finance.

6      Q      -- boss?

7      A      Correct.  Again, college-wide responsibility.

8      Q      And Dan Simpson at this time was what?

9      A      He was vice-president for academic affairs.  That

10    also is in my office and also has state-wide responsibility.

11     Q      I'm just curious.  What does the vice-president for

12    academic affairs do?

13     A      Like a provost for a university.

14     Q      What's that do?

15     A      They are the chief academic officer for the

16    institution.  All of the degrees and programs and courses

17    and so forth come under their review.

18     Q      And Mr. Simpson's education was what?

19     A      He is currently working on his doctorate.  I believe

20    his course work is done.  He has to write his dissertation.

21     Q      Does he have a master's degree?

22     A      Um-hmm.  Yes.

23     Q      In what?

24     A      I don't know.

ORLANDO J. GEORGE, JR.                                    34

1      Q      All right.  Let's take these one at a time.

2              What did Dr. Miller tell you concerning

3      Dr. Johnson?  And I want to be fairly specific.  I don't

4      want you to just say he said she was a mean, nasty person.

5      I want to know when she was.  You know, I want the incident

6      described, if you can.

7      A      Well, counselor, the best I can do is to tell you

8      that over a long period of time, in 2004, I heard from all

9      four of those individuals.

10     Q      I want to go through them one at a time.  So let's

11     not say all four.

12             Dr. Miller.  Can you recite to me any specific

13     example where he complained of her, of Dr. Johnson?

14     A      Many times.

15     Q      Describe one.

16     A      He indicated to me that he felt ad hoc was not

17     working anymore because of the relationships were breaking

18     down because of the unprofessional and abusive behavior that

19     Dr. Johnson was exhibiting.

20     Q      Can you cite to me one instance of this behavior

21     that Dr. Miller described to you?

22     A      It seemed like I heard pretty much after every ad

23     hoc meeting, which was once a month.

24     Q      Am I correct that you cannot describe for me any

ORLANDO J. GEORGE, JR.                          35

1    single incident of this type of behavior?

2       A    What do you mean I can't describe it?

3       Q    Well, you kept saying Dr. Miller said that we had

4    this meeting in the spring of 2004 when Dr. Johnson called

5    me a liar for saying something.  I mean I'm trying to get at

6    a handle on the nature, you know, of these conducts

7    factually what happened.  And all you're telling me is broad

8    generalities.  I'm asking for specifics.

9       A    I did not ask vice-presidents to put any of this in

10   writing because I was still trying to work through all of

11   these with Peg.

12      Q    So you don't know that they were telling the truth,

13   though, do you?

14      A    Well, I think, if I heard it four times, it seemed

15   to me that there was something to the behavioral issue.

16      Q    Unless there was an agreement among the

17   vice-presidents to destroy Dr. Johnson's professional

18   career?  I'm not saying that happened.  But that's a

19   possibility.  You would want to know factually what happened

20   before you knew it was true, didn't you?

21      A    And that's why, counselor, I had decided that I was

22   going to do an independent investigation at the beginning of

23   this year so that I could get to the bottom of the

24   behavioral issues once and for all to find out whether they

ORLANDO J. GEORGE, JR.                    36

1    were true or not.  And maybe I should have done that before.

2    But my hope was, because of the professional relationship I

3    thought we had, and my wanting to support Peg, I was hoping

4    that that behavioral issue, that she would deal with that.

5        Q    Let's go back to Dr. Miller.  Can you describe for

6    me any specific instant factually of the complaint given to

7    you by Dr. Miller concerning Dr. Johnson?

8        A    On this date and this time and this incident?

9        Q    Yes.

10       A    No, other than what I have already said to you that,

11   each month after ad hoc, I would talk to my vice-presidents.

12       Q    Can you give me a description factually of any

13   specific incident that Mr. McNesby complained to you about?

14       A    All of the conversations dealt with Peg's out of

15   control behavior.

16       Q    Can you describe one conversation that Mr. McNesby

17   complained of?

18       A    After an ad hoc meeting, I would ask how things went

19   and I would get a response that things were rough and there

20   was always a reference to Peg's behavior.

21       Q    I don't even know when these meetings happened.  So

22   can you describe what was said during one of these

23   exchanges, describe the disagreement that went on or did

24   you -- let me back up.  Did you do anything to try to find

1    out what the nature of the disagreement was?

2        A    What I tried to find out was what the context of

3    Peg's behavior was.

4        Q    So whether or not behavior was justified or not, you

5    didn't inquire into?

6        A    Well, there is no justification for abusive

7    behavior, counselor.

