(4) Compensation.  Compensation hereunder shall be payable to Employee in such amounts and at such time as set forth in the Personnel Data Form, subject, however, to the appropriation of sufficient funds by the General Assembly of the State of Delaware for such purpose.  Changes in the rate of compensation benefits, method of payment and/or duties for which compensation is paid or payable shall be set forth by amendment to the Personnel Data Form or by preparation of a supplemental Personnel Data Form to be attached hereto and made a part hereof.

(5) Rights and Remedies.  Questions arising under the terms of this contract and disputes arising from the employment relationship shall be heard and decided in accordance with the procedures set forth in the Delaware Technical and Community College Board of Trustees Personnel Policy Manual.  Employee acknowledges that he has reviewed the Manual and agrees to the procedures provided therein.

(6) Notices.  Notices permitted or required under this contract shall be given, in writing, and shall be transmitted by certified or registered mail – return receipt requested – to the respective parties.  Notice to Employer shall be directed to Campus Director, Delaware Technical and Community College, _____ Stanton _____ Campus, P.O. Box 1260 __ Newark __, Delaware; notice to Employee shall be directed to Employee's address as set forth on the Personnel Data Form.

(7) Term of Employment.  It is the intent of Employer to continue employment of Employee under the terms and conditions of this contract for a period of one year and, thereafter, for additional periods of one year unless or until terminated as herein provided.  It is understood and agreed that prior to May 1 of each year, non-receipt by the Employee of notification of term-ination of employment due to discontinuance and/or elimination of Employee's area of employment shall be evidence to Employee that Employer intends to continue Employee's specific area of employment to and including the Spring quarter of the following academic year, subject, however, to the terms of this Agreement.

(8)  Binding Agreement.  It is agreed that this contract sets forth the entire understanding of the parties, shall be binding upon them, and shall not be orally modified.

IN WITNESS WHEREOF the parties have executed and sealed this Agreement this 25th day of July , 19 74.

Witness:

DELAWARE TECHNICAL
AND COMMUNITY COLLEGE

By

EMPLOYEE

## RULES OF PROCEDURE FOR THE
## CONDUCT OF TERMINATION PROCEEDINGS
## INVOLVING A VICE PRESIDENT AND CAMPUS DIRECTOR

1.    **APPLICATION OF THE RULES**

These rules apply in the event a pre-termination hearing is conducted for a Vice-President and Campus Director. Delaware Technical and Community College's ("the College") existing pre-termination and grievance procedures are not appropriate in the case of such a pre-termination hearing because the pre-termination procedures state that the final decision to terminate is to be made by the Vice President and Campus Director. The procedures set forth below assure a Vice-President and Campus Director (hereinafter referred to as "employee") receive a hearing before an independent, impartial decision maker which complies with the requirements of the Due Process Clause of the United States Constitution.

2.    **NOTICE OF TERMINATION**

The notice of intention to terminate a Vice President and Campus Director shall be initiated by the President. Notice of intention to terminate shall be in writing and shall:

A.    state the reason(s) for the termination;

B.    be sent to the employee's counsel;

C.    specify the address to which any request for a hearing shall be sent; and

D.    be accompanied by a copy of these Rules of Procedure.

3.    **REQUEST FOR A HEARING**

A.    Within 10 days after receipt of the written notice of intention to terminate services, the notified employee may request an opportunity to be heard. Such a request must be in writing and received by the College, or the College's counsel,



DEPOSITION
EXHIBIT
# 15

A43

within 10 days after receipt of the written notice of intention to terminate. If the employee fails to submit a timely, written request for a hearing, the notice of intention to terminate shall constitute the final notice of termination effective 60 days after receipt of the notice.

B.    A date shall be set for such hearing. The hearing shall be held with 60 days notice unless the employee and the College agree to an earlier hearing date.

## 4.    CONDUCT OF HEARING

A.    The hearing of oral testimony and receipt of other evidence shall be conducted by an independent, impartial Hearing Officer designated by Chief Legal Counsel.

B.    The Hearing Officer shall have full authority to control the conduct of the hearing, including authority to admit or exclude evidence, and rule upon motions and objections.

C.    The hearing and testimony shall be limited to the reason(s) set forth in the notice of intention to terminate.

D.    The Parties may be represented by counsel.

E.    Counsel designated by the College shall first submit any evidence, followed by the response of the employee, if any. Further rebuttal evidence by either party may be permitted, if the Hearing Officer believes such evidence is necessary.

F.    The Hearing Officer in conducting the hearing shall accept and consider any relevant information or evidence offered by the employee or the College and shall not be bound by common-law or statutory rules of evidence or by technical or formal rules of procedure. The Hearing Officer may exclude plainly irrelevant

evidence. Unduly repetitive proof, rebuttal and cross examination may be excluded. Hearsay evidence shall be admissible.

G.    The testimony of witnesses shall be under oath. The witnesses shall be sworn by the Hearing Officer or the court stenographer.

H.    The parties and their counsel may examine and cross examine witnesses.

I.    A stenographic record of the hearing shall be taken and prepared by a qualified court stenographer and paid for by the College.

J.    Grounds for termination have not been established unless one or more of the reasons set forth in the Notice of Intention to Terminate is established by a preponderance of the evidence.

5.    **HEARING OFFICER'S DECISION**

A.    Within 20 days from the conclusion of the hearing, the Hearing Officer shall prepare a written decision. The Report shall state findings of fact, conclusions of law and a determination whether to terminate.

B.    The decision of the Hearing Officer shall be final and binding upon the College.

6.    **CALCULATIONS OF TIME**

In calculating periods of time provided for in the Rules of Procedure, intervening Saturdays, Sundays and legal holidays shall be included, unless the final day of the period falls on either a Saturday, Sunday or legal holiday, and in that case the final day shall be the next day which is not a Saturday, Sunday or legal holiday.



William A. Santora, CPA
Michael E Baffone, CPA
David G. Dwyer, CPA
John A. D'Agostino, CPA, MST

April 12, 2005

Gerard M. McNesby
Vice President for Finance
Delaware Technical and Community College
Office of the President
P.O. Box 897
Dover, DE  19903

Dear Mr. McNesby:

We have performed the procedures enumerated below, which were agreed to by Delaware Technical and Community College (DTCC), solely to assist you with determining the adherence to established policies for certain transactions and events entered into or performed by Marguerite M. Johnson, Ed.D. (Dr. Johnson), in her capacity as Vice President/Campus Director of the Terry Campus. This agreed-upon procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of those parties specified in the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

Our procedures and findings are as follows:

**Procedures Applied**

We interviewed Kathy Powell, Administrative Assistant to Dr. Johnson, regarding her performance of non-DTCC activities performed during normal DTCC business hours at the direction of Dr. Johnson from July 1, 1999 to December 31, 2004.

