1           We got nothing resolved about that.

2      Q.   When you say, "verbally abusive," what did she

3   say that was abusive?

4      A.   Well, when I say that, I say that in terms of

5   when you're speaking to someone in a tone of voice and

6   in a way that is disrespectful to your colleagues

7   professionally in that more the way that you say it

8   than what is said, and I personally found that

9   offensive.

10     Q.   Well, I've known now Dr. Johnson for a few

11  months since I have worked with her. She has a very

12  loud-speaking voice and is not what I'd call a quiet,

13  soft-spoken person.

14          So can you sort of give me an idea of what

15  you mean? Did she yell and scream?

16     A.   Pretty much, yes.

17     Q.   This is on the phone that she yells?

18     A.   (The witness nodded.)

19     Q.   Did she curse?

20     A.   I don't recall that she did.

21     Q.   Did she call anybody names?

22     A.   I am not sure in this particular instance

23  whether she did or not.

24     Q.   The disagreement she was having was between the

1    position that you and Dan Simpson were taking and she

2    was taking a different position?

3       A.    That is correct.

4       Q.    Were there other vice presidents on this call

5    other than just the three of you?

6       A.    Yes.

7       Q.    Who else would have been in on that call?

8       A.    If I recall, Dr. Smith, the campus director of

9    Owens Campus, was on the line.

10      Q.    Who was that?  I'm sorry?

11      A.    Dr. Smith, Ileana Smith.  Mr. Miller, the vice

12   president and campus director of Stanton in

13   Wilmington, and I'm not sure about Mr. McNesby, vice

14   president for finance, if he was there that day or

15   not.

16      Q.    Did any of those persons express concerns about

17   the way she was acting?

18      A.    Frankly, there was no opportunity for anybody

19   to express anything in that conversation.

20      Q.    When did this occur?

21      A.    I don't know the exact year that that would

22   have been.  It could have been '03.  It could have

23   been '04.  I don't recall.

24      Q.    Any other examples in the ad hoc committee



Hope Murray                                          34

1    where she was disruptive or abusive?

2        A.    I can tell you that for the last several years

3    that Dr. George -- that Dr. Johnson was employed at

4    the college it was a regular occurrence and I can't

5    give you chapter and verse, but it became a pattern

6    that we experienced.

7        Q.    So if called upon to describe the abusive or

8    disruptive behavior, you could only speak, except for

9    this one incident about this database management

10   situation, you can only speak in generalities without

11   being specific?

12       A.    Without having agendas that I could go down

13   from previous meetings and I could, I'm sure I could

14   remember if I knew what the agenda items were and what

15   we were talking about.  A similar kind of thing did

16   occur related to the reorganization of the IT division

17   in the college.  There was debate and discussion in ad

18   hoc about that and, again, Dr. Johnson was very verbal

19   and I would say making disparaging remarks about some

20   of the people in that IT division.

21       Q.    Disparaging remarks as in that they weren't

22   competent or disparaging remarks in that they were

23   just mean, nasty people?

24       A.    No.  That they were not competent and why would



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A83

Hope Murray                                    51

1    years?

2        A.    Since '88.

3        Q.    So about 17 years?

4        A.    16 years.

5        Q.    Can you describe other discipline that the

6    school has administered to employees that you can

7    think of?  I'm sure there have been some that you have

8    terminated.

9        A.    Over the years we have a progressive

10   disciplinary policy and so it begins with verbal

11   reprimands and written and suspensions and

12   terminations and, depending on the nature of the

13   violation or offense, it can be any of those.

14              And so I have dealt with all of those

15   through the years.

16       Q.    Well, in some instances, I assume there's some

17   instances where somebody has done something so bad

18   they have gone right to termination and bypassed

19   everything else?

20       A.    That's correct.

21       Q.    And by something serious I meant like stealing

22   school funds or such?

23       A.    Something that's of a serious enough nature

24   that would warrant discipline or termination.



A84

Hope Murray                         52

1    Q.    Some things might just be so minor you would

2    say don't do it again, that's the verbal reprimand or

3    something?

4    A.    It could be a verbal reprimand.

5    Q.    Are there other actions that are deemed more

6    inappropriate that you would skip the verbal reprimand

7    and go to a written reprimand first?

8    A.    There could be.

9    Q.    And then there are other offenses where you

10   might skip the verbal reprimand, skip the written

11   reprimand and go to whatever the next level is?

12   A.    There could be a suspension, yes.

13   Q.    How long are those suspensions for?

14   A.    My recollection is three days, five days.  I

15   don't recall.  I haven't dealt with them in a while.

16   Q.    When people receive that type of discipline,

17   can they take it to a grievance?

