Marguerite A. Johnson                          93

1    way others should treat you?

2        A.    Well, everyone should treat each other.    I

3    don't think the pendulum should swing one way and not

4    both ways.    It should be equal.    Everyone should have

5    that opportunity to be treated that way.

6        Q.    Doesn't this numbered paragraph 2 talk about

7    what you're going to do?

8        A.    No.    What this talks about is that I will --

9    let's read what it says:    "I will continue to

10   demonstrate the leadership and set the same high

11   performance standards as always, being mindful of each

12   of the Delaware Technical & Community College

13   Characteristics of Excellence, including We will treat

14   people with respect, dignity and fairness and, 2, In

15   all of our communications and decisions we will be

16   open, honest, and exhibit the highest standards of

17   integrity.    I will be open to the recommended

18   suggestions in communication styles made by the above

19   organization in keeping with the College and Terry

20   Campus cultures."

21       Q.    So you're talking about what we will do, that

22   includes you?

23       A.    It includes me and everyone else I would hope.

24       Q.    I'm going to hand you a document that's been



A121

1    marked as Johnson 16.  It's a December 17, 2002 letter

2    to you from Dr. George.

3              MR. ABER:  Have these all been previously

4    produced by you?

5              MR. WILLIAMS:  I believe so.  I don't

6    know.

7              MR. ABER:  It's not Bates stamped.

8              THE WITNESS:  No.

9    BY MR. WILLIAMS:

10   Q.   Is this a letter that you got from Dr. George?

11   A.   I don't remember seeing this.  I remember

12   having a conversation with him on the phone, but I

13   don't recall seeing this.

14   Q.   You don't deny receiving it?  You just don't

15   have a recollection of it?

16   A.   I don't remember.  I remember having a

17   conversation with him about these items.

18   Q.   Maybe this will help.  I will hand you a

19   document that's been marked for identification as

20   No. 17.

21   A.   (Reviewing document).

22   Q.   The first sentence of that letter refers to

23   Dr. George's December 17th, 2002 letter which is a

24   document that I just showed you that you said you



Marguerite A. Johnson                95

1    don't recall receiving.

2              Does this refresh your recollection as to

3    whether you received it?

4    A.    Yes, it does.  As I said, the information

5    looked familiar, but I don't remember receiving it

6    because I know we also had a telephone conversation

7    about this.

8    Q.    I'm handing you a document that's been marked

9    as Johnson Exhibit 20 that's also dated December 17,

10   2002.  It's a memo from Dr. George to you.

11   A.    (Reviewing document).

12   Q.    Do you recall receiving this document?

13   A.    Yes, I do.

14   Q.    What is Telamon Corporation?

15   A.    Head Start.

16   Q.    The third paragraph of the memo indicates that

17   Esther Graham of the Telamon Corporation reported to

18   Dr. George that you stated that Telamon would never

19   have Delaware Tech's support again, and that she would

20   be hearing from your attorneys.

21              Do you see that?

22   A.    I see that.

23   Q.    This issue that you had with Esther Graham

24   related to your sister?



Marguerite A. Johnson                    96

1    A.    Yes, it did.

2    Q.    And did you, in fact, tell her that as a result

3    of your dissatisfaction Telamon would never have

4    Delaware Tech's support again?

5    A.    No, I did not.

6    Q.    So that's a fabrication on her part?

7    A.    Yes, it is.

8    Q.    It would be inappropriate to say such a thing,

9    would you agree, as an administrator of the college?

10    A.    It would be inappropriate.  That's why I would

11    never say anything like that.

12    Q.    Now let me hand you what's been marked as

13    Johnson Exhibit 21, which is a January 23, 2003 letter

14    from Dr. George.

15            MR. ABER:  Dave, you say these documents

16    have already been produced.  Are you saying --

17            MR. WILLIAMS:  No.  I'm saying I don't

18    know that they have been.  I don't think you have ever

19    asked for them.  And they weren't responsive to any of

20    the other requests that you had related to the

21    pre-termination hearing.  I don't think they're

22    relevant to the pre-termination hearing.

23            MR. ABER:  I think I have asked for these

24    type of documents.



1          MR. WILLIAMS:  If you point out to me

2    where you have done that, I will stand corrected.

3    BY MR. WILLIAMS:

4        Q.   Is this a letter that you received from

5    Dr. George on or about January 23rd, 2003?

6        A.   I believe so.

7        Q.   In the second paragraph he refers to a

8    discussion the two of you had about the matter.  I

9    assume you had such a discussion?

10       A.   Yes, we did.

11       Q.   He says that "while denying you called

12   Ms. Graham, quote, low down, close quote, or

13   threatened anything with respect to Delaware Tech, you

14   conceded you were loud and may have been perceived as

15   rude."

16       A.   To the best of my knowledge.  Since she called

17   me at home, I was disturbed, first of all, that she

18   called me at home.

19       Q.   Did you, in fact, concede to Dr. George that

20   you were loud and may have been perceived as rude?

21       A.   Well, I'm always perceived as loud.  I have a

22   loud voice whether I'm happy, whether I'm upset.  I

23   just speak loudly.  I mean, that's me.

24       Q.   Is the statement an accurate statement?



Marguerite A. Johnson                    98

1    A.    The statement is accurate in the sense that I

2  may have been loud and she may have perceived that as

3  being rude because the tone of my voice is always

4  loud.

5    Q.    Well, I won't quibble with you over the grammar

6  of the sentence.

7          But aren't there two things that are

8  referred to, one being loud and the other being rude?

9    A.    Well, what my document says --

10          MR. ABER:   Objection.

11          THE WITNESS:   I can still answer, right?

12          MR. ABER:   Yes.

13    A.    It says, "you conceded you were loud and may

14  have been perceived as rude."  That's what mine says.

15    Q.    Okay.  He goes on in that paragraph to remind

16  you that you are always a vice president and campus

17  director and that your behavior in your personal

18  capacity reflects on the college.

19          Do you agree with that statement?

20    A.    Yes.  And I said something similar back to him

21  that also applied to him and all the other

22  administrators also.

23    Q.    Marked as Johnson 22 is a letter dated December

24  8, 2004.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    pages that he sent me with all the other copies.

2    Q.    Now, there's some discussion about the IT

3    reorganization.

