IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,             )
                                   )
            Plaintiff,             )
                                   )        C.A. No.  05-157 (KAJ)
      v.                           )
                                   )        Trial By Jury Demanded
ORLANDO J. GEORGE, JR.,            )
in both his official and personal )
capacities, and DELAWARE          )
TECHNICAL AND COMMUNITY           )
COLLEGE,                          )
                                   )
            Defendants.            )

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED: July 19, 2006

## TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| TABLE OF CITATIONS |  | v |
| NATURE AND STAGE OF THE PROCEEDINGS |  | 1 |
| SUMMARY OF ARGUMENT |  | 1 |
| STATEMENT OF RELEVANT FACTS |  | 3 |
| A. | Marguerite Johnson's Career at Delaware Technical & Community College | 3 |
| B. | George's Unsupported Suspicion of Johnson's Behavior | 4 |
| C. | Dr. Johnson Was Considered a "Tough Cookie" But a "Driving Force" | 5 |
| D. | The "IT" Department and its Reorganization | 6 |
| E. | Terry Campus Meeting Regarding "IT" Organization | 7 |
| F. | Simpson's Involvement in the Investigation | 9 |
| G. | Dan Simpson Assumes Dr. Johnson's Place on the Del Tech Terry Campus | 10 |
| H. | Del Tech's Multiple Rounds of Interviews | 10 |
| I. | The CPA, Dwyer's Investigation Was Admittedly Not Designed To Seek The Truth | 12 |
| J. | The Interview Process | 14 |
| K. | The "Agreed Upon Procedures" Report was Riddled with Errors and "Violations of the AICPA Standards" | 14 |
| L. | The State Auditor's Report Lacked Full Disclosure By Del Tech | 19 |
| M. | Del Tech Credit Card Policies | 21 |
| N. | Financial Oversight of the Terry Campus | 22 |

| | | |
|---|---|---|
| O. | Johnson's Personal Work | 24 |
| P. | Johnson Paid for Family Reunion Efforts | 25 |
| Q. | West Virginia Purchases | 26 |
| R. | Wake College Trip | 27 |
| S. | Marketing Department Problems | 27 |
| T. | Selection of Vincent a Bifferato, Esquire as Hearing Officer | 28 |

ARGUMENT

| | | |
|---|---|---|
| I. | THE LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT | 30 |
| II. | DR. JOHNSON ENGAGED IN SPEECH WHICH WAS PROTECTED UNDER THE "FREE SPEECH" PROVISIONS OF THE FIRST AMENDMENT, WHICH SPEECH INVOLVED MATTERS OF PUBLIC CONCERN | 31 |
| | A. Introduction | 31 |
| | B. Public Concern | 32 |
| | C. Garcetti was Narrowly Decided and is Inapplicable. | 34 |
| | D. Dr. Johnson was Subjected to An Adverse Action | 36 |
| | E. Motivating Factor | 38 |
| | F. The Disruptive Factor: Balancing | 39 |
| III | DR. JOHNSON HAD A CONSTITUTIONALLY PROTECTED "PROPERTY INTEREST" FOR DUE PROCESS FOR TERMINATION | 40 |
| | A. The Basic Constitutional Law | 40 |
| | B. The Inherent Unfairness of the Termination Process | 41 |

C.    Denial of Procedure Due Process:  Dr.
       Johnson's Property Interest is Founded
       Both by Contract and Del Tech's
       "Personnel Handbook".                                    44

D.    Dr. Johnson's Property Interest in Her Contract
       And Notice of Specific Changes.                          45

E.    Failure to Provide Specific Notice                        46

F.    Denial Substantive Due Process                            47

IV    THE DEFENDANT, DR. GEORGE, IS CLEARLY
       NOT ENTITLED TO QUALIFIED IMMUNITY.                      49

CONCLUSION                                                      50

## TABLE OF CITATIONS

**Page No.**

Accord Allah v. Seiverling
    229 F.3d 220, 225 (3d Cir. 2000)                36

Anderson v. Pasadena School District
    184 F.3d 439 (5th Cir. 1999)            41

Anderson v. Liberty Lobby, Inc
    477 U.S. 242, 248, 106 S.Ct. 2505, 2510
    91 L.Ed.2d 202 (1986)         30

Antol v. Esposito
    100 F.3d 1111 (3d Cir. 1996)        45

Artway v. Scheidemantal
    671 F.Supp. 330, n. 6 (D.N.J. 1987)    50

Augusto-d-Feliciano v. Aponte-Rogue,
    889 F.2d  1209, 1217 (1st Cir. 1989)    37

Azzaro v. County of Allegheny
    110 F.3d 968, 976 (3d Cir. 1997)    31, 33

Baca v. Sklar
    398 F.3d 1210, 1220 (10th Cir. 2005)    37

Baldassare v. New Jersey
    250 F.3d 188, 195 (3d Cir. 2001)    31, 33, 39

Banks v. J. East Baton Rouge Parish Sch. Bd.
    320 F.3d 570, 580 (5th Cir. 2003)    37

Bennett v. Hendrix,
    423 F.3d 1247, 1254-55) (11th cir. 2005)    37

Bloch v. Ribar,
    156 F.3d 673, 678 (6th Cir. 1998)    37

Board of Regents of State College v. Roth,
    408 U.S., 564, 93 S.Ct. 2701, 33 L.Ed.2d 548 (1972)    40, 44, 47

Brennan v. Norton
    350 F.3d 399, 413 (3d Cir. 2003)    31, 33, 40

Brennan v. Stewart
    834 F.2d 1248, 1255, 1256 (5th Cir. 1986)         41

Brooks v. Univ. wisc. Bd. of Regence
    406 F.3d 476 (7th Cir. 2005)         34

Carroll v. Pfeffer,
    262 F.3d 847, 850 (8th Cir. 2001)         37

Carter v. City of Philadelphia
    989 F.2d 117, 120 (3d Cir. 1993).         41

Chippollini v. Spencer Gifts, Inc.
    814 F.2d 893, 896 (3d Cir.)         30

Connick v. Myers
    461 U.S. 138, 148, 103 S.Ct. 1684
    75 L.Ed.2d 708 (1983)         34, 39

Coszalter v. City of Salem,
    320 F.3d 968, 975 (9th Cir. 2003)         37

Czurlanis v. Albanese
    721 F.2d 98, 103 (3d Cir. 1983)         32

Desi's Pizza, Inc. v. City of Wilkes-Bare
    321 F.3d 411 (3d Cir. 2003)         41

Dilettoso v. Potter
    2006 WL 197146 (D.Ariz. 2006)         36, 38

Dennison v. Dept. of PA Dept. of Corr.
    286 F.Supp.2d 387, 399 (N.D. Pa. 2003)         32

Ellis v. Crawford,
    2005 WL 525406, *7-8 (N.D. Tex. March 3, 2005);         37

Feldman v. Philadelphia Housing Authority
    43 F.3d 823, 829 (3d Cir. 1994)         32

Finch v. Fort Bend Independent School District,
    33 F.3d 555, 565 (5th Cir. 2003)         49

Finch v. Hercules
    865 F.Supp. 1104, 1117 (D.Del. 1994)         30

Fitzgerald v. Mountain Laurel Racing, Inc.
    607 F.2d 589, 602 (3d Cir. 1979)               47

Garcetti v Ceballos,
    __, U.S.__, 126 S.Ct. (2006)           34,35, 36

Garity v. New Jersey
    385 U.S. 493, 500, 87 S.Ct. 616
    17 L.Ed.2d 562 91967)               33

Gilbrook v. City of Westminster,
    177 F.3d 839 (9th Cir. 1999)          38, 39

Givhan v. Western Mine Consolidated School District
    439 U.S. 410, 425-26, 99 S.Ct. 693
    58 L.Ed.2d 619 (1979)              36

Goodman v. Mead Johnson & Co.
    534 F.2d 566, 573 (3d Cir. 1976)        30

Green v. Philadelphia Housing Authority
    105 F.3d 882, 889 (3d Cir. 1997)        30, 32

Haley v. City of Camden
    2006 WL 1875402 (D.N.J. 2006)       36

Hardiman v. Jefferson County Board of Education,
    709 F.2d 635, 638 n.2 (11th Cir. 1983)    38

Harriston v. Gainesville Sun. Pub. Co.,
    9 F.3d 913, 920 (11th Cir. 1993)        36

Heller v. Fulare,
    371 F.Supp.2d 743, 750 (W.D.Pa. 2005)   49

Hickman v. Valley Local Sch. Dist.
    619 F.2d 606, 610 (6th Cir. 1988)       38

Horne v. Russell County Commission
    379 F.Supp.2d 1305, 1328-30 (N.D. Ala. 2005)   36, 38

Howard v. Bd. of Educ. of City of East Orange
    90 Fed.Appx. 571, 576 n. 6 (3d Cir. 2003)   32

Hullen v. Yates
    322 F.3d 1229 (10th Cir. 2003).         41

In Re:  Unisys Savings Plan Litigation
    74 F.3d 420, 433 (3d Cir. 1996)       30

International Bus. Mach. Corp. v. Edelstein
    526 F/2d 27(2d Cir. 1975)       42

Jeffries v. Delaware Technical & Community College
    743 A.2d 675 (Del.Supr. 1999)       28

Joint Anti-Fascist Refugee Committee v.McGrath,
    341 U.S. 123, 161-163, 71 S.Ct. 624, 95 L.Ed. 817 (1951).       47

Kadetsky v. Egg Harbor Township Bd of Educ.,
    60 F.Supp.       37

Katzenmoyer v. City of Reading
    2001 WL 1132374, *2 (E.D.Pa. Sept. 21, 2001)       37

Keenan v. Tejeda,
    290 F.3d 252, 258 (5th cir. 2002)       37

Kelleher v. City of Reading,
    2002 WL 1067442, *5 (E.D.Pa May 29, 2002)       37

Kodak Co. v. Image Technical Services, Inc.
    504 U.S. --, 112 S.Ct. 2072,
    119 L.Ed.2d 265 (1992)       30

Kodrea v. City of Kokomo, Indiana
    2006 WL 1750071       36, 49

Lapinski v Bd. of Educ. of Brandywine School District
    163 Fed.Appx. 157 (3d Cir. 2006)       36

Lloyd v. Jefferson
    53 F.Supp.2d 643 (D.Del. 1999)       47

Mitchell v. Street
    415 F.Supp.3d, 490 n.5 (E.D.Pa. 2005)       32

Monsanto v. Quinn
    674 F.2d 990, 994 (3d Cir. 1982)       35

Morrero v. Camden County Bd. of Social Serv.,
    164 F.Supp.2d 455, 467 (D.N.J. 2001)    37

Morris v. Board of Education of Laurel School District,
    401 F.Supp. 188 (D.Del. 1975)    48

Morrissey v. Curran
    423 F.2d 493, 499 (2d Cir. 1969)    50

Mt. Healy City School District Bd. of Ed. v. Doyle
    429 U.S. 274, 287, 97 S.Ct. 568
    58 L.Ed.2d 471 (1977)    31, 39

O'Conner v. City of Newark,
    440 F.3d 125, 128 (3d Cir. 2006).    38

Ohio Bell Telephone v. Public Utilities Commission
    301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937)    41

Ostad v. Oregon Health Services University
    327 F.3d 876, 885 (9th Cir. 2003)    38

Perry v. Sindermann
    408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1992)    40, 41, 44

Pickering v. Board of Edcuation
    391 U.S. 563, 568, 88 S.Ct. 1731
    20 L.Ed.2d 811 (1968)    31, 39, 40

Power v. Summers,
    226 F.3d 815, 820-21 (7th Cir. 2000)    37

Rankin v. McPherson
    483 U.S. 378, 385, 107 S.Ct. 2891
    97 L.Ed.2d 315 (1987)    32

Rivera-Jimenez v. Pierluisi
    362 F.3d 87, 94 (1st Cir. 2004)    37

Robinson v. City of Pittsburgh,
    120 F.3d 1286, 1397-1300 (3d Cir. 1997)    37

Rodriguez v. Torres,
    60 F.Supp.2d 334, 349 (D.N.J. 1999)    37

Rutan v. Republican Party
    497 U.S. 62, 76 n. 8                                    38

San Fillippo v. Bongiovanni
    30 F.3d 424, 434 (3d Cir. 1994)                  32, 47

Saye v. St. Vrain Valley Sch. Dist.
    785 F.2d 862, 867-868 (10th Cir. 1986)           38

Smith v. National Collegiate Athletic Ass'n.,
    266 F.3d 152, 163 (3d Cir. 2001)                 45

Smith v. Plati,
    258 F.3d 1167, 1176 (11th Cir. 2001)             37

Sprague v. Fitzpatrick
    546 F.2d 560 (3d Cir. 1976)                      40

Stana v. School District of The City of Pittsburgh
    775 F.2d 122, 126 (3d Cir. 1985)                 45

Strahan v . Kirkland
    287 F.3d 821 (9th Cir. 2001)                     39

Sunkett v. Misci,
    183 F.supp.2d 691, 708 (D.N.J. 2002)             37

Suppan v. Dadonna
    203 F.3d 228, 235 (3d Cir. 2000)                 36

Swineford v. Snyder County Pennsylvania
    15 F.3d 1258, 1274 (3d Cir. 1994)               40

Trujillo v. Bd. of Educ. of Albuquerque Public Sch.,
    377 F.Supp.2d 994, 1010-11 (D.N.M. 2005)      37

Trzeciak v. Village of LaGrange,
    2003 WL 1193318, *11-12 (N.D. Ill. March 13, 2003)    37

Washington v. County of Rockland,
    373 F.3d 310, 320 (2d Cir. 2004)                37

Walters v. City of Philadelphia
    55 F.3d 886, 892 (3d Cir. 1995)               32, 33, 40

Waters v. Churchill,
    511 U.S. 661, 671, 114 S.Ct. 1878
    128 L.Ed.2d 686 (1984)                31

Wharton v. Caldaron,
    127 F.3d 1201, 1204 (9th Cir. 1997)     42

Wilcoxon v. Red Clay Cons. Sch. Dist. Bd. Ed
    _F.Supp.2d__, 2006 WL 1793546 (D.Del. 2006)    36

Willis v. Marion county Auditor's Office
    118 F.3d 542, 547 (7th Cir. 1997)      43

Zugarek v. Southern Tioga Sch. Dist.,
    214 F.Supp.2d 468, 476-77 (M.D. Pa. 2002)    37

## NATURE AND STAGE OF THE PROCEEDINGS

A Complaint in this matter was filed on March 15, 2005. The Complaint alleged that the plaintiff was excluded from the campus of Delaware Technical & Community College by the defendant, Dr. Orlando George, for speaking out on matters of public concern, as to the ability of the school's "IT" Department to provide service to both the college community, and Delaware, and non-Delaware community that utilizes the "IT" services for purposes of communication and off campus interactive courses. An Answer was filed on April 4, 2005.

