# TAB 3

Westlaw.

Slip Copy

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently
available.NOT FOR PUBLICATION
United States District Court, D. New Jersey.
Kevin HAILEY, et al., Plaintiffs,
v.
CITY of CAMDEN, et al., Defendants.
Civil No. 01-3967.

July 5, 2006.

Gregg L. Zeff, Esquire, Frost & Zeff, Esqs., Cherry
Hill, NJ, for the plaintiffs.
Cheryl L. Cooper, Esquire, Holston, Macdonald,
Uzdavinis & Ziegler, A Professional Corporation,
Woodbury, NJ, for the defendants.

**OPINION**

ROSEN, United States Magistrate Judge.

### I. Introduction

*1 Presently before the court is the defendants'
renewed motion for judgment as a matter of law
pursuant to Fed.R.Civ.P. 50(b), for a new trial, or in
the alternative for remittitur pursuant to
Fed.R.Civ.P. 59(a). Also before the court is the
plaintiff's motion for injunctive and declaratory
relief. After having carefully considered the
submissions of the parties, the trial testimony, and
the relevant jurisprudence, and the argument of
counsel conducted on the record on June 5, 2006,
the court shall grant in part the defendants' motion
and order a new trial on certain issues as detailed
below. And the court shall deny without prejudice
the motion for declaratory and injunctive relief.

### II. Factual and Procedural Background

On August 20, 2001, Kevin Hailey and Terrence
Crowder, two African-American Deputy Fire Chiefs

for the City of Camden, filed suit against the City of
Camden, former Fire Chief Herbert Leary, Chief
Joseph Marini, former Mayor Milton Milan, and
former City Attorney John Misci, Jr. alleging racial
discrimination, hostile working environment, and
retaliation in violation of, *inter alia,* Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, as
amended, the Civil Rights Act of 1871, 42 U.S.C. §§
1981, 1983, 1988, and the New Jersey Law Against
Discrimination, N.J.S.A. 10:5-1, et seq.

The case proceeded to trial on November 10, 2004.
The plaintiffs voluntarily dismissed Defendants
Milan and Misci as well as their Title VII claims.
The case was presented to the jury which returned a
verdict in favor of the plaintiffs and against the
defendants on all claims. The defendants, thereafter,
retained new counsel for the post-trial motions and
the instant motion followed.

### III. Discussion

### A. Standard for Renewed Motion for Judgment
as a Matter of Law and New Trial

Federal Rule of Civil Procedure 50 allows parties to
request judgment as a matter of law and provides:
**(a) Judgment as a Matter of Law.**
(1) If during a trial by jury a party has been fully
heard on an issue and there is no legally sufficient
evidentiary basis for a reasonable jury to find for
that party on that issue, the court may determine the
issue against that party and may grant a motion for
judgment as a matter of law against that party with
respect to a claim or defense that cannot under the
controlling law be maintained or defeated without a
favorable finding on that issue.
(2) Motions for judgment as a matter of law may be
made at any time before submission of the case to
the jury. Such a motion shall specify the judgment
sought and the law and the facts on which the
moving party is entitled to the judgment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
*2 (1) if a verdict was returned:
(A) allow the judgment to stand,
(B) order a new trial, or
(C) direct entry of judgment as a matter of law; or
(2) if no verdict was returned;
(A) order a new trial, or
(B) direct entry of judgment as a matter of law.
**(c) Granting Renewed Motion for Judgment as a Matter of Law; Conditional Rulings; New Trial Motion**
(1) If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

Courts may grant judgment as a matter of law where "there is no legally sufficient evidentiary basis for a reasonable jury" to find in favor of the non-moving party. Fed.R.Civ.P. 50(a). When a court denies an initial motion under Rule 50(a), the party may renew its motion following verdict. Fed.R.Civ.P. 50(b). Upon such a renewed motion, the district

court must determine whether, viewing the evidence in the light most favorable to the verdict-winner, a reasonable jury could have found for the prevailing party. *Johnson v. Campbell,* 332 F.3d 199, 204 (3d Cir.2003). The Third Circuit has cautioned that Rule 50 motions should be granted "sparingly." *Id.* at 204. Thus, such motions should be granted only where "the record is critically deficient of the minimum quantum of evidence" in support of the verdict. *Gomez v. Allegheny Health Servs., Inc.,* 71 F.3d 1079, 1083 (3d Cir.1995).

Parties may in the alternative move for a new trial under Fed.R.Civ.P. 59:
**(a) Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

*3 The defendants base their request for a new trial both on insufficiency of the evidence as well as on trial error.

"Motions for new trial are seldom granted, especially when the asserted ground is insufficiency of evidence and the subject matter is not particularly complex and deals with material which is familiar and simple." *Helena Chemical Co. v. Nelson,* 2000 WL 1880331 (D.N.J.2000) (citing *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90-91 (3d Cir.1960)). "The party challenging the verdict ... bears a heavy burden of showing that the verdict is against the weight of the evidence and that 'a miscarriage of justice would result if the verdict were to stand.' " *Id.* (citing *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993)). "[A] new trial should only be granted where 'a miscarriage of justice would result if the verdict were to stand,' the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 3

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.' " *Price v. Delaware Dept. of Correction,* 40 F.Supp.2d 544, 550 (D.Del.1999) (citing *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991)). "[T]he court is permitted to consider the credibility of witnesses and to weigh the evidence, however the court must 'exercise restraint to avoid usurping the jury's primary function.' " *Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 734 (D.N.J.1998) (citing *Hurley v. Atlantic City Police Dept.,* 933 F.Supp. 396, 403 (D.N.J.1996), rev'd in part on other grounds, 174 F.3d 95 (3d Cir.1999)).

The defendants similarly request a new trial based on trial court error. Federal Rule of Civil Procedure 61 governs such motions and provides:
No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. The district court is granted broad latitude "when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings, *see Bhaya v. Westinghouse Elec. Corp.,* 922 F.2d 184, 187 (3d Cir.1990), ... or prejudicial statements made by counsel[, *s]ee Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.1960)." *Klein v. Hollings,* 992 F.2d 1285, 1289-90 (3d Cir.1993). Within this context, under Federal Rule of Civil Procedure 61, the court must determine (1) whether an error was in fact made, and (2) whether the error was so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice." Fed.R.Civ.P. 61.

**B. Requests/Assertions of Error**

**1. Punitive Damages Against the City of Camden based on §§ 1981 and 1983**

*4 While there are numerous assertions of error in the motion before the court, two cause this court greatest concern and both involve Defendant the City of Camden.

The first is the City's identification of what this court considers to be reversible error in the Jury Interrogatories, specifically, Section V of the Jury Interrogatories, which provides as follows:
Section V. Punitive Damages: Plaintiff Hailey

*A. Plaintiff Hailey v. the City of Camden*

If you awarded damages, even nominal damages of one dollar, to Plaintiff Hailey and against the City of Camden in any of the above sections, you must now consider the issue of punitive damages against Defendant the City of Camden. (Refer to Instruction 37 if you awarded damages in Sections I and/or II. Refer to Instruction 38 if you awarded damages in Sections III and/or IV.)
We find that punitive damages should be awarded to Plaintiff Hailey and against Defendant the City of Camden in the following amount:
$_____
(State the full amount or, if none, write the word " none")
Proceed to Question B

*B. Plaintiff Hailey v. Defendant Leary*

If you awarded damages, even nominal damages of one dollar, to Plaintiff Hailey and against Defendant Leary in any of the above sections, you must now consider the issue of punitive damages against Defendant Leary. (Refer to Instruction 37 if you awarded damages in Sections I and/or II. Refer to Instruction 38 if you awarded damages in Sections III and/or IV.)
We find that punitive damages should be awarded to Plaintiff Hailey and against Defendant Leary in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

Page 4

the following amount:
$_____
(State the full amount or, if none, write the word " none")
Proceed to Question C

*C. Plaintiff Hailey v. Defendant Marini*

If you awarded damages, even nominal damages of one dollar, to Plaintiff Hailey and against Defendant Marini in any of the above sections, you must now consider the issue of punitive damages against Defendant Marini. (Refer to Instruction 37 if you awarded damages in Sections I and/or II. Refer to Instruction 38 if you awarded damages in Sections III and/or IV.)
We find that punitive damages should be awarded to Plaintiff Hailey and against Defendant Marini in the following amount:
$)))))
(State the full amount or, if none, write the word " none")

Jury Interrogatories, Section V.[FN1] As a review of the above reveals, each of these subsections A, B, and C are identical save for the names of the defendants to which they refer. I shall explain in more detail below how this is in error and how this error cannot be allowed to stand.

> FN1. Section V concerning Plaintiff Crowder is identical to Plaintiff Hailey's Section V, save 1 for the substitution of Plaintiff Crowder for Plaintiff Hailey.

Although the City asserts that the court charged the jury with punitive damages on the federal claims, this was not the court's intention. Rather, as trial counsel may recall, during the court's off-the-record discussion of the defendants' objection to charging the jury on punitive damages against the City under sections 1983 and 1981, all agreed that such a charge would not be viable as no punitive damages could lie against the City under these statutes. It is unfortunate that this discussion occurred off-the-record only. However, that is of no moment.

Because whether the court and the parties memorialized these discussions on the record would not ameliorate the confusion Section V of the jury interrogatories created on this issue.[FN2]

> FN2. The plaintiffs argue that the defendants did not preserve their objection on this issue, and a close review of the record supports that argument *(see* Tr. 12/3/04). Nevertheless, as the following discussion will explicate, the court finds that the error in Section V Interrogatory vis-a-vis the City of Camden is sufficient to meet the heightened standard of Fed.R.Civ.P. 51(d)(2). *See Franklin Prescriptions, Inc. V. New York Times Co.,* 424 F.3d 336, 339 (3d Cir.2005).

*5 Following the agreement of the parties to drop punitive damages against the City based on the federal statutes, the court removed reference to the City specifically in Instruction 37 of the jury charge entitled "Punitive Damages-42 U.S.C. § 1981 and 1983." The charge therefore did not specifically reference the City. The charge was still necessary for the individual defendants and thus remained. However, Instruction 37 did not specifically name only the individual defendants.

