# TAB 6

Westlaw.

Slip Copy

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D.
Indiana,Indianapolis Division.
Matthew G. **KODREA**, Plaintiff,
v.
CITY OF **KOKOMO**, INDIANA, and Matthew
McKillip, individually and as Mayor of the City of
Kokomo, Dan Smith, in his individual capacity, and
Jack Dodd, in his individual capacity, Defendants.
**No. 1:04-CV-1843-LJM-WTL.**

June 22, 2006.

Lawren K. Mills, McMains Morse P.C., Mary Jane
LaPointe, McMains LaPointe, Indianapolis, IN, for
Plaintiff.
Andrew P. Wirick, Hume Smith Geddes Green &
Simmons, Indianapolis, IN, for Defendants.

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LARRY J. McKINNEY, Chief Judge.

**\*1** This cause is before the Court on Defendants',
City of Kokomo, Indiana (the "City"), Matthew
McKillip (the "Mayor"), Dan Smith ("Smith"), and
Jack Dodd ("Dodd") (all four defendants
collectively, "Defendants"), Motion for Summary
Judgment. In his Amended Complaint, Plaintiff,
Matthew G. Kodrea ("Kodrea") raises claims under
42 U.S.C. § 1983 and Indiana Code § 36-1-8-8, a
state "whistleblower" statute. More specifically,
Kodrea contends that Defendants unlawfully
terminated him in retaliation for his reports of two
situations of alleged abuse within City government.
As a result, Kodrea claims that Defendants violated
his rights guaranteed by the First Amendment and
the state statute. The parties have fully briefed the
matter and it is now ripe for ruling.

For the reasons stated herein, Defendants' motion is
**GRANTED in part and DENIED in part.**

### I. *PRELIMINARY EVIDENTIARY CONSIDERATIONS*

Defendants requested in their reply brief that the
Court strike several items that Kodrea submitted
with his designated materials in opposition to the
motion for summary judgment. Defendants also
filed a Motion to Strike Affidavits that were
submitted with Kodrea's sur-reply. The list of items
that Defendants seek to strike are as follows: (1)
letters from Alan Warner ("Warner") and Joe
Hawkins ("Hawkins"), as well as their affidavits
submitted with the sur-reply; (2) affidavits of Patsy
Liali ("Liali") and David McKinney ("McKinney");
(3) the affidavit of James Trobaugh ("Trobaugh"),
former Mayor of Kokomo; (4) Findings of Fact,
Conclusions of Law, and Order entered by the
Howard Circuit Court in the case styled *Kern v.
City of Kokomo*, Cause No. 34C01-0507-PL-0632 *("
Kern* Order"); and (5) deposition exhibits labeled
12(B), 12(C), and 12(F) [FN1] and the affidavit of
Jesse A. Dixon ("Dixon"). The Court addresses
each of these five groups of items in turn.

> FN1. Apparently the exhibits were
> numbered at the various depositions that
> have been taken in this case on an ongoing
> basis rather than separately numbered for
> the particular deposition in which they
> were identified. Rather than re-label these
> exhibits when he filed his designated
> materials, Kodrea simply used the original
> designated numbers. For clarity, the Court
> will refer to those exhibits as they were
> designated at the depositions and cite to
> them as "Dep. Ex. ___" in this Order.

First, with respect to the Warner and Hawkins
letters, Defendants argue that the letters contain
inadmissible hearsay and that they not
self-authenticating and contain no foundation for
their consideration. Defendants also seek to strike
the affidavits, which are duplicative of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

Page 2

information in the letters. As an initial matter, the Court notes that evidence offered during a summary judgment proceeding need only be admissible in content, not in form. *See Juarez v. Menard, Inc.,* 366 F.3d 479, 484 n. 4 (7th Cir.2004). Kodrea identified the letters as ones he had received from Warner and Hawkins and attached them to his own affidavit. Kodrea Aff., ¶ 13. Warner and Hawkins' affidavits simply restate the same information contained in the letters and were offered in response to Defendants' authentication and foundation concerns, *i.e.,* the form of the letters. To the extent the letters and affidavits contain hearsay, the Court will disregard such information; however, the Court declines to strike these materials in their entirety at this stage of the proceedings on merely technical grounds.

*2 Next, the Court considers the affidavits of Liali and McKinney. Defendants first contend that the affidavits should be struck because they improperly contradict Kodrea's testimony. Defendants do not explain the basis for this objection, and they fail to make any citation to that portion or portions of Kodrea's testimony that they believe is contradictory. The Court declines to scour the record and make Defendants' argument for them. Defendants next raise a hearsay objection to paragraphs 4 through 7 of Liali's affidavit and paragraphs 6 through 8 of McKinney's affidavit. Portions of those paragraphs relate to things that Kodrea indicated were said or done by Smith. To the extent that these statements are offered to prove what Smith may have said, they are hearsay and will be disregarded. However, the Court declines to strike the affidavits in their entirety.

Third, Defendants seek to strike Trobaugh's affidavit on the basis that it is irrelevant under Federal Rule of Evidence ("FRE") 402. "Relevant evidence" is that evidence which has a tendency to make the existence of any fact of consequence to the determination of the action more or less probable. FRE 401. Kodrea argues in his surreply that the affidavit is relevant to demonstrate that Defendants should reasonably have known that employees could not be retaliated against for exercising their First Amendment right to speak out on matters of public concern. Thus, the affidavit is

relevant to the issue of qualified immunity. The Court concludes that Trobaugh's affidavit has some relevance to that issue and therefore denies Defendants' request to strike Trobaugh's affidavit.

Fourth, Defendants seek to strike the *Kern* Order on the basis that it is irrelevant. Kodrea claims that the *Kern* Order is relevant to showing a municipal pattern and practice of violating First Amendment rights of City employees. The Court does have some concerns about the relevancy of the *Kern* Order. Though the parties do not discuss it in detail, Kern (unlike Kodrea) presumably was a merit-based employee and decisions regarding his employment fell under a merit-based system. Further, it appears that Kern vocalized his particular concerns directly to the public via the media. Based on these distinctions, the probative value of the *Kern* Order is slight, and when considering the potential prejudice under FRE 403 the *Kern* Order might well be excluded. The Court is hesitant, however, to strike the *Kern* Order prematurely at this stage of the proceedings. In any event, the Court concludes that the *Kern* Order is not necessary for disposition of Defendants' Motion for Summary Judgment and need not even be considered.

Finally, Defendants seek to strike deposition exhibits 12(B), 12(C), and 12(F) and the Dixon affidavit. Kodrea identified the deposition exhibits in his own affidavit and attached the Dixon affidavit to his surreply. Kodrea Aff., ¶ 6; Surreply. The deposition exhibits contain various e-mails, letters, cards, a list of achievements and community activities, and newspaper articles about Kodrea's community involvement and work on behalf of the Parks Department. Deposition exhibit 12(F) in particular appears to be a letter that Dixon wrote and the information contained therein is duplicative of that in the Dixon affidavit. Defendants's arguments regarding the deposition exhibits are broad and do not specifically discuss each particular document of the numerous documents submitted, but they seek to strike the deposition exhibits on the basis of inadmissible hearsay and improper character evidence under FRE 404. Defendants' Motion to Strike seeks to exclude the Dixon affidavit pursuant to Local Rule 56.1(d).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

**\*3** With respect to the deposition exhibits, the Court finds that the newspaper articles, to the extent that they are being offered for the truth of the matters asserted therein, are inadmissible hearsay and cannot be relied upon for summary judgment proceedings. *See Chi. Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 654 (7th Cir.2001); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). To the extent that the newspaper articles discuss Kodrea's community involvement, they are also irrelevant and will be struck. Likewise, the items that relate to Kodrea's character and go beyond his capacity for truthfulness are improper character evidence under FRE 404 and are inadmissible. The Court will further disregard as irrelevant the unsigned note about child labor laws, Kodrea's list of community activities that are unrelated to his job, and various recommendation letters from the fire chief, Delphi supervisor, Howard County Sheriff, and a City councilman, all which appear to pre-date the beginning of Kodrea's employment with the Parks Department. However, any remaining items that relate to Kodrea's work performance or suggest the level of involvement by each individual defendant in the employment actions against Kodrea will be considered for the limited purposes of refuting Defendants' evidence to the contrary. Finally, with respect to deposition exhibit 12(F) and the Dixon affidavit, the Court declines to strike those matters for the same reasons discussed above for the Warner and Hawkins items.

## II. BACKGROUND

Kodrea was hired as the recreational programmer for the City's Parks Department on July 28, 2003. Kodrea Dep. at 47. Although he had some sports-related experience from participation in athletics during high school and college, Kodrea did not have any particular work experience as a recreational programmer. Kodrea Dep. at 10, 28-29. Kodrea's immediate supervisor was Smith, Superintendent of the Parks Department. Kodrea Dep. at 47. Smith was supervised by the Mayor. Kodrea Dep. at 47. Dodd was Director of Human Resources. Dodd Dep. at 12-13.

As a new employee, Kodrea was supposed to

receive a 30-day, a 60-day, and a 90-day evaluation. Smith Dep. at 67. Kodrea claims that he did not actually receive a 30-day evaluation, but he contends that Smith verbally informed him that he was doing fine. Kodrea Dep. at 108. Kodrea's subsequent 60-day and 90-day evaluations were favorable for the most part, as was his "end of the year" evaluation in January 2004. Kodrea Dep. at 107; Dep. Ex. 12(D).

Kodrea's job responsibilities included supervising and coordinating recreational programs and supervising the seasonal staff for concession stands. Kodrea Dep. at 29, 71-72. Kodrea was also encouraged to work as the district commissioner for the American Softball Association ("ASA"). Kodrea Dep. at 84-86. However, nothing in Kodrea's job description required him to monitor or report misconduct. Dep. Ex. 13; Kodrea Dep. at 29. In addition, Kodrea was not responsible for signing and approving or otherwise completing employee time sheets. Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5. Further, with respect to the ASA, Kodrea was not responsible for determining the amount of the ASA fees. Reed Dep. at 17; Kodrea Dep. at 87. Beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling ASA money. Kodrea Dep. at 88-91; Metz Dep. at 12-13; Reed Dep. at 17, 25.

**\*4** Sometime in the fall of 2003, Kodrea noticed a discrepancy with the time for one of the seasonal employees, Jim Campbell ("Campbell"). Kodrea Dep. at 77-78, 130-31. Kodrea also noted that Campbell had not completed the closing procedures for one of the concession stands. Kodrea Dep. at 130. Kodrea reported the problem to Smith. Kodrea Dep. at 135, 138. Smith told Kodrea to take care of the problem, so Kodrea ordered that Campbell's checks be stopped and finished closing the concession stands himself. Kodrea Dep. at 130, 135.

In May of 2004, Kodrea again noted a discrepancy with Campbell's time and claims that he once again notified Smith to voice his concerns that Campbell was being paid for hours that he had not worked. Kodrea Dep. at 140-42. Kodrea also told Smith that Campbell was working for another company and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

not working his actual hours. Kodrea Dep. at 142. Smith allegedly told Kodrea that Campbell kept Smith from being audited and that Campbell's time was not an issue and not to worry about it. Kodrea Dep. at 140, 142-43. More specifically, Kodrea claims that Smith stated, "That's never been a problem, it's not a problem now, and it's never going to be a problem." Kodrea Dep. at 143.

Shortly thereafter, in June of 2004, Kodrea was contacted by Wayne Meyer ("Meyer"), the State ASA Commissioner. Kodrea Dep. at 89-90. Meyer asked Kodrea where the "refund check" for overpayment of ASA fees for that year should be sent because the prior recreational programmer was no longer employed at the City. Kodrea Dep. at 90. When Kodrea questioned Smith about the ASA refund, Smith told Kodrea not to worry about it and that he would take care of it. Kodrea Dep. at 94. Kodrea claims that Smith was very abrupt and direct with his response. Kodrea Dep. at 96.

Kodrea claims that shortly after he brought the ASA refund issue to Smith's attention he received a problem employee performance appraisal. Kodrea Dep. at 96; Dep. Ex. 12(E). Kodrea claims that he had never received any indication of a problem with his work nor any counseling on performance issues prior to receiving the appraisal, a point disputed by Defendants. Kodrea Dep. at 70, 118; McKillip Dep. at 43, 54-55; Dodd Dep. at 43; Smith Dep. at 51, 63-64, 74-75, 78-79. Kodrea claims that Smith called him into Smith's office and informed him that no one had seen the appraisal yet and that Kodrea's next evaluation in thirty days was already prepared with the same information and that Kodrea would be terminated at that point. Kodrea Dep. at 120-21; Dep. Ex. 26. Kodrea also claims that Smith gave him an ultimatum to either resign by noon the following workday and no one would see the appraisal or Kodrea would be terminated with the appraisal on his record and Smith would make sure that he did not get another City job. Kodrea Dep. at 120; Dep. Ex. 26.

Rather than resign, Kodrea alleges that he reported the meeting to Dodd and expressed his belief that he was being retaliated against for reporting Campbell and the ASA refund issue. Kodrea Dep. at 146-49;

Kodrea's Answers to Interrogatories at 3. Kodrea claims that Dodd stated he would investigate. Kodrea Dep. at 146-49; Kodrea's Answers to Interrogatories at 3. Kodrea also submitted a written response to the appraisal and alleged that he was being retaliated against for bringing Campbell's work hours and the ASA refund to Smith's attention. Kodrea Dep. at 100, 126; Dep. Ex. 12(E). Thereafter, Smith removed the concession staff from Kodrea's supervision and removed all ASA contacts from Kodrea's responsibility. Kodrea Dep. at 221; Kodrea's Answers to Interrogatories at 12.

*5 A week after receiving the problem employee performance appraisal, Dodd informed Kodrea that he was being placed on probation for thirty days. Kodrea Dep. at 146; Dodd Dep. at 98. Kodrea was required to undergo counseling sessions with Smith, which were attended by Dodd. Kodrea Dep. at 147, 153; Dodd Dep. at 41, 53. Kodrea continued to raise concerns about what he considered Campbell's time abuse and the misuse of public funds and complained that he felt he was being retaliated against for reporting these instances. In fact, he submitted a written report to Dodd about the two instances of alleged misconduct. Kodrea Dep. at 172. Kodrea also sought a transfer to another department, but his request was denied. Kodrea Dep. at 206; Dodd Dep. at 88.

Kodrea claims that he completed the probationary period satisfactorily. Kodrea Dep. at 154, 156. In fact, both Smith and Kodrea signed a list entitled "Goals and Objectives" which indicated completion of the probationary period. Dep. Ex. 33. In contrast, the Defendants claim that the probation period was extended for an additional thirty days, though there is nothing in writing to indicate that this is the case. Dodd Dep. at 71; Smith Dep. at 65. Rather, Defendants claim that Kodrea was verbally advised of the extension of the probationary period. Dodd Dep. at 71, 90; Smith Dep. at 65, 87, 89, 148-49. On September 9, 2004, prior to the completion of this disputed second probationary period, Kodrea was terminated based on Smith's recommendation. Kodrea Dep. at 157; Dodd Dep. at 13; Smith Dep. at 49. Kodrea sought reinstatement via the City's grievance process, but he was unsuccessful. McKillip Dep. at 59.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 5

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

### III. *SUMMARY JUDGMENT STANDARD*

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267-68 (7th Cir.1990), *cert. denied,* 499 U.S. 923 (1991). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir.2003), *reh 'g denied.* Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996), *cert. denied,* 520 U.S. 1116 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *Celotex,* 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992).

\*6 In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996), *cert. denied,* 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied,* 519 U.S. 1115 (1997).

### IV. *DISCUSSION*

### A. RETALIATION CLAIM UNDER § 1983

Kodrea claims that he was terminated in retaliation for questioning Campbell's work hours and questioning how the ASA refund was handled. His claim rests on an alleged violation of his First Amendment right to free speech.[FN2]

> FN2. The Court notes that Kodrea has sued the Mayor in both his official and individual capacities. An official capacity suit against government employees is treated in all respects as one suit against the municipality. *See Leahy v. Bd. of Tr's of Cmty. Coll. Dist. No. 508,* 912 F.2d 917, 922 (7th Cir.1990). In addition, courts have emphasized that civil rights claims

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

against individual defendants in their official capacities are redundant of the claims brought against a governmental entity; therefore, there exists no additional claims against the Mayor in his official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 14 (1985); *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986). Kodrea concedes this point in his response to the motion for summary judgment. Resp. in Opp. to Summ. J. at 39. Accordingly, the Court **DISMISSES** the claims against the Mayor in his official capacity.

Generally speaking, public employment cannot be conditioned on a basis that infringes on an employee's constitutionally protected interest in freedom of expression. *See Connick v. Myers,* 461 U.S. 138, 142 (1983). While the government enjoys greater latitude in regulating the speech of its employees than that of the general public, a citizen does not surrender all First Amendment protection by accepting a job with a governmental entity. *See Carreon v. Ill. Dep't of Human Servs.,* 395 F.3d 796, 790-91 (7th Cir.2005) (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 568 (1968)). The Court must apply a three-part analysis in evaluating Kodrea's First Amendment retaliation claim under 42 U.S.C. § 1983: 1) Was his speech constitutionally protected? 2) If so, were Defendants' actions motivated by Kodrea's constitutionally protected speech? 3) If Kodrea can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can Defendants show that they would have taken the same action in the absence of Kodrea's exercise of his rights under the First Amendment? *See Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 973 (7th Cir.2000). If Kodrea can establish the first two prongs, the burden shifts to Defendants to prove that Kodrea would have been terminated regardless of his protected speech. *See Garrett v. Barnes,* 961 F.2d 629, 632 (7th Cir.1992). If Defendants carry that burden, Kodrea bears the burden of persuasion to show that Defendants' proffered reasons were pretextual and that discrimination was the real reason Defendants fired him. *See King v. Preferred Tech. Group,* 166 F.3d

887, 893 (7th Cir.1999). In the summary judgment context, this means that Kodrea must show that a rational factfinder could infer that Defendants' stated reasons for firing him were lies. *See Alexander v. Wis. Dep't of Health & Family Servs.,* 263 F.3d 673, 683 (7th Cir.2001).

### 1. Constitutionally Protected Speech

*7 Whether Kodrea's speech is protected under the First Amendment is normally a question of law for the Court to determine. *See Kokkinis v. Ivkovich,* 185 F.3d 840, 843 (7th Cir.1999). In addressing this question, the Court must determine whether Kodrea spoke as a citizen on a matter of public concern. *See Connick,* 461 U.S. at 147. However, to the extent that there are factual issues that must be addressed by a jury first, the Court will be unable to make a conclusive determination.

The main thrust of Defendants' argument is that Kodrea's speech was not done in his capacity as a citizen but in the context of his employment. The Supreme Court just recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties in *Garcetti, et al. v. Ceballos,* 547 U.S. ----, 2006 WL 1458026 (May 30, 2006). The plaintiff in *Garcetti,* Ceballos, was a deputy district attorney employed as a calendar deputy with supervisory responsibilities. *See Garcetti,* 2006 WL 1458026, *3 . Pursuant to his duties, he investigated a complaint from a defense attorney regarding inaccuracies in an affidavit used to obtain a search warrant. *See id.* Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed. *See id.* Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated. *See id.* at *4. In spite of Ceballos' concerns, the district attorney's office decided to proceed with prosecution. *See id.* Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his observations, but the trial court upheld the warrant. *See id.* Ceballos claimed that he was subsequently subjected to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

retaliation, including a transfer and denial of a promotion. *See id.*

The Supreme Court found that the controlling factor in answering the question of whether Ceballos' speech was protected was that his expressions were made pursuant to his official duties. *See id.* at *8. Indeed, part of Ceballos' responsibilities were to investigate concerns and advise his supervisors regarding pending cases, a fact that was not disputed by the parties. *See id.* Under these circumstances, the Supreme Court concluded that Ceballos was not acting as a citizen but as a government employee, doing what he was employed to do, and so his speech did not qualify for First Amendment protection. *See id.*FN3

> FN3. Prior to this ruling, the Seventh Circuit had found no constitutional protection for speech made under similar circumstances. *See, e.g., Schad v. Jones,* 415 F.3d 671 (7th Cir.2005); *Gonzalez v. City of Chicago,* 239 F.3d 939 (7th Cir.2001).

In reaching this decision, the Supreme Court made several observations applicable to this case. First, because the parties did not dispute that Ceballos' memo was done pursuant to his duties, the Supreme Court observed that it did not have occasion to articulate a framework for defining the scope of an employee's duties in cases where there is room for serious debate. *See id.* at * 10. It did reject, however, the suggestion that an employer can restrict an employee's rights simply by creating broad job descriptions. *See id.* In addition, the Court was not persuaded that Ceballos' speech was unprotected merely because he had expressed his views in the office and they concerned the subject matter of his employment, explicitly noting that in some cases employees may still receive First Amendment protection for expressions made at work or related to the employee's job. *See id .* at *7.

**\*8** *Garcetti* reveals that an important factor in addressing whether or not Kodrea's speech was protected is his job responsibilities. Unlike the situation in *Garcetti,* however, there is a factual

dispute in this case concerning whether Kodrea's complaints about Campbell's hours and the ASA refund were made pursuant to his ordinary duties. As Kodrea notes, nothing in his job description required him to monitor or report misconduct. Dep. Ex. 13; Kodrea Dep. at 29. Further, Kodrea was not responsible for signing and approving or otherwise completing Campbell's time sheets; that responsibility was handled by Smith and the Parks Department secretaries. Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5. Indeed, it is not clear how much oversight Kodrea even had over Campbell's hours because Smith apparently authorized Campbell to work from home, authorization that should have come from Campbell's supervisor and which Kodrea knew nothing about. Smith Dep. at 15; Dodd Dep. at 28; Kodrea Aff., ¶ 5. Finally, Kodrea claim that Smith explicitly told him not to worry about Campbell's hours and that it was not a problem, which suggests that it was Smith's responsibility to oversee Campbell's hours rather than Kodrea's. Kodrea Dep. at 140, 142-43.

With respect to the ASA and refunds, the evidence and testimony favorable to Kodrea demonstrates that he did not determine the amount of the initial ASA fees; that amount had been the same for years. Reed Dep. at 17; Kodrea Dep. at 87. Further, beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling money. Kodrea Dep. at 91. Specifically, he was not responsible for depositing the collected fees in the bank or with the controller or with handling any paperwork related to these activities. Metz Dep. at 12-13; Reed Dep. at 17, 25; Kodrea Dep. at 88-89. Finally, there is no evidence that Kodrea had any oversight of the refunds. To the contrary, he claims that Smith said he would take care of this issue, which suggests that the refund process was not part of Kodrea's job at all. Kodrea Dep. at 94.

Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds. Neither activity appears to have been Kodrea's core function as a recreational program director. The Court is unable to conclude that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 8

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

Kodrea's complaints were made simply as an employee rather than a concerned citizen. Accordingly, the Court must resolve any doubt in favor of Kodrea for purposes of summary judgment and conclude at this stage of the proceedings that Kodrea may have acted as a concerned citizen. Therefore, from the record before the Court, Defendants are not entitled to summary judgment on the question of whether Kodrea acted as a concerned citizen and *Garcetti* does not preclude Kodrea from presenting his claims to a jury for consideration.

*9 Having concluded that there is a factual dispute about whether Kodrea acted as a citizen that precludes entry of summary judgment, the Court must next address whether Kodrea's speech was a matter of public concern. To answer this question, the Court must look at " 'the precise content, form, and context of the speech that admittedly may be of some interest to the public.' " *Kokkinis*, 185 F.3d at 844 (quoting *Clif v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir.1994)). Relevant questions include whether the point of the speech was to raise issues of public concern or to further a purely private interest. *See id.* (internal citations omitted). The content of the speech is the most important factor in the inquiry. *See Kuchenreuther*, 221 F.3d at 974. Unlike the question of whether not Kodrea acted as a citizen, the Court finds that it is able to make the legal determination of whether Kodrea's speech was on a matter of public concern.

First, the content of the speech in question supports a conclusion that the speech is a matter of public concern. Kodrea's speech concerned a situation where an employee was allegedly not working the hours for which he was being paid and a situation of potential misappropriation of funds. Numerous cases from the Seventh Circuit have discussed complaints regarding potential breaches of public trust in situations of time abuse and misuse of funds and concluded that the speech is on a matter of public concern. *See, e .g., Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 941 (7th Cir.2004); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir.1994); *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir.1990); *Ohse v. Hughes*, 816 F.2d 1144, 1150-51 (7th Cir.1987), *vacated and remanded*, 485 U.S. 802, *reinstated in relevant part*, 863 F.2d 22 (1988). Indeed, " [s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Gazarkiewicz*, 359 F.3d at 941 (quoting *Conaway v. Smith*, 853 F.2d 789, 797 (10th Cir.1988)). The Court concludes that the content of Kodrea's speech is comfortably on the socially valuable side of the constitutional line.

The Court next considers the form of Kodrea's speech. Kodrea initially conveyed his concerns internally to Smith, his supervisor. Defendants contend that Kodrea's speech was not a matter of public concern because he did not seek a form of communication to air his concerns publically. However, First Amendment protection of speech is not limited to only those instances where the speech is broadcast to the world. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979). The fact that Kodrea may have spoken privately with Smith does not make his speech less a matter of public concern. *See Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir.2002) (citing *Givhan*, 439 U.S. at 415-16). Indeed, as the Seventh Circuit has recognized, "an employee who attempts to follow internal mechanisms to resolve important issues should not be automatically treated less favorably than the individual who immediately turns to the press or public forum." *Spiegla v. Hull*, 371 F.3d 928, 937-38 (7th Cir.2004). To accept Defendants' argument would be to disregard these principles and place a burden on plaintiffs to become public champions of potential wrongdoing in order to be afforded First Amendment protection, a result not required by the law. Moreover, the Court notes that Kodrea has presented evidence suggesting that he did not simply report his concerns to his supervisors but also consulted other City employees for advice on the matters. Kodrea Dep. at 126, 129, 139; Liali Aff., ¶¶ 4-5; McKinney Aff., ¶¶ 4-8. Under the circumstances, the Court is unable to find that the form of Kodrea's speech renders it unworthy of constitutional protection.

*10 Finally, the Court considers the context of Kodrea's speech. At this stage, the Court considers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 9

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

Kodrea's motive for speaking as a "relevant, though not dispositive, factor." *Spiegla,* 371 F.3d at 938 (citing *Sullivan v. Ramirez,* 360 F.3d 692, 700 (7th Cir.2004). "Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee." *Gustafson v. Jones,* 290 F.3d 895, 908 (7th Cir.2002) (internal quotations and citations omitted). In considering the context of speech, "it is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light?" *Kokkinis,* 185 F.3d at 844 (internal quotations omitted). The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public concern. *Cliff,* 42 F.3d at 410. To find otherwise would permit motive to supplant content in terms of overall importance. *Id.*

Here, the Court disagrees with Defendants' contention that the evidence shows that Kodrea's only motivation for speaking was to protect his job. Kodrea claims that he began expressing concerns related to Campbell's work hours in the fall of 2003 and expressed concerns again in May 2004, both before he received the problem employee performance appraisal form dated June 25, 2004. Kodrea Dep. at 130-31, 135, 138, 140-43; Dep. Ex. 12(E). Kodrea also spoke with Smith about the ASA refunds prior to receiving the problem employee performance appraisal form. Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E). Kodrea claims that the first time he heard about any problems with his performance was the problem employee performance appraisal. Kodrea Dep. at 118. After receiving the appraisal, Kodrea began to question it as retaliation for raising his concerns with Smith. Kodrea Dep. at 100. While Kodrea's motivation from that point on in part may have been a desire to protect his job, the Court cannot conclude from the timing of Kodrea's speech that Kodrea's sole motivation in voicing his concerns was for personal reasons. Therefore, the Court finds that the context of Kodrea's speech supports a conclusion that Kodrea's speech was on a matter of public concern.

Considering the content, form, and context of

Kodrea's speech, with the overriding consideration given to the speech's content as required by precedent, the Court concludes that Kodrea's speech was on a matter of public concern. As a final matter then, the Court must consider the *Connick-Pickering* balance test.[FN4] Even if speech relates to a matter of public concern, it is not constitutionally protected unless the speaker's First Amendment interests outweigh the public employer's interests in providing services efficiently. The parties have not presented any meaningful argument with regard to the *Connick-Pickering* balance test; however, there is nothing in the record to suggest that Kodrea's speech was sufficiently disruptive that the government's interest in promoting efficiency outweighed Kodrea's First Amendment rights. Indeed, it appears that Kodrea voiced his concerns to his immediate supervisors in a non-disruptive manner through the appropriate chain of command. Accordingly, and assuming without deciding that Kodrea spoke as a citizen, the Court must conclude at this stage that Kodrea's speech is protected. Defendants are therefore not entitled to summary judgment on this issue.

> FN4. Factors to be considered when balancing an employee's and employer's relative interests include: "(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public." *Kokkinis,* 185 F.3d at 845 (citation omitted).

2. *Substantial or Motivating Factor/Pretext*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 10

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

*11 The Court must next address whether retaliation was the substantial or motivating factor in Defendants' decision to terminate Kodrea. *See Carreon,* 395 F.3d at 791. In order to prove retaliation, it is not enough to show that a defendant "welcomed" the end of the protected activity "or even that such activity played some minor role in the [adverse employment] decision ." *Rakovich v. Wade,* 850 F.2d 1180, 1189 (7th Cir.1988) (citations omitted). *See also O'Connor v. Chi. Transit Auth.,* 985 F.2d 1362, 1369 (7th Cir.1993). A plaintiff must demonstrate a causal link between the protected speech and the adverse employment action. *See Healy v. City of Chicago,* --- F.3d ----, 2006 WL 1652434, *6 (7th Cir. June 16, 2006). However, a plaintiff also does not have the onerous burden of showing that retaliatory motive was the sole reason for the defendant's actions. *Rakovich,* 850 F .2d at 1190. Instead, a plaintiff's burden is to show that *"had it not been for the violation,* the injury of which he complains would not have occurred." *Id.* (citations omitted) (emphasis in original). Additionally, a plaintiff may show improper motivation based on the timing of the adverse employment action, *i.e.,* by showing that the action "took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir.1994).

Defendants claim that Kodrea was terminated for a legitimate reason, *i.e.,* poor performance. However, Kodrea has presented sufficient evidence to place that rationale in dispute. Prior to the problem employee peformance appraisal, Kodrea received numerous compliments on the work that he was doing. Dep. Ex. 12(B). Further, his previous performance evaluation had been, for the most part, favorable. Dep. Exs. 12(D), 15. Indeed, Kodrea claims that the first time that Defendants made any mention of poor performance was when he received the problem employee performance appraisal, and Smith verified that Kodrea had not received any written communication expressing poor performance prior to that time. Kodrea Dep. at 70, 118; Smith Dep. at 109. Kodrea claims that the appraisal surfaced right after he spoke with Smith about the ASA refunds. Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E). Kodrea also claims that when he

received the appraisal he was given the ultimatum to resign or be fired, but chose to file a response and questioned the action as retaliation. Kodrea Dep. at 100; 120-21, 126.

Further, following the problem employee performance appraisal, Kodrea was placed on probation for thirty days. Kodrea Dep. at 145-46. Defendants contend that the probation period was extended an additional thirty days; however, like the lack of written communication on alleged poor performance, there is a lack of anything in writing to document such an extension. Indeed, Kodrea claims that he was informed that he had completed probation and believed that he had completed probation satisfactorily. Kodrea Dep. at 154, 156; Dep. Ex. 33.

*12 Here, the timing of Defendants' employment actions is suspect. The first time that Kodrea received a written communication regarding alleged poor performance was shortly after he expressed concerns about the ASA refunds. Moreover, once Kodrea persisted in voicing his concerns and claimed retaliation, he was ultimately terminated. Finally, Kodrea testified that he was awarded unemployment benefits, which if true suggests that the Indiana Department of Workforce Development found no just cause for the termination. Kodrea Dep. at 171. Under the circumstances, the Court concludes that a jury could reasonably find that Kodrea's speech was a substantial or motivating factor for the poor performance appraisal and, ultimately, termination and that Defendants' stated reasons for their actions are mere pretext.

### 3. *Qualified Immunity and Individual Liability*

Defendants contend that even if Kodrea's speech is protected, they are entitled to qualified immunity. Defendants Smith and the Mayor further claim that they cannot be individually liable for any violation that may have occurred because they did not personally participate in Kodrea's termination. The Court addresses each argument in turn.

Government officials enjoy qualified immunity and are shielded from civil liability, "as long as their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987). To determine whether an official is entitled to qualified immunity requires a two part inquiry, as follows: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established" such that it would have been clear to a reasonable official " that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001).

The Court has already concluded that the facts as alleged and in the light most favorable to Kodrea reveal that Kodrea's First Amendment right may have been violated. Therefore, if Kodrea's right was "clearly established," then Defendants do not have qualified immunity.

The Court concludes that the right was clearly established. As the Court has already noted, numerous cases demonstrate that complaints by public employees regarding time abuse or the misuse of funds are matters of public concern. Further, *Connick* has been the law for over twenty years. In addition, former Mayor Trobaugh was certainly aware of an employee's First Amendment rights to speak out on such matters Troubaugh Aff., ¶¶ 8-9. Dodd was likewise aware that an employee could not be retaliated against for voicing his concerns. Dodd Dep. at 65. Finally, Defendants were apparently aware that Kodrea's complaints touched on a matter of public concern as they purport to have investigated the allegations. Under the circumstances, any reasonable individual in Defendants' positions would have recognized that Kodrea could not be terminated for expressing concerns about Campbell's work hours or the ASA refunds. Defendants are therefore not entitled to qualified immunity.

*13 The Court must next consider the question of individual liability for the Mayor and Smith. To establish liability under § 1983, it is necessary to show some causal connection between the action complained of and the official sued. *See Wolf-Lillie*

*v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). However, direct participation by a defendant is not necessary. *See Conner v. Reinhard,* 847 F.2d 384, 396 (7th Cir.1988). Instead, any official who " causes" a citizen to be deprived of her constitutional rights can be held liable. *Id.* at 396-97. "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." *Id.* at 397.

Here, the Court concludes that a jury could reasonably find that both the Mayor and Smith participated in the adverse employment actions against Kodrea. With respect to the Mayor, Dodd testified that the Mayor is ultimately responsible for decisions on employment issues. Dodd Dep. at 12, 15. The Mayor likewise testified that in most cases he is part of the termination process. McKillip Dep. at 54. Further, the Mayor was kept apprised of the employment issue with Kodrea and tacitly approved of Dodd's decision to terminate Kodrea when Dodd notified the Mayor of that decision. Dodd Dep. at 42-43. It also appears that the Mayor was the individual responsible for recommending the use of the problem employee performance appraisal form (the first instance, according to Kodrea, of anyone noting a problem with his performance), and the Mayor approved all employment policies that were drafted by Human Resources. McKillip Dep. at 43; Kodrea Dep. at 118; Dodd Dep. at 19. Finally, the Mayor was involved in Kodrea's grievance process, ultimately denying the grievance and upholding the decision to terminate. McKillip Dep. at 59. Based on these circumstances, the Court finds that a jury reasonably could conclude that the Mayor helped to set in motion the events that led to the alleged retaliation.

Likewise, the Court finds that a jury reasonably could conclude that Smith is individually liable. Smith recommended Kodrea's termination, a recommendation upon which the jury could reasonably infer that Dodd relied. Smith Dep. at 49. Smith also completed the problem employee performance appraisal, and he apparently worked with Dodd on drafting that form. Smith Dep. at 73; Dep. Exs. 12(E), 24. Further, Smith was involved

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 12

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
(Cite as: Slip Copy)

with discussions with the Mayor and Dodd about Kodrea's employment, and he was in charge of the counseling sessions with Kodrea that followed the problem employee performance appraisal. Dodd Dep. at 41, 53-54; Kodrea Dep. at 153. Finally, Kodrea claims that one of the volunteers for softball told him that Smith was going to fire him, and Kodrea claims that when Smith provided him with a copy of the problem employee performance appraisal Smith gave Kodrea the ultimatum to resign or be fired. Kodrea Dep. at 120-21, 244. Taking the circumstances in the light most favorable to Kodrea, the Court finds that Smith, like the Mayor, could be found to have participated in the adverse employment actions. Accordingly, the Court denies summary judgment on the question of individual liability for both the Mayor and Smith.

### 4. *Municipal Liability*

**\*14** As a final matter, the Court must address the question of municipal liability. A government entity is only liable under § 1983 when execution of a government policy or custom "by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" inflicts the injury of which a plaintiff complains. *See Monell v. N.Y. City Dep ' t of Soc. Servs.,* 436 U .S. 658, 694 (1978). Unconstitutional policies or customs can take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that, although unauthorized, is so permanent and well-settled that it constitutes a " custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury. *See Rasche v. Vill. of Beecher,* 336 F.3d 588, 597 (7th Cir.2003). Defendants contend that summary judgment is appropriate because there is no evidence of any policy or custom. The Court, however, disagrees and finds that summary judgment is inappropriate.

A single constitutional violation by a person with final policymaking authority may trigger liability under § 1983. *See Kujawski v. Bd. of Comm'rs,* 183 F.3d 734, 737 (7th Cir.1999). Here, the Mayor had the ultimate responsibility for decisions related to employment issues, and he testified that in most

cases he is part of the termination process. Dodd Dep. at 12, 15; McKillip Dep. at 54. In fact, the evidence favorable to Kodrea reveals that the Mayor participated in and approved of the decision to terminate Kodrea. Dodd Dep. at 43; McKillip Dep. at 43, 59.

Defendants nonetheless contend that there can be no municipal liability because Dodd fired Kodrea. Even if the Mayor played no part in Kodrea's termination, and in spite of the evidence to the contrary suggesting the Mayor's involvement, Defendants cannot escape municipal liability by claiming that Dodd made the termination decision on his own. Final policymaking authority may be delegated or ratified by an official having policymaking authority. *See Kujawski,* 183 F.3d at 737; *Waters v. City of Chicago,* 416 F.Supp.2d 628, 630 (N.D.Ill.2006). In this case, there is evidence that when Dodd made the decision to terminate Kodrea the Mayor approved of the decision. Dodd Dep. at 12-13, 42-43; Smith Dep. at 49; McKillip Dep. at 59. As Dodd acknowledged, the Mayor had the ultimate responsibility for decisions related to employment issues, including approval of employment policies (Dodd Dep. at 12, 15, 19), and his approval of Dodd's decision means that municipal liability can be imposed.

Moreover, municipal liability could be imposed even if the Mayor and Dodd deny any motive for retaliation against Kodrea. A jury could reasonably infer that the decision to terminate Kodrea was based on Smith's recommendation, and a jury could certainly conclude that Smith had a reason for retaliating against Kodrea. As the Northern District of Illinois recently noted, "a tainted input" may be sufficient to establish liability. *Waters,* 416 F.Supp.2d at 630-31. *See also Dey,* 28 F.3d at 1459.

**\*15** For all of these reasons, the Court concludes that Defendants are not entitled to summary judgment on the question of municipal liability.

### B. STATE WHISTLEBLOWER CLAIM

While Defendants offer several rationales for why they are entitled to summary judgment on Kodrea's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

state whistleblower claim, the Court finds one dispositive: whether Kodrea has a private right of action under Indiana Code § 36-1-8-8. This statute provides in relevant part that a public employer may not terminate an employee for reporting in writing a violation of law or misuse of public resources. An employer who violates this statute commits a Class A infraction. *See* Ind.Code § 36-1-8-8(d). Whether or not Defendants may have violated the state statute, the Court concludes that the state statute does not provide Kodrea with a private right of action.

The parties have not directed the Court to any Indiana appellate decisions addressing this particular statute, and the Court's own research found none. Therefore, the Court must look to the language of the statute itself to determine whether the General Assembly intended to provide for a private right of action. The Court concludes that the plain language of the statute clearly limits Kodrea's remedy to appealing any disciplinary action pursuant to the procedures set forth by personnel policy or collective bargaining agreement, a remedy which Kodrea apparently employed via the grievance process in which the termination decision was upheld. *See* Ind.Code § 36-1-8-8(c). Thus, on its face, the statute does not grant Kodrea a private right of action.

This conclusion is strengthened by a comparison of this statute with Indiana Code § 22-5-3-3, a " companion" statute passed in the same piece of legislation. *See* 1987 Ind. Acts, Pub.L. No. 32, §§ 3-4 at 938-40.[FN5] Indiana Code § 22-5-3-3 provides protection for employees of private employers under public contract and is virtually identical to § 36-1-8-8 in all material respects except for the remedy in subsection (c). Specifically, § 22-5-3-3(c) provides that an employee of a private employer under public contract may "process an appeal of [any] disciplinary action as a civil action." This difference in language reveals that the General Assembly can and does provide for a civil remedy when it chooses to do so.[FN6] Further, unlike § 36-1-8-8, § 22-5-3-3 has been addressed by Indiana's appellate courts. The Indiana Court of Appeals agreed that where an employee of a private employer under public

contract brings a whistleblower claim, the cause of action arises under § 22-5-3-3 rather than common law. *See Coutee v. Lafayette Neighborhood Hous. Servs., Inc.,* 792 N.E.2d 907, 911-12 (Ind.Ct.App.2003), *reh 'g and trans. denied.* Based on *Coutee,* this Court concludes that in order for Kodrea to have a cause of action, it must arise under Indiana Code § 36-1-8-8 itself. Again, however, the statute explicitly limits Kodrea's remedy and does not provide for a private right of action.

> FN5. The two statutes were also later amended at the same time. *See* 1990 Ind. Acts, Pub.L. No. 9, §§ 14, 16 at 482-85.

> FN6. In fact, the General Assembly recently provided for such a remedy in legislation protecting employees who report that false claims for payment have been made to the State. *See* 2005 Ind. Acts, Pub.L. No. 222, § 23 at 3591 (codified as Indiana Code § 5-11-5.5-8(c)).

**\*16** Finally, the Court notes that its conclusion that Kodrea does not have a private right of action is consistent with Indiana's employment-at-will doctrine, which provides that where there is no definite term of employment that the employment is at-will and is presumptively terminable at any time, with or without cause. *See Coutee,* 792 N.E.2d at 911. One exception to this doctrine is the public policy exception, which is applicable when an employee is discharged for exercising a statutory or constitutional right or for refusing to commit an illegal act for which he would be personally liable. *See, e.g., McGarrity v. Berlin Metals, Inc.,* 774 N.E.2d 71, 76 (Ind.Ct.App.2002); *Pepsi-Cola Gen. Bottlers, Inc. v. Woods,* 440 N.E.2d 696, 697 (Ind.Ct.App.1982). However, the Indiana Supreme Court has been reluctant to broaden the exceptions to the employment-at-will doctrine in the absence of clear statutory expression, and so the public policy exception has been construed narrowly by Indiana courts. *See, e.g., Dale v. J.G. Bowers, Inc.,* 709 N.E.2d 366, 368 (Ind.Ct.App.1999); *Wicor v. Anchor Indus., Inc.,* 669 N.E.2d 172, 177 n. 5 (Ind.1996). Thus, where the General Assembly has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 14

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

explicitly provided a remedy for a violation in a statute itself, courts have found the public policy exception inapplicable. *See Groce v. Eli Lilly & Co.,* 193 F.2d 496, 502-04 (7th Cir.1999) (discussing Indiana state law claim of retaliatory discharge for reporting violations of the Indiana Occupational Safety and Health Act); *Coutee,* 792 N.E.2d at 911. In this case, the statute in question provides a specific remedy, *i.e.,* the right to appeal a disciplinary action pursuant to internal personnel policies, and so under Indiana law the public policy exception would not assist Kodrea. He is therefore limited to the remedy provided in the statute.[FN7] Given the plain language of the statute and its explicit limitation on a remedy, a comparison of the statute to similar statutory provisions, and the employment-at-will doctrine, Kodrea's argument that a private right of action may be implied is unavailing. Accordingly, the Court concludes that Indiana Code § 36-1-8-8 does not provide Kodrea with a private of right of action. Kodrea's state law claim must therefore be dismissed.

> FN7. The Court notes that Judge Lozano of the Northern District of Indiana, relying on an analysis of the employment-at-will doctrine, recently reached a similar conclusion when he dismissed a plaintiff's state law claim brought pursuant to Indiana Code § 36-1-8-8. *See Jennings v. Warren County Comm'rs,* No. 4:04-cv-094, 2006 WL 694742, *7-8 (N.D.Ind. March 14, 2006).

### V. *CONCLUSION*

For the foregoing reasons, Defendants', City of Kokomo, Matthew McKillip, Dan Smith, and Jack Dodd, Motion for Summary Judgment is **GRANTED in part and DENIED in part.** Plaintiff's, Matthew G. Kodrea, state law claim is dismissed with prejudice.

The Court also dismisses the claims against Defendant Matthew McKillip in his official capacity as Mayor. Any individual claims against Defendant Matthew McKillip remain pending.[FN8]

> FN8. For the reasons stated herein, the Court also **DENIES** Defendants' Motion to Strike (Doc # 77).

IT IS SO ORDERED this 22nd day of June, 2006.

S.D.Ind.,2006.
Kodrea v. City of Kokomo, Ind.
Slip Copy, 2006 WL 1750071 (S.D.Ind.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1436231 (Trial Motion, Memorandum and Affidavit) Plaintiff's Surreply (Apr. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 1436230 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Motion for Summary Judgment (Apr. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1113716 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response in Opposition to Summary Judgment (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 735193 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law In Support of Motion For Summary Judgment (Feb. 17, 2006) Original Image of this Document (PDF)
• 2004 WL 2889448 (Trial Pleading) Complaint and Demand for Jury Trial (Nov. 9, 2004) Original Image of this Document (PDF)
• 1:04cv01843 (Docket) (Nov. 9, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern
Division.
William K. **TRZECIAK**, Plaintiff,
v.
VILLAGE OF **LAGRANGE**, an Illinois municipal
corporation and body politic, and Loren Clark,
Defendants.
**No. 01 C 4977.**

March 13, 2003.

police sergeant, sued village under Title VII and
police chief and village under § 1983, claiming he
experienced retaliation because he provided too
positive an evaluation of subordinate who had
brought claims of sex discrimination and for
testifying truthfully in deposition in her case.
Defendants moved for summary judgment. The
District Court, Hart, J., held that: (1) sergeant did
not have sufficient direct evidence of any of his
claims; (2) sergeant established prima facie
retaliation claim under Title VII against village; (3)
§ 1983 claim against police chief was based on his
personal participation in retaliation; (4) chief was
final policymaking official, so village could also be
held liable under § 1983; and (5) sergeant did not
sufficiently establish Title VII or § 1983 retaliation
claim based on merit and efficiency rating (MER)
scores and denial of promotion.

Motion granted in part and denied in part.

West Headnotes

**[1] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most
Cited Cases

**Municipal Corporations 268 ☞185(1)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B)  Municipal  Departments  and
Officers Thereof
            268k179 Police
                268k185 Suspension and Removal of
Policemen
                    268k185(1)  k.  Grounds  for
Removal or Suspension. Most Cited Cases
Police   sergeant's   nondiscriminatory   annual
performance review of patrol officer who was
otherwise being subject to pattern of discrimination
was "protected activity" for purposes of Title VII
retaliation claim. Civil Rights Act of 1964, §
704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[2] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1   Particular   Expressions   and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2)   k.   Public
Employment. Most Cited Cases
While internally complaining about discrimination
against oneself is not speech on matter of public
concern  for  purposes  of  First  Amendment
retaliation claim, speaking out as to discrimination
against others may be. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ☞1249(1)**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1249 Public Employment
                78k1249(1) k. In General. Most Cited
Cases

**Municipal Corporations 268 ☞185(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B) Municipal Departments and Officers Thereof
            268k179 Police
                268k185 Suspension and Removal of Policemen
                    268k185(1) k. Grounds for Removal or Suspension. Most Cited Cases
Police sergeant's lowered performance review and resulting smaller raise was "adverse action" for purposes of Title VII retaliation claim; sergeant received 2% raise instead of 2.25%, representing difference of $135 annually plus additional percentage increases in following years. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[4] Civil Rights 78 ⟐1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases

**Municipal Corporations 268 ⟐184.1**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B) Municipal Departments and Officers Thereof
            268k179 Police
                268k184.1 k. Promotion of Policemen. Most Cited Cases
Police sergeant failed to establish prima facie case of retaliation under Title VII based on his lowered merit and efficiency rating (MER) scores and denial of promotion; lieutenant's MER was turned in before sergeant engaged in the protected activity and thus could not have been motivated by retaliation, and chief's MER score by itself did not affect sergeant's ranking on promotional eligibility list and thus did not have materially adverse effect on sergeant's promotion. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[5] Constitutional Law 92 ⟐90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment. Most Cited Cases

**Municipal Corporations 268 ⟐184.1**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B) Municipal Departments and Officers Thereof
            268k179 Police
                268k184.1 k. Promotion of Policemen. Most Cited Cases
Police sergeant did not sufficiently establish § 1983 claim based on chief's lowering of his merit and efficiency rating (MER) scores and denial of promotion, allegedly in retaliation for his protected speech on behalf of subordinate; MER was confidential and not likely to deter exercise of First Amendment rights by sergeant, who had no actual knowledge of rating chief had given him on MER until after lawsuit was filed. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⟐1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most Cited Cases
    (Formerly 78k242(3))
Police sergeant established causation element of retaliation claims through evidence that, immediately after sergeant gave somewhat favorable performance review of subordinate who was being subjected to pattern of discrimination, police chief pulled out that review and indicated to sergeant that he had rated subordinate too high, that chief informed lieutenant about meeting shortly thereafter, and that lieutenant then revised sergeant's own annual performance review downward, with chief's approval. 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

2000e-3(a).

[7] Civil Rights 78 ⟶1359

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1359 k. Employment Practices. Most
Cited Cases
    (Formerly 78k207(2), 78k207(1))
Police chief could be held liable under § 1983 for
First Amendment retaliation, if proven, against
sergeant in which he had personally participated,
and village could also be held liable given that chief
was official with final policymaking authority.
U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

*MEMORANDUM OPINION AND ORDER*

HART, J.
*1 Plaintiff William Trzeciak works in the Police
Department of defendant Village of LaGrange,
Illinois. Also named as a defendant is Police Chief
Loren Clark. Plaintiff claims he experienced
retaliation because he provided too positive an
evaluation of an officer who had brought claims of
sex discrimination and also for testifying truthfully
in a deposition taken in that case. Count I is a claim
against the Village under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
Count II is a constitutional claim against both
defendants under 42 U.S.C. § 1983. Presently
pending is defendants' motion for summary
judgment.

On a motion for summary judgment, the entire
record is considered with all reasonable inferences
drawn in favor of the nonmovant and all factual
disputes resolved in favor of the nonmovant. *Lesch
v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th
Cir.2002); *Hilt-Dyson v. City Of Chicago,* 282 F.3d
456, 462 (7th Cir.), *cert. denied,* 537 U.S. 820, 123
S.Ct. 97, 154 L.Ed.2d 27 (2002); *Schneiker v.
Fortis Insurance Co.,* 200 F.3d 1055, 1057 (7th
Cir.2000). The burden of establishing a lack of any
genuine issue of material fact rests on the movant.
*Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th
Cir.2001); *Wollin v. Gondert,* 192 F.3d 616, 621-22

(7th Cir.1999). The nonmovant, however, must
make a showing sufficient to establish any essential
element for which he will bear the burden of proof
at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Billings v.
Madison Metropolitan School District,* 259 F.3d
807, 812 (7th Cir.2001). The movant need not
provide affidavits or deposition testimony showing
the nonexistence of such essential elements. *Celotex,*
477 U.S. at 324. Also, it is not sufficient to show
evidence of purportedly disputed facts if those facts
are not plausible in light of the entire record. *See
NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d
231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104,
115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v.
Carey Canada, Inc.,* 950 F.2d 481, 485 (7th
Cir.1991); *Collins v. Associated Pathologists, Ltd.,*
844 F.2d 473, 476-77 (7th Cir.), *cert. denied,* 488
U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).
As the Seventh Circuit has summarized:
The party moving for summary judgment carries the
initial burden of production to identify "those
portions of the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any, which it believes
demonstrate the absence of a genuine issue of
material fact." *Logan v. Commercial Union Ins. Co.,*
96 F.3d 971, 978 (7th Cir.1996) (citing *Celotex
Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.
2548, 91 L.Ed.2d 265 (1986) (citation and internal
quotation omitted)). The moving party may
discharge this burden by " 'showing'-that is,
pointing out to the district court-that there is an
absence of evidence to support the nonmoving
party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct.
2548, 91 L.Ed.2d 265. Once the moving party
satisfies this burden, the nonmovant must "set forth
specific facts showing that there is a genuine issue
for trial." Fed.R.Civ.P. 56(e). "The nonmovant
must do more, however, than demonstrate some
factual disagreement between the parties; the issue
must be 'material.' " *Logan,* 96 F.3d at 978. "
Irrelevant or unnecessary facts do not preclude
summary judgment even when they are in dispute ."
*Id.* (citation omitted). In determining whether the
nonmovant has identified a "material" issue of fact
for trial, we are guided by the applicable substantive
law; "[o]nly disputes that could affect the outcome
of the suit under governing law will properly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party....' ' *Logan,* 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*2 *Outlaw,* 259 F.3d at 837.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of summary judgment are as follows. The LaGrange Police Department ("LPD") consists of the Chief, three lieutenants, five sergeants, and 19 patrol officers. The LPD prepares annual performance reviews which evaluate all significant aspects of job performance, suggest areas for improvement, and identify future performance goals. As of 1999, the ratings for each category were 1 to 4, with 4 being the best rating. The overall score on the performance review determines the annual base salary increase for all non-union personnel. Typically, a sergeant generates a draft review for each patrol officer on his or her shift, which is then reviewed and possibly revised by the shift's lieutenant, and finalized by the Chief. Sergeant reviews typically are conducted by a supervising lieutenant. Lieutenants typically create their own initial drafts, which are then reviewed, revised, and finalized by the Chief.

The LPD's promotion process is distinct from the annual review process. Promotion decisions are solely within the authority of the LaGrange Board of Fire and Police Commissioners ("BFPC"), which is an independent entity consisting of three residents

appointed by the Village President. Historically, the BFPC has filled each vacancy by appointing the next candidate on the BFPC's eligibility list for that position. Every three years, the BFPC generates an eligibility list by ranking all candidates for the particular promotion. The ranking scores are based on (a) a written examination conducted by the BFPC, (b) an oral interview conducted by the BFPC, and (c) a merit and efficiency rating ("MER") determined by averaging the MER scores submitted for each candidate by each LPD supervisor ranked above that candidate. Points are also awarded based on seniority and military service.

MER's are generated separate from the annual performance reviews and are to be kept confidential, including from the person being rated. Clark states in his affidavit that, unlike performance reviews, MER's are to measure potential performance in the new position, not performance in the person's current position. However, the MER instructions contain no such direction. The general instructions are written in the present tense, referring to whether the candidate "demonstrates the particular characteristic." The "factors to consider" for each of the ten categories of characteristics are questions written in the present tense and refer to job performance that has occurred. For example, one of the factors under self sufficiency is: "Does this officer spend his/her time effectively performing his/her work assignments?" On defendants' summary judgment motion, it must be taken as true that, like a performance review, an MER is based on the employee's performance in his or her current position.

*3 Plaintiff began working for the LPD in 1984. In 1996, he was promoted to sergeant. In 1999, one of the lieutenant positions became vacant. The prior lieutenant eligibility list had expired and the BFPC had not yet undertaken the process of generating a new list. Clark had the authority to temporarily appoint an acting lieutenant. From May to October 1999, plaintiff was an acting lieutenant. As stated in the memorandum announcing the appointment, plaintiff was selected based on his job performance and the ability to carry out the duties of the position. FN1 When the temporary lieutenant appointment expired, plaintiff continued as a sergeant. On

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

September 4, 2002, it was announced that plaintiff would be appointed as a lieutenant effective September 27, 2002.[FN2]

> FN1. Clark has testified otherwise, but, on defendants' summary judgment motion, this factual dispute must be resolved in plaintiff's favor.

> FN2. Plaintiff's answer to summary judgment was filed prior to the announcement of this appointment and the stated effective date was after defendants filed their reply. There is no indication that the appointment did not go through.

In Fall 1999, the LPD conducted annual performance reviews for the year ended August 31, 1999. Plaintiff had to draft performance reviews for eight subordinates, including patrol officer Marge Kielczynski who had a Title VII and § 1983 sex discrimination and retaliation case pending as against the Village and Clark. *See Kielczynski v. Village of LaGrange, Ill.,* 19 F.Supp.2d 877 (N.D.Ill.1998) (granting in part and denying in part motion to dismiss); *Kielczynski v. Village of LaGrange, Ill.,* 122 F.Supp.2d 932 (N.D.Ill.2000) (" *Kielczynski II"* ) (denying motion for summary judgment). Plaintiff contends retaliation began immediately after he turned in his review of Kielczynski.

In accordance with instructions from Chief Clark, on Friday, October 8, 1999, plaintiff handed out his reviews to the officers that were present that day, including Kielczynski. On Monday October 11, plaintiff personally handed Clark all of the reviews plaintiff had written. At the time, discovery in Kielczynski's lawsuit was ongoing. Clark flipped through the reviews, immediately pulled out Kielczynski's, and reviewed it. Clark questioned the accuracy of plaintiff's review by stating, "Is she really this good?" [FN3] Plaintiff contends that Clark thereafter retaliated by downgrading defendant's MER rating and annual performance review. Plaintiff also contends that Lieutenant Patrick O'Connor aided Clark in that retaliation by also giving a negative MER and review.

> FN3. Defendants object that plaintiff's present affidavit to this effect should not be credited because it is inconsistent with plaintiff's prior deposition testimony. *See Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 736 (7th Cir.2001), *cert. denied,* 535 U.S. 928, 122 S.Ct. 1299, 152 L.Ed.2d 211 (2002) (quoting *Patterson v. Chicago Association for Retarded Citizens,* 150 F.3d 719, 720 (7th Cir.1998)) ("an affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable"). At his deposition, plaintiff testified as follows: " Q: Did you ever have another discussion with him about her evaluation? Did he ever express any disagreement with it or tell you anything about how he felt about that evaluation? A: No, we never-after I gave it to him, he said he was going to hold on to it. And he said, you know, she's this good, or something like that. I said, yeah, I even had Bryan look at it. And that was the last time we discussed it, except he said he's going to hang on to it." Pl. Dep. I at 34. Contrary to defendants' contention, this testimony is consistent with the present affidavit. Plaintiff indicates Kielczynski's review was singled out. Further, "Is she really this good?" is "something like" " she's this good ." The affidavit is not so inconsistent with the deposition testimony that it cannot possibly be credited. Defendant also points to plaintiff's deposition response of "gee, no" to the question of whether he had any "evidence" that his MER ratings were related to the evaluation of Kielczynski. *Id.* at 161. A layperson cannot be expected to respond to such a question with either a full understanding of the term evidence or the evidence available in his case. That question is not a basis for finding that a later affidavit contradicts deposition testimony.

O'Connor's MER for plaintiff is dated Monday, October 4, 1999, which is prior to Clark receiving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

plaintiff's performance review of Kielczynski. If O'Connor did indeed create the MER on that date, it could not have been motivated by retaliation since there is no contention that, prior to October 11, Clark or O'Connor had any reason to retaliate. Plaintiff contends there is evidence from which a reasonable trier of fact could conclude that O'Connor did not turn in plaintiff's MER until after plaintiff's October 11 meeting with Clark.

It is undisputed that the MER prepared by O'Connor was delivered to Cathy Benjamin, secretary for the BFPC. Plaintiff contends Benjamin was on leave the entire week of October 4, thereby giving O'Connor the opportunity to revise the MER before Benjamin returned. In his affidavit, plaintiff states he tried to turn in the MER's he had written, but was told that Benjamin was on vacation that entire week. He does not state that he was actually at Benjamin's office on October 5 to observe she was not there. Plaintiff's statement about Benjamin being absent the entire week is therefore hearsay from unspecified sources. Benjamin, however, provides an affidavit stating that she was in the office the morning of October 5. Corroborating attendance sheets are also provided. Additionally, Benjamin provides a cover memorandum from O'Connor that is dated October 5 and was taped to a sealed envelope containing all the MER's he prepared. Benjamin, though, does not state that she received the envelope while at work the morning of October 5. For purposes of defendants' motion for summary judgment, it must be assumed that Benjamin did not find the envelope until she returned on Monday October 11. But even making this assumption, that still meant Benjamin had O'Connor's MER's on October 11. There is no evidence that plaintiff's October 11 meeting with Clark was substantially earlier than Benjamin's arrival at work that day. There is no basis for finding that an adequate opportunity existed, following Clark's meeting with plaintiff, for Clark to contact O'Connor, O'Connor to modify the MER on his computer, and O'Connor to substitute a modified MER and reseal the envelope, prior to Benjamin arriving at her office that day. O'Connor's 1999 MER for plaintiff could not have been motivated by retaliation.

*4 Clark's MER for plaintiff is dated October 5. There is no evidence regarding when Clark actually provided this MER to the BFPC. However, there is also no contention by defendants that Clark did not have an opportunity to create or modify the MER after he met with plaintiff on October 11.[FN4] For present purposes, it must be assumed that Clark finalized plaintiff's MER after the October 11 meeting between plaintiff and Clark.

> FN4. In their opening brief, defendants raise no issue regarding the timing of Clark's MER. In their reply, defendants dispute that Clark's MER was based on conduct of plaintiff that occurred after October 5, but there is no express contention that the MER itself was not completed or modified after October 5. Since the issue is not raised by defendants, it will be assumed that Clark completed or modified the MER on October 11 or thereafter.

O'Connor also created the final draft of plaintiff's performance review, which was completed on October 12. However, it was prior to October 11 that Clark assigned O'Connor and Lieutenant John Neuzil to prepare plaintiff's performance review.[FN5] Clark discussed plaintiff's performance evaluation with O'Connor, but not Neuzil.[FN6] It was after plaintiff's October 11 meeting with Clark that O'Connor first told plaintiff that he was doing plaintiff's performance review. Also, O'Connor's initial draft of plaintiff's performance review contained references to performance reviews that plaintiff turned in to Clark on October 11. It is a reasonable inference that Clark and O'Connor discussed plaintiff's performance review after the October 11 meeting and before the performance review was finalized and signed by Clark on October 12. Although Neuzil worked and commented on an earlier draft of plaintiff's performance review, O'Connor was the one who prepared the final draft for Clark's signature.

> FN5. Plaintiff contends that this is contrary to the normal procedure of having

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

lieutenants prepare their own initial draft. Plaintiff, though, was an acting lieutenant, not a regular lieutenant. In any event, no retaliatory motive can be inferred from the action of assigning plaintiff's performance review to O'Connor and Neuzil since the decision to assign it to them occurred prior to October 11. Also, plaintiff's contention that selecting O'Connor to draft his performance review is also evidence of retaliation is belied by the fact that O'Connor had also drafted plaintiff's performance reviews from the immediately preceding years.

> FN6. Clark testified that he did not recall Neuzil being present, but was not sure if he was there or not. On defendants' summary judgment motion, it must be assumed that Neuzil was not present.

It must be considered whether the evidence supports that plaintiff's performance review of Kielczynski was such that Clark would have been motivated to retaliate.[FN7] It also must be considered whether the evidence supports that Clark's 1999 MER of plaintiff and the 1999 performance review of plaintiff were motivated by retaliation and, if so, if either had a material adverse effect on plaintiff.

> FN7. Plaintiff's deposition in the *Kielczynski* case was taken in January 2000. Since plaintiff points to no evidence of retaliatory actions taken thereafter, the deposition testimony could not have motivated any retaliatory acts.

Defendants contend the performance review of Kielczynski could not have motivated any retaliation because it was not a very good review. There is no dispute that the *Kielczynski* case was being actively litigated as of October 1999. Also, evidence supports that Clark actually engaged in acts of discrimination and retaliation against Kielczynski, both before and after plaintiff's preparation of Kielczynski's 1999 performance review.[FN8] Evidence supports that there was a " pattern of antagonism" toward Kielczynski. *See*

*Kielczynski II,* 122 F.Supp.2d at 952 n. 7. Additionally, plaintiff's own affidavit is sufficient to support that plaintiff believed Kielczynski was experiencing discrimination [FN9] and that he consciously chose to provide an accurate evaluation of Kielczynski rather than join in the discriminatory conduct.

> FN8. As defendants concede, plaintiff relies on the same evidence that Kielczynski presented in opposing summary judgment in her case. As is discussed in detail in *Kielczynski II,* 122 F.Supp.2d at 938-54, that evidence was sufficient to create a genuine factual dispute that Kielczynski suffered discrimination and retaliation.

> FN9. Plaintiff's affidavit is admissible as evidence of his subjective beliefs. His mere opinions are not considered as evidence that the discrimination actually occurred.

Defendants contend the performance review of Kielczynski is "largely unremarkable," giving Kielczynski a "good" or "B" rating in nine of ten categories and giving her the fourth highest score of the five patrol officers plaintiff evaluated. As plaintiff points out, however, this is an overall good evaluation and is more favorable than performance reviews that Kielczynski had received the previous three years. The 1999 performance review also contained more favorable narrative comments than the prior performance reviews. As was noted in the summary judgment ruling in the *Kielczynski* case, the ratings plaintiff gave Kielczynski were "similar" to the ratings he gave other patrol officers and the evaluation "praised her productivity, cooperative attitude, and reliability." *Kielczynski II,* 122 F.Supp.2d at 942. Moreover, when Clark received the performance reviews prepared by plaintiff, Clark immediately picked out Kielczynski's and questioned whether she was "really this good." Some evidence supports that plaintiff's 1999 performance review for Kielczynski was better than Clark would have preferred and that Clark was not pleased with the review.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 8

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

**\*5** Plaintiff's overall score on his 1999 performance review was 77. This resulted in a 2.00% increase in pay compared to a 2.25% increase that he would have received had he scored 79.[FN10] O'Connor's initial draft of the performance review had the 77 overall score. Neuzil had then revised the draft to delete some negative comments and add a total of two points. Without further consulting Neuzil, O'Connor left in the two additional points, but reduced the "Employee Monitoring And Evaluation" category by one point. That resulted in an overall reduction of two points since that category is counted double in determining the overall score. This last change was made after plaintiff's October 11 meeting with Clark. Clark approved and signed O'Connor's final draft.

> FN10. The difference between a 2.00% and a 2.25% increase was $135 per year. There is also a continuing effect in the following years in which further percentage increases would have been received. There is no evidence as to whether there would still be an effect once plaintiff was promoted to lieutenant in 2002.

Plaintiff disagreed with the rating for "Quantity of Work, Initiative & Industry," contending the calculation that he did not meet ticket-writing standards fails to properly take into account the days he was not assigned to the street because of authorized absences, training, or other duties. Plaintiff also disagreed with his rating for "Employee Monitoring And Evaluation." On October 13, plaintiff timely submitted a written memorandum requesting to meet with Clark to discuss the ratings for these two sections. Clark never responded.[FN11]

> FN11. Defendants provided the affidavit of Lieutenant Edward Lichner in which he states that he informed plaintiff that Clark authorized a meeting and that plaintiff declined to pursue the meeting. Lichner does not state when this occurred. In any event, on defendants' summary judgment motion, plaintiff's deposition testimony that there was no response to his request must be taken as true.

The possible ratings for "Quantity of Work, Initiative & Industry" were 1 ("little or no initiative"), 2 ("limited initiative"), 3 ("able worker"), and 4 ("progressive worker"). Plaintiff received a 2, with the comment being "This sergeant has to lead by example, during this period he wrote an average of 16 citations a month, which is lowest of the street Sergeants. He averaged only 31 self-initiated activities and completed only one criminal investigation. He had four misdemeanor and one felony arrests for the entire period. Much more effort is needed in this area."

Plaintiff questions the reference to 16 citations per month; he does not challenge the other comments. For the pertinent time period, LPD officers (including supervisors) were required to generate a certain number of traffic citations to meet standards. During each 28-day work cycle, 0-18 citations is "below standards," 19-24 citations is "average standards," and 25 or more is "above standards." The number is reduced by one for each day of authorized absence or other duty. In his October 13 memorandum, Plaintiff contends he actually averaged 19.9 per month, which would satisfy the "average standards" requirement. Plaintiff does not provide evidence to support the contention that he had a "monthly average" of 19.9 citations.[FN12] Plaintiff does point to Clark's deposition testimony and an attached exhibit that contains 9 of the 13 talley sheets for the year covered by the 1999 performance review.[FN13] Clark Dep. at 186-90 & Exh. 15. For those nine periods and taking into account authorized absences, plaintiff was "average standards" six times and was "below standards" three times. Plaintiff generated 144 citations for an average of 16 citations per period. However, taking into account his 28 authorized absences during those nine time periods, minimally reaching "average standards" would have required 143 citations (171 minus 28). Overall, plaintiff was on the low end of "average standards" since he issued 144 citations, one more than the overall minimum for those nine periods.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 9

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

FN12. As defendants point out, it is incorrect to consider a "monthly" average. The citations standard is based on a 28-day period. There are 13 28-day periods in a year, not 12 as with months. However, since plaintiff does not provide the underlying data, it is unclear how he calculated the 19.9 figure.

FN13. A tenth talley sheet (for the period August 25 through September 21, 1999) is also provided, but it falls outside the annual review period that ended August 31, 1999.

*6 On the evidence before the court, it cannot be found that O'Connor was incorrect in calculating 16 citations per month. However, it also cannot be found, based on averaging out the periods and taking into account absences, that overall plaintiff was below standards in issuing citations. It is undisputed that the comment and the 2 rating was on the performance review in O'Connor's initial draft. Neuzil did not disagree, though he did not examine the underlying citations data. Additionally, Clark's failure to meet with plaintiff to discuss this rating could have been motivated by retaliation. On the evidence before the court on defendants' summary judgment motion, it must be assumed that, had Clark met with plaintiff and not acted with a retaliatory motive, Clark would have agreed to modify the comment about averaging 16 citations per month, though he might have still included that plaintiff was "below standards" for at least three periods during the year. Nevertheless, plaintiff does not point to sufficient evidence from which it can be found that a nonretaliatory supervisor would have increased the rating in this category to 3. Even if plaintiff minimally satisfied the citations requirement, he does not challenge the other stated reasons for the 2 rating.

The other complaint about the 1999 performance review is receiving a 2 rating instead of a 3 rating for Employee Monitoring And Evaluation. A 2 rating is described as an "inconsistent evaluator" and a 3 rating is described as a "good evaluator." O'Connor's comment is: "The sergeant must be sure to note all employee deficiencies as well as an employee's good points. Part of being a good supervisor is the balanced picture an employee should get from his evaluation. The Sergeant has not been able to do this up to this point in his supervisory career. Performance evaluations are given on a timely basis." On the final draft, O'Connor unilaterally reduced this rating from 3 to 2 without informing Neuzil. Evidence supports that at least some of the stated reasons for the 2 rating are inconsistent with facts. The statement that plaintiff had had these same problems up to that point in his career is inconsistent with prior performance reviews that were also drafted by O'Connor. In both 1997 and 1998, O'Connor rated plaintiff 3 ("good evaluator"), including a comment in the 1997 performance review that plaintiff was "not afraid to engage in negative employee comments." Also, defendants' explanation that O'Connor and Clark rated plaintiff lower in 1999 because there were higher expectations for an acting lieutenant than a sergeant is inconsistent with the comments that repeatedly refer to plaintiff as "Sergeant." On defendants' summary judgment motion, it must be assumed that plaintiff was actually entitled to a 3 rating in this category. It must also be assumed that Clark, had he acted without a retaliatory motive, would have agreed to revise this rating if he had met with plaintiff to discuss it. Such a change would have increased plaintiff's overall score to 79 and would have entitled him to the 2.25% raise instead of 2.00%. [FN14]

FN14. An overall score of 79 would still have been the lowest that year for the LPD's four sergeants. The other three sergeants had overall scores of 89, 89, and 85. Also, whether the overall score is 77 or 79, it would still be close to plaintiff's overall score of 78 on his 1998 performance review.

*7 The Final Promotional Eligibility Register for Police Lieutenant was issued approximately October 24, 1999 and was to be effective for three years. The published list reports overall scores, it does not show the underlying ratings and calculations that determined the final score. Plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

was ranked fourth of four candidates, with a score
of 65.10. The other candidates scored 80.20, 80.00,
and 74.40. The MER ratings used in determining
the overall score remained confidential. Plaintiff
was unable to learn of the MER ratings until
obtained in discovery after the present lawsuit was
filed. *See* Complaint ¶ 13(f). In response to
summary judgment, plaintiff does not point to any
evidence as to any knowledge or speculation he
had, as of 1999, regarding Clark's or O'Connor's
scoring on his MER's.

Plaintiff presently contends that, if not for
retaliation, O'Connor and Clark would have scored
him higher on the MER's and he would have ranked
third on the list instead of fourth, resulting in a
promotion in August 2001. The rankings of the
third-ranked candidate and plaintiff were calculated
as follows.

| | | |
|---|---:|---:|
| MER average | 74.67 | 53.67 |
| Written test | 71.00 | 69.00 |
| Oral Interview | 85.67 | 87.67 |
| Subtotal | 231.34 | 210.34 |
| (30% of subtotal) | 69.40 | 63.10 |
| Seniority | 5.00 | 2.00 |
| Military | 0.00 | 0.00 |
| Total | 74.40 | 65.10 |

Although not taken into account at the time,
plaintiff was entitled to claim 3.5 military points.
The only part of the total score that plaintiff
contends was affected by retaliation was the MER
average, which was based on MER's prepared by
Clark (55), O'Connor (25), and Neuzil (81).
Plaintiff does not contend that Neuzil acted with
retaliation. As previously discussed, O'Connor
completed his MER of plaintiff before October 11.
Therefore, O'Connor's MER scoring could not have
been affected by retaliation. Even if it is assumed
that Clark would have scored plaintiff a perfect 100
absent any retaliatory motive, plaintiff's MER
average would be 68.67 (206/3). Plaintiff's total
score would then be calculated as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

| | |
|---|---:|
| MER average | 68.67 |
| Written test | 69.00 |
| Oral Interview | 87.67 |
| Subtotal | 225.34 |
| (30% of subtotal) | 67.60 |
| Seniority | 2.00 |
| Military | 3.50 |
| Total | 73.10 |

Thus, even assuming a perfect rating from Clark and the 3.5 military points, plaintiff would not have outscored the third-ranked candidate. Therefore, even assuming Clark retaliated by scoring plaintiff low on his MER, there was no possible impact on plaintiff's ranking on the 1999 promotional eligibility register.

As to whether Clark intentionally scored plaintiff lower than plaintiff deserved, the evidence is mixed. The MER form allows for a short comment at the end, but it primarily consists of numerical rankings of 0 to 10 in ten categories. Clark scored plaintiff 55 and added the comment: "Bill has done a good job in the sergeants position. However, Bill is not ready for advancement to the position of lieutenant at this time."

*8 Plaintiff makes much of the fact that, on plaintiff's 1996 MER, Clark gave him a score of 76. That, however, was a rating for promotion to sergeant. Plaintiff had been a patrol officer for approximately 12 years at the time. When being considered for lieutenant, he had been a sergeant for approximately three years. Plaintiff compares Neuzil, though, who rated plaintiff 56 on the 1996 MER, but 81 in 1999. On the other hand, however, O'Connor rated plaintiff 77 in 1996 and dropped him to 25 in 1999. Also, although there is no strict correlation between the annual performance review and MER, some categories are similar. Nevertheless, on the MER, Clark rated plaintiff comparatively lower in a number of the similar categories. Clark explains that, in completing the MER, he considered plaintiff's potential abilities as a lieutenant. Although consistent with his comment on the MER, that explanation is inconsistent with the instructions for the MER. Additionally, Clark's low rating on the MER is inconsistent with the stated reasons for temporarily appointing plaintiff

as a lieutenant. Although a reasonable finder of fact could find either way, on defendants' motion for summary judgment, it must be assumed that Clark's MER rating was not reflective of plaintiff's actual qualifications.

In a recent decision, the Seventh Circuit established a new framework for analyzing retaliation claims on a motion for summary judgment. *See Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir.), *cert. denied.,* 537 U.S. 879, 123 S.Ct. 79, 154 L.Ed.2d 134 (2002). That case states that there "should" be "two (and only two) distinct routes" for a plaintiff on a motion for summary judgment. *Id.* at 644. The first, "the more straightforward, ... is to present direct evidence (evidence that establishes without resort to inference from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains.... The second route to summary judgment, the adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Id.* Unlike the direct evidence approach, the indirect method does not require any evidence of a causal link between the protected activity and adverse action. *Stone* eliminated a possible distinction between the direct and indirect methods whereby the former required proof of but-for causation, while the latter only involved a lower standard of proof of a causal link, that the protected activity and adverse action "were not wholly unrelated." *See id.* at 642-44.

Plaintiff contends he is relying on the direct evidence approach.[FN15] Plaintiff contends that he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

. Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

has presented sufficient evidence that (a) he engaged in protected activity, (b) he suffered adverse actions, and (c) a causal relation exists between the two. As to the last element, plaintiff primarily relies on the close temporal proximity between his conduct and the adverse action. The problem with plaintiff's purported reliance on the direct evidence approach is that he is relying on circumstantial evidence. *Stone*, 281 F.3d at 644, explicitly states that direct evidence does not include circumstantial evidence. The Seventh Circuit has described direct evidence as

> FN15. Plaintiff does not satisfy the indirect method *prima facie* case set forth in *Stone* because he does not present evidence of similarly situated employees who did not engage in protected activity. *See Rogers v. City of Chicago*, 320 F.3d 748, 2003 WL 483202 *6 (7th Cir. Feb.26, 2003).

*9 evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption. If the evidence consists of isolated statements, those statements should be causally related to the ... decision making process, for direct evidence relate [s] to the motivation of the decisionmaker responsible for the contested decision. Remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality. *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir.2001) (quoting *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999). Accord *Clanton v. Kirk & Blum Manufacturing Co.*, 2002 WL 31761363 *8 (S.D.Ind. Dec.6, 2002). *See also Sanghvi v. St. Catherine's Hospital, Inc.*, 258 F.3d 570, 574 (7th Cir.), *cert. denied*, 534 U.S. 1114, 122 S.Ct. 923, 151 L.Ed.2d 887 (2002); *Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000); *Shannon v. Sheahan*, 2003 WL 366584 *10 (N.D.Ill. Feb.18, 2003). Temporal proximity as proof of a causal relationship is generally considered to be circumstantial, not direct, evidence. *See Bilow v. Much Shelist Freed Denenberg Ament &*

*Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir.2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir.2000)); *Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1014 (7th Cir.1997); *McKay v. Town & Country Cadillac, Inc.*, 2002 WL 664024 *23 (N.D.Ill. April 23, 2002) ; *Horwitz v. City of Chicago*, 2002 WL 1777050 *7 (N.D.Ill. Aug.1, 2002); *Medina v. City of East Chicago, Indiana*, 184 F.Supp.2d 805, 819-20 (N.D.Ind.2001). *But see Hamm v. Weyauwega Milk Products, Inc.*, 199 F.Supp.2d 878, 897 (E.D.Wis.2002); *Matheny v. Reid Hospital & Health Care Services, Inc.*, 2002 WL 655702 *9 (S.D.Ind. March 12, 2002). *Stone*, though, apparently leaves open the possibility that temporal proximity may be considered under the direct evidence approach. *See Stone*, 281 F.3d at 644 (" The question of how much evidence the plaintiff must present to establish a triable issue that the adverse employment action of which he complains was retaliatory is not susceptible of a general answer. But we remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."); *McKay*, 2002 WL 664024 at *23; *Smith v. Allstate Insurance Corp.*, 2002 WL 485374 *16 (N.D.Ill. March 29, 2002). But even if the reliance on temporal evidence as proof of causation does not take plaintiff out of the direct evidence approach, he also does not present any direct evidence of Clark's (or even O'Connor's) retaliatory motive. Plaintiff does not have sufficient direct evidence as to any of his claims.

*10 Although plaintiff does not make out a direct evidence case, the three elements that he claims to have shown state a standard formulation of the indirect method, *prima facie* case that predates *Stone*. *See, e.g., McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997); *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1457 (7th Cir.1994) (quoting *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1313 (7th Cir.1989)). Even after *Stone*, a number of Seventh Circuit cases have relied on this formulation. *See, e.g., Fine v. Ryan International*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

*Airlines,* 305 F.3d 746, 752 (7th Cir.2002); *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 772-73 (7th Cir.2002); *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1008 (7th Cir.2002). Although, following *Stone,* a plaintiff may not be required to provide proof of a causal link in order to satisfy the *prima facie* case, *see Rogers v. City of Chicago,* 320 F.3d 748, 2003 WL 483202 *6 (7th Cir. Feb.26, 2003), a plaintiff is not necessarily precluded from attempting to make out the *prima facie* case by taking the more difficult approach of showing a causal link. In light of *Stone,* though, the plaintiff must make a showing of but-for causation, not the lesser "not wholly unrelated" standard. *See Stone,* 281 F.3d at 642-44; *Wells,* 289 F.3d at 1008. FN16

> FN16. *Stone* indicates that making a showing of but-for causation satisfies a plaintiff's entire proofs, not just the *prima facie* case. *See Stone,* 281 F.3d at 643. This need not be resolved because plaintiff himself is not requesting summary judgment and defendants do not contend they have rebutted any *prima facie* case that has been shown. But-for causation is also applicable to the § 1983 claim. *See Abrams v. Walker,* 307 F.3d 650, 654 (7th Cir.2002); *Love v. City of Chicago Board of Education,* 241 F.3d 564, 569 (7th Cir.2001). *Compare Suppan v. Dadonna,* 203 F.3d 228, 236 (3d Cir.2000).

[1] Defendants contend plaintiff has not provided adequate proof of any of the three elements. The first issue to consider is whether plaintiff has shown that he engaged in protected activity. Protected activity under Title VII includes "opposition conduct," that is "oppos[ing] any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a); *McDonnell v. Cisneros,* 84 F.3d 256, 262 (7th Cir.1996). This can include the passive conduct of declining to engage in discriminatory practices against other employees. *See id.* Evidence supports that there was a pattern of discrimination against Kielczynski and that plaintiff believed she was being discriminated against. Plaintiff declined to participate in that discrimination, instead

choosing to score Kielczynski's annual performance review in a nondiscriminatory manner. Plaintiff has shown that he engaged in protected activity under Title VII.

[2] The § 1983 retaliation claim is different. Plaintiff labels his § 1983 claim as an equal protection claim and refers to it as being " discrimination" based on the same facts as the Title VII retaliation claim. Plaintiff does not contend that he was discriminated against because of his gender, race, or nationality. To the extent his claim is one for discrimination, it would be based on being discriminated against for being a person who opposed discrimination. Such a claim is more properly analyzed as a First Amendment retaliation claim. *See Vukadinovich v. Bartels,* 853 F.2d 1387, 1391-92 (7th Cir.1988).FN17 A public employee is not engaging in protected speech unless he or she is speaking out on a matter of public concern. *Horwitz v. Board of Education of Avoca School District No. 37,* 260 F.3d 602, 618 (7th Cir.2001). In determining whether the speech at issue was on a matter of public concern, the content, form, context, and motivation of the speech must be considered. *Id.* It is well settled that internally complaining about discrimination against oneself is not speaking out on a matter of public concern. *Gray v. Lacke,* 885 F.2d 399, 411 (7th Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 419-20 (7th Cir.1988); *Mata v. Illinois State Police,* 2001 WL 292804 *5 (N.D.Ill. March 22, 2001). On the other hand, speaking out as to discrimination against others may be speech on a matter of public concern. *See Marshall v. Allen,* 984 F.2d 787, 794-96 (7th Cir.1993); *Tindal v. Montgomery County Commission,* 32 F.3d 1535, 1539-40 (11th Cir.1994); *Kessel v. Cook County,* 2001 WL 826914 *5 (N.D.Ill. July 12, 2001). Here, plaintiff was opposing discrimination against one other employee, not discrimination against himself. However, there is no evidence that plaintiff forthrightly expressed opposition to Clark's conduct. Plaintiff did not attempt to stop the discrimination other than to refuse to join in it. It is highly doubtful that plaintiff's completion of a nondiscriminatory evaluation constitutes speech on a matter of public concern that constitutes protected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 14

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

expression by a public employee.[FN18] However, since the parties have not expressly addressed this issue, it will be assumed that plaintiff's activity constituted protected speech for purposes of his constitutional claim.

> FN17. Even if considered as an equal protection claim, defendants' actions would only be subject to strict scrutiny if the discrimination implicated a fundamental right such as First Amendment speech protections. *Martin v. Shawano-Gresham School District,* 295 F.3d 701, 712 (7th Cir.), *cert. denied,* 537 U.S. 1047, 123 S.Ct. 601, 154 L.Ed.2d 520 (2002); *Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997). Thus, an equal protection claim based on the fundamental right of speech would still require that plaintiff show he engaged in protected speech in that he was speaking out on a matter of public concern. *See Vukadinovich,* 853 F.2d at 1392.

> FN18. Plaintiff was also deposed in the *Kielczynski* case, but that occurred at a later time and there is no present contention that any retaliation occurred after the deposition was given.

*11 [3] The next issue to consider is whether plaintiff has made a sufficient showing of an adverse action. Although often referred to as the " adverse *employment* action" requirement, it is not a necessary element of a Title VII retaliation claim that the adverse action affect conditions of employment. *Aviles v. Cornell Forge Co. .,* 183 F.3d 598, 605-06 (7th Cir.1999); *Gawley v. Indiana University,* 276 F.3d 301, 314 (7th Cir.2001). *See also Herrnreiter v. Chicago Housing Authority,* 315 F.3d 742, 745-46 (7th Cir.2002) (*dictum* ). However, there still must be some form of materially adverse action. *Gawley,* 276 F.3d at 314. *But compare Herrnreiter,* 315 F.3d at 746 (suggesting in *dictum* that the adverse action may not need to be as severe for a Title VII retaliation claim as for a discrimination claim). The Seventh Circuit has repeatedly held that a negative evaluation or recordation in an employee's file is

not, by itself, a sufficient adverse action to support a Title VII retaliation claim; there must also be a materially adverse effect. *Gawley,* 276 F.3d at 314-15; *Ribando v. United Airlines, Inc.,* 200 F.3d 507, 511 (7th Cir.1999); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 664 (7th Cir.1997); *Smart v. Ball State University,* 89 F.3d 437, 442 (7th Cir.1996). *See also Silk v. City of Chicago,* 194 F.3d 788, 802-03 (7th Cir.1999) (Americans with Disabilities Act retaliation claim).

As to the 1999 performance review, there is sufficient evidence for the trier of fact to find that plaintiff was affected by receiving a 2.00% raise instead of a 2.25% raise. That represented a difference of $135.00 annually, plus additional percentage increases in the following years. The Seventh Circuit has held that a one-time reimbursement of $156.89 is too low and sporadic to satisfy the materially adverse requirement. *Fyfe v. City of Fort Wayne,* 241 F.3d 597, 602-03 (7th Cir.2001). That case, however, expressly distinguished one-time payments from raises. The raise that plaintiff lost was not discretionary; had he scored two more points on his performance review he would have automatically received the raise. Also, it would have affected his salary for future years as well, at least up until he was promoted to lieutenant in 2002. In an alternative holding, and thus nonbinding, *dictum,* the Seventh Circuit has held that the denial of a raise of several hundred dollars is sufficiently adverse to qualify as an adverse employment action. *See Power v. Summers,* 226 F.3d 815, 821 (7th Cir.2000). *See also Kersting v. Wal-Mart Stores, Inc.,* 250 F.3d 1109, 1115-16 (7th Cir.2001); *Boyd v. Illinois State Police,* 2001 WL 301150 *8 (N.D.Ill. March 28, 2001). Because the lowered score on plaintiff's 1999 performance review decreased his raise, it constitutes an adverse action for purposes of his Title VII retaliation claim.

[4] The Title VII retaliation claim regarding the MER scores and potential promotion to lieutenant, however, is different. As is discussed above, O'Connor's MER was turned in before plaintiff engaged in protected activity and therefore could not have been motivated by retaliation. Clark's MER score, by itself, did not affect plaintiff's ranking on the promotional eligibility list. Since

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                         Page 15

Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

Clark's MER did not have a materially adverse effect on plaintiff's promotion, it cannot support a Title VII retaliation claim. Plaintiff's Title VII claim based on the denial of a promotion will be dismissed.

*12 A different adverse action standard applies to the § 1983 retaliation claims. For the § 1983 claims, there is no requirement of an adverse employment action. *Power,* 226 F.3d at 820. A necessary element, though, is that there be some form of retaliatory conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights. *Id.* at 820-21; *DeGuiseppe v.. Village of Bellwood,* 68 F.3d 187, 192 (7th Cir.1995). *Power* holds that it cannot be found, as a matter of law, that the denial of a raise of a few hundred dollars is unlikely to deter speech. 226 F.3d at 821. There is no basis for holding that the lowered score on the 1999 performance review was not sufficiently adverse to deter plaintiff's exercise of his First Amendment rights.

[5] The § 1983 retaliation claim based on the MER scores and denial of a promotion is different. The burden is on plaintiff to show that the action taken against him was sufficiently adverse. *See id.* at 820. Therefore, in response to a motion for summary judgment that raises an issue as to satisfying the adversity element, the burden was on plaintiff to provide evidence from which a jury could find that element. *See Celotex,* 477 U.S. at 317; *Billings,* 259 F.3d at 812. While the denial of a promotion would likely satisfy that requirement, *see Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72-75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Suppan v. Dadonna,* 203 F.3d 228, 234, 236-37 (3d Cir.2000) , plaintiff was not actually denied a promotion because of the MER. However, at the time the MER was completed, it was not known that it would not actually affect plaintiff's ranking for a promotion. A supervisor's lowering of a promotion-related rating could deter the employee's exercise of speech if the rating had a potential of affecting the employee's chance to be promoted. *See Suppan,* 203 F.3d at 234-35. The problem with that theory, as applied to plaintiff's situation, is that the MER's were confidential. It is undisputed that plaintiff had no actual knowledge of the rating Clark had given him

on the MER until after this lawsuit was filed. There is no contention that any retaliation was still occurring at that point. There is no basis in the record for finding that Clark's confidential scoring of plaintiff's 1999 MER was an action that was likely to deter plaintiff's exercise of his First Amendment rights. Therefore, the § 1983 retaliation claim based on the MER and denial of a promotion will be dismissed.

[6] Any claim related to the denial of a promotion has been dismissed. The remaining claims are limited to retaliation in the form of plaintiff's lowered annual performance review. It still must be considered whether there is sufficient evidence of a causal link between plaintiff's performance review of Kielczynski and the lowered scoring on his annual performance review. The evidence, viewed in the light most favorable to plaintiff, is that Clark immediately pulled out the annual performance review of Kielczynski and indicated to plaintiff that he had rated her too high. Shortly thereafter, Clark informed O'Connor about this meeting and O'Connor then revised plaintiff's annual performance review downward and Clark approved it. That downgrading occurred the same day as plaintiff's meeting with Clark or, at the latest, the next day. Also, the downgrading was done without informing Neuzil, who had worked on the prior drafts of plaintiff's performance review. Additionally, two days after October 11, plaintiff requested that Clark meet with him to discuss the performance review and Clark failed to even respond to the request. From this evidence, it can be inferred that the downgrading was motivated by Clark's displeasure with plaintiff's nondiscriminatory evaluation of Kielczynski. *See McClendon,* 108 F.3d at 796-97; *Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991).

*13 [7] Plaintiff has shown that he engaged in protected activity (a nondiscriminatory annual performance review of Kielczynski), he was subjected to an adverse action (a lowered annual performance review that resulted in a smaller raise), and a causal connection between the two. The Title VII retaliation claim against the Village based on this conduct will not be dismissed. Since the claim is based on Clark's personal participation in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.