IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.  05-157 (KAJ) |
| v. | ) | |
| | ) | Trial By Jury Demanded |
| ORLANDO J. GEORGE, JR., | ) | |
| in both his official and personal | ) | |
| capacities, and DELAWARE | ) | |
| TECHNICAL AND COMMUNITY | ) | |
| COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**VOLUME I**


GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED: July 19, 2006

# TABLE OF CONTENTS

**Page No.**

**VOLUME I**

<u>**EXHIBITS**</u>

| | |
|---|---|
| Supplemental Complaint | B-1 |
| Answer | B-16 |
| Marguerite A. Johnson, Resume | B-28 |
| November 19, 2004 Meeting Minutes | B-32 |
| Craft Show Letters | B-34 |
| George Lt: December 8, 2004 | B-46 |
| Marguerite A. Johnson, Lt: to George | B-48 |
| Notice of Administrative Leave | B-50 |
| Administrative Leave Announcement | B-51 |
| Termination Announcement | B-52 |
| Newspaper Articles | B-53 |
| Marguerite Johnson Travel Form | B-58 |
| List of Witnesses Interviewed | B-59 |
| Simpson Summaries | B-61 |
| Powell's Recreation of Johnson's Time | B-65 |
| Results of Investigation | B-68 |
| Correspondence Concerning "IT" Department | B-69 |
| Correspondence Between Counsel | B-71 |
| Del Tech Personnel Policy Manual | B-112 |

Rules of Procedure or Vice-President Termination                B-119

Letter:  Re:  Suspension Grievance                              B-122

Del Tech Terry Campus Travel Policy                             B-124

Del Tech Supercard Guidelines                                  B-125

Racist Memo                                                    B-128

Marguerite A. Johnson Contract                                 B-129

Shirey Lt: May 11, 2005: Hiring Bifferato                      B-136

Memo Re: Bifferato Firm Representation                         B-137

Del Tech Invoice and Check                                     B-138

GRID Invoices and Check                                        B-141

Payment to Chris Travis                                        B-143

Miscellaneous Johnson Payments to Del Tech                     B-144

Tim Kavel Travel Request                                       B-152

Marguerite A. Johnson Travel Request                           B-155

West Virginia Receipts                                         B-158

PNC Statement                                                  B-160

Emails                                                         B-161

Santora & Baffone Engagement Letter                            B-171

Santora & Baffone, April 12, 2006 Report                       B-174

David Dwyer Interview Summaries                                B-182

American Institute of Certified Public Accountants Standards

Defendants' Answers to Plaintiff's Interrogatories             B-204

Hearing Officer Report:  July 19, 2005                         B-211

Evaluations of Marguerite A. Johnson, Ph.D.                B-215

Evaluation of Daniel A. Houghtailing                       B-275

Evaluation of Daniel L. Simpson                            B-288

Daniel L. Simpson's Calendars                             B-310

Affidavit of Gary W. Aber                                  B-332

Affidavit of Marguerite A. Johnson                         B-334

Affidavit of Harry N. Smith                                B-343

Affidavit of Patsy Kelly Waters                            B-345

"Stigma" Letters                                           B-348

## VOLUME II

### TRANSCRIPTS

Transcript Excerpts Hearing: June 25, June 30, 2005        B-350

### DEPOSITION EXCERPTS

Lauretta Copper                                            B-372

Shelby Crawford                                            B-387

R. Ronald Draper                                           B-399

David Dwyer                                                B-415

Orlando J. George, Jr.                                     B-476

Charlotte P. Lister                                        B-500

Gerald M. McNesby                                          B-502

Susan H. Molikan                                           B-550

Hope Murray                                                B-558

Ronald J. Pleasanton                                       B-572

Nancy J. Rockey                                          B-612

Peter D. Shoudy

Daniel L. Simpson                                        B-628

Connie M. Spampinato                                     B-662

Christine M. Travis                                      B-667

Ruth Yanos                                               B-671

Dywer Interview Transcripts                              B-677

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                )
                                      )
            Plaintiff,                )
                                      )     C.A. No. 05-157 (KAJ)
       v.                             )
                                      )     Trial By Jury Demanded
ORLANDO J. GEORGE, JR.,               )
in both his official and personal     )
capacities, and DELAWARE              )
TECHNICAL AND COMMUNITY               )
COLLEGE,                              )
                                      )
            Defendants.               )

## SUPPLEMENTAL COMPLAINT

### THE PARTIES

1.    The plaintiff, Marguerite Johnson is a resident of the State of Delaware, residing in Kent County.

2.    Orlando J. George, Jr., is a resident of the State of Delaware, residing in New Castle County.

3.    Delaware Technical and Community College is an institution of higher learning organized and existing under the laws of the State of Delaware, 14 Del.C. §9101 et.seq.

### JURISDICTION

4.    This Court has jurisdiction over this matter in that it is brought pursuant to the provisions of 28 U.S.C. §§1331, 1332 and 1343(a)(3)(4), 28 U.S.C. §§2201 and 2202, as well as the Fourteenth Amendment of the United States Constitution.

5.    Venue in this Court is predicated by the provisions of 28 U.S.C. §1391(b)(c).



DEPOSITION EXHIBIT 8
Johnson 8
2-28-0006
PENGAD 800-631-6989

B1

## FACTUAL BACKGROUND

6.    The plaintiff, Marguerite A. Johnson (hereinafter referred to as "Johnson") holds a Doctorate in Education Degree from Temple University, and at all times relevant herein, was employed as the Campus Director for the Terry Campus of the defendant Delaware Technical and Community College, in Kent County, Delaware.

7.    Dr. Johnson was originally hired by Delaware Technical and Community College in 1970 as a GED Instructor at the Northern Branch, and was promoted in 1973 as Acting Assistant Director of Continuing Education.

8.    By 1979 Johnson became the Acting Director of Continuing Education at the Stanton Campus of Delaware Technical and Community College.

9.    By October 1979 Dr. Johnson was promoted to the position of Director of Continuing Education at the Stanton/Wilmington Campus of Delaware Technical and Community College, a position she continued to hold until December 1992.

10.    In January 1993, Johnson was promoted and made Executive Dean of Instruction of Student Services for the Terry Campus, Office of the President Kent County, of Delaware Technical and Community College.

11.    In 1994, the Board of Directors of Delaware Technical and Community College, pursuant to the provisions of 14 Del.C. §9105 approved Johnson's appointment as Vice-President and Campus Director of the Terry Campus, Kent County, Delaware Technical and Community College.

12.    In September 1996, as a part of the evaluation process of the plaintiff's performance in her position as vice-president and campus director for the Terry Campus, her contributions were described as "invaluable", while she was commended

B2

for placing the Terry Campus in a sound financial condition and thanked for the support that she had offered to the president of that institution.

13. In September 1997, in reviewing the plaintiff's performance during the preceding school year, she was commended for promoting the image of the Delaware Technical and Community Campus, located in Kent County, and for helping make that campus a "major force for positive change for Kent Countians". Further, her leadership was described as very effective, and she was commended for her inclusive planning processes.

14. In 1998 the plaintiff's job performance was characterized as outstanding, which permitted the Terry campus to reach new heights of effectiveness.

15. For the years 1999, 2000 and 2001, the plaintiff's performance as Vice-President and Campus Director for the Terry Campus was credited as permitting the "...Terry Campus to reach new heights of effectiveness..." which "...has positioned the Terry Campus as a positive can do force for quality education and training in Kent County".

16. In September 2002 Johnson's efforts resulted in "special commendation for your leadership and providing additional programs for the community, increasing legislative support of the campus, your involvement in the Kent County community and your tireless support of the President.".

17. In September 2003 the plaintiff's efforts were recognized with a "special commendation for (her) leadership of the Middle State's effort leading to full accreditation ...increased record enrollment growth (and) involvement in the Kent County community."; as well as her tireless support of the President.

18.    Most recently, in September 2004 Johnson's efforts on behalf of Delaware Technical and Community College were given "special commendation for (her) leadership in significantly enhancing the programs available to the Kent County community and (her) successful leadership in tying together the involvement of the campus community, students, faculty & staff with the community at large..." as well as her support and leadership between various divisions of the college.

19.    For each year since her appointment as Vice-President and Director of the Terry Campus, of Delaware Technical and Community College, the plaintiff has received merit increases in salary.

20.    Delaware Technical and Community College, in order to acquaint full time employees with its policies and regulations has promulgated an "Administrator's Personnel Handbook." The provisions of the "Administrator's Personnel Handbook" have been by custom and practice given the employees of Delaware Technical and Community College a reasonable expectancy in certain policies and procedures.

21.    The Administrator's Personnel Handbook, provides that the employment of the position of Vice-President, Campus Director requires the approval of the Board of Trustees.

22.    Section XI, of the Administrator's Personnel Handbook provides that members of the faculty of Delaware Technical and Community College should be free from college censorship or discipline.

23.    The provisions of the Administrator's Personnel Handbook provide for a means of discipline, Section XII, and grievances, Section XIII, to be utilized in the event that an employee is suspended or otherwise disciplined.

24.    During the course of the plaintiff's employment by the defendant, Delaware Technical and Community College, the defendant, George has on repeated occasions demonstrated a history of giving credence to and using anonymous comments made concerning Johnson as a means of managing and disciplining the plaintiff.

25.    On November 19, 2004, a meeting was held at the Terry Campus of Delaware Technical and Community College for Departmental Chairs and administrators to discuss reorganization of the college's technical network.

26.    During the course of the meeting of November 19, 2004 at the Terry Campus of Delaware Technical and Community College as described in ¶25, the plaintiff, in an effort to assist the day-to-day management of the Terry Campus, for which she had responsibility as Vice-President and Campus Director, made inquiries as to how the reorganization system would operate and asked for various explanations. Such comments were made in a non-disruptive manner and were matters of public concern to the public at large and specifically to the Terry Campus community.

27.    Nineteen (19) days after the meeting of November 19, referenced in ¶26, on December 8, 2004 the defendant George forwarded correspondence to Johnson accusing Johnson of improper public comments, which were "antagonistic" and "inconsistent of what can be expected of a Vice-President and Campus Director" describing her comments as "creating a negative attitude". Dr. Johnson's comments were further described as being subversive and undermining moral as well as constituting insubordination.

28.    The letter of December 8, 2004 from the defendant George to the plaintiff, directed Johnson to report to the defendant George's office the following day to discuss her alleged inappropriate behavior.

29.    On December 9, 2004, the plaintiff requested to meet with the defendant George, during which time the defendant George told Johnson that she had one of two choices, to either voluntarily retire, or that she would be placed on administrative leave while her colleagues and staff were interrogated.

30.    Shortly following the meeting of December 9, 2004, on December 13, 2004, the plaintiff was hospitalized with chest pains and shortness of breath.

31.    Thereafter, Johnson responded to the meeting with the defendant, George of December 10, 2004 by a letter dated January 3, 2005 in which it was confirmed that the matters that she brought up during the meeting of November 19, 2004 were matters of public concern surrounding the nature and extent of the reorganization of the Terry Campus, for which she had administrative responsibilities as Vice-President and Director of the Terry Campus. Johnson reiterated the statements that were made in a non-disruptive manner.

32.    In Johnson's letter of January 3, 2005 to George in response to the December 10, 2004 meeting she requested the opportunity, that if she was going to be disciplined. to proceed with the grievance procedures as outlined in Section 12.01 of the "Delaware Technical and Community College Administrator's Personnel Handbook".

33.    Immediately following receipt of the letter by George of Johnson's January 3, 2005 letter, and the meeting with her that same day, defendant George in retaliation for the public comments made during the November 19, 2004 meeting, issued a memo

to Johnson, which placed Johnson on administrative leave "...until further notice". Johnson was verbally informed to remove all of her personal belongings from her office.

34.    At the same time as Johnson was placed on administrative leave, she was admonished not to visit any college facility, nor to participate in any college function, either on or off campus.

35.    When Johnson was placed on administrative leave, she was directed that she was not to discuss any investigation that the college was going to conduct of her, not only with present employees, but not to discuss it with even former employees of Delaware Technical and Community College.

36.    On January 4, 2005 a public announcement was made to the community at large that Johnson had been placed on administrative leave and that a replacement had been appointed to Acting Assistant Campus Director of the Terry Campus, and that replacement was to have "...full administrative responsibility for the Terry Campus". The authority previously possessed by Johnson.

37.    Shortly after the issuance of the public announcement of January 4, 2005, that Johnson was being placed on administrative leave, some furniture from her office was removed in order that her replacement could occupy her office.

38.    As a result of the actions of the defendants, in removing the plaintiff from her position as Vice-President and Campus Director of the Terry Campus, members of the public have expressed to her concern, evidencing a belief that she is guilty of wrongful or improper conduct or other unprofessional or inappropriate conduct, incompatible with her position as Vice-President and Direct of Terry Campus.

39.    On March 16, 2005, the plaintiff, by and through her attorney provided to the defendant a copy of a draft complaint, which the plaintiff proposed to file.

40.    Thereafter, on March 23, 2005 the defendant caused to be provided to all "Delaware Tech Employees" an announcement that an investigation was to be conducted concerning the plaintiff, and that all employees were to cooperate with the investigation.

41.    The purpose of the investigation was the coerced interrogation of all Delaware Tech employees at the Terry Campus, in Dover, Delaware, to elicit damaging information concerning the plaintiff, in order to orchestrate the termination of the plaintiff's employment.

42.    The plaintiff, by reason of the contractual terms of the written contract between the plaintiff and Delaware Tech, had employment, which could be terminated only for good cause, and such good cause was to be supported by affidavits.

43.    On April 27, 2005, the defendant caused Delaware Tech to issue a "Notice of Intent to Terminate Employment" of the plaintiff.

44.    Transmitted with the in the Notice of Intent to Terminate Employment, were specially drafted rules of what was purported to be a termination procedure for a hearing in order to effectuate the termination of the plaintiff, drafted solely for the use in terminating the plaintiff.

45.    Prior to the conducting of such termination hearing, the plaintiff was instructed to have no contact with any potential witness, thus being prevented from preparing for or interviewing any potential witnesses concerning the termination proceeding.

46.    At the same time the plaintiff was being prevented from having any discussions with or interviewing any potential witnesses, the defendant, and the administration of Delaware Tech regularly and uniformly met on many occasions with witnesses in order to interrogate such witnesses, and to mold their testimony for the termination hearing.

47.    The plaintiff did not have the power or means to compel the attendance of any witnesses at the hearing.

48.    The defendants did not supply to the plaintiff the contractually required affidavits in a timely fashion, until immediately prior to the termination hearing.

49.    Given the fact that the defendant made a general announcement that the plaintiff had been placed on administrative leave, and that employees at Delaware Tech were pressured into making critical comments of the plaintiff, the plaintiff requested the defendant to announce that no Delaware Tech employee would be subject to retaliation for testifying at the hearing.

50.    Despite the request by the plaintiff for guarantees that witnesses would not suffer any retaliation for testifying on her behalf at the hearing, the defendant, and the administration of Delaware Tech refused to provide any such guarantees, until only immediately prior to the hearing, when, at which time, for practical purposes such guarantees were meaningless and of no use, resulting in the plaintiff being unable to present adequate testimony on her behalf.

51.    The plaintiff has been denied any right to contest, appeal or grieve her suspension, or termination.

52.    That as a direct and proximate result of the actions of the defendant, the plaintiff has undergone great suffering pain and mental anguish.

53.    That as further direct and proximate result of the wrongful conduct of the defendant, the plaintiff has been forced to expend, and may in the future be forced to expend great sums of money for medical treatment.

54.    As a further direct proximate result of the actions of the defendant, the plaintiff has suffered injury to her professional reputation and future earning capacity.

55.    As a result of the investigation, pressure on witnesses, the denial of the plaintiff to have access to the witnesses prior to the hearing, and the delay in producing the required affidavits, all proceeding the hearing, which ultimately resulted in the termination of the plaintiff's employment with Delaware Technical & Community College.

## COUNT I

### Free Speech Clause

56.    The plaintiff incorporates herein and makes a part hereof the allegations contained in paragraphs 1 though 55.

57.    The individual defendant took action adverse to the plaintiff, as a direct and proximate result of retaliation for plaintiff's First Amendment protected speech on matters of public concern.  There is a demonstrated and admitted causal relationship between plaintiff's aforementioned protected speech and the adverse employment action consisting of suspension from her job duties, and the subsequent denial of a grievance procedure.  Thus the First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

58.    The actions by the defendant, in causing a coerced investigation to be conducted concerning the plaintiff, and in conducting a termination hearing, without providing equal access to employees and witnesses to the plaintiff as had by the defendant and Delaware Tech, all for the purpose of engineering the termination of the plaintiff, were in further retaliation for the plaintiff's exercising of her First Amendment Rights of Protected Speech, and the plaintiff's refusal to submit to discipline and to resign as a result of the defendant's displeasure over the exercise of such rights.

59.    The individual defendant cannot prove by a preponderance of the evidence that absent a Constitutional violation they would have grounds to discipline the plaintiff while at the same time denying the plaintiff a grievance procedure.

60.    Plaintiff's Constitutional right of free speech has been denied under the First Amendment of the United States Constitution and 42 U.S.C. §1983.

## COUNT II

### Procedural Due Process

61.    The plaintiff incorporates herein and makes a part hereof the allegations contained paragraphs 1 through 60.

62.    The plaintiff, by rule, regulation, by policy custom and practice, had a reasonable expectancy for a protected property interest a disciplinary process, which included but was not limited to a written notice of discipline and a right to proceed with a grievance procedure after the application of any discipline.

63.    The plaintiff was deprived of her protected property interest, in that she was not provided sworn affidavits outlining the basis of her termination reasonably prior

B11

to any termination hearing, which was guaranteed to her by the policy manuals of Delaware Technical & Community College.

64.    The plaintiff was deprived of further due process by the denial of her access to the right to speak with potential witnesses prior to any termination hearing, while at the same time the defendant, and Delaware Technical & Community College had complete and continual access and preparation of such witnesses for testimony at the termination hearing.

65.    The plaintiff was deprived of her protected property interest in the disciplinary process and was placed on administrative leave with out recourse, without a hearing, and without the right to a grievance procedure.

66.    The actions of placing the plaintiff on administrative leave, which constituted disciplinary action, without providing appropriate notice and/or grievance procedure, denied the plaintiff a property interest so as to violate her constitutional right to due process of law under the due process clause under the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. §1983.

## COUNT III

### Procedural Due Process- Liberty Interest

67.    The plaintiff incorporates herein and makes a part hereof the allegations contained paragraphs 1 through 66.

68.    Plaintiff was a full time employee of Delaware Technical and Community College, who could not, by policy, regulation, custom, and practice be disciplined without due process and a grievance procedure.

69.    As set out more fully in Count I, the defendants violated the plaintiff's rights and denied her the due process rights to which she was entitled.

70.    In denying the plaintiff her due process rights, the defendants have distinguished the rights and status guaranteed to the plaintiff by State and/or Federal Law.

71.    The actions of the defendants were committed under the color of law.

72.    The actions of the defendants have damaged the plaintiff in both her professional and personal reputation therefore denying her a property interest in her employment and damaging her protected liberty interest.

73.    The actions of the defendants have created such a stigma, which will deprive the plaintiff of her present employment, and will limit the possibility of future employment by other employers in her field as an educational administrator.

74.    The actions of the defendant George, may seriously damage her reputation and associations in the community by creating an implied impression that she was guilty of either dishonesty, immoral or other wrongful conduct.

WHEREFORE, the plaintiff requests this Court to:

a.    Enter a judgment against the defendants.

b.    Enter a declaratory judgment declaring that the acts of the individual defendant were a violation of the plaintiff's Constitutional rights.

c.    Enter a judgment against the individual defendant for nominal or presumed damages.

d.    Enter a judgment against the individual defendant for compensatory damages, including any lost wages, or future or front pay, pain, suffering, humiliation, embarrassment, injury to reputation, and other personal injuries.

e.    Enter a judgment against the individual defendant for punitive damages.

f.    Award the plaintiff costs, interest and attorney fees for this lawsuit.

g.    Issue a mandatory injunction directing that the individual defendant restore the plaintiff to her position.

h.    Issue a permanent injunction directing the individual defendant to

1.    Notify each and every person who learned of the defendants treatment of the plaintiff, that the individual defendant's conduct was illegal and wrongful, and;

2.    Expunge plaintiff's personnel file of any derogatory information relating to the allegations contained in this complaint.

3.    Enjoin the individual defendant and his successors from retaliating against the plaintiff now or in the future.

i.    Require such other and further relief as this Court deems just and proper under the circumstances.

ABER, GOLDLUST, BAKER & OVER

/s/ Gary W. Aber
GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE 19899
302-472-4900
Attorney for Plaintiff

DATED: September 16, 2005

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of the attached pleading was served via electronic mail on September 16, 2005 to the following counsel:

David H. Williams, Esquire
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899

_____/s/ Melissa A. Chionchio_____
Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-157-KAJ |
| | ) | |
| ORLANDO J. GEORGE, JR., in both his | ) | Trial By Jury Demanded |
| official and personal capacities, and | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO
## PLAINTIFF'S SUPPLEMENTAL COMPLAINT

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted that Plaintiff Marguerite A. Johnson ("Johnson") alleges this Court has jurisdiction pursuant to the statutory and constitutional authority cited in paragraph 4 of the Complaint.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Denied; except admitted the September, 1996 evaluation speaks for itself.

13.     Denied; except admitted the September, 1997 evaluation speaks for itself, and that Johnson quotes a portion of the 1997 evaluation.

14.     Denied; except admitted the 1998 evaluation speaks for itself.

15.     Denied; except admitted the 1999, 2000 and 2001 evaluations speak for themselves, and that Johnson quotes a portion of one of the evaluations.

16.     Denied; except admitted the September, 2002 evaluation speaks for itself, and that Johnson quotes a portion of the 2002 evaluation.

17.     Denied; except admitted the September, 2003 evaluation speaks for itself, and that Johnson quotes a portion of the 2003 evaluation.

18.     Denied; except admitted the September, 2004 evaluation speaks for itself, and that Johnson quotes a portion of the 2004 evaluation.

19.     Denied; except admitted that since her appointment as Vice President and Director of the Terry Campus of the Delaware Technical and Community College ("the College), Johnson has received the same salary increases received by other employees, and has received bonuses.

20.     Denied; except admitted the College promulgated an "Administrator's Personnel Handbook", and that the Administrator's Personnel Handbook speaks for itself.

21.     Admitted.

22.     Denied; except admitted that Section XI of the Administrator's Personnel Handbook speaks for itself.

23.     Denied; except admitted that Sections XII and XIII of the Administrator's Personnel Handbook speak for themselves.

24.     Denied; except admitted that on two occasions Dr. Orlando J. George, Jr. ("George") spoke to Johnson about anonymous comments he received concerning Johnson.

25.     Admitted.

26.     Denied; except admitted that during the course of the November 19, 2004 meeting at the Terry Campus Peter Shoudy, CTO for the College explained, and answered questions about, the IT reorganization previously unanimously approved by the President's Council; that Johnson asked a series of questions in an antagonistic tone raising doubts about Johnson's support of Shoudy and the IT reorganization, and exhibiting a lack of understanding of the IT reorganization.

27.     Denied; except admitted the December 8, 2004 letter to Dr. Johnson speaks for itself.

28.     Admitted.

29.     Denied; except admitted that Johnson met with George on December 9, 2004, and that she was offered the option of either voluntarily retiring or being placed on paid administrative leave in order to afford the College the opportunity to conduct an independent investigation.

30.     The Defendants are without sufficient information to affirm or deny the allegations of paragraph 30.

31.     Denied; except admitted that Johnson's January 3, 2005 letter to George speaks for itself.

32.     Denied; except admitted that Johnson's January 3, 2005 letter to George speaks for itself.

33.     Denied; except admitted George placed Johnson on paid administrative leave effective January 3, 2005, and Johnson was afforded the opportunity to remove personal belongings from her office.

34.     Denied; except admitted the notice of placement on paid administrative leave provided to Johnson speaks for itself.

35.     Denied; except admitted the notice of placement on paid administrative leave provided to Johnson speaks for itself.

36.     Denied; except admitted that on January 4, 2005, the announcement attached to this Answer as Exhibit A was provided to employees of the College, and that the announcement speaks for itself.

37.     Admitted.,

38.     Defendants are without information sufficient to affirm or deny the allegations in paragraph 38 of the Complaint.

39.     Denied; except admitted Johnson, through her attorney, provided the Defendants a copy of the draft complaint on February 16, 2005.

40.     Denied.

41.     Denied.

42.     Denied; except admitted that Johnson's employment agreement speaks for itself.

43.     Denied; except admitted that by letter dated April 27, 2005, counsel for the College provided Johnson's counsel with notice of intent to terminate.

44.     Denied; except admitted that Rules of Procedure for the Conduct of Termination Proceedings Involving a Vice President and Campus Director were attached to the

April 27, 2005 Notice of Intent to Terminate, and that such Rules of Procedure were drafted for the conduct of the Johnson's termination proceeding, as well as any future termination proceedings for a Vice President and Campus Director.

45.    Denied; except admitted that the January 3, 2005 memorandum from George to Johnson speaks for itself.

46.    Denied; except admitted that independent investigators retained by the College met with witnesses in connection with the investigation of Johnson's misconduct, as well as preparation for the termination hearing.

47.    Denied; except admitted that Johnson's counsel did not have subpoena power. By way of further answer, the College offered to make every reasonable effort to secure the cooperation of employee/witnesses, and to secure the appearance of such individuals at the hearing.

48.    Denied; except that paragraph 3(c)(ii) of Johnson's employment agreement speaks for itself. By way of further answer, the Notice of Intention to Terminate Johnson included a copy of the detailed forensic audit conducted by SantoraBaffone dated April 12, 2005; Johnson's counsel had access to the work product of SantoraBaffone in advance of the termination hearing; and the provision in Johnson's employment agreement providing for the affidavits of employees was drafted, and the agreement was signed, at a time when the College's procedures for the conduct of pretermination hearings provided that the administration was not obligated to produce witnesses, or be subject to the cross-examination.

49.    Denied; except admitted the January 4, 2005 announcement reported that Johnson was on administrative leave, and Johnson requested that the College make a public announcement that no College employee would be subjected to retaliation for testifying at the

hearing. By way of further answer, the College offered to provide any prospective witnesses with a letter from the President offering assurances that there will be no retaliation for testifying at the hearing.

50.    Denied.

51.    Denied that Johnson's paid administrative leave pending the completion of an investigation constituted a suspension, and denied Johnson was not afforded the right to contest the termination of her employment..

52.    Denied that Defendants engaged in any wrongful action. The Defendants are without sufficient information to affirm or deny the allegations of paragraph 52 concerning Dr. Johnson's allegations of suffering pain and mental anguish.

53.    Denied that Defendants engaged in wrongful conduct. The Defendants are without sufficient information to affirm or deny the allegation Johnson has expended great sums of money for medical treatment.

54.    Denied.

55.    Denied; except admitted the termination of Plaintiff's employment resulted from the investigation and the conduct of a pretermination hearing which satisfied, and exceeded, all of the requirements of the due process clause.

## COUNT I

56.    The responses to paragraphs 1 through 55 are incorporated by reference.

57.    Denied.

58.    Denied.

59.    Denied there was a Constitutional violation.    Denied the individual defendant has the burden of proof. Denied there are not grounds to terminate Johnson.

60.  Denied.

## COUNT II

61.  The responses to paragraphs 1 through 60 are incorporated by reference.

62.  Denied the placement of Johnson on paid administrative leave pending the completion of an investigation constituted discipline or the deprivation of a property interest. Admitted Johnson had a protected property interest in the pre-termination hearing which satisfied all of the requirements of the Due Process clause

63.  The allegations of paragraph 63 set forth a legal conclusion as to which no responsive pleading is required.

64.  The allegations of paragraph 64 set forth a legal conclusion as to which no responsive pleading is required.

65.  Denied the placement of Johnson on paid administrative leave pending the completion of an investigation constituted discipline or deprived her of a protected property interest.

66.  Denied.

## COUNT III

67.  The responses to paragraphs 1 through 66 are incorporated by reference.

68.  Denied the placement of Johnson on paid administrative leave constituted discipline.  Admitted Johnson had due process rights prior to the termination of her employment.

69.  Denied.

70.  Denied Johnson was deprived of her due process rights

71.  Denied that the Defendants have violated any of Johnson's rights.

72.  Denied.

7

73.    Denied.

74.    Denied.

## FIRST ADDITIONAL DEFENSE

75.    The Defendants move to dismiss the Complaint on the grounds that Johnson fails to state a claim upon which relief can be granted.

## SECOND ADDITIONAL DEFENSE

76.    Defendant George moves to dismiss the claims against him in his personal capacity on the grounds that the Complaint fails to state a claim upon which relief can be granted against him in his personal capacity.

## THIRD ADDITIONAL DEFENSE

77.    The claims against Defendant George in his personal capacity are barred by the doctrine of official immunity.

## FOURTH ADDITIONAL DEFENSE

78.    Johnson is not entitled to injunctive relief because she has an adequate remedy of law.

## FIFTH ADDITIONAL DEFENSE

79.    The claims against the College and George in his official capacity are barred by the Eleventh Amendment and the doctrine of sovereign immunity.

## SIXTH ADDITIONAL DEFENSE

80.    The Court lacks subject matter jurisdiction over Johnson's claims in whole or in part.

## SEVENTH ADDITIONAL DEFENSE

81.    Johnson did, or with reasonable effort could have, mitigated her damages in whole or in part.

WHEREFORE, the Defendants request that the Complaint be dismissed with all costs and fees assessed against Johnson.

## COUNTERCLAIM OF
## DELAWARE TECHNICAL AND COMMUNITY COLLEGE

82.    On January 3, 2005, Johnson was placed on administrative leave pending an investigation involving her pattern of behavior over the past several years.

83.    During her tenure as Vice-President and Campus Director of the Terry Campus, Johnson was inappropriately abusive to many employees who worked under her supervision.  This abusive treatment served to fraudulently conceal Johnson's misconduct by creating an atmosphere thwarting employees from questioning or reporting Johnson's misconduct.

84.    After Johnson was placed on paid administrative leave in January, 2005, Terry Campus employees came forward to report Johnson's improper use of College personnel and resources for Johnson's personal purposes.

85.    At that point, the investigation of Johnson's pattern of behavior was placed on hold, and the college retained SantoraBaffone CPA Group to conduct a forensic audit of the activities of Johnson reported by College employees.

86.    The forensic audit resulted in the April 12, 2005 Report of SantoraBaffone attached as Exhibit A.

87.    On April 27, 2005, the College issued a notice of intent to terminate Johnson for the reasons set forth in the April 12, 2005 Report.

88.     The notice of intent to terminate resulted in a two day termination hearing on June 29 and July 1, 2005.

89.     On July 19, 2005, Vincent A. Bifferato, the Hearing Officer designated by the College, issued his decision concluding the College sustained its burden of establishing the facts set forth on pages 2 through 4 of the July 19, 2005 decision, a copy of which is attached as Exhibit B, and incorporated herein by reference.

90.     The College seeks restitution for the following amounts:

(a)     $23,422 for the time Kathy Powell devoted to working on Johnson's personal matters during business hours;

(b)     $6,097 representing a conservative estimate of the cost of College personnel and College material costs devoted to Johnson's 1999 family reunion;

(c)     $80 for the purchase of jewelry with a College credit card from Three Castle Antiques Shop in October, 2002;

(d)     $371 for the purchase of antique books with a College credit card from the Three Castle Antiques Shop in October, 2002;

(e)     $2,851 representing the costs, including the value of Johnson's salary for 3 days, of Johnson's trip to Raleigh, North Carolina in October, 2002 for personal purposes, but charged to the College as a business expense.

WHEREFORE, the College requests the Court enter judgment against Johnson in the amount of $32,821, together with interest.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP


_David H. Williams_

David H. Williams (#616)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
dwilliams@morrisjames.com
Attorneys for Defendants

Dated:   September 29, 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-157-KAJ |
| | ) | |
| ORLANDO J. GEORGE, JR., in both his | ) | Trial By Jury Demanded |
| official and personal capacities, and | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, David H. Williams, hereby certify that on September 29, 2005, I electronically filed the attached **DEFENDANTS' ANSWER TO PLAINTIFF'S SUPPLEMENTAL COMPLAINT** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Gary W. Aber, Esquire
> Aber, Goldlust, Baker & Over
> 702 King Street, Suite 600
> Wilmington, DE 19899-1675

David H. Williams (#616) (dwilliams@morrisjames.com)
Jennifer L. Brierley (#4075) (jbrierley@morrisjames.com)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900/6848

Dated: September 29, 2005

DHW/007409-0131/1173039/1

**Marguerite A. Johnson**
1022 Quail Run
Camden Wyoming, DE 19934
(302) 698-1626 (H)
johnsogs@comcast.net

## SUMMARY OF QUALIFICATIONS

- 35 years of teaching and administration in adult, vocational, and community college education as well as workforce development
- Proven leader in all aspects of community college operations: customer service, curriculum development, student services, human resources, fiscal management, facilities planning, and fundraising
- A creative visionary, equally comfortable collaborating in a team effort, working independently or directing others
- Excellent problem solver: able to make unpopular but essential decisions
- Ability to effectively communicate and relate to a diverse population in a multi-cultural environment

## PROFESSIONAL EXPERIENCE
Delaware Technical and Community College, 1970-2005

**Vice President and Campus Director, Terry Campus, Dover, DE,**
**February 1994 - July 2005**

- Provided leadership for the overall direction and management of the Campus encompassing all instructional, financial, administrative, operational, fundraising, and community outreach in concert with the mission and goals of the college; reported directly to the President
- Guided the campus back to fiscal solvency increasing revenues more than 5% annually
- Received successful annual state and federal audits of campus funds "with no findings or recommendations"
- Established a Corporate and Continuing Education Center which houses a video conferencing room and meeting facilities
- Worked with architects to develop a campus facilities master plan which included a major building renovation project
- Created a positive image of the campus in the community which reflected quality programming and a commitment to excellence
- Developed a customer service driven campus
- Worked with staff to increase unduplicated student enrollment 66% over the past 10 years
- Provided leadership for the successful implementation of an institutional strategic planning process, accountability in budget planning, and a campus re-accreditation in 2003
- Increased legislative support of campus initiatives
- Developed local and national partnerships which funded innovative programs; HTV (Homework on Television), PEAK ( Program of Educational Alternatives in Kent


DEPOSITION
EXHIBIT
Johnson 10
228 06KT
PENGAD 800-631-6989

County) and WHEELS, (a mobilized bus equipped with computers used to provide on site training for business, industry and community organizations)
- Spearheaded a successful fundraiser, "Gourmet Gala" which raised $100,000 for student scholarships, October, 2004

**Executive Dean of Instruction and Student Services, Office of the President, January 1993 – January, 1994**

- Served in a staff capacity to the President by performing a variety of professional and administrative duties related to Instruction, Student Services, Libraries, and Information technology
- Assisted in the planning, development, and implementation of board policies, operational procedures, and strategies for achieving college goals and objectives in accordance with the college mission
- Provided leadership for coordination of college-wide programs
- Worked closely with college deans to convert from a quarter to a semester term
- Provided Leadership for the development of the College-wide Diversity Plan

**Director of Continuing Education, Stanton/Wilmington Campus, July 1979 - December 1992**

- Managed all aspects of two (2) campus locations to include monitoring 400 continuing education adjunct faculty, implemented statewide programs, provided support services for evening and weekend students
- Planned, developed and implemented credit and non-credit courses and certificate programs
- Worked with business and industry to customize programs for their employees
- Established a satellite campus

**Director of Continuing Education, Stanton Campus, March 1979 - June 1992**

- Managed all aspects of a comprehensive continuing education division
- Provided leadership for workforce development programs
- Expanded credit and non-credit courses for evening and weekend programs
- Established and facilitated a mentoring program for minority students

**Assistant Director of Continuing Education, Stanton Campus, September 1973 - February 1979**

- Supervised adjunct faculty, professional and support staff
- Refined and revised non-credit curriculum
- Advised and registered students for credit and non-credit courses
- Prepared quarterly financial reports
- Worked with the marketing staff to design and develop course schedules
- Served as chief examiner for the GED testing center

**GED/Basic Skills Instructor, Northern Branch,**
**August 1970 – January 1973**

- Taught GED/Basic Skills courses

### Education

- Temple University, Ed.D., Vocational Education
- Indiana University of Pennsylvania, M.A., Adult Education
- Morgan State College, B.A., Sociology

### Honors

- Graduated Cum Laude from Morgan State College, 1970, Indiana University of Pennsylvania, 1979, and Temple University, 1987
- Morgan State College Irene Diggs Award for Excellence in Sociology; Honors program; Trustee Scholarship recipient; Alpha Kappa Mu Honor Society, 1970
- Participant, Professional Development Program for Executive Level Administrators in Two Year Colleges, sponsored by the National Institute for Development, 1989
- Kellogg Fellow, "Expanding Leadership Opportunities for Minorities in Community Colleges, sponsored by League of Innovations and Kellogg Foundation, 1989-1990
- Participant, Kaleidoscope Konnections Professional Development for Black and Hispanic Women in Higher Education, sponsored by The American Association of Women in Community Colleges, 1991
- Special Service Award, Brandywine Professional Association, 1991
- Delaware Today Magazine, selected as One of the Successful, High Profile People to Watch in 1995
- Super Stars in Education Award, Delaware State Chamber of Commerce, 1995
- Phi Delta Kappa Educational Fraternity, 1996 - Present
- Appointed to the Commission on Diversity and Inclusion for the American Association of Community Colleges for a 3 year term, 2000-2003
- Honoree, "Women Educators Leading the Way in Education and Training", Delaware's 8[th] Annual International Women's Day Celebration, 2002
- Service Award, Association of Black Women in Higher Education, Philadelphia Area Chapter, 2003
- Award for Educational Leadership, sponsored by National Council on Black American Affairs and Morgan State University Community College Doctoral Program, 2005

### PUBLICATIONS

Dissertation, "The Perceptions of Community College Administrators and Industrial Managers Concerning Factors that Potentially Facilitate or Impede the Implementation of Exemplary Partnerships", 1987, University Microfilm International

Article: "A Survey of Factors Affecting Workplace Performance and Career Advancement of Black Women Administrators in Middle and Upper Level Management Positions in Community Colleges, Summary of Findings", published in the NCBAA/AACJC Northeast Region Fall/Winter 1991-1992 Newsletter and in ERIC Clearinghouse for Junior Colleges

Article: "Student Goals Analysis as an Outcome Assessment", Community Service Catalyst, NCCSCE/AACJC, 1992

## PROFESSIONAL ACTIVITIES

Member, American Association of Women in Community Colleges, 1973 - 2004
Panelist, "Power Influence and Authority: The Professional and Personal Experiences of Female Leaders", Temple University, Philadelphia, PA, 1988
Chairperson, Stanton/Wilmington Campus Cultural Diversity Committee, 1990-1993
Evaluator, New Jersey Challenge Grant, 1991
Panelist, Leadership 2000, League for Innovation, Chicago, Il, "Issues Facing Black Female Administrators in Community Colleges: Male Responses," 1991
Evaluator, Middle States Association Accreditation Teams, 1991 – 1993
Panelist, Mid-Life Women's Roundtable, Delaware Commission for Women, 1992
External Accreditation Reviewer, Middle States Association 1995 – 1998
Member, Institutional Review Board, Human Protection Committee, Delaware State University, 1998 - 2004
Member, Partnership Team, National Conference on Teacher Quality, U.S. Department of Education, 2002
Panelist, "Governance and Decision Making", Delaware Technical and Community College Leadership Development Classes, 2000 - 2004
Mentor, Delaware Technical and Community College Leadership Development Program, 1997 – 2004

## OTHER ACTIVITIES

Member, Agenda for Delaware Women, 1993 - 2004
Board Member, City of Dover, DE, Executive Advisory Committee, 1998
Chair, Fundraising Committee, Delaware Women's Conference Board of Directors, 1998
Board Member, Swartz Center for the Arts, Dover, DE 1998 – 2002
Member, Women Networking in Southern Delaware, 1998 – 2004
Participant, Delaware State Chamber of Commerce, Principle for a Day Program, 1999 and 2004
Presenter, "Women and Careers in Education, Shortlidge Elementary School, Wilmington, DE, 2000
Board Member, Greater Dover Boys and Girls Club, 2001 -2004
Co-Chair, Kent County Heart Association, Walk-A-Thon, Dover, DE, 2000
Participant, Business Industrial Education Program, "What's My Line", Dover, DE, 2000 – 2004

## CURRENT MEMBERSHIPS AND AFFLIATIONS

Charter Member, Downtown Rotary
Board Member, Central Delaware Chamber of Commerce
Member, Central Delaware Economic Development Council
Vice President of Operations, Hope Foundation of Delaware Board of Directors
Member, Kent County Go Red Committee, American Heart Association
Tutor, Academy of Dover Charter School, Inc.


DEPOSITION
EXHIBIT
Spampinato
1-19-06 Kf

**Department Chair Meeting**
**November 19, 2004**
**Minutes**

Attendees: C. Spampinato, J. Buckley, C. Miri, K. Bates, P. Prouse, J. Peck, L. Cooper, K. Cuthrell, Z. Royston, L. Link, C. Spranklin R. Pleasanton, R. Yanos

Absentees: A. Pierce

Guests: Linda Fantini and Peter Shoudy

Invitations were extended to Deans and Directors interested in hearing Mr. Shoudy's presentation of the IT reorganization. Attendees were: Dr. Johnson, Dr. Houghtaling, and Shelby Crawford.

**Holiday Work Schedule**
If you need to get on campus during the Christmas break, you need prior approval. Send Bill Ayres an email and copy the dean.

**SLOA Memo**
A thank you and update memo which was just approved at yesterday's DOI meeting was distributed. It will be going out to all DCs collegewide. Please pay attention to this memo. The success of our SLOA assessments is vital to the accreditation of the college. When you submit the name of the collegewide point of contact for your plan to Kim Holston, please copy the dean and Debbie St. Jean.

**Master Schedule**
Due dates for summer and fall master schedules are approaching. A timeline was distributed. Please try to offer more Friday sections.

**LCD Projectors**
A few LCD projectors have arrived. If you requested one in your budget, please contact Randy.

**Recruitment Opportunity**
Since there was such short notice, Connie and Lauretta decided to use the next DC meeting time (Dec. 3) for the Smyrna Middle School project. Smyrna middle school 8th graders will spend 10 minutes with each DC in a round table discussion to learn about career opportunities. A hands-on activity is suggested to keep the children interested. Get the name of the occupation you will focus on to Ron by Monday and he will create caricatures. We will need to leave here at 8:00 to be there by 8:30 and ready for the children at 9:00.

**Other Hand-outs**
- Connie distributed a copy of a Human Services check-off sheet, which includes CCCs and PGCs and a disclosure statement.
- Another sheet with an advisory statement was distributed. This statement has been approved collegewide and will be shared with students on the Web. We are being

asked to also share this with students at the time of academic advisement. Please include this statement on your check-off sheets.

- A draft of an adjunct instructor classification spec was also distributed. LDA and No-Show rosters will be included in #3 under Principal Accountabilities. Provide any feedback to the dean by next Wednesday (Nov. 24).

**Academic Standing Action Plan**
Everyone on campus approved the draft form created by Les Link and his committee, but the Deans of Instruction seem to think this is a collegewide form. Connie will provide an update when available.

**Essential Functions**
Essential functions need to be developed for all programs. Connie has a book from the Owens campus if you want to review it for guidance and/or ideas.

**Faculty Grants**
Faculty grants for about $1000 each are available for various projects. You need to fill out a one-page grant application, which will be coming out shortly. The first deadline is coming up on December 1.

**LDA Rosters**
There were still problems even after our discussion at the last meeting. This is a federal guideline to be followed, not a campus rule. Please do whatever you must to have these rosters in by the due date.

**CAPP**
Linda Fantini discussed the CAPP process and distributed some hand-outs showing how your forms should look when turned in to Academic Affairs. Ron asked Linda for a check sheet so that we can be sure we have followed all required steps in the process.

**IT Re-organization**
Peter Shoudy joined the meeting to discuss the changes to the collegewide IT structure. He distributed four organizational charts. Mr. Shoudy will attend the IT Open Forum on December 13. Please encourage your faculty and staff to attend.

Mr. Shoudy stated that although changes have been made to the IT structure, the campuses will not be adversely affected.

**IT Items Discussed at the Meeting**
Access to files while off-campus – this is in process and will hopefully be available when we come back for the spring semester.

Collegewide calendaring – this will be piloted with a select group in the spring.

Web payment – this will be up and running no later than pre-registration for fall semester.

Mr. Shoudy acknowledged that there is a breakdown in communication when it comes to updating the status of IT requests and stated that he is working to improve this area of customer service.

Mr. Craig Eliassen
Board Member
Delaware Technical & Community College


Dear Mr. Eliassen,

I am an employee at the Terry Campus. Last Monday, November 11, Terry Campus
hosted a craft fair with numerous vendors presenting their work in the front lobby and
cafeteria area. The first day of registration was also happening with many students and
craft show attendees in this area.

Dr. Johnson came into the lobby and upon seeing the crowd, began to rant and shout that
the craft show had to closed down and that all vendors were to leave her campus. It was
an embarrassing episode for everyone there, including her staff. At one point, she said
'You can sue me, my name is Dr. Marguerite Johnson, spelled J O H N S O N.' Her
behavior in front of so many was totally unprofessional and disrespectful.

The rumor going around now is that the Public Relations people are trying to get spin
control on this so as Dr. George will not hear about it. I think Dr. George should hear
about this and do something about it. Protecting this type of behavior is detrimental to the
college as well as the community.

If our Board chooses to ignore this type of public display of anger, then what will happen
next? I apologize for not revealing my name, but I need my job and fear for retaliation
should she find out this letter was written.

A concerned DelTech employee.



DEPOSITION
EXHIBIT
#1
11/30/05 ASB

DTCC0384



**DELAWARE TECH**

*Dover♦Georgetown♦Stanton♦Wilmington*

*Orlando J. George, Jr., President*

November 26, 2002

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904

Dear Peg:

Attached is a copy of a disturbing letter directed to Trustee Craig Eliassen. At this point, I do not know whether the enclosed letter accurately reports what occurred on November 11, 2002. I am, however, deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior.

The purpose of this letter is to present you with the option of acknowledging that your behavior is all too frequently out of control, and accept my offer to take all reasonable steps aimed at helping you modify such behavior. If you reject this preferred option, the College will retain outside counsel to conduct a thorough investigation of the alleged November 11 incident, anecdotal reports of similar incidents in recent history, and any future incidents of a similar nature. If you force me to move in this direction, I am determined to get to the bottom of all such incidents. If the investigation verifies unacceptable behavior on your part, such behavior will be documented, and, if appropriate, discipline will be imposed.

On several occasions, I met with you to discuss anecdotal reports that you engaged in conduct typically involving shouting at and publicly berating staff. The manner in which you interact with peers is also a concern. Such behavior will not be tolerated. My efforts to offer assistance bog down in denials the behavior occurred, or efforts to explain why your conduct was justified. In all events, I cannot continue attempting to assist you unless you acknowledge there is a problem, and sincerely commit to work with me on a solution. If you reject this final offer to help, I will promptly and aggressively discharge my obligation to find the facts, and, if appropriate, take action.

In closing, you are about to leave on a five day break from work. Please carefully consider your options. I would like to see you on Tuesday, December 3 at 10:30 a.m. in my office. At that time, please be prepared to tell me how you wish to proceed.

Sincerely,

Orlando J. George, Jr.
President
Delaware Technical & Community College

OJGJr.
Attachment

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*

DTCC0383



**DELAWARE TECH**

*Marguerite M. Johnson, Vice President/Campus Director* ♦ *Dover* ♦ *Georgetown* ♦ *Stanton* ♦ *Wilmington*

December 2, 2002

Dr. Orlando J. George, Jr., President
Delaware Technical & Community College
P.O. Box 897
Dover, DE 19903

Dear Dr. George:

Thank you for forwarding a copy of the anonymous letter sent to Trustee Craig Eliassen. It is of great concern to me that someone, albeit anonymously, suggests that I would harm Terry Campus and that the College would engage in unethical behavior to suppress it. Throughout my 32 years of employment at Delaware Technical & Community College, customer service has always been my number one priority. Therefore, I will be happy to provide you with a full accounting of the events surrounding the craft fair referred to in your letter of November 26, 2002. These facts will be supported by both the Dean of Instruction and the Dean of Student Services, whose interest in student safety and comfort during registration prompted my intervention. In each position I have held, from classroom instructor, to department chair, division director, executive dean and campus director, my goal has always been the same – to enhance the College's mission through excellence in teaching and service.

We are both proud of the many accomplishments and successes the Terry Campus has attained under my leadership. When selected for this position, I vowed to make this campus the best in the system. This devotion to quality has not always resulted in my popularity. Those with different agendas have not always been open to the changes necessary to reach the heights to which we aspire. You are aware of the challenges I have faced, and still face, in moving Terry Campus in a positive direction.

The results speak for themselves. The high caliber of programs, the reputation for innovation, and the growth of the campus in terms of students and facilities attest to my professionalism and leadership. Over the last eight years, Terry Campus has accomplished more than in all of its previous history. My motivation and personal satisfaction are directly related to its success. I always have its best interests at heart.

I am saddened that there are those whose self-serving motives are given more credence than my proven record of progressive and positive performance. I am confident that we will resolve this matter to our mutual satisfaction on behalf of the entire College community. As the Vice President and Campus Director of the Terry Campus, my plan is to maintain the same high standards for which I am known and to proceed forward into the future focusing on the Characteristics of Excellence.

Sincerely,

Marguerite M. Johnson
Vice President and Campus Director

*Delaware Technical & Community College*
*Terry Campus*
100 Campus Drive, Dover, DE 19901
Phone: 857-1126 Fax: 857-1096 E-mail: mjohnson@outland.dtcc.edu
Equal Opportunity/Affirmative Action Institution

James A. Lancaster
Perla F. Lancaster
665 Dyke Branch Rd.
Dover DE. 19901
(302) 678-1852

13 November 2002

Representative Bruce C. Ennis
522 Smyrna Clayton Blvd.
Smyrna DE. 19977

Dear Sir:

It is with deep regret that we must write this letter. However, it is most important that you are made aware of the following incident and that such acts not go unreported. On the 11ᵗʰ of November 2002 my wife and I participated in a Holiday Craft Show held at the Delaware Technical & Community College Terry Campus. We specialize in a variety of hand painted glass vases. All participating vendors were set up in the lobby or cafeteria of the building as instructed.

Once we completed the initial set up and our merchandise was on display, I, James Lancaster took a few empty boxes out to our vehicle. Upon my return, My wife, Perla Lancaster informed me a gentleman whom was walking pass our table, knocked over two of our vases in what appeared to be an intentional act. Although neither of the vases were broken, the individual offered no apology and preceded without concern. Approximately five minutes later the gentleman passed our display again. I called out " excuse me sir, may I have a word with you". As he reluctantly stopped and turn to me, I stated that that he had previously knocked two of the vases over and if he could possible be more careful when passing the display. The gentleman replied in a hostile tone," I picked one up and I told your wife to pick up the other". It was at this point that I realized the gentleman had no remorse or concern as to what had happen. However after I repeated "could you just be more careful", things took a turn for the worst. It was at this point the gentleman lashed out that I was close to being thrown out. Not only was I stunned by his statement, but also confused as to who he was and what had warrant this type of behavior. When asked who he was, the gentleman became highly irate and requested that Security be called. It was then that the gentleman went to the security station himself.

With all of the commotion, a staff member came over to our table and asked what was going on. Once we told her the ramifications and pointed out the gentleman, she identified him as being Dan Simpson, the *(Dean of Instructors)*. I don't know exactly what was told to the Security Personnel, but they never approach me or my wife. I can only surmise they felt there was no valid reason to ask me to leave the premises or issue any type of warning. After all, no violations had been committed. As Mr. Simpson left

DTCC0412

the Security Station and was passing our table, I made an attempt to speak with him in efforts to correct and resolve any misunderstandings. When I called to him "sir", he replied, " don't talk to me" and kept walking. I could hardly believe this was the actions of a Dean.

Shortly afterwards, Dean Simpson returned to the lobby with Dr. Marguerite Johnson (*Vice President and Campus Director*) who openly had very sharp words with the staff member whom had inquired about the commotion. Dr. Johnson instructed the staff member to relocate all of the vendors in the lobby to another area or leave. However, Dr, Johnson made it clear that she could care less. This led to a whole new ordeal which spawned arguments between Dr. Johnson and a few of the other vendors. It was decided by all the vendors that we were being harassed by the administration for what reason was unknown. We all felt that we had responded to an advertisement of solicitation provided by Delaware Tech. However, after spending our time and effort preparing and traveling to this event, we found ourselves being treated like second class citizens.

Both my wife and I plus all the other vendors agreed the insensitive actions of Dean Simpson and Dr. Johnson were in extremely poor taste and highly unprofessional. We being hard working Small Business Owners of the commonwealth of Delaware, and Americans should not be subjected to such acts of injustice. We find Delaware Tech to be one of best intuitions of higher learning in state and should not be tarnished by such acts. Therefore I'm asking you as an elected voice of the people to look into this matter and provide a resolution to keep occurrences of this kind happening to anyone else. We thank you in advance for your time and concern.

Sincerely

*James A. Lancaster*

James A. Lancaster

*Perla F. Lancaster*

Perla F. Lancaster

Copy to:
Senator, James Vaughn

B38

DTCC0413



*Orlando J. George, Jr., President*                          *Dover♦Georgetown♦Stanton♦Wilmington*

## MEMORANDUM

TO:      Marguerite M. Johnson, Vice President & Campus Director
         Daniel L. Simpson, Dean of Instruction

FROM:    Orlando J. George, Jr., President

DATE:    January 15, 2003

RE:      Letter to Representative Ennis


Attached is a letter that both of you need to see. It was given to me yesterday by Representative Bruce Ennis. We need to respond to this letter. How do you suggest we proceed?


OJGJr.
Attachment

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*
B39

DTCC0411



*Marguerite M. Johnson, Vice President/Campus Director*          ♦ *Dover* ♦ *Georgetown* ♦ *Stanton* ♦ *Wilmington*

TO:         Orlando J. George, Jr., President

FROM:      Marguerite M. Johnson Vice President & Campus Director

CC:         Daniel L. Simpson, Dean of Instruction

DATE:       January 21, 2003

RE:         Letter to Representative Ennis

In response to your memorandum of January 15, 2003, I asked Dean Simpson to provide a written accounting of the events that transpired on November 11, 2002. His report is enclosed.

As a result of reading Dean Simpson's accounting and the letter from the Lancasters, I am suggesting the enclosed response to Representative Ennis.

Enclosures

*Delaware Technical & Community College*
**Terry Campus**
1832 N. DuPont Parkway, Dover, DE 19901
Phone: 741-2901 Fax: 741-2713 E-mail: mjohnson@outland.dtcc.edu
B40
Equal Opportunity/Affirmative Action Institution

DTCC0410


**DELAWARE TECH**

# MEMORANDUM

**TO:** Dr. Orlando J. George, Jr.

**FROM:** Dan Simpson

**DATE:** January 16, 2003

**SUBJECT:** Complaint

On Monday, November 11, 2002, at approximately 7:45 a.m., I entered the Terry Lobby from the east stairway. I saw a student with a small child walking toward the Registrar's Office. As she passed a stack of painted boxes, she brushed against them. The stack nearly fell. A lady standing next to the stack admonished the student to be careful. It was at this point that I realized there were people in the lobby setting up displays. This was the first day of open registration.

I went to the Security office and asked John Schaible (Security Supervisor) why there were vendors in the lobby. He informed me they were part of a craft show and they were waiting outside when he arrived to open the building. He also told me some of the vendors were complaining because the building had not been opened sooner. I told John it was the first day of open registration and besides normal traffic, there would be students coming to register. He agreed that the tables were going to be a problem.

I went from the Security Office to Dr. Johnson's office. As I approached the bookstore, my left hip brushed against a table with glassware. The glasses rattled and I quickly turned and reached out to prevent damage. Not a single glass fell or broke. At that time there was no one at the table. I continued to Dr. Johnson's office. When I learned she had not yet arrived, I went back to the lobby. I found Chris Knotts (from CCP, coordinator of the craft show) and advised her that it was the first day of open registration and the vendor tables were an obstruction to students registering. I asked if the tables could be moved to the CCP building. Chris said no because all the students are going to be here in the Terry building. I told Chris that was exactly why the vendors could not be in the lobby. Chris said there was nothing she could do because the vendors had a contract. I started back to Dr. Johnson's office.

As I passed the table with the glasses, a man stepped forward and said, "Excuse me sir, can I talk to you?" I said sure. He told me that earlier I had walked passed his table and bumped it. I responded, " Yes I did. Nothing fell or broke did it?" He said, "No, but you should have apologized." I told him there was no one there. He said someone who works at a college should have better manners (something like that). I told him there was no one there, nothing was damaged, nothing fell and it shouldn't be an issue. I still did not see his wife, and he pointed to a lady standing near Dr. Mishoe's office, approximately 15 to 20 feet away. I told him the table was in a bad location and others would be bumping into it. I also told

DTCC0414

him a large number of students would be arriving and since his table was partially blocking the hallway directly outside the bookstore, it would have to be moved. He said he wasn't moving. I started to walk away and he stepped in front of me and began to point out that I should have apologized for bumping his table. At this point, he appeared agitated and assumed a posture that could easily have been interpreted as physically threatening. I told him to tone it down or I would have security remove him from the building. I continued to Dr. Johnson's office. When I didn't find Dr. Johnson, I went to the security office.

John Schaible and Wayne Dabson were outside the security office. Wayne said he had spoken with Chris Knotts and told her the vendors should not be in the lobby. I told John and Wayne that they could probably expect trouble if the vendors were told to move. I related the incident with the man outside the bookstore and told them he could be a problem. I also told them I thought he was about to get physical, and I thought I was going to have to punch him. Wayne and John agreed that the glassware table was in a position where people would continue to bump it.

As I was returning to Dr. Johnson's office, the glass vendor called out that he wanted to talk to me... wasn't finished talking... or something like that. I don't believe I responded. I saw no need to escalate the situation. I'm certain I did not engage in further conversation. I found Dr. Johnson and explained the situation to her. She told me she had not authorized the use of the lobby and would never have authorized usage during registration. She also said Chris Knotts would have to figure out how to accommodate the vendors outside the lobby. I walked to the lobby with Dr. Johnson. Dr. Johnson asked for Chris Knotts. I found Chris Knotts standing by the admissions office and told her Dr. Johnson wanted to see her. At that point I continued on to my office. About an hour later, I returned to the lobby and the vendors were gone.

The vendor's statement about intentionally bumping the table is not true. The vendor's statement about knocking glasses over is not true. The vendor's statement about picking up a vase and telling his wife to pick up the other is not true. I had never spoken to his wife. The vendor's statement about a response in a hostile tone is not true. When the vendor's demeanor reached the point where it was physically threatening, I firmly stated that if he didn't tone it down security would remove him from the building. The vendor's statement that I did not speak to him when he called out is accurate. His statement that I said, "don't talk to me," probably is not accurate. I do not recall saying anything because I didn't want to make a bad situation worse. "Don't talk to me," does not sound like me.

The issue was not with this one vendor. The issue was the safety and convenience of our students. This involved finding a solution that could be applied to all the vendors. Dr. Johnson told me she took steps to prevent this situation from reoccurring. I wasn't focused on the glass vendor and once the situation was resolved, I haven't given it further consideration. It was an unfortunate incident. I believe the glass vendor responded poorly to an accident that would not have occurred if he had been directed to place his table in a safe location.

I have responded to Rep. Ennis' inquiry as accurately as memory will allow. I sincerely hope that my response is helpful.

DTCC0415

# DELAWARE TECH ◆

*Orlando J. George, Jr., President*                                    *Dover ◆ Georgetown ◆ Stanton ◆ Wilmington*

January 15, 2003

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904



Dear Peg:

Thank you for your letter of December 11, 2002 in which you outline (1) the steps you plan to take, including timeline for completion, (2) what I can expect from you, and (3) what you need from me to implement your plan, and your letter of December 18, 2002 in which you provide additional clarifying information. Following are my responses to each of the three areas I asked you to address.

(1)   I have researched Respect, Incorporated and am satisfied that this organization may be helpful to you, through one-on-one coaching, in resolving the behavioral issues we have discussed, including conflict resolution, speaking loud, losing your temper, being rude, providing a respectful work environment, and other anger management related issues. I accept your recommendation to contract with Respect, Inc., and will make the initial referral to begin the consulting process in accordance with your proposed plan.

(2)   I am most pleased to hear from you that I can expect you to demonstrate your leadership and performance within the context of the College's Six Characteristics of Excellence. The two characteristics you specifically list, (a) treating others with respect, dignity and fairness and (b) being open and honest in all communications and exhibiting the highest standards of integrity, are of particular importance given the nature of recent complaints.

(3)   In providing you with the support you need, I approve your request for the College to fund the contractual relationship with Respect, Inc., as outlined in Paragraph (1), not to exceed $3,000.

I will be in touch with you as soon as I have arrangements in place for the initial contact with Respect, Inc. I am pleased that you have agreed to take positive steps toward modifying your behavior—steps that will be beneficial to both you and the College.

Sincerely,

Orlando J. George, Jr.
President

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*

B-42

DTCC0416



# DELAWARE TECH

*Marguerite M. Johnson, Vice President/Campus Director*     ♦ Dover ♦ Georgetown ♦ Stanton ♦ Wilmington

January 22, 2003

Dr. Orlando J. George, Jr.
President
Delaware Technical & Community College
Office of the President
Dover, Delaware 19904

Dear Dr. George:

Thank you for forwarding the letter from James A. and Perla F. Lancaster, two vendors at the Terry Campus Holiday Craft Fair, sponsored by Corporate and Community Programs (CCP), that was held November 11, 2002. It is unfortunate that the craft fair coincided with Open Registration, a very busy time when both new and returning students meet with counselors and register for spring semester. Approval to use the lobby for the event had not been requested. If such a request had been made, I would have denied it as not being in the best interests of providing a high level of customer service to Terry Campus students.

Dean Daniel L. Simpson entered the lobby and became concerned about the potential overcrowding. Dean Simpson conferred with Security who agreed that the craft tables and the shoppers presented a potential hazard to students, blocking their way as they traveled among the various services such as the Business Office and Financial Aid Office. There was also the potential for damage to the merchandise. He expressed his concerns to me. After viewing the situation, I spoke to Christine Knotts, the CCP staff member coordinating the fair, suggesting to Ms. Knotts that the fair relocate to the Corporate Training Center for both the safety of the students and the crafts. I felt that moving the fair and directing potential customers to the alternate site was a win-win for all concerned. Ms. Knotts decided that she would prefer to cancel the fair and refund the vendors their $25 table rental fee.

Steps were taken immediately to make amends to the vendors for the inconvenience caused them. These steps included a letter of apology from Stephanie Beaudet, the Director of CCP, a refund to all vendors, and a certificate for a free CCP class. A copy of the letter is attached. I have informed appropriate staff that my signed approval for scheduling events in the lobby and cafeteria areas is needed to ensure that competition for limited space does not arise again.

I note that the letter from the Lancasters is dated November 13, two days following the incident. Since that time, CCP has received calls from vendors who wish to take advantage of the free class and from others wishing to reserve a table for the next craft fair.

We are pleased that the Lancasters recognize the contributions of Terry Campus to the educational goals of Delawareans, and we are working to earn their continued respect despite of this setback. We believe that the situation has been resolved to everyone's satisfaction.

Sincerely,

Marguerite M. Johnson
Vice President & Campus Director

---

*Delaware Technical & Community College*
Terry Campus
100 Campus Drive, Dover, DE 19901
Phone: 857-1126 Fax: 857-1095 E-mail: mjohnson@outland.dtcc.edu
Equal Opportunity/Affirmative Action Institution

DTCC0407





*Orlando J. George, Jr., President*                                          *Dover ♦ Georgetown ♦ Stanton ♦ Wilmington*

January 15, 2003

Dr. Marguerite M. Johnson
Vice President & Campus Director
Delaware Technical & Community College
Terry Campus
100 Campus Drive
Dover, DE 19904



Dear Peg:

Thank you for your letter of December 11, 2002 in which you outline (1) the steps you plan to take, including timeline for completion, (2) what I can expect from you, and (3) what you need from me to implement your plan, and your letter of December 18, 2002 in which you provide additional clarifying information. Following are my responses to each of the three areas I asked you to address.

(1)  I have researched Respect, Incorporated and am satisfied that this organization may be helpful to you, through one-on-one coaching, in resolving the behavioral issues we have discussed, including conflict resolution, speaking loud, losing your temper, being rude, providing a respectful work environment, and other anger management related issues. I accept your recommendation to contract with Respect, Inc., and will make the initial referral to begin the consulting process in accordance with your proposed plan.

(2)  I am most pleased to hear from you that I can expect you to demonstrate your leadership and performance within the context of the College's Six Characteristics of Excellence. The two characteristics you specifically list, (a) treating others with respect, dignity and fairness and (b) being open and honest in all communications and exhibiting the highest standards of integrity, are of particular importance given the nature of recent complaints.

(3)  In providing you with the support you need, I approve your request for the College to fund the contractual relationship with Respect, Inc., as outlined in Paragraph (1), not to exceed $3,000.

I will be in touch with you as soon as I have arrangements in place for the initial contact with Respect, Inc. I am pleased that you have agreed to take positive steps toward modifying your behavior—steps that will be beneficial to both you and the College.

Sincerely,

Orlando J. George, Jr.
President

*Delaware Technical & Community College*
Office of the President
P.O. Box 897, Dover, DE 19903
Phone: (302) 739-4053 Fax: (302) 739-6225 E-mail: pres@college.dtcc.edu
*Equal Opportunity/Affirmative Action Institution*