**Check 1**

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

DATE 11-16-01

PAY TO THE ORDER OF _Twenty Center_ 00/100 $ 60.00

_Sixty_ and 00/100 DOLLARS

First Union National Bank of Delaware
firstunion.com
Org. 049 R/T 031100869

MEMO _Ivers_

⑈031100869⑈ 1000081045575⑈ 1333 ⑈000000600

**Check 2**

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311        1118

DATE 12-13-01

PAY TO THE ORDER OF _DTCC_ $ 15.00

_Fifteen_ and 00/100 DOLLARS

First Union Bank of Delaware
029202990 415 13 5173 5158
R/T 031100869

MEMO _Roberts – Returned_

⑈031100869⑈ 1000081045575⑈ 1118 ⑈000001500

**Check 3**

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311        1120

DATE 12-18-01

PAY TO THE ORDER OF _DTCC_ $ 220.85

_Two hundred twenty_ and 85/100 DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO _Cnft TRIPS_

⑈031100869⑈ 1000081045575⑈ 1120 ⑈00000220 8

**Check 4**

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311        1122

DATE 12-19-01

PAY TO THE ORDER OF _DTCC_ $ 26.35

_Twenty six_ and 35/100 DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO _Cnft TRIPS_                      B145

⑈031100869⑈ 1000081045575⑈ 1122 ⑈000000263

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

DATE 12-4-02

PAY TO THE ORDER OF DTCC                    $ 187.5

One hundred eighty seven and 5/100          DOLLARS

First Union National Bank of Delaware
firstunion.com
Org. 049 R/T 031100869

MEMO Telephone (Cell)

⑈031100869⑈ 100008 1045575⑈ 1356 ⑈000001875

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                    998

DATE 6-21-01

PAY TO THE ORDER OF DTCC                    $ 14.98

Fourteen and 98/100                         DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO Tuition

⑈031100869⑈ 100008 1045575⑈ 0998 ⑈000001498

---

RECEIVED
APR 1 2 2001

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                    945

DATE 3-26-01

PAY TO THE ORDER OF Delaware Tech + CC      $ 120.00

One hundred twenty and 00/100               DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO Spring Gala

⑈031100869⑈ 100008 1045575⑈ 0945 ⑈000012000

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                    976

DATE 5-24-01

PAY TO THE ORDER OF DTCC Bookstore          $ 18.95

Eighteen 05072800 415 13 5008 5680 95/100   DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO B146

⑈031100869⑈ 100008 1045575⑈ 0978 ⑈000001895

GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE 19934
PH. 302-698-1626

Date 10-12-01

Pay to the
Order of Kathy Powell $ 17.50

Seventeen and 50/100 Dollars

CITIZENS BANK

For PIZZAS

⑆031101143⑆ 8 2000 1833 2⑆ 2247 ⑆0000017 01

---

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE 19934
PH. 302-698-1626

21

Date 12-10-03

Pay to the
order of DTCC $ 68.00

Sixty eight and 00/100 Dollars

Citizens Circle Account

CITIZENS BANK

For Employee Travel

⑆031101143⑆ 8 2000 1833 2⑆ 2146 ⑆000006

---

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE 19934
PH. 302-698-1626

212

Date 9-25-03

020177210 449 00 3080 7584

Pay to the
order of DTCC $ 33.00

Thirty three and 00/100 Dollars

Citizens Circle Account

CITIZENS BANK

For PIZZA Admin

⑆031101143⑆ 8 2000 1833 2⑆ 2121 ⑆00000033 00

---

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE 19934
PH. 302-698-1626

212

Date 9-26-03

Pay to the
order of DTCC $ 15.00

Fifteen and 00/100 Dollars

Citizens Circle Account

CITIZENS BANK

For Movie Tickets

⑆031101143⑆ 8 2000 1833 2⑆ 2123 ⑆00000 1500

**Check 1**

GEORGE S. JOHNSON
CAMDEN, DE  19934
PH. 302-698-1626

Date 3-10-04

2
62-11

Pay to the order of: Delaware Tech / Women's Center    $ 5.00

Five and  00/100  Dollars

CITIZENS BANK    Citizens Circle Account

For Women's Center    Marguerite A John

⑇031101143⑇ 8 2000 1833 2⑈    2197  ⑈000000050

© Clarke American

**Check 2**

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE  19934
PH. 302-698-1626

Date 8-29-03

21
62-114

Pay to the order of: Delaware Tech    $ 20.00

Twenty and  00/100  Dollars

CITIZENS BANK    Citizens Circle Account

For    Marguerite A John

⑇031101143⑇ 8 2000 1833 2⑈    2115  ⑈000000 2000

© Clarke American

**Check 3**

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE  19934
PH. 302-698-1626

Date 8-22-03

21
62-114

Pay to the order of: DTCC    $ 20.00

Twenty and  00/100  Dollars

CITIZENS BANK    Citizens Circle Account

For

⑇031101143⑇ 8 2000 1833 2⑈    2110  ⑈000000 2000

© Clarke American

**Check 4**

GEORGE S. JOHNSON    08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE  19934

62-86/311

895

DATE 12-17-00

PAY TO THE ORDER OF: DTCC    $ 20.00

Twenty and  00/100  DOLLARS

FIRST UNION®    First Union Bank of Delaware
R/T 031100869    030160732 415 13 5390 5392

Marguerite M John

MEMO    B148

⑇031100869⑇ ⑇00008 10455 75⑈ 0895  ⑈000000 2000

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                1052

DATE 8-31-00

PAY TO THE ORDER OF DTCC                    $ 85.00

Eighty 020505200 415 13 5029 5031 00/100         DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO Silent Auction

⑆031100869⑆ 100008 1045575⑈ 1052 ⑇0000008500

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                1053

DATE 8-31-01

PAY TO THE ORDER OF DTCC                    $ 9.00

Nine 020508205 415 13 5029 5031         DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO Movie Tickets

⑆031100869⑆ 100008 1045575⑈ 1053 ⑇0000000900

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                1025

DATE 11-20-01

PAY TO THE ORDER OF DTCC                    $ 13.50

Thirteen and 090504565 415 13 5040 5039 7/00         DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO

⑆031100869⑆ 100008 1045575⑈ 1025 ⑇0000001350

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311                1077

DATE 10-3-01

PAY TO THE ORDER OF Anthony + Paula Digenakis     $ 150.00

One hundred fifty and 020205154 320 15 1487 1565 00/100         DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO annual party B149

⑆031100869⑆ 100008 1045575⑈ 1077 ⑇0000015000

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

DATE 6-28-02

PAY TO THE
ORDER OF DTCC $ 56.00

Fifty six and 00/100 DOLLARS

First Union National Bank
of Delaware
firstunion.com
Org. 042 R/T 031100869

MEMO Stephen Johnson

⑆031100869⑆ 100008104557⑈ 1212 ⑈0000005600

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311 1237

DATE 8-2-02

PAY TO THE
ORDER OF DTCC $ 20.00

Twenty and 00/100 DOLLARS

First Union National Bank
of Delaware
firstunion.com
Org. 049 R/T 031100869

MEMO Flch Fee

⑆031100869⑆ 100008104557⑈ 1237 ⑈0000002000

---

GEORGE S. JOHNSON 08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE 19934

62-86/311 1121

DATE 12-19-01

PAY TO THE ORDER OF Kathy Powell $ 50.00

Fifty and 00/100 DOLLARS

First Union Bank of Delaware
R/T 031100869

MEMO Christmas

⑆031100869⑆ 100008104557⑈ 1121 ⑈0000005000

---

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE 19934
PH: 302-698-1626

62-114/

Date 12-18-03

Pay to the
order of DTCC $ 5.00

Five and 00/100 Dollars

CITIZENS BANK

Citizens Circle Account

For

⑆031101143⑆ 820001833⑈ 2150 ⑈0000000500

1149

GEORGE S. JOHNSON   08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE  19934

62-86/311

DATE 2-11-02

PAY TO THE
ORDER OF  DTCC                              $ 78.58

Seventy eight and 58/100                    DOLLARS

First Union Bank of Delaware
R/T 031100869
MEMO  Telephone                    [signature]

⑈031100869⑈ ⑈000081045575⑈ 1149  ⑈00000078558

---

GEORGE S. JOHNSON   08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE  19934

62-86/311

1150

DATE 2-11-02

PAY TO THE
ORDER OF  DTCC Owers Campus Alumni  ASSC    $ 200.00

Two hundred and 00/100                      DOLLARS

First Union Bank of Delaware
R/T 031100869
MEMO  Women's Dinner            [signature] Margurite M Johnson

⑈031100869⑈ ⑈000081045575⑈ 1150  ⑈00000020000

---

DR. MARGUERITE A. JOHNSON
GEORGE S. JOHNSON
1022 QUAIL RUN
CAMDEN, DE  19934
PH. 302-698-1626.

62-114

22

Date 10-18-0?

Pay to the
Order of.  DTCC Educational Foundation    $ 1200.00

Twelve hundred and 00/100                   Dollars

CITIZENS BANK

For  TABLE Sponsor          [signature] Margurite A Johnson

⑈031101143⑈ 8 2000 18332⑈ 2250  ⑈000020000

---

GEORGE S. JOHNSON   08/94
MARGUERITE M. JOHNSON
1022 QUAIL RUN
WYOMING, DE  19934

62-86/311

1231

DATE 8-30-0?

PAY TO THE
ORDER OF  U.S. Dept of State            $ 45.00

Fourty five and 00/100                      DOLLARS

First Union National Bank
of Delaware
firstunion.com
R/T 031100869
MEMO                          [signature] Margurite M Johnson

⑈031100869⑈ ⑈000081045575⑈ 1231  ⑈000000045000

3028565392
02/10/00   THU 12:31 FAX 3028565392          Campus Director's Office

### Delaware Technical & Community College
### Jack F. Owens Campus

## TRAVEL REQUEST

DEPOSITION
EXHIBIT
McNesby 1
4-13-06      PS
PENGAD 800-631-6989

**TO:**          Tim Kavel, Ed.D.
                 Vice President and Campus Director

**FROM:**        *Tim Kavel*

**DATE:**        2/7/00

                 ✈ ✈ ✈

**NAME:**        Dr. Tim Kavel

**MEETING:**     American Assoc. of Comm. College Convention

**LOCATION:**    Hilton Washington Hotel, Washington DC.

**DATE(S):**     April 9-11, 2000

**ESTIMATED COST OF TRIP:** registration $448, lodging $486 + meals, tax, misc.

**SOURCE OF FUNDS:** tuition

**MODE OF TRAVEL:** State vehicle

**JUSTIFICATION:** to stay abreast of community college trends and strengthen relationships with other college professionals

- - ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ -

☐ Approved                    ☑ Approved
☐ Disapproved                 ☐ Disapproved
            Dept. Chair                        Dean/Director

Date 2/7/0      ☐ Approved
                ☐ Disapproved      *Tim Kavel*
                                Vice President and Campus Director

*November 9, 1999*

B152

DTCC 2953

### Delaware Technical & Community College
### Jack F. Owens Campus

## TRAVEL REQUEST

TO:     ~~Tim Kavel, Ed.D.~~ Dr. Barbara Ridgely
        Vice President and Campus Director

DEPOSITION
EXHIBIT
McNisby 2
4-13-06    PS
PENGAD 800-631-6989

FROM:   Dr. Tim Kavel

DATE:   2/14/01

                        ✈ ✈ ✈

NAME:   Dr. Tim Kavel

MEETING: American Assoc. of Community Colleges 8th Annual Conv.

LOCATION: Hyatt Regency Chicago, Chicago, Illinois

DATE(S): April 4-7, 2001

ESTIMATED COST OF TRIP: Registration $379, Lodging $360 + meals, tax, misc, Airfare 302.50

SOURCE OF FUNDS: _____

MODE OF TRAVEL: Airplane

JUSTIFICATION: To stay abreast of community college trends

and to strengthen relationships with other college professionals.

✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈ ✈

❑ Approved            ❑ Approved
❑ Disapproved _____  ❑ Disapproved _____
        Dept. Chair              Dean/Director

                ☒ Approved
Date 3/12/01    ❑ Disapproved    _Tim Kavel_
                                Vice President and Campus Director

*November 9, 1999*

B153

DTCC 2962

# Delaware Technical And Community College
# Jack F. Owens Campus

## *Travel Request*

TO:        Dr. Orlando J. George, Jr.
           President



FROM:      Tim Kavel, Ed.D.
           Vice President and Campus Director

DATE:      April 22, 2002

✈  ✈  ✈

NAME: ___ Delaware Tech and CCID staff development trip _____

MEETING : American Educators – Exploring the World – Impacting New Knowledge to
          Students

LOCATION : Turkey/Greece _____

DATE(S) :  June 15 – June 29, 2002 _____

ESTIMATED COST OF TRIP:  $3,400 _____

SOURCE OF FUNDS :   Educational Foundation, interest line – unrestricted – OWENS
                                                                        CAMPUS

MODE OF TRAVEL :  Airplane _____

JUSTIFICATION :   To be administrative liaison for 30+ faculty members _____

_____

_____

✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈✈

☐ Approved _____   ☐ Approved _____  4/22/02
        Depart. Chair                    Vice President and Campus Director

Date __4/25/02__                 ☒ Approved _____
                                 ☐ Disapproved _____
                                         President

DELAWARE TECHNICAL & COMMUNITY COLLEGE - TERRY CAMPUS

# TRAVEL REQUEST FORM

Name: Marguerite Johnson                   Date: 11/10/03

Date of Departure: 12/7/03          Date of Return: 12/9/03

Destination: Phila, PA Middle States Annual Conference

Explanation of Travel Request: MSA/CHE Conference

**RECEIVED**
**NOV 1 3 2003**
**ACCOUNTS PAYABLE**

Method of Transportation: (Please check)

☐ Bus          ☐ Train          ☐ Plane          ☒ State Car          ☐ Own Car

Estimated Costs:

| | | |
|---|---|---|
| Travel | $ 40.72 | |
| Meals | 62.00 | PNC Dec |
| Hotel | 362.96 | PNC Dec 413.96  inc.56 Parking |
| Registration Fee | 295.00 | PNC Nov. |
| Other (specify) | 50.00 | |
| TOTAL COSTS | $ 817.70 | |

Funding Source: 3625-8019          Amount: 817.70

DEPOSITION
EXHIBIT
McNesby 4
4-13-06   PS
PENGAD 800-631-6989

Approvals:

| | | |
|---|---|---|
| Dept. Chairman | | Date: |
| Dean/Director | | Date: |
| Business Manager | | Date: 11/12/03 |
| Campus Director | Marietta | Date: 11-12-03 |

**DELAWARE TECH** ◆

White Copy - Employee     Canary Copy - Chairman     Pink Copy - Business Office

B155

DTCC1224

DELAWARE TECHNICAL & COMMUNITY COLLEGE - TERRY CAMPUS

# TRAVEL REQUEST FORM

Name: *Ms. Marguerite Johnson*          Date: *April 16, 2004*

Date of Departure: *April 22, 2004*     Date of Return: *April 27, 2004*

Destination: *Minneapolis, MN*

Explanation of Travel Request: *Keeping the Promise, AACC 84th*

*Annual Convention.*

Method of Transportation: (Please check)

☐ Bus          ☐ Train          ☑ Plane          ☑ State Car     *Fleet Car airport 132.16*     ☐ Own Car

Estimated Costs:

*Due Employee*
*$55.53*              Travel              $*1080.77*     *385.19 PNC April Airline*
                                                        *Rental Car PNC May 366.51*
*Ch # 16920*         Meals               *196.00*     *May/April Cash 303.87*
*5/28/04*            Hotel               *954.85*     *PNC May 954.90  Parking $100*

                     Registration Fee    *520.00*     *PNC January*
                                                      *BWI Parking 78 - PNC May*
                     Other (specify)     *115.00*

                     TOTAL COSTS         $*2466.62*

```
DEPOSITION
EXHIBIT
McNosby 5
4-13-06    PS
PENGAD 800-631-6989
```

Funding Source: *3625-8019*          Amount: *$2466.62*

Approvals:

Dept. Chairman _____     Date: _____

Dean/Director _____      Date: _____

Business Manager *[signature]*             Date: *4/20/04*

Campus Director *[signature]*              Date: *4-20-04*

*RECEIVED*
*APR 20 2004*
*BUSINESS OFFICE*

# DELAWARE TECH ◆

White Copy - Employee     Canary Copy - Chairman     Pink Copy - Business Office

B156

DTCC1255

WYE RIVER
410-827-0117

F-0218    TABLE# 2 #Party 1
Svr: 333 SvrCk:100 14:53 10/26/02

1 FRIED OYSTER SAN          6.99
1 RED SODA                  1.19

              Sub Total:    8.18
                   Tax:     0.41
10/26 14:56 TOTAL:          8.59

VISIT OUR
RETAIL STORE
IN THE OUTLETS

ORDER#:  218

B.W.I. AIRPORT PARKING
E.S.P. LOT B
MARYLAND PARKING

Rcpt# 16621
10/26/02 12:47  LN51 AB 2  Tmp 1941?
10/23/02 07:45 In  10/26/02 12:47 Out
Tkt# 060550
Fee ......6  $  49.60
Total Tax   $   2.40
Total Fee   $  52.00
VISA CARD   $  52.00-
XXXXXXXXXXX7561 07/04
Approval No.: 060050
Reference No.: 29904021
Change Due  $   0.00
          THANK YOU
          HAVE A SAFE TRIP

Embassy Suites- R860
Nicols's
4700 Creedmoor Road
Raleigh, N.C. 27612
919-881-0000

                    42732
KATERINA K    Table 504
Thu 10/24/02 7:15 PM   Guests  1

1 [SPECIAL    ]    22.95
1  BAKED            0.00

            SubTotal    22.95
            Service Chrg  4.13
            Taxes...      1.72

        Total  28.80

*********************************
* FOR ROOM CHARGES & MASTER ACCTS ONLY!  *
*
* GUEST NAME
*
* ROOM #
*
* TIP AMOUNT                 not included in MVC charge
*
* TOTAL CHARGE
*
* SIGNATURE
*
* NOTES:
*
*********************************



B157

DEPOSITION
EXHIBIT
Simpson 4
4-3-06 CG

115-1500-0165-7361
7104

383607

| CUSTOMER'S ORDER NO. | DATE 10/3/02 |
| NAME | |
| ADDRESS | |
| CITY, STATE, ZIP | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RETD. | PAID OUT |
| --- | --- | --- | --- | --- | --- | --- |

| QUAN. | DESCRIPTION | PRICE | AMOUNT | |
| --- | --- | --- | --- | --- |
| 1 | Little Black Samba | 125.00 | 125. | 00 |
| 1 | Little Black Samba | 150.00 | 150. | 00 |
| 1 | My Favorite Story Book | 75.00 | 75. | 00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | Tax | 21 | 00 |
| | | | 371 | 00 |

| RECEIVED BY | |

Redi-form  4705        KEEP THIS SLIP FOR REFERENCE

David Downs
Marsha Diaz

Rt. 32 Cannan Valley
Davis, WV 26260

Three Castle Antiques
Three Castle Antiques
Three Castle Antiques

(304) 866-9900        e-mail: diazdowns@meer.net

SIGN HERE
X

2/7/15-1500-0165-7361

EXPIRATION DATE
CHECKED

CUSTOMER: RETAIN THIS COPY FOR YOUR RECORDS

| | DATE 10/3/02 | 1 | Book - Samba | 125 | 00 |
| --- | --- | --- | --- | --- | --- |
| | | 1 | Book - Samba | 150 | 00 |
| | | 1 | Book - Samba | 75 | 00 |

AUTHORIZATION
0b0803a

REG./DEPT.    CLERK

5189538

| SUB TOTAL | 125 | 00 |
| TIP/MISC. | 150 | 00 |
| TAX | 75 | 00 |
| TOTAL | 21 | 00 |
| | 371 | 00 |

SALES SLIP
COPY

DEPOSITION
EXHIBIT
Dwyer 12
sp 3/21/06

DTCC0377

upon receipt in office
no. receipt in office
— cutting Board ? not in office 383611
— wooden item w/inables — not in office



| CUSTOMER'S ORDER NO. | | | DATE 10/5/02 | | |
|---|---|---|---|---|---|

NAME

ADDRESS

CITY, STATE, ZIP

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RET'D | PAID OUT |
|---|---|---|---|---|---|---|

| | QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | J 141 | | 40 00 |
| 2 | | J 243 | | 40 00 |
| 3 | | P 124 or 15 145 | | 135 00 |
| 4 | | Indian P of M or 15 18 | | 15 00 |
| 5 | | P 316 Indian or 15 38 | | 25 00 |
| 6 | | Harpers 1887's 55 | | 50 |
| 7 | | P 484 or 15 35 | | 30 00 |
| 8 | | | | |
| 9 | | | | 335 00 |
| 10 | | | | |
| 11 | | TAX | | 20 10 |
| 12 | | | | 354 10 |

RECEIVED BY

adams 4705    KEEP THIS SLIP FOR REFERENCE

The holder of the card identified on this item is authorized to pay the amount shown as TOTAL upon proper presentation. I promise to pay such TOTAL (together with any other charges due thereon) subject to and in accordance with the agreement governing the use of such card.

EXPIRATION
DATE
CHECKED

| QTY. | CLASS | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| | | Medallion Set | 335 | 00 |
| | | | | |
| | | | | |

DATE 10/5/02    AUTHORIZATION 007121

REG./DEPT.    CLERK

SIGN HERE
X

5189539

| SUB TOTAL | |
|---|---|
| TAX | 20 10 |
| TIP / MISC. | |
| TOTAL | 355 10 |

SALES SLIP

CUSTOMER: RETAIN THIS COPY FOR YOUR RECORDS

B159

 **PNCBANK** 

PNC BANK
TREASURY MANAGEMENT
PO BOX 96064
PITTSBURGH PA 15226

### MEMO STATEMENT

| | |
|---|---|
| ACCOUNT NUMBER | 4715 1500 0165 7361 |
| STATEMENT DATE | 10-28-02 |
| TOTAL ACTIVITY | $3,047.28 |

** MEMO STATEMENT ONLY **
DO NOT REMIT PAYMENT

MARGUERITE M JOHNSON
ST OF DEL DELAWARE TECH
ATT LINDA TETRICK
100 CAMPUS DR
DOVER  DE  19904-1383

N04567

## CARDHOLDER SUMMARY

| MARGUERITE M JOHNSON<br>4715 1500 0165 7361<br>9004063425 | Purchases<br>And Other Debits | + | Cash<br>Advances | – | Credits | = | Total<br>Activity |
|---|---|---|---|---|---|---|---|
| Cardholder Total | $3,047.28 | | $0.00 | | $0.00 | | $3,047.28 |

## CARDHOLDER ACTIVITY

| Post<br>Date | Tran<br>Date | Reference Number | Transaction Description | Amount | |
|---|---|---|---|---|---|
| 10-01 | 09-30 | 24906042273040200050667 | HILTON ADV RESERVATION WASHINGTON DC<br>0000085790          ARRIVAL: 09-30-02 | 193.51 | *Hotel Dec* |
| 10-16 | 10-06 | 24301722288960102651214 | THREE CASTLE ANTIQUES DAVIS WV<br>Purch ID     Sales Tax $0.00 | 355.10 | *? K P Bound 2/1405 ?* |
| 10-16 | 10-04 | 24301722288960102650323 | THREE CASTLE ANTIQUES DAVIS WV<br>Purch ID     Sales Tax $0.00 | 371.00 | *?* |
| 10-18 | 10-16 | 24610432290004106928508 | BEAU CHENE TRUCK STOP GRAND COTEAU LA<br>Purch ID  9700034020   Sales Tax $0.00 | 10.00 | *Lunch-oct* |
| 10-21 | 10-18 | 24388942293360146578387 | ESP LOT WASHINGTON DC<br>Purch ID     Sales Tax $0.00 | 39.00 | *Parking* |
| 10-21 | 10-19 | 24492152293703619100059 | THE COLLEGE BOARD (IMIS) 800-787-7477 NY<br>Purch ID  VQVA64675210   Sales Tax $0.00 | 110.00 | *SS — Mary Lynn* |
| 10-21 | 10-19 | 24246512291605423012790 | ENTERPRISE RENTACAR BATON ROUGE LA<br>D528953 | 140.88 | *Baton Rouge* |
| 10-21 | 10-19 | 24492152293703619100026 | THE COLLEGE BOARD (IMIS) 800-787-7477 NY<br>Purch ID  VSNA30544900   Sales Tax $0.00 | 150.00 | *D-J  40 refund* |
| 10-21 | 10-19 | 24492152293703619100042 | THE COLLEGE BOARD (IMIS) 800-787-7477 NY<br>Purch ID  VRNA72977378   Sales Tax $0.00 | -150.00 | *Inst  40 refund* |
| 10-21 | 10-19 | 24492152293703619100067 | THE COLLEGE BOARD (IMIS) 800-787-7477 NY<br>Purch ID  VQMA64675424   Sales Tax $0.00 | -150.00 | *Inst  *Refund* |
| 10-21 | 10-19 | 24492152293703619100075 | THE COLLEGE BOARD (IMIS) 800-787-7477 NY<br>Purch ID  VQVA64675735   Sales Tax $0.00 | -150.00 | *Inst  40 Refund* |
| 10-21 | 10-19 | 24610432293072006510582 | MARRIOTT HOTELS-BATON RGE BATON ROUGE LA<br>0017240910190          ARRIVAL: 10-16-02 | 364.38 | *Hotel Baton* |
| 10-23 | 10-21 | 24792622295624599070558 | SOUTHWESTAIR5262723414661 DALLAS TX<br>JOHNSON/MARGUERITE<br>BWI WN Y RDU WN Y BWI | 165.50 | *N. Carolina* |
| 10-28 | 10-26 | 24388942300380192929774 | ESP LOT WASHINGTON DC<br>Purch ID     Sales Tax $0.00 | 52.00 | *N. Carolina* |
| 10-28 | 10-26 | 24229702300527400120080 | EMBASSY SUITES  9573 RALEIGH NC<br>00001622530001          ARRIVAL: 10-23-02 | 645.95 | *N. Carolina* |

| CUSTOMER SERVICE CALL<br>1-800-685-4039 | ACCOUNT NUMBER<br>4715-1500-0165-7361 | ACCOUNT SUMMARY | |
|---|---|---|---|
| LOST/STOLEN CARDS CALL<br>1-800-685-4039 | STATEMENT DATE<br>10/28/02 | PURCHASES &<br>OTHER CHARGES | $3,047.28 |
| | CREDIT LIMIT<br>$15,000.00 | CASH ADVANCES<br>CASH ADVANCE FEES | .00<br>.00 |
| SEND INQUIRIES TO:<br>PNC BANK<br>TREASURY MANAGEMENT<br>PO BOX 96064<br>PITTSBURGH PA 15226 | DISPUTED AMOUNT<br>$0.00 | CREDITS<br>TOTAL ACTIVITY | .00<br>$3,047.28 |

B160    Page 1 of 1

*$270⁰⁰ Credit*

DTCC1417

Pending PNC

**Subject: Pending PNC**
   Date: Tue, 14 Jan 2003 10:39:23 -0500
   From: Cena Sweeney <csweeney@college.dtcc.edu>
      To: rhearn@college.dtcc.edu

Bob,
   The following items are pending concerning PNC credits:

12/20
- $745.64  Reimb from State for other agency charges  Aug PNC  *proc. hAvent seen hard copy*
- $212.10  waiting for credit for Genny Iplenski  Sept PNC
- $726.10  Receipts for Three Castle Antiques purchases on 10/4 & 10/6  Dr. Johnson
- $110.00  waiting for credit College Board reg fee Dean Simpson  Oct PNC (Dr. Johnson's card)

These total $1,842.84.  That agrees with my spreadsheet for items not reimbursed to 1201-8022.

The following travel needs to be reconciled for Dr. Johnson.  I don't know if she owes the college $ or we owe her $.

- Washington DC trip 12/15
- Bala Cynwyd, PA 11/21
- AACC 11/13 11/5  *w edn*
- College Board 11/5 *11/13 Atl. City*
- Baton Rouge 10/15
- Raleigh, NC 10/23

Also, I have emailed Randy to find out the status of the reimbursement from the Ed Foundation for $390.00.  This is from PNC Oct (Dan Houghtaling) for the Middle States Dinner.  I have never seen the receipt for this meal.   *1/24 asked KP    4801-8019*

Cena

*PE Dan H. 12/15 Washington DC*

*Need receipts on reimb 726.10*
*PNC Oct*

DEPOSITION
EXHIBIT
Powell  10
3-14-06    PS
PENGAD 800-631-6989

115-1500-0165-7361

x 7104

383607



CUSTOMER'S ORDER NO.                DATE 10/3/02

ME

DRESS

TY, STATE, ZIP

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RET'D | PAID OUT |
|---------|------|--------|--------|----------|-------------|----------|
| QUAN. | DESCRIPTION | | | | PRICE | AMOUNT |
| 1 | Little BlackSambo | | | | 125 00 | 125 00 |
| 1 | Little Black Sambo | | | | 150 00 | 150 00 |
| 1 | My Favorite Story Book | | | | 75 00 | 75 00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | Tax | 21 00 |
| | | | | | | 371 00 |

RECEIVED BY

4705   KEEP THIS SLIP FOR REFERENCE

David Downs
Marsha Diaz

RL 32 Cannan Valley
Davis, WV 26260

Three Castle Antiques
Three Castle Antiques
Three Castle Antiques

(304) 866-9900      e-mail: diazdowns@meer.net

DEPOSITION
EXHIBIT
McNesby 11
4-13-06
PS

B162

DTCC0377

Spot receipt in office
No. rece. at in office
- cutting Board - not in office 383611
- wooden item w/marbles - not in office

| CUSTOMER'S ORDER NO. | | | | | | DATE 10/5/02 | |
|---|---|---|---|---|---|---|---|
| NAME | | | | | | | |
| ADDRESS | | | | | | | |
| CITY, STATE, ZIP | | | | | | | |
| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RETD. | PAID OUT | |
| QUAN. | | DESCRIPTION | | | | PRICE | AMOUNT |
| 1 | | J 141 | | | | 40 | 00 |
| 2 | | J 243 | | | | 40 | 00 |
| 3 | | P 124 or is 145 | | | | 135 | 00 |
| 4 | | Indian Pict or is 18 | | | | 15 | 00 |
| 5 | | P 36 Indian or is 38 | | | | 85 | 00 |
| 6 | | Hairpins (88's) 55 | | | | 50 | — |
| 7 | | P 484 or is 35 | | | | 30 | 00 |
| 8 | | | | | | | |
| 9 | | | | | | 335 | 00 |
| 10 | | | | | | | |
| 11 | | | | | | TAX 20 | 10 |
| 12 | | | | | | 355 | 10 |
| RECEIVED BY | | | | | | | |

adams 4705    KEEP THIS SLIP FOR REFERENCE

| EXPIRATION | | QTY. | CLASS | | DESCRIPTION | | PRICE | | AMOUNT | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ DATE CHECKED | | | | | MERCHANDISE | | 335 | 00 | | |
| | | | | | | | | | | |
| DATE 10/5/02 | | AUTHORIZATION 007121 | | | | | SUB TOTAL | | | |
| | | REG./DEPT. | CLERK | | | | TAX | 20 | 10 | |
| SIGNATURE | | | | | | TIP MISC. | | | | |
| X | | | | 5189539 | | | TOTAL | 355 | 10 | |

The issuer of the card identified on this item is authorized to pay the amount shown as TOTAL upon proper presentation. I promise to pay such TOTAL (together with any other charges due thereon) subject to and in accordance with the agreement governing the use of such card.

CUSTOMER: RETAIN THIS COPY FOR YOUR RECORDS

SALES SLIP

DTCC0378



**DELAWARE TECH**

*Dover ✦ Georgetown ✦ Stanton ✦ Wilmington*

*Marguerite A. Johnson, Vice President and Campus Director*

## MEMORANDUM

**TO:**      Gerard M. McNesby
           Vice President of Finance

**FROM:**    Marguerite A. Johnson
           Vice President/Campus Director

**DATE:.**   November 25, 2003

**RE:**      EDUCATIONAL FOUNDATION DISBURSEMENT

Please generate checks for the following amounts:

- $156.32 payable to the Terry Campus Bookstore per attached invoices #4722 & #4726. (General Fund Account #600)
- $66.60 payable to Ruby Schaffer, reimbursement for the Terry Campus United Way Wrap-up. (Interest Fund Account #602)
- $29.16 payable to DTCC (reimburse PNC charge), for amount over daily per diem on 10/20/03. Please see note from Bob Hearn. (Interest Fund Account #602)

Please forward checks to my office.  If you need additional information, please call Kathy Powell at 857-1126.

attachments

**P A I D**
CK. 6006
12/16/03
156.32

**P A I D**
CK. 6007
12/16/03
JSJ

**P A I D**
CK. 6008
12/16/03
JSJ

DEPOSITION EXHIBIT
Dwyer - 11
ejs  3/21/06
PENGAD 800-631-6989

---

*Delaware Technical & Community College*
**Terry Campus**
100 Campus Drive, Dover, DE 19904
Phone: (302) 857-1126 Fax: (302) 857-1096 email: mjohnson@college.dtcc.edu
Equal Opportunity/Affirmative Action Institution

*Dinner*

RIO CITY CAFE
1110 FRONT STREET
SAC. CA. 95814
(916) 442-8226

Date:        Oct20'03 09:00PM
Card Type:   Visa
Acct #:      4715150001657361
Exp Date:    07/04
Auth Code.   074628
Check:       1710
Table:       52/1
Server:      151 David M
            RITE M JOHNSON

Subtotal:           132.16
Customer COPY

Tip _____   22.00

Total _____   154 16

Customer
Copy        *Johnson*
            *Cunning*
            *Debriley*

10/20

10/20/03

$45.00 per day for meals
X 3 people (all DTCC employees)
$135.00 Total per diem for 3
(154.16) Dinner
(10.00) Lunch
(29.16) Amount over per diem meal allowance
Reimb. Dr. Tribbett PVC from Ed Foundation

**Subject: PNC Pending Items**
   Date: Thu, 03 Apr 2003 07:48:34 -0500
   From: Cena Sweeney <csweeney@college.dtcc.edu>
     To: rhearn@college.dtcc.edu

Bob,
   Just a reminder the following PNC items need be reconciled.

Travel
Dr. Johnson  12/15 Washington DC Trip  AQA
Dr. Johnson  11/13  Atlantic City  College Board
Dr. Johnson  11/5  Washington DC  AACC
Dr. Johnson  10/23 Raleigh NC  Wake Tech Comm College
Dr. Johnson  10/15  Baton Rouge   NCBAA

Other Travel not on PNC Card:
Dr. Johnson  Bala Cynwyd  11/21  College Board's Middle States Open House
Refund 10/22 trip to New Orleans cancelled  pd $160.00 reg fee from Petty Cash on 8/27

Need receipts for Three Castle Antiques Dr. Johnson PNC October
$355.10, $371.00
Need  credit $110.00 for cancelled trip College Board Dean Simpson on Dr. Johnson's card (**I finally paid on Feb PNC EX**)
Need reimb fr Ed Foundation $42.00  alcholic beverages from IACLEA dinner-I called Kathy 4/3 for check status

Cena



DEPOSITION EXHIBIT
McNesby 8
4-13-06

**Subject: Pending PNC Items**
   Date: Wed, 05 Mar 2003 07:56:05 -0500
   From: Cena Sweeney <csweeney@college.dtcc.edu>
      To: rhearn@college.dtcc.edu

Bob,
   Just a reminder the following PNC items need be reconciled:

Travel
Dan H.   12/15  Washington DC Trip   AQA  4/1
Dr. Johnson   12/15  Washington DC Trip   AQA
Dr. Johnson   11/13  Atlantic City   College Board
Dr. Johnson   11/5  Washington DC   AACC
Dr. Johnson   10/23  Raleigh NC   Wake Tech Comm College
Dr. Johnson   10/15  Baton Rouge   NCBAA


Other Travel not on PNC Card:
Dr. Johnson   Bala Cynwyd   11/21   College Board's Middle States Open
House
Refund 10/22 trip to New Orleans cancelled   pd $160.00 reg fee from
Petty Cash on 8/27

Need receipts for Three Castle Antiques Dr. Johnson PNC October
$355.10, $371.00
Need  credit  $110.00 for cancelled trip College Board Dean Simpson on
Dr. Johnson's card   Proc on ex  0406  8032
Need reimb fr Ed Foundation $42.00   alcholic beverages from IACLEA
dinner

Cena



DEPOSITION
EXHIBIT
McNesby 7
4-13-04     P5

**Subject: Pending PNC**
   Date: Tue, 14 Jan 2003 10:39:23 -0500
   From: Cena Sweeney <csweeney@college.dtcc.edu>
   To: rhearn@college.dtcc.edu

Bob,

  The following items are pending concerning PNC credits:

12/20
- $745.64  Reimb from State for other agency charges  Aug PNC *proc. hAven't seen hard copy*
- $212.10  waiting for credit for Genny Iplenski  Sept PNC
- $726.10  Receipts for Three Castle Antiques purchases on 10/4 & 10/6  Dr. Johnson
- $110.00  waiting for credit College Board reg fee Dean Simpson  Oct PNC (Dr. Johnson's card)

These total  $1,842.84.  That agrees with my spreadsheet for items not reimbursed to 1201-8022.

The following travel needs to be reconciled for Dr. Johnson.  I don't know if she owes the college $ or we owe her $.

- Washington DC trip 12/15
- Bala Cynwyd, PA  11/21
- AACC 11/13  11/5  W Wdn
- College Board  11/5 11/13  Atl. City
- Baton Rouge  10/15
- Raleigh, NC  10/23

XP.O 3/14
Also, I have emailed Randy to find out the status of the reimbursement from the Ed Foundation for $390.00.  This is from PNC Oct (Dan Houghtaling) for the Middle States Dinner.  I have never seen the receipt for this meal.    '/24 ocred K P    4801~8019

Cena

PC  Dan H.  12/15 washington DC

Need receipts on reimb 726.10
   PNC Oct



DEPOSITION
EXHIBIT
McNusby 6
4-13-06  PS
PENGAD 800-631-6989

Subject: November 19 Department Chair Meeting
From: kriley@dtcc.edu
Date: Wed, 17 Nov 2004 13:48:23 -0500
To: Bill Ayers <ayers@dtcc.edu>, Stephanie Beaudet <sbeaudet@dtcc.edu>, Bob Hearn
<rhearn@dtcc.edu>, Dan Houghtaling <dhoughta@dtcc.edu>, "Dr. Johnson" <mjohnson@dtcc.edu>,
Charlotte Lister <clister@dtcc.edu>, "Dr. Mishoe" <wmishoe@dtcc.edu>

Deans and Directors,
Peter Shoudy will be attending our Department Chair meeting this Friday to
review the new IT organizational structure. You are more than welcome to
come and hear what Mr. Shoudy has to say at 10:30 in room TER 215.

DEPOSITION
EXHIBIT
#4
Shoudy  2/15/06 ASR

**Email Message**                                                          (Page 1 of 1)

```
turn-Path: <ctravis@dtcc.edu>
Date: Fri,  8 Apr 2005 09:13:20 -0400
From: ctravis@dtcc.edu
To: David Dwyer <ddwyer@sbgcpa.com>
Subject: File
User-Agent: Internet Messaging Program (IMP) 3.2.6
```

Mr. Dwyer,

Attached are tge reqyested files. I color coded the lines in yellow that I remember doing.  The files coded in green are files that I recall working jointly with Kathy Powell.

As I stated in our phone conversation on 4/7/2005, I cannot exactly recall the amount of time spent on each of the files.

I have answered your inquiries to the best of my ability.  If I can be of further assistance, please feel free to contact me.

Have a good day.





William A. Santora, CPA
Michael F. Baffone, CPA
David G. Dwyer, CPA
John A. D'Agostino, CPA, MST

March 22, 2005

Gerard McNesby
Delaware Technical and Community College
P.O. Box 897
Dover, DE 19903

Dear Jerry:

We are pleased to confirm our understanding of the services we are to provide for the Delaware Technical and Community College (DTCC), Terry Campus.

This formal engagement is a culmination of prior discussions, which began in February 2005. Based on the discussions between SantoraBaffone CPA Group (SBG) and the management of DTCC, we understand this engagement entails reviewing the transactions and events listed below, which were entered into by or performed under the direction of Marguerite M. Johnson, Ed.D., in her capacity as Vice President/ Campus Director of the Terry Campus, to determine their adherence to established laws and policies.

We will perform the following services:

➢ We will interview Kathy Powell, Administrative Assistant to Dr. Johnson, in regards to her performance of noncollege activities performed during normal college business hours at the direction of Dr. Johnson.

➢ We will interview certain other DTCC employees to determine their participation in planning Dr. Johnson's 1999 and 2001 family reunions. If, based on the above discussions, it is determined that DTCC employees were directed by Dr. Johnson to perform noncollege activities during normal business hours, we will attempt to quantify the dollar amount of diverted salaries and related costs incurred by DTCC.

➢ We will review the following Supercard transactions incurred by Dr. Johnson to determine their appropriateness and adherence to established laws and policies:



DEPOSITION
EXHIBIT
Dwyer  "3
ep  3/21/06

Christiana Executive Campus ▲ 220 Continental Drive ▲ Suite 112 ▲ Newark, DE 19713-4309
Phone: (302) 737-6200 ▲ (800) 347-0116 ▲ Fax: (302) 737-3362
E-Mail: info@sbgcpa.com ▲ www.santorabaffone.com

B-174

Gerard McNesby
March 22, 2005
Page 2

| | |
|---|---|
| Three Castle Antiques | October 4, 2002 |
| Three Castle Antiques | October 6, 2002 |
| Bag & Baggage, Inc. | August 10, 2002 |
| Terry Campus Bookstore | October 31, 2002 |
| Friends of the Capital Theater | September 12, 2002 |
| Friends of the Capital Theater | September 17, 2002 |
| Friends of the Capital Theater | June 25, 2003 |

➢ We will review the following business trips of Dr. Johnson to determine their appropriateness and adherence to established laws and policies:

    Wake Technical Community College    Raleigh, NC

➢ In all cases, we will attempt to verify whether Dr. Johnson reimbursed DTCC for the personal use of DTCC assets.

In order to determine the appropriateness of the aforementioned transactions, we will gain an understanding of the laws and policies related to travel and entertainment, use of the Supercard, and the use of employees for noncollege-related matters. Once we have an understanding of these laws and policies, we will examine the financial records of DTCC that support these transactions and interview DTCC employees in order to determine whether transactions or events occurred that were contrary to established policies.

At the completion of our engagement, we will provide a written report presenting our findings in a format that states the existing policies in place, any deviation noted, an estimate of losses to DTCC, and if determinable, the cause of the deviation.

If anyone subpoenas any information or materials related to this engagement, which is in our custody or control, we will inform you prior to disclosure and as soon as practicable following our receipt of such subpoena. Otherwise, no disclosure of our report or any information or material in our custody or control will be disclosed to any third party without the express written consent of DTCC.

Our fees are based on the time required by the professionals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and level of skill required. Our fee will also include out-of-pocket costs such as travel reimbursement, communication costs, and data processing charges. Our fees may also include any legal action that may be required on our part. Additional

Gerard McNesby
March 22, 2005
Page 3

expenses that may be incurred for court testimony or depositions will be indemnified by
DTCC to SBG based on actual expenses incurred and the hourly rate of the
professionals involved. Should the information needed to perform this engagement be
incomplete or unavailable, SBG reserves the right to withdraw from the engagement or
report findings to that effect.

We appreciate the opportunity to be of service to you and believe this letter accurately
summarizes the significant terms of our engagement. If you have any questions or
concerns, please let us know. If you agree with the terms of our engagement as
described in this letter, please sign and date the enclosed copy and return it to us in the
enclosed, postage-paid envelope.

Warm regards,


David G. Dwyer, CPA, CFE

Enclosures

xc: Dr. Orlando George

Acknowledged:
Delaware Technical and Community College


_____
Gerard McNesby


_____
Date  3/24/05

# SantoraBaffone
Innovation. Solutions. Results.    **CPA Group**

William A. Santora, CPA
Michael E Baffone, CPA
David G. Dwyer, CPA
John A. D'Agostino, CPA, MST

April 12, 2005

Gerard M. McNesby
Vice President for Finance
Delaware Technical and Community College
Office of the President
P.O. Box 897
Dover, DE 19903

Dear Mr. McNesby:

We have performed the procedures enumerated below, which were agreed to by Delaware Technical and Community College (DTCC), solely to assist you with determining the adherence to established policies for certain transactions and events entered into or performed by Marguerite M. Johnson, Ed.D. (Dr. Johnson), in her capacity as Vice President/Campus Director of the Terry Campus. This agreed-upon procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of those parties specified in the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

Our procedures and findings are as follows:

**Procedures Applied**

We interviewed Kathy Powell, Administrative Assistant to Dr. Johnson, regarding her performance of non-DTCC activities performed during normal DTCC business hours at the direction of Dr. Johnson from July 1, 1999 to December 31, 2004.

**Policy**

Based on the DTCC Personnel Policy Manual, Section 6.01, the Vice President and Campus Director in charge of the campus is authorized to establish working periods and to designate work assignments in the best interests of DTCC. In addition, Section 11.11 of the Policy Manual states that the first duty and responsibility of the full-time employee is to render to DTCC the most effective service possible. No outside service or enterprise, professional or other, should be undertaken that might interfere with this discharge of this primary responsibility.



DEPOSITION
EXHIBIT
#21
11/30/05 ASR

Christiana Executive Campus ▲ 220 Continental Drive ▲ Suite 112 ▲ Newark, DE 19713-4309
Phone: (302) 737-6200 ▲ (800) 347-0116 ▲ Fax: (302) 737-3362
E-Mail: info@sbgcpa.com ▲ www.santorabaffone.com

Gerard M. McNesby
April 12, 2005
Page 2

## Findings

From the interview, it was determined that Ms. Powell officially reported to Dr. Johnson since July 1, 1999 and has performed considerable non-DTCC activities for Dr. Johnson on a routine basis during this time. Ms. Powell spent a substantial amount of time working on the following items for Dr. Johnson during regular business hours and using DTCC assets (i.e., computer equipment and supplies):

- The McConnell-McClurkin Family Reunion nonprofit corporation was incorporated in 2001. This was a corporation formed by Dr. Johnson to receive donations to help fund the costs of hosting a personal reunion. Ms. Powell typed the bylaws, board agendas, board minutes, executive committee meeting minutes, other correspondence, and also set up mail merge distribution lists, mailing labels, and reconciled the checkbook.
- Reconciling Dr. Johnson's personal checkbook every month.
- Doing Dr. Johnson's personal on-line banking, and upon direction, transferring money to her personal savings account.
- Handling numerous correspondences to close personal credit card accounts for Dr. Johnson.
- Handling numerous correspondences for Dr. Johnson's disabled sister's care, including sending monthly invoices to her sister's insurance company seeking reimbursement.
- Filling out Dr. Johnson's son's Free Application for Student Financial Aid (FASFA) form on-line.
- Handling numerous correspondences for Dr. Johnson's son, including letters regarding his lease, the Department of Elections for Kent County, and Salisbury State University.
- Handling invitations to Dr. Johnson's son's graduation and being the RSVP contact.
- Handling numerous correspondences for Dr. Johnson's daughter, including letters to her sorority; canceling a book club membership; to the post office to correct her address; to the Wyndam Hotel for her daughter's wedding; and graduation invitations.
- Handling miscellaneous letters on behalf of Dr. Johnson's husband to the Department of Public Safety for running a red light and to New All Saints Catholic Church to complain about a family member's funeral and signing the family members' names at the end of the letter.
- Handling 21 family Thanksgiving place cards.
- Running numerous personal errands for Dr. Johnson on demand during business hours.
- Handling a personal family reunion in 1999 as outlined in more detail below.

Ms. Powell's estimate of the amount of time she time spent working on non-DTCC activities during business hours for Dr. Johnson was 10%. In order to quantify the amount of Ms. Powell's diverted personnel costs from July 1, 1999 to December 31, 2004, we multiplied her annual salary and benefit costs for each respective year by 10%. This equated to $23,422.

## Procedures Applied

We interviewed seven other DTCC current employees to determine their participation in planning Dr. Johnson's 1999 and 2001 personal family reunions. The results of those conversations are as follows:

Gerard M. McNesby
April 12, 2005
Page 3

## Policy

Based on the DTCC Personnel Policy Manual, Section 6.01, the Vice President and Campus Director in charge of the campus is authorized to establish working periods and to designate work assignments in the best interests of DTCC. In addition, Section 11.11 of the Policy Manual states that the first duty and responsibility of the full-time employee is to render to DTCC the most effective service possible. No outside service or enterprise, professional or other, should be undertaken that might interfere with this discharge of this primary responsibility.

## Findings

Each employee interviewed had some involvement in Dr. Johnson's 1999 family reunion. Their involvement in the 1999 reunion included typing correspondence, typing recipes, designing and creating marketing pieces, scanning and touching up photographs, and copying and assembling the completed project. The completed project included a cookbook, genealogy book, program, save the date cards, candy bar wrappers, reminder cards, and bookmarks. The 2001 reunion involved two employees who scanned photographs into an insert for a program. Since the reunion happened almost six years ago, it was difficult to obtain a definitive answer from people regarding the amount of time spent on the 1999 family reunion. In order to quantify the amount of diverted personnel costs, we used time estimates from interviews to arrive at a high/low range of hours worked multiplied by the employees' hourly rate of pay for that time period. In order to quantify the material costs associated with producing all of the reunion documents, we used paper usage estimates from the interviews and by our examination of certain documents. The cookbook had 66 pages, the genealogy book had between 35 and 45 pages, and the program had between 10 and 20 pages. We estimated one page for the other reunion pieces listed above. Based on our interviews and examination of the reunion database file, we estimated 150 to 200 copies were made for each piece. We have compiled the table below as a means of summarizing the dollar amount of diverted personnel costs and material costs incurred by DTCC. See the accompanying schedules for further details of estimates.

| High | | | |
|---|---|---|---|
| Reunion | Personnel Costs | Material Costs | Reunion Total |
| 1999 2001 | $5,724 261 $5,985 | $4,340 – $4,340 | $10,064 261 $10,325 |

| Low | | | |
|---|---|---|---|
| Reunion | Personnel Costs | Material Costs | Reunion Total |
| 1999 2001 | $3,204 122 $3,326 | $2,771 – $2,771 | $5,975 122 $6,097 |

Gerard M. McNesby
April 12, 2005
Page 4

In addition to her personal family reunions, Dr. Johnson used DTCC personnel to perform the following other non-DTCC related services:

- Vacation pictures:  Dr. Johnson asked the Marketing Department to download her 2003 vacation pictures from an Internet site and print them for her.  Based on the results of our interviews, there were 40 to 50 pictures that took hours to print on the color copier. Once Dr. Johnson reviewed all the pictures, she requested duplicates of certain pictures, again tying up the color copier for hours.

- Banners:  Dr. Johnson requested two banners be made in the Marketing Department. They were congratulation banners for her daughter's graduation in 1998.

- Graduation invitations:  Dr. Johnson requested her son's graduation invitations be made in the Marketing Department.

**Conclusion**

In the above procedures and findings, we set out to determine if there were any deviations from existing policies in place, and if determinable, the cause of the deviation from such policies. Based on our 12 interviews of DTCC personnel, Dr. Johnson created an atmosphere of intimidation and fear.  When the personnel were asked if they knew it is was wrong to perform non-DTCC related business for the benefit of Dr. Johnson, the consistent answer was "yes, but you did what you were told to do."  These people feared reprisal in the form of a bad evaluation or even being "sent to the parking lot," which was Dr. Johnson's saying for job termination.  Dr. Johnson was known to call people incompetent and threaten people with being replaced by someone better qualified.   These people feared Dr. Johnson, and in order to keep their employment at DTCC, they did what Dr. Johnson told them, without objection.

**Procedures Applied**

We reviewed the following specific transactions as identified by DTCC to determine their appropriateness and adherence to established policies:

| | | |
|---|---|---|
| 1) | Three Castle Antiques | October 4, 2002 |
| 2) | Three Castle Antiques | October 6, 2002 |
| 3) | Bag & Baggage, Inc. | August 10, 2002 |
| 4) | Terry Campus Bookstore | October 31, 2002 |
| 5) | Friends of the Capital Theater | September 12, 2002 |
| 6) | Friends of the Capital Theater | September 17, 2002 |
| 7) | Friends of the Capital Theater | June 25, 2003 |

Gerard M. McNesby
April 12, 2005
Page 5

## Policy

The existing DTCC fiscal policy relating to the use of the PNC Bank Supercard credit card states the individual cardholder agrees to use the card for approved purchases and agrees not to charge personal purchases. Each cardholder is responsible for maintaining an activity log of all card purchases with supporting documentation. All Supercard transactions are subject to prior written approval. Any misuse of the Supercard will be grounds for discipline up to and including termination of employment. All employees who are issued a Supercard are required to review and sign off documenting their understanding of the policy.

## Findings

- Items purchased in transaction 1 included two pieces of jewelry, purchased by Dr. Johnson for $80, that are in violation of the allowable costs in accordance with Supercard Employee Disclosure Statement and Guidelines, which Dr. Johnson signed upon issuance of her Supercard. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated this transaction and these items could not be located on the Terry Campus.

- Transaction 2 included the purchase by Dr. Johnson of three children's storybooks from an antique store in West Virginia totaling $371. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated this transaction and these items could not be located on the Terry Campus.

- Transaction 3 included the purchase by Dr. Johnson of a $435 attaché case, and based on our inquiries with certain campus personnel, this item could not be located on the Terry Campus.

- Transaction 4 was for the purchase by Dr. Johnson of a $39 silver bracelet and could not be located on the Terry Campus. This transaction was charged to a state appropriation code and the supporting invoice did not indicate the business purpose of the purchase. No personal reimbursement from Dr. Johnson could be located.

- Transactions 5 and 6, which were entered into by Dr. Johnson, totaled $1,100. Transaction 5 was for $800 to purchase a table for the Camelot Fund Raising Gala held at the Schwartz Center for the Arts. Transaction 6 is for two season tickets for the fall/winter 2002 season at the Schwartz Center. Both transactions violate the allowable cost provisions of the Supercard Employee Disclosure Statement and Guidelines. Based on inquiries with Business Office personnel, Dr. Johnson did not provide supporting documentation that substantiated these transactions.

- Transaction 7 in the amount of $450 for the purchase of two season tickets to the Schwartz Center for the Arts, was initiated by and included on Kathy Powell's Supercard and subsequently approved by Dr. Johnson, is in violation of the allowable cost provisions associated with Supercard purchases.

Gerard M. McNesby
April 12, 2005
Page 6


**Procedures Applied**

We reviewed the following business trip of Dr. Johnson to determine its appropriateness and adherence to established laws and policies:

Wake Technical Community College (WTCC)    Raleigh, NC    October 23-26, 2002

**Policy**

The existing DTCC fiscal policy relating to the use of the PNC Bank Supercard credit card states that the individual cardholder agrees to use the card for approved travel and agrees not to charge personal purchases. Each cardholder is responsible for maintaining an activity log of all card purchases with supporting documentation. All Supercard transactions are subject to prior written approval. Any misuse of the Supercard will be grounds for discipline up to and including termination of employment. All employees who are issued a Supercard are required to review and sign off documenting their understanding of the policy.

DTTC Terry Campus Travel Policy and Section 11.10 of the DTCC Personnel Policy Manual states that a travel request must be completed by the employee and approved by the employee's supervisor prior to departure and authorization for travel is the responsibility of the President. Upon return from the trip, the travel reconciliation form should be completed by the employee and submitted to the Accounting Office within 10 days. If personal travel expenses are billed at the same time as business-related travel expenses, the employee will reimburse DTCC for the personal portion within 10 working days of the employee's return.

**Findings**

Examination of Dr. Johnson's WTCC travel request form indicated there was no approval by her supervisor, Dr. Orlando George, DTCC College President, prior to her departure. Dr. Johnson submitted a "DTCC - Terry Campus TRAVEL REQUEST FORM," dated October 21, 2002, to the Business Office with a stated destination of Raleigh, North Carolina, departing on October 23, 2002 and returning October 26, 2002. The October 21, 2002 dating of the travel request form preceded Dr. Johnson's signature date of November 11, 2002. The travel request form stated the following Explanation of Travel Request: "To tour and meet with administrators for Institutional Advancement/Development and Public Safety/Security from Wake Technical Community College in Raleigh, NC."

Based upon this data, SantoraBaffone CPA Group (SBG) contacted the individuals at WTCC responsible for Public Safety/Security and Institutional Advancement/Development - Carol E. Himes, Facilities' Engineer Officer, and Jane A. Rabon, Executive Director of WTCC Foundation. Mrs. Himes could not remember the exact date of Dr. Johnson's visit, but stated "that late October 2002, seemed about right." Mrs. Himes stated that she received a call from Dr. Johnson asking if she could meet with Mrs. Himes to discuss Public Safety/Security at WTCC, while she [Dr. Johnson] was in town visiting family. The fact that the call took place is

Gerard M. McNesby
April 12, 2005
Page 7

validated by reference to Dr. Johnson's Verizon Wireless bill, billing date November 19, 2002, that shows a call being placed by Dr. Johnson, utilizing her cell phone, on October 24, 2002 at 3:11 p.m. to Mrs. Himes' telephone number. Per my discussions with Mrs. Himes, this is the only time that Dr. Johnson spoke with her prior to their meeting to discuss WTCC Public Safety/Security.

Mrs. Himes remembered meeting with Dr. Johnson, subsequent to the phone call, for approximately one to two hours where they discussed general college public safety and security issues.

Mrs. Rabon stated that she could not remember meeting with anyone from DTCC during her tenure as Executive Director of WTCC Foundation.

The total cost of the three-day WTCC trip charged on the Supercard was $1,198, and included round trip airfare ($166), three-day hotel stay ($646), three-day car rental ($334), and three days of parking at BWI ($52). The total personnel cost of the three-day WTCC trip for Dr. Johnson was $1,653, and includes her daily salary ($451) plus benefits costs ($99).

## Conclusion

According to DTCC Fiscal Guidelines, the Vice President/Campus Director shall share overall responsibility with the Office of the President for insuring that fiscal operations are accomplished in conformance with appropriate laws, regulations, and policies, and shall take steps necessary to bring about compliance. Based on the procedures applied to the Supercard purchases and travel expenditures, Dr. Johnson deviated from the established DTCC Fiscal Guidelines as follows:

- By not providing supporting documentation for expenditures incurred,

- By purchasing personal items with state funds and not providing personal reimbursement,

- By not safeguarding DTCC assets purchased with state funds,

- By not obtaining prior approval for business trips, and

- By not providing the documentation that substantiated the business purpose for the expenditures incurred.

In all cases, we attempted to verify whether Dr. Johnson reimbursed DTCC for the personal use of DTCC assets. Based upon our inquiries, we were able to locate one receipt from Dr. Johnson in the amount of $365.40. This receipt was dated August 16, 1999, and the description for the transaction was "Reimb fr Dr. Johnson." We were not able to locate supporting documentation for the transaction.

Gerard M. McNesby
April 12, 2005
Page 8

**Summary**

Based on interviews with DTCC staff and external personnel, review of supporting documentation, and review of existing policies and procedures, there are specific instances where Dr. Johnson deviated from state and DTCC policies, charged DTCC for unauthorized/ nonbusiness-related travel, and misused DTCC personnel and the assets entrusted to her. We recommend that DTCC inform the appropriate state agency as a means of initiating a more in-depth investigation into these matters.

We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the management of DTCC, the Attorney General's Office, and the Office of the Auditor of Accounts and is not intended to be and should not be used by anyone other than these specified parties.

*Santora Baffone*
    CPA Group

**Delaware Technical Community College – Terry Campus**

**MEMORANDUM**

TO:        File
FROM:      David Dwyer, CPA, CFE
SUBJECT:   Interview of Joan Erhart
DATE:      March 24 2005

---

Joan Erhart, was interviewed in room 206, 100 Campus Drive, Dover, DE. The purpose of the meeting was to inquire of Dr. Marguerite Johnson's (Dr. J) misappropriation of DTCC personnel and fiscal resources for her family reunion and to see if she had knowledge of any other instance of Dr. J misappropriating DTCC resources.

- Joan has worked at the college for 9 years. She has worked in CCP for a 1.5 years, left the college, came back and worked as the evening receptionist. She has worked upstairs in the Copy Room for the past 4-5 years. Joan reports to Fred Evins.
- Family reunion – Joan was really not involved. She thinks Susan did the cookbook. She remembers going down stairs in Dr. J's conference room and stuffing folders that she was going to give out to individuals. Joan also remembers the note pads.
- Kathy Powell came up with pictures and monopolized the color copier to copy pictures for the reunion.
- Joan thinks it was May or June of 1999 but she does not know for sure.
- There were a few days Joan came in early to help out in Dr. J's office. There were a couple of times she came in early and worked from 1-3 in Dr. J's office and then to the receptionist desk at 3. Joan never got a break from the Dr. J's office to the receptionist desk. She may have gotten compensated for it but can't remember. Dr. J would approve her payroll record for any times her hours were extended over 29 hours per week.
- Dr. J has always been nice to her. Dr. J is the one who gave her the full time position in the Copy Room. She never really mistreated her.
- When Dr. J's daughter got married, she brought up an invitation for Susan to frame. Joan was sure Dr. J brought her own frame because it was not a cheap frame the college uses.
- When Joan was assembling in the Dr. J's conference room, Dr. J told her she was keeping a running tab and that she was paying for it.
- Joan remembers staying late one time in Dr. J's conference room and they bought them dinner.

DTCC2070

# Delaware Technical Community College – Terry Campus

## MEMORANDUM

TO:        File
FROM:      David Dwyer, CPA, CFE
SUBJECT:   Interview of Ron Pleasanton, Dept. Chair and Instructor in the Visual
           Communications Department
DATE:      March 28, 2005

Ron Pleasanton was interviewed in room 206, 100 Campus Drive, Dover, DE. The
purpose of the meeting was to inquire of Dr. Marguerite Johnson's (Dr. J)
misappropriation of DTCC personnel and fiscal resources for her family reunion and to
see if he had knowledge of any other instance of Dr. J misappropriating DTCC resources.

- Ron had worked for the college for 10 years. For the past 8 years he has been the
  Dept. Chair. He reports to Connie Spampinato, Dean of Instruction.
- Family reunion: It was near the end of the spring term, in the summer and there
  were not many students around. Dr. J approached him and needed a banner for
  the event and wanted something special. She asked him if he or his students
  could work on the banner. Being summer, there were no students around, so Ron
  said he would be happy to do it. He designed and worked on the banner. He
  bought the materials for the banner. At first he thought it was going to be a
  simple banner. He found and bought special kinte cloth he wanted to add to it.
  Most of the work was outside the spectrum of his college job. It didn't interfere
  with his job. He did the work in the evenings on a vinyl-cutting machine that a
  college club owns. He was the only one that knows how to operate it and it was
  at his house. He cut the vinyl at his house because the machine was kept at his
  house for safekeeping while they worked on a Dover Downs project. He cut the
  vinyl letters, and might have used 15-20 ft. of vinyl out of a 50 yd. roll. The vinyl
  was excess from the Dover Downs project. He was reimbursed directly from Dr.
  J for the banner materials. He didn't give a bill for the labor, only a bill for the
  materials. He does not have a copy of the bill he gave Dr. J. He assembled it on
  campus time. He spent a couple hours, or an afternoon, on campus time
  assembling it. Dr. J asked him to make this banner. She liked the banner.        Banner
- This is the only family reunion he worked on.
- Ron is not aware of any other personal family projects for Dr. J.

DTCC2078

## Delaware Technical Community College – Terry Campus

### MEMORANDUM

TO:        File
FROM:      David Dwyer, CPA, CFE
SUBJECT:   Interview of Bob Hearn, Business Manager
DATE:      March 28, 2005

---

Bob Hearn was interviewed in room 206, 100 Campus Drive, Dover, DE. The purpose of the meeting was to inquire of Dr. Marguerite Johnson's (Dr. J) misappropriation of DTCC personnel and fiscal resources for her family reunion and to see if he had knowledge of any other instance of Dr. J misappropriating DTCC resources.

- Bob started as Business Manager in April 2002, prior to that he worked in the Office of President since June 1996. His duties as Business Manager include accounts receivable, accounts payable, the bookstore, and the financial aid office. He reports to directly to the Campus Director, Dr. J.
- Dr. J's family reunion, was before his time at the Terry Campus.
- Bob was aware of a personal trip to WV to visit Dan Simpson's property that Dr. J went on with her husband. Cena Sweeney brought two WV supercard transactions to his attention. There were one or two transactions that totaled $700. They never received a receipt from Dr. J for them. They were never sure what she purchased. That was in the fall of 2002. They asked Kathy Powell for receipts. When Kathy was cleaning out Dr. J's office, she found the receipts. It appeared by the name of the store that it was an antique store. Since they now have the receipt, it appears it might be some sort of collectibles. They did not know if it was within her scope as Campus Director. Their first impression was she pulled the wrong card out. If an employee did not have a trip schedule, it appears the employee might have a personal purchase on the campus credit card.
- Usually when Dr. J would travel, there would be travel request form filled out, the expenses of the trip, purpose of the trip, gone for which days, hotel, airfare, etc. Bob would look at the form and approve it if there are founds available. He had no knowledge if someone approved her trips higher than her. His impression from working as an Accounting Manager in the President's Office, the Campus Directors do not have to get presidential authority to travel. So when he worked as an Accounting Manager he did not police their travel. Bob looked up the fiscal guidelines and did not find anything specific, only that your direct supervisor has to approve your travel. During his time at the campus, her request forms never went anywhere else for approval.
- There were 5 business trips they never received receipts from Dr. J. They usually reconcile every trip for supercard purchases, expenses. These trips were never reconciled.

DTCC2079

## Delaware Technical Community College – Terry Campus

### MEMORANDUM

TO:         File
FROM:       David Dwyer, CPA, CFE
SUBJECT:    Interview of Kathy Powell, Administrative Assistant to the Campus Director
DATE:       March 31, 2005

---

Kathy Powell, was interviewed in the Campus Director's Office, 100 Campus Drive, Dover, DE. The purpose of the meeting was to inquire the amount of time spent working on Dr. J's personal items.

- The amount of time Kathy spent on Dr. J's personal business was hard to measure. Besides the family reunion, the work was spread out. The checkbook could take more than an hour at a time, especially when it was messed up. Kathy would have to print out the bank statements on-line.
- Range of time: minimum of 3 hours per month; maximum of 12 hours per month. Based on a 7.5-hour workday, that equates to 2% - 8% of Kathy's time spent on Dr. J's personal business.

DTCC2083

## AT Section 201

# *Agreed-Upon Procedures Engagements*

**Source: SSAE No. 10; SSAE No. 11.**

**Effective when the subject matter or assertion is as of or for a period ending on or after June 1, 2001, unless otherwise indicated.**

## Introduction and Applicability

**.01**  This section sets forth attestation standards and provides guidance to a practitioner concerning performance and reporting in all agreed-upon procedures engagements, except as noted in paragraph .02. A practitioner also should refer to the following sections of this Statement on Standards for Attestation Engagements (SSAE), which provide additional guidance for certain types of agreed-upon procedures engagements:

  *a.*   Section 301, *Financial Forecasts and Projections*

  *b.*   Section 601, *Compliance Attestation*

**.02**  This section does not apply to the following:[1]

  *a.*   Situations in which an auditor reports on specified compliance requirements based solely on an audit of financial statements, as addressed in AU section 623, *Special Reports*, paragraphs .19–.21

  *b.*   Engagements for which the objective is to report in accordance with AU section 801, *Compliance Auditing Considerations in Audits of Governmental Entities and Recipients of Governmental Financial Assistance*, unless the terms of the engagement specify that the engagement be performed pursuant to SSAEs

  *c.*   Circumstances covered by AU section 324, *Service Organizations*, paragraph .58, when the service auditor is requested to apply substantive procedures to user transactions or assets at the service organization, and he or she makes specific reference in his or her service auditor's report to having carried out designated procedures (However, this section applies when the service auditor provides a separate report on the performance of agreed-upon procedures in an attestation engagement.)

  *d.*   Engagements covered by AU section 634, *Letters for Underwriters and Certain Other Requesting Parties*

  *e.*   Certain professional services that would not be considered as falling under this section as described in section 101, *Attest Engagements*, paragraph .04.

---

[1]  The Attest Interpretation, "Responding to Requests for Reports on Matters Relating to Solvency" (section 9101.23–.33), prohibits the performance of any attest engagements concerning matters of solvency or insolvency.

**2602**    Statements on Standards for Attestation Engagements

## Agreed-Upon Procedures Engagements

.03  An agreed-upon procedures engagement is one in which a practitioner is engaged by a client to issue a report of findings based on specific procedures performed on subject matter. The client engages the practitioner to assist specified parties in evaluating subject matter or an assertion as a result of a need or needs of the specified parties.[2] Because the specified parties require that findings be independently derived, the services of a practitioner are obtained to perform procedures and report his or her findings. The specified parties and the practitioner agree upon the procedures to be performed by the practitioner that the specified parties believe are appropriate. Because the needs of the specified parties may vary widely, the nature, timing, and extent of the agreed-upon procedures may vary as well; consequently, the specified parties assume responsibility for the sufficiency of the procedures since they best understand their own needs. In an engagement performed under this section, the practitioner does not perform an examination or a review, as discussed in section 101, and does not provide an opinion or negative assurance.[3] (See paragraph .24.) Instead, the practitioner's report on agreed-upon procedures should be in the form of procedures and findings. (See paragraph .31.)

.04  As a consequence of the role of the specified parties in agreeing upon the procedures performed or to be performed, a practitioner's report on such engagements should clearly indicate that its use is restricted to those specified parties.[4] Those specified parties, including the client, are hereinafter referred to as *specified parties*.

## Standards

.05  The general, fieldwork, and reporting standards for attestation engagements as set forth in section 101, together with interpretive guidance regarding their application as addressed throughout this section, should be followed by the practitioner in performing and reporting on agreed-upon procedures engagements.

## Conditions for Engagement Performance

.06  The practitioner may perform an agreed-upon procedures attest engagement provided that—

*a.*    The practitioner is independent.

*b.*    One of the following conditions is met.

(1) The party wishing to engage the practitioner is responsible for the subject matter, or has a reasonable basis for providing a written assertion about the subject matter when the nature of the subject matter is such that a responsible party does not otherwise exist.

---

[2]  See paragraphs .08 and .09 for a discussion of subject matter and assertion.

[3]  For guidance on expressing an opinion on specified elements, accounts, or items of a financial statement based on an audit, see AU section 623.11–.18.

[4]  See section 101.78–.83 for additional guidance regarding restricted-use reports.

**AT §201.03**    Copyright © 2002, American Institute of Certified Public Accountants, Inc.

Agreed-Upon Procedures Engagements    **2603**

    (2)  The party wishing to engage the practitioner is not responsible for the subject matter but is able to provide the practitioner, or have a third party who is responsible for the subject matter provide the practitioner with evidence of the third party's responsibility for the subject matter.

*c.*  The practitioner and the specified parties agree upon the procedures performed or to be performed by the practitioner.

*d.*  The specified parties take responsibility for the sufficiency of the agreed-upon procedures for their purposes.

*e.*  The specific subject matter to which the procedures are to be applied is subject to reasonably consistent measurement.

*f.*  Criteria to be used in the determination of findings are agreed upon between the practitioner and the specified parties.

*g.*  The procedures to be applied to the specific subject matter are expected to result in reasonably consistent findings using the criteria.

*h.*  Evidential matter related to the specific subject matter to which the procedures are applied is expected to exist to provide a reasonable basis for expressing the findings in the practitioner's report.

*i.*  Where applicable, the practitioner and the specified parties agree on any materiality limits for reporting purposes. (See paragraph .25.)

*j.*  Use of the report is restricted to the specified parties.

*k.*  For agreed-upon procedures engagements on prospective financial information, the prospective financial statements include a summary of significant assumptions. (See section 301.52.)

## Agreement on and Sufficiency of Procedures

    **.07**  To satisfy the requirements that the practitioner and the specified parties agree upon the procedures performed or to be performed and that the specified parties take responsibility for the sufficiency of the agreed-upon procedures for their purposes, ordinarily the practitioner should communicate directly with and obtain affirmative acknowledgment from each of the specified parties. For example, this may be accomplished by meeting with the specified parties or by distributing a draft of the anticipated report or a copy of an engagement letter to the specified parties and obtaining their agreement. If the practitioner is not able to communicate directly with all of the specified parties, the practitioner may satisfy these requirements by applying any one or more of the following or similar procedures.

- Compare the procedures to be applied to written requirements of the specified parties.

- Discuss the procedures to be applied with appropriate representatives of the specified parties involved.

- Review relevant contracts with or correspondence from the specified parties.

The practitioner should not report on an engagement when specified parties do not agree upon the procedures performed or to be performed and do not take responsibility for the sufficiency of the procedures for their purposes. (See

AICPA Professional Standards                    **AT §201.07**

**2604**    Statements on Standards for Attestation Engagements

paragraph .36 for guidance on satisfying these requirements when the practitioner is requested to add other parties as specified parties after the date of completion of the agreed-upon procedures.)

## Subject Matter and Related Assertions

**.08** The subject matter of an agreed-upon procedures engagement may take many different forms and may be at a point in time or covering a period of time. In an agreed-upon procedures engagement, it is the specific subject matter to which the agreed-upon procedures are to be applied using the criteria selected. Even though the procedures are agreed upon between the practitioner and the specified parties, the subject matter and the criteria must meet the conditions set forth in the third general standard. (See section 101.23 and .24.) The criteria against which the specific subject matter needs to be measured may be recited within the procedures enumerated or referred to in the practitioner's report.

**.09** An assertion is any declaration or set of declarations about whether the subject matter is based on or in conformity with the criteria selected. A written assertion is generally not required in an agreed-upon procedures engagement unless specifically required by another attest standard (for example, see section 601.11). If, however, the practitioner requests the responsible party to provide an assertion, the assertion may be presented in a representation letter or another written communication from the responsible party, such as in a statement, narrative description, or schedule appropriately identifying what is being presented and the point in time or the period of time covered.

## Establishing an Understanding With the Client

**.10** The practitioner should establish an understanding with the client regarding the services to be performed. When the practitioner documents the understanding through a written communication with the client (an *engagement letter*), such communication should be addressed to the client, and in some circumstances also to all specified parties. Matters that might be included in such an understanding include the following:

- The nature of the engagement
- Identification of the subject matter (or the assertion related thereto), the responsible party, and the criteria to be used
- Identification of specified parties (See paragraph .36.)
- Specified parties' acknowledgment of their responsibility for the sufficiency of the procedures
- Responsibilities of the practitioner (See paragraphs .12 to .14 and .40.)
- Reference to attestation standards established by the American Institute of Certified Public Accountants (AICPA)
- Agreement on procedures by enumerating (or referring to) the procedures (See paragraphs .15 to .18.)
- Disclaimers expected to be included in the practitioner's report
- Use restrictions
- Assistance to be provided to the practitioner (See paragraphs .22 and .23.)

**AT §201.08**    Copyright © 2001, American Institute of Certified Public Accountants, Inc.

- Involvement of a specialist (See paragraphs .19 to .21.)
- Agreed-upon materiality limits (See paragraph .25.)

# Nature, Timing, and Extent of Procedures

## Responsibility of the Specified Parties

.11 Specified parties are responsible for the sufficiency (nature, timing, and extent) of the agreed-upon procedures because they best understand their own needs. The specified parties assume the risk that such procedures might be insufficient for their purposes. In addition, the specified parties assume the risk that they might misunderstand or otherwise inappropriately use findings properly reported by the practitioner.

## Practitioner's Responsibility

.12 The responsibility of the practitioner is to carry out the procedures and report the findings in accordance with the general, fieldwork, and reporting standards as discussed and interpreted in this section. The practitioner assumes the risk that misapplication of the procedures may result in inappropriate findings being reported. Furthermore, the practitioner assumes the risk that appropriate findings may not be reported or may be reported inaccurately. The practitioner's risks can be reduced through adequate planning and supervision and due professional care in performing the procedures, determining the findings, and preparing the report.

.13 The practitioner should have adequate knowledge in the specific subject matter to which the agreed-upon procedures are to be applied. He or she may obtain such knowledge through formal or continuing education, practical experience, or consultation with others.[5]

.14 The practitioner has no responsibility to determine the differences between the agreed-upon procedures to be performed and the procedures that the practitioner would have determined to be necessary had he or she been engaged to perform another form of attest engagement. The procedures that the practitioner agrees to perform pursuant to an agreed-upon procedures engagement may be more or less extensive than the procedures that the practitioner would determine to be necessary had he or she been engaged to perform another form of engagement.

## Procedures to Be Performed

.15 The procedures that the practitioner and specified parties agree upon may be as limited or as extensive as the specified parties desire. However, mere reading of an assertion or specified information about the subject matter does not constitute a procedure sufficient to permit a practitioner to report on the results of applying agreed-upon procedures. In some circumstances, the procedures agreed upon evolve or are modified over the course of the engagement. In general, there is flexibility in determining the procedures as long as the specified parties acknowledge responsibility for the sufficiency of such procedures for their purposes. Matters that should be agreed upon include the nature, timing, and extent of the procedures.

---

[5] Section 601.19 and .20 provide guidance about obtaining an understanding of certain requirements in an agreed-upon procedures engagement on compliance.

AICPA Professional Standards     **AT §201.15**

**2606**    Statements on Standards for Attestation Engagements

**.16** The practitioner should not agree to perform procedures that are overly subjective and thus possibly open to varying interpretations. Terms of uncertain meaning (such as general review, limited review, check, or test) should not be used in describing the procedures unless such terms are defined within the agreed-upon procedures. The practitioner should obtain evidential matter from applying the agreed-upon procedures to provide a reasonable basis for the finding or findings expressed in his or her report, but need not perform additional procedures outside the scope of the engagement to gather additional evidential matter.

**.17** Examples of appropriate procedures include the following:

- Execution of a sampling application after agreeing on relevant parameters

- Inspection of specified documents evidencing certain types of transactions or detailed attributes thereof

- Confirmation of specific information with third parties

- Comparison of documents, schedules, or analyses with certain specified attributes

- Performance of specific procedures on work performed by others (including the work of internal auditors—see paragraphs .22 and .23)

- Performance of mathematical computations

**.18** Examples of inappropriate procedures include the following:

- Mere reading of the work performed by others solely to describe their findings

- Evaluating the competency or objectivity of another party

- Obtaining an understanding about a particular subject

- Interpreting documents outside the scope of the practitioner's professional expertise

## Involvement of a Specialist[6]

**.19** The practitioner's education and experience enable him or her to be knowledgeable about business matters in general, but he or she is not expected to have the expertise of a person trained for or qualified to engage in the practice of another profession or occupation. In certain circumstances, it may be appropriate to involve a specialist to assist the practitioner in the performance of one or more procedures. The following are examples.

- An attorney might provide assistance concerning the interpretation of legal terminology involving laws, regulations, rules, contracts, or grants.

- A medical specialist might provide assistance in understanding the characteristics of diagnosis codes documented in patient medical records.

- An environmental engineer might provide assistance in interpreting environmental remedial action regulatory directives that may affect

---

[6] A *specialist* is a person (or firm) possessing skill or knowledge in a particular field other than the attest function. As used herein, a specialist does not include a person employed by the practitioner's firm who participates in the attest engagement.

**AT §201.16**    Copyright © 2001, American Institute of Certified Public Accountants, Inc.

the agreed-upon procedures applied to an environmental liabilities account in a financial statement.

- A geologist might provide assistance in distinguishing between varying physical characteristics of a generic minerals group related to information to which the agreed-upon procedures are applied.

**.20**  The practitioner and the specified parties should explicitly agree to the involvement of the specialist in assisting a practitioner in the performance of an agreed-upon procedures engagement. This agreement may be reached when obtaining agreement on the procedures performed or to be performed and acknowledgment of responsibility for the sufficiency of the procedures, as discussed in paragraph .07. The practitioner's report should describe the nature of the assistance provided by the specialist.

**.21**  A practitioner may agree to apply procedures to the report or work product of a specialist that does not constitute assistance by the specialist to the practitioner in an agreed-upon procedures engagement. For example, the practitioner may make reference to information contained in a report of a specialist in describing an agreed-upon procedure. However, it is inappropriate for the practitioner to agree to merely read the specialist's report solely to describe or repeat the findings, or to take responsibility for all or a portion of any procedures performed by a specialist or the specialist's work product.

## Internal Auditors and Other Personnel

**.22**  The agreed-upon procedures to be enumerated or referred to in the practitioner's report are to be performed entirely by the practitioner except as discussed in paragraphs .19 to .21.[7] However, internal auditors or other personnel may prepare schedules and accumulate data or provide other information for the practitioner's use in performing the agreed-upon procedures. Also, internal auditors may perform and report separately on procedures that they have carried out. Such procedures may be similar to those that a practitioner may perform under this section.

**.23**  A practitioner may agree to perform procedures on information documented in the working papers of internal auditors. For example, the practitioner may agree to—

- Repeat all or some of the procedures.

- Determine whether the internal auditors' working papers contain documentation of procedures performed and whether the findings documented in the working papers are presented in a report by the internal auditors.

However, it is inappropriate for the practitioner to—

- Agree to merely read the internal auditors' report solely to describe or repeat their findings.

- Take responsibility for all or a portion of any procedures performed by internal auditors by reporting those findings as the practitioner's own.

- Report in any manner that implies shared responsibility for the procedures with the internal auditors.

---

[7]  AU section 322, *The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements*, does not apply to agreed-upon procedures engagements.

**2608**        Statements on Standards for Attestation Engagements

# Findings

.24  A practitioner should present the results of applying agreed-upon proce-
dures to specific subject matter in the form of findings. The practitioner should not
provide negative assurance about whether the subject matter or the assertion is
fairly stated based on the criteria. For example, the practitioner should not include
a statement in his or her report that "nothing came to my attention that caused
me to believe that the [identify subject matter] is not presented based on [or the
assertion is not fairly stated based on] [identify criteria]."

.25  The practitioner should report all findings from application of the
agreed-upon procedures. The concept of materiality does not apply to findings
to be reported in an agreed-upon procedures engagement unless the definition
of materiality is agreed to by the specified parties. Any agreed-upon material-
ity limits should be described in the practitioner's report.

.26  The practitioner should avoid vague or ambiguous language in report-
ing findings. Examples of appropriate and inappropriate descriptions of find-
ings resulting from the application of certain agreed-upon procedures follow.

| Procedures Agreed Upon | Appropriate Description of Findings | Inappropriate Description of Findings |
|---|---|---|
| Inspect the shipment dates for a sample (agreed-upon) of specified shipping documents, and determine whether any such dates were subsequent to December 31, 20XX. | No shipment dates shown on the sample of shipping documents were subsequent to December 31, 20XX. | Nothing came to my attention as a result of applying that procedure. |
| Calculate the number of blocks of streets paved during the year ended September 30, 20XX, shown on contractors' certificates of project completion; compare the resultant number to the number in an identified chart of performance statistics. | The number of blocks of streets paved in the chart of performance statistics was Y blocks more than the number calculated from the contractors' certificates of project completion. | The number of blocks of streets paved approximated the number of blocks included in the chart of performance statistics. |
| Calculate the rate of return on a specified investment (according to an agreed-upon formula) and verify that the resultant percentage agrees to the percentage in an identified schedule. | No exceptions were found as a result of applying the procedure. | The resultant percentage approximated the predetermined percentage in the identified schedule. |

**AT §201.24**      Copyright © 2001, American Institute of Certified Public Accountants, Inc.

Agreed-Upon Procedures Engagements    **2609**

| Procedures Agreed Upon | Appropriate Description of Findings | Inappropriate Description of Findings |
|---|---|---|
| Inspect the quality standards classification codes in identified performance test documents for products produced during a specified period; compare such codes to those shown in an identified computer printout. | All classification codes inspected in the identified documents were the same as those shown in the computer printout except for the following:<br><br>[List all exceptions.] | All classification codes appeared to comply with such performance documents. |
| Trace all outstanding checks appearing on a bank reconciliation as of a certain date to checks cleared in the bank statement of the subsequent month. | All outstanding checks appearing on the bank reconciliation were cleared in the subsequent month's bank statement except for the following:<br><br>[List all exceptions.] | Nothing came to my attention as a result of applying the procedure. |
| Compare the amounts of the invoices included in the "over ninety days" column shown in an identified schedule of aged accounts receivable of a specific customer as of a certain date to the amount and invoice date shown on the outstanding invoice and determine whether or not the invoice dates precede the date indicated on the schedule by more than ninety days. | All outstanding invoice amounts agreed with the amounts shown on the schedule in the "over ninety days" column, and the dates shown on such invoices preceded the date indicated on the schedule by more than ninety days. | The outstanding invoice amounts agreed within approximation of the amounts shown on the schedule in the "over ninety days" column, and nothing came to our attention that the dates shown on such invoices preceded the date indicated on the schedule by more than ninety days. |

# Working Papers

**[.27–.30]**  [Paragraphs deleted by the issuance of Statement on Standards for Attestation Engagements No. 11, January 2002.][8–9]

---

[8-9] [Footnote deleted by the issuance of Statement on Standards for Attestation Engagements No. 11, January 2002.]

**AICPA Professional Standards**    **AT §201[.27–.30]**