8        Q    Unless somebody is abusive to her first.

9             Did you do anything, first of all, to inquire

10   of Mr. McNesby whether he had done anything to instigate

11   Dr. Johnson's anger?

12       A    My conversations with all of these vice-presidents

13   generally related to what happened, what was the behavior

14   and their sense that these meetings had become unproductive.

15   I heard that over and again by all four of these

16   individuals.

17       Q    Can you for Mr. McNesby -- I'll ask it again --

18   describe any specific incident that he related to you

19   concerning this inappropriate behavior?  Yes or no.

20       A    No.

21       Q    Can you for Dr. Murray relate to me any specific

22   incident that she complained to you about concerning

23   Dr. Johnson?  Yes or no.

24       A    No.

1    Q    Can you for Dan Simpson relate to me any specific

2    instance where he complained about Dr. Johnson's behavior?

3    A    Other than that it occurred after an ad hoc meeting.

4    And you're asking for a specific, this particular incident?

5    Q    Right.

6    A    No.

7    Q    I'm asking for any specific incident.

8    A    No.

9    Q    So am I correct that, prior to November 18th, you

10   had general statements by your vice-presidents concerning

11   Dr. Johnson but you had no knowledge of any facts to back up

12   their conclusions?

13   A    And, counselor, that is correct.  And that's why I

14   did not discipline Dr. Johnson.  And that's why I decided to

15   do the investigation.  So that I could determine whether all

16   of these accusations were, in fact, true.

17              MR. ABER:  Off the record for a second.

18              (Discussion held off the record.)

19   BY MR. ABER:

20   Q    In the transcript during the hearing of Dr. Johnson,

21   at page 16, you stated that there were many sources of

22   complaints prior to November 18th.  We have now discussed

23   the two incidents where you put something in writing and the

24   complaint you received from the vice-presidents.  Are there

1    Q    Understanding I'm somewhat challenged in the

2    computer field.

3    A    Well, we all are, counselor.

4         It was a reorganizational plan that dealt with

5    moving existing staff into a new structure called DIET,

6    which was the Division for Information and Educational

7    Technology, D-I-E-T.  Peter Shoudy was the individual that I

8    had hired away from the University of Pennsylvania Wharton

9    School to help provide leadership in this new division.  And

10   in order to help create it, I had, over quite a period of

11   time in working with all of my vice-presidents and with

12   Mr. Shoudy, went through several iterations on a

13   reorganizational structure that would take IT folks who

14   heretofore had reported to someone on a campus and now put

15   them in a reporting structure that would take them up to

16   Mr. Shoudy.

17   Q    When you say IT, these people would have been

18   responsible for everybody's personal computer?

19   A    Yeah.  Everything related to computers.

20   Q    Would they have been responsible for things like

21   teleconferencing?

22   A    The phone network?

23   Q    Yeah.

24   A    Yeah, I believe that was part of it.  Um-hmm.

1    Q    Would they have been responsible for -- I believe

2    your school has videoconferencing capabilities?

3    A    Yes.

4    Q    What else is in this IT umbrella?

5    A    Well, it would have had to do with everything

6    relating to the administrative computing system, which is

7    our whole system for, you know, keeping track of our

8    students, their enrollment, their courses, their grades, our

9    financial system.  Everything that you have to access a

10   computer for, they would have been responsible.

11   Q    Does Del Tech have a -- I'm not sure what I want to

12   call it -- computer education courses where somebody off

13   site can take a computer course, a course on the computer?

14   Maybe not a computer course.  I might live in Harrington and

15   take a course in English via the computer.

16   A    Yes.  Counsel, you can live in Texas and take a

17   course, as you say, on the computer.  It's online.

18   Q    And the operation of that system would have been

19   under this centralized IT?

20   A    The delivery system would have been.  The academic

21   component would have still been part of the instructional

22   division of the college.  The faculty and the chairs and the

23   Deans and so forth.

24   Q    But the hardware and the transmitting of that would

1    have been centralized in Wilmington?

2        A    Centralized in Wilmington?

3        Q    In other words, Mr. Shoudy's office.  Where was his

4    office going to be?

5        A    Dover.

6        Q    Okay.  Dover, then?

7        A    It would have -- I mean it would have been at all

8    five locations, the four campuses and the president's

9    office.  He would have been responsible for all five

10   locations.

11       Q    Right.  But where would his staff be located?

12       A    At all five locations.

13       Q    Okay.  And were there any concerns expressed about

14   the system by any of the administrators other than

15   Dr. Johnson?

16       A    When we first started, there were many concerns that

17   were brought up.  And that's why I said earlier we went

18   through many iterations.  And I had held up the approval of

19   this until I got to a point in a meeting with all of my

20   vice-presidents where I asked specifically if anyone had any

21   objections to the current structure.  There were none.  So I

22   instructed everyone to implement that structure that I had

23   approved it.

24       Q    Would the operation of this IT system have affected

ORLANDO J. GEORGE, JR.                    43

1    the way the administrators did their work?

2        A    Yeah, I mean, sure.  Everything they did would have

3    affected the administrators.

4        Q    Would the IT system have affected the way the

5    students interacted with the school?

6        A    Yes.

7        Q    And would the IT system have affected the way the

8    public outside the immediate student body would interact

9    with the school?

10       A    Sure.

11       Q    Now, the meeting itself.  What did you hear about

12   the meeting that gave you cause for concern?  We are talking

13   about I think it's the November 19th, 2004 meeting.

14       A    What did I hear?

15       Q    Yeah.  What gave rise to your concerns?

16       A    What I heard was that Dr. Johnson attended this

17   meeting and that her behavior was abusive, that there was a

18   sense that she did not approve of the whole structure and

19   what we had done, that there was a sense that, you know,

20   that she did not support what the president had approved and

21   asked everyone to implement.

22            MR. ABER:  Mark this as the next exhibit.

23            (George Deposition Exhibit No. 2 was marked for

24   identification.)



A16

ORLANDO J. GEORGE, JR.                    44

1    BY MR. ABER:

2        Q    I have handed you a letter dated December 8th, 2004.

3    Is that the letter that you wrote to Dr. Johnson concerning

4    your concerns about the meeting?

5        A    Yes.

6        Q    First of all, who first complained to you or where

7    did you hear any complaints about Dr. Johnson concerning

8    that meeting?

9        A    The first instance that I had heard that something

10   had -- something inappropriate had occurred came from my

11   vice-president for academic affairs, who was Dan Simpson.

12       Q    And when did he tell you something?

13       A    It would have been sometime subsequent to the

14   November 19th meeting.

15       Q    And what did he tell you?

16       A    He indicated to me that he had heard from some of

17   the department chairs and then he proceeded to express to me

18   what I put in that first -- that first paragraph, that

19   Dr. Johnson's conduct, line of questioning, was

20   antagonistic, inconsistent with what should be expected of a

21   campus director.

22       Q    Did Dan Simpson, was he present at the meeting?

23       A    I don't believe he was.

24       Q    Okay.  So he reported to you what departmental

ORLANDO J. GEORGE, JR.                                    45

1    chairs had supposedly said to him?

2        A    Yes.

3        Q    And then based upon what Dan Simpson told you, you

4    wrote this letter?

5        A    I wrote this letter and had other conversations with

6    individuals who were at the meeting.

7        Q    Who else did you have a conversation with?

8        A    The chairman of the math department, John Buckley.

9        Q    What did he tell you?

10       A    Pretty much what's in this memo.

11       Q    What did he precisely tell you, to the best of your

12   recollection, word for word?

13       A    He told me that Dr. Johnson's behavior was abusive

14   and unprofessional, that it appeared that she was not in

15   favor of the reorganization that had been approved.

16       Q    You can say someone is angry and that's your

17   conclusion based upon your observation.  You can then say

18   that person yelled at you, son of a bitch, that's describing

19   factually what he did.  Do you understand the difference

20   between conclusion and description?  I'm trying to get you

21   to tell me what Mr. Buckley described to you her behavior,

22   not his conclusions.

23       A    I'm sorry, counselor.  Would you try that again,

24   please?



1     Q     I'm asking you to try and tell me exactly what

2     behavior Mr. Buckley described to you.  Describe the

3     behavior itself rather than put a label on it as abusive,

4     antagonistic or whatever.  I want to hear what it was that

5     was abusive or antagonistic.

6     A     I believe I recall, you know, hearing that people

7     were embarrassed because of the unprofessional behavior.

8     They felt embarrassed.

9     Q     What did Dr. Johnson say?  Did she call Mr. Shoudy

10    an idiot?  Did she call him incompetent?  What did she say

11    or do that was inappropriate, according to Mr. Buckley?

12    A     He indicated that it was clear that Dr. Johnson was

13    not in support of this reorganization.

14    Q     What did she say that indicated that she was not in

15    support?

16    A     She was antagonistic towards Mr. Shoudy.

17    Q     What did she say that was antagonistic?  Did she

18    call him any names?

19    A     Counselor, this is exactly why I decided to go and

20    authorize an investigation.  So in January, to determine --

21    let me answer your question, please.

22    Q     Okay.

23    A     I understand your question.

24          And up through these incidents that we have

ORLANDO J. GEORGE, JR.                                    47

1    talked about, I have tried to keep this on a -- in such a

2    relationship with Dr. Johnson that I was hopeful that if

3    there were -- if there were behavorial issues, that she

4    would deal with them and change, that I wouldn't have to

5    reprimand her, that I wouldn't have to discipline her.  And

6    it was only after the incident in November, the comments

7    from the vice-presidents, the incidents going back in '02,

8    it's all of those together that forced me then to say, I

9    have to get to the bottom and determine whether or not these

10   incidents have any substance to them.

11   Q    Let me jump forward for a second, Dr. George.

12          After you sent this letter of December 8th, you

13   asked Dr. Johnson to meet with you, correct?

14   A    Yes.

15   Q    You write this letter and you asked Dr. Johnson to

16   meet with you and she did come in at a meeting?

17   A    Yes.

18   Q    At that meeting, you asked her to respond to you,

19   issue a written response, correct?

20   A    I think there was a written response, yes.

21   Q    And then there was another meeting before there was

22   an investigation, correct?

23   A    That is correct.

24   Q    And in that meeting, you gave her two alternatives,

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

A20

ORLANDO J. GEORGE, JR.                    48

1     did you not?

2         A     Yes.

3         Q     To either resign or you would investigate?

4         A     Counselor, what I said was that based on the

5     incidents in '02, the comment from the vice-presidents and

6     this particular incident, that I was going to be forced to

7     authorize an independent investigation of all of these

8     incidents.    And that was one alternative.

9              The other alternative would be the obvious one,

10    if she did retire, that there would be no need for the

11    investigation.

12        Q     Resign, retire, they are the same?

13        A     Except I didn't quite say it the way that you just

14    did.

15        Q     But her choices were in January of 2005, the

16    beginning of January, she had two choices, to either resign/

17    retire or you were going to do an investigation, correct?

18        A     Yes.

19        Q     And when you did that investigation, she was going

20    to be excluded from the campus, correct?

21        A     I had --

22        Q     Is that correct or incorrect?

23        A     She was put on administrative leave and she was -- I

24    asked her to please remove her personal belongings from her

ORLANDO J. GEORGE, JR.                                    49

1    office.  So, yes, she was removed from the campus.

2       Q    She was not only removed from the campus, she was

3    told not to talk to any past employees or any present

4    employees, correct?

5       A    That is correct.

6       Q    And this is before you determined whether any of

7    these allegations were true?

8       A    That is correct.

9       Q    All right.  Now, let's back up for a second.  What

10   did John Buckley tell you that any independent observer

11   would, if they had observed the conduct, describe as

12   antagonistic, abusive or inappropriate?  I'm trying to

13   understand the nature of the conduct, not the label you put

14   on it, but exactly factually what happened.  Did she throw

15   something at Mr. Shoudy?  Did she encourage people to yell

16   at him?  What did she do?

17      A    I believe what I heard was a raised voice, an angry

18   voice.

19      Q    Saying what?

20      A    I think that got lost in the translation, which is

21   typically I think what was beginning to concern me, that if

22   there were issues relating to Dr. Johnson's behavior, that

23   they would, in fact, get in the way of perhaps what she was

24   trying to do or say.

1      A      I reviewed the allegations. I said to Dr. Johnson

2   that they were allegations, that I did not know whether they

3   were true or not. But that this allegation of this incident

4   in November coupled with the reports from her

5   vice-presidents or colleagues over the last year, which

6   would have been 2004, coupled with those several incidents

7   in '02, that I had to get to the bottom of whether or not

8   these behavioral issues that seemed to be arising, whether

9   they were true or not. And that I was determined that I was

10  going to do that. And that she, you know, I gave her the,

11  you know, I told her that I would do that, that I would do

12  it in such a way as to protect both the college and her due

13  process rights. And then I gave her the other alternative,

14  if she retired, then I would not proceed with this.

15      Q      Did you ask for a response from her?

16      A      I asked her to tell me which option she would like

17  to choose.

18      Q      So at that point after December 8th, she had one of

19  two alternatives, she could either resign and retire or she

20  could be excluded from campus while you did your

21  investigation?

22      A      Those were the two options.

23      Q      Did you tell her you were going to exclude her from

24  the campus while you did the investigation?

1        Q    Just so we're clear.  You were placing her on

2   administrative leave and excluding her from the campus based

3   upon the conclusionary allegations made by other people?

4        A    It was my opinion -- the answer is yes.  It was my

5   opinion that, in order to conduct an investigation that

6   would be fair to the college and fair to Dr. Johnson, that I

7   had to do it a certain way, which included removing her from

8   the campus so that individuals would be free to testify as

9   to what they knew factually.

10       Q    Now, the people who had related all of these

11  instances up until this point of inappropriate conduct was

12  this person from off the campus concerning her sister.  So

13  she wouldn't be on the campus when you did the

14  investigation, would she?

15       A    She --

16       Q    The one back in 2002.

17       A    She wasn't a member of the campus.

18       Q    So whether Dr. Johnson was on campus or not would

19  not have intimidated her, would it?

20       A    Counselor, I can't answer that.  Because she made a

21  reference to some of our programs on the campus.

22       Q    But she wasn't on the campus, was she?

23       A    She was not.

24       Q    And then the people involved at the craft show were

1   not members of the Delaware Community College campus, were

2   they?

3      A    I would assume that they were not.

4      Q    So her presence on campus wouldn't intimidate them,

5   would it?

6      A    I don't know the answer to that.

7      Q    And was it your opinion that Dr. Johnson's presence

8   on the campus would intimidate say Dan Simpson?

9      A    I don't believe that her presence or lack of it

10  would have intimidated Dan Simpson but I have no way of

11  knowing for sure.

12     Q    Do you think it would have intimidated Larry Miller?

13     A    I don't believe so but I can't say for sure.

14     Q    And he was on a different campus altogether?

15     A    Um-hmm.

16     Q    And Mr. McNesby was on a different campus

17  altogether?

18     A    Right.

19     Q    And the other vice-president was Hope Murray, who

20  was in your office also on a different -- she was in Dover

21  but in a different office building?

22     A    Right.

23     Q    So none of the other vice-presidents came in regular

24  day-to-day contact with her during their run of the campus,

ORLANDO J. GEORGE, JR.                                    62

1    did they?

2        A    During the day, there was a lot of contact.

3        Q    But they might go a week without seeing each other?

4        A    That would be unusual for the vice-presidents not to

5    talk.  If not on a daily basis, on an every other day basis.

6        Q    Could you have not then investigated the allegations

7    of inappropriate conduct that you knew of as of this moment

8    with people who were either not going to be intimidated by

9    her or not on the campus, correct?

10       A    No, counselor.  It was my opinion that I needed to

11   remove Dr. Johnson so as to protect, you know, the college.

12   I needed to find out and I needed to create an environment

13   where people would feel free to say factually what they

14   knew.

15       Q    Who was going to be intimidated?  Was it going to be

16   Mr. Miller?

17       A    I don't know that Mr. Miller would have been

18   intimidated.

19       Q    Would Mr. Mendes have been intimidated?

20       A    I can't answer that.

21       Q    Would Dan Simpson have been intimidated?

22       A    I can't speak for him.

23       Q    Who were you going to talk to who she might be

24   capable of intimidating?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A26**

1    A    Well, we certainly would have gone back to all the

2    people in that meeting.  And these are all employees who

3    would have reported to Dr. Johnson.

4    Q    And eventually were all those people interviewed?

5    A    Counselor, you know, that process was going to take

6    place.  But when I received word from our counsel that you

7    wanted to have an opportunity to talk through some kind of a

8    solution, I agreed that I would delay that investigation to

9    allow counsels to talk.

10    Q    Was it appropriate that, after her personal

11    belongings were removed, that, as I understand it, there is

12    a conference room where you have all the vice-presidents'

13    pictures and such hanging up, that her picture was taken

14    down?

15    A    If that occurred, it was -- it did not happen at my

16    direction.

17    Q    That was not my question.

18            My question was, was it appropriate that

19    someone else ordered that done?

20    A    You're asking me to answer a question assuming that

21    someone ordered it done.  And I can't speak to that.

22    Q    I'm asking you exactly that, assuming somebody

23    ordered it done, was it appropriate for that to have

24    occurred?



1    A    That's a good ballpark.

2    Q    That's eight weeks.  That's a city.  That's not a

3  ballpark.

4              Was it the beginning of February or the end of

5  February, if you can remember?

6    A    I can't remember.  I want to be careful with dates

7  and I don't want to represent to you something I'm not

8  factually remembering.  It was somewhere in that general

9  vicinity, that time frame.

10             (George Deposition Exhibit No. 10 was marked

11  for identification.)

12  BY MR. ABER:

13    Q    This is a letter that Mr. Williams sent to me in

14  March.  Were you aware of this correspondence?

15    A    Yes.

16    Q    In this correspondence, it states that information

17  coming forward concerning Dr. Johnson and questionable

18  expenditures by her.

19             That all occurred while Mr. Williams was on

20  vacation.  How did that information come up and to whom?

21  Since he was on vacation, he wasn't around doing the

22  investigation.

23    A    Well, it certainly would have come to my attention.

24    Q    How did it come to your attention?

1     A    It would have been brought to my attention by

2  Dr. Murray and Mr. Simpson.

3     Q    Okay.  Together they came in together to talk to

4  you?

5     A    I don't recollect whether they were together.  But I

6  know that I have talked to both of them.

7     Q    I'm trying to be very precise now.  I want to know

8  who came to you first, Dr. Murray or Mr. Simpson?

9     A    I don't recollect which one came first.  I did talk

10  to both of them.

11     Q    And what did they tell you?

12     A    They informed me that individuals had come forward

13  with information relating to questionable expenditures by

14  Dr. Johnson.  And that information was then shared with me.

15     Q    Did they say who came forward?

16     A    I believe that one of the individuals was someone in

17  the business office.

18     Q    Okay.  To the best of your recollection, give me, as

19  close as you can, word for word the nature of those

20  discussions?

21     A    The discussions would have revolved around what was

22  shared with me was that there were questionable expenditures

23  that people have information on related to Dr. Johnson, that

24  they had tried to speak to Dr. Johnson previously about this

1    proceeding?

2    A    I believe my course of action that I took was

3    dictated by what information had been provided to me as

4    president by all of the parties, the investigators, the

5    counsel.

6    Q    Were the terms of the contract reviewed to determine

7    how her employment could be terminated?

8    A    When I instructed counsel to -- in any decision or

9    action, in any policy or procedure, that Dr. Johnson's due

10    process rights were to be taken fully into account.  In my

11    mind, I met this contract, all the policies of the Board,

12    all the laws of the state.

13    Q    Going back to the letter of April 27, 2005, which is

14    George -- what number is that?

15    A    13.

16    Q    That says that it included a set of new rules and

17    regulations, which we'll mark as George 15.

18    (George Deposition Exhibit No. 15 was marked

19    for identification.)

20    BY MR. ABER:

21    Q    Are those the new rules and regulations that were

22    put into effect?

23    A    These were the rules of procedure adopted

24    unanimously by the Board of Trustees upon recommendation of

ORLANDO J. GEORGE, JR.                    120

1    counsel.

2        Q     When were they submitted to the Board?

3        A     I believe they were adopted by the Board of Trustees

4    in a vote by -- on April 26th.

5        Q     Was there a formal Board meeting or by

6    teleconference?

7        A     No, it was a formal Board meeting.

8        Q     So there would be minutes and everything for this?

9        A     Yes.

10       Q     Okay.  Explain to me again why a new set of rules

11   were in place.  Up to this point, Brian Shirey had been

12   kept -- what's the word -- there had been a wall separation

13   between him and this entire investigation process, correct,

14   because it was anticipated that he might have to be a

15   presiding officer in a termination process?

16       A     Yes.  That's the advice that I was given.

17       Q     I had trouble understanding, then, if he had not

18   been involved with this process, he could have been an

19   independent hearing officer and followed the policy manual,

20   couldn't he, and had a termination hearing?

21       A     Mr. Aber, it was counsel's advice to me as president

22   that in order to protect Dr. Johnson's due process rights,

23   that I should ask the Board of Trustees to adopt these rules

24   of procedure.



ORLANDO J. GEORGE, JR.                              138

1   know, coercing results rather than leading them to results?

2      A    No, that would not be a good leader.

3      Q    In this evaluation, you talk about Dr. Johnson's

4   demonstration of -- I'll use the term positive.  How good

5   her leadership is.  You commend her leadership and the

6   school has benefitted from her leadership, how her

7   leadership has enabled the school to reach heights of

8   effectiveness and such.

            Was this leadership a result of her abusing

10  people?

11     A    Mr. Aber, I had not conducted any investigations to

12  determine whether or not that abusive behavior applied.  So

13  it would not have been appropriate to put it in her

    evaluation.  In fact, as I had stated before, I purposely

    did not want to put it in her evaluation or in any kind of a

    disciplinary situation under the hopes that, you know,

    whatever perhaps was occurring, that a word to the wise

    would have been sufficient and that the behavior would have

    been modified accordingly.

       Q    You agree that you're bound by the college

    administrator's policies, aren't you?

       A    Yes.

       Q    You try and follow those policies, don't you?

       A    The best I can.



**DELAWARE TECH**

*Orlando J. George, Jr., President*      *Dover♦Georgetown♦Stanton♦Wilmington*

December 8, 2004

Dr. Marguerite A. Johnson
Vice President and Campus Director
Terry Campus
Delaware Technical & Community College
100 Campus Drive
Dover, De 19904

Dear Dr. Johnson:

It has been brought to my attention that you attended a Terry Campus Department Chairs meeting on Friday, November 19, 2004. At that meeting Peter Shoudy, CTO for the college, answered questions about the IT reorganization and future direction. It is reported that your conduct and line of questioning during the meeting was antagonistic and inconsistent with what can be reasonably expected of a Vice President and Campus Director. It is the opinion of those in attendance that you expressed a negative attitude toward the DIET reorganization, opposition to the DIET structure, and disdain for Mr. Shoudy. If the reports I received are accurate, your comments and questions raised doubts about your support of Mr. Shoudy and the IT reorganization and led at least some of the participants to believe you were unaware of the changes brought about by the reorganization. Your specific references to Mr. Siok and the emerging technologies initiatives left many with the sense that you were unfamiliar with the elements of the new DIET structure. It is alleged your demeanor before your subordinates was subversive and undermined the morale of those who look to you for assurance and institutional loyalty. Since you, Dan Houghtaling and Shelby Crawford are not regular attendees at department chair meetings, it is the opinion of those in attendance that the purpose of your visit was to confront and attack Mr. Shoudy.

At the October meeting of President's Council, the current structure of the DIET was approved unanimously. The approval for the restructure was deferred at two previous meetings so that the Campus Directors could have time to provide input in the new IT structure, ask questions and express concerns. As you know, I invite and welcome the candid views of the Campus Directors and other senior staff. Once the President, along with President's Council, makes a decision on a path forward, however, I expect your support and cooperation in implementing our decision. Moreover, the decision here followed a lengthy discussion and a unanimous affirmative vote at President's Council, including the President.

*Delaware Technical & Community College*
**Office of the President**
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*



DEPOSITION
EXHIBIT
#2
11/20/05 ASB

A33

Under these circumstances, allegations you failed to support Mr. Shoudy and the reorganization in an open forum constitute insubordination. Indeed, at the meeting of the President's Council I directed the President's Council to move forward with the reorganization and to support Mr. Shoudy in his effort to advance our IT services. Your conduct on November 19th demonstrates a lack of support to the college IT efforts and an unwillingness to follow my directives.

The allegations concerning this incident are particularly troubling given the fact I have received reports you engaged in similar conduct over at least the past several years, and have expressed my concern to you about your reported inappropriate and unprofessional behavior. Please report to my office on Thursday, December 9, 2004 at 10:30 a.m. to discuss the November 19, 2004 incident outlined above and your continuing inappropriate behavior.

Sincerely,

Orlando J. George, Jr.
President

A34



**DELAWARE TECH**

*Orlando J. George, Jr., President*                                    *Dover✦Georgetown✦Stanton✦Wilmington*

## CONFIDENTIAL

### MEMORANDUM

To:        Dr. Marguerite A. Johnson
           Vice President & Campus Director, Terry Campus

From:      Dr. Orlando J. George, Jr.
           President

Date:      January 3, 2005

Re:        NOTICE OF PLACEMENT ON PAID ADMINISTRATIVE LEAVE

This memorandum serves as notice that effective at the end of the day you are placed on paid administrative leave until further notice pending an investigation focusing on allegations concerning your pattern of behavior over at least the past several years. I discussed such allegations with you during our December 9, 2004 meeting.

For the duration of your paid leave you shall not visit any of the college facilities nor participate in any college functions on or off the campus without my permission. Thus, please collect and take with you at the end of the day whatever personal effects you may need from your office. In addition, you are not to discuss the investigation with present or former employees. Further, I expect you to cooperate fully with the investigation.



DEPOSITION
EXHIBIT
#4
11 30 05 ASB

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*

Announcement Report



**Announcement Report**

Close

**Message**

Effective January 4, 2005, Dr. Marguerite A. Johnson, Vice President & Campus Director, Terry Campus, is on administrative leave.

As a result, Daniel L. Simpson, Vice President for Academic Affairs, has been appointed Acting Assistant Campus Director and will have full administrative responsibility for the Terry Campus.

In addition, Dr. Cornelia N. Winner, Assistant Campus Director, Stanton/Wilmington Campus, has been appointed Acting Vice President for Academic Affairs and will have full administrative responsibility for the Division of Academic Affairs in the Office of the President.

With the beginning of our spring semester, as always, please know how much I appreciate everything you do to support our students and our College.

Dr. Orlando J. George, Jr.
President

Contact the content administrator for this web page, with comments, changes, or corrections.
Contact us for more information

Accredited by the Commission on Higher Education
Middle States Association of Colleges and Schools
Copyright 1994 – 2005 Delaware Technical & Community College



DEPOSITION
EXHIBIT
# 5
11/20/05 ASB

DTCC0006
**A36**

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP APR 2 8 2005

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801-1621
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

David H. Williams
(302) 888-6900
dwilliams@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

April 27, 2005

**HAND DELIVERY**

Gary W. Aber, Esquire
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
Wilmington, DE 19899-1675


DEPOSITION
EXHIBIT
#13
11/30/05ASR

RE:    Marguerite Johnson v. Delaware Technical & Community College

Dear Gary:

As you know, Delaware Technical and Community College ("the College") retained me to conduct an independent investigation of Dr. Marguerite M. Johnon ("Johnson"). Based upon my investigation, as well as the parallel investigation conducted by Santora Baffone, I recommended the President authorize the initiation of termination proceedings. The President accepted my recommendation. This will serve as the College's notice of intent to terminate the employment of Johnson. The reason is a course of conduct which constitutes a hazard to the health, safety and well-being of the college and its employees and students. More specifically, the reasons are set forth in Santora Baffone's April 12, 2005 Report, a copy of which was provided to you on April 15, 2005. The evidence offered will include proof of Johnson's administration by fear and intimidation resulting in employees doing what they were told to do despite knowing it was wrong, and refraining from reporting Johnson's misconduct.

Attached are the Rules and Procedures for the Conduct of Termination Proceedings Involving a Vice President and Campus Director. These Rules were adopted by the College's Board of Trustees on April 26, 2005.

You may request a hearing. Such a request must be in writing and received by me within 10 days of your receipt of this notice. If you fail to submit a timely, written request for a

**A37**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

April 27, 2005
Page 2

hearing, this notice shall constitute the final notice of termination effective 60 days after receipt
of this notice.

Sincerely,

David H. Williams

DHW/jam
Enclosure: Rules of Procedure for the Conduct of Termination Proceedings Involving a
Vice President and Campus Director
cc:  Ms. Hope Murray

**A38**

DELAWARE TECHNICAL AND COMMUNITY COLLEGE

An Equal Opportunity Employer

Employee Master Contract

IT IS HEREBY AGREED by and between,

Marguerite Johnson _____ , ("Employee"),

and

THE BOARD OF TRUSTEES OF DELAWARE TECHNICAL AND COMMUNITY COLLEGE ("Employer"

That Employee shall be employed by the Delaware Technical and Community

College, _____ Stanton _____

Campus Name

under and subject to the direction, supervision and authority of Employer, its duly

authorized administrative personnel, successor and assigns, on the following terms

and conditions:

(1)  Personnel Data Form.  A Delaware Technical and Community College

Personnel Data Form shall be prepared by Employee and Employer and shall contain

the terms and conditions of employment, including job classification, position,

title, additional duties, and/or administrative responsibility, rates and methods

of compensation and work schedule and such other data as the parties may deem

appropriate and as agreed between Employer and Employee.  The Personnel Data Form

is incorporated by reference and shall be a part of this Agreement; the Personnel

Data Form may be amended from time to time and, as amended, shall be made a part

of this Agreement.

(2)  Probationary Period.  Employee shall be a probationary employee

for a period of two years from the date of commencement of employment hereunder.

Provided, however, that the probationary period for persons employed by Employer

in the same or similar employment prior to the execution of this Agreement shall be

deemed to commence upon the date of first employment by Delaware Technical and

Community College, (provided, such employment has been continuous and uninterrupted)

and such probationary period shall terminate on the second anniversary of the

date of such employment.

DEPOSITION
EXHIBIT
# 14

DTCC0379

A39

(3)  Termination of Employment.  This contract and employment hereunder may be terminated:

(a)  By agreement of Employee and Employer; date of termination shall be as agreed between Employee and Employer's Campus Director.

(b)  By Employee, upon the giving of not less than 60 days notice of resignation.

(c)  By Employer, upon the giving of not less than 60 days notice to Employee, which notice shall set forth the reason(s) for termination;

(i)  During the probationary period, termination shall be for cause only, which shall be fully set forth in the notice of termination;

(ii) After the probationary period, termination shall be for good cause, which shall be fully set forth in the notice of termination and, further, shall be supported by affidavits of person(s) having knowledge of such cause and by such other evidence as may be deemed sufficient to Employer.

(d)  By Employer, at any time, for:  (1)  insubordination (2) conviction on any felony or of any crime involving moral turpitude (3) in-competency  (4)  any act or course of conduct which, in the judgment of Employer, constitutes a reasonable hazard to the health, safety and well-being of Employer, its agents, servants and employees or students.

(e)  By Employer, upon the giving of not less than 60 days notice, in the event that the specific area of employment of the employee, or the ed-ucational program or administrative function performed by Employee be discontinued or eliminated as the result of reorganization of programs by Employer in com-pliance with legislation, administrative directives or to meet funding require-ments of the State of Delaware, its agencies, or any other governmental entity having responsibility or authority therefor.  Notice of termination under this sub-paragraph shall set forth the specific area affected and the basis for discontinuance or reorganization.