**Policy**

Based on the DTCC Personnel Policy Manual, Section 6.01, the Vice President and Campus Director in charge of the campus is authorized to establish working periods and to designate work assignments in the best interests of DTCC. In addition, Section 11.11 of the Policy Manual states that the first duty and responsibility of the full-time employee is to render to DTCC the most effective service possible. No outside service or enterprise, professional or other, should be undertaken that might interfere with this discharge of this primary responsibility.



DEPOSITION
EXHIBIT
#21
11/30/05 ASR

Christiana Executive Campus ▲ 220 Continental Drive ▲ Suite 112 ▲ Newark, DE 19713-4309
Phone: (302) 737-6200 ▲ (800) 347-0116 ▲ Fax: (302) 737-3362
E-Mail: info@sbgcpa.com ▲ www.santorabaffone.com

A46

Gerard M. McNesby
April 12, 2005
Page 2

### Findings

From the interview, it was determined that Ms. Powell officially reported to Dr. Johnson since July 1, 1999 and has performed considerable non-DTCC activities for Dr. Johnson on a routine basis during this time. Ms. Powell spent a substantial amount of time working on the following items for Dr. Johnson during regular business hours and using DTCC assets (i.e., computer equipment and supplies):

- The McConnell-McClurkin Family Reunion nonprofit corporation was incorporated in 2001. This was a corporation formed by Dr. Johnson to receive donations to help fund the costs of hosting a personal reunion. Ms. Powell typed the bylaws, board agendas, board minutes, executive committee meeting minutes, other correspondence, and also set up mail merge distribution lists, mailing labels, and reconciled the checkbook.
- Reconciling Dr. Johnson's personal checkbook every month.
- Doing Dr. Johnson's personal on-line banking, and upon direction, transferring money to her personal savings account.
- Handling numerous correspondences to close personal credit card accounts for Dr. Johnson.
- Handling numerous correspondences for Dr. Johnson's disabled sister's care, including sending monthly invoices to her sister's insurance company seeking reimbursement.
- Filling out Dr. Johnson's son's Free Application for Student Financial Aid (FASFA) form on-line.
- Handling numerous correspondences for Dr. Johnson's son, including letters regarding his lease, the Department of Elections for Kent County, and Salisbury State University.
- Handling invitations to Dr. Johnson's son's graduation and being the RSVP contact.
- Handling numerous correspondences for Dr. Johnson's daughter, including letters to her sorority; canceling a book club membership; to the post office to correct her address; to the Wyndam Hotel for her daughter's wedding; and graduation invitations.
- Handling miscellaneous letters on behalf of Dr. Johnson's husband to the Department of Public Safety for running a red light and to New All Saints Catholic Church to complain about a family member's funeral and signing the family members' names at the end of the letter.
- Handling 21 family Thanksgiving place cards.
- Running numerous personal errands for Dr. Johnson on demand during business hours.
- Handling a personal family reunion in 1999 as outlined in more detail below.

Ms. Powell's estimate of the amount of time she time spent working on non-DTCC activities during business hours for Dr. Johnson was 10%. In order to quantify the amount of Ms. Powell's diverted personnel costs from July 1, 1999 to December 31, 2004, we multiplied her annual salary and benefit costs for each respective year by 10%. This equated to $23,422.

### Procedures Applied

We interviewed seven other DTCC current employees to determine their participation in planning Dr. Johnson's 1999 and 2001 personal family reunions. The results of those conversations are as follows:

Gerard M. McNesby
April 12, 2005
Page 3

## Policy

Based on the DTCC Personnel Policy Manual, Section 6.01, the Vice President and Campus Director in charge of the campus is authorized to establish working periods and to designate work assignments in the best interests of DTCC. In addition, Section 11.11 of the Policy Manual states that the first duty and responsibility of the full-time employee is to render to DTCC the most effective service possible. No outside service or enterprise, professional or other, should be undertaken that might interfere with this discharge of this primary responsibility.

## Findings

Each employee interviewed had some involvement in Dr. Johnson's 1999 family reunion. Their involvement in the 1999 reunion included typing correspondence, typing recipes, designing and creating marketing pieces, scanning and touching up photographs, and copying and assembling the completed project. The completed project included a cookbook, genealogy book, program, save the date cards, candy bar wrappers, reminder cards, and bookmarks. The 2001 reunion involved two employees who scanned photographs into an insert for a program. Since the reunion happened almost six years ago, it was difficult to obtain a definitive answer from people regarding the amount of time spent on the 1999 family reunion. In order to quantify the amount of diverted personnel costs, we used time estimates from interviews to arrive at a high/low range of hours worked multiplied by the employees' hourly rate of pay for that time period. In order to quantify the material costs associated with producing all of the reunion documents, we used paper usage estimates from the interviews and by our examination of certain documents. The cookbook had 66 pages, the genealogy book had between 35 and 45 pages, and the program had between 10 and 20 pages. We estimated one page for the other reunion pieces listed above. Based on our interviews and examination of the reunion database file, we estimated 150 to 200 copies were made for each piece. We have compiled the table below as a means of summarizing the dollar amount of diverted personnel costs and material costs incurred by DTCC. See the accompanying schedules for further details of estimates.

| High | | | |
|---|---|---|---|
| Reunion | Personnel Costs | Material Costs | Reunion Total |
| 1999 | $5,724 | $4,340 | $10,064 |
| 2001 | 261 | - | 261 |
| | $5,985 | $4,340 | $10,325 |

| Low | | | |
|---|---|---|---|
| Reunion | Personnel Costs | Material Costs | Reunion Total |
| 1999 | $3,204 | $2,771 | $5,975 |
| 2001 | 122 | - | 122 |
| | $3,326 | $2,771 | $6,097 |

A48

Gerard M. McNesby
April 12, 2005
Page 4

In addition to her personal family reunions, Dr. Johnson used DTCC personnel to perform the following other non-DTCC related services:

- Vacation pictures: Dr. Johnson asked the Marketing Department to download her 2003 vacation pictures from an Internet site and print them for her. Based on the results of our interviews, there were 40 to 50 pictures that took hours to print on the color copier. Once Dr. Johnson reviewed all the pictures, she requested duplicates of certain pictures, again tying up the color copier for hours.

- Banners: Dr. Johnson requested two banners be made in the Marketing Department. They were congratulation banners for her daughter's graduation in 1998.

- Graduation invitations: Dr. Johnson requested her son's graduation invitations be made in the Marketing Department.

## Conclusion

In the above procedures and findings, we set out to determine if there were any deviations from existing policies in place, and if determinable, the cause of the deviation from such policies. Based on our 12 interviews of DTCC personnel, Dr. Johnson created an atmosphere of intimidation and fear. When the personnel were asked if they knew it was wrong to perform non-DTCC related business for the benefit of Dr. Johnson, the consistent answer was "yes, but you did what you were told to do." These people feared reprisal in the form of a bad evaluation or even being "sent to the parking lot," which was Dr. Johnson's saying for job termination. Dr. Johnson was known to call people incompetent and threaten people with being replaced by someone better qualified. These people feared Dr. Johnson, and in order to keep their employment at DTCC, they did what Dr. Johnson told them, without objection.

## Procedures Applied

We reviewed the following specific transactions as identified by DTCC to determine their appropriateness and adherence to established policies:

| | | |
|---|---|---|
| 1) | Three Castle Antiques | October 4, 2002 |
| 2) | Three Castle Antiques | October 6, 2002 |
| 3) | Bag & Baggage, Inc. | August 10, 2002 |
| 4) | Terry Campus Bookstore | October 31, 2002 |
| 5) | Friends of the Capital Theater | September 12, 2002 |
| 6) | Friends of the Capital Theater | September 17, 2002 |
| 7) | Friends of the Capital Theater | June 25, 2003 |

Gerard M. McNesby
April 12, 2005
Page 5

## Policy

The existing DTCC fiscal policy relating to the use of the PNC Bank Supercard credit card states the individual cardholder agrees to use the card for approved purchases and agrees not to charge personal purchases. Each cardholder is responsible for maintaining an activity log of all card purchases with supporting documentation. All Supercard transactions are subject to prior written approval. Any misuse of the Supercard will be grounds for discipline up to and including termination of employment. All employees who are issued a Supercard are required to review and sign off documenting their understanding of the policy.

## Findings

- Items purchased in transaction 1 included two pieces of jewelry, purchased by Dr. Johnson for $80, that are in violation of the allowable costs in accordance with Supercard Employee Disclosure Statement and Guidelines, which Dr. Johnson signed upon issuance of her Supercard. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated this transaction and these items could not be located on the Terry Campus.

- Transaction 2 included the purchase by Dr. Johnson of three children's storybooks from an antique store in West Virginia totaling $371. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated this transaction and these items could not be located on the Terry Campus.

- Transaction 3 included the purchase by Dr. Johnson of a $435 attaché case, and based on our inquiries with certain campus personnel, this item could not be located on the Terry Campus.

- Transaction 4 was for the purchase by Dr. Johnson of a $39 silver bracelet and could not be located on the Terry Campus. This transaction was charged to a state appropriation code and the supporting invoice did not indicate the business purpose of the purchase. No personal reimbursement from Dr. Johnson could be located.

- Transactions 5 and 6, which were entered into by Dr. Johnson, totaled $1,100. Transaction 5 was for $800 to purchase a table for the Camelot Fund Raising Gala held at the Schwartz Center for the Arts. Transaction 6 is for two season tickets for the fall/winter 2002 season at the Schwartz Center. Both transactions violate the allowable cost provisions of the Supercard Employee Disclosure Statement and Guidelines. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated these transactions.

- Transaction 7 in the amount of $450 for the purchase of two season tickets to the Schwartz Center for the Arts, was initiated by and included on Kathy Powell's Supercard and subsequently approved by Dr. Johnson, is in violation of the allowable cost provisions associated with Supercard purchases.

Gerard M. McNesby
April 12, 2005
Page 6

### Procedures Applied

We reviewed the following business trip of Dr. Johnson to determine its appropriateness and adherence to established laws and policies:

Wake Technical Community College (WTCC)    Raleigh, NC        October 23-26, 2002

### Policy

The existing DTCC fiscal policy relating to the use of the PNC Bank Supercard credit card states that the individual cardholder agrees to use the card for approved travel and agrees not to charge personal purchases. Each cardholder is responsible for maintaining an activity log of all card purchases with supporting documentation. All Supercard transactions are subject to prior written approval. Any misuse of the Supercard will be grounds for discipline up to and including termination of employment. All employees who are issued a Supercard are required to review and sign off documenting their understanding of the policy.

DTTC Terry Campus Travel Policy and Section 11.10 of the DTCC Personnel Policy Manual states that a travel request must be completed by the employee and approved by the employee's supervisor prior to departure and authorization for travel is the responsibility of the President. Upon return from the trip, the travel reconciliation form should be completed by the employee and submitted to the Accounting Office within 10 days. If personal travel expenses are billed at the same time as business-related travel expenses, the employee will reimburse DTCC for the personal portion within 10 working days of the employee's return.

### Findings

Examination of Dr. Johnson's WTCC travel request form indicated there was no approval by her supervisor, Dr. Orlando George, DTCC College President, prior to her departure. Dr. Johnson submitted a "DTCC – Terry Campus TRAVEL REQUEST FORM," dated October 21, 2002, to the Business Office with a stated destination of Raleigh, North Carolina, departing on October 23, 2002 and returning October 26, 2002. The October 21, 2002 dating of the travel request form preceded Dr. Johnson's signature date of November 11, 2002. The travel request form stated the following Explanation of Travel Request: "To tour and meet with administrators for Institutional Advancement/Development and Public Safety/Security from Wake Technical Community College in Raleigh, NC."

Based upon this data, SantoraBaffone CPA Group (SBG) contacted the individuals at WTCC responsible for Public Safety/Security and Institutional Advancement/Development – Carol E. Himes, Facilities' Engineer Officer, and Jane A. Rabon, Executive Director of WTCC Foundation. Mrs. Himes could not remember the exact date of Dr. Johnson's visit, but stated "that late October 2002, seemed about right." Mrs. Himes stated that she received a call from Dr. Johnson asking if she could meet with Mrs. Himes to discuss Public Safety/Security at WTCC, while she [Dr. Johnson] was in town visiting family. The fact that the call took place is

Gerard M. McNesby
April 12, 2005
Page 7

validated by reference to Dr. Johnson's Verizon Wireless bill, billing date November 19, 2002, that shows a call being placed by Dr. Johnson, utilizing her cell phone, on October 24, 2002 at 3:11 p.m. to Mrs. Himes' telephone number. Per my discussions with Mrs. Himes, this is the only time that Dr. Johnson spoke with her prior to their meeting to discuss WTCC Public Safety/Security.

Mrs. Himes remembered meeting with Dr. Johnson, subsequent to the phone call, for approximately one to two hours where they discussed general college public safety and security issues.

Mrs. Rabon stated that she could not remember meeting with anyone from DTCC during her tenure as Executive Director of WTCC Foundation.

The total cost of the three-day WTCC trip charged on the Supercard was $1,198, and included round trip airfare ($166), three-day hotel stay ($646), three-day car rental ($334), and three days of parking at BWI ($52). The total personnel cost of the three-day WTCC trip for Dr. Johnson was $1,653, and includes her daily salary ($451) plus benefits costs ($99).

**Conclusion**

According to DTCC Fiscal Guidelines, the Vice President/Campus Director shall share overall responsibility with the Office of the President for insuring that fiscal operations are accomplished in conformance with appropriate laws, regulations, and policies, and shall take steps necessary to bring about compliance. Based on the procedures applied to the Supercard purchases and travel expenditures, Dr. Johnson deviated from the established DTCC Fiscal Guidelines as follows:

- By not providing supporting documentation for expenditures incurred,

- By purchasing personal items with state funds and not providing personal reimbursement,

- By not safeguarding DTCC assets purchased with state funds,

- By not obtaining prior approval for business trips, and

- By not providing the documentation that substantiated the business purpose for the expenditures incurred.

In all cases, we attempted to verify whether Dr. Johnson reimbursed DTCC for the personal use of DTCC assets. Based upon our inquiries, we were able to locate one receipt from Dr. Johnson in the amount of $365.40. This receipt was dated August 16, 1999, and the description for the transaction was "Reimb fr Dr. Johnson." We were not able to locate supporting documentation for the transaction.

Gerard M. McNesby
April 12, 2005
Page 8

## Summary

Based on interviews with DTCC staff and external personnel, review of supporting documentation, and review of existing policies and procedures, there are specific instances where Dr. Johnson deviated from state and DTCC policies, charged DTCC for unauthorized/ nonbusiness-related travel, and misused DTCC personnel and the assets entrusted to her. We recommend that DTCC inform the appropriate state agency as a means of initiating a more in-depth investigation into these matters.

We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the management of DTCC, the Attorney General's Office, and the Office of the Auditor of Accounts and is not intended to be and should not be used by anyone other than these specified parties.

*Santora Baffone*
CPA Group

**A53**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,               )
                                     )
              Plaintiff,             )
                                     )      C.A. No. 05-157 (KAJ)
       v.                            )
                                     )      Trial By Jury Demanded
ORLANDO J. GEORGE, JR.,              )
in both his official and personal    )
capacities, and DELAWARE             )
TECHNICAL AND COMMUNITY              )
COLLEGE,                             )
                                     )
              Defendants.            )

## SUPPLEMENTAL COMPLAINT

### THE PARTIES

1.     The plaintiff, Marguerite Johnson is a resident of the State of Delaware,

residing in Kent County.

2.     Orlando J. George, Jr., is a resident of the State of Delaware, residing in

New Castle County.

3.     Delaware Technical and Community College is an institution of higher

learning organized and existing under the laws of the State of Delaware, 14 Del.C.

§9101 et.seq.

### JURISDICTION

4.     This Court has jurisdiction over this matter in that it is brought pursuant to

the provisions of 28 U.S.C. §§1331, 1332 and 1343(a)(3)(4), 28 U.S.C. §§2201 and

2202, as well as the Fourteenth Amendment of the United States Constitution.

5.     Venue in this Court is predicated by the provisions of 28 U.S.C. §1391(b)(c).

A54

## FACTUAL BACKGROUND

6.      The plaintiff, Marguerite A. Johnson (hereinafter referred to as "Johnson") holds a Doctorate in Education Degree from Temple University, and at all times relevant herein, was employed as the Campus Director for the Terry Campus of the defendant Delaware Technical and Community College, in Kent County, Delaware.

7.      Dr. Johnson was originally hired by Delaware Technical and Community College in 1970 as a GED Instructor at the Northern Branch, and was promoted in 1973 as Acting Assistant Director of Continuing Education.

8.      By 1979 Johnson became the Acting Director of Continuing Education at the Stanton Campus of Delaware Technical and Community College.

9.      By October 1979 Dr. Johnson was promoted to the position of Director of Continuing Education at the Stanton/Wilmington Campus of Delaware Technical and Community College, a position she continued to hold until December 1992.

10.     In January 1993, Johnson  was promoted and made Executive Dean of Instruction of Student Services for the Terry Campus, Office of the President Kent County, of Delaware Technical and Community College.

11.     In 1994, the Board of Directors of Delaware Technical and Community College, pursuant to the provisions of 14 Del.C. §9105 approved Johnson's appointment as Vice-President and Campus Director of the Terry Campus, Kent County, Delaware Technical and Community College.

12.     In September 1996, as a part of the evaluation process of the plaintiff's performance in her position as vice-president and campus director for the Terry Campus, her contributions were described as "invaluable", while she was commended

for placing the Terry Campus in a sound financial condition and thanked for the support that she had offered to the president of that institution.

13.   In September 1997, in reviewing the plaintiff's performance during the preceding school year, she was commended for promoting the image of the Delaware Technical and Community Campus, located in Kent County, and for helping make that campus a "major force for positive change for Kent Countians". Further, her leadership was described as very effective, and she was commended for her inclusive planning processes.

14.   In 1998 the plaintiff 's job performance was characterized as outstanding, which permitted the Terry campus to reach new heights of effectiveness.

15.   For the years 1999, 2000 and 2001, the plaintiff's performance as Vice-President and Campus Director for the Terry Campus was credited as permitting the "...Terry Campus to reach new heights of effectiveness..." which "...has positioned the Terry Campus as a positive can do force for quality education and training in Kent County".

16.   In September 2002 Johnson's efforts resulted in "special commendation for your leadership and providing additional programs for the community, increasing legislative support of the campus, your involvement in the Kent County community and your tireless support of the President.".

17.   In September 2003 the plaintiff's efforts were recognized with a "special commendation for (her) leadership of the Middle State's effort leading to full accreditation ...increased record enrollment growth (and) involvement in the Kent County community."; as well as her tireless support of the President.

18.    Most recently, in September 2004 Johnson's efforts on behalf of Delaware Technical and Community College were given "special commendation for (her) leadership in significantly enhancing the programs available to the Kent County community and (her) successful leadership in tying together the involvement of the campus community, students, faculty & staff with the community at large..." as well as her support and leadership between various divisions of the college.

19.    For each year since her appointment as Vice-President and Director of the Terry Campus, of Delaware Technical and Community College, the plaintiff has received merit increases in salary.

20.    Delaware Technical and Community College, in order to acquaint full time employees with its policies and regulations has promulgated an "Administrator's Personnel Handbook." The provisions of the "Administrator's Personnel Handbook" have been by custom and practice given the employees of Delaware Technical and Community College a reasonable expectancy in certain policies and procedures.

21.    The Administrator's Personnel Handbook, provides that the employment of the position of Vice-President, Campus Director requires the approval of the Board of Trustees.

22.    Section XI, of the Administrator's Personnel Handbook provides that members of the faculty of Delaware Technical and Community College should be free from college censorship or discipline.

23.    The provisions of the Administrator's Personnel Handbook provide for a means of discipline, Section XII, and grievances, Section XIII, to be utilized in the event that an employee is suspended or otherwise disciplined.

24.    During the course of the plaintiff's employment by the defendant, Delaware Technical and Community College, the defendant, George has on repeated occasions demonstrated a history of giving credence to and using anonymous comments made concerning Johnson as a means of managing and disciplining the plaintiff.

25.    On November 19, 2004, a meeting was held at the Terry Campus of Delaware Technical and Community College for Departmental Chairs and administrators to discuss reorganization of the college's technical network.

26.    During the course of the meeting of November 19, 2004 at the Terry Campus of Delaware Technical and Community College as described in ¶25, the plaintiff, in an effort to assist the day-to-day management of the Terry Campus, for which she had responsibility as Vice-President and Campus Director, made inquiries as to how the reorganization system would operate and asked for various explanations. Such comments were made in a non-disruptive manner and were matters of public concern to the public at large and specifically to the Terry Campus community.

27.    Nineteen (19) days after the meeting of November 19, referenced in ¶26, on December 8, 2004 the defendant George forwarded correspondence to Johnson accusing Johnson of improper public comments, which were "antagonistic" and "inconsistent of what can be expected of a Vice-President and Campus Director" describing her comments as "creating a negative attitude". Dr. Johnson's comments were further described as being subversive and undermining moral as well as constituting insubordination.

28.     The letter of December 8, 2004 from the defendant George to the plaintiff, directed Johnson to report to the defendant George's office the following day to discuss her alleged inappropriate behavior.

29.     On December 9, 2004, the plaintiff requested to meet with the defendant George, during which time the defendant George told Johnson that she had one of two choices, to either voluntarily retire, or that she would be placed on administrative leave while her colleagues and staff were interrogated.

30.     Shortly following the meeting of December 9, 2004, on December 13, 2004, the plaintiff was hospitalized with chest pains and shortness of breath.

31.     Thereafter, Johnson responded to the meeting with the defendant, George of December 10, 2004 by a letter dated January 3, 2005 in which it was confirmed that the matters that she brought up during the meeting of November 19, 2004 were matters of public concern surrounding the nature and extent of the reorganization of the Terry Campus, for which she had administrative responsibilities as Vice-President and Director of the Terry Campus. Johnson reiterated the statements that were made in a non-disruptive manner.

32.     In Johnson's letter of January 3, 2005 to George in response to the December 10, 2004 meeting she requested the opportunity, that if she was going to be disciplined. to proceed with the grievance procedures as outlined in Section 12.01 of the "Delaware Technical and Community College Administrator's Personnel Handbook".

33.     Immediately following receipt of the letter by George of Johnson's January 3, 2005 letter, and the meeting with her that same day, defendant George in retaliation for the public comments made during the November 19, 2004 meeting, issued a memo

to Johnson, which placed Johnson on administrative leave "...until further notice". Johnson was verbally informed to remove all of her personal belongings from her office.

34.    At the same time as Johnson was placed on administrative leave, she was admonished not to visit any college facility, nor to participate in any college function, either on or off campus.

35.    When Johnson was placed on administrative leave, she was directed that she was not to discuss any investigation that the college was going to conduct of her, not only with present employees, but not to discuss it with even former employees of Delaware Technical and Community College.

36.    On January 4, 2005 a public announcement was made to the community at large that Johnson had been placed on administrative leave and that a replacement had been appointed to Acting Assistant Campus Director of the Terry Campus, and that replacement was to have "...full administrative responsibility for the Terry Campus". The authority previously possessed by Johnson.

37.    Shortly after the issuance of the public announcement of January 4, 2005, that Johnson was being placed on administrative leave, some furniture from her office was removed in order that her replacement could occupy her office.

38.    As a result of the actions of the defendants, in removing the plaintiff from her position as Vice-President and Campus Director of the Terry Campus, members of the public have expressed to her concern, evidencing a belief that she is guilty of wrongful or improper conduct or other unprofessional or inappropriate conduct, incompatible with her position as Vice-President and Direct of Terry Campus.

39.    On March 16, 2005, the plaintiff, by and through her attorney provided to the defendant a copy of a draft complaint, which the plaintiff proposed to file.

40.    Thereafter, on March 23, 2005 the defendant caused to be provided to all "Delaware Tech Employees" an announcement that an investigation was to be conducted concerning the plaintiff, and that all employees were to cooperate with the investigation.

41.    The purpose of the investigation was the coerced interrogation of all Delaware Tech employees at the Terry Campus, in Dover, Delaware, to elicit damaging information concerning the plaintiff, in order to orchestrate the termination of the plaintiff's employment.

42.    The plaintiff, by reason of the contractual terms of the written contract between the plaintiff and Delaware Tech, had employment, which could be terminated only for good cause, and such good cause was to be supported by affidavits.

43.    On April 27, 2005, the defendant caused Delaware Tech to issue a "Notice of Intent to Terminate Employment" of the plaintiff.

44.    Transmitted with the in the Notice of Intent to Terminate Employment, were specially drafted rules of what was purported to be a termination procedure for a hearing in order to effectuate the termination of the plaintiff, drafted solely for the use in terminating the plaintiff.

45.    Prior to the conducting of such termination hearing, the plaintiff was instructed to have no contact with any potential witness, thus being prevented from preparing for or interviewing any potential witnesses concerning the termination proceeding.

A61

46.     At the same time the plaintiff was being prevented from having any discussions with or interviewing any potential witnesses, the defendant, and the administration of Delaware Tech regularly and uniformly met on many occasions with witnesses in order to interrogate such witnesses, and to mold their testimony for the termination hearing.

47.     The plaintiff did not have the power or means to compel the attendance of any witnesses at the hearing.

48.     The defendants did not supply to the plaintiff the contractually required affidavits in a timely fashion, until immediately prior to the termination hearing.

49.     Given the fact that the defendant made a general announcement that the plaintiff had been placed on administrative leave, and that employees at Delaware Tech were pressured into making critical comments of the plaintiff, the plaintiff requested the defendant to announce that no Delaware Tech employee would be subject to retaliation for testifying at the hearing.

50.     Despite the request by the plaintiff for guarantees that witnesses would not suffer any retaliation for testifying on her behalf at the hearing, the defendant, and the administration of Delaware Tech refused to provide any such guarantees, until only immediately prior to the hearing, when, at which time, for practical purposes such guarantees were meaningless and of no use, resulting in the plaintiff being unable to present adequate testimony on her behalf.

51.     The plaintiff has been denied any right to contest, appeal or grieve her suspension, or termination.

52.    That as a direct and proximate result of the actions of the defendant, the plaintiff has undergone great suffering pain and mental anguish.

53.    That as further direct and proximate result of the wrongful conduct of the defendant, the plaintiff has been forced to expend, and may in the future be forced to expend great sums of money for medical treatment.

54.    As a further direct proximate result of the actions of the defendant, the plaintiff has suffered injury to her professional reputation and future earning capacity.

55.    As a result of the investigation, pressure on witnesses, the denial of the plaintiff to have access to the witnesses prior to the hearing, and the delay in producing the required affidavits, all proceeding the hearing, which ultimately resulted in the termination of the plaintiff's employment with Delaware Technical & Community College.

### COUNT I

### Free Speech Clause

56.    The plaintiff incorporates herein and makes a part hereof the allegations contained in paragraphs 1 though 55.

57.    The individual defendant took action adverse to the plaintiff, as a direct and proximate result of retaliation for plaintiff's First Amendment protected speech on matters of public concern.  There is a demonstrated and admitted causal relationship between plaintiff's aforementioned protected speech and the adverse employment action consisting of suspension from her job duties, and the subsequent denial of a grievance procedure.  Thus the First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

58.    The actions by the defendant, in causing a coerced investigation to be conducted concerning the plaintiff, and in conducting a termination hearing, without providing equal access to employees and witnesses to the plaintiff as had by the defendant and Delaware Tech, all for the purpose of engineering the termination of the plaintiff, were in further retaliation for the plaintiff's exercising of her First Amendment Rights of Protected Speech, and the plaintiff's refusal to submit to discipline and to resign as a result of the defendant's displeasure over the exercise of such rights.

59.    The individual defendant cannot prove by a preponderance of the evidence that absent a Constitutional violation they would have grounds to discipline the plaintiff while at the same time denying the plaintiff a grievance procedure.

60.    Plaintiff's Constitutional right of free speech has been denied under the First Amendment of the United States Constitution and 42 U.S.C. §1983.

## COUNT II

### Procedural Due Process

61.    The plaintiff incorporates herein and makes a part hereof the allegations contained paragraphs 1 through 60.

62.    The plaintiff, by rule, regulation, by policy custom and practice, had a reasonable expectancy for a protected property interest a disciplinary process, which included but was not limited to a written notice of discipline and a right to proceed with a grievance procedure after the application of any discipline.

63.    The plaintiff was deprived of her protected property interest, in that she was not provided sworn affidavits outlining the basis of her termination reasonably prior

to any termination hearing, which was guaranteed to her by the policy manuals of Delaware Technical & Community College.

64.    The plaintiff was deprived of further due process by the denial of her access to the right to speak with potential witnesses prior to any termination hearing, while at the same time the defendant, and Delaware Technical & Community College had complete and continual access and preparation of such witnesses for testimony at the termination hearing.

65.    The plaintiff was deprived of her protected property interest in the disciplinary process and was placed on administrative leave with out recourse, without a hearing, and without the right to a grievance procedure.

66.    The actions of placing the plaintiff on administrative leave, which constituted disciplinary action, without providing appropriate notice and/or grievance procedure, denied the plaintiff a property interest so as to violate her constitutional right to due process of law under the due process clause under the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. §1983.

## COUNT III

### Procedural Due Process- Liberty Interest

67.    The plaintiff incorporates herein and makes a part hereof the allegations contained paragraphs 1 through 66.

68.    Plaintiff was a full time employee of Delaware Technical and Community College, who could not, by policy, regulation, custom, and practice be disciplined without due process and a grievance procedure.

69.    As set out more fully in Count I, the defendants violated the plaintiff's rights and denied her the due process rights to which she was entitled.

70.    In denying the plaintiff her due process rights, the defendants have distinguished the rights and status guaranteed to the plaintiff by State and/or Federal Law.

71.    The actions of the defendants were committed under the color of law.

72.    The actions of the defendants have damaged the plaintiff in both her professional and personal reputation therefore denying her a property interest in her employment and damaging her protected liberty interest.

73.    The actions of the defendants have created such a stigma, which will deprive the plaintiff of her present employment, and will limit the possibility of future employment by other employers in her field as an educational administrator.

74.    The actions of the defendant George, may seriously damage her reputation and associations in the community by creating an implied impression that she was guilty of either dishonesty, immoral or other wrongful conduct.

**WHEREFORE,** the plaintiff requests this Court to:

a.    Enter a judgment against the defendants.

b.    Enter a declaratory judgment declaring that the acts of the individual defendant were a violation of the plaintiff's Constitutional rights.

c.    Enter a judgment against the individual defendant for nominal or presumed damages.

d.      Enter a judgment against the individual defendant for compensatory damages, including any lost wages, or future or front pay, pain, suffering, humiliation, embarrassment, injury to reputation, and other personal injuries.

e.      Enter a judgment against the individual defendant for punitive damages.

f.      Award the plaintiff costs, interest and attorney fees for this lawsuit.

g.      Issue a mandatory injunction directing that the individual defendant restore the plaintiff to her position.

h.      Issue a permanent injunction directing the individual defendant to

1.      Notify each and every person who learned of the defendants treatment of the plaintiff, that the individual defendant's conduct was illegal and wrongful, and;

2.      Expunge plaintiff's personnel file of any derogatory information relating to the allegations contained in this complaint.

3.      Enjoin the individual defendant and his successors from retaliating against the plaintiff now or in the future.

i.      Require such other and further relief as this Court deems just and proper under the circumstances.

ABER, GOLDLUST, BAKER & OVER

_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
302-472-4900
Attorney for Plaintiff

DATED:  September 16, 2005

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of the attached pleading was

served via electronic mail on September 16, 2005 to the following counsel:

David H. Williams, Esquire
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899


_____/s/ Melissa A. Chionchio_____
Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire

A68

1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,          )
                                )
          Plaintiff,            )
                                )    Civil Action No.
v.                              )    05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR.,         )
in both his official and        )
personal capacities, and        )
DELAWARE TECHNICAL AND          )
COMMUNITY COLLEGE,              )
                                )
          Defendants.           )

          Deposition of GERARD M. McNESBY taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street, Dover,
Delaware, beginning at 10:05 a.m., on Thursday, April 13,
2006, before Patricia L. Shelton, Registered Professional
Reporter and Notary Public.


APPEARANCES:


          GARY W. ABER, ESQ.
          ABER GOLDLUST BAKER & OVER
             702 King Street – Suite 600
             Wilmington, Delaware  19801
             for the Plaintiff

          DAVID H. WILLIAMS, ESQ.
          MORRIS JAMES HITCHENS & WILLIAMS, LLP
             222 Delaware Avenue - 10th Floor
             Wilmington, Delaware  19801
             for the Defendants


ALSO PRESENT:


          BRIAN D. SHIREY, ESQ., DTCC General Counsel
          MARGUERITE A. JOHNSON
                  WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

A69

Gerard M. McNesby

24

1    the state auditor's office, there were -- in terms of the

2    travel reimbursements, the state auditors found that the

3    internal control procedures and policy manuals and

4    directives were in place and the campus director did not

5    comply with the existent policy.

6        Q.    How did she not comply?

7        A.    That's a question you'd have to ask the state

8    auditor's office.

9        Q.    Mr. McNesby, you were involved in the general

10   investigation of Dr. Johnson, weren't you?

11       A.    No.

12       Q.    Well, did you have a hand in hiring

13   SantoraBaffone to do the audit or whatever you call it

14   that they did?

15       A.    Agreed-upon procedures engagement, as I

16   understand it.

17       Q.    Did you hire them?

18       A.    I did, yes.

19       Q.    And did you dictate to them what the agreed

20   procedures would be?

21       A.    I basically followed the same process that we

22   used for a situation that we had at the Wilmington campus

23   in '03 where certain allegations were made about

24   employees there.  And I took those allegations there and



Gerard M. McNesby

25

1    I needed to get those confirmed.  And I did that by

2    bringing in an independent outside CPA firm to confirm

3    those allegations.

4              Once those -- in that case, it was

5    SantoraBaffone.  In this case, it was also

6    SantoraBaffone.  Brought them in.  They confirmed the

7    allegations.  Because of the nature of the allegations

8    being confirmed, it was incumbent upon them to turn their

9    findings over to the attorney general's office, who then

10   referred us to the state auditor's office.

11             Those two -- these two situations follow a

12   similar path.  I brought in a CPA firm to confirm to make

13   sure that any of these allegations that were coming

14   forward were validated.

15   Q.   My question to you was, are you the one that told

16   SantoraBaffone what the agreed procedures would be?

17   A.   No.

18   Q.   Who told them what the agreed procedures would

19   be?

20   A.   They came back and proposed what the agreed --

21   they determined what the agreed-upon procedures would be.

22   Q.   So they suggested the agreed-upon procedures, not

23   you?

24   A.   That's true.



A71

Gerard M. McNesby

96

1    A.    We have president's council that is usually one

2    team.   There is -- you know, one year the president's

3    council was -- you know, participated in answering

4    questions.

5    Q.    Have you ever seen Dr. George react when a vice

6    president got a wrong answer?

7    A.    Didn't notice either -- I mean, see him react?

8    Yes, I've seen him react.

9    Q.    How did he react?

10   A.    Wrong answer or right answer, did you say?

11        They're both substantially the same.   And it

12   would be joking and kidding.   But then everyone around

13   the table is competitive and we want to win.

14   Q.    Do you remember the reorganization of the IT

15   department, for lack of a better term?

16   A.    Yeah, I do.

17   Q.    How did that come about?

18   A.    Over a number of years of president's council

19   being frustrated about the fragmented way that technology

20   was being addressed throughout the college.   And that

21   came about to try to get a uniformed system of the

22   administration of technology under one umbrella.

23   Q.    Do you remember when it was finally approved or

24   set to go in effect?


**A72**

Gerard M. McNesby

97

```
1    A.    I don't know the exact date when.

2    Q.    And I didn't ask when.  But you remember it

3  happening?

4    A.    Oh, yes, I do.

5    Q.    And you're a member of the president's council?

6    A.    I am a member, yes.

7    Q.    When it came up for approval, who voted against

8  it?

9    A.    No one.

10   Q.    Who voted for it?

11   A.    Everyone that was at the meeting.

12   Q.    How was the vote done?

13   A.    Similar to the way we do every other type of

14  major initiative, in terms of people expressing whether

15  something should go forward or not.

16   Q.    Did anybody express reservations in the

17  organization?

18   A.    Not when, you know, the final vote was done.  I

19  mean, quite frankly, I had concerns about it earlier on

20  before it was approved and, you know, may have been

21  deferred because I was concerned about the staffing, how

22  it was going to effect the budget.  And then by the time

23  the final vote had taken place, I mean, I was well

24  satisfied that it was thought out.
```



A73

Gerard M. McNesby

98

Q.    Was the vote by written ballot?

A.    No.

Q.    By raised hands or just general acclamation?

A.    Neither.  I don't know what general acclamation means.

Q.    All in favor say aye, all opposed say nay.  Or, was it just assumed it was --

A.    No, it wasn't assumed.  You know, Dr. George -- and these aren't exact words, in terms of -- scanning president's council, Does anyone have any major concerns about this reorganization that haven't been addressed? And I remember no dissension as a result of that meeting. And that's what I recall from that.

Q.    So he wanted to know whether there were any new concerns which had not been previously addressed and no one spoke up?

A.    No one raised any issues.  And I can't recall -- you know, all those in favor, I know that didn't happen.

Q.    So then based upon the failure to respond to that question, it was deemed approved?

A.    No.  I think there was more than that in terms of, you know, is silence approval.  It was the kind of atmosphere where, you know, do you have any concerns with this proposal going forward?  You know, speak now.



Gerard M. McNesby

99

1    Q.    First you said do you have any concerns that have

2  not been previously addressed?

3    A.    I said that or you said it?

4    Q.    You said that.

5    A.    I thought you said that.

6    Q.    We'll let the record speak for itself.

7          It was not by written ballot?

8    A.    It was not by written ballot.

9    Q.    It was not by raised hands?

10   A.    It was not by raised hands that I can recall.

11   Q.    It was not by all those in favor say aye; all

12 those opposed say nay?

13   A.    I'm sorry.  I don't --

14   Q.    Do you recall that happening or not?

15   A.    I recall the discussion, you know, that all

16 president's council was on board.  How --

17   Q.    I'm asking mechanics of the vote.

18   A.    I can't give you any more detail on that.  It was

19 an atmosphere where people could express their continued

20 concern about it.  I mean, this issue was deferred a

21 couple times because people did not see eye-to-eye on

22 everything, myself included.

23          (McNesby Deposition Exhibit No. 12 was

24 marked for identification.)



**A75**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                    )
                                          )
            Plaintiff,                    )
                                          )    Civil Action
v.                                        )    No. 05-157(KAJ)
                                          )
ORLANDO J. GEORGE, JR.,                   )
in both his official and personal         )
capacities, and DELAWARE                  )
TECHNICAL AND COMMUNITY                    )
COLLEGE,                                  )
                                          )
            Defendants.                   )


            Deposition of HOPE MURRAY taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street,
Dover, Delaware, beginning at 10:10 a.m., on Thursday,
January 19, 2006, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

ALSO PRESENT:
        MARGUERITE A. JOHNSON

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

**A76**

ATTACH TO DEPOSITION OF: _Hope Murray_

DATE TAKEN: _January 19, 2006_

IN THE MATTER OF: _Johnson v George, Jr._

### ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet.  **Do not make any marks or notations on the transcript itself.**  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address indicated below.  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| 31 | 13 | research, not recent. |
| 40 | 23 | their, not the |
| 78 | 9 | Shirey, not Shyer |
| 80 | 14 | with, not at |
|    |    |    |
|    |    |    |
|    |    |    |
|    |    |    |
|    |    |    |
|    |    |    |
|    |    |    |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _2/13/06_    _Hope N. Murray_
(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
1330 King Street
Wilmington, DE  19801

**A77**

Hope Murray                                29

1    Q.    Well, that's what I am trying to understand.

2          You have described the one incident with

3    the vice president where she went to Dr. George and

4    then she met in your office or you met in her office

5    afterwards and you were upset with the tone of that

6    conversation.

7    A.    I think if we go back to your original

8    question, you're not asking me now what you asked me

9    originally about my relationship with her.  That's not

10   what you're asking me now.

11   Q.    Right.  I asked you what your relationship was

12   with her and any instances where you thought it was

13   inappropriate.  And you described this incident

14   with --

15   A.    With me?

16   Q.    Yes, with her.

17   A.    Specifically with me?

18   Q.    That's all I'm talking about right now.

19   A.    On a personal basis --

20   Q.    Well, I don't know about personal or

21   professional.

22   A.    I didn't mean it in that way.  Where she and I

23   had a discussion or a dispute, the two of us together,

24   I would have to say yes to that, if that's what you're



WILCOX & FETZER LTD.
Registered Professional Reporters

A78

1    asking.

2        Q.    Other than that one incident, there were no

3    other disputes that you and she had?

4        A.    I don't recall that.

5        Q.    Now, maybe where you wanted to go I'll give you

6    the opportunity now.  Did you ever witness her having

7    disputes with other people?

8        A.    I have, I have witnessed Dr. Johnson's behavior

9    over many years of disputing other people, what they

10   say, having various opinions and voicing that in loud

11   language and creating dissension within the working

12   group.  That I have observed.

13       Q.    When you say, "creating dissension," is it

14   because of the position she took or the manner in

15   which she took it?

16       A.    Most of the time the manner in which she took

17   it.

18       Q.    Can you give me an example?

19       A.    One example that I can think of now is the vice

20   presidents would meet without the president in a group

21   which we refer to as ad hoc, ad hoc president's

22   council.  And Dr. Johnson would become in the last

23   couple of years at the president's council meetings no

24   matter it seemed what the agenda item was, what the



1    topic was, Dr. Johnson dominated the conversation.

2    She had very strong opinions on every topic and in

3    many cases was opposed to whatever was being

4    recommended by the other vice presidents and it was

5    difficult to get anything resolved to bring closure.

6              One example I can think of is there was --

7    and we sometimes held these ad hoc meetings via

8    telephone conference call.  One that I recall is when

9    we were trying to resolve an issue of how we were

10    going to be handling database management for the new

11    assessment process that was taking place in the

12    college.  And there was a vacant director of

13    institutional recert. position in the office of the

14    president.  We were trying to figure out how this

15    person could interact or play a role in helping the

16    campuses with their database management.

17              And Dr. Johnson was very verbal in terms

18    of what she thought it should be and how it should be

19    different than it is and different than what I had

20    recommended and in my recall the vice president of

21    academic affairs had recommended.  And when we were

22    trying to have a discussion about that she became very

23    loud and verbally abusive is the best that I can think

24    of.



WILCOX & FETZER LTD.
Registered Professional Reporters

A80