18   A.    Yes.

19   Q.    And describe that process for me.

20   A.    The grievance process is --

21   Q.    Let's say somebody has done something

22   inappropriate and their manager says I am suspending

23   you for whatever, for doing such-and-such.

24   A.    Yes.



Hope Murray                              53

1      Q.    Then what happens?

2      A.    They have the right to grieve that.  They have

3      so many days, I don't recall off the top of my head if

4      it's ten or twenty days, in order to put in their

5      grievance.  The grievance, the Delaware Tech grievance

6      says that a grievance must either be of a disciplinary

7      nature, disciplinary grievance having to do with

8      disciplinary issues or having to do with contract

9      interpretation issues, policy interpretation issues.

10     Q.    What are disciplinary issues?

11     A.    Such as you just mentioned, if someone was

12     suspended and they wanted to grieve that, that would

13     be grievable under a disciplinary.

14     Q.    What makes a suspension grievable?  The fact

15     that they're not allowed to come into work?

16     A.    The grievance process, if I remember this

17     correctly, it says there either has to be a

18     misinterpretation or misapplication of college policy

19     or the individual must be monetarily adversely

20     affected by the action.

21     Q.    Run that by me again.

22     A.    I don't have the policy in front of me.

23     Q.    What was the first one?

24     A.    That there is a misinterpretation or



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A86

1    misapplication of college policy.

2        Q.    Against the employee?

3        A.    Yes.  Or that the employee has been monetarily

4    adversely affected by the action taken.

5        Q.    All right.  And in Dr. Johnson's case she was

6    suspended indefinitely on July 3rd I think it was or

7    January 3rd, correct?

8        A.    No, that is not correct.

9        Q.    Let me show you a document that's been

10   previously marked George Deposition Exhibit 4.

11              Do you recognize that document?

12       A.    Yes, I do.

13       Q.    Did you write this one?

14       A.    No, I did not.

15       Q.    When was the first time you saw it?

16       A.    I would have seen this sometime after January

17   3rd.

18       Q.    But it says she's placed on administrative

19   leave?

20       A.    Correct.

21       Q.    What's the difference between that and a

22   suspension?

23       A.    Administrative leave is exactly that.  It is a

24   leave in which you're receiving full pay, benefits,



Hope Murray                          55

1    all of the rights to your position. Nothing changes

2    there except that you are on a leave, not reporting to

3    work.

4        Q.    Can that be voluntarily entered into?

5        A.    Administrative leave?

6        Q.    Yes.

7        A.    Yes. It can be voluntary or involuntary.

8        Q.    Do you know of any other instance where

9    somebody was placed on, involuntarily put on

10   administrative leave?

11       A.    Yes.

12       Q.    When was that or who?

13            MR. WILLIAMS:  Before we just identify

14   who, if you want that information I would like that

15   part of the transcript to be under seal because now

16   we're going to get into a sensitive discipline matter

17   involving another employee.

18            MR. ABER:  Let's go off the record for a

19   second.

20            (Discussion off the record.)

21   BY MR. ABER:

22       Q.    Can you describe the other situation where

23   somebody was involuntarily placed on administrative

24   leave?



A88

Hope Murray                                          56

1    A.    There was, there was an instance where an

2    individual, it had been determined that this person

3    was not accomplishing what it was hoped would be

4    accomplished in the position that she occupied and so

5    given that -- and actually it was someone who reported

6    to me and I had to let her know that her employment

7    with the college was not going to continue under the

8    current situation.

9             MR. ABER:  Let's make this part

10   confidential.  I'm going to have to find out the job,

11   what it was.

12                      -   -   -   -   -

13

14             (Pages 57 through 58, respectively, were

15   deemed confidential by counsel and are contained in

16   the sealed envelope stamped CONFIDENTIAL attached to

17   the back of the transcript.)

18

19                      -   -   -   -   -

20

21

22

23

24

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1    BY MR. ABER:

2       Q.    The position that you're talking about, what

3    was that position?

4       A.    It was the position of the associate vice

5    president for institutional advancement.

6       Q.    Institutional what?

7       A.    Institutional advancement.

8       Q.    And what is their job?

9       A.    This was the job that was to raise funds,

10    private funds college-wide to assist the campuses in

11    their fundraising initiatives, to assist the president

12    in the development of a capital campaign.

13       Q.    And who had complained about that person's job

14    performance?

15       A.    The campus directors had been complaining about

16    her job performance.

17       Q.    This would be all of the campuses?

18       A.    Yes.

19       Q.    And was this the same person that you had

20    mentioned before that Dr. Johnson had complained about

21    as not doing a job well?  You had mentioned the

22    marketing department and you also used the term

23    institutional advancement.

24              Is this that same department?



Hope Murray

58

```
1        A.    That was one of the positions, yes.

2              MR. ABER:  Go back on.

3                        -   -   -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A91**

1   BY MR. ABER:

2       Q.    Any other fact situations that you can

3   describe, suspensions? Let me back up a second before

4   I go on.

5               That person was put on administrative

6   leave for how long?

7       A.    For the 60-day period that we give notice of

8   termination and that person was put on administrative

9   leave for that 60-day period rather than coming to

10  work for those 60 days.

11      Q.    So she knew she was going to be terminated?

12      A.    She knew at that point that she could either be

13  terminated or of course she could voluntarily resign

14  from the position.

15      Q.    Could she have filed a grievance --

16      A.    Which she did.

17      Q.    -- on the termination?

18      A.    Which she did. She voluntarily resigned the

19  position and we put her on administrative leave for

20  the 60 days.

21      Q.    Let me back up for a second.

22              You put her on administrative leave, then

23  she resigned or she resigned and then you put her

24  administrative leave for 60 days?



Hope Murray                    60

1      A.    She resigned effective a certain date.  She

2    resigned in October with an effective date of December

3    and we put her on administrative leave for that 60-day

4    period.

5      Q.    Okay.  So the administrative leave came after

6    the decision was made that she was leaving the school

7    as an employee?

8      A.    Yes.

9      Q.    That's a little bit different than what

10   happened to Dr. Johnson?

11     A.    There are a number of ways that administrative

12   leave is utilized.

13     Q.    Do you know of anybody else that was ever, do

14   you know of any other fact situations where anybody

15   else was put on indefinite administrative leave?

16     A.    There have been instances of administrative

17   leave applied when there were issues that need to be

18   looked into to see if there was a basis for

19   disciplinary action.  So if you are not sure and there

20   needs to be a further investigation so that you're not

21   applying disciplinary action without cause, you can

22   institute administrative leave and find out.

23     Q.    Can you give me an example of anybody else who

24   has been put on indefinite administrative leave?



A93

1    A.    Generally and my recollection is that

2    administrative leaves are indefinite because you don't

3    know how long it will be before you have the facts

4    that you need to make a decision.

5        Q.    Are there other examples of that happening

6    other than Dr. Johnson?

7    A.    I know there have been some in the past and I

8    cannot recall their names, but over the years that I

9    have been to Delaware Tech there have been instances

10   of people placed on administrative leave.

11       Q.    So today other than Dr. Johnson you can think

12   of no specific individual who was ever placed on

13   administrative leave?

14   A.    No.    There was one that was, a more recent one

15   in addition to the institutional advancement one I'm

16   telling you about that had to do with an instance of

17   an employee at the Wilmington Campus in which there

18   had been the appearance that there was some financial

19   improprieties in the business office.    And there

20   needed to be an investigation to determine the extent

21   of that and if, in fact, it was as it appeared to be.

22   So the individual in charge of that department was

23   placed on administrative leave.

24       Q.    Do you know of anybody who has ever been placed



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                    )
                                          )
            Plaintiff,                    )
                                          )   Civil Action
v.                                        )   No. 05-157(KAJ)
                                          )
ORLANDO J. GEORGE, JR.,                   )
in both his official and personal )
capacities, and DELAWARE                  )
TECHNICAL AND COMMUNITY                   )
COLLEGE,                                  )
                                          )
            Defendants.                   )

            Deposition of MARGUERITE A. JOHNSON
taken pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 10:10 a.m., on
Tuesday, February 28, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

ALSO PRESENT:
        BRIAN D. SHIVEY, ESQ., CHIEF LEGAL COUNSEL -
        DELAWARE TECHNICAL & COMMUNITY COLLEGE

            WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477



COPY

A95

1          Do you know what I am referring to when I

2    talk about the IT reorganization?

3    A.    Could you repeat what you just said?  Because I

4    missed the first part of it.

5    Q.    There's been testimony in this case by

6    witnesses, including Peter Shoudy and others, about an

7    IT reorganization that took place within the college.

8          Do you know what I am referring to when I

9    say IT reorganization?

10   A.    Yes.  IT or the DIET?

11   Q.    Yes.

12   A.    Okay.

13   Q.    The reorganization was the subject matter of

14   discussion at the president's council, was it not?

15   A.    Yes, it was.

16   Q.    Members of the president's council, including

17   you, had an opportunity to ask questions about it,

18   raise concerns?

19   A.    Which meeting are you referring to?

20   Q.    During how many meetings was the IT

21   reorganization discussed?

22   A.    Over several meetings because that was an

23   ongoing process for maybe a year or so.

24   Q.    So there are a series of meetings where the IT



Marguerite A. Johnson                    26

1    reorganization is discussed.  Were you present at

2    those meetings?

3        A.    Probably most of them.

4        Q.    During the course of those meetings you had an

5    opportunity to ask questions?

6        A.    Up until a point, yes.

7        Q.    What do you mean when you say, "up until a

8    point"?

9        A.    We did not have the vice presidents or ad hoc,

10   we did not have our last meeting.

11       Q.    What do you mean when you say you did not have

12   your last meeting?

13       A.    Well, we were to have another meeting.  We were

14   waiting for Mr. Simpson to get back to us, to the vice

15   presidents, and then we were told that there would be

16   no more discussion.

17       Q.    The IT reorganization plan was unanimously

18   approved at the October meeting of the president's

19   council.  Isn't that correct?

20       A.    I believe so.  I can't remember.

21       Q.    You attended that meeting, did you not?

22       A.    I think I did, yes.

23       Q.    Wasn't that the last meeting where the IT

24   reorganization plan was discussed?



WILCOX & FETZER LTD.
Registered Professional Reporters

A97

Marguerite A. Johnson                    27

1    A.    I'm not sure.  I'm not sure whether there was

2    anything after that.

3    Q.    Well, if it was approved unanimously by the

4    president's council at the October meeting, what was

5    left to discuss among the president's council once it

6    was approved?

7    A.    Implementation and how we would go about

8    notifying people about it.

9    Q.    Leading up to that October 2004 meeting of the

10   president's council there were several meetings when

11   this topic was discussed and you raised questions, did

12   you not?

13   A.    I raised concerns along with everyone else

14   raised concerns.

15   Q.    The minutes of the October meeting, as I said a

16   few minutes ago, indicate that the IT reorganization

17   plan was unanimously approved at the October meeting.

18   Is that accurate?

19   A.    The minutes are accurate.  However, it was

20   understood and we were told there would be no more

21   discussion.

22   Q.    The president once it was approved indicated

23   that now that the discussion was over and the plan had

24   been unanimously approved he expected the members of



1   the president's council to support the IT

2   reorganization plan.  Did he not?

3       A.    I don't recall his exact words.

4       Q.    What do you recall him saying after it was

5   approved?

6       A.    I really don't remember what he said.

7       Q.    Okay.  Do you remember him saying something?

8       A.    Not necessarily because we had several agenda

9   items, so I really don't remember.  That was a long

10  time ago.

11      Q.    So if Dr. George or others testified that he

12  indicated that he expected the members of the

13  president's council to support it, you wouldn't have a

14  basis upon which to disagree with that testimony?

15      A.    All I can say is that I do not remember any

16  exact words that he said after that.

17      Q.    Do you remember any words generally?

18      A.    I don't remember anything generally that he

19  said about that.

20      Q.    So you just have no recollection at all?

21      A.    I really don't remember.

22      Q.    If the president of the college announced an

23  expectation that members of the president's council

24  would support the IT reorganization plan, would you



Marguerite A. Johnson                    29

1    find that to be a surprising or unusual statement on

2    his part?

3        A.    I would have to know exactly what he said.  I

4    don't think I'm understanding your question.  Or is it

5    a question?

6        Q.    It is a question.

7              You stated that there was a point at which

8    you were told the discussion was over.  Is that

9    correct?

10       A.    Yes.

11       Q.    And is it your testimony that Dan Simpson made

12   you aware of that fact?

13       A.    No.  Dr. George called and said that we would

14   not have the meeting that we were supposed to have

15   with Simpson, that the vice presidents would not have

16   that meeting.

17       Q.    When was that meeting supposed to occur?

18       A.    I don't remember the date.

19       Q.    Before or after the October meeting when the

20   plan was unanimously approved?

21       A.    It was before then.

22       Q.    In addition to the meetings of the president's

23   council, was there also an ad hoc group that met on a

24   regular basis?



A100

1     Q.   Did he say anything like that?

2     A.   I don't really remember.

3     Q.   Does he live in Dover as well?

4     A.   I don't know if he's in Dover or outside of

5    Dover.  I don't know exactly.

6     Q.   Did Neete Evans express a belief that you were

7    guilty of wrongful or improper conduct or other

8    unprofessional or inappropriate conduct?

9     A.   I think she expressed that the inference was

10   there from the article.

11    Q.   The inference that you did something wrongful

12   or illegal?

13    A.   Something similar to that.  I don't remember

14   her exact words.

15    Q.   Who else expressed such a concern?

16    A.   Let's see.  Pat Edwards.

17    Q.   Is she a friend?

18    A.   No.  She's part of the alumni association.

19    Q.   Where did you see her?

20    A.   I ran into her somewhere in the community.  I

21   don't remember where.

22    Q.   Did she tell you that it was her belief that

23   you were guilty of wrongful or improper conduct or

24   other unprofessional or inappropriate conduct?





A101

Marguerite A. Johnson                    41

1     A.    I think she expressed the same concern that,

2     you know, people would think that if they don't know

3     me and know what everything was about.

4     Q.    But she didn't think that?

5     A.    I'm not sure whether she thought that or not.

6     Q.    Did she tell you that she thought that?

7     A.    I don't remember her saying that.

8     Q.    Did anyone say to you "I have a belief that you

9     are guilty of wrongful or improper conduct or other

10    unprofessional or inappropriate conduct"?

11    A.    I don't think they came right out and said

12    those words, but in generalities when people don't

13    know why you've been put on leave then they assume

14    that you have done something.

15    Q.    So you're assuming what they assumed, but they

16    didn't say those words?

17    A.    They said things that would make me believe

18    that they probably thought something had happened, but

19    I can't remember exactly.  I tried not to discuss the

20    case with anyone so I was very careful in any of my

21    responses.

22    Q.    Apart from what you surmise or assume people

23    may have thought, did anyone tell you that they

24    believed that you were guilty of wrongful or improper



A102

1    conduct?

2    A.    I don't believe that anyone came out directly

3    and said those words.  There may have been something

4    similar but not those exact words.

5    Q.    Who said something similar and what did they

6    say?

7    A.    I can't remember exactly.  It's been a long

8    time ago.

9    Q.    So you can't identify anyone who said something

10   similar to "I believe that you engaged in wrongful or

11   improper conduct"?

12   A.    I think most of them said something to the

13   effect that, you know, without knowing exactly what

14   happened, you know, most people would think you don't

15   get put on leave for no reason at all; you had to do

16   something, you know, serious for you to be put on

17   leave, particularly someone at my level.

18   Q.    But they know you so they didn't think that?

19   A.    I don't know exactly what they thought, you

20   know.  I know I didn't discuss the case at length with

21   them.

22   Q.    Did you discuss the case at all with them?

23   A.    No, other than to say that, you know, I really

24   can't say why.  You know, whatever they have in the



1   paper, you know, that's the only thing that I can

2   refer to.

3       Q.    Paragraph 40 on the next page, I direct your

4   attention to that.

5       A.    (Reviewing document).

6       Q.    The allegation that on March 23rd, 2005 the

7   defendant, which I assume refers to the college,

8   caused to be provided to all Delaware Tech employees

9   an announcement that an investigation was to be

10  conducted concerning the plaintiff, what is the basis

11  for the statement that such an announcement was

12  provided to all Delaware Tech employees?

13      A.    I'm trying to remember.  I think it may have

14  been announced in meetings.

15      Q.    On March 23rd, 2005?

16      A.    The date I really, without looking at the

17  calendar, I really don't remember the date.

18      Q.    But you said meetings.  What meetings do you

19  have in mind?

20      A.    I think the administrative council, department

21  chair meetings.

22      Q.    What is the source of your information that

23  such an announcement was made in a meeting?

24      A.    Well, any time there's something that occurs at



Marguerite A. Johnson                    44

1    the college, there's a meeting to let people know.

2        Q.    Did someone report to you concerning an

3    announcement that was made in a meeting?

4        A.    I don't really remember.  I don't know whether

5    that came from -- I really don't recollect at this

6    point.

7        Q.    Do you know if it happened?

8        A.    I believe so.  I'm not sure.  I would assume

9    so.

10       Q.    But you can't tell me what the basis for your

11   belief is?

12       A.    I can't remember.

13       Q.    Now, is it your testimony that what's referred

14   to in paragraph 40 is a verbal announcement at a

15   meeting as opposed to a document provided to

16   employees?

17             MR. ABER:  Objection.

18       A.    Well, I didn't see any documents.  I don't

19   believe I remember seeing any documents, other than I

20   was placed on leave.

21       Q.    So is the answer to my question that it's your

22   allegation and belief that there was an announcement

23   made at a meeting?

24       A.    To the best of my recollection.



Marguerite A. Johnson                45

1    Q.    And that was a meeting involving all Delaware

2  Tech employees?

3    A.    I'm not sure.

4    Q.    When is the last time there was a meeting of

5  every Delaware Tech employee?

6    A.    I believe when they announced that Mr. Simpson

7  had a meeting, according to what I heard in testimony

8  that he had a meeting with all of the staff.

9    Q.    You're talking about all of the Terry Campus

10  staff?

11    A.    Yes.

12    Q.    Is that what this refers to, all of the Terry

13  Campus staff, or all Delaware Tech employees?

14    A.    Well, all Delaware Tech employees is probably

15  the announcement.  I'm not sure.

16    Q.    You don't know?

17    A.    No.  I don't remember.

18         MR. ABER:  Objection.

19    Q.    In paragraph 41 there's an allegation that

20  there was a coerced interrogation of all Delaware Tech

21  employees at the Terry Campus to elicit damaging

22  information concerning you and in order to orchestrate

23  your termination.

24         Do you see that?



Marguerite A. Johnson                47

1    been someone else that told me.  I can't recall.

2       Q.    And that's not something that you're likely to

3    remember?

4       A.    I really can't say.  I mean, I really don't

5    remember.

6       Q.    Paragraph 66 of the complaint, if you will turn

7    to that, as I understand it there's an allegation that

8    the action of placing you on a paid administrative

9    leave constituted disciplinary action.

10                Do I understand that allegation correctly?

11      A.    I believe so.

12      Q.    When you were placed on administrative leave,

13   you received full salary for the period of time you

14   were on administrative leave, did you not?

15      A.    Yes, I did.

16      Q.    And that extended until sometime in July of

17   2005 following the decision of the hearing officer

18   following the pre-termination hearing?

19      A.    I believe so.

20      Q.    And during that time you received full benefits

21   as well?

22      A.    I think so, yes.

23      Q.    Was there a written reprimand issued to you at

24   the time you were placed on paid administrative leave?



Marguerite A. Johnson                48

1      A.    I received a memo from Dr. George indicating

2    that I was to take all my personal effects and leave

3    the campus.  And I also remember him telling me that I

4    could not talk to anyone or be on the campus.

5      Q.    Actually, I don't need to have that marked.

6    I'm going to hand you a document that's been

7    previously marked as Deposition Exhibit 4 and I

8    believe this was marked at the deposition of

9    Dr. George.

10            It's a January 3, 2005 memorandum to you

11    from Dr. George.  Is that the memo you were just

12    referring to?

13      A.    Yes.  And the conversation I had with him.

14      Q.    Is this document what you are identifying as a

15    written reprimand?

16      A.    It doesn't say reprimand.  I'm saying this is

17    the information he gave me and then based on the way

18    he talked to me in that meeting, I knew it was not

19    friendly.

20      Q.    Is it correct to say then that there was no

21    written reprimand issued to you in January 2005?

22      A.    There was no document written that said

23    reprimand.

24      Q.    And you were not suspended without pay at any



Marguerite A. Johnson                          56

1    A.    No, they did not.  I was told that all of that

2    was confidential and shouldn't be shared with anyone.

3    Q.    Is that why you didn't send it to them?

4    A.    I would not have sent it, you know, if it's

5    marked as confidential.

6    Q.    Was it your understanding that it was marked as

7    confidential to protect your privacy right?

8    A.    That was my understanding.  I believe you sent

9    something to that effect.

10   Q.    But you felt free to offer your version of the

11   events?

12            MR. ABER:  Objection.

13   A.    Am I supposed to answer that?

14            MR. ABER:  Yes.

15   Q.    Yes.

16            MR. ABER:  You can ignore me when I say

17   that, unless I tell you not to answer.

18            THE WITNESS:  Okay.

19   A.    I didn't give them a version.  I told them the

20   truth.

21   Q.    The truth as you see it?

22   A.    I told them the truth.

23   Q.    I want to ask you to turn to paragraph 9.

24            Dr. Johnson, I want to focus you on the

Marguerite A. Johnson                    57

1    statement on -- the pages aren't numbered, but at the

2    top of the page after the paragraph 9 question, the

3    language in bold, "The following are the precise

4    questions that were asked by Dr. Johnson."

5                Do you see that?

6    A.    Yes, I do.

7    Q.    Is that your best recollection of the questions

8    that you asked at the November 19th, 2004 meeting of

9    the department chairs?

10   A.    Yes, it is, to the best of my recollection.

11   Q.    Are those the only two questions that you

12   asked?

13   A.    To my recollection, that's the only two

14   questions I asked.

15   Q.    Do you have notes that would help assist you in

16   determining which questions you asked at that meeting?

17   A.    No.   I didn't take any notes.

18   Q.    Apart from these two questions, did you say

19   anything else during the course of the November 19,

20   2004 meeting?

21   A.    To the best of my knowledge, I don't remember

22   anything else.

23   Q.    Dr. Johnson, in paragraph 10 -- you talked

24   about this a few minutes ago.   This is the question I



1   asked you about the supplemental complaint which

2   refers to members of the public who expressed concern

3   when you were placed on leave.

4            Do you remember that testimony?

5   A.    I remember, yes.

6   Q.    And you identified Neete Evans.  I think you

7   identified a couple of these other individuals.  I

8   don't remember you mentioning Dan King.

9            Who is Dan King?

10  A.    He's someone that used to work at the college.

11  Q.    Did he express a belief that you engaged in

12  improper or wrongful conduct?

13  A.    I think he expressed similar to what the others

14  did, that -- I believe someone may have called him and

15  he really didn't know what happened, but the concern

16  was that it must have been something really bad to be

17  on leave.

18  Q.    Does seeing this list of names refresh your

19  recollection?

20  A.    Yes.

21  Q.    And it would continue to be fair to say that

22  none of these individuals expressed to you a belief on

23  their part that you engaged in some kind of improper,

24  wrongful or unprofessional conduct?



1              MR. ABER:  Objection.

2     A.   As I said, I can't remember exactly what they

3     said or what their belief was.  I just don't remember

4     it's been so long ago.

5     Q.   So at this point you don't know what they

6     believed and you don't know what they expressed as to

7     their belief?

8     A.   I can't remember.

9              MR. WILLIAMS:  Why don't we take a break

10    for a few minutes?

11              (A brief recess was taken.)

12    BY MR. WILLIAMS:

13    Q.   Dr. Johnson, I want to circle back for just a

14    minute to plaintiff's response to defendants' first

15    request for production of documents that's been marked

16    for identification as Johnson Exhibit No. 7.  I don't

17    know if you have it still in front of you.

18    A.   This (indicating)?

19    Q.   Do you have No. 7?

20    A.   I think this is No. 7.

21    Q.   All right.  I notice that among the materials

22    that you list here that you removed from your office

23    on January 3rd is development council notebook.

24    A.   Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    appreciate it.

2            THE WITNESS:  Well, it was put here so I

3    assumed I was supposed to do it.

4            MR. ABER:  Off the record for a second.

5            (Discussion off the record.)

6    BY MR. WILLIAMS:

7    Q.    Dr. Johnson, if I can retrieve those from you.

8    I will hand them to you one at a time.  I don't want

9    to try to confuse you here.

10           The first one is marked as Johnson 14.

11   It's a November 26th, 2002 letter from Dr. George.

12   A.    (Reviewing document).

13   Q.    Do you recognize the document?  Have you seen

14   it before?

15   A.    Yes, I do recognize it.

16   Q.    Is it a letter, a copy of a letter that you

17   received from Dr. George?

18   A.    Yes, it is.

19   Q.    The third paragraph of the letter says, "On

20   several occasions, I met with you to discuss anecdotal

21   reports that you engaged in conduct typically

22   involving shouting at and publicly berating staff.

23   The manner in which you interact with peers is also a

24   concern.  Such behavior will not be tolerated."



1           Is it accurate that prior to November

2    26th, 2002 Dr. George had met with you to discuss such

3    reports?

4    A.    Again, this goes back to the anonymous.  There

5    were never any names attached to any of these

6    anecdotal reports.

7    Q.    Is it an accurate statement though to say that

8    he met with you to discuss anecdotal reports that you

9    engaged in such conduct several times prior to

10   November 26th?

11   A.    I wouldn't say several.  What do you define as

12   several?

13   Q.    What would you define as several?

14   A.    I don't know.  I didn't write it.  So, you

15   know, that's a discussion that I had with him.

16   Q.    Did you ask him that question?

17   A.    Yes, I did.

18   Q.    What was his response?

19   A.    His response was "I don't remember who told me.

20   You know, I'm not going to get into that."  So he

21   never would answer the question.

22   Q.    As to what several means?

23   A.    Right.

24   Q.    Did you or did you not meet with him?  How many



Marguerite A. Johnson                    82

1     knowledge.  Maybe less than five.

2       Q.    I want to hand you a document that's marked as

3     Johnson Exhibit 18.

4                    MR. ABER:  This is 15.

5                    MR. WILLIAMS:  This is 18.

6                    MR. ABER:  We're out of sync?

7                    MR. WILLIAMS:  Yes.  I handed them to Kurt

8     out of sync.  They're out of chronology.

9     BY MR. WILLIAMS:

10      Q.    Is this a copy of your response to Dr. George's

11    November 26th, 2002 letter?

12      A.    Yes, it is.

13      Q.    I'm handing you a document that's been marked

14    as Johnson 19.  It's a December 4, 2002 letter from

15    Dr. George and ask if you can identify that document.

16      A.    (Reviewing document).

17      Q.    Did you receive this letter on or about

18    December 4, 2002?

19      A.    Yes.

20      Q.    Is it accurate that you met with Dr. George on

21    December 3, 2002?

22      A.    I assume that's the date.

23      Q.    Dr. George in the first sentence says, "I am

24    pleased that you have chosen to accept my offer to



Marguerite A. Johnson                83

1    take all reasonable steps aimed at helping you modify

2    your behavior."

3              Is that accurate, that you did accept his

4    offer?

5         A.    No.    That was not my response to him.    I never

6    said that my behavior needed modifying.    I agreed to

7    do what he directed me to do.

8         Q.    Did you respond to this letter?

9         A.    I'm not sure whether I did.    I had a verbal

10   discussion with him, but I probably sent my plan how I

11   was going to address it.

12        Q.    How you were going to address what?

13        A.    Whatever he thought.    You know, I have to go

14   back to the conversation and the other letter that I

15   sent him.    I don't remember verbatim, but I know after

16   speaking with my attorney I did what he asked me to

17   do.

18        Q.    And that was to submit a plan to modify your

19   behavior?

20        A.    Just to submit a plan, not necessarily to

21   modify my behavior.    I don't think I said that in my

22   response to him.

23        Q.    You didn't think there was anything about your

24   behavior that needed to be modified?



A116

1    A.    I didn't think so.  I mean other than I speak

2    loudly.  If people don't agree with me, they get

3    upset.  But beyond that...

4          I mean, you can't really defend yourself

5    when you don't know who's making the allegations.

6    Q.    What steps did you agree to take?

7    A.    I spoke with my attorney and he knew Dr. George

8    and knew how sometimes he overreacts, the kind of

9    personality he has.  So he suggested that I contact

10   this group Respect because they work with companies

11   and I thought not only would it be good for me but

12   good for all of the administrators because we all have

13   different communication styles.

14   Q.    So it was your view that the problem was

15   Dr. George's overreaction?

16   A.    When you don't supply names, you cannot defend

17   yourself against anything that's anonymous and that

18   was my concern.  I don't have a problem addressing an

19   issue if I know who has made that allegation.  You

20   know, can we sit, can we discuss it?

21          But I find it very difficult to try to

22   defend yourself against anonymous anything.

23   Q.    Well, you made a statement that you explained

24   how he overreacts.  Are you referring to Dr. George?



Marguerite A. Johnson                89

1      Q.    It was at that December 3rd meeting that you

2   agreed to take steps?

3      A.    No.  I took the information back and I told him

4   I would be responding to him.

5      Q.    If you refer back to Johnson Exhibit 19, which

6   is the December 4, 2002 letter from Dr. George to you.

7   Do you have that in front of you?

8      A.    Yes, I have it in front of me.

9      Q.    The first sentence of that letter says, "As a

10   follow up to our December 3, 2002 meeting, I am

11   pleased that you have chosen to accept my offer to

12   take all reasonable steps aimed at helping you modify

13   your behavior."

14          When you received this letter did you

15   understand that to be a reflection of Dr. George's

16   understanding of what you agreed to do during the

17   December 3, 2002 meeting?

18      A.    I just accepted it that I was going to go back

19   and look at options and I would get back to him.  I

20   never indicated to him that I thought my behavior

21   needed to be modified.

22      Q.    What options did you look at?

23      A.    I looked at whether or not I wanted to respond

24   to him.  I called my attorney and talked to my husband



A118

1    to see if I really wanted to go forward and perhaps

2    this time bring a grievance.

3             And after speaking with my attorney, then

4    I decided on the action that I took.

5    Q.    Which was what?

6    A.    Which was to contact a group called Respect and

7    get information on possible courses that I could take

8    or workshops.

9    Q.    What did you tell Respect when you contacted it

10   to inquire about courses or workshops?  What kind of

11   workshops or courses did you inquire about?

12   A.    I told them exactly that my attorney had

13   recommended me to call them, that my supervisor

14   thought that I had a problem and wanted me to attend

15   some type of training and could you send me

16   information?

17   Q.    What kind of training did you tell them you

18   were interested in?

19   A.    Training that would address behavior, address

20   communication styles, lots of different areas.  I

21   don't remember everything.

22   Q.    I don't want you to tell me what you discussed

23   with your attorney.  But who was your attorney at that

24   time?



WILCOX & FETZER LTD.
Registered Professional Reporters

A119

1    A.    Robert Stewart.

2    Q.    I'm going to hand you a December 11, 2002

3    letter which has been marked as Johnson 15 and ask if

4    that's a letter that you wrote to Dr. George dated

5    December 11, 2002?

6    A.    (Reviewing document).

7    Q.    Is that the letter that you wrote?

8    A.    Yes, it is.

9    Q.    And the first numbered paragraph talks about

10   services in the area of behavioral change?

11   A.    The first sentence on my sheet says, "I have

12   researched organizations that provide professional

13   development and organizational change for executives."

14        Is that the same one you have?

15   Q.    Well, the third sentence then talks about or

16   uses the phrase "Behavioral Change."

17   A.    "Particularly in the areas listed in their Core

18   Services in Behavioral Change and the individual

19   coaching."

20        MR. ABER:    Behavioral Change, Core

21   Services in Behavioral Change is capitalized.

22   A.    Do you see that?

23   Q.    Yes.    It was Dr. George's view that that's the

24   kind of assistance that you needed and would be