4            Did you and the other vice presidents ever

5    vote to give a final approval to the IT

6    reorganization?

7    A.    No, we did not vote.

8    Q.    Would you normally have voted for something

9    like this as part of your president's council

10   function?

11   A.    Sometimes we would vote.  Sometimes Dr. George

12   would just say this is the way it's going to be.

13   Q.    Well, Mr. Williams in his question referred to

14   the October minutes to say there was a unanimous

15   approval of the reorganization.  If you didn't vote on

16   it, how could it be unanimous?

17   A.    Because Dr. George said it was unanimous.

18   Q.    Did anybody, did he ask anybody if they had any

19   objections?

20   A.    No.  You knew not to have any objections.  Once

21   he makes a decision, you don't go against that

22   decision.

23           MR. ABER:  I have no further questions.

24





**DELAWARE TECH**

*Dover♦Georgetown♦Stanton♦Wilmington*

Orlando J. George, Jr., President

November 26, 2002

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904

Dear Peg:

Attached is a copy of a disturbing letter directed to Trustee Craig Eliassen. At this point, I do not know whether the enclosed letter accurately reports what occurred on November 11, 2002. I am, however, deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior.

The purpose of this letter is to present you with the option of acknowledging that your behavior is all too frequently out of control, and accept my offer to take all reasonable steps aimed at helping you modify such behavior. If you reject this preferred option, the College will retain outside counsel to conduct a thorough investigation of the alleged November 11 incident, anecdotal reports of similar incidents in recent history, and any future incidents of a similar nature. If you force me to move in this direction, I am determined to get to the bottom of all such incidents. If the investigation verifies unacceptable behavior on your part, such behavior will be documented, and, if appropriate, discipline will be imposed.

On several occasions, I met with you to discuss anecdotal reports that you engaged in conduct typically involving shouting at and publicly berating staff. The manner in which you interact with peers is also a concern. Such behavior will not be tolerated. My efforts to offer assistance bog down in denials the behavior occurred, or efforts to explain why your conduct was justified. In all events, I cannot continue attempting to assist you unless you acknowledge there is a problem, and sincerely commit to work with me on a solution. If you reject this final offer to help, I will promptly and aggressively discharge my obligation to find the facts, and, if appropriate, take action.

In closing, you are about to leave on a five day break from work. Please carefully consider your options. I would like to see you on Tuesday, December 3 at 10:30 a.m. in my office. At that time, please be prepared to tell me how you wish to proceed.

Sincerely,


Orlando J. George, Jr.
President
Delaware Technical & Community College

OJGJr.
Attachment

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*



DEPOSITION
EXHIBIT 14
Johnson
R-28-06 KF

A128

Mr. Craig Eliassen
Board Member
Delaware Technical & Community College

Dear Mr. Eliassen,

I am an employee at the Terry Campus. Last Monday, November 11, Terry Campus hosted a craft fair with numerous vendors presenting their work in the front lobby and cafeteria area. The first day of registration was also happening with many students and craft show attendees in this area.

Dr. Johnson came into the lobby and upon seeing the crowd, began to rant and shout that the craft show had to closed down and that all vendors were to leave her campus. It was an embarrassing episode for everyone there, including her staff. At one point, she said 'You can sue me, my name is Dr. Marguerite Johnson, spelled J O H N S O N.' Her behavior in front of so many was totally unprofessional and disrespectful.

The rumor going around now is that the Public Relations people are trying to get spin control on this so as Dr. George will not hear about it. I think Dr. George should hear about this and do something about it. Protecting this type of behavior is detrimental to the college as well as the community.

If our Board chooses to ignore this type of public display of anger, then what will happen next? I apologize for not revealing my name, but I need my job and fear for retaliation should she find out this letter was written.

A concerned DelTech employee.

**A129**

# DELAWARE TECH ◆

*Marguerite M. Johnson, Vice President/Campus Director*          ◆ *Dover* ◆ *Georgetown* ◆ *Stanton* ◆ *Wilmington*

December 11, 2002

Orlando J. George, Jr.
President
Delaware Technical & Community College
Office of the President
Dover, Delaware 19904

Dear Dr. George:

In response to your letter of December 4, 2002, the following outlines (1) the steps I plan to take and the timelines for accomplishment, (2) what you can expect from me and (3) what I need from you to implement the plan.

1. I have researched organizations that provide professional development and organizational change for executives. As you can see from the attached materials, Respect, Incorporated has experience working with top-level organizations. Upon receipt of your approval, I will initiate contact with them and arrange for a meeting and services, particularly in the areas listed in their Core Services in Behavioral Change and the individual coaching.

2. I will continue to demonstrate the leadership and set the same high performance standards as always, being mindful of each of the *Delaware Technical & Community College Characteristics of Excellence*, including (1) We will treat people with respect, dignity and fairness and (2) In all of our communications and decisions we will be open, honest, and exhibit the highest standards of integrity. I will be open to the recommended suggestions in communication styles made by the above organization in keeping with the College and Terry Campus cultures.

3. I believe you will agree that Respect, Incorporated is results-oriented organization that can greatly benefit me and the College. Therefore, I request that you approve the funding and support needed to enter into a contractual relationship with this company. Their fee schedule indicates a cost of $250 per hour, with a recommended three ½-day sessions to begin with ($3,000 total). Please let me know of your decision so I can make the initial contact with them.

I trust you will find that is is an agreeable path forward.

Sincerely,

Marguerite M. Johnson
Vice President and Campus Director

*Delaware Technical & Community College*
**Terry Campus**
1832 N. DuPont Parkway, Dover, DE 19901
Phone: 741-2901 Fax: 741-2713 E-mail: mjohnson@outland.dtcc.edu
Equal Opportunity/Affirmative Action Institution



DEPOSITION
EXHIBIT
Dhnson 15

**A130**

## Respect, Incorporated

### Fee structure

Consulting and facilitating workshops  -  $2,000 per day per consultant.

Coaching  -  $250/hr., $500 minimum.  Typical coaching process begins with a series of three, ½ day sessions (4 hours), followed by shorter sessions.   Materials included.



# Respect inc.

*Solving the people puzzle
in organizations*

### Management Systems
- Employee recruitment and hiring
- Employee policies and procedures
- Employee recognition and performance appraisal systems

### Education and Interventions
- Based on organization's goals
- Customized
- Experiential and instrumented
- Based on respect for people and a belief that their treatment directly impacts organizational effectiveness

### Educational Program Design
- Customized process development
- Leader's guides
- Internal facilitator training

### Specialized Workshops
- Search Conferences for strategic business planning
- Participative Democracy Workshops for more effective teamwork through organizational structural change

### Inscape Publishing Profiles and Workshops
### (formerly Carlson Learning Company)
We are pleased to offer resources for learning, leading and performing in today's team-oriented, diverse and information-driven workplace:
- DiSC Personal Profile System
- Dimensions of Leadership
- Discovering Diversity
- Innovate with C.A.R.E.
- Adventures in Attitudes
- Time Mastery
- Personal Listening
- Coping and Stress

Respect, Incorporated is certified as a Disadvantaged Business Enterprise,
**Certification # C-415-08-13-2003**

3706 Old Capitol Trail, Wilmington, DE 19808 ☎ 302.892.9095 ☐ 302.892.9096    www.respectinc.com
email: respect@respectinc.com

**A132**



# Respect inc.

*Solving the people puzzle*
*in organizations*

## CONFLICT RESOLUTION

- **Client Puzzle:** Members in a family business were trying to cope with work and personal issues that were disruptive to their group effectiveness and financial success.
- **Respect Inc. Solution:** Created and conducted a series of one-on-one and joint interventions with three objectives: reduce daily conflict, clarify roles and accountabilities and increase individual performance levels. Family chose to limit implementation due to effect on relationships.

## TEAM BUILDING

- **Client Puzzle:** Initial diversity training at consumer products manufacturer revealed major issues in management-employee communication and interpersonal conflict.
- **Respect Inc. Solution:** Helped senior leadership identify "success behaviors" for their organization. Then designed and conducted a series of team-building sessions to implement behaviors, improve communications and appreciate the diversity of operations employees. Goal was to help entire supervisory team become more effective in dealing with each other and with subordinates.

## SEXUAL HARASSMENT

- **Client Puzzle:** Menninger Foundation requested help with training more than 600 US Army chaplains in the US and Germany about all aspects of sexual harassment.
- **Respect Inc. Solution:** Served as consultants on a team that included psychologists, therapists, and lawyers. Addressed causes, theoretical approaches to improvement, gender socialization, profiling of harassers, therapeutic treatment, and other topics related to reducing the frequency of sexual harassment and dealing effectively with everyone involved in an incident.

## ONE-ON-ONE COACHING

- **Client Puzzle:** Senior vice president of large, privately-held market leader needed assistance with domineering behavioral style as well as his involvement in two sexual harassment complaints, one with racial overtones.
- **Respect Inc. Solution:** Coached VP to gain insight into his behavioral motivation and the impact he has on others. As a result, the individual was able to determine his unhappiness and frustration with aspects of managing. He ultimately quit his job and returned to work he really liked.

3706 Old Capitol Trail, Wilmington, DE 19808   ☎ 302.892.9095   ✆ 302.892.9096       www.respectinc.com
email: respect@respectinc.com

**A133**



# Respect inc.

*Solving the people puzzle
in organizations*

## SNAPSHOTS OF SUCCESSFUL PUZZLE-SOLVING

### DIVERSITY

- **Client Puzzle:** Governor ordered major department of state government to conduct diversity training.
- **Respect Inc. Solution:** Designed and implemented three types of workshops: one for top administrators, one for all managers and supervisors, and one for all employees. Workshops share a common theme and focus, while remaining specific to needs of each audience. Based on the success of their approach, Respect was asked to provide management development workshops.

### DIVERSITY

- **Client Puzzle:** Local leaders of international religious group needed to implement their initiative to end racism and help churches be more inclusive.
- **Respect Inc. Solution:** Developed a process to train facilitators to act as diversity resources within their congregations. Its success led to a follow-up initiative to educate clergy and lay leaders, as well as facilitator training in other locales.

### AFFIRMATIVE ACTION/EEO

- **Client Puzzle:** University needed help managing the complex legal requirements of Affirmative Action/Equal Employment Opportunity.
- **Respect Inc. Solution:** Wrote Affirmative Action/EEO plans and designed related training for supervisors and managers.

### LEADERSHIP DEVELOPMENT

- **Client Puzzle:** Two leaders in a technical facility had very different personalities and diametrically opposed perceptions of their management roles. Their conflict hampered subordinate relationships and achievement of business goals.
- **Respect Inc. Solution:** In individual and group sessions, coached each leader in behavior style technology. This technology enabled them to reduce their conflict, focus on joint goals and guide their subordinates more effectively and creatively.

3706 Old Capitol Trail, Wilmington, DE 19808  ☎ 302.892.9095  📠 302.892.9096    www.respectinc.com
email: respect@respectinc.com

**A134**



# Respect inc.

*Solving the people puzzle*
*in organizations*

## EMPLOYEE DEVELOPMENT AND QUALITY OF WORKLIFE

- **Client Puzzle:** Fortune 500 company realized that several important issues had surfaced during Respect Inc.'s diversity training for employees, issues that should be addressed to improve the quality of their workplace.
- **Respect Inc. Puzzle:** Used learning profiles to help each employee uncover his or her preferred listening style and skills for managing stress. This insight helped employees effectively manage their way through a significant merger and related culture change.

## SEXUAL HARASSMENT

- **Client Puzzle:** Fortune 500 Company was under a court-ordered decree to conduct sexual harassment prevention training for an entire organization. Management needed an approach that would go above and beyond legal requirements, and be relevant in manufacturing, office, field sales, and laboratory settings. Complicating factors: Unionized plant sites and limited funding.
- **Respect Inc. Solution:** Developed an approach tied to strategic corporate value of respect for people. Created a curriculum with modules that addressed needs of specific audiences. A unique feature was a team, including bargaining unit employees, trained to address future complaints and ensure long-term compliance with corporate policy.

## SEXUAL HARASSMENT

- **Client Puzzle:** Division manager of higher education organization was accused of sexual harassment of a subordinate. Experienced, unbiased, and non-legal consultants were needed to conduct a confidential investigation and recommend actions to address the problem and protect the organization's reputation.
- **Respect Inc. Solution:** Plan and implement the investigation, and recommend a course of action that meets the organization's immediate and future goals.

**A135**

 **Respect** inc.

*Solving the people puzzle*
*in organizations*

## CLIENTS

This is a partial list of the clients we have served since our founding in the
early months of 1992.

| | |
|---|---|
| AT&T | Multiple US Locations |
| E. I. Du Pont de Nemours & Co., Inc. | Multiple Locations |
| AstraZeneca Pharmaceuticals, LP | Wilmington & Newark, DE |
| Blue Cross Blue Shield of Delaware | Wilmington, DE |
| Hercules, Inc. | Wilmington, DE |
| Dade Behring | Newark, DE |
| Delaware Department of Transportation | Dover, DE |
| Delaware Office of Information Services | Dover, DE |
| Wilmington Parking Authority | Wilmington, DE |
| Drexel University | Philadelphia, PA |
| Lucent Technologies | Parsippany, NJ |
| Joseph E. Seagram & Sons, Inc. | Multiple Locations |
| Tyco Healthcare | King of Prussia, PA |
| Protein Technologies International | St. Louis, MO, Louisville, KY |
| AVECIA | Mt. Pleasant, TN |
| Mead Paper Co., Coated Board Division | Phenix City, AL |
| North American Mortgage Co. | Minneapolis, MN |
| New Castle Presbytery | Wilmington, DE |

3706 Old Capitol Trail, Wilmington, DE 19808    ☎ 302.892.9095    ✆ 302.892.9096    www.respectinc.com    email: respect@respectinc.com

 **Respect** inc.

*Solving the people puzzle*
*in organizations*

## We're proud of the following comments from our clients:

"People are demonstrating internalization of classroom learnings by exhibiting positive new behaviors on the job. Generally, people are behaving more respectfully toward one another during the course of daily business interactions."

"The personal sincere commitment that each of you made to helping us achieve our project goal and objectives is unique to me in my previous dealings with consultants."

The House of Seagram

"We feel you have done an excellent job in capturing the 'mood' of Zeneca Engineering towards Diversity."

AstraZeneca Inc.

"I sincerely enjoyed the training you provided to me and my fellow managers. I have attended many training sessions and workshops in the past years, and very few have provided either the quality or the personalized approach I received in your presentations. "Leadership for the Millennium Workshop - Are Your Management Skills Y2K Ready?" is at the top of my list for worthwhile seminars.

DE Department of Transportation

"This session provided employees with a different perspective of the work-place environment of the Nineties. We were extremely pleased with the involvement of everyone throughout this interactive seminar and that interaction was the result of having you both as facilitators."

Rockland Technologies, Inc.
(Hewlett-Packard)

"The Work Group Against Racism of New Castle Presbytery wishes to thank you for your outstanding work of planning and facilitating this year and a half-long-project on diversity and facilitation training. I have heard nothing but good things from the 15 participants. ...You bring a high degree of professionalism and expertise to your work along with a compassion for those who have lived too long on the margins of society."

New Castle Presbytery

3706 Old Capitol Trail, Wilmington, DE  19808   ☎ 302.892.9095   📠 302.892.9096      www.respectinc.com
email: respect@respectinc.com

**A137**



# Respect inc.

*Solving the people puzzle*
*in organizations*

### CLINT HATTON, JR.

Clint Hatton, Jr., a Principal of Respect, Incorporated, brings 35 years of manufacturing and human resources experience to his work, beginning with his career at the DuPont Co. While at DuPont, Mr. Hatton's manufacturing team contributed to the launch of the Automatic Clinical Analyzer, the establishment of related manufacturing procedures and training programs for new operators.

Clint's experience base broadened as a consultant in the Corporate EEO section, where he conducted investigations, wrote affirmative action plans and participated in compliance reviews. His expertise made him ideally qualified for interviewing and recruiting. In this capacity, Clint brought many minority and female employees to DuPont.

Clint later moved to the Corporate Training and Development area, where he designed and delivered many key employee training programs, including the problem-solving workshop used throughout the company. Working with major European businesses and customers through this workshop, Clint and his colleagues solved significant problems for the corporation. Clint's team also redefined the exempt Career Development process into a unique approach that defined development as a shared responsibility between employee and manager. Implementation and communication were so successful that DuPont extended the process to all levels in the organization.

In 1985, Clint became one of the first men to be involved in DuPont's award-winning Personal Safety Program, which deals with the sensitive issues of rape, battering and abuse. He conducted awareness workshops for managers and trained internal facilitators. Clint also facilitated the widely acclaimed "A Matter of Respect" workshops on sexual discrimination and harassment.

Clint has worked with many of the nation's leading diversity and development consultants. His membership on a global team to design and implement training for a worldwide stock option plan provided him with a wealth of knowledge of cultural differences. Clint continued his personal growth through National Training Laboratory's Diversity Management Certification Program.

In 2001, Clint spoke at the AFL-CIO Information Technology Directors conference on the diversity of behavior style. He is a member of the American Society for Training and Development and has presented at its national conference. He is a member of the Board of Directors of the Delaware Chapter of the Society for Human Resources. He holds a BS in Chemistry from Morgan State University.

3706 Old Capitol Trail, Wilmington, DE 19808   ☎ 302.892.9095   📠 302.892.9096          www.respectinc.com
email: respect@respectinc.com

**A138**



# Respect inc.

*Solving the people puzzle in organizations*

### EDWARD S. BARDZIK, JR.

Ed Bardzik is a Principal of Respect, Incorporated. His twenty-nine years at the Du Pont Co., including twenty years in manufacturing and nine years in Human Resources, helped him develop a sensitivity for people issues. This experience reinforced his belief that companies that work to create respectful environments, that value employees, reap the benefits in increased productivity and competitiveness.

While at DuPont, Mr. Bardzik developed the first program on sexual harassment that brought women and men together in an interactive process to address behavior, beliefs and attitudes. He trained internal facilitators to deliver the program to over 80,000 employees. Mr. Bardzik also pioneered men's involvement in a unique program that dealt with the issues of rape, battering and abusive relationships. He also trained internal facilitators and conducted awareness workshops for managers. His training in crisis intervention and short-term counseling enhanced his effort on the staff of a confidential hotline that supported victims of rape, battering, and sexual harassment, as well as gave advice and counsel to managers who were trying to resolve sensitive situations.

A highlight of Mr. Bardzik's extensive diversity experience is the design, formation and facilitation of a support group for white men to enable them to better partner with women and people of color. As a result of this activity, Mr. Bardzik appeared on television on The Wall Street Journal Report and the Discovery Channel during the Anita Hill-Clarence Thomas controversy. He has written for periodicals, and been interviewed by The Washington Post and The Philadelphia Inquirer, and The Wilmington (DE) News-Journal.

Mr. Bardzik is a member of the Board of Directors of "Women Organized Against Rape" in Philadelphia, PA. He is a Board Member of the Greater Valley Forge Human Resource Association. He participated at the "Diversity Symposium" sponsored by The American Institute for Managing Diversity, Inc., at Morehouse College in February, 1994. Mr. Bardzik is a member of the American Society for Training and Development and the only white man to serve on their Multicultural Network Executive Board. He has presented at The Sex and Power in the Workplace Conference in Seattle, the Conference on Diversity for the Office of Personnel Management in Washington, DC., addressed The Conference Board on Work/Family issues, and presented at the University of Cincinnati's Diversity Conference. In conjunction with the law firm of Dilworth, Paxson, Kalish & Kauffmann, Mr. Bardzik and his colleagues at Respect Inc. delivered a series of sexual harassment seminars for Federal Publications.

Mr. Bardzik's education includes a BS in Chemical Engineering and an MBA in Management from Drexel University.

3706 Old Capitol Trail, Wilmington, DE 19808  ☎ 302.892.9095  ☏ 302.892.9096

www.respectinc.com
email: respect@respectinc.com

**A139**



# Respect inc.

*Solving the people puzzle
in organizations*

### DEBORAH S. WELCH

Deborah Welch, a Principal in Respect, Incorporated, started her 20 year career in industry in Finance and used those skills, as well as those in marketing and strategic planning, to successfully manage a $50 million international electronics business for DuPont. Her tenure as business manager, and as a member of the leadership team for a $500 million films business, taught her the importance of human capital.

As manager, she integrated multi-cultural team building interventions into global business meetings that significantly improved implementation of business plans, thereby increasing profits. She designed a leadership development program for the exempt manufacturing staff that added flexibility and competitiveness to the business. On a larger scale, Ms. Welch co-designed several multi-day interventions focused on leadership development, trust, and teamwork. These efforts, combined with her extensive cost study and restructuring plan, contributed to a significant financial turnaround.

While at DuPont, Ms. Welch joined corporate leadership on the cutting edge of diversity training as a member of the original "Core Group" exploring issues of race and gender, and as co-designer of the first Women's Conference, a three-day experience for 150 women. Externally, she worked with representatives of Digital Equipment Corporation and Procter and Gamble to share technology for moving diversity through major organizations. Ms. Welch presented at the American Society of Women Personnel Administrators conference in Washington, DC. on these issues.

Ms. Welch presented at the 1993 University of Cincinnati Diversity conference and conducted workshops across the US on sexual harassment for Federal Publications. She is a judge for the Delaware Quality Consortium's annual awards, and spoke about diversity and its link to quality at the 1994 and 1995 Delaware State meeting of the American Society of Quality Control. Through Respect, she has been featured in numerous newspapers and books, and often speaks before professional organizations, including the Delaware Employers' Council, the Inscape Publishing International Business Conference, and the Women's Entrepreneurial Conference of the Chamber of Commerce of New Castle County.

Deborah has served as chairperson of the largest fund-raiser for the Delaware Division of the American Cancer Society. She is a member of the Board of Directors of the Delaware Chapter of the Society of Human Resources, and the Forum of Executive Women. Ms. Welch graduated from Juniata College with a BS degree in Business Administration.

3706 Old Capitol Trail, Wilmington, DE 19808   ☎ 302.892.9095   ☎ 302.892.9096    www.respectinc.com
email: respect@respectinc.com

**A140**



**DELAWARE TECH**

*Dover♦Georgetown♦Stanton♦Wilmington*

C⋯do J. George, Jr., President

December 4, 2002

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904

Dear Peg:

As a follow up to our December 3, 2002 meeting, I am pleased that you have chosen to accept my offer to take all reasonable steps aimed at helping you modify your behavior. Engaging in a candid discussion of this sensitive personnel issue is difficult for both of us. I trust, however, the December 3 meeting represents a starting point in a process aimed at modifying unacceptable behavior.

This letter will confirm your agreement to prepare, and submit to me in writing, a plan addressing the following:

    1.    The steps you will take to modify the behavior described in my November 26, 2002 letter to you, including a timeline for taking such steps;

    2.    What I can expect from you in terms of your behavior; and

    3.    The support you may need from me to assist in the successful implementation of your plan.

I trust you share my commitment to promptly address this issue. I look forward to receiving your plan and reaching agreement on a path forward.

Sincerely,

Dr. Orlando J. George, Jr.
President
Delaware Technical & Community College

OJGJr.

*Delaware Technical & Community College*
**Office of the President**
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*


DEPOSITION EXHIBIT
Johnson 19
12-28-04

**A141**

**DELAWARE TECH** ◆

Or....do J. George, Jr., President                          *Dover◆Georgetown◆Stanton◆Wilmington*

<u>Memorandum</u>

To:           Marguerite M. Johnson, Vice President & Campus Director

From:        Orlando J. George, Jr., President

Date:        December 17, 2002

Re:           Call from Esther Graham, Telamon Corporation

      I received a call from Esther Graham, Telamon Corporation, regarding a December 13, 2002, conversation she had with you.  She said the call was regarding your sister, who previously worked for Telamon Corporation.  Ms. Graham said your sister had resigned from Telamon and that you wanted Telamon to write a letter attesting to your sister's mental illness. Ms. Graham said she talked with her Human Resources Director about this request; however since nothing was stated about a mental illness in your sister's letter of resignation, Telamon could not attest to this.

      Ms. Graham made the following comments about your phone call:

           Your phone call was inappropriate.
           You referred to Ms. Graham as unethical and low down.
           You were very disrespectful and rude to Ms. Graham.
           You were so loud and abusive that Ms. Graham's co-worker could hear
                you over the phone.

      She said that you stated that Telamon would never have Delaware Tech's support again, and that she would be hearing from your attorneys.

      Ms. Graham said this conversation was very upsetting to her because Telamon has at least 10 students enrolled (each semester) in the Early Childhood Education program, which they pay for.  She said she really wants to continue a good relationship with the College, but will not have someone speak to her the way you did that afternoon.

      Ms. Graham placed a call to her Executive Director in North Carolina, but also felt it was necessary to speak with me.

      Please call me within the next day to schedule an appointment to discuss this.

*Delaware Technical & Community College*
**Office of the President**
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*



**A142**



**DELAWARE TECH**

*Orlando J. George, Jr., President*                    *Dover♦Georgetown♦Stanton♦Wilmington*

January 23, 2003

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904

Dear Peg:

This letter is a follow up to our December 19, 2002, meeting which focused on Esther Graham's complaint about your conduct during a December 13, 2002, telephone conversation with her.

In our discussion, while denying you called Ms. Graham ``low down'' or threatened anything with respect to Delaware Tech, you conceded you were loud and may have been perceived as rude. I reminded you then, as I remind you now, that you are always a Vice President & Campus Director. Thus, your behavior in your personal capacity reflects on the College.

I am pleased that you have chosen a forward path in an attempt to modify your behavior. I am currently reviewing your proposal and will be back to you on next steps. In light of your decision to seek professional leadership counseling, no further action is necessary in regards to this particular issue. It is your responsibility, however, to identify what is causing your behavior, and to take advantage of the opportunity being offered you by the College to modify it.

Sincerely,

Orlando J. George, Jr.
President

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*



**DEPOSITION EXHIBIT**

**A143**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                   )
                                         )
                Plaintiff,               )
                                         )    Civil Action
            vs.                          )    No. 05-157 (KAJ)
                                         )
ORLANDO J. GEORGE, JR., in both          )
his official and personal capacities,    )
and DELAWARE TECHNICAL AND COMMUNITY     )
COLLEGE,                                 )
                                         )
                Defendants               )

            Deposition of PETER D. SHOUDY taken pursuant
to notice at the law offices of Morris, James, Hitchens &
Williams, 29 N. State Street, Dover, Delaware, beginning at
1:35 p.m. on Wednesday, February 15, 2006, before Allen S.
Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER, GOLDLUST, BAKER & OVER
        702 King Street, Suite 600
        Wilmington, DE 19801

            For - Plaintiff

        DAVID H. WILLIAMS, ESQUIRE
        MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
        222 Delaware Avenue, 10th Floor
        Wilmington, DE 19801

            For - Defendants

ALSO PRESENT:

        MARGUERITE A. JOHNSON

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

**A144**

1    reorganization, or about the time of the reorganization, did

2    any campus vice-presidents express any concerns over the

3    reorganization?

4        A    Yeah.  The process was, I came on board and I began

5    to assess the situation, met with people, met with campus

6    directors, met with campus personnel.  And then in the

7    approximately I would say the August time frame, I issued

8    the first draft of my reorganization proposal.  There were

9    meetings with campus directors, both conducted by Dan

10    Simpson, who was, again, my boss at the time.  We had at

11    least one conference call that I recall with the campus

12    directors on the phone to review the -- to review the

13    document.  Again, taking their feedback and concerns,

14    considering those and then revising the document as

15    appropriate.  It culminated with the final report, the

16    recommendation report being issued at the beginning of

17    October.  And approval at president's council and then

18    implementation subsequent to that.

19        Q    Did you make any -- I hate to use the word major

20    because that is a matter of interpretation.  But obviously

21    any changes to your organization based upon what the

22    vice-presidents gave you?

23        A    There were changes made based upon input and

24    feedback from the campus directors.

1    Q    Can you tell me what some of those changes were?

2    A    At this point, I'd have to go back into the various

3    versions of the proposal and the organization charts.

4    Q    You obviously have discussed your deposition here

5    today with somebody in preparation for it, didn't you?

6    A    Well, I met with Mr. Williams before how the process

7    would -- how the process would go, how this would, again,

8    had I done one before, the same sorts of questions.

9    Q    And you know that part of the focus will be

10   discussion of the November 19th meeting that you went to?

11   A    I understand that now.  I did not know that until

12   just a week or so ago.

13   Q    Prior to that meeting, were there any concerns

14   expressed by any vice-presidents other than Dr. Johnson?

15   A    Again, I can only comment about one conversation to

16   which I was a party, a telephone conference.  And then what

17   I was told about a meeting that took place after the

18   president's council meeting in September that was off site

19   at Rehoboth.  I know Dr. Johnson, Dr. Smith and I believe

20   Mr. Miller, spoke to Dan Simpson about the document, sort of

21   the version two of the document.  Dan and I discussed some

22   of their feedback, made some decisions about what we would

23   incorporate, what we would not.  There was a subsequent,

24   like I said, a conference call with Dr. Johnson, Dr. Smith.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,           )
                                 )
            Plaintiff,           )
                                 )   Civil Action
v.                               )   No. 05-157(KAJ)
                                 )
ORLANDO J. GEORGE, JR.,          )
in both his official and personal )
capacities, and DELAWARE         )
TECHNICAL AND COMMUNITY          )
COLLEGE,                         )
                                 )
            Defendants.          )

            Deposition of DANIEL L. SIMPSON taken
pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 11:05 a.m., on
Monday, April 3, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware  19801
            For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19801
            For the Defendants

ALSO PRESENT:
        MARGUERITE A. JOHNSON
        BRIAN D. SHIVEY, ESQ., CHIEF LEGAL COUNSEL -
        DELAWARE TECHNICAL & COMMUNITY COLLEGE

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A147

Daniel L. Simpson                    53

1    A.    (The witness nodded.)

2    Q.    Shakes of the head don't count.

3    A.    I'm not disagreeing with you.  I don't know.

4    Q.    Have you ever been told that?

5    A.    No.  No one has ever told me that's the basis.

6  I know that was an incident that was an issue.

7    Q.    Do you know why Dr. Johnson was put on

8  administrative leave?

9    A.    Behavioral issues.

10    Q.    What behavioral issues?

11    A.    I don't know.  Collectively, jointly, all of

12  them.  I don't know.

13    Q.    Let's go back to the November 19th, 2004

14  meeting.  Did you attend the meeting?

15    A.    Are you talking -- I don't know which meeting

16  you're talking about.  You're talking about the one

17  that occurred over on the Terry Campus with the

18  department chairs?

19    Q.    The one which you met with Dr. George about

20  soon after it.

21    A.    I didn't meet with Dr. George soon after about

22  any meeting.

23    Q.    Did you discuss it with him in any way?

24    A.    Yeah.  But not soon after.  Long after.



Daniel L. Simpson                54

1    Q.    What do you mean by "long after"?

2    A.    That meeting was on the 19th of November, if

3    you're talking about the one with Peter Shoudy and the

4    department chairs, and then the telephone conference

5    call we had with ad hoc which was that afternoon, that

6    was on the 19th.  That was a Friday.

7    Q.    Wait a second.  You mean the ad hoc committee,

8    what I call the vice presidents --

9    A.    Vice presidents, I understand, yes.

10   Q.    It was on the afternoon before the meeting or

11   the day after the meeting?

12   A.    No. It was the same day.  The meeting; the

13   meeting that Peter Shoudy attended on the Terry Campus

14   was in the morning.  In the afternoon there was an ad

15   hoc telephone conference call.  So actually in my mind

16   there're two meetings.

17   Q.    Did you discuss the meeting with Dr. Johnson

18   during the ad hoc meeting?

19   A.    No.  There was reference to it because when we

20   were talking about --

21   Q.    We will get to it in a minute.  I'm just asking

22   a simple question.

23         Did you discuss --

24   A.    In terms of discussion, no.



Daniel L. Simpson                55

1    Q.    When was the first time you discussed the

2    events of that meeting with Dr. George?

3    A.    Not probably until sometime in December

4    because, I know that because the meeting was on the

5    19th and that night or the early morning on the 20th I

6    was admitted to the hospital and I was in the hospital

7    until I got out for Thanksgiving.

8         And then the day after Thanksgiving was a

9    holiday.   The following week I was in and out of the

10   office.   I don't recall having any conversations with

11   Dr. George at all until one of the full days that I

12   came back to work and that would have been sometime in

13   December, earlier part of December.

14   Q.    What was the nature of that discussion?

15   A.    Well, I went into his office and it started out

16   with him asking me about my health and how I was doing

17   and so forth and should I be there for full days and

18   so forth.

19        And then the conversation shifted to

20   generally how are things going and where are we

21   getting, the DIET reorganization, which is the IT

22   people problem, and how that was going?   And I told

23   him then that there were still issues; that even

24   though everybody on ad hoc had voted to move ahead

A150

Daniel L. Simpson                    56

1    with the reorganization, had approved the

2    reorganization that Dr. Johnson still wasn't happy

3    with it.

4              And his response -- I remember part of his

5    response at that time.  Part of his response was that

6    "I know, I've heard."  And then I told him, expressed

7    what had happened over at the Terry Campus and at ad

8    hoc as indications that she was not aboard with the

9    reorganization.

10    Q.    Did she vote for it in the approval meeting?

11    A.    Yes, she did.

12    Q.    She said, "Yes, I approve it"?

13    A.    Yes, she did.  As a matter of fact, the

14    president polled everybody in there individually,

15    including me, who had been working very closely with

16    it.  He went around and asked each individual and

17    pointed at each individual and asked the question and

18    each individual said yes.  He asked the question about

19    for approval and he polled the group in the room and

20    pointed at each person, including me, and we all said

21    yes.

22    Q.    Did you ever discuss the November 19th meeting

23    with Dr. George other than -- have you told me

24    everything that you discussed with him in this first



Daniel L. Simpson                    57

1    meeting?

2     A.    That's generally it.  I mean, that was the

3    nature of the conversation, yeah.

4     Q.    Did you ever suggest that Dr. Johnson's

5    behavior at the November 19th meeting was

6    inappropriate?

7     A.    Do I have an absolute recollection of that?

8    No.  But my feeling was it was inappropriate.  So I

9    may have given that impression.

10    Q.    Were you aware of the meeting before it took

11    place?

12    A.    I was aware that Peter Shoudy was going over to

13    do one of his campus forums with department chairs

14    like he had done on the other campuses.

15    Q.    Were you notified of the meeting or did you

16    just happen to learn about it accidentally?

17    A.    Peter told me he was going over to do it.

18    Q.    And did you attend the meeting?

19    A.    No.

20    Q.    Did you discuss the meeting with anybody prior

21    to the vice presidents ad hoc meeting that afternoon?

22    A.    Yes, I did.

23    Q.    Who did you discuss it with?

24    A.    The dean of instruction.



Daniel L. Simpson                                    58

1    Q.    Who was?

2    A.    Connie Spampinato.  And when Peter told me what

3    happened, he told me --

4    Q.    Wait a second.  You said you first --

5    A.    You asked me who.

6    Q.    You said Spampinato.

7    A.    I'm getting to who.

8    Q.    I want them in chronological order.

9    A.    All right. I don't know.  I would have to think

10   about it, what the chronology was.  I don't know if I

11   can give you a chronology.  I can tell you who they

12   were.

13   Q.    Who was the first person you talked to?

14   A.    Probably Peter.  I'm sure it was Peter.

15   Q.    Right after the meeting?

16   A.    Yeah.

17   Q.    The same day?

18   A.    Yes.

19   Q.    What did he tell you?

20   A.    He told me that he went over to address the

21   department chairs on the campus like he had done the

22   other campuses to tell them about the reorganization

23   and what the plans were and so forth and that

24   Dr. Johnson and some other administrative people were



Daniel L. Simpson                                59

1    there at the meeting.  And he used the word ambush,

2    that it was like an ambush, that he felt that what

3    should have been a positive thing he had to struggle

4    to keep it on a positive note because the questions

5    and the comments from Dr. Johnson became very

6    negative.

7              And my concern was and my questions to him

8    were based on what were her questions about?  What

9    were her comments about?  Because I know Dr. Johnson.

10   I worked for her.

11             And he told me that basically they were

12   comments about and questions that would lead somebody

13   to believe that Dr. Johnson was completely unfamiliar

14   with the reorganization and at what was taking place

15   there and her focus was also on one position with Dan

16   Siok, who was at the Terry Campus.  That's what made

17   me feel that that was inappropriate because as a vice

18   president she doesn't have to get that kind of

19   information at a meeting with department chairs, that

20   that's what ad hoc does and that's what president's

21   council does.

22             So I thought that regardless of what her

23   comments were or how they would be accurately or

24   inaccurately interpreted by somebody who didn't really



Daniel L. Simpson                          60

1    know her, the forum was not appropriate.  None of that

2    should have been discussed openly because the people

3    came out of that meeting and the department chairs,

4    and I'll get to who those department chairs were as

5    part of your first question, expressed some concerns

6    about the way that Peter was treated as a new person

7    and also doubts about how the administrators within

8    the college had their act together as far as this DIET

9    reorganization was concerned.

10                 So whether -- I can't tell you about the

11    appropriateness of her comments or anything.  I just

12    think whatever she said there if there was questioning

13    about it, it probably should have been questioned

14    somewhere else.

15    Q.   Were you informed by Mr. Shoudy that some of

16    the comments dealt with the quality or nature of the

17    services performed by the IT department?

18    A.    Maybe.  I don't remember that.

19    Q.    Would that be a legitimate area of concern by

20    the administrators, that they weren't getting the

21    service that they should?

22    A.    Sure.  Sure.  The whole purpose of bringing

23    Peter Shoudy aboard and the DIET reorganization was

24    really to resolve those issues.  The college



WILCOX & FETZER LTD.
Registered Professional Reporters

Daniel L. Simpson                    61

1    historically never had anybody with Peter Shoudy's

2    background, so that was exactly what he was supposed

3    to do.

4        Q.    So if administrators had concerns about the

5    quality of the servcie that they were getting, it

6    would not have been inappropriate to ask Mr. Shoudy

7    about those problems, would it?

8        A.    Yes.   Under those circumstances, Mr. Aber, I

9    think it would have been.

10       Q.    Even by the department chairs?

11       A.    Oh, no.   The department chairs would have been

12   fine because that's what that was for.   But my only

13   issue with it was -- it certainly wasn't with

14   anybody's questions or any question that wanted to be

15   asked.   My issue was that was not the right place to

16   do it.

17       Q.    There have been other people who have attended

18   that meeting who did not feel that Dr. Johnson's

19   comments were antagonistic or inappropriate. Are they

20   liars?

21       A.    No.   I didn't say her, I didn't say her

22   comments were inappropriate.   I'm only saying to you

23   that what I thought was whatever she did to question

24   the reorganization was inappropriate at that place.   I



A156

Daniel L. Simpson                    62

1    don't know what she said.  I wasn't there.

2        Q.    So you have no reason to believe that the

3    nature of her comments was inappropriate, except the

4    subject matter?

5        A.    Yes.  If you want to count what Peter Shoudy

6    had to say to me and the department chairs and the

7    dean of instruction, yes, I do have reason to believe

8    it was, but I wasn't there.

9        Q.    So then if other people said they were not

10   inappropriate, then someone is not telling the truth?

11       A.    I don't think it's always a question of truth.

12   I think it's a question a lot times of perception.

13       Q.    Okay.  So it's an issue of fact as to whether

14   it happened or didn't happen depending on who you want

15   to believe?

16       A.    Again, I don't know if it's a question of fact.

17   A lot of times it's a question of perception.

18   Dr. Johnston may not have thought they were

19   inappropriate.

20       Q.    I'm talking about other administrators who were

21   there and have testified they didn't think it was

22   inappropriate.

23       A.    I don't know.  Again, sometimes it's not a

24   question of who is telling the truth.  It's a question



Daniel L. Simpson                    63

1    of perception.

2        Q.    What other people did you discuss the meeting

3    with other than Shoudy?

4        A.    I talked to a couple of the department chairs.

5    I don't remember --

6        Q.    Who?

7        A.    I remember speaking to John Buckley because

8    John Buckley -- I'm not sure I called John Buckley.    I

9    think John Buckley may have contacted me wanting to

10   know how to contact Peter Shoudy because he was

11   embarrassed because of what happened at the meeting.

12   And he told me after the meeting he tried to get to

13   Peter to tell Peter that he had the support of the

14   department chairs, but for whatever reason that didn't

15   happen.    He was sending him an e-mail.

16       Q.    What did Mr. Buckley say about Dr. Johnson?

17       A.    He said Dr. Johnson was very negative and led

18   everybody to believe that she was hearing this

19   reorganization thing for the first time, that she

20   didn't think it was going to work, the wrong people

21   were picked, you know, that kind of stuff.

22       Q.    Who else did you hear anything from?

23       A.    Connie Spampinato, who was the dean.

24       Q.    Anybody else?



A158

Daniel L. Simpson                    64

1    A.    Yeah.   Probably.   But I can't remember who it

2    was.

3    Q.    Did you call doctor, I guess it's

4    Dr. Spampinato, or did she call you?

5    A.    No.  I think I called her and she wasn't

6    available and she called me back.  And I called her to

7    ask her what happened at the meeting.

8    Q.    Did you evidence any upsetness with her?

9    A.    Yes.   Actually, I did.   Actually, I evidenced

10   being upset with her and then apologized to her

11   because I understood that she probably wasn't in

12   control of that meeting after Dr. Johnson arrived.

13   Q.    And then after you spoke with Dr. Spampinato

14   and Mr. Buckley, did you ever contact Dr. Johnson and

15   ask for an explanation?

16   A.    No.   We had the ad hoc conversation.   That was

17   the only conversation I had with her and then, again,

18   I was in the hospital and at home.

19   Q.    Well, when did these calls come from Buckley

20   and --

21   A.    The same day, between the two meetings.

22   Q.    And what was discussed during the ad hoc

23   meeting?

24   A.    You know, there was --



A159

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                )
                                      )
                Plaintiff,            )
                                      )   Civil Action
v.                                    )   No. 05-157(KAJ)
                                      )
ORLANDO J. GEORGE, JR.,               )
in both his official and personal     )
capacities, and DELAWARE              )
TECHNICAL AND COMMUNITY               )
COLLEGE,                              )
                                      )
                Defendants.           )

          Deposition of CONNIE M. SPAMPINATO taken
pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 1:45 p.m. on
Thursday, January 19, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

ALSO PRESENT:
        MARGUERITE A. JOHNSON

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters
COPY

**A160**