Subsequent to a flawed termination hearing, a Supplemental Complaint was filed on September 16, 2005, which added claims of denial of procedural due process and liberty interest. An Answer to the Supplemental Complaint and counterclaim was filed on September 29, 2005.

The defendants have filed an opening brief in support of their motion for summary judgment. This is the plaintiff's answering brief in response to the defendants' motion[1].

## SUMMARY OF THE ARGUMENT

I.    This matter is brought for a violation of Dr. Marguerite Johnson's right of free speech under the First Amendment.  After she asked a few of questions concerning the technology "IT" department, which had become centralized and not under her direction and control, she was summarily placed on administrative leave, excluded from the campus, with all signs that she was still the Vice-President/Campus Director removed.  At the same time, the defendants initiated a punitive investigation with the intent to terminate her employment.  That investigation included multiple rounds of interviews of Del Tech employees, including, by the school's regular employment legal counsel, a flawed accountant's report, riddled with errors and omissions.

II.    In conducting the investigation and subsequent termination hearing, the defendants deprived Dr. Marguerite A. Johnson of both procedural due process, and substantive

---

[1] The defendants made no motions and no relief was sough with regards to their counterclaim.

1

due process/liberty interest. This was a result of the unbalanced investigation, during which she had been directed not to discuss the investigation, with not only present employees, but past employees, by the defendant, Dr. Orlando George. During the investigation, an accountant was hired by the school to justify the termination of Dr. Johnson. He proceeded with an investigation that did not comport with his own professional standards, and was fatally flawed because relevant information was not supplied to him by the defendants. As a result, the flawed report written by the accountant, was heavily relied upon by the hearing officer in upholding Dr. Johnson's termination. Dr. Johnson was further denied due process, in that the hearing officer concluded that her conduct intimidated employees from raising issues, before her exclusion from the school which were used to purportedly justify her termination. That evidence was presented to the hearing officer despite repeated requests by Dr. Johnson's counsel for the specifics of those charges, required by her contract, the former rules for termination proceedings, and the rules for termination proceedings specially enacted for Dr. Johnson's termination. The result was that the entire termination proceeding did not comply with rudimentary elements of basic fairness, so egregious as to shock the conscious of this Court.

**III.**    The individual defendant, Dr. Orlando George, is not entitled to official immunity because he received the advice of two attorneys prior and during the process of terminating Dr. Johnson. Further it was well established that the termination of Dr. Johnson for speaking out on matters of public concern would have deterred a person of ordinary firmness from exercising their First Amendment rights.

## STATEMENT OF RELEVANT FACTS

**A.    Marguerite Johnson's Career at Delaware Technical & Community College**:

Dr. Johnson was originally hired by Delaware Technical & Community College (hereinafter referred to as "Del Tech") in 1970 as a GED Instructor (Complaint, ¶7, B-2)[2] Her career then progressed to Acting Director of Continuing Education (Complaint, ¶8, B-2), then to Director of Continuing Education at the Wilmington Campus (Complaint, ¶9, B-2), until she was appointed by Del Tech to become Vice-President and Campus Director of the Terry Campus, in 1994 (Complaint, ¶11,B-2).[3] When Johnson first moved to Dover after being selected as Vice-President/Campus Director, the general population was not supportive of her selection (George 18, B-53,54), and she was subjected to racial attacks (B-128 ).

Throughout Dr. Johnson's career she was regularly commended for her professional contributions, problem solving skills, leadership, tireless support of the President, and outstanding professional achievements. (Evaluations)[4] During this period of time she regularly received the maximum merit bonuses, which the president, Dr. George, could authorize (George145, B497) (Complaint, ¶19, B-3).

On January 3, 2005 the defendants issued to the plaintiff a letter placing her on administrative leave "until further notice pending investigation". (B-50). Even before Dr. George

---

[2] References to the Complaint, unless otherwise noted, are to paragraphs of the supplemental complaint(B-1) that were admitted by the defendants in their answer. (B-16 )

[3] When Dr. Johnson was appointed to vice-president of the Terry Campus, it had great financial problems, which Dr. Johnson worked to resolve (Rockey 11-12, B-55)

[4] In her 1999-2000 evaluation she was described as outstanding, professional, and an invaluable member of the president's team, and complimented in that the "...the college, faculty, staff, students benefit from your leadership...". (B-222). In her 2001-2002 evaluation the President of the college thanked her for her hard work, imaginative thinking, and problem solving skills (B-234). In 2001-2002 she received special commendation for leadership, and tireless support of the President (DTCC586). In 2002-2003 she was described as having "...leadership (which) has enabled the Terry Campus to reach new heights of effectiveness..." (B-258). Finally, in her last evaluation, for the school year 2003-2004 she was commended for outstanding professional achievements and given "special commendation" for her "...leadership...in tying together the involvement of the campus community, students, faculty & staff with the community at large..." (B-B-274).

3

put Dr. Johnson on administrative leave, it had been decided that she was leaving as an emplyee (Murray 60, B 566). In that directive, she was told not to visit any college facilities, not to participate in any college functions on or off campus, to remove her personal effects (George 48, B 488) . She was also told not to discuss the subject matter of the investigation with any present or former employees.(George 49, B 489). Thus, she was not permitted to perform her regular duties (George 74, B 495).[5] A public announcement was made of her removal on January 4, 2005 (Powell 48, B-51). On April 27, 2005 Dr. Johnson received from Del Tech a "Notice of Intent to Terminate Employment". (B-84)

**B.    George's Unsupported Suspicions of Johnson's Behavior:**    Before George instigated an investigation of Johnson, he had no factual basis to believe there was low morale on the Terry Campus (George 154, B 498)[6]. He described two complaints he received concerning Dr. Johnson, the first which was unrelated to Del Tech business (George 22, B 478). That complaint involved a dispute that Dr. Johnson had with her ill sister's employer (George 22, B 478). The second incident was an anonymous letter that George received (George 25, B-34), where he never determined who sent it. (George 25, B 479). In that incident, both Johnson and a Dan Simpson were mentioned (George 29, B 480), Simpson was described to Dr. George as having knocked over a table during a craft festival (George 29, B 480). Dr. George wrote to Dr. Johnson on November 26, 2002 concerning that incident, and while the defendant suggests that Dr. George was demanding that Dr. Johnson take action, once Dr. Johnson responded, and Dan Simpson responded to his inquiries, the entire matter was dropped based upon Dan Simpson's explanation (George 30, B 481).[7]

---

[5] When excluded from campus no one checked her emails, (Powell 38-39, B 591, 592) and if any telephone calls came in for her the callers were told she is "not with us". (Id.)
[6] In fact deposition testimony has revealed campus morale was "good" (Cooper 8, B 375).
[7] The defendant's suggestion that Dr. Johnson needed help (DB-5), was abandoned by George once he learned of Simpson's involvement in the craft show incident (George 30, B 482)(B-42).

Other than those two incidents, concerning Johnson's ill sister and craft festival, George had no factual basis to believe that Johnson was creating an atmosphere of intimidation or fear (George 154-155, B 498, 499). Nor could George describe any specific incidents of inappropriate behavior (George 37-38, B 482, 483) and knew of no other facts to show that Johnson was disruptive (George 55, B 490).  Rather, George's decision to place Johnson on administrative leave, was based upon conclusive allegations without any knowledge of facts to support the allegations (George 59-60, B 491, 492)[8]

**C.    Dr. Johnson Was Considered a "Tough Cookie" But "Driving Force"**: Numerous department chairs and other administrators on the Terry Campus have testified that Dr. Johnson's leadership was appropriate.   The former Department Chair of the Nursing Department stated that since Dr. Johnson became campus director in 1994, she never acted inappropriately (Yanos 7), and never harassed employees (Yanos 7).   Nor did Johnson act disrespectfully  when she attended meetings (Yanos 6-7, B 673, ).  Rather, as Ron Pleasonton, head of the Graphics Department testified, Dr. Johnson was a driving force on the campus, a tough cookie who didn't pull punches and the entire place (Del Tech Terry Campus) grew under her (Pleasanton 5, 6-7, B 573, 574, 575).  Dr. Johnson's consuming interest was in customer service (Cooper 29, B 387). Anybody that did not give good customer service (to the students and the community) would have an issue with Dr. Johnson (Cooper 29, B 387), Dr. Johnson mentioned regularly that customer service was important and they had to treat students properly (Cooper 29, B 387).  Nevertheless, Johnson was never seen acting improperly during meetings, or when supervising people at meetings (Crawford 9-10, B 389, 390), but rather demonstrated professional leadership skills (Crawford 7, B 388). While there had been complaints by people who were corrected by Dr. Johnson, it was usually for the purpose of correcting something that

---

[8] Despite suggestions by the defendants, (DB-4), that Johnson was disruptive at the president council meetings, George did not know of any members of the President's Council who would have been intimidated by her (George 61, B 493)

they had not done properly and was justified (Cooper 6, B. 373 T-463-464, B )[9]. When Dr. Johnson disciplined anyone it was done in a "professional and considerate" manner (Demby, B-371A) When Dr. Johnson would instruct people on proper behavior, she would never embarrass them (Cooper 6, B 373), and would treat them with dignity and respect (Cooper 18-19, B 384, 385). Under Dr. Johnson campus morale was good (Cooper 8, B 375). Even  An Simpson expressed his through enjoyment at being part of her team (B-293).

The Vice-President of Financial Affairs for the entire Del Tech College, testified that he never had problems dealing with Dr. Johnson, anymore than with any other campus director (McNesby 12, B 507). He was not intimidated by Johnson or her office (McNesby 12, B 507). With regards to the meetings, which he attended with her, at the President's Council meetings, he does not recall any misconduct by Johnson (McNesby 129-30,B 540, 541), nor did the head of Human Resources recall any misconduct at the Vice-President's AD HOC meeting (Murray 34, B 562)

**D.    The "IT" Department and its Reorganization**: Prior to the reorganization of the IT Department, centralizing it on a school wide basis, rather than on an individual campus basis (George 41, B 484), there had been serious concerns about customer service with the IT Department (Cooper 11-12, B 378, 379), and those issues had been a part of the Middle States Accreditation process in 2003 (Cooper 11-12, B 378, 379). Personnel on the Terry Campus were concerned because data on their computers had been lost by the computer service department (Crawford 17-18, B 394, 395). This lead to a general reorganization of the IT Department to

---

[9] References to Dr. Johnson's sending people to the parking lot was never said in an abusive or confrontational manner (Crawford 29, B 398), rather it was used, during pep talks at in-service meetings, in reference to customer service, and that student's had to be treated properly (Crawford 29,B 398). Anybody who did not give students good customer service would get sent to the parking lot (Crawford 29, B 398). Such comments were made in a joking manner (Cooper 7, B 374, Yanos 9, B 674), and no one viewed it as a threat (Cooper 8, B 375, Yanos 9, B 674), since it was usually made as a joke to lighten up a serious subject (Cooper 8, B 375).

centralize it and to make it a more uniform system (McNesby 96, B 536). During meetings, with the President's Council, the issue was discussed regularly, until in October 2004 when with no specific opposition stated, Dr. George testified he then instructed the college "...to implement that instruction that I had approved it". (George 42, B 485)[10]

**E.    Terry Campus Meeting Regarding "IT" Organization**: On November 19, 2004 there was a department chair meeting at the Terry Campus. The Terry Campus Dean of Instruction, Dr. Connie M. Spampinato sent out notices of the meeting inviting the deans and directors of the Terry Campus (Spampinato 16, B-169). At such meetings it was not unusual for department chairs to send representatives if they could not be present (Cooper 10, B 377).

At the November 19, 2004 meeting, two persons made presentations, the second being Peter Shoudy, about the reorganization of the "IT" department (Crawford 14, B 391). This meeting with Shoudy did not seem any different than any other organizational meeting (Crawford 21, B 397). Numerous individuals asked questions of Shoudy (Crawford 15, 20, B 397, Spampinato 26-27, B 663, 664), because customer service had always been a question with the IT department. (Cooper 17, B 383). Shoudy admitted to the problems (Spampinato 27, B 664) There were a lot of questions asked, all of which seemed appropriate (Crawford 21, B 397). During the meeting Dr. Johnson asked some questions of Shoudy (Cooper 15, B 381). In addition to Johnson, other people who asked questions, included a Zac Royston, Shelby Crawford, Dan Haughtailing, Ron Pleasanton and Dr. Spampinato (Cooper 16, B 382).

It was conceded by all parties, that the inquiries during the meeting concerning the quality and nature of the IT services would be a matter of legitimate concern and appropriate to discuss (Simpson 60-61, B 635, 636), and matter of public concern (Shoudy 27, 56, 58, B 625, 626, 627). Dr. George agreed that the IT effort affected how administrator's would work, how students would interact with the school, and how the outside public would interact with the

---

[10] Despite the defendant's claims that the process was subject to a unanimous vote (DB-4), it was approved without a vote (McNesby 97, B 537)

school using the computer system (George 42-43, B 485, 486). Dr. Johnson's questions were relevant because it was known that she was always very focused on customer service (Cooper 14, B 380), and there was nothing about the tone or the substance of her questions that was inappropriate (Cooper 14, B 380 Crawford 15, B 392)[11]. Johnson did not appear antagonistic (Cooper 14, B 380 Crawford 15, B 392), nor did she do anything to try and chastise Shoudy concerning his presentation (Cooper 15, B 381).

Johnson's questions were of public concern, because it was known that there had been previous issues with the IT Department (Crawford 16-17, B 393, 394). The consensus of the persons attending the meeting was that nothing unusual happened (Yanos 5-6, B 672, 673) nor did Johnson act inappropriately (Yanos 6, B 673 Pleasanton 19, B 584).[12]

Following the meeting, Shoudy discussed the meeting with Dan Simpson Vice-President for Academic Affairs (and Dr. Johnson's successor) (Simpson 58-59, B 633, 634), stating he felt that he had been ambushed (Simpson 58-59, B 633, 634 ). Shoudy did inform Simpson that the comments that were made at the meeting dealt with the quality and nature of the services performed by the IT Department, which Shoudy felt were areas of legitimate concern (Simpson 60, B 635).

Simpson without seeking any explanation from Dr. Johnson (Simpson 54, 64, B 631, 637) went to tell  Dr. George of the meeting (Simpson 55, B 632 George 44, B 487), which was the first Dr. George had heard of it (George 44, B 487).  George sent a letter to Dr. Johnson, on December 8,2004 questioning her conduct, which he termed as being "subversive" and insubordinate (George ,48, B 488), at Simpson's suggestion.(George 68, B 494 Simpson 68, B 638).

---

[11] Although the defendants claim Dr. Johnson's questions were abusive (DB-5), the meeting chair admitted Dr. Johnson did not yell or scream (Spampinato 39).
[12] As Ron Pleasanton head of the Del Tech graphics department noted, Dr. Johnson is a tough cookie and can ask tough questions, but during the meeting they were not disrespectful (Pleasanton 19, B 584).

8

During a subsequent meeting he informed her that she had two choices, to retire, or he would conduct an independent investigation (which would presumably lead to the termination of her employment). On January 3, 2006 Dr. George placed Dr. Johnson on administrative leave. Dr. George claimed that he was going to select and independent counsel to do an investigation of Dr. Johnson (T-6). What he actually chose was the same counsel that had continuously been representing Del Tech for the entire 10 years Dr. George had been President. (George 86, B 494), When, pursuant to the Del Tech Personnel Handbook (B-111) a grievance hearing was requested (B-71). The request for a grievance was rejected, even though the head of Human Resources testified suspensions were grievable (Murray 52-53, B 564, 565).

F.    **Simpson's Involvement in the Investigation**:    Dan Simpson, Dr. Johnson's successor as Vice-President/Campus Director for the Terry Campus, although denying doing so (Simpson 54-55, B 631, 632),  began his own investigation in early January (Simpson 86-87, B 641, 642).  He wrote summaries of his interviews (B-61).  Those interviews were conducted at the instruction of Gerald McNesby, Del Tech's Vice-President for Financial Affairs (Simpson 87-88, 105, B 642, 643, 648)[13].    During Simpson's interviews he interviewed Johnson's secretary, representatives of the finance office, and the entire marketing department (Simpson 89, 97, B 644, 646). [14] Those interviews took place in January 2005 immediately after Johnson was put on leave (Simpson 100, B 647).    The secretary was asked to recreate Dr. Johnson's time (Powell 97, B-65).

Despite Simpson's denial that he was involved in the investigation (Simpson 54-55, B 631, 632), his calendars are to the contrary.  His calendars reflected many meetings during his

---

[13] McNesby, in his sworn testimony, denies that he ever instructed Simpson to interview anybody, states that he was unaware of Simpson's involvement in any investigation, and did not even suggest that Simpson interview people. (McNesby 117-118, 538, 539). Simpson acknowledges that he sent the summaries of the interviews to McNesby (Simpson 86, B 641).

[14] Simpson, a former state police superintendent, acknowledged that his training as a police officer included interrogating people that he was trained in that process (Simpson 28, B 630), and was skillful in interrogating (Simpson 29,B 630).

investigation (B-310.et. seq.) as well as noting his many interviews (B-313-316). Further, he was consulting regularly concerning Dr. Johnson's explanations (B-317), as well as being intimately involved in the investigation (B-118).

**G.    Dan Simpson Assumes Dr. Johnson's Place on the Del Tech Terry Campus:**

After Dr. Johnson was placed on administrative leave, Dan Simpson, was called into Dr. George's office and was told to assume Dr. Johnson's duties (Simpson 73-74, B 639, 640). Although there was vacant office space near Dr. Johnson's office (Powell 19, B 586 Simpson 113, 114, B 649, 650), Simpson moved some of Johnson's furniture out of her office (Spampinato 37, B 665 Simpson 114, B 650), had the office painted (Powell 33, B 590 Simpson 114, B 650), and moved into her office and her parking space (Simpson 113-114, B 649, 650).[15] To further demonstrate that Johnson would not be returning to campus, he took Johnson's picture down from the campus conference room and put it in a closet (Simpson 115, B 651)

**H.    Del Tech's Multiple Rounds of Interviews:** During Del Tech's investigation of Dr. Johnson, although she was excluded from campus, and explicitly told not to speak to any present or former employees, there were four rounds of interviews done of employees by Del Tech personnel. The first interviews were conducted by Hope Murray, the Human Resources Director, of all persons who attended the November 19, meeting (Murray 67-68, B 597, 598). The second round of interviews was by Dan Simpson (Simpson 87-88, 105, B 642, 643, 648). The third round of interviews were conducted by David Williams, the attorney representing Del

---

[15] Although Johnson was removed from the Terry Campus, allegedly for inappropriate behavior towards staff, Simpson himself had a reputation for abusing staff. He had a reputation for being abusive (Rockey 36,B 623), and aggressive (Lister 15, B 501), on occasion would "fly off" (Rockey 35-36, B 622, 623). On one occasion he was seen to lose his temper and "totally went off" (Rockey 35-36, B 622, 623). When staff would disagree with Simpson, he would confront them by screaming and yelling at the top of lungs, cursing and physically threatening to throw them off campus (Yanos 14-15, B 675, 676). Several witnesses in this matter testified reluctantly, feared adverse action (Yanos, B-674A) and felt a need for protection (Rockey, B-616-616A).

Tech in this matter (B-205).[16]  Finally, David Dwyer, a CPA hired by the school to justify Dr.

Johnson's termination also conducted interviews.[17]  While initially Simpson testified that his

only role in the investigation was to give word to people to be available for interviews (Simpson

96, B 645) he did admit preparing summaries during his investigation at the request of the vice-

president of finance, Gerald McNesby (Simpson 105, B 646).[18]  Ultimately, he and Hope Murray

prepared a list of 42 people to be interviewed (Murray 67, B 568 Spampinato 48, B166, B-

59)[19]

      During the interview process, Simpson suggested only names of people who would

support allegations of misconduct against Dr. Johnson (Simpson 132, B 652), and gave no

thought to interviewing people who would have something positive to say about Dr. Johnson

(Simpson 133, B 653).  No thought was given to supplying names of people who support

Johnson as to Johnson's leadership (Simpson 134, B 654), or any names of individuals who

might support a different version of the summaries already prepared by Simpson (Simpson 134,

B 654).  During the investigation, no one suggested asking Dr. Johnson for her version of any of

the alleged facts, and no one contacted Johnson for her version (McNesby 138-140, B 544, 546).

Many of the interviews took place in President George's office (Simpson 135). The interviews

were so slanted that one member of the marketing department felt free to describe a desire to do

personal harm to Dr. Johnson and to her property. (Molikan 12-13, B 554, 555).  She further

---

[16] Although it was claimed by George and Williams that this was an "independent investigation" Williams had represented Del Tech since 1995 (George 86).  Further while the head of Human Resources testified, Williams was not involved in investigating financial matters (Murray 70, B 569). Williams maintains to the contrary (B-73).

[17] The inadequacies and inappropriateness of Dwyer's report, which violated his professional standards is described at p.10 , infra.

[18] McNesby denies directing Simpson seek out more information or conduct interviews (McNesby 118, B 539).

[19] Simpson denied having prepared the list. (Simpson 129, B 651)

promised the CPA that interviewed her that she would "scrounge around" to find more things on Dr. Johnson (Molikan 18, B 556).

I.    **The CPA, Dwyer's Investigation Was Admittedly Not Designed To Seek The Truth**: Dwyer admitted he was not hired to seek the truth (Dwyer 55, B 432), but rather perform an "Agreed Upon Procedure" (Dwyer 18, B 418).    This process is an investigation conducted by the two parties, the accountant, and the "specified party" (Dwyer 18, B 418), who directs the investigation. In this case, the "specified party" was Del Tech. (Dwyer 19, B 419).  Any services performed by Dwyer in regards to this investigation were directed to be done by Gerald McNesby, the Vice-President for Finance (Dwyer 19, B 419).  McNesby gave him five (5) agreed upon procedures, which are listed in his engagement letter (Dwyer 22, B 420)[20].  The only persons that Dwyer was to consult during the investigation were persons he was directed to by the defendant, Del Tech (Dwyer 24, B 421).  Those persons that he was to interview were selected by Dan Simpson (Dwyer 30, B 423).

David Dwyer, a CPA with the firm of Santora & Baffone ("S & B") was consulted by Del Tech in connection with the investigation of Dr. Johnson on February 25, 2005. (Dwyer 33, B 425, B171).  Santora & Baffone had previously done other work for Del Tech (Dwyer 15, B 416), and the defendant, Orlando George's daughter, works as a staff accountant for that firm (Dwyer 17, B 417).

The accountant admitted that his investigation and final report (B174) violated the Professional Standards (B-186) by which he was bound.  In doing so he investigated only those areas directed to be investigated by the defendants, utilizing only the facts given him by the defendants, included subjective opinions, rather than objective findings, omitted contradictory evidence required by his Professional Standards,(B186) and misstated facts revealed in the investigation.

---

[20] McNesby denies dictating the "agreed upon procedures" (McNesby 25, B 517).

In his investigation, under the agreed procedure process, he was not to interview people who would make positive statements about Dr. Johnson (Dwyer 31, B 424), although Dr. Johnson was a Del Tech employee, who was involved in the transactions related to the agreed upon procedures (Dwyer 39-40, B 427, 428). He thought interviewing Dr. Johnson was rejected since it was outside the terms of his engagement (Dwyer 38, B 426), and Vice-President McNesby considered it irrelevant (McNesby 26-27, 517, 518).

In an agreed upon procedures investigation, there is no attempt to find the truth of the allegations, except as within the limits of the directed agreed upon procedures (Dwyer 55, B 432). Similarly a fact known to the specified party (Del Tech), if withheld might result in the final report not being accurate (Dwyer 55, B 432). Any materials or evidence that contradicted his findings under the agreed upon procedures, should have been included in his final report (Dwyer 61-62, B 436, 437)[21]

The agreed upon procedures performed by Dwyer were governed to the standards set out by the American Institute of Certified Public Accountants (AICPA) (Dwyer 40-41, B 428, 437). Specifically it was covered by the Attestation Standard §201. (Dwyer 41, B 429)(B-186 ). Under these standards the agreed upon procedures finding should not be subjective in any nature. (Dwyer 59, B 434). Contrary to the AICPA standards, and the requirement that positive statements be included in his final report, Dwyer did not do so even though some people did have positive things to say about Johnson (Dwyer 24, 62, B 421, 437). Dwyer did not attempt to determine whether there was any factual basis to support the subjective comments criticizing Dr. Johnson (Dwyer 69, B 442), and merely included these in his report, in violation of the standard (Dwyer 59, B 434).

In addition, the standards state that the report should not be distributed to anyone other than the specified party (Dwyer 59, B 434), and should not be used by any person other than the

---

[21] This did not prove true since he admitted that positive statements made during his investigation were not included in his report. (Dwyer 62, B 437)

specified party (Dwyer 57, B 433). It is clear that the AICPA standards were violated when his report was used, not for internal purposes, but for the purpose, but for the purpose of terminating the employment of Dr. Johnson, and by circulating it to the Delaware State Auditor's office (See Section "J", infra.)

J.    **The Interview Process:**    During the agreed upon procedures, Dwyer interviewed twelve (12) persons[22]. The first interview was with Dan Simpson, who would tell him who else was to be interviewed. (Dwyer 28, B 422). Most of the people to be interviewed, were people who were selected by Simpson (Dwyer 30, B 423). During the interviews conducted, Dwyer would guarantee the interviewees that Dr. Johnson would not be returning to campus (Molikan 19, B 557). In response to a question as to whether or not Johnson would be returning, Dwyer stated that Del Tech had guaranteed (before his investigation was concluded) she would not be returning:

> "That's not going to happen. I already - - I said you know what's going to happen when people ask me that question, they guarantee that she will not be back." (Molikan 19).

K.    **The "Agreed Upon Procedures" Report was Riddled with Errors and "Violations of AICPA Standards":** Recognizing that the "Agreed Upon Procedures" that Dwyer embarked upon was not an attempt to determine the truth of any allegations against Dr. Johnson (Dwyer 55), nevertheless his report failed in numerous ways to follow his professional standards.

1.    **Travel Policy:** Dwyer's report found and concluded that Dr. Johnson had violated Del Tech's travel policies by not obtaining the President's approval for her travel (Report B-179-80)(Dwyer 62-63, 437, 438). However, during his interview processes, he interviewed Robert Hearn, the business manager for the Terry Campus (B-184 ). His summary of that interview indicates that when Hearn worked in the President's office there was a custom and

---

[22] A copy of those recorded interviews was not made available to the plaintiff prior to the termination hearing, and not until after depositions of George, Murray, Dwyer, and Powell.

practice that Vice-Presidents/Campus Directors did not need to get approval from the President to travel (B-184 ).(Dwyer 67-68, B 440, 441). Dwyer conceded that Dr. Johnson would have been covered by such a custom and practice (Dwyer 64-65, B 439). As Dwyer further conceded, that the failure to include that material in his final report (Dwyer 67-68, B 440, 441) would have been a violation of the AICPA Standard, §201.4, which required any materials that contradicted the agreed upon procedures to be included in the report (Dwyer 63, 68, B 438, 441). Nor, did Dwyer do anything to follow up on Hearn's statements, which contradicted his conclusions (Dwyer 68, B 441). (Dwyer agrees that such a custom and practice should have been in his report) (Dwyer 63, B 438). [23] Further investigation by Dwyer would have revealed, from documents provided him by Del Tech, that other Vice-Presidents/Campus Directors did not obtain approval for their travel, in conformance with the custom that Hearn described (McNesby 31-35, B 519, 523 ,B-152-54). In fact, Johnson's travel forms broke down purposed expenses in much more detail than other campus directors, and were more specific (McNesby 37, B 524). Despite Dwyer's criticisms, Johnson's secretary, Kathy Powell testified that Johnson never refused to give information that was needed to reconcile her travel vouchers (Powell 77, 85-86, B 597, 602, 603).

2.    Personal Work by Powell: A substantial part of the accountant's report dealt with personal work done by Dr. Johnson's secretary, Kathy Powell. The report stated that 10% of her time was used for Dr. Johnson's personal work (Dwyer 74, B 447), and that figure was used to calculate the financial cost of Powell's doing Johnson's personal work. However, the interview performed by Dwyer of Kathy Powell indicates that as little as 2% of her time and no more than 8% of her time was devoted to personal work (Dwyer 73, B 446)(B-185). That documentary evidence was contradictory to his report's findings (Dwyer 79, B 448), and Dwyer acknowledged

---

[23] Dwyer was never given the documentary evidence that Dr. George had, which detailed specifically Dr. Johnson's travel each year, in her annual evaluations (**Exhibit Pages**)(Dwyer 114, B 471).

that this was a violation of the AICPA Standards, §201.40 (B-199, requiring such contradictory evidence be in the report.[24]  In a further attempt to determine the amount of personal work that Kathy Powell did for Johnson, he reviewed Powell's computer files (Dwyer 41, B 429). However, he did not look at Dr. Johnson's computer files (Dwyer 41, B 429), and does not know to what the extent the materials in Dr. Johnson's computer was merged/transferred into Powell's files (Dwyer 41, B 429).  He acknowledged that the personal correspondence in Powell's computer might have originated someplace else other than by her preparing them herself, and he made no attempt to determine their source of origination (Dwyer 41-42, B 429, 430) (See Affidavit of Dr. Johnson, ¶ 5,B-335 ).

     3.   <u>Reunion:</u>     Dwyer's description of Dwyer's family reunion was wrought with inaccuracies and lack of information supplied to him by the defendants. A primary example was that Del Tech never showed him the invoice or check for payment of the reunion work, prepared by Powell (Dwyer 82, 88,B 451, 457, B-138-39) where, under the agreed upon procedures, Del Tech was to have supplied him such documents (Dwyer 88, B 457).  Rather, Del Tech informed him that the payment, which was reflected in Del Tech's ledgers was for "supplies" (Dwyer 82-83, B 451, 452).  Likewise, when Dr. Johnson paid for the banner used at the reunion (Dwyer 117-118, B 472, 473, Ex. 10), Dwyer simply overlooked that fact (Dwyer 96, 118, B 462, 473). Dwyer acknowledged that Johnson paid every bill presented to her, in connection with her reunion in full (Dwyer 81-82, 87-88, B 450, 451, 456, 457), but that statement was never included in his report, another violation of the AICPA standards.[25]

     A significant part of Dwyer's report dealt with an attempt to retrospectively calculate copies and costs connected with the family reunion.  However, people interviewed had trouble recalling the number of copies (Dwyer 83-84, B 452, 453), and he based his calculations upon

---

[24] At Johnson's termination hearing Dwyer testified without any documentary or testimonial support, that Powell's personal work done for Johnson was as much as 15% (T-178-179, B 360, 361).

[25] Dwyer never mentioned that Dr. Johnson paid for some of the typing (Travis 6-7, B 668)

the number of invitations sent out, even though he had no idea of the number of people who actually attended (Dwyer 84, B 453). Dwyer acknowledged that Johnson would not have had more copies printed than the number of attendees (Dwyer 84-85, B 453, 454), and Dwyer could not determine how many people actually attended (Dwyer 85, B 454). Rather, he used a rough estimate of the number of people he thought attended to calculate the number of copies. (Dwyer 85, B 545).[26]

His setting a price for the number of copies made was likewise without factual foundation. He did not have any idea whether the rates he applied were equal to the commercial rates (Dwyer 88-89, B 457, 458), since he never attempted to determine if his numbers were accurate (Dwyer 89, B 458). In fact, the marketing department never billed for black and white copies for anybody, so there was no set price (T-151, B 357)[27]. Thus, Dwyer had no knowledge of what to use for black and white copies. (T-170, B 359). In attempting to determine the cost of supplies, he never attempted to ask if Johnson supplied any materials (Dwyer 83-84, B 452, 453), and only assumed they all came from the school. (Dwyer 86, B 455). He acknowledged that if he had asked Dr. Johnson he might have found out that she had in fact supplied some of the paper and other materials (Dwyer 86, B 455).

With regards to the time that an individual spent preparing documents for the family reunion, Dwyer also acknowledged that when questioned, she could not remember how much time was spent on that task (Dwyer 43, B 431), and could not even give an estimate as to whether it was 10 hours or 50 hours (Dwyer 43, B 431). That contradictory fact, omitted in Dwyer's final report. Finally, in trying to estimate the amount of time spent on the reunion, by

---

[26] Dwyer acknowledged that he issued a report estimating the cost even though he did not know the number of attendees (Dwyer 85, B 454), and likewise acknowledged, in using an analogy of wedding invitations, that a significant number of people invited may not have attended. (Dwyer 84-85, B 453, 454), and his estimate of the number of attendees was "absolutely" a rough estimate (Dwyer 85, B 454).

[27] As the Vice-President for Finance testified this investigation was the only time the marketing department set a price for copies (McNesby 165, B 549).

Johnson's secretary, Kathy Powell, he testified that she could not remember (Dwyer 89, B 458, Ex. 8), and he described Powell as "waffling" on that subject (Dwyer 90-91, B 459, 460). This also was omitted.

      4.    Credit Card Purchase: Examining the credit card purchases of Dr.Johnson, he examined only those purchases directed to him by Del Tech, and did not review the thousands of purchases made by Johnson (Dwyer 103, B 465), to determine her adherence to school policies. His report did not acknowledge that the travel policy provided for reimbursement for personal expenditures made at the same time as business purchases (Dwyer 106, B 468 McNesby 67, B-124). He failed to note that it was business office's duty to reconcile all credit card purchases (Dwyer 104, 107, 466, 469) and acknowledged that the business office had failed in its obligations to do such a reconciliation concerning the West Virginia purchases (Dwyer 107-108, B 469, 470). Such reconciliation would have promptly put Johnson on notice to provide the receipts that were ultimately found in her office (Dwyer 105, B 464), and in the travel folders maintained by her secretary Kathy Powell (Powell 78-79, B 598, 599). These facts were omitted in his report, again violating the AICPA standards.[28] As result the hearing officer erroneously concluded that Johnson had to be reminded to make repayments to the school. There was no evidence to support such a conclusion!

      5.    Unreconciled Trips  Dwyer's report did not mention the fact that he learned during the investigation, that Powell told him it was her obligation to reconcile all trips (Dwyer 97, B 463). She also told him that she dealt with the business office (Dwyer 98, B 464), and the business office communicated with Powell and not with Johnson (Dwyer 98, B 464).

      6.    Per Diem Reimbursements:  While Dwyer's report criticizes certain per diem reimbursements by Johnson, he acknowledged that the vice-president for finances had approved

---

[28] Dr. Johnson had regularly made payments purchases and to reimburse the school for expenditures, which the hearing officer viewed as evidence of improper conduct. The Vice-President of the Finance Department rejected this by stating his offices was unaware of those reimbursed expenditures being improper (McNesby 162-163, B-144).

of such reimbursements (Dwyer 185, B 454)(B-164), and any suggestion in his report that such reimbursements were improper were contradicted by McNesby's approval (Dwyer 125-126, B 474, 475). Again, this contradictory information, as required by the AICPA standards was, omitted from his report.

       7.    <u>Dwyer Agrees No Laws or Del Tech Policies Were Violated</u>: Dwyer after his investigation, was unable to report that any laws were violated by Dr. Johnson (Dwyer 70, B 443). Further, while Dwyer's report attempts to suggest that various Del Tech policies were violated, specifically §6.01(dealing with the vice-president's power to establish work periods and designate work assignments), and §11.11(dealing with outside employment)(B-114 &115), Dwyer agreed, in his deposition, that he could not determine whether those policies were violated, since he never made any determination, whether any of the work for Dr. Johnson interfered with any of Del Tech's day-to-day operations (Dwyer 71-72, B 444, 445), nor could he determine whether any of the work that Powell was requested to do violated the policy (Dwyer 72, B 445)[29] As to the travel policies, as already pointed out, Dwyer could not establish that Johnson violated any of those policies, because other vice-president's did not obtain presidential approval for travel (Dwyer 72, B-152-154), and when he wrote his report he was aware of the custom and practice that the Vice-President/Campus Director's did not require presidential approval (B-184). This was a further violation of the AICPA standards (Dwyer 68, B 441).

       **L.**    **State Auditor's Report Lacked Full Disclosure by Del Tech**: Del Tech, on its own initiative, publicized its accusations against Dr. Johnson by contacting the State of Delaware Auditor's Office (McNesby 57, 137, B 531, 543), at the suggestion of McNesby (Simpson 142, B 656) and Santora & Baffone (Report).

---

[29] Recall that the testimony during depositions, was that Powell's work done for Dr. Johnson did not interfere with her day-to-day duties (T-126, B 355), and the reunion work done at Dr. Johnson's request was done at the end of the year, when the school year was over, and there was significantly less students on campus (Pleasanton 11, B 579), and did not interfere with regular work (Travis 7-8, B 669).

The State Auditor received a copy of the Santora & Baffone/Dwyer Report (Draper 8, B 400). With regards to the personal work done by Del Tech employees. The State Auditor's office relied solely upon the Santora & Baffone/Dywer report and did not go beyond any work they did (Draper 13-14, B 402, 403)[30]  If the Santora & Baffone report was wrong concerning personal use of Del Tech employees, then the Auditor's report was also wrong (Draper 47, B 413).

The State Auditor's Office was familiar with the AICPA Standards, and agreed that those standards should have been followed by Santora & Baffone and, was under the impression that they were followed (Draper 12-13, B 401, 402).  However, with the findings that Santora & Baffone made, and the State Auditor's own independent examination, they were never informed that Santora & Baffone found in their investigation that there was a custom and practice, in the President's office, that Vice-President/Campus Directors did not need to obtain Presidential approval for their travel (Draper 23, B 404).  The impression in the President's office was that campus directors did not need Presidential approval for travel had never been conveyed to him and it is not reflected in his report. (Draper 28-29, B 405, 406) If that fact had been known it would have changed the Auditor's findings (Draper 23, B 404).  Likewise, although they concluded that Dr. Johnson was the only one who did not obtain approval of the president to travel, they were never shown the travel documents of the former Vice-President of the Sussex County Campus, Dr. Tim Kavel (B-152-154).   If he had seen the travel documents for the Sussex Campus (Id.), the State Auditor's Report he would not have made the statement that other campus supervisors always receive travel approval (Draper 32, B 407).   In regard to the travel policies, he believed that Dwyer did not follow the AICPA standards, because he failed to put the information concerning the custom and practice that they obtained through their interviews, (B-184) in the report.(Draper 32, B 407)

---

[30] Thus, any weaknesses in the Dwyer analysis (p.12, supra.) would also be weaknesses with the State Auditor's Report.

The final area that the State Auditor's Office reviewed was the use of the credit card policies. The auditor's office agreed that the Del Tech credit card policies (B-119) anticipated personal use of the credit card, while requiring repayment (Draper 36-37, B 408, 409). However such repayment would have required someone to notify the card holder that the charge had been disallowed (Draper 37, B 409), and the auditor's office was unaware whether Johnson had ever been notified of the disallowance of her credit card purchases (Draper 37-38, B 409, 410). This was a weakness in the Terry Campus Business Office (Draper 41, B 411), since he acknowledged that apparently the campus director's credit card purchases were not always reviewed and approved properly (Draper 32, B 407). Finally, it was concluded that Johnson had a reasonable expectation that such purchases would be reviewed (Draper 44, B 412).

**M.    Del Tech Credit Card Policies**:    Del Tech, Terry Campus, is governed by two policies concerning the use of its credit cards, the Del Tech travel policies (McNesby Ex. 9), and the Del Tech "Supercard Employee Disclosure Statement and Guidelines" (McNesby Ex. 10). Both of those policies anticipated and provided for the use of the card for business expenses and personal expenses in conjunction with such business expenditures. The Travel Policy (McNesby Ex. 9, ¶10) specifically stated that if personal expenses were billed at the same time as business expenses, employees were to reimburse the college. The "Supercard Disclosure Statement Guidelines" provide that if the card was used for personal expenses, which are subsequently disallowed by the business office, the card holder would be expected to reimburse the college within 24 hours of notice. (McNesby Ex. 10, ¶II (D). The vice-president of financial affairs for the college testified that the campus business offices would notify the card user if a purchase had been disallowed (McNesby 80-81, B 533, 534), and the business office had the obligation to notify the employee (McNesby 82, B 535). If the business office could not determine if the expense was personal or business, it would approach the **cardholder** for receipts. (McNesby 81, B 534).

Dr. Johnson's secretary, Kathy Powell testified that she was responsible for reconciling Dr. Johnson's travel expenses (Powell 88, B 605) and keeping track of all personal expenses, such as cell phone costs, Powell would assemble the information then Dr. Johnson would write a check to the college (T-259-260, B 365). Johnson never refused to give receipts (Powell 85-86, B 602, 603).

With regards to Johnson's PNC purchases that were questioned in this matter, no one every approached Powell directly (Powell 84-85, 87, B 601-603, B-166). After an initial inquiry, the matter was allowed to lay dormant for two years (Powell 88, B 605). Hearn, the Terry Campus Business Manager never asked Johnson for receipts (T-254, B 363). Hearn never contacted Johnson by email asking for receipts (T-263, B 366). Hearn admitted that although an employee who must reimburse the college within 24 hours after a charge is disallowed, they have to wait until they are actually notified it was disallowed (T-267, B 368). The only supercard purchase that Dr. Johnson did not reimburse the college for appropriately was for the West Virginia purchases (T-265, B 367), for which she never received direct notice. The conclusion by the hearing officer that Dr. Johnson had a "pattern of abuse" in the use of the credit card and had to be reminded to reimburse the school (by her checks, B-144-151), was unsupported by any evidence. Buying books for the Del Tech learning center would be campus related (T-265, B 367).

N.      **Financial Oversight of the Terry Campus**: The Del Tech, Terry Campus for which Dr. Johnson served as Vice-President/Campus Director was subject to significant regular audits. Audits were performed for the various campuses by the State Auditor's Office and independent CPA's (McNesby 13, B 508) including a national accounting firm, KP & G (McNesby 13-14, B 509, 510). Outside local accountants did internal reviews to make sure internal control procedures were applied (McNesby 14-15, 509, 510). Finally, the Vice-President of Financial Affairs also conducted regular financial reviews (McNesby 16, B 511).

22

Prior to the S & B report the Finance Department never knew of any financial irregularities by Dr. Johnson's campus (McNesby 17-18, B 512, 513).

The individual campuses have business managers, who report to each campus' Vice-President/Campus director (McNesby 10, B 505). The Vice President of Financial Affairs coordinated with the business managers to make sure that policies and procedures were uniform (McNesby 10, B 505). McNesby never had problems dealing with Dr. Johnson anymore than with any other campus director (McNesby 12, B 507), and was not intimidated by Dr. Johnson (McNesby 12, B 507). Although the business manager's staff had notified Hearn on three occasions (McNesby 53, B 530), that there were receipts that were unaccounted for (McNesby Ex. 7 and 8, McNesby 51-53, B 528, 530), the Terry Campus business manager never approached McNesby about any difficulty resolving those issues (McNesby 52-53, B 529, 530). If he had such problems, he should have approached McNesby (McNesby 11-12, B 506, 507) (Note this is especially true since McNesby had both hired Bob Hearn, the Terry Campus Business manager and Hearn had worked in McNesby's office, McNesby 19, B 514). Thus, there was no reason why Hearn could not have contacted McNesby for any alleged problems with Dr. Johnson (McNesby 12, B 507). At no time did Hearn ever complain about Dr. Johnson (McNesby 20, B 515) and never said that Johnson was impeding his duties as business manager (McNesby 20, B 515). Accordingly, Hearn should have approached Johnson with any unreconciled expenses or receipts (McNesby, 41, B 525), and if Johnson had not responded to Hearn, then Hearn should have gone to McNesby (McNesby 42, B526) If Hearn, who never did, had approached McNesby concerning any unreconcilled issues, McNesby then would have contacted Johnson himself (McNesby 42, B526). However, McNesby had no knowledge of

Johnson ever refusing to deal with issues reflected in the internal memos of the Terry Campus business office (McNesby 43, B527 )[31]

**O.**    **Johnson's Personal Work:** While the defendants claim that Johnson utilized her secretarial staff to do significant personal work, the entire analysis was flawed. (See Section 2, p. supra.)  There was a general custom and practice among Del Tech administrators that their secretarial staff would assist them in some personal work so that there time could be devoted to Del Tech matters.  For instance, one veteran secretary has admitted doing a plethora of personal work, for as many as nine (9) Del Tech administrators over a period of 33 years (Waters Affidavit, B-345).

Other testimony showed that personal work for executives was not uncommon (Rockey 15-16, 20, B615-616, B619), including preparation of dissertations, executive papers for the administrator's doctorate degrees, and to prepare papers for classes the executives were taking (Rockey 16, B616).  That is, such work was non-college personal work. (Rockey 16, B616).  In addition, the secretarial staff would do such personal work as pick up laundry, type personal letters, and prepare materials for classes that administrator's would teach off campus (Rockey 18, B617).  There was no announcement or policy prohibiting such work (Rockey 19, B618), and the personal work did not interfere with their day-to-day duties (Rockey 19-20, B618-619).[32]

Similarly, the marketing department would do work for non-college events, such as preparing for birthday parties (Molikan 8, B551) as well as other work for non-campus, non-profit  organizations in which that college personnel were involved (Molikan 19, B557).  The work for those off campus organizations was never charged to them (Molikan 9, B552).  The graphics department also did work for non-campus, outside organizations (Pleasanton 12, B580).

---

[31] Thus, any claim that the Terry Campus Business Manager was intimidated by Dr. Johnson and feared reprimands (B363-364) is clearly contradicted by the testimony of his immediate superior, Vice-President for Financial Affairs.

[32] This testimonial evidence, by Del Tech's secretary, could not be presented at the hearing since Dr. Johnson had been instructed not to have contact with past or present Del Tech employees..

24

Those organizations would not pay for the work, except for reimbursing the expenses (Pleasanton 12, B580).

Although, Dr. Johnson's secretary did prepare some personal correspondence for Dr. Johnson she never kept track of the amount of time that work took (Powell 98-99, B607-608)). When she did such personal correspondence she would use the same form for multiple letters, and just use new numbers (Powell 103, B609). An example of this was correspondence concerning the nursing home maintenance of Dr. Johnson's ill sister, when she would use the same form and just put in new numbers making it a fairly repetitious task (Powell 103, B609). Dr. Johnson's secretary, as she might do for Dr. Johnson, had picked up lunch for President George (Powell 104-105, B610-611).

**P.**     **Johnson Paid for Family Reunion Efforts**: Dr. Johnson attempted to pay in full, promptly, all bills submitted to her in connection with the family reunion. For instance, she requested the graphics department to prepare a banner for her in June 1999 (Pleasanton 8, B576). Ron Pleasanton, the head of the Graphics Department, and his GRID Club worked on the banner and it provided a learning experience for the students.(Pleasanton 9-10, B577-578). During the process, Dr. Johnson was clear that she wanted and asked for receipts to pay for the banner (Pleasanton 10, B578), which she eventually paid for by check (Pleasanton 10, B578, B141-142). At no time did Dr. Johnson asked not to be charged for the job and never suggested that the price be low balled (Pleasanton 10, B578). She wanted to pay the full value of what she got, and did so (Pleasanton 10-11, B578-579). It was known that Johnson bought some of the supplies and had given them to the marketing department (B354).

With regards to the written materials for the family reunion, Dr. Johnson had asked the Marketing department to prepare a bill, but they told Powell they did not have the proper forms. Dr. Johnson"s secretary then prepared a form and bill herself.[33]   When Johnson asked her to

---

[33] One Marketing Department employee testified she had helped prepare an invoice (B356)

prepare the invoice, she did not ask her to exclude anything (Powell 68, B595), nor, after the invoice was prepared, did Johnson ask it be reduced (Powell 68, B595). Dr. Johnson was charged for copies exactly as everybody else (B357-358). Dr. Johnson paid the invoice without question with no attempt to have Powell low ball the amount of the invoice (Powell 68-69, B595-596). When the work was being prepared, Dr. Johnson was open and obvious as to what was being done and there was no attempt to try and sneak the job passed anybody so she wouldn't have to pay for it (Molikan 10, B553) (B362). The work did not interfere with or prevent other work from being done (B369-370).

Q.    **West Virginia Purchases** While traveling to West Virginia, with Dan Simpson, Dr. Johnson called Kathy Powell and asked for the credit card number for her school issued PNC credit card. (Powell 82, B600). During that trip, Dr. Johnson made several purchases, including pictures to be used at the school, three antique children's books (The Sambo Books) and some personal jewelry.[34]

As a part of Dr. Johnson's secretary's regular job duties, she was to reconcile all travel expenses and charge card receipts (Powell 88, B605). There was an initial inquiry concerning these purchases in 2002 by an email directed to Robert Hearn, the Terry Campus Business Manager, by one of his staff. However, Powell was not "copied" on it (Powell 87, B604). After the initial internal inquiry in 2002, until 2005 there was no other attempts by the business office to reconcile the charges for the West Virginia trip (Powell 88, B605), that is nothing was done during that three year period (Powell 88, B605). The PNC card statement for the West Virginia purchases was never reconciled (Powell 88, B605), although it was part of the secretary's regular job duties to prepare such reconciliations (Powell 88, B-605). The failure to reconcile the statement was not Dr. Johnson's fault, and she never refused to respond to Powell's inquiries

---

[34] Recall that the school policy for using the PNC card anticipated that school related purchases might be combined with personal purchases, and then, upon notification, the employee was expected to promptly reimburse (B125 ).

(Powell 86, B603), Dr. Johnson's secretary has no recollection of the statement ever actually being given to Dr. Johnson or asking Dr. Johnson for the receipts (Powell 84-85, B601-602), and no one came to her between 2002 and 2005 asking for those receipts. (Id.)

The receipts for those West Virginia purchases were apparently given to Powell and was found in Powell's travel folder. The second one Simpson found in a folder in Dr. Johnson's office (T-28). There was never any attempt by Johnson to hide the receipts (Simpson 148, B658). [35]

**R.**    **Wake College Trip**: The claim that Dr. Johnson traveled to Wake College as a pretext to visit her cousin, Harry Smith, to plan a future family reunion, is factually incorrect.[36] First, as the Affidavit of Harry Smith (B-343), Dr. Johnson's cousin, shows, there was no visit during the period in later October 2002, when the trip occurred. Secondly, the mileage for the rental care would not have allowed Dr. Johnson to travel to her cousin's who was located outside of Raleigh, in Carey, North Carolina. (Johnson Affidavit ¶ 3 & 4 ,B-334 ).[37]

**S.**    **Marketing Department Problems**:[38] The marketing department, which provided much of the complaints against Dr. Johnson, had a long history of not producing professional quality work. (Pleasanton 16-17, B581-582). They had been the subject of discussions between Dr. Johnson, and her assistant to the campus director, when it was noted that efforts had to be made to "...resolve reoccurring issues in the marketing department." (B-326). The difficulties

---

[35] Although Simpson testified at his deposition that the second receipt was found in Cena Seeney's travel folder (Simpson 147-148, B657-658), after his deposition he changed his testimony on his Errata Sheet to indicate that he had obtained the receipts a year before Dr. Johnson was placed on administrative leave, in January or February of 2004 (B-661). (Apparently Simpson was holding these receipts for a year until he found an opportunity to use them.) (Note: Simpson in the recorded interviews by Dwyer, stated that he found the second receipt in the "stuff" in Johnson's office (B-678).

[36] Any claim that the trip was improper because it was not authorized by the President, that will be dealt with later in that the custom and practice of Del Tech was that its Vice-Presidents/ Campus Directors did not have to receive Presidential approval.

[37] Prior to the termination hearing, although the Wake College witness was questioned two or more times by Del Tech (by Simpson, by Dwyer, and even perhaps by Williams), Johnson's counsel was denied any interview access, after Williams had spoken to the college's attorney (B-101, Affidavit of Gary W. Aber, ¶1, B-332).

[38] Most of the people who complained about Dr. Johnson during Dwyer's interviews worked in the Marketing Department (Dwyer 59-60, B434-435).

with the marketing department were well known on campus (Spampinato 48, B666, Powell 21, B586), since their work was not professional (Pleasanton 16-17, B581-582). The concerns revolved around both output and the errors the department made (Powell 21-22, B586-587). The situation was aggravated because many errors were discovered even after the final printing (Powell 23, B588). Members of Dr. Johnson's staff would bring them to her attention (Powell 22, B587). The nature of the errors, in spelling, punctuation and grammar were aggravated by the fact that they were being made by a member of the department who had been an English instructor (Rocky 34, B621).[39] The department also had problems getting work done with adequate quality (Pleasanton 18, B583) or in a timely manner (Rocky 34, B621). Johnson and her staff would have to regularly correct their work (Rocky 33-35, B620-622). In exhibiting an inappropriate attitude (Pleasanton 18, B583) the marketing department viewed Johnson as "picky and particular", even though the criticisms were justified (Rocky 34-35, B621-622).

     **T.**     **<u>Selection of Vincent A. Bifferato, Esquire as Hearing Officer</u>**: Although Del Tech Administrator's Handbook provided that the school's counsel would be a hearing officer in any termination proceeding Dr. George decided on an outside hearing officer, Vincent A. Bifferato, Esquire, a retired judge. This selection was made by Dr. George at the suggestion of Hope Murray, head of Human Relations (Murray 9, B561).[40]

     Murray suggested Bifferato, despite her obvious knowledge that his law firm had represented Del Tech in the past. Murray had been involved in the legal affairs of Del Tech since 1998 (Murray 4-5, B559-560), but claims she was unaware of any prior relationship between Del Tech and Judge Bifferato (Murray 78, B570). Despite Murray's denial, there is evidence that firm for which Bifferato was associated, had represented Del Tech on numerous occasions (B-

---

[39] The marketing people were aware of Johnson's concerns, because she had told them directly, and thus her comments were not behind their backs (Murray 39, B563).
[40] Dr. Johnson's counsel had requested to be consulted in the selection of Shirey's replacement (B-86), but that request was ignored (B-88)

208-209)[41].  In fact, Murray had been involved in an internal memorandum concerning that representation. (B-137).[42]

---

[41] See: <u>Jeffries v. Delaware Technical & Community College</u>, 743 A.2d 675 (Del.Supr. 1999).
[42] After the hearing was concluded, Judge Bifferato was notified of these issues, and sent a letter apologizing and revealing his firm's prior representation in connection with Del Tech  (B-137A).

## I.  THE LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT.

Summary Judgment is governed Rule 56, <u>F.R.C.P</u>, and this may be ordered only when:

> "...the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56, <u>Federal Rules of Civil Procedure</u>.

The United States Supreme Court has determined that "...if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), a genuine issue of fact exists. The burden of proving that there is no issue of material fact remains at all times with the moving party, here the Defendant, even if that party would not have the burden of proof at trial. <u>Finch v. Hercules, Inc.</u>, 865 F.Supp. 1104, 1117 (D. Del. 1994) citing <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d Cir.) <u>en banc</u>, <u>cert. denied</u>, 483 U.S. 1052 (1987).

The Court must examine all the evidence, in a light most favorable to the non-moving party. <u>Finch</u> at 1118, citing <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566, 573 (3d Cir. 1976), <u>cert denied</u>, 429 U.S. 1038 (1977). If there is any dispute concerning issues of material fact, the non-moving party's version, must be presumed correct. <u>Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. - -, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Even where certain facts are undisputed "...summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts." <u>In Re: Unisys Savings Plan Litigation</u>, 74 F.3d 420, 433 (3d Cir. 1996). It remains the province of the fact finder to resolve any issues of believability and the weight of the evidence. <u>Id.</u>, at ftn. 10. Here, the plaintiff is to receive the benefit of the doubt whenever her assertions conflict with those of the defendants' and have all inferences drawn in her favor. <u>Id.</u>, at ftn. 10.

II.   DR. JOHNSON ENGAGED IN SPEECH WHICH WAS
      PROTECTED UNDER THE "FREE SPEECH" PROVISIONS
      OF THE FIRST AMENDMENT, WHICH SPEECH
      INVOLVED MATTERS OF PUBLIC CONCERN.

A.   **Introduction**: In order to establish a violation of the protection of a right to free

speech under the First Amendment, there is a multi-step procedure.  The threshold issue in

determining whether or not a speech is protected under the First Amendment, is whether or not

the plaintiff's speech was a matter of public concern. Azzaro v. County of Allegheny, 110 F.3d

968, 976 (3d Cir. 1997).  If it is determined that the plaintiff's speech is of public concern, the

second step is for the plaintiff to demonstrate that the employee's interest in the speech

outweighs any interest the employer has in promoting the efficiency of the public service it

provides.  Brennan v. Norton, 350 F.3d 399, 413 (3d Cir. 2003); Baldassare v. New Jersey, 250

F.3d 188, 195 (3d Cir. 2001).  That analysis is commonly known as the *Pickering* balancing,

based upon the U.S. Supreme Court case in Pickering v. Board of Education, 391 U.S. 563, 568,

88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  Whether or not there is disruption in the office of the

employee claiming the protection is a factor in the balancing test under *Pickering*.  Baldassare v.

New Jersey, supra, at p.199.  That factor are issues of law for the Court to decide.  Waters v.

Churchill, 511 U.S. 661, 671 (1984); Baldassare v. New Jersey, supra, at p. 195.[43]

The final step in the analysis is whether or not the speech was a motivating factor for the

retaliatory actions. Mt. Healy City School District Bd. of Ed. v. Doyle, 429 U.S. 274, 287, 97

S.Ct. 568, 58 L.Ed.2d 471 (1977).  These are generally considered issues of fact for the fact

finder, that is for the jury, and not susceptible for resolution on summary judgment. Green v.

Philadelphia Housing Authority, 105 F.3d 882, 889 (3d Cir. 1997).

There can be no question that in this case Dr. Johnson was placed on administrative leave,

excluded from the campus, and told not to speak to any past or present employees, because of the

---

[43] In this case the defendants appear to have waived (p. 30, infra.)  In any case there is ample
evidence that her questions were non-disruptive, p. 5-6   , supra.

31

comments that she made during the November 19, 2004 meeting (B-50). Thus, the causation question is not an issue. But for Dr. George's insistence that Dr. Johnson resign, or he would investigate her, the flawed investigation by the CPA (p. 12, supra.) never would have occurred. The defendants in this matter have also never conceded and dispute that they took an adverse action against plaintiffs because of her speech (DB-18-19). Under Third Circuit precedents, they have waived any claim of disruption as a defense. San Filippo v. Bongiovanni, 30 F.3d 424, 434 (3d Circ. 1994); Howard v. Bd. of Educ. of City of East Orange, 90 Fed. Appx. 571, 576 n.6 (3d Cir. 2003); Dennison v. Dept. of PA Dept. of Corr. 286 F.Supp.2d 387, 399 (N.D. Pa. 2003); Bedford v. Septa, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994); Mitchell v. Street, 415 F.Supp.3d, 490 n.5 (E.D. Pa. 2005). Therefore, the final step is not an issue.

**B.    Public Concern**:     In determining whether speech is a matter of public concern, the Courts look to three elements, the content, the form, and context of the statements. Rankin v. McPherson, 483 U.S. 378, 385, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).   An employee's speech that addresses matters of public concern when it relates to "...any matter of political or social, or other concern to the community." Green v. Philadelphia Housing Authority, 103 F.3d 882, 885-886 (3d Cir. 1997); Walters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir 1995).

Speech by a public employee is deemed to be speech about a public concern, when it relates to their employment and does not relate to only matters of a personal interest. Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983). That is, the public speech cannot relate to personal grievances.  Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829 (3d Cir. 1994). Therefore a speaker's motive, while relevant to the context of the speech is not dispositive of determining whether it is a matter of public concern, but rather, the Court must concentrate on the value of the speech itself. Brennan v. Norton, 350 F.3d 399, 412-413 (3d Cir. 2003); citing

Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997); Baldassare v. New Jersey,

250 F.3d 188, 197 (3d Cir. 2001).  As the Azzaro Court has stated:

> "Silencing a public employee seeking to speak out on a matter of
> public concern deprives a self-governing society of information that
> may be vital to informed decision making. Azzaro v. County of
> Allegheny, supra, at p. 977.

The Third Circuit has set the test on public versus private speech by concentrating on the

value of the speech itself.

> "We have 'declined to distinguish between a public employee's expression
> as a public employee and a public employee's expression as a citizen' Baldassare
> 250 F.3d at 197. **'Instead we concentrate on the value of the speech itself'** Id.
> Common sense suggests that public employees no less than other employees,
> would be more likely to speak out when then are disgruntled or personally
> dissatisfied with some aspect of their employment or the employer. Brennan v.
> Norton, et.al. , 350 F.3d 399, 413 (3d Circ. 2003)(Emphasis Added).

The Court went on to state that the emphasis would be on the content of the speech among other

things. Id.

Public employees, like teachers are "...not relegated to a watered-down version of

Constitutional rights." Garity v. New Jersey, 385 U.s. 493, 500, 87 s.Ct. 616, 17 L.Ed.2d 562

(1967). The right to free speech is not traded for the acceptance of a public office. Waters v. City

of Philadelphia, 55 F.3d 886, 889.

The evidence in this case is uncontested, by the defendant, Dr. George, Dr. Johnson's

successor, Dan Simpson, and other witnesses, that the subject matter of the questions at the

November 19, 2004 meeting, by Dr. Johnson, were matters of public concern.  The speaker at the

meeting, Peter Shoudy agreed that the questions dealt with matters, which would concern the

public (Shoudy 27, 56, 58, B625, B626, B627), and even the defendant Dr. George agreed that

the "IT" department affected how the administrators, students and the outside public would

interact with the school (George 42-43, B485-486).  The chair of the meeting also agreed that

Johnson's questions were concern about how the campus would best be served (Spampinato 19).[44]

C.    **Garcetti was Narrowly Decided and is Inapplicable:** The defendants, relying Garcetti v. Ceballos, __,U.S.__, 126 S.Ct. (2006), argue that Dr. Johnson's questions concerning the ability of the "IT" Department to serve the school and community at large were not matters of public concern.  The Garcetti decision was a very narrow one, where the Supreme Court was most careful to note the limited scope of its holding since there was no dispute that Garcetti's written memo, as a prosecutor, was part of "...his **daily** professional activity." Garsetti, supra, at p. 1960[45] (Emphasis added).  The Court emphasized that its ruling was not intended "...to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." (Id. at p. 1961).  The Court went on to note that the controlling factor [  ] is that his memo was made pursuant to his duties as a calendar deputy. Id. at 1959-60.  The Court also noted that that fact "distinguishes Ceballos' case from those for which the First Amendment provides protection against discipline" (Id.at p. 1960).  The Court, at the very outset emphasized that prior precedent was left undisturbed:

> "It is well settled that a 'state cannot condition public employment on a basis that infringes on an employee's constitutional protected interest and freedom of expression.' " Id. at 1955, citing Conick v Meyers, supra. at 467 U.S. 142.

Most importantly is the fact that the very subject matter of the November 19, 2004 meeting, precludes the defendants' argument that Dr. Johnson's job duties required her to supervise the reorganized "IT" Department.  The reorganization of the "IT" Department was to centralize it on a school wide basis.  Thus, Dr. Johnson did not have any control or direction over

---

[44] The reliance by the defendants on Brooks v. Univ. of Wisc. Bd. of Regents, 406 F.3d 476 (7th Cir. 2005) it is clearly inapposite. That case clearly dealt with "...nothing more than an internal personal squabble...", at p. 480.  As demonstrated above, Dr. Johnson's comments clearly dealt with matters of public concern, how the "IT" department would interact not only with the college community, but with the community at large, using the school's off campus interactive classes (Aff'd. M. Johnson, ¶ 2 , B -334).
[45] In Garcetti it was undisputed that the speech was a part of the prosecutor's daily job duties.

the department. That is, her job duties no longer required her to manage, direct, or control the "IT" Department, which clearly distinguishes her situation from that of the prosecutor in Garcetti.

Equally important is the implied admission by the defendants that Dr. Johnson was not acting within her job duties. The very contention by the defendants that Dr. Johnson's actions were "subversive" and "insubordinate" (B-46). At the same time the defendants, and the present administration admitted that the quality and nature of the "IT" services would be a matter of legitimate concern and appropriate to discuss (Simpson 60-61, B635-636) that the "IT" Department would effect not only how the campus would operate, but how the outside public would interact with the school (George 42-43, 485-486). The defendants have, by means of Dr. George's letter of December 8, 2004 (B-46) clearly indicated that Dr. Johnson's job duties did not include raising those issues for public discussion. Either Dr. Johnson acted appropriately in discussing these public concerns for the "IT" system, and was not "subversive" or "insubordinate", or, she acted outside her job duties in raising those issues. The defendants cannot at the same time argue that in discussing this matter she was acting within her job duties, and at the same time maintain that in discussing these matters she was acting outside her job duties. In Garcetti the Court expressly rejected any suggestion that an employer could restrict an employee's right of free speech, by simply creating an excessively broad job description. Garcetti, supra, at 1962.

The mere fact that Dr. Johnson's speech was made within the school, and did not "go public" does not deprive her of the protections under the First Amendment. Freedom of speech is not "...lost to the public employee who arranges to communicate privately with its employer, rather than spread his views before the public." Monsanto v. Quinn, 674 F.2d 990, 994 (3d Cir. 1982) (Letter by employee to head of her department criticizing specific operations were

protected) citing <u>Givhan v. Western Mine Consolidated School District</u>, 439 U.S. 410, 425-26, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

The recent decisions interpreting <u>Garcetti</u>, make the very point that it does not apply unless the speech is a part of the employee's formal job duties. This Court, in <u>Wilcoxon v. Red Clay Cons. Ch. Dist. Bd. Ed.</u>, ___F.Supp.2d__, 2006 WL 1793546 (D.Del. 2006) held that that an employee's maintenance of a journal containing the absences of a fellow teacher did not lose its constitutional protections, since it was not written pursuant to the official duties of the employee. <u>Id.</u> at p. 5.; <u>Kodrea v. City of Kokomo, Indiana</u>, 2006 WL 175071, holding that <u>Garsetti</u> did not require the granting of summary judgment when there was a factual dispute as to job duties. See aslo: <u>Haley v. City of Camden</u>, 2006 WL 1875402 (D.N.J. 2006). Speech not within the job duties is still protected.

**D.** **<u>Dr. Johnson Was Subjected to An Adverse Action</u>**: The defendants' argument that Dr. Johnson's speech was not protected since she did not suffer an adverse employment action is based upon inapplicable law.[46] An adverse action for the purposes of the First Amendment retaliation cases is much lower than in other context. The proper test, which was applied by the Third Circuit Court of Appeals, is to determine whether an adverse action would have been found if retaliatory conduct sufficient to deter a person of **ordinary firmness** from exercising his first amendment rights." <u>Suppan v. Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000) (Emphasis Added); <u>Accord Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000); <u>Lapinski v. Bd. of Educ. of Brandywine School District</u>, 163 Fed.Appx. 157 (3d Cir. 2006)(reversing the

---

[46] While Courts have held that being placed on administrative leave, or paid leave, is an adverse employment action. <u>Harriston v. Gainsville Sun Pub. Co.</u>, 9 F.3d 913, 920 (11thc Cir. 1993)(holding that a 30 day suspension with pay was an adverse employment action); <u>Horene v. Russell County Commission</u>, 379 F.Supp.2d 1305, 1328-30 (N.D. Ala. 2005)(holding a 90 day administrative leave is an adverse employment action); <u>Diettoso v. Potter</u>, 2006 WL 197146 (D. Ariz. 2006)(Paid administrative leave during an investigation qualifies as an adverse employment action), most of the cases cited by the defendant (DB-19-20), deal with Title VII claims, and thus are inapplicable in a First Amendment retaliation claim, as explained above.

District Court for failing to apply the person of ordinary firmness standard). [47]  While the ordinary firmness standard is an easier standard to meet than the adverse employment action used for Title VII actions. The person of ordinary firmness standard is an easier standard to meet than the statutorily based adverse employment action Title VII test. See: Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004). Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005)(rejecting Title VII standards to First Amendment Rights); Power v. Summers, 226 F.3d 815, 820-21 (7th Cir. 2000); Banks v. J. East Baton Rouge Parish Sch. Bd., 320 F.3d 570, 580 (5th Cir. 2003); Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); Ellis v. Crawford, 2005 WL 525406, *7-8 (N.D. Tex. March 3, 2005); Trujillo v. Bd. of Educ. of Albuquerque Public Sch., 377 F.Supp.2d 994, 1010-11 (D.N.M. 2005); Trzeciak v. Village of LaGrange, 2003 WL 1193318, *11-12 (N.D. Ill. March 13, 2003); Rodriguez v. Torres 60 F.Supp.2d  345, n.10 (D.N.J. , 1999); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1397-1300 (3d Cir. 1997).

The breadth of this protection is demonstrated by the Supreme Court and the Third Circuit's repeated recognition that it "...protects state employees not only from patronage dismissals, but also an act even as trivial as failing to hold a birthday party for a public employee...when intended to punish (the employee) for exercising (their) free speech rights." Suppan, supra, at 234 (Quoting Rutan v. Republican Party, 497 U.S. 62, 76 n.8); O'Conner v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006).

---

[47] Numerous other courts have adopted this standard. see e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55) (11th cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th cir. 2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (11th Cir. 2001);  Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998); Augusto-d-Feliciano v. Aponte-Rogue, 889 F.2d  1209, 1217 (1st Cir. 1989)(en banc); Bart, 677 F.2d at 628; Rodriguez v. Torres, 60 F.Supp.2d 334, 349 (D.N.J. 1999); Kadetsky v. Egg Harbor Township Bd of Educ., 60 F.Supp.Katzenmoyer v. City of Reading, 2001 WL 1132374, *2 (E.D.Pa. Sept. 21, 2001); Morrero v. Camden County Bd. of Social Serv., 164 F.Supp.2d 455, 467 (D.N.J. 2001); Sunkett v. Misci, 183 F.supp.2d 691, 708 (D.N.J. 2002); Kelleher v. City of Reading, 2002 WL 10067442, *5 (E.D.Pa May 29, 2002); Zugarek v. Southern Tioga Sch. Dist., 214 F.Supp.2d 468, 476-77 (M.D. Pa. 2002).

The fact that the plaintiff was put on administrative leave, when she refused to retire, with the apparent intent to force her resignation, has been recognized as such an adverse action as to create a property right. Hardiman v. Jefferson County Board of Education, 709 F.2d 635, 638 n.2 (11th Cir. 1983). The placement on paid administrative leave during an investigation does qualify as an adverse employment action. Dilettoso v. Potter, 2006 WL 197146 (D.Ariz. 2006)[48]

**E.    Motivating Factor:** Courts have held that even where the ultimate decision maker (here Judge Bifferato) was not himself retaliating against the plaintiff, where the person who set in motion a chain of events that led to the plaintiff's termination themselves, were motivated to retaliate against the plaintiff for the protected speech, there would be a violation: Ostad v. Oregon Health Services University , 327 F.3d 876, 885 (9th Cir. 2003)(approving the Court's instruction.).

In Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir. 1999), the Court agreed with the 5th, 6th and 10th Circuits that a party who sets in motion a retaliatory sequence of events cannot shield themselves from liability, where the ultimate decision maker is not acting for retaliatory purposes. See: Saye v. St. Vrain Valley Sch. Dist., 785 F.2d 862, 867-868 (10th Cir. 1986) Holing that the liability for a retaliatory discharge is not avoided where a school board decided to dismiss a teacher based upon the retaliatory intent of the teacher's principal; Hickman v. Valley Local Sch. Dist. 619 F.2d 606, 610 (6th Cir. 1988) holding that where causation begins with the retaliatory intentions of a school's principal or superintendent, liability occurs even where the final decision is made by independent board members (all cited by Gilbrook).

As the Court acknowledged in Gilbrook, the U.S. Supreme Court's decision in Mt. Healy City Sch. Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), makes the issue

---

[48] In Horne v. Russell County Com'n, 379 F.Supp.2d 1305 (N.D. Ala 2005) the Court recognized that being placed on a paid leave made the plaintiff subject to an adverse employment action. However, the Court did reject the claim of any due process requirements since, unlike Dr. Johnson, there the employee was reinstated.

was not whether, as here, the defendant's have produced an arguably legitimate basis for Dr. Johnson's termination, but rather, whether she would have been terminated absent the protected conduct.    To paraphrase the Gilbrook court:

> "[I]n the same way that (Dr. Johnson) cannot use protected conduct as a shield against a dismissal that would have occurred even in the absence of the protected conduct (the defendants) cannot use the non-retaliatory motive of (the hearing officer) as a shield against liability if that (hearing officer) never would have considered a dismissal but for the (defendants) retaliatory conduct. Gilbrook v. City of Westminster, supra, at p. 855.

See Also: Strahan v. Kirkland, 287 F.3d 821 (9th Cir. 2001)(applying Gilbrook to a retaliatory investigation).

   **F.    The Disruption Factor: Balancing[49]:** The second step in determining whether or not Dr. Johnson's speech is protected, is to demonstrate whether the value of the speech outweighed any interest of the employer. Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 21 L.Ed.2d 811 (1968); Baldassare v. New Jersey, supra, at p. 195.   That is, was there any disruption caused by her speech? In conducting that examination it must be determined whether or not the protected speech has caused any disruption in the employer's ability to maintain the workplace. Id.

   The defendants, here acting as the State, must make a strong showing of disruption in order to override the right to speak out on a matter of public concern. Connick v. Myers, 461 U.S. 138, 151-152, 103 S.Ct. 1684, 75 L.Ed.2 708 (1983). In performing its balancing analysis this Court is required to give speech, relating to matters of public concern, "...the highest rung of First Amendment protection." Swineford v. Snyder County Pennsylvania, 15 F.3d 1258, 1274 (3d Cir. 1994).   This is true since the right of free expression would mean little were the defendants able to silence Dr. Johnson merely because her comments cause a degree of discomfort to Dr. George. Brennan v. Norton, 350 F.3d 399, 414 (3d Cir. 2003)

---

[49] Although this issue has been waived, Section "A", supra, it nevertheless is discussed.

The Third Circuit Court of Appeals, in <u>Waters v. City of Philadelphia</u>, 53 F.3d 886 93d Cir. 1995) in applying <u>Pickering</u>, reversed the granting of summary judgment to an employer-defendant, holding that the balancing of interests test required a finding that the director of an employee assistance program (EAP) was not so intertwined with the management of the city police department as to override the public concern in the administration of the program. The Court went on to note that there was a lack of authority of the EAP Director over uniformed personnel. To paraphrase the holding in <u>Waters</u>, as it would apply to Dr. Johnson;

> "(Dr. Johnson)" enjoyed neither the level of authority, not the degree
> of responsibility (of the "IT" Department exercised by its new director)
> <u>Id.</u> at p. 898 (Distinguishing <u>Sprague v. Fitzpatrick</u>, 546 F.2d 560 (3d Cir. 1976).

### III.    DR. JOHNSON HAD A CONSTITUTIONALLY PROTECTED "PROPERTY INTEREST" FOR DUE PROCESS FOR TERMINATION

A.    <u>**The Basic Constitutional Law**</u>: The recognition of a Constitutionally protected "property interest" in one's employment begins with <u>Board of Regents of State College v. Roth</u>, 408 U.S., 564, 93 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which outlined the basis upon which a property interest could have a foundation in being Constitutionally protected. To have such a right, there would have to be a legitimate claim of entitlement. <u>Board of Regents v. Roth</u>, supra, at 92 S.Ct. 2709. Such a claim must be more than an abstract need or desire for such a right. <u>Id.</u>

Issued simultaneously with <u>Board of Regents</u>, was <u>Perry v. Sindermann</u>, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1992). The <u>Sindermann</u> Court expanded upon <u>Roth's</u> holding that property rights must be premised upon existing rules, or a mutually explicit understanding. The Court offered as an example of property interest, which would not be found in a statute, rule or regulation, as being a **written contract.** <u>Sindermann</u>, supra, at 92 S.Ct. 2699. In that holding the Court directed that before a decision could be made of whether or not a property interest existed, the plaintiff/employee "...must be given an opportunity to prove the legitimacy of his

claim of such entitlement in light of the '**policies and practices of the institution**' (citation omitted)" <u>Sindermann</u>, supra, at 92 S.Ct. 2700. (Emphasis Added).

The Third Circuit has specifically held to claim such a property interest the plaintiff must demonstrate the entitlement was found in either,  first, a state statute, secondly a regulation, thirdly, a  governmental  policy,  or  fourth,  a  mutual  explicit  understanding  between  the government employer and the employee.  <u>Carter v. City of Philadelphia</u>, 989 F.2d 117, 120 (3d Cir. 1993).

**B.**    **The Inherent Unfairness of the Termination Process**: Due process is not an amorphous concept.  Rather it is characterized as "protection of the individual against arbitrary action" which has been characterized as "the very essence of due process".  <u>Ohio Bell Telephone v. Public Utilities Commission</u>, 301 <u>U.S.</u> 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).  The mere appearance of fairness does not result in a finding of due process. <u>Brennan v. Stewart</u>, 834 F.2d 1248, 1255, 1256 (5th Cir. 1986).  There may be a violation of due process, where the government acts in such an egregious or outrageous manner that it may be fairly said to shock the conscience of the Court.  <u>Desi's Pizza, Inc. v. City of Wilkes-Bare</u>, 321 F.3d 411 (3d Cir. 2003)(Applying that rule to interests protected by the U.S. Constitution).  The interest sought to be protected for Dr. Johnson is the right to **fair** procedural due process. [50]

A fundamental denial of due process was the nature of the investigation, which resulted in the hearing, which terminated Dr. Johnson's employment.  That is, she was entitled to fair due process, not just the form/appearance of due process.

Despite the attempt to create the appearance of fairness in the investigation/termination process, its hallmarks were of one sidedness and unfairness.  The beginning of the process was Dr. George's instruction to Dr. Johnson to remain off campus, remove her personal belongings,

---

[50] Contrary to the suggestion by the defendants that high ranking administrators do not enjoy protection for speaking out on matters of public concern (DB-16), it is clear that school administrators are protected from First Amendment Retaliation. <u>Anderson v. Pasadena School District</u>, 184 F.3d 439 (5th Cir. 1999); <u>Hullen v. Yates</u>, 322 F.3d 1229 (10th Cir. 2003).

and not to have any contact with not only present employees, but also any past employees concerning his investigation. That restriction was never lifted. While those restrictions were in place, the defendants conducted four (4) different rounds of interviews, by Hope Murray, Dan Simpson, David Williams and David Dwyer, often interviewing the same employees multiple times.. This unrelenting questioning of Del Tech employees, who were still subject to the direction and control of Dr. George, with no right of Dr. Johnson or her representative to even speak with those individuals does not meet the general contours of fairness.

Courts have generally recognized the right to interview witnesses, prior to Court hearings is an important part of tdue process. <u>Wharton v. Caldaron</u>, 127 F.3d 1201, 1204 (9th Cir. 1997), citing <u>International Bus. Mach. Corp. v. Edelstein</u>, 526 F.2d 27 (2d Cir. 1975)(Holding that restrictions on interviewing witnesses impaired constitutional rights of the parties).

At the same time the employees were being instructed to cooperate with the investigation and interviews (B-68) the defendants refused to give any assurance that the plaintiff requested (B-90 & 98) for witnesses she wished speak with or call ( guaranteeing them no retaliation) until one day prior to the termination hearing, (B-107), too late to do any investigation or interviews. As shown earlier (p. 12 supra ), the investigation and report of the accounting firm hired by the defendants, was not only riddled with numerous errors, omissions of contradictory facts (based in part by evidence withheld by the defendants) but it did not live up to the standards governing the accounting firm, AICPA Standards. Where an employer, conceals relevant information from the ultimate decision maker, it is able thus to manipulate the decision making process and liability still exists. <u>Willis v. Marion County Auditor's Office</u>, 118 F.3d 542, 547 (7th Cir. 1997). As a result, the decision by the hearing officer, Vincent A. Bifferato, Esquire, relying on the report, was itself intrinsically flawed.

The hearing officer's decision rested upon two pillars. First, that Dr. Johnson had incurred significant expenses from the college by use of personnel time, and personal matters.

As shown earlier, that pillar was insufficient to support the hearing officer's decision, because the report and accountants testimony given to the hearing officer were grossly flawed. The means of calculating the cost of personnel time was based upon inaccurate and false information (p. 14 ,supra.). [51]

The hearing officer's decision was further flawed because Dwyer was never informed, in preparing his report, that Johnson had fully reimbursed the college for all expenses for which she was billed (p. 14-15, 23, supra).[52] The defendants did not provide Dwyer the evidence of payment for those materials, and thus his report was flawed. Likewise, the report upon which the hearing officer relied and concluded that Johnson had engaged in inappropriate travel, without authority, ignored the custom and practice under which the President's office operated, that vice-presidents/campus directors did not need the president's approval to travel (B-184 ). The accountant conceded the failure to include that material in his report violated the AICPA standards.[53]

Finally, the report upon which the hearing officer relied also criticized Johnson for using the credit card on trips for personal expenses. In view of the fact that the CPA's report omitted

---

[51] Specifically, rather than include in his report Johnson's secretary's statement that she could not recall exactly how much time she spent on personal matters, although it was estimated to be between as little as 2% and no more than 8%, Dwyer testified at the hearing that he found it could have been as much as 15%, and based his calculations upon 10%. None of Dwyer's figures were based on facts in his interviews. Similarly, his calculation of the cost of the reunion matters (p. 14, supra), were likewise inherently flawed, because as he agreed, his estimates in calculating the cost, for instance the reunion matter, were "absolutely" a rough estimate (Dwyer 85, B454).

[52] Although, the college had maintained that Dr. Johnson had directed her clerical staff to falsify business records, enabling her to reimburse the college at rates substantially lower than the actual cost (B-82), the testimony was directly to the contrary. (Pleasanton 10-11, B578-578; B-357-358 Powell 68-69, B595-596).

[53] To the extent that the State Auditor's Office concluded that Dr. Johnson had violated any policy, they agreed that if they had known of that custom and practice, it would have changed their findings (Draper 23, B404).

any reference to the school travel policies that anticipated such expenditures and made provision for its reimbursement, the report again was flawed.[54]

The second pillar upon which the hearing officer's decision rested, was the finding that Dr. Johnson had acted inappropriately towards employees. While there is evidence that contradicts that finding (p.3, supra), during the hearing Dr. Johnson was hampered in refuting such testimony, because the defendants, despite repeated efforts by Dr. Johnson's counsel, refused to provide any specifics concerning such testimony (See p. 43, infra., B-86, 93, 95, 102, 106).[55] This lead to additional due process violations.

### C.    Denial of Procedural Due Process: Dr. Johnson's Property Interest is Founded Both by Contract and Del Tech's "Personnel Handbook":

A Constitutionally protected property interest can be created formally, such as by contract, statutes, rules and regulations, and by mutual understandings that are less formal. As the Third Circuit Court of Appeals recognized, relying upon both Perry v. Sindermann, supra, and Board of Regents v. Roth, supra:

> "Property interests are often expressly created by state statutes or regulations, but they can also arise from written or unwritten state or local government policies, or from 'mutually explicit understandings' between a government employer and employee." See Perry v. Sindermann, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972), Stana v. School District of The City of Pittsburgh, 775 F.2d 122, 126 (3d Cir. 1985).

Dr. Johnson asserts a property interest in **appropriate** due process based upon her written contract (B-129) as well as a personnel handbook created by the school (**handbook**) enacted pursuant to Delaware State Statute, 14 Del.C. §9105(d)(6)

First in the order of temporal occurrence, Dr. Johnson was entitled to a grievance hearing when she was placed on administrative leave. While the defendants argue that "administrative

---

[54] It was not known until discovery in this matter that Johnson's lack of notice of her outstanding credit expenditures, which needed to be reimbursed resulted by the failure of the business manager to reconcile the bills and notify her (p. 19-21, supra).
[55] As will be shown in Argument III (D., infra.), this failure to provide notice to Dr. Johnson of the facts supporting such a charge against her denied her due process.

leave with pay" is not intended to be disciplinary, the "Personnel Handbook for Administrators" specifically states that disciplinary actions include "suspensions with or without pay" (B-116). Claiming that an administrative leave with pay is different that a suspension with pay elevates form over substance. Smith v. National Collegiate Athletic Ass'n., 266 F.3d 152, 163 (3d Cir. 2001); Antol v. Esposito, 100 F.3d 1111 (3d Cir. 1996). As shown at p. 7, supra, the Personnel Handbook of Del Tech clearly gave Dr. Johnson a right to a grievance when excluded from the campus (at the same time as her personal belongings were removed from her office, and any indicia of her presence on the campus removed). The request was made (B-71) and was rejected. [56]

**D.      Dr. Johnson's Property Interest in Her Contract And Notice of Specific Charges**: Dr. Johnson's contract specifically provided that she was entitled to notice of termination which would "fully set forth the cause for the termination" and "...shall be supported by affidavit of person(s) having knowledge of such cause..." (B-30,¶ 3). Those affidavits were provided on June 28, 2005 (B-107) one day before the hearing on June 29, 2005. Not only were they not provided with the notice of termination (B-84) as required by the contract, but they were provided so late as to prove worthless for the purposes of preparation for the hearing.[57] Thus, Dr. Johnson did not receive compliance with her contractual rights. The defendants attempt to argue that the affidavits were superfluous because the defendants had enacted new procedures (B-133) especially for Dr. Johnson. Those new procedures could not eliminate Dr. Johnson's pre-existing contractual right to timely affidavits.

---

[56] Dr. Johnson was denied not only procedural due process, but her regularly earned merit bonus for the 2004-2005 year (Aff'd M. Johnson, ¶1, B-334 )

[57] In fact, they were delivered in such a fashion, that some of the affidavits were not received until after the hearing actually commenced (B-352-353). To the extent that the defendants argue that the Santora & Baffone report satisfied their requirement of the affidavits, it clearly did not. Not only was the report rift with omissions, and factual errors, (p_12, supra) but it did not provide the witness specific information necessary to prepare for such a hearing, nor anything about the alleged abuse.

**E.    Failure to Provide Specific Notice:** The consistent failure of the defendants to provide the notice required not only by the contract, but by both sets of rules of the procedure was perhaps the most egregious denial of due process. .[58]    The Del Tech Personnel Handbook, provides specifically, that before the termination hearing, the employee is to be notified of the "incidents" that led to the purposed termination (p.117, §12.02(2)).    Even the rules specially enacted for Dr. Johnson's termination[59] require that the reasons for the termination be stated in the "Notice of Intent to Terminate".    In correspondence by Dr. Johnson's counsel, defendants were asked specifically for the specific description of the acts that would prove "...administration by fear and intimidation" which would have constituted a hazard to health and safety. (B-96).    In response, the defendants' counsel wrote back merely repeating the definition without giving a factual description. (B-88)    On June 23, 2005 Dr. Johnson's counsel wrote indicating that the defendants refused to identify the specific allegations that would support such charges, and stating that there was no such evidence. (B-102).

This sequence of events becomes important because of the substantial evidence presented at the hearing on that very subject matter, and the result was that the hearing officer concluded that Dr. Johnson's abuse thwarted attempts or suggestions by employees concerning the allegations.    Without the required advance knowledge of the specific acts upon which the hearing officer rested his conclusion, Dr. Johnson was clearly prevented for adequately preparing for the hearing and refuting such allegations.

**F.    Denial Substantive Due Process**: Whenever a "persons good name, reputation, honor, or integrity is at stake, because of what the government is doing to him, a property interest

---

[58] Recall that the school enacted new rules for the termination of Dr. Johnson, after they reached a conclusion that they wished to terminate her, and after she had been placed on administrative leave (B-84)

[59] It is clear that those rules were created for Dr. Johnson, because under §2(B) it states that the required notice is to be sent to the employee's "counsel". In this case, the defendants knew that Dr. Johnson was already represented, but that would not normally be the case. Why else would they include it in the rules?

is involved and due process requirements apply" <u>San Filippo v. Bongiovianni</u>, 961 F.2d 1125, 1134 (3d Cir. 1992)(internal citations omitted).

> The parameters of due process has long been defined as basic fairness:

>> "Fairness of procedure is due process in the fairest sense... expressing as it does in its ultimate analysis respect in force by law for the feeling of just treatment, which has been evolved through centuries of Anglo-American Constitutional History and Civilization, due process cannot be imprisoned within tretuous limits of any formula." <u>Joint Anti-Fascist Refugee Committee v. McGrath,</u> 341 U.S. 123, 161-163, 71 S.Ct. 624, 95 L.Ed. 817 (1951). (Justice Frankfurter concurring).

The denial of an opportunity to earn a livelihood can impair an individuals liberty interest. <u>Board of Regence v. Roth</u>, supra; <u>Fitzgerald v. Mountain Laurel Racing, Inc.,</u> 607 F.2d 589, 602 (3d Cir. 1979)(Finding that there had been no procedural due process).

This Court in <u>Lloyd v. Jefferson</u>, 53 F.Supp.2d 643 (D.Del. 1999) examined the parameters of due process and liberty interest. There, the Court recognized that an educator may have a substantive due process claim involving their liberty interest and their good name in their profession. <u>Lloyd</u>, supra, at p. 660-661. The Court went on to explain that in order for government action to infringe upon such a right, there must be publication that is substantially and materially false. <u>Id.</u> at p. 6661. The Court went on to state that since the plaintiff there, had had a judicial ruling on the appropriateness of his dismissal, in the Delaware Superior Court, he did not have a due process claim. The Court also recognized that the First Amendment claim had never been raised in the Superior Court matter, and thus could proceed. By contrast, in the present case, Dr. Johnson's procedural dues process rights, as explained earlier, were significantly violated in a number of instances, most importantly in being denied a pre-hearing disclosure the specifics of testimony as required by her contractual rights to affidavits, being denied a description of the evidence to be used to prove her abuse of employees, and, perhaps

47

most importantly, the use of a CPA's report which was "riddled with errors" and contrary to professional standards.[60]

In Morris v. Board of Education of Laurel School District, 401 F.Supp. 188 (D.Del. 1975), the Court found do to the violation of both procedural due process and substantive process under similar circumstances. There, a dismissed teacher was found to have been denied procedural due process because she had not been given the reasons for her dismissal. However, the Court went on to state, with regards to her claim for a liberty interest:

> "In addition, the Court had found that in addition to the termination (on procedural due process) was without basis and fact. Accordingly, a violation of the substantive due process has also been established. Id.at 211.

In this case, Dr. Johnson was stigmatized by both negative newspaper articles (B-56.57), resulting from the defendants' forwarding the flawed Santora & Baffone report to the State Auditor's Office, and which resulted in the Auditor's report in itself being flawed (p. 17 , supra).

Further Dr. Johnson's being placed on administrative leave clearly left her stigmatized (B-348-349).

### IV.    THE DEFENDANT, DR. GEORGE, IS CLEARLY NOT ENTITLED TO QUALIFIED IMMUNITY.7

The defendant raises, for the first time in their brief, the issue of qualified immunity for Dr. George.[61] If this Court concludes that Dr. Johnson's First Amendment rights were violated it follows that those rights were "clearly established" the defendant does not have qualified immunity. Kodrea v. City of Kokomo, Indiana, 2006 WL 1750071 (S.D. Ind. 2006, at p.12).

There seems to be little question the plaintiff's rights in this matter were clearly established. First, a reasonable person in Dr. George's position would have known that

---

[60] Recall also that the CPA, when confronted with the errors in his report, admitted that he could make no finding of a violation of law or breach of Del Tech policies (p. 17, supra.).
[61] The answer to the supplemental complaint does not raise the issue of "qualified immunity" (B-16). The third additional defense in the answer does assert "professional immunity" (B-23). However, such a defense seems to be basically one utilizing state theories rather than constitutional theories. Finch v. Fort Bend Independent School District, 33 F.3d 555, 565 (5th Cir. 2003)(Deciding to consider "professional immunity based upon its pendent jurisdiction).

48

retaliation by excluding Johnson from the school, announcing the administrative leave (p. 34, supra.), and by instigating an investigation against the plaintiff, when she failed to retire, because the plaintiff exercised her rights of free speech, would be a violation of the First Amendment. Heller v. Fulare, 371 F.Supp.2d 743, 750 (W.D.Pa. 2005). Equally important is the fact that Dr. George was receiving the advice of not one, but two attorneys in this matter, Brian Shirey, Esquire, Del Tech's in-house counsel, and David Williams, Esquire, with regards to the plaintiff's rights to a grievance (Letter). It is clear that in the past, Del Tech had granted a grievance hearings for individuals subject to suspension (Appendix)(Granting a grievance for a one day suspension in 2005). As shown earlier, Dr. Johnson had a due process right to a grievance hearing immediately upon being placed upon administrative leave. The subsequent investigation, which led to the discredited CPA report, which was relied upon in substantial part by the hearing officer, shows that the denial of the grievance hearing was the first domino leading to Dr. Johnson's termination. The failure to grant her the grievance hearing would be a violation of well-established standards, which led to the admittedly flawed CPA report; itself relied upon by the hearing officer.

## CONCLUSION

For the reasons stated herein, the defendant's motion for summary judgment should be denied in all respects.[62]

However, in view of the uncontradicted issues concerning the plaintiff's claim for violation of her rights of free speech, that is, it is uncontradicted that her speech was a motivating factor for the defendants' actions, the defendants have waived any claim that her speech was disruptive, the only issue, with regards to the free speech claim, is for the Court decide whether or not her speech, concerning the interactions of the "IT" Department with the college community and the community at large was a matter of public issue.

---

[62] The defendants' counterclaim is not an issue in these proceedings.

49

This Court has the authority and power to grant summary judgment under appropriate circumstances against the party who was the original mover. Morrissey v. Curran, 423 F.2d 493, 499 (2d Cir. 1969); Artway v. Scheidemantal, 671 F.Supp. 330, n. 6 (D.N.J. 1987).


Respectfully Submitted,


_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
ABER, GOLDLUST, BAKER & OVER
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
302-472-4900
Attorney for Plaintiff

DATED:  July 19, 2006