Although the court intended to reference only the individual defendants, the charge used general language in the instruction. For example, the Instruction 37 states: "If you find in favor of either of the plaintiffs and against any or all of the defendants ..." and "You may assess punitive damages against any or all of the defendants or you may refuse to impose punitive damages." This general language could quite easily and logically be read to encompass the City as well as the individual defendants.

The general language of Instruction 37 assumes greater import when read in conjunction with the serious typographical error in the Section V Interrogatory. Specifically, the court merely changed the defendants' names in each of the subsections A, B, and C to Section V. Thus, as to the City of Camden, subsection A refers the jury to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

Instruction 37, punitive damages under 42 U.S.C. §§ 1981 and 1983. In addition to this reference to Instruction 37, the Interrogatory similarly refers the jury to Sections I and II of the Interrogatory. Section I of the Jury Interrogatory asks the jury in three separate sub-parts whether the jury finds each of the three defendants liable for Race Discrimination under 42 U.S.C. §§ 1981 and 1983. Section II of the Jury Interrogatory pertains only to the claim of First Amendment retaliation by Defendants Leary and Marini against the plaintiffs. Neither of these sections supply a basis for punitive damages against the City of Camden, indeed, Section II does not concern the City of Camden at all.

Although the parties and the court had an opportunity to review this interrogatory, none recognized this error. The question before the court now, therefore, is whether this error is sufficient to vitiate the punitive damages award against the City of Camden.

The plaintiff argues that the generic language of Instruction 37, coupled with the court's intention, should be sufficient to preserve the charge. However, juries are not charge with intentions but with necessarily specific and particular words. By referring the jury back to Instruction 37 (punitive damages under §§ 1981 and 1983) **and** Interrogatory Section I and II (race discrimination under §§ 1981 and 1983 and First Amendment retaliation under § 1983 respectively), in addition to Sections III (NJLAD race discrimination) and IV (NJLAD hostile work environment), the court can come to no other conclusion but that the jury incorporated all claims into their consideration of the punitive damages verdict against the City of Camden. The error is not, therefore, harmless, as it is highly probable that the error contributed to the judgment. *See Hurley v. City of Atlantic City,* 174 F.3d 95, 124 (3d Cir.1999).

**\*6** The plaintiffs also attempt to save the punitive damages verdict against the City by arguing that the entire punitive damages amount may be attributed to the viable New Jersey Law Against Discrimination punitive damages claim, and thus the reference to the federal claims was harmless.

*(See* Pl.'s Br. at 59-64). The plaintiffs cite numerous cases that stand for the general proposition that courts should and do make every effort to read a jury's answers to interrogatories consistently, none of which speak specifically to the situation at hand. The one case on which the plaintiffs in particular rely, *Hurley v. Atlantic City Police Department,* 174 F.3d 95 (3d Cir.1999), does not persuade this court.

In *Hurley,* a claim of sexual harassment by a female Atlantic City Police Officer, the Third Circuit found that the district court had improperly charged the jury on the quid pro quo discrimination claim. The court did not, however, reverse the verdict based on this error. Rather, the court found that the jury's verdict could rely on the remaining counts of sexual harassment because the claims were distinct and the evidence supporting the harassment claim was overwhelming.

The most significant distinction between the *Hurley* case and the instant case is that in *Hurley,* the court submitted a general verdict sheet to the jury. Thus, the verdict for the plaintiff could have relied on one or all of the claims. The Third Circuit determined that the quid pro quo evidence was so weak, that no reasonable jury would have relied on it in reaching its verdict. In explaining, the court opined:
The dissent persuasively identifies the reasons that the quid pro quo claim was the least tenable of Hurley's claims.... In fact, the conduct of which she complained was part of the hostile work environment she experienced, and this would necessarily have been apparent to the jury. But in light of the total record here, we are satisfied that no jury would have found the defendants liable solely on the basis of the quid pro quo instruction. Multiple sources-including physical evidence-corroborated the most egregious examples of sexual harassment, including the tampon incident and the obscene graffiti, while the only evidence of [the defendant's quid pro quo] suggestion came from Hurley's testimony. To us, it is inconceivable that a jury would have believed her testimony on this one issue, concluded that the ACPD was vicariously liable for one advance, and discounted the other incidents, which were sufficiently pervasive to constitute a hostile environment. Juries

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 6

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

may be unpredictable, but we are not willing to posit total illogic, which would be contrary to our faith in the jury system as a whole. We are thus persuaded that any error was harmless.

*Hurley,* 174 F.3d at 120-121 (internal citations and notes omitted).

In contrast to *Hurley's* general verdict sheet, this court, at the parties' request, submitted specific interrogatories to the jury. In so doing, the court directed each step of the jury's deliberations. Moreover, both the section 1981/1983 and the New Jersey Law Against Discrimination claims sought recovery for racial discrimination: they are not distinct claims in the same way as are harassment and quid pro quo discrimination at issue in *Hurley.* Thus, *Hurley* is inapposite, and this court is not now free to rely upon the inherent strength of the jury system to rationalize a parsing of the verdict. The defendants' motion for a new trial on this issue shall be granted.

**\*7** This decision does not, however, complete the analysis. At oral argument, counsel for the plaintiffs posited that granting a new trial on punitive damages as to the City of Camden only would be inconsistent with substantial justice. Counsel argued that the jury's punitive damages decision vis-a-vis the City necessarily had an impact on its decision not to assess punitive damages against the individual defendants. Because of the error in Section V of the Jury Interrogatory, this court agrees.

The jury found that the individual defendants had committed First Amendment violations in Jury Interrogatory Section II. The punitive damages Interrogatory directed the jury to consider punitive damages against *the City* as a result of the *individual defendants'* First Amendment violations found in Section II. This reference would have caused the jury to understand the liability structure as one resembling respondeat superior; that is, that the City could be held liable for the conduct of the individual defendants vis-a-vis their First Amendment violations. Consequently, the jury may have subsumed the individual punitive liability in the City's punitive liability. This court cannot state

with confidence that the profound confusion flowing from the court's typographical error did not vitiate the entire punitive damages scheme. And, although the court shares the Third Circuit's faith in the jury system, *see Hurley,* 174 F.3d at 121, the court cannot sustain a punitive damages finding derived from such inaccurate Interrogatories.

The court thus finds that it committed an error in the Jury Interrogatory, which error was so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice," and that for the error to be corrected, a new trial on punitive damages must be had as to all parties. Fed.R.Civ.P. 61.

**2. Nominal Damages**

With no jurisprudential support, the defendants assert plain error resulting from the court's nominal damages interrogatories. Specifically, the defendants argue that the interrogatories erred by " instruct[ing] the jury to award damages against the defendants in the amount of $1.00, even if it determined that plaintiffs suffered no compensable damages[.]" (Def.'s Br. at 9). The defendants' position runs directly counter to relevant jurisprudence. The Third Circuit recently discussed the import of the nominal damages charge:

Racial discrimination, according to the Supreme Court, is a "fundamental injury to the individual rights of a person," *Goodman v. Lukens Steel,* 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L .Ed.2d 572 (1987), and the inability to buy or lease real property can be considered one of the badges and incidents of slavery. *See also The Civil Rights Cases,* 109 U.S. 3, 22-23, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Indeed, even absent proof of actual injury, nominal damages are to be awarded to recognize violation of a constitutional right. *Carey v. Piphus,* 435 U.S. 247, 266-67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). This entitlement is not automatic, however, "but rather, it is incumbent upon the plaintiff to make a timely request for nominal damages." *Campos-Orrego v. Rivera,* 175 F.3d 89, 98 (1st Cir.1999). In this instance, the plaintiffs requested and received an instruction on nominal damages, but failed to bring to the District Court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 7

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

attention their contention that the jury should have been instructed that nominal damages are mandatory with a finding of discrimination.

*8 *Alexander v. Riga,* 208 F.3d 419, 429 (3d Cir.2000). The court's instructions confirmed the mandatory nature of nominal damages, upon request of the plaintiffs, and the court finds that the interrogatories are not in error.

### 3. Wage Loss Award Based Upon Speculation and Against Weight of the Evidence

The defendants object to the wage loss award of Plaintiffs Hailey and Crowder, $70,000 and $116,000 respectively, as speculative. The defendants argue that because the plaintiffs did not present expert testimony or documentary evidence on the issue of damages but relied only on their own testimony, the damages award cannot stand. The defendants generally rely on the so-called "rule of certainty" to refute the plaintiffs' wage loss award. Notably, none of the cited cases concern lost wages. Additionally, the Third Circuit has remarked that the rule is not to be strictly applied. Rather, " ' [w]here a wrong has been committed and damages have resulted, mere uncertainty as to the amount of damages will not preclude a recovery even though proof of the amount of damages is inexact.' " *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1176 (3d Cir.1993) (quoting *Viviano v. CBS, Inc.,* 251 N.J.Super. 113, 129 (App.Div.1991)). The defendants supply no legal support for their assertion that the plaintiffs must present either expert testimony or documentary evidence to permit a finding of lost wages. Moreover, courts have found that credible testimony need not be buttressed by expert testimony, tax returns, or other documentation. See *e.g. Hawkins v. 248 Haynes St. Assoc., Inc.,* 1995 WL 378462 at *9 (N.J.Super.App.Div.1995). The trial testimony is replete with specific references to the plaintiffs' earning activities, salary comparisons, and losses based on the activities of the defendants. *(See e.g.* Tr. 11/19/04 at pp. 114-116). Thus, the court finds the defendants' objection to lost wages without merit.

### 4. Testimony of Alleged Acts of Discrimination and/or Retaliation Occurring After August 20, 2001

The defendants further argue that the court erred in permitting evidence of alleged acts of discrimination occurring after the law suit's filing date of August 20, 2001. Specifically, the defendants assert that the plaintiffs did not make allegations of continuing violation in either the complaint or the final pretrial order. *(See* Defs.' Br. at 13-18).

First, the complaint contains numerous references to continuing violation theories. For example, paragraph 51 of the complaint provides, "Despite the foregoing policy, Chief Marini selected Thomas Quinn and Robert Zieniuk, both Caucasians as Acting Deputy Fire Chiefs. Furthermore, Marini has allowed the racial discriminatory practices to continue since he has become Fire Chief." The plaintiffs also included a statement of continuing harm in their Wherefore clause, requesting that the court "enter a declaratory judgment that Defendants' discriminatory and retaliatory acts, policies, practices and procedures complained of herein, have violated and continue to violate the rights of Plaintiffs ... [and] enjoin Defendants from continuing in their discriminatory and retaliatory practices." Thus, the continuing violations theory was apparent from the outset of the case.

*9 The Joint Final Pretrial Order ("FPTO") similarly reflects both the plaintiffs' continuing violation theory as well as the plaintiffs' intention to introduce evidence post-dating August 20, 2001. The plaintiffs' contested facts describe a continuing pattern and practice of discrimination by the defendants. For example, the FPTO provides: "51. Defendants have engaged in a pattern and practice of denying Hailey and Crowder promotions due to his race despite his qualifications and experience. 52. This practice is a continued practice of discrimination and retaliation against Plaintiff due to his race and for speaking out on public issues concerning overtime and race that Plaintiff has made during his course of employment." (FPTO, Part III, ¶¶ 51, 52). The FPTO further provides: " 79. Defendants engaged in a pattern and practice to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 8

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

keep Crowder, due to his race, from obtaining the necessary experience to gain promotions in the department and/or not promoting Plaintiff despite his experience and qualifications. 80. This practice is a continued practice of discrimination and retaliation against Crowder for speaking out on public issues concerning overtime, race and grievances that Plaintiff has made during his course of employment." Additionally, the plaintiff's list of exhibits included numerous documents that post-date August 20, 2001. (*See e.g.* FPTO at 30-35, P-56, P-59, P-62, P-65, P-72, P-82, P-89, P-108, P-128, P-129, P-143). Notably, the defendants did not object to any these documents based on the date on which they were created or the time period which they cover.

More importantly, even the defendants indicated an intention to enter evidence that post-dates August 20, 2001. The defendants indicate that Defendant Chief Marini will testify to his management practices while Chief of the Fire Department:
Mr. Marini will give a detailed history of the City of Camden Fire Department and its operations. He will also detail his efforts concerning the management of the Fire Department. He will give testimony about his knowledge of plaintiffs' careers. He will testify about the earnings of the plaintiffs as compared with other minorities and/or non-minority members of the Fire Department.

(FPTO at 24). Additionally, the defendants indicated an intention to introduce documentary evidence that post-dated August 20, 2001. (*See e.g.* D-11, D-32). Most notably, however, is the failure of the defendants to include any objection concerning testimony that post-dated August 20, 2001. This absence of objection is highlighted by the presence of an objection to evidence prior to 1999. (*See* FPTO at 42, Part IX. 2).

The defendants did object to entry of any evidence after August 20, 2001 at trial. That objection consisted of the following argument:
Mr. Gonzalez: Judge, at this point in time I have to make an objection to any further incidents after August 20th, 2001.
Therefore, it is irrelevant as to any harm he might have suffered after 2001.

**\*10** The Court: Counsel?
Mr. Zeff: If I am not mistaken, there was a motion in limine filed by the defense on this issue, and you made a ruling that it is a hostile work environment case and that incidents that have occurred prior to the date of the filing are not only relevant, but also provide background information as to that.
Mr. Gonzalez: I am talking about subsequent.
Mr. Zeff: Subsequent?
Mr. Gonzalez: Yes.
Mr. Zeff: It's been continuing. It's been put in the complaint that way.
The Court: I have to look at the pretrial orders.
Mr. Zeff: Not only for things that are subsequent, but the complaint has been amended to things that happened last week. The Court: I will permit it.

(Tr. 11/15/04 135:5-136:7). This was the entirety of counsel's objection to testimony of incidents occurring after August 20, 2001. The court considered and ruled on the defendants' continuing violations objections (which ruling the court considers anew infra), finding that the plaintiffs did allege such a theory and that that theory was thoroughly litigated both over the course of trial preparation and at trial. The defendants did not assert that they were prejudiced in their preparedness for trial on this issue, and the plaintiffs' pleadings as well as the defendants' own pretrial submissions included information that post-dates August 20, 2001. Consequently, the court finds this argument wholly without merit.

### 5. Liability Under 42 U.S.C. § 1983

#### a. Municipal Liability

This is the second area in which the court has grave concerns. In the Rule 50 motion and now in the renewed motion, the City of Camden argued that the State of New Jersey was in control of the City during part of the relevant time period. The reference in the Rule 50 motion was vague and unsupported by any jurisprudence. Similarly, the reference in the renewed motion did not satisfy the court that the issue should not have been presented to the jury.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

Upon review of the instant motion, however, the court's concern was aroused when both the City of Camden and the plaintiffs relied on the identical person as the individual with "final decision-making authority"-Norton Bonaparte, the Business Administrator. The defendants asserted that Mr. Bonaparte was not a City employee. The plaintiffs argued that he indeed was. The trial testimony provided insufficient guidance for the court to determine. Therefore, to ensure that no injustice had been wrought, the court requested additional briefing on the issue.

After having carefully considered the supplemental briefing, the court finds that a new trial must be granted to Defendant the City of Camden on the issue of liability under 42 U.S.C. § 1983.

### (i) Municipal Liability under Section 1983

The Supreme Court has articulated the "guiding principles" for municipal liability as follows:
First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." *Pembaur [v. City of Cincinnati],* 475 U.S. [469,] 480, 106 S.Ct., at 1298. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.,* at 483, 106 S.Ct., at 1300 (plurality opinion). Third, whether a particular official has "final policymaking authority" is a question of *state law. Ibid.* (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.,* at 482-483, and n. 12, 106 S.Ct., at 1299-1300, and n. 12 (plurality opinion).

*11 *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (emphasis in original). On the topic of determining which official may have that final policy-making authority, the Court stated:We begin by reiterating that the identification of policymaking officials is a question of state law. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. Cincinnati, supra,* 475 U.S., at 483, 106 S.Ct., at 1300 (plurality opinion). Thus the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies. See generally C. Rhyne, The Law of Local Government Operations §§ 1.3-1.7 (1980). Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.

*City of St. Louis,* 485 U.S. at 124-125. Thus, it was the court's duty to determine what individual had "final policy-making" authority sufficient for liability to attach to the City.

At the time of trial, the court was not fully apprised of the basis for defendants' objections to its instruction regarding municipal liability. Indeed, much of what has recently come to light was never addressed to the court before or during trial. The supplemental briefing to the instant motion has greatly assisted the court in this task. The relevant question being can Norton Bonaparte, as the final policy-maker, subject the City of Camden to liability under section 1983. If the answer is yes, then the verdict may stand in this respect. If the answer is no, then it cannot. A review of the relevant legislation regarding control and oversight of the City of Camden reveals that the answer lies somewhere in between.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

### (ii) Legislative Basis for State Oversight

Three legislative acts define control of the City of Camden during the relevant time period.[FN3]

> FN3. Although the defendants have argued in the instant motion that neither that period before August 20, 1999 nor that period after August 20, 2001 should be included as part of the relevant time period for this case. The court rejected the former argument before trial and the court rejects the latter argument herein. The case involves a continuing violation of anti-discrimination statutes. Such was pled and such was tried. Consequently, the relevant period ran continuously for the period of the plaintiffs' employment to the time of trial, December 2004.

First, Public Law 1998, Chapter 45, the Annual Appropriates Act for the State's 1998-1999 fiscal year authorized the Local Finance Board ("LFB") to create, by resolution, a Financial Review Board (" FRB") for the City of Camden. P.L.1998, c. 45 (N.J.A.C. 5:30, Subchapter 13, "Financial Review Boards"). [FN4] The defendant asserts that establishment of this rule supplanted the City of Camden as the governing authority in exchange for governance by the Financial Review Board, an arm of the State of New Jersey. As a consequence, the City asserts that it could not be subject to liability under section 1983 as no employee of the City of Camden had "final policy-making authority."

> FN4. This subchapter was created for the City of Camden pursuant to an Emergency New Rule Adopted and Concurrent Proposed New Rule authorized by the Acting Chair of the Local Finance Board, with gubernatorial approval, effective August 1998. Effective October 20, 2003, subchapter 13 was amended to generically cover any municipality.

*12 While establishment of the financial review board wrested some authority from the City of Camden, it did not supplant the City as a governing body. Rather, this legislation merely provided for financial oversight of the City of Camden on a general level. Day to day management of the City remained with the City. And the City's own contemporary analysis of its autonomy under the financial review board belies its current position.

In April 2000, the LFB conducted a hearing and evaluated the financial condition of the City. Following that hearing, on May 10, 2000, the LFB placed the City under its supervision pursuant to the second relevant act, the "Local Government Supervision Act of 1947", N.J.S.A. 52:27BB-1 to 100 ("Supervision Act"). The LFB then proceeded to dismiss the City's then-Business Administrator and directed it to appoint Norton N. Bonaparte, Jr., as the City's business administrator. The City sued the LFB and the Director of the Division of Local Government Services of the Department of Community Affairs, claiming that "the LFB and the Director have, in this instance, exceeded their powers under the Supervision Act and violated long-standing traditions of 'home rule' and local autonomy." *City of Camden v. Kenny,* 336 N.J.Super. 53, 56 (App .Div.2000). Specifically, the City argued that the LFB did not have the authority to hire, fire, or otherwise dictate whom the City must appoint as its business administrator. The court, after careful consideration of the City's arguments and the intent of the Supervision Act, found that beginning on May 10, 2000, the LFB had "strong remedial powers ... to correct gross financial failings at the municipal level" and that these powers "must prevail over the general power of the Mayor and City Council to appoint and confirm a business administrator." 336 N.J. Super at 61. The court noted that the Supervision Act " specifically speaks to personnel reform, whether classified or unclassified, union or non-union." 336 N.J.Super. at 62 (citing N.J.S.A. 52:27BB-66.1). The court concluded that through the Supervision Act, the LFB and the Director were granted a " pantheon of powers ... to accomplish the obvious intent of the Legislature to stem fiscal bleeding and administrative ineptness in distressed municipalities. " *Id. Kenney* confirms that prior to May 10, 2000, the City had control of its management functions, including the power to hire and fire and after May

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

10, 2001, the City lost that control to the LFB through the Supervision Act.

The Supervision Act specifically provides that the LFB and the Director have authority over personnel decisions, and Norton Bonaparte, the appointed business administrator, stated that beginning with his appointment in October 2000, he was an employee of the State and not of the municipality. (See Tr. 121-124).

There is no testimony to the contrary.

This regime continued until the establishment of the "Municipal Rehabilitation and Economic Recovery Act of 2002", N.J.S.A. 52:27BBB-1, et seq. This Act changed the City's organizational structure vis-a-vis liability in tort and contract. Section 52:27BBB-32 defines the contours of contract or tort liability for "the chief operating officer or a State officer or employee involved in the rehabilitation or revitalization of the municipality, as municipal employees." First, the section immunizes the State from liability "for any action or inaction involving the rehabilitation or revitalization of the municipality." Second, the section immunizes the "chief operating officer, assistant chief operating officer, and any State officer or employee involved in the rehabilitation or revitalization of the municipality" from liability personally or as State employees "for any action or inaction involving the rehabilitation or revitalization of the municipality." Third, it establishes that "chief operating officer or a State officer or employee involved in the rehabilitation or revitalization of the municipality" are subject to suit as municipal employees.

**\*13** Notably, this statute became effective July 22, 2002, and is applicable retroactive to June 30, 2002.

Thus, the three pieces of legislation read in conjunction result in the following liability pattern in this case: The City retained control of its personnel decisions and had "final policy-making" authority up until May 10, 2000. Beginning in May 2000 and up until June 30, 2002, the State in the form of the Local Finance Board of the Department of Community Affairs had control and its agent, Norton Bonaparte, was the final policy-making

authority. Finally, with the enactment of the Municipal Rehabilitation and Economic Recovery Act of 2002, the municipality could be held liable for the acts of the business administrator notwithstanding his official employment with the State.

Left with this information and the trial testimony, the court would be required to find that the City could be held liable for the conduct of its own administrators for acts of discrimination during the period of continuing violation up until May 10, 2000. Then, the City could not be held liable for the discriminatory employment acts of the LFB during that period beginning with the State's wresting control from the City on May 10, 2000 to the enactment of the MRERA effective June 30, 2002. Thereafter, the City could again be held liable for the discriminatory acts of the rehabilitation administrators through the trial date. However, as the court failed to include the relevant statutory scheme in its calculation of municipal liability, the court did not properly advise the jury as to the relevant period of liability.

Further complicating the issue is a very critical fact only disclosed to this court in the City's second supplemental filing following oral argument. The City states that after the MRERA went into effect, " Mr. Bonaparte lost his job and Mr. Primas was placed, by the State, as the C.O.O. of Camden." (Defs.' Supp. Br. dated 6/9/06 at 9). The City thus concludes that the MRERA did not apply to Mr. Bonaparte's employment as Business Administrator of the City of Camden. *(See id.)*. The defendants make this argument presumably to highlight the consequent effect that Mr. Bonaparte's termination vitiates City liability based on his conduct. However, more important to this court is that this heretofore unknown yet highly significant fact illustrates the depth of the court's ignorance of whom to identify as the final policymaker.

The court is responsible for determining the final policymaker and supplying that information to the jury for determination of liability. The court, bereft of knowledge of either the relevant statutes or the impact they had on the City's governance, did not adequately address the question of City liability.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**

Moreover, the briefing for this motion illustrates the lack of a factual foundation upon which such a determination can be made. As a consequence, the court did not properly identify for the jury the final policymaker for purposes of section 1983 liability. This error led to a finding of liability against the City for conduct during a period in which the City *may* not be responsible. [FN5] And the court finds that this error merits a new trial on the question of section 1983 liability for the City.

> FN5. The court emphasizes that further factual development is required before a court can definitively address these questions. This record can be further developed in preparation for the new trial on the question of liability.

#### b. Individual Liability

**\*14** The defendants argue that the individual defendants are entitled to judgment in their favor for claims brought under section 1983. The defendants' argument relies solely upon the individual defendants' liability in their official capacities. *(See* Defs.' Br. at 22-23). Yet, the plaintiffs brought the claim against the individual defendants in individual capacities. Thus, the defendants's argument is inapposite.

#### c. Section I of the Jury Interrogatory Sheet

The defendants argue that Section I of the Jury Interrogatory Sheet is fundamentally flawed because it specifically references only Jury Instruction 18(a) ("Race Discrimination: Elements"). The defendants do not expound on this point. The court can only posit that the defendants were objecting that the Interrogatory did not specifically refer the jury to each and every charge related to the discrimination claim against the defendants. However, a full review of the charges reveals provisions specifically related to municipal liability and defenses. *(See e.g.* Instructions 21, 28). Thus, the court finds no error here.

#### 6. Admission of Testimony Regarding Alleged Acts Prior to August 20, 1999

The defendants rely generally on *Shephard v. Hunterdon Developmental Center,* 174 N.J. 1 (2002), in support of their renewed motion to bar testimony of continuing violation. The defendants accurately describe the *Lehmann v. Toys R Us* standard as restated in *Shephard:* that the plaintiffs must show that the complained of conduct (1) would not have occurred but for the employees' protected status, and (2) was severe or pervasive enough to make a(3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. 174 N.J. at 24. Similarly, the court agrees with the defendants that a supervisor's coldness, lack of civility, rudeness, lack of sensitivity, simple teasing, offhand comments, and isolated incidents do not constitute discrimination. *(See* Defs.' Br. at 25). However, the defendants would have this court reject the jury's consideration of the evidence in favor of the defendants' general assertion that the plaintiffs' testimony did not constitute severe or pervasive conduct. The defendants cite to the entirety of the plaintiffs' testimony without detail. In contrast, the plaintiffs parse the testimony and provide an accurate and thorough description of numerous incidents of discrimination over many years. Moreover, the court reviewed the trial testimony and finds the plaintiffs' factual recitation accurate and the evidence more than adequate to support a finding of liability under the above standard. Thus, the defendants' motion on this point is denied.

#### 7. NJLAD Aiding and Abetting by Individuals

The defendants assert first that the plaintiffs did not present evidence to substantiate a claim of aiding and abetting under the NJLAD. However, the court finds, after review of the evidence, that the plaintiffs met their burden of proof to establish aiding and abetting liability.

**\*15** Second, the defendants vaguely assert that the court did not supply the correct charge. However, the court's aiding and abetting charge was very

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

specific and included all the information necessary to assist the jury in determining liability of the individual defendants as aiders and abettors under NJLAD. *See Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 127 (3d Cir.1999).

## 8. Punitive Damages-New Jersey Law Against Discrimination

### a. Willful Indifference

The defendants argue that the plaintiffs did not establish that the defendants acted with willful indifference and wanton disregard. The plaintiffs marshal much evidence and the court has reviewed the testimony and concurs that sufficient evidence exists to support the jury's award.

### b. Punitive Damages under NJLAD against the City of Camden-Jury Instruction Regarding Upper Management

The defendants object to the inclusion of Chief Zieniuk in the charge regarding upper management. The defendants did object to the inclusion of Chief Zieniuk as a member of upper management at trial and now argue that Chief Zieniuk should not have been included in that group because he did not have the authority to hire, fire, promote, and discipline the employees. *(See Defs.' Br. at 32).* However, that is not the only or even the necessary quality of a member of upper management. Rather, as the charge states:
For an employee on the second tier of management to be considered a member of "upper management," the employee should have *either* (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline, *or* (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.

(Jury Instruction 38E) (emphasis supplied). It is the jury who has the duty to determine this question, particularly where as here the parties do not agree as to the members of upper management. *See*

*Hurley,* 174 F.3d at 124. The jury so determined. The court has reviewed the testimony and finds that there is sufficient evidence with which to support that determination and the defendants present no viable argument to the contrary.

## 9. *Garcetti v. Ceballos*

At oral argument, the defendants raised for the first time the issue of whether the plaintiffs' First Amendment claims constitute protected speech. The basis for this untimely assertion was the Supreme Court's recent decision, *Garcetti v. Ceballos,* --- U.S. ----, 126 S.Ct. 1951 (2006), issued on May 30, 2006. The defendants contend that *Garcetti* nullifies the First Amendment protection formerly enjoyed by Crowder's and Hailey's conduct. The defendants identify that conduct as the plaintiffs complaining about safety, overtime, and hiring practices to the fire department, the newspaper, and to City Council. (*See* Defs.' Supp. Br., 6/9/06, at 3). The defendants note that Crowder spoke out against the fire department's policy with respect to overtime, complained concerning the abuse of overtime and the lack of equitable distribution of overtime to members of the fire department, and complained about access to promotions and the Fire Chief test. (*See id.* at 3-4). The defendants summarize Hailey's testimony to include speaking out on disrepair of fire department equipment, overtime, lack of adequate personnel assigned to the fire department, and safety concerns resulting from these alleged problems, as well as complaining about the department's handling of the *Angemi* matter. (*See id.* at 4-5). The defendants argue that the plaintiffs made all of these statements pursuant to their official duties. Thus, the defendants conclude, *Garcetti* ejects them from the realm of protected speech.

*\*16* In opposition, the plaintiffs distinguish *Garcetti,* asserting that the plaintiffs attended City Council meetings and spoke with newspapers as private citizens and not as employees. The plaintiffs, citing trial testimony, maintain that the plaintiffs spoke out not in their capacities as fire fighters, but as concerned citizens. The plaintiffs testified that they placed their names on the agenda as any citizen

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 14

Slip Copy, 2006 WL 1875402 (D.N.J.)
(Cite as: Slip Copy)

would. (*See* Tr. 11/16-18/04 at 66-67).

I have no doubt that many courts will struggle to define the breadth of *Garcetti* and its impact on First Amendment jurisprudence. That struggle, however, need not begin with this case as *Garcetti* is clearly distinguishable. *Garcetti* concerned a Los Angeles County district attorney's claim of retaliation based solely on an internal memorandum that he wrote to his superiors. The Court held that " when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." 126 S.Ct. at 1960. The Court explained "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy.... Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 1959-60. To further illustrate the point, the court provided a contrasting example:
Contrast, for example, the expressions made by the speaker in *Pickering,* whose letter to the newspaper had no official significance and bore similarities to letter submitted by numerous citizens every day.
Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id.* at 1960. The Court reaffirmed as necessary " informed, vibrant dialogue in a democratic society" and acknowledged that "costs may arise when dialogue is repressed." *Id.* at 1959. Plaintiffs Hailey and Crowder referenced uncontested testimony that they attended and spoke at the City Council meetings and to the newspapers as private citizens. The defendants have pointed to no testimony even suggesting that attending City Council meetings and speaking with newspapers was a part of the

plaintiffs official duties. Rather, the testimony confirms that plaintiffs' speech at the City Council meetings and to the newspaper served to promote the "public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti,* 126 S.Ct. at 1958. *Garcetti* did not immunize the defendants from retaliation for the plaintiffs' speech in this case. The jury found actionable retaliation and this court need not disturb that finding based on *Garcetti.*

### C. Conclusion

*17 For the foregoing reasons, the defendants' motion for a new trial shall be granted in part, ordering a new trial, in accordance with the above discussion, (1) on the issue of punitive damages as to all parties and (2) on the section 1983 claim against the City of Camden. The question of the final policy maker for purposes of section 1983 liability against the City of Camden shall be decided by the trial court upon presentation of evidence necessary for that determination. As to all other points, the defendants' motion shall be denied.

### IV. Plaintiffs' Motion for Injunctive and Declaratory Relief

The plaintiffs have moved for injunctive and declaratory relief. The court shall deny this motion without prejudice pending the outcome of the new trial ordered herein. However, the court shall make one observation. The plaintiffs first request that this court order the City to supply the court with proof that it has complied with Section 9(a) of the Consent Decree of May 30, 1980 "from January 1, 2005 and for every sixty days thereafter until such time as the Court deems Camden in compliance." (Proposed Order). Although the court is not making a finding at this time, the court reflects that the plaintiffs dropped any and all claims under the Consent Decree prior to the commencement of trial. Thus, if and when the plaintiffs renew their motion following the new trial, the plaintiffs should limit their injunctive relief to that which is properly before the court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 15

Slip Copy, 2006 WL 1875402 (D.N.J.)
**(Cite as: Slip Copy)**


An appropriate order shall enter this date.

D.N.J.,2006.
Hailey v. City of Camden
Slip Copy, 2006 WL 1875402 (D.N.J.)

Briefs and Other Related Documents (Back to top)

• 1:01CV03967 (Docket) (Aug. 20, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Michael KATZENMOYER, Charlotte
Katzenmoyer,
v.
CITY OF READING, et al.
**No. CIV. A. 00-5574.**

Sept. 21, 2001.

*MEMORANDUM*

JOHN R. PADOVA, Judge.
**\*1** Defendants move for summary judgment on
Counts VII and VIII of the Amended Complaint.
For the reasons that follow, the Court grants
Defendants' Motion and grants judgment in favor of
Defendants on these counts.
I. Background

In Count VII, Plaintiff Charlotte Katzenmoyer ("
Katzenmoyer") brings a claim under § 1983 and the
First Amendment. Specifically, Katzenmoyer
alleges that Defendants City of Reading ("City"),
Mayor Joseph Eppihimer ("Eppihimer") and Jesus
Pena ("Pena") refused to promote her to the
position of City Engineer in retaliation for filing and
maintaining a lawsuit against them. In Count VIII,
Katzenmoyer seeks "mandatory injunctive relief" in
relation to the claims made in Count VII.

In her response to Defendants' Motion, Plaintiff
argued that the existing record provided sufficient
basis to deny the motion, but, in the alternative,
asked that the Court defer disposition of the Motion
until discovery had been completed. The Court
deferred judgment under Rule 56(f) until the
completion of discovery, and set a deadline for the
filing of supplemental memoranda. On August 30,
2001, Defendants filed a supplemental brief, but

Plaintiff did not, thus choosing to rely on her prior
submission.[FN1]

> FN1. By letter to the Court dated
> September 7, 2001, Plaintiff's counsel
> confirmed that she would not be filing any
> supplemental materials in opposition to the
> Motion for Partial Summary Judgment.

I. Legal Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any,
show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(c).
An issue is "genuine" if the evidence is such that a
reasonable jury could return a verdict for the
non-moving party. *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). A factual dispute is "material" if it might
affect the outcome of the case under governing law.
*Id.*

A party seeking summary judgment always bears
the initial responsibility for informing the district
court of the basis for its motion and identifying
those portions of the record that it believes
demonstrate the absence of a genuine issue of
material fact. *Celotex Corp. v. Catrett,* 477 U.S.
317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Where the non-moving party bears the burden of
proof on a particular issue at trial, the movant's
initial *Celotex* burden can be met simply by "
pointing out to the district court that there is an
absence of evidence to support the non-moving
party's case." *Id.* at 325. After the moving party has
met its initial burden, "the adverse party's response,
by affidavits or otherwise as provided in this rule,
must set forth specific facts showing that there is a
genuine issue for trial." Fed.R.Civ.P. 56(e). That is,
summary judgment is appropriate if the non-moving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

party fails to rebut by making a factual showing " sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

II. Discussion

**\*2** Section 1983 of Title 42 of the United States Code provides a remedy against "any person" who, under the color of law, deprives another of his constitutional rights. 42 U.S.C. § 1983 (1994). Courts apply a three-step, burden-shifting analysis for retaliation claims made pursuant to the First Amendment under § 1983. *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 285-86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). First, the plaintiff must show that she engaged in conduct or speech that is protected by the First Amendment. *Id.* Second, the plaintiff must show that the defendant responded with retaliation, and that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997); *Watters,* 55 F.3d at 892. Third, the defendant may defeat the plaintiff's claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct. *Watters,* 55 F.3d at 892.

Defendants contend they are entitled to judgment because Plaintiff cannot establish that an adverse employment action was taken against her. (Def. Mot. at 11.) Specifically, Defendants contend that Plaintiff cannot demonstrate that she was entitled to or had a property right in the position, because she

lacked the necessary professional licensing. In such a § 1983-First Amendment claim, however, a plaintiff need not demonstrate she was entitled to the promotion. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (citing *Perry v. Sinderman,* 408 U.S. 593, 596-98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)); *Suppan v. Dadonna,* 203 F.3d 228, 234 (3d Cir.2000)(rejecting the argument that the First Amendment rights of public employees had not been infringed because they were not entitled to promotion, transfer, or rehire). Retaliatory conduct falling within the scope of § 1983 and the First Amendment is conduct that would "deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan,* 203 F.3d at 235. " [T]he First Amendment ... protects from ... even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Rutan,* 497 U.S. at 76 n. 8.

Defendants further contend, however, that they are entitled to judgment because Plaintiff cannot adduce evidence that there is a causal link between Plaintiff's exercise of First Amendment rights and Defendants' failure to promote her. The Court agrees. In a First Amendment retaliation case, the plaintiff has the initial burden of showing that the constitutionally protected conduct was a "substantial " or "motivating factor" in the relevant decision. *Mount Healthy,* 429 U.S. at 287. It is sufficient if a plaintiff establishes that the exercise of the First Amendment rights played some substantial role in the relevant decision; a plaintiff need not establish that the retaliation was motivated solely or even primarily by the protected activity. *Id.* at 270-71.

In response to Defendants' Motion, Plaintiff presents evidence consisting of an affidavit and a city job description. In order to be considered on summary judgment, facts set forth in affidavits must be such that they would be admissible in evidence. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.") Of Plaintiff's many averments, only a few

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

appear to suggest any link to her filing and maintenance of the law suit with the decision not to promote her:

*3 6. Mr. White told me on numerous occasions that Mr. Eppihimer told him that I would not be elevated to the position of Director Public Works unless and until my husband Michael Katzenmoyer withdrew his law suit against the City of Reading.

7. Mr. White also advised me that Mayor Eppihimer would claim that I could not be elevated to the position of Director of Public Works because I did not yet have my Professional Engineer's license. Mr. White told me on more than one occasion that this was not true. He said Mayor Eppihimer told him that the basis for the denial of the promotion was the existence of Michael Katzenmoyer's law suit.

11. I had several conversations with Jeffrey White about my selection as Director of Public Works and was advised by him, ... that the reason I was not selected was in retaliation for my support of my husband Michael Katzenmoyer in his legal action against the City of Reading.

12. Mr. White made clear to me that my support of as well as my association with Michael Katzenmoyer and his law suit made me unacceptable [sic] Joseph Eppihimer

19. I spoke with Eppihimer about becoming Director of Public Works because of the Professional Engineer's license requirement of the City Charter he said "you know that is not the case."

Pl. Answer to Def. Mot. for Summ. Judgment Ex. A. None of these statements, however, are made on the affiant's personal knowledge; they are hearsay statements that would not be admissible into evidence. Plaintiff's only other submission-the job description-sheds no light as to causation. The Court concludes that Plaintiff's submissions are insufficient to show that there is a genuine issue of material fact as to the issue of whether Plaintiff's lawsuit was a substantial motivating factor in Defendants' decision not to promote her. Accordingly, the Court concludes that Defendants are entitled to judgment on Count VII. The Court also grants judgment in favor of Defendant on Count VIII, insofar as entitlement to the relief sought in Count VIII depends on proof of the claim in Count VII.

An appropriate Order follows.

### ORDER

AND NOW, this day of September, 2001, upon consideration of Defendants' Motion for Partial Summary Judgment (Doc. No. 21), any responses thereto and all attendant briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. Judgment is entered in favor of Defendants on Counts VII and VIII of the Amended Complaint.

E.D.Pa.,2001.
Katzenmoyer v. City of Reading
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:00CV05574 (Docket) (Nov. 02, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

# Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Linda **KELLEHER**,
v.
CITY OF **READING**, et al.
No. CIV.A.01-3386.

May 29, 2002.

## MEMORANDUM

PADOVA, J.

**\*1** The instant matter arises on the two separate Motions for Summary Judgment filed by the Defendants. Plaintiff Linda Kelleher, the City Clerk of the City Council of Reading, Pennsylvania, filed this suit against the City of Reading ("City"), Mayor Joseph Eppihimer ("Eppihimer"), the Mayor's assistant Kevin Cramsey ("Cramsey"), and City Councilman Jeffrey Waltman ("Waltman") for a series of allegedly harassing actions taken by the Defendants against her in retaliation for exercising her First Amendment rights to free speech. Plaintiff brings First Amendment retaliation claims and conspiracy claims pursuant to 42 U.S.C. § 1983. She also brings a claim for invasion of privacy against Defendant Cramsey for allegedly publicizing e-mails and other purportedly private information relating to her suspension by the City Council. Defendant Waltman filed a Motion for Summary Judgment asserting qualified immunity as well as other bases for dismissal or judgment. The remaining Defendants filed a joint Motion for Summary Judgment asserting a variety of grounds for judgment. For the reasons that follow, the Court grants the Motions as to all claims in favor of all Defendants.

### I. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by " pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing " sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

## II. Discussion

### A. *Qualified Immunity-Claims Against Defendant Waltman*

**\*2** Defendant Waltman moves for summary judgment on all claims against him on the basis of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Government officials have qualified immunity from suit under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The test is whether reasonable persons in the defendants' position at the relevant time "could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The defendant has the burden of pleading and proving qualified immunity. *Harlow,* 457 U.S. at 815.

When resolving issues of qualified immunity, a court must first determine whether the plaintiff has alleged a deprivation of a constitutional right. *Saucier,* 121 S.Ct. at 2156; *Torres v. McLaughlin,* 163 F.3d 169, 172 (3d Cir.1998) (internal citations omitted). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified

immunity. *Saucier,* 121 S.Ct. at 2156. If the court determines that a constitutional violation is viable on a favorable view of the parties' submissions, the court must then ask whether the right was clearly established. *Saucier,* 121 S.Ct. at 2156. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* Although a right may be clearly established even if there is no prior precedent that is directly on point, " [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Saucier,* 121 S.Ct. at 2156 (internal quotations omitted); *Eddy v. Virgin Islands Water & Power Auth.,* No.99-3849, 2001 WL 770088, at \*2 (3d Cir. July 10, 2001). Accordingly, the relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier,* 121 S.Ct. at 2156; *Eddy,* 256 F.3d 204, 2001 WL 770088, at \*2.

Plaintiff alleges that Waltman spoke to the media and disclosed information relating to her suspension in order to retaliate against her for engaging in conduct that was protected by the First Amendment. Where a plaintiff alleges an unconstitutional subjective intent, she must proffer particularized evidence of direct or circumstantial facts that support the claim of an improper motive in order to avoid summary judgment on qualified immunity grounds. *Keating v. Bucks Cty. Water & Sewer Auth.,* Civil Action No. 99-1584, 2000 U.S. Dist. LEXIS 18690, at \*29 (E.D.Pa. Dec. 29, 2000). " The standard allows an allegedly offending official sufficient protection against baseless and unsubstantiated claims, but stops short of insulating an official whose objectively reasonable acts are besmirched by a prohibited unconstitutional motive. " *Id.* at 30 (citing *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996)).

**\*3** In this case, Plaintiff admits that she has no direct evidence demonstrating that Defendant Waltman disseminated copies of the e-mails to the media, but adduces some circumstantial evidence designed to establish such dissemination. (Pl.'s Resp. to Def. Waltman's Mot. at 6.) It is undisputed that Defendant Waltman spoke to the media in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 3

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

interviews. (Pl.'s Resp. to Def. Waltman's Mot. Ex. 3 at 6-8.) Plaintiff also presents evidence that Waltman advocated Plaintiff's termination. (Def. Waltman's Ex. A. at 68.)

Absent, however, is any evidence showing any connection between Plaintiff's alleged constitutionally protected speech and any actions taken by this Defendant.[FN1] In the context of qualified immunity analysis, Plaintiff has failed to provide any evidence of an improper motive by Defendant Waltman for any of the actions taken. Although Plaintiff alleges in her Complaint that the motive was to retaliate for speech in which she engaged, none of the evidence has the tendency to prove such a motive either directly or circumstantially. Plaintiff has likewise adduced no evidence demonstrating that Waltman conspired with the other Defendants for the purpose of retaliating against her for exercising her free speech rights. With no evidentiary connection whatsoever between any actions that might have been taken by this Defendant and Plaintiff's First Amendment free speech rights, reasonable persons in the Defendant's position at the relevant time "could have believed, in light of clearly established law, that [his] conduct comported with established legal standards." See Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Accordingly, Defendant Waltman is entitled to qualified immunity. The Court dismisses all claims against him.

FN1. Because this part of the qualified immunity inquiry is based on the pleadings rather than evidence in the record, the Court has considered the possible connection between Plaintiff's alleged conduct relating to the Reading Water Authority and the televised debate. As indicated below, infra, Plaintiff has failed to establish that she engaged in the alleged conduct that serves as the basis for the alleged retaliation.

B. First Amendment Retaliation Claim [FN2]

FN2. Count 1 brings a retaliation claim under 42 U.S.C. § 1983 against the City of Reading and each of the individual Defendants in their official capacities. Count 2 brings the same retaliation claim against the Defendants in their individual capacities.

Plaintiff alleges that the Defendants violated her constitutional rights by retaliating against her for exercising her First Amendment right to free speech. Plaintiff alleges that the Defendants engaged in a campaign of harassment as a result of certain conduct and speech which they thought she engaged in.

*4 The First Amendment protects public employees from retaliation by their employer. Under 42 U.S.C. § 1983, a public employee may sue to enforce that protection if: (1) she spoke on a matter of public concern; (2) her interest in that field outweighed the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the retaliatory action would not have occurred but for the speech. Green v. Philadelphia Housing Auth., 105 F.3d 882, 885 (3d Cir.1997).

The Court determines that Plaintiff has failed to establish a genuine issue of material fact to sustain her claim of First Amendment retaliation. Plaintiff has failed to adduce evidence that she engaged in speech or conduct that is protected by the First Amendment. Furthermore, even if Plaintiff could establish that she engaged in such speech or conduct, she has failed to establish that the conduct was the substantial motivating factor behind the allegedly retaliatory actions taken by the Defendants.

1. Protected Speech

In order to be considered protected speech under the First Amendment, the speech or activity engaged in must address a matter of public concern. Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir.1997). Speech addresses a matter of public concern when it relates "to any matter of political,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

social, or other concern to the community." [FN3] *Id.* at 977. However, regardless of the subject of the alleged speech, a plaintiff must actually engage in the type of conduct protected from retaliation under the First Amendment. *Fogarty v. Boles,* 121 F.3d 886, 887-88 (3d Cir.1997) (dismissing retaliation claim based on allegation the employer believed plaintiff engaged in the protected conduct where plaintiff denied actually speaking to the press about the matter). A retaliation claim cannot be based on speech or conduct if the defendant erroneously believed that the plaintiff engaged in such speech or conduct. *Id.; Barkoo v. Melby,* 901 F.2d 613, 619 (7th Cir.1990) ("[Plaintiff] provides no authority for the proposition that her free speech rights are deprived in violation of § 1983 when the speech at issue admittedly never occurred.")

> FN3. "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.' " *Green,* 105 F.3d at 885-86 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In this respect, we focus on the content, form, and context of the activity in question. *Connick,* 461 U.S. at 147-48; *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995). Speech in a form that is not deemed a matter of public concern in one context does not become a matter of public concern simply because it could be deemed protected in a different context. *See Connick,* 461 U.S. at 148 n. 8.

Here, Plaintiff alleges that the Defendants retaliated against her because of their perception that she engaged in speech or conduct relating to two public issues: the municipal trash collection referendum and the proposal to abolish the Reading Area Water Authority ("Authority"). She alleges that this speech and conduct was protected by the First Amendment. The primary incident occurred in 1998, and related to Plaintiff's role in organizing and overseeing a televised debate on the trash collection referendum. (Compl. ¶ 22; Defs.' Ex. F ( "Kelleher Dep.") at 88, 90-91.) Plaintiff testified in

her deposition that her role in the debate was helping to secure a debate representative for each side and establishing rules regarding the format of the debate. (Kelleher Dep. at 88.) Kelleher testified that while she was involved in screening calls to put on the air, she only screened the calls to ensure the remarks related to the debate topic, and not to determine which side the caller intended to support. (*Id.* at 89-90.) She testified that after the debate, she perceived that Eppihimer was upset with her " because of the way the programming went." (*Id.* at 92.) Plaintiff did not appear on the debate or speak to the Defendants on the issue at that time.

In light of Plaintiff's own testimony regarding the limited nature of her activities in connection with the debate, and her testimony that she did not engage in the specific conduct that purportedly motivated the Defendants to retaliate against her, Plaintiff's showing is insufficient to establish that she engaged in conduct that is protected by the First Amendment. For example, even if Plaintiff could show at trial that Eppihimer became upset with her because he perceived that she barred callers from speaking against the municipal trash collection referendum, Plaintiff's own deposition testimony that she did not engage in such activity means that any actions taken on his part in retaliation for such conduct would be based on a mistaken belief as to what Plaintiff had done. Even if such conduct were protected,[FN4] the fact that Plaintiff did not actually engage in such conduct means that the televised debate incident cannot be the basis for Plaintiff's First Amendment retaliation claim.[FN5] *See Barkoo,* 901 F.2d at 619.

> FN4. Because the Court determines that the Plaintiff has failed to establish a genuine issue of material fact as to whether she engaged in the purportedly protected activity, it need not consider the legal question of whether such conduct would be protected by the First Amendment.

> FN5. Plaintiff further testified in her deposition that she spoke on the subject of municipal trash collection when she objectively told Eppihimer the "pros and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

cons" of adopting such a plan. (Pl.'s Resp. to Defs.' Mot. Ex. 1 ("Kelleher Verification") ¶ 23.) This speech, however, is not alleged in the Complaint, and therefore is not part of Plaintiff's retaliation claim here. Furthermore, Plaintiff fails to identify the specifics of that speech, such as the time and place at which it took place or the circumstances in which the speech was given. Even had Plaintiff included an allegation that she engaged in such speech, Plaintiff has provided insufficient evidence to establish a genuine issue of material fact concerning whether she engaged in speech that was protected.

*5 Plaintiff's evidence is similarly insufficient concerning the other alleged incident. Plaintiff alleges that in 1997, Eppihimer, then a Councilman, asked her to draft an ordinance to abolish the Authority. (Compl. ¶ 13.) Plaintiff alleges that she researched the issue and learned that abolishing the Authority would, among other things, place restrictions on the City's sale of water to outlying communities and force the City to assume the Authority's bond debt. (Id. ¶ 14.) When Plaintiff informed Eppihimer of these facts, he "began yelling at her, and saying that she was against him and he would have her fired." (Id. ¶ 15.) Plaintiff's retaliation claim, with respect to this incident, is based on the Defendant's perception that she was speaking against his position on the abolition of the Authority.

Kelleher testified in her deposition, however, that she made no such recommendation or criticism regarding the merits of Eppihimer's proposal to abolish the Authority. (Kelleher Dep. at 53-54.) Plaintiff admits that she did not have an opinion as to whether the authority should be abolished. (Id.) She denies that she did anything other than objectively relay the results of her research to Eppihimer. (Id.) Because Plaintiff denies having engaged in the speech that forms the alleged basis of Defendants' alleged retaliatory motive, that speech cannot form the basis of her retaliation claim.

2. *Nexus Between Alleged Retaliation and Speech*

Furthermore, even if Plaintiff could establish that she engaged in protected speech and conduct, she has failed to establish a connection between that speech and conduct and the allegedly retaliatory conduct by the Defendants. A plaintiff must show that her protected activity was a substantial or motivating factor in the actions alleged to be retaliatory. *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997). Even assuming that Plaintiff engaged in protected activity, Plaintiff has failed to meet her burden to show that the protected activity was a substantial or motivating factor in the alleged retaliatory actions.

In this case, Plaintiff alleges that the Defendants engaged in a campaign of harassment that included a host of different retaliatory actions: (a) Plaintiff's one-week suspension; (b) Plaintiff's lock-out from City Hall during her suspension; (c) the retrieval and reading of Plaintiff's e-mails; (d) dissemination of her e-mail messages to the media; (e) dissemination of the ethics complaint to the media; (f) public comments regarding Plaintiff's suspension; (g) refusal to issue Plaintiff a parking permit; (h) refusal to pay Plaintiff additional salary allotted by the City Council; and (i) initiation of rumors of Plaintiff's extramarital affairs.[FN6]

FN6. Because the Court determines that Plaintiff has failed to establish a genuine issue of material fact with respect to there being a retaliatory motive, it is unnecessary to examine in detail the evidence that such retaliation took place at the hands of the Defendants. The Court notes, however, that in several respects, Plaintiff's evidentiary showing is insufficient to establish genuine issues of material fact.
For example, Plaintiff points to no admissible evidence that she was actually locked out of either the building (after hours) or the computer system during the relevant period. Although Plaintiff testified in her deposition that Councilman Waltman ordered her to be locked out of City Hall and the computer system, and that Eppihimer did so, (Kelleher Dep. at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

282-88), Plaintiff admits that she had no personal knowledge of Mr. Waltman having told Defendant Eppihimer to lock Plaintiff out of City Hall. (Kelleher Dep. at 288.)

Similarly, Plaintiff provides no admissible evidence that Defendants actually disseminated the e-mails. Plaintiff provides a statement in her Verification that Don Kaiser, a television news reporter, "sent [a copy of] the e-mails and ethics complaint to me after I agreed to trim off the header. I looked at the header before I trimmed it off, and saw that the facsimile had been sent from the Mayor's office, ..." (Kelleher Verification ¶ 58.) However, this account of events is contradicted by her prior deposition testimony, in which she indicated that "... Kaiser and.... Weiler ... told me they received copies of the complaint. It was faxed. And although they, let's say, trimmed the lead, whatever you call that section at the top, they did tell me that it was from the mayor's office." Plaintiff also testified in her deposition that she never saw any copy of the ethics complaint with any fax identifier on it. (Kelleher Dep. at 238, 324-26). Given the conflict in testimony, it is appropriate to disregard the subsequent verification statement, because on a motion for summary judgment, a court may properly refuse to consider testimony presented in an affidavit when the non-movant's affidavit contradicts, without satisfactory explanation, testimony previously provided in deposition. *See Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3d Cir.1988) ("The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.") Furthermore, Plaintiff's statements as to what Kaiser and Weiler told her about the origins of the e-mails (that they came from Eppihimer's office) are inadmissible hearsay.

Moreover, Plaintiff fails to establish that all of the allegedly retaliatory actions were sufficiently serious enough for purposes of the retaliation claim. In a First Amendment retaliation case, the alleged retaliatory action itself does not have to infringe on a federally protected right independent of the First Amendment. *See Perry v. Sinderman,* 408 U.S. 593, 596-98 (1972) (" [E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, ... [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests ... his interest in freedom of speech.); *see also Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

Nevertheless, while the actions taken do not independently need to violate a constitutional right, not every action of harassment is actionable under § 1983 in a retaliation case. Rather, the actions must be such that they would "deter a person of ordinary firmness" from exercising her First Amendment rights. *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000) . "[I]n the field of constitutional torts de minimis non curat lex. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ..." *Suppan,* 203 F.3d at 235 (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982)).

Several of the retaliatory actions likely do not pass the *Suppan* test. For example, Plaintiff alleges that the Defendants monitored and screened her private e-mails, yet she adduces no evidence to demonstrate that such correspondence was confidential. In fact, Plaintiff admits that she signed a statement saying that she received and read a copy of the City's usage guidelines, which specifically reserve the City's right to read and monitor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

e-mail communications. (Kelleher Dep. at 430-33; Defs.' Ex. T ("Guidelines.") Plaintiff also does not dispute that such monitoring has occurred on other occasions with other employees. (Defs.' Ex. C ("Tangredi Dep.") at 121-24.) Given that Plaintiff was clearly subject to such monitoring, had notice of such monitoring, and that such monitoring had occurred before with another employee, the action seems far less likely to deter a person of ordinary firmness from the exercise of protected activity.

Similarly, Plaintiff alleges that the Defendants denied her a dashboard parking permit. However, notwithstanding her unsubstantiated claim that it "is undisputed that free parking is one of the fringe benefits of fulltime employees of the City of Reading who work in City Hall," (Pl.'s Resp. at 12), Plaintiff adduces no evidence, and there is no evidence in the record, which establishes such an entitlement. Plaintiff, in fact, did not receive a new permit until after the City Council passed an ordinance granting parking passes to the City Council and employees, thus suggesting that she was not entitled to such a permit. (See Kelleher Dep. at 418.) Furthermore, Plaintiff's primary grievance is the large number of parking tickets that she received; yet Plaintiff received tickets for parking in areas where she admits she did not know whether the dashboard permits allowed for the waiver of the parking rules. (See Kelleher Dep. at 426-27.) In light of Plaintiff's failure to adduce evidence that she was entitled to such a permit and that such a permit would have prevented all of her parking tickets, it is unlikely that such a denial of the permit would deter a person of ordinary firmness from engaging in protected conduct.

*6 Examining the evidence in the record, however, the Court can identify no admissible evidence that draws a connection between Plaintiff's alleged speech and conduct in 1997 and 1998, and the

alleged retaliatory actions that form the "campaign of harassment." [FN7] None of the deposition testimony or the documentary evidence establishes such a connection. Plaintiff argues that this connection can be inferred from the series of retaliatory actions themselves; however, this kind of circular reasoning simply underscores the fact that there is no genuine issue of material fact with respect to a nexus between the protected conduct and the retaliation. In the absence of some other type of evidence, this inference is not one that can be supported solely by the alleged "retaliatory campaign." This is particularly true in light of Plaintiff's failure even to adduce evidence to support that all of the actions took place.

> FN7. Plaintiff does point to statements that tend to indicate Eppihimer's desire to see Plaintiff terminated as the City Clerk. (Kelleher Dep. at 84.) However, these statements, even if admissible, are insufficiently connected to Plaintiff's speech in 1997 and 1998. Moreover, the statements are an insufficient basis upon which to infer that Defendants engaged in particular activities for the purpose of retaliating against her.

Moreover, the large gap in time between the allegedly protected speech (in 1997 and 1998) and the alleged retaliatory activities (in 2000 and later) cuts against Plaintiff's position that the Defendants' actions were motivated by a retaliatory motive.[FN8] Temporal proximity between the protected activity and the allegedly retaliatory action is a factor to consider in retaliation cases. See Grimm v. Borough of Norristown, No.01-CV-431, 2002 U.S. Dist. LEXIS 3954, at *83 (E.D.Pa. Mar. 11, 2002) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir.2000) (noting that temporal proximity has probative value in retaliation cases, but that other evidence suggesting a causal connection between protected activity and allegedly retaliatory action may be considered)); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997) (noting that if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be "unusually

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

suggestive" of retaliatory motive); *see generally Russoli v. Salisbury Twp.*, 126 F.Supp.2d 821, 855 (E.D.Pa.2000).

> FN8. The only exception is that the alleged spreading of rumors took place closer in time to Plaintiff's allegedly protected speech. However, Plaintiff has adduced no admissible evidence that either individual Defendant was responsible for spreading any such rumors. Plaintiff states that "I believe that Mr. Eppihimer was responsible for these rumors [of extramarital affairs] because a variety of people told me that they heard that he was spreading the rumors." (Kelleher Verification ¶ 13.) Plaintiff also discusses at length in her deposition the various rumors. (Kelleher Dep. at 58-77.) However, Plaintiff provides no testimony from any of the individuals that allegedly heard Mr. Eppihimer make such statements or otherwise had personal knowledge that he spread the rumors. Plaintiff has likewise provided insufficient evidence upon which to infer that Eppihimer was responsible for starting them. Accordingly, the Court has not considered the rumors as part of Plaintiff's contention that there was a retaliatory motive behind the alleged "campaign of harassment."

Accordingly, judgment on the retaliation claims is granted in favor of the City of Reading and the individual Defendants in their official and individual capacities.

### C. *Conspiracy Claims* [FN9]

> FN9. Count 3 brings a conspiracy claim under 42 U.S.C. § 1983 against the City of Reading and the individual Defendants in their official capacities. Count 4 brings the same conspiracy claim against the individual Defendants in their individual capacities.

*7 Plaintiff also alleges that the Defendants conspired to violate her First Amendment rights. To demonstrate a conspiracy under § 1983, a plaintiff must show: (1) there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences; (2) the purpose of the plan was to violate a constitutional right of the plaintiff; (3) an overt act resulted in an actual deprivation of the plaintiff's constitutional rights; and (4) the constitutional violation was the result of an official custom or policy of the municipality. *Sieger v. Township of Tinicum*, Civ.A. No. 89-5236, 1990 WL 10349, at *2 (E.D.Pa. Feb. 6, 1990).

As discussed above, Plaintiff has failed to demonstrate the deprivation of a constitutional right, because she has failed to demonstrate retaliation under the First Amendment. Accordingly, her conspiracy claims fail, and Defendants are entitled to judgment on those claims.

### D. *Invasion of Privacy Claim*

Plaintiff's final count is a claim for invasion of privacy against Defendant Cramsey in his individual capacity. Pennsylvania law provides four theories on which a claim of invasion of privacy can be based: (1) intrusion upon seclusion; (2) appropriation of name and likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. *Smith*, 112 F.Supp.2d at 434. Plaintiff's claim proceeds on the "intrusion upon seclusion" and "publicity given to private life" theories. For the reasons that follow, the Court determines that Defendant is entitled to judgment on this Count.

The Pennsylvania courts have adopted section 652B of the Restatement (Second) of Torts which provides:
One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Restatement (Second) of Torts § 652B (1976); *Harris v. Easton Publ'g Co.*, 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984). The invasion may take various forms including: (a) physical intrusion into a place where the plaintiff has secluded herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation into plaintiff's private concerns. Restatement (Second) of Torts § 652B cmt. b (1976); *Harris*, 483 A.2d at 1383. Defendant is subject to liability under this section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about her person or affairs. Restatement (Second) of Torts § 652B cmt. c (1976). There is no liability unless the interference with the plaintiff's seclusion is both substantial and highly offensive to the ordinary reasonable person. *Id.* cmt. d; *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir.1992).

Defendant first contends that Plaintiff had no expectation of privacy with respect to her e-mail communications. Some courts have held that there is no reasonable expectation of privacy in e-mail communications. *See Smyth v. Pillsbury Co.*, 914 F.Supp. 97, 101 (E.D.Pa.1996) ("[U]nlike urinalysis and personal property searches, we do not find a reasonable expectation of privacy in e-mail communications voluntarily made by an employee to his supervisor over the company e-mail system notwithstanding any assurances that such communications would not be intercepted by management."); *see also Commonwealth v. Proetto*, 771 A.2d 823, 827, 830-31 (Pa.Super.Ct.2001) (rejecting criminal defendant's challenge under the Fourth Amendment that e-mail evidence used against him at trial was improper). *Smyth* and *Proetto* do not necessarily foreclose the possibility that an employee might have a reasonable expectation of privacy in certain e-mail communications, depending upon the circumstances of the communication and the configuration of the e-mail system. *See, e.g., McLaren v. Microsoft Corp.*, No. 05-97-00824-CV, 1999 Tex.App. LEXIS 4103, at *10-12 (Tex.Ct.App. May 28, 1999) (examining the configuration of the company e-mail system to determine if there was an expectation of privacy).

*8 In this case, however, the uncontroverted evidence demonstrates that Plaintiff did not have a reasonable expectation of privacy with respect to her e-mail. The City's Guidelines regarding the expectation of privacy of e-mail messages, which are uncontroverted, explicitly informed employees that there was no such expectation of privacy:

Messages that are created, sent, or received using the City's e-mail system are the property of the City of Reading. The City reserves the right to access and disclose the contents of all messages created, sent, or received using the e-mail system. The E-mail system is strictly for official City of Reading messaging.

(Defs.' Ex. T ("Guidelines")). Plaintiff signed an acknowledgment that she had received and read the Guidelines on September 16, 1999. (*Id.*; Kelleher Dep. at 431-33.) Although Plaintiff contends that other employees were not subject to such review, she adduces no evidence to support her allegations, and, in fact, Defendant presents evidence, again uncontroverted, of at least one other instance in which an employee had his e-mail communications monitored and reviewed. (Defs.' Ex. C ("Tangredi Dep.") at 131-32.) It is clear from the undisputed evidence in the record that there is no genuine issue of material fact, and that the Plaintiff clearly lacked a reasonable expectation of privacy with respect to her e-mail communications on the City of Reading's e-mail system. *See Smyth*, 914 F.Supp. at 101.

Aside from the e-mail communications, Plaintiff alleges that Defendant "disseminated information about the executive session in which it was decided to suspend her without pay for one week; and/or disseminated information about the Ethics Complaint which had been lodged against her." (Compl. ¶ 109.) Whether these allegations are sufficient to support the intrusion upon seclusion claim depends on whether Plaintiff had a reasonable expectation of privacy in this information. Plaintiff alleges that the information involved was not part of the public record, and that she therefore had a reasonable expectation of privacy in this information.[FN10] However, Plaintiff adduces no evidence to support her contention that she had a reasonable expectation of privacy in this information. Although she testified in her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

deposition that Mayor Eppihimer had previously said that the reasons that he fired an employee were confidential, such evidence does not tend to demonstrate that her being disciplined by a different body-here, the City Council-is similarly confidential.

> FN10. If, for example, this information was deemed to be part of the public record, then there could be no intrusion upon seclusion for publicizing the information. Restatement (Second) of Torts § 652B cmt. c.

*9 Similarly, Plaintiff's privacy claim fails under the publicity of private life theory. Section 652D of the Restatement (Second) of Torts states:
One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter published is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D; *Harris,* 483 A.2d at 1384. To state a cause of action, the plaintiff must prove that the defendant (1) publicized (2) private facts (3) that would be highly offensive to a reasonable person, and (4) are not of legitimate concern to the public. *Id.* The publicity element requires that the matter be communicated " to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Kryeski v. Schott Glass Techs., Inc.,* 426 Pa.Super. 105, 626 A.2d 595, 601 (Pa.Super.Ct.1993) (quoting Restatement (Second) of Torts § 625E (1976)); *Harris,* 483 A.2d at 1384. Disclosure of information to only a small number of people is insufficient to constitute publicity. *See Kryeski,* 626 A.2d at 602 (disclosure to two people is insufficient); *Harris,* 483 A.2d at 1384 (disclosure to one person is insufficient).

To determine if facts are "private facts," the line is drawn "when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency...." Restatement (Second) of Torts § 652D cmt. h.

In this case, Plaintiff adduces no evidence demonstrating that the fact of her suspension by the City Council constitutes private information, the publication of which would offend standards of decency. Plaintiff has cited no evidence demonstrating that she had any expectation of privacy in this information, which related to her professional conduct in the course of her job as the clerk for the City Council.

*10 Furthermore, even if Plaintiff did adduce evidence establishing that she had a privacy right in the fact of her being suspended by the City Council, or that the fact of her suspension constituted private facts the disclosure of which would represent an intrusion into her private life, she has adduced no evidence that Defendant Cramsey, the only Defendant remaining in this Count, took any action to publicize or distribute the information. Plaintiff's only evidence is testimony from her deposition that Cramsey spent a great deal of time with Mayor Eppihimer. Such evidence is insufficient to support an inference that proves Plaintiff's position.

For these reasons, the Court grants judgment in favor of Defendant Cramsey as to the invasion of privacy claims.

### III. Conclusion

For all of the above reasons, the Court grants Defendant Waltman's Motion for Summary Judgment and Defendants City of Reading, Joseph Eppihimer, and Kevin Cramsey's Motion for Summary Judgment. The claims against Defendant Waltman are dismissed under the doctrine of qualified immunity. Judgment is entered in favor of the remaining Defendants on all of the remaining claims.

An appropriate Order follows.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 11

Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

*ORDER*

AND NOW, this day of May, 2002, upon
consideration of Defendants' Unopposed Motion to
File Reply Brief (Doc. No. 26), IT IS HEREBY
ORDERED that said Motion is GRANTED and the
Reply Brief is filed herewith. IT IS FURTHER
ORDERED that:
1. Upon consideration of Plaintiff's Motion to
Amend Response to Defendants' Motion for
Summary Judgment (Doc. No. 28), and the
response thereto, said Motion is GRANTED and
the Response is considered AMENDED as
specified by Plaintiff.
2. Upon consideration of Defendant Jeffrey
Waltman's Motion for Summary Judgment (Doc.
No. 16), and all responsive and supporting briefing,
IT IS HEREBY ORDERED that said Motion is
GRANTED. All claims against said Defendant are
DISMISSED under the doctrine of qualified
immunity.
3. Upon consideration of Defendants City of
Reading, Joseph D. Eppihimer, and Kevin
Cramsey's Motion for Summary Judgment (Doc.
No. 21), and all responsive and supporting briefing,
IT IS HEREBY ORDERED that said Motion is
GRANTED. Judgment is ENTERED in favor of
said Defendants on all remaining counts.


E.D.Pa.,2002.
Kelleher v. City Of Reading
Not Reported in F.Supp.2d, 2002 WL 1067442
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV03386 (Docket) (Jul. 05, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.