IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,           )
                                 )
            Plaintiff,           )
                                 )        C.A. No.  05-157 (KAJ)
      v.                         )
                                 )        Trial By Jury Demanded
ORLANDO J. GEORGE, JR.,          )
in both his official and personal)
capacities, and DELAWARE         )
TECHNICAL AND COMMUNITY          )
COLLEGE,                         )
                                 )
            Defendants.          )

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## VOLUME II

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED: July 19, 2006

## TABLE OF CONTENTS

**Page No.**

### VOLUME I

## EXHIBITS

| | |
|---|---|
| Supplemental Complaint | B-1 |
| Answer | B-16 |
| Marguerite A. Johnson, Resume | B-28 |
| November 19, 2004 Meeting Minutes | B-32 |
| Craft Show Letters | B-34 |
| George Lt: December 8, 2004 | B-46 |
| Marguerite A. Johnson, Lt: to George | B-48 |
| Notice of Administrative Leave | B-50 |
| Administrative Leave Announcement | B-51 |
| Termination Announcement | B-52 |
| Newspaper Articles | B-53 |
| Marguerite Johnson Travel Form | B-58 |
| List of Witnesses Interviewed | B-59 |
| Simpson Summaries | B-61 |
| Powell's Recreation of Johnson's Time | B-65 |
| Results of Investigation | B-68 |
| Correspondence Concerning "IT" Department | B-69 |
| Correspondence Between Counsel | B-71 |
| Del Tech Personnel Policy Manual | `B-112 |

Rules of Procedure or Vice-President Termination                    B-119

Letter:  Re:  Suspension Grievance                                  B-122

Del Tech Terry Campus Travel Policy                                 B-124

Del Tech Supercard Guidelines                                       B-125

Racist Memo                                                         B-128

Marguerite A. Johnson Contract                                      B-129

Shirey Lt: May 11, 2005: Hiring Bifferato                           B-136

Memo Re: Bifferato Firm Representation                              B-137

Del Tech Invoice and Check                                          B-138

GRID Invoices and Check                                             B-141

Payment to Chris Travis                                             B-143

Miscellaneous Johnson Payments to Del Tech                          B-144

Tim Kavel Travel Request                                           B-152

Marguerite A. Johnson Travel Request                               B-155

West Virginia Receipts                                              B-158

PNC Statement                                                       B-160

Emails                                                              B-161

Santora & Baffone Engagement Letter                                B-171

Santora & Baffone, April 12, 2006 Report                           B-174

David Dwyer Interview Summaries                                     B-182

American Institute of Certified Public Accountants Standards

Defendants' Answers to Plaintiff's Interrogatories                 B-204

Hearing Officer Report:  July 19, 2005                             B-211

Evaluations of Marguerite A. Johnson, Ph.D.                B-215

Evaluation of Daniel A. Houghtailing                       B-275

Evaluation of Daniel L. Simpson                            B-288

Daniel L. Simpson's Calendars                             B-310

Affidavit of Gary W. Aber                                 B-332

Affidavit of Marguerite A. Johnson                        B-334

Affidavit of Harry N. Smith                               B-343

Affidavit of Patsy Kelly Waters                           B-345

"Stigma" Letters                                          B-348

## VOLUME II

### TRANSCRIPTS

Transcript Excerpts Hearing: June 25, June 30, 2005       B-350

### DEPOSITION EXCERPTS

Lauretta Copper                                           B-372

Shelby Crawford                                           B-387

R. Ronald Draper                                          B-399

David Dwyer                                               B-415

Orlando J. George, Jr.                                    B-476

Charlotte P. Lister                                       B-500

Gerald M. McNesby                                         B-502

Susan H. Molikan                                          B-550

Hope Murray                                               B-558

Ronald J. Pleasanton                                      B-572

Nancy J. Rockey                                          B-612

Peter D. Shoudy

Daniel L. Simpson                                        B-628

Connie M. Spampinato                                     B-662

Christine M. Travis                                      B-667

Ruth Yanos                                               B-671

Dywer Interview Transcripts                              B-677

1   IN THE MATTER OF:                                    )

2   THE TERMINATION OF MARGUERITE JOHNSON, Ph.D.        )

3                    Termination hearing in the

4   above-referenced matter taken pursuant to notice

5   before Tanya M. Congo, a Notary Public and Certified

6   Professional Reporter, in Conference Room 305 of the

7   MBNA Building at Delaware State University, Dover,

8   Delaware, on Wednesday, June 29, 2005, beginning at

9   9:35 a.m., there being present:

10  APPEARANCES:

11  BIFFERATO, GENTILOTTI & BIDEN, P.A.
    1308 Delaware Avenue
12  Wilmington, Delaware 19899
    BY:  THE HONORABLE VINCENT A. BIFFERATO, SR.
13  Hearing Officer

14  ABER, GOLDLUST, BAKER & OVER
    702 King Street, Suite 600
15  Wilmington, Delaware 19899
    BY:  GARY W. ABER, ESQUIRE
16  Attorney for Dr. Marguerite Johnson

17  MORRIS, JAMES, HITCHENS & WILLIAMS
    222 Delaware Avenue, 10th Floor
18  Wilmington, Delaware 19801
    BY:  DAVID H. WILLIAMS, ESQUIRE
19  Attorney for Delaware Technical and Community College

20

21

22

23

24                        B350

Page 16

1       A.    I indicated to Dr. Johnson that I had a

2    responsibility to investigate fully the allegations

3    of abusive behavior on her part.  That they were

4    coming from many different sources, and that my

5    responsibility was to get to the bottom of it, so to

6    speak, and find out whether the allegations were true

7    or false.

8              I made the determination that I had to

9    protect both the college and Dr. Johnson's due

10   process rights.  For that reason I made a decision,

11   and shared this with Dr. Johnson as one of the

12   options, that if we were to proceed with the

13   investigation, that I would retain outside counsel,

14   an independent, arm's length, well-respected law

15   firm, who would come in and do the independent

16   investigation formally, and determine whether or not

17   the allegations were true.

18              In that manner I believe I was

19   protecting her due process rights rather than just

20   turning it over to my internal staff for an

21   investigation.

22              Conversely, in order to protect the

23   college's interest, I placed her on paid

24   administrative leave, and B35did that to protect the

1   affidavit myself.

2       Q.   Who else signed affidavits?

3       A.   It is my understanding that counsel has

4   been working with those who are being called to

5   testify, and those affidavits are -- have been signed

6   by those individuals.

7       Q.   What's the purpose of providing an

8   affidavit to the employee?

9            You provide the affidavits after the

10  hearing or before the hearing?

11           MR. WILLIAMS:  Does your question

12  suggest that they're being provided after the

13  hearing?

14           MR. ABER:  What?

15           MR. WILLIAMS:  Does your question -- I

16  have a problem with the form of your question,

17  because it suggests that affidavits are being

18  provided after this hearing.

19           MR. ABER:  Well, they haven't been

20  provided to me before the hearing yet.

21           MR. WILLIAMS:  They were provided to

22  you this week.

23           MR. ABER:  I haven't seen them.

24           MR. WILLIAMS:  I have a cover letter

1    sending them to you.

2                JUDGE BIFFERATO:  I don't know.  I

3    don't have any affidavits in my possession.

4                I'll ask Mr. Williams if he supplied

5    affidavits.  But I'll have to tell you, testimony

6    under oath has the same effect to me as an affidavit.

7                MR. ABER:  Yes, but the idea of an

8    affidavit is that you're supposed to have notice

9    before you walk into the hearing room --

10               JUDGE BIFFERATO:  I agree.

11               MR. ABER:  -- of what they are.

12               MR. WILLIAMS:  Let me just say to Your

13   Honor that the detail of the Notice of Intent, and

14   the reasons for it are extraordinary in this case

15   because the Santora Baffone report is incorporated by

16   reference.  It's twelve pages of details.

17               MR. ABER:  Mr. Williams --

18               MR. WILLIAMS:  This is not a

19   blindsiding.

20               MR. ABER:  I know, I'm just making a

21   record that I'm entitled to.

22               MR. WILLIAMS:  And I'm making mine.

23               MR. ABER:  There may be affidavits but

24   I have not received them yet.

1    A.   Yes.

2    Q.   Did you use materials and supplies from

3  the college inventory?

4    A.   Yes.

5    Q.   And --

6    A.   Although I do recall some paper being

7  purchased elsewhere.

8    Q.   What about the genealogy book, what was

9  the nature of that book?

10         Did that also involve some college

11  reproduction?

12    A.   I think all of the black and white was

13  photographed that weren't copyright in the black and

14  white, but it was like put on different copies to be

15  assembled.

16    Q.   Was that also a difficult thing to

17  assemble, reproduce?

18    A.   Only the stuff that was like piecemeal,

19  because you could do like a frame, like this, but,

20  then, you had to take the picture and put it in the

21  middle and, then, copy it.

22    Q.   How many pages, to the best of your

23  recollection, did the genealogy book consist of?

24    A.   I don't remember exactly.  A lot of it, I

1  mean?

2      Q.   Yes.  You mean you had other jobs you were

3  doing, your normal work duties?

4      A.   Yes.

5      Q.   And when you didn't have anything to do

6  there, that's when you worked on the reunion?

7      A.   Well, or if anything wasn't pressing or

8  anything with an extreme deadline.

9      Q.   Did the reunion cause you to not do work

10  that you would otherwise have done?

11      A.   The job -- all of my jobs I consider I did

12  in its entirety.  I just may not have done it

13  immediately.  I mean, surely if I had an extra three

14  hours on my hands I could have done two more hours of

15  typing or two more hours of filing or something like

16  that.

17              I mean, I'm not sure if I'm answering

18  that correctly or not.

19      Q.   Dr. Johnson, as of today as far as you

20  know, is still employed at Del Tech, isn't she?

21      A.   Yes.

22      Q.   And the attache case that she boxed up her

23  things and took home, she still has a right to use

24  that to take things back and forth as long as she's

1    Q.    Did you work on a 1999 reunion project

2    involving Dr. Johnson's family?

3    A.    Yes.

4    Q.    Did you ever create an invoice for that?

5    A.    Yes.

6    Q.    Were you asked to create an invoice?

7    A.    Yes.

8    Q.    What is the frequency of your contact with

9    Dr. Johnson over the years, from 1999 to 2004?

10    A.    A lot of the things I work on have to be

11    approved by the Campus Director's office.  So I was

12    interactive with Dr. Houghtaling's -- Kathy Powell,

13    she wasn't married at the time, but Powell, and Dr.

14    Johnson would be after Dr. Houghtaling approved it.

15    It would go to Dr. Johnson for approval.

16    Q.    Did you ever have occasion to hear Dr.

17    Johnson reprimand another employee?

18    A.    Yes.

19    Q.    Do you recall any specific instances --

20    MR. ABER:  Excuse me.  I do not think

21    -- I was specifically told that this was not going to

22    be a subject matter for this termination hearing.

23    MR. WILLIAMS:  You've never been told

24    that.  You've been told from the outset, from the

Page 151

bind them, would she have any way of knowing what

2   that cost was, or was she dependent on your

3   department to tell her what the cost was?

4       A.   No, the color copier, everyone knew we had

5   to charge for.

6       Q.   They knew you had to charge, but the

7   amount of the charge, who had knowledge of that

8   generally?

9       A.   Dr. Houghtaling, the Marketing Department.

10  There was a charge for copying at 38 cents a copy,

11  color copy.  For black and white copies we didn't

?   normally charge, but we kept track of each part of

13  the copier count.

14      Q.   Turn if you would to 7 in this book right

15  here.  That one, yeah.

16              You just said the cost for a color

17  copy was cents a page?

18      A.   Yes.

19      Q.   And the adjusted invoice that Dr. Johnson

20  was given for copying, how much was she charged a

21  page for color copying?

22      A.   Thirty-eight cents.

23      Q.   So she was charged exactly the same price

24  as everybody else, wasn't she?

B357

1       A.   Yes.

2       Q.   Did the Marketing Department ever do any

3   other personal copying for her other than purely Del

4   Tech business?

5       A.   What do you mean?

6       Q.   Any outside organizations come in and have

7   copying done there?

8       A.   Not that I'm aware of.  I take pictures at

9   the graduations and when students see them on the

10  bulletin board, they want pictures and I let them

11  have it, but I mean, as far as private like this, no.

12      Q.   You mean you've never had community

13  organizations come in and have things copied?

14      A.   No.

15      Q.   What is your present job now?

16      A.   Marketing Administrative Assistant.

17      Q.   And there's no outside organization that

18  ever came in to get things copied?

19      A.   No.

20           Mr. ABER:  I have no other questions.

21           MR. WILLIAMS:  I just have one or two.

22               REDIRECT EXAMINATION

23  BY MR. WILLIAMS:

24      Q.   Mr. Aber referred you to this invoice, Dr.

Page 170

1      A.   Yes.

2      Q.   -- pertaining to the value of her time?

3      A.   Yes, we actually saw her expense report,

4  and we believe it's listed in our report.  You'll see

5  travel, air fare, parking, hotels and a rental car.

6      Q.   If you turn to Exhibit 17 and the

7  documents that follow after the first page of Exhibit

8  17 --

9      A.   Yes.

10      Q.   -- are these some of the documents you

11  reviewed?

12      A.   Yes.

13      Q.   Are these self-reported -- or these are

14  what Dr. Johnson reported --

15      A.   Correct.

16      Q.   -- with respect to the costs of the trip?

17      A.   According to our interviews, this is what

18  we received.

19           MR. WILLIAMS:  No further questions.

20                CROSS-EXAMINATION

21  BY MR. ABER:

22      Q.   The report you put together contained

23  numerous other accusations that you didn't discuss

24  today?                    B359

1    those computer screen printouts, estimate how much

2    time is devoted to preparing the document shown

3    there?

4        A.    No.

5        Q.    If you look at the K-bytes, kilobytes,

6    whatever it is?

7        A.    No, I can't determine how much time was

8    taken to create it, but I'll -- some of these

9    documents were accessed every month and she used it

10   as a template to print off different documents.

11       Q.    Now, some of the documents that are shown

12   here in Kathy Powell's personal documents, were

13   actually prepared offsite and, then, sent to Dr.

14   Johnson, weren't they?

15              In other words, they were kept in this

16   -- they could be kept in the file labeled Personal.

17   So they could be something that's generated offsite

18   and, then, sent to the computer?

19       A.    Anything's possible.  But these files were

20   taken from Kathy Powell's computer.

21       Q.    Now, how many total hours did you say

22   Kathy Powell spent on Dr. Johnson's work based on

23   your calculations?

24       A.    It fluctuated. But went from 5 to 10 to 15

B360

1    percent.

2         Q.    Well, did you calculate her total hours

3    for --

4         A.    Yes, I have.

5         Q.    Where is that?

6         A.    I said 10 percent.

7         Q.    But where is that calculation?

8         A.    Whatever tab that was.  Here it is, 16.

9    Ten percent of her time.

10        Q.    And how many hours did you figure that to

11    be?

12        A.    Three point seven five hours a week times

3    weeks, would give you a yearly rate.

14        Q.    So you figured roughly about 200 hours a

15    year?

16        A.    If we had a calculator, probably.  Maybe a

17    little less.

18        Q.    Now, in your report, if I look at it,

19    under your Findings you say -- you keep using the

20    term, handling numerous correspondences.  What do you

21    mean when you say, handling this, handling that?

22              What do you mean when you write

23    handling?

4         A.    What tab is the report in?

1    employed at Delaware Technical and Community College?

2        A.    Twenty-five years.

3        Q.    So you've known Dr. Johnson as head of the

4    Del Tech Terry Campus for the nine years that she was

5    there?

6        A.    Yes.

7        Q.    During that time the 1999 family reunion

8    project, was that the only, what I'll call, major

9    project that she ever asked you to do personally?

10       A.    As far as I know, yes.

11       Q.    Did she, at any time when she was working

12   on that, tell you to hide the fact you were doing it

13   from anybody?

14       A.    No.

15       Q.    Was she fairly open and obvious, you know,

16   that this was getting done?

17       A.    Well, I would say people knew, yeah, it

18   was getting done.

19       Q.    Did she ever instruct you to work on it

20   off the books so it could not be billed?

21       A.    Well, we don't really bill people for our

22   services.  We're not a professional shop.  So we

23   don't bill hourly.

24       Q.    Does your shop do any work for any other

1   and so had Stina.

2        Q.   Now, if you turn the page, there are

3   receipts on the next couple pages.  When did you

4   finally receive those receipts?

5        A.   I saw these receipts for the first time in

6   January of this year, January, 2005.

7        Q.   And these purchases go back to October,

8   2002?

9        A.   Yes, that's correct.

10       Q.   What was the problem?  Why couldn't you

11  get the receipts?

12       A.   I wasn't able to obtain it, and the only

13  information I got from Kathy Powell was that they

14  were for the junk which -- again, was information

15  that she was relaying from Dr. Johnson, was that they

16  were campus-related.

17                 I just wanted to make sure that they

18  were campus-related, business-related expenses that

19  we could so document, and that it was something

20  campus-related, and I had heard that it was other

21  business.

22       Q.   Well, did you go to Dr. Johnson's office

23  and demand receipts?

24       A.   No, I did not. B363

Page 255

1          Q.   Why not?

2          A.   To be honest, I didn't want to be

3     reprimanded.  I knew that we had made inquiries

4     through Kathy, and we had not gotten anywhere on it.

5     And I just figured it wasn't something that was worth

6     getting reprimanded over, to be perfectly honest.

7                    And, also, I had no reason to doubt

8     that if she said it was something that was

9     campus-related, that I believed it was campus

10    related.  I had no reason to doubt that at that

11    point.

12         Q.   How about trips, did you have any

13    difficulty getting receipts from Dr. Johnson with

14    respect to various trips?

15         A.   There were -- I believe there were five

16    trips that I was made aware that we couldn't get all

17    of the receipts, all of the receipts for the

18    transactions that were identified on the Super Card.

19                    We'd want to get all of the receipts

20    in and do a trip reconciliation on a form that we

21    have in the Accounting office.  And we weren't able

22    to obtain all of the receipts, so, therefore, we

23    weren't able to finalize and reconcile the trips.

24         Q.   Getting back to these purchases from the

1    any time she went over or spent -- made a personal

2    expenditure?

3         A.   I wouldn't say regularly, 'cause I know

4    now that the West Virginia purchase was a personal

5    purchase that wasn't reimbursed.

6         Q.   Excluding that one, and you understand

7    that's a trip where some purchases that you didn't

8    get the receipts?

9         A.   No.

10        Q.   Excluding that one, didn't she regularly

11   reimburse in a timely fashion whenever her charges

12   required her to?

13        A.   For any personal --

14        Q.   Yes.

15        A.   -- direct personal expenses?  There were

16   instances when Dr. Johnson would reimburse the campus

17   for that, yes, in terms of cell phone.

18             There were also instances when I know

19   that the educational foundation was asked to

20   reimburse the campus for overages of meals, instead

21   of the employees reimbursing us, which is typical

22   practice for every other campus.

23        Q.   If she was on campus business, though, and

24   had to entertain somebody?B365 She has to entertain

Page 263

1    Q.    Did she say why she couldn't get them?

2    A.    She just said she couldn't get them.  She

3    won't give them to me.

4    Q.    Did she say Dr. Johnson refused to give

5    them to her, or --

6    A.    She said she had asked for them and she

7    wasn't given them.  I wasn't privy to that

8    conversation.

9    Q.    Did you ever ask Dr. Johnson directly, or

10   send her a direct E-mail -- you know how to send

11   E-mail, don't you?

12   A.    Yes, I do.

13   Q.    Did you ever send Dr. Johnson an E-mail

14   saying that we've been unable to get these receipts?

15   A.    No, I did not.

16   Q.    And how long were you Business Director --

17   Business Manager?

18   A.    I've been there for just over three years.

19   Q.    And in those three years were there ever

20   any other instances where Dr. Johnson refused to turn

21   in receipts on a timely fashion other than this West

22   Virginia trip?

23   A.    Well, the five trips that we've cited, the

24   five --

ge 265

1    and before I even signed it.  I don't know what the

2    estimate -- I know that the next page in that exhibit

3    is a detailed breakdown of those numbers, which is

4    typically attached to the travel request form.  It

5    gives just a little bit more detail as to what those

6    numbers on the first page are.

7        Q.    Were there any other Super Card purchases

8    that Dr. Johnson did not reimburse you for for items

9    other than the one West Virginia trip?

10       A.    Nothing that at the time I didn't think

11   was college related.  I mean, there were some things

12   in some -- maybe some gray areas, but I always --

13   again, my assumption was, she's the Campus Director

14   and she has discretion to spend money on tickets to

15   the Capital Theater for instance that were going to a

16   certain event that was part of what a Campus Director

17   does.  That was my understanding.  So I would not

18   question those.

19       Q.    Buying books for a Del Tech Learning

20   Center, would that be campus related?

21       A.    If the books were to be used on campus by

22   students or employees, then, yes, I would think that

23   would be business related.

24       Q.    You stated that they were supposed to

B367

Page 267

1    cardholder must submit a check reimbursing the

2    College for that amount within 24 hours.

3                 That's the 24 hours you were talking

4    about, wasn't it?

5         A.    Yes, it says in terms of 24 hours from the

6    time they are disallowed.

7         Q.    So the obligation to pay the College back

8    doesn't arise until the employee's notified that is a

9    disallowed expense?

10        A.    Well, my interpretation is, if the

11   employee already knows it's a personal expense then

12   they know and they've acknowledged that they have 24

13   hours to pay us back.

14        Q.    If they knew it was a personal expense?

15        A.    Yes.

16        Q.    But if they didn't know it was a personal

17   expense, then you have to wait until they're notified

18   it was disallowed, correct?

19        A.    That's correct.

20        Q.    And if they didn't think it was a personal

21   expense, they'd have no reason to reimburse until

22   they were notified?

23        A.    Well, then, they'd have no reason not to

24   give us the receipts for it either.

B368

1    for her family to show what the elements of a good

2    family are.  Wasn't that used also by administration

3    as a marketing piece?

4        A.    Yeah, it was used as a marketing piece for

5    the entire marketing program.

6        Q.    So, what I'm getting at is, the fact that

7    the Marketing Department developed this candy bar

8    concept for a family reunion was used as a marketing

9    piece for Del Tech, too, wasn't it?

10       A.    At a later date it was a promotional

11   piece, yes.

12       Q.    You testified that when this work was

13   being done for the family reunion there were no

14   complaints of work that was not being done, correct?

15       A.    There were complaints that people were

16   doing work that was not college related that were

17   addressed to me on several occasions.

18       Q.    You testified, though, that nobody

19   complained that college work was not getting done,

20   correct?

21       A.    I think I said that knowing the

22   department, the work in the department would get

23   done, despite of doing other projects.  They are

24   professional people, and they've never missed a

1  deadline date that I can think of.

2      Q.    Do you know if Dr. Johnson ever told

3  anybody to stop working on Del Tech work, put Del

4  Tech aside and work on this family reunion stuff?

5      A.    At the time of the family reunion stuff

6  none of the work came through me directly.  She

7  worked directly with the marketing personnel.

8      Q.    My question was, very specifically, do you

9  know if she ever told anybody to stop doing Del Tech

10  work to work on the reunion?

11      A.    I don't know that for a fact.  Like I

12  said, I wasn't in the process of the family reunion.

3  It didn't come through me.  She dealt with marketing

14  directly.

15      Q.    You testified when you were working with

16  Dr. Johnson there were good times and bad times,

17  correct?

18      A.    Yes.

19      Q.    How would you describe your working

20  relationship with Dr. Johnson?

21      A.    It was one I accepted in my role, and I

22  consider myself pretty much a professional and, in

23  fact, I can get along with almost anybody.

4      Q.    Did you think her criticism of you were

1        Q.   How did it come that that invoice was

2    prepared for you?

3        A.   I kept asking for an invoice, or

4    something, because I was not going to write out a

5    check.  They gave me the amount.  Kathy had gotten

6    that from them.  But I wanted to have a paper trail.

7    I wanted to be able to show what I paid for, and I

8    wanted it to be deposited into the Marketing

9    Department fund.

10       Q.   So, who did you ask for this bill to be

11   prepared by?

12       A.   Well, I asked the Marketing Department,

13   and Kathy got a call back then that they really

14   didn't have a form for people from the outside,

15   because usually they did the work for free.  They

16   didn't charge for black and white.  Their internal

17   form was for one department to another department.

18   So, she took it upon herself to develop a form.

19       Q.   And did you have any input into the

20   figures that were put into this form?

21       A.   No, she worked on that working with the

22   Marketing Department.

23       Q.   And then the second page of Exhibit 7, is

24   that your check?

Page 464

1    word discipline, I guess correct another employee's

2    performance?

3        A.    I've seen her correct an employee's

4    performance.

5        Q.    How would you describe how she does it?

6        A.    Professional, and considerate.

7        Q.    Has she ever been hostile towards

8    employees?

9        A.    Not that I've witnessed.

10        Q.    Have you ever seen her lose her temper?

11        A.    Not that I've witnessed.

12        Q.    Ever see her abuse anybody?

13        A.    No, sir.

14        Q.    Can you give us an example of somebody

15    she's had to discipline, and how she did it?

16        A.    Well, it was very brief.  Something didn't

17    occur, and she asked why didn't it occur, and then

18    she asked the person how do we need to proceed to

19    make sure this occurs.  That was just it.

20        Q.    What was that employee's reaction to this?

21        A.    He was happy in my mind set.  He was happy

22    that she was more or less being supportive and

23    corrective, as opposed to destructive and punitive.

24        Q.    Are you familiar with Dr. Johnson's

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON, )
         )
   Plaintiff,   )
         ) Civil Action
   vs.     ) No. 05-157 (KAJ)
         )
ORLANDO J. GEORGE, JR., in both )
his official and personal capacities, )
and DELAWARE TECHNICAL AND COMMUNITY )
COLLEGE,      )
         )
   Defendants  )

    Deposition of LAURETTA COOPER taken pursuant to notice at the law offices of Morris, James, Hitchens & Williams, 29 N. State Street, Dover, Delaware, beginning at 1:42 p.m. on Friday, February 24, 2006, before Allen S. Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

  GARY W. ABER, ESQUIRE
  ABER, GOLDLUST, BAKER & OVER
  702 King Street, Suite 600
  Wilmington, DE 19801

   For - Plaintiff

  DAVID H. WILLIAMS, ESQUIRE
  MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
  222 Delaware Avenue, 10th Floor
  Wilmington, DE 19801

   For - Defendants

ALSO PRESENT:

  BRIAN D. SHIREY, ESQUIRE
  MARGUERITE A. JOHNSON

    WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
    (302) 655-0477

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
B372
COPY

1      A      As very knowledgeable about the college and the

2  campus and very professional.

3      Q      Did you ever see her embarrass people when she would

4  talk to them or instruct them?

5      A      No, I did not see that.

6      Q      Did you ever see her abuse people in any way?

7      A      No, I did not.

8      Q      Did you ever hear people comment that she was

9  treating them inappropriately?

10     A      I have heard people say that someone they knew had

11  had an issue and that she had chastised them about it.

12     Q      When you say chastised them, was it your

13  understanding that she was correcting them because they did

14  something wrong?

15     A      Correct.

16     Q      Or she was dealing with, you know, somebody that

17  goes off the deep end with somebody or loses their cool?

18     A      No.  It was that she was correcting something that

19  was not quite right.

20     Q      Did you attend regularly the in-service meetings?

21     A      Almost every single one.  I don't believe I missed

22  one.

23     Q      What was Dr. Johnson's attitude towards customer

24  service?

1      A    It was very-well known at the campus.  Certainly I

understood that to be a very important facet of her

3    administration at the campus.

4      Q    Did she give presentations at these in-service

5    meetings?

6      A    Yes, she did.

7      Q    Do you ever remember one where she discussed about

8    being customer friendly with the people that you were

9    serving?

10     A    Frankly, at almost every in-service, at the very

11   first in-service, when I first became a faculty, my very

12   first in-service, as well as at an adjunct in-service as

well.

14     Q    Do you ever remember a comment that she linked to

15   the being customer friendly, yeah, customer service, being

16   customer friendly, in connection with, if you don't do it,

17   you might be out in the parking lot?

18     A    Yes.  That was -- I heard that expression my very

19   first semester there in reference to customer service.  It

20   would be -- she always stressed the importance of customer

21   service and that people who did not provide our customers,

22   the students, with good customer service, would go to the

23   parking lot.  It was like a recognized joke, something that

24   she said on a regular basis.  Everyone understood that that

1   would be an issue with the campus director, Dr. Johnson, if

2   you didn't provide the student with good customer service.

3        Q    The reference to go to the parking lot, was it said

4   in a threatening manner?

5        A    No.  I think everyone understood that she was

6   serious about customer service but that was said almost as a

7   joke added onto it, to lighten a serious subject that we

8   expect good customer service and to lighten it basically and

9   she would also say you're going to the parking lot if you

10  don't give good customer service.

11       Q    Did you ever hear anybody voice or express a feeling

12  that was offensive to them to say that?

13       A    No.

14       Q    What was Dr. Johnson's attitude towards the quality

15  of services that were being provided?

16       A    She had very high quality standards.  It was very

17  well known that she was very meticulous and very detail

18  oriented.  So quality in the programs and the quality of

19  services that you gave to the customers and students were I

20  think very well recognized.

21       Q    How would you describe the campus morale under

22  Dr. Johnson's leadership?

23       A    Good.  It was -- we recognized that there was a high

24  focus on quality in the programs.  We recognized that

1    Dr. Johnson attended very many functions before and after

     the regular workday.  And the campus morale was fine.

3        Q    Did you attend a meeting on November 19th, 2004, of

4    the department chairs?

5        A    Yes.

6        Q    And was that something that you would normally

7    attend?

8        A    Yes.

9        Q    Let me show you a document that has been marked

10   Spampinato 2 and ask if you have ever seen that before?

11   It's the minutes of that meeting.

12       A    Yes, I have seen the minutes of this meeting.

         Q    Was this something after the meeting that would be

14   circulated to you?

15       A    That is correct.  It's usually e-mailed to us.

16       Q    Okay.  How is it you came to attend that meeting?

17       A    As a department chair.  It would have been one of

18   Dean Spampinato's -- Dr. Spampinato's department chair

19   meetings.

20       Q    And at that time, she was what?

21       A    She was the Dean of Instruction.

22       Q    Were all the department chairs present or did some

23   of the department chairs send representatives?

24       A    I cannot remember which ones sent representatives.

1    In general, I remember the department chairs that were there

2    but I don't remember who might have been missing.

3        Q    Was it unusual for a department chair to say I can't

4    attend this meeting, I'll send a representative?

5        A    It was not unusual to send a representative if a

6    department chair was going to be unavailable.

7        Q    I want you to now remember this meeting

8    specifically.  Were there any presentations made at the

9    meeting?

10       A    Yes.  There were at least a couple that I can

11   remember.

12       Q    And who made them?

13       A    Linda Fantini from the Office of the President made

14   a presentation about I believe making changes in the CAP

15   system, for example, and changes to courses and curricula.

16   That kind of thing.  And, in addition, Peter Shoudy, the

17   information technology administrator, made a presentation

18   about the new DIET organization.

19       Q    Was Dr. Johnson present for the entire meeting?  Do

20   you remember?

21       A    From what I remember, she was not present for the

22   entire meeting.

23       Q    Do you remember where she physically sat at the

24   meeting?

1      A      She sat to the front of the room on the left-hand

_      side if your back were to the door.

3      Q      And did she sit with anybody?

4      A      She sat next to Dean Spampinato, Dr. Spampinato.

5      Q      What did Mr. Shoudy speak about?

6      A      He spoke about the new IT organization, that the

7      function was now college-wide and who the players were in

8      the organization, his staff for the organization.

9      Q      And had you heard any comments about this IT

10     organization before you went into that meeting?

11     A      No, I had not.

12     Q      Had Dr. Spampinato ever commented about it before

       the meeting?

14     A      Not that I can recall.

15     Q      What was your understanding at that time about the

16     IT organization with regards to customer service?  Were they

17     good at it, bad at it or immediate or what?

18     A      In general, at the Terry Campus, as at most places

19     that I have worked, IT has usually had a reputation for they

20     can never quite get to things on time.  They have so many

21     requests that they tend to be understaffed.  But I believe

22     there were some concerns about customer service with IT at

23     that time.  It seems to me that something was written in

24     Middle States with reference -- in our Middle States

1   accreditation with reference to IT.

2       Q    Which year would that have been?

3       A    I believe 2003.  2002, 2003.

4       Q    Do you remember any discussions concerning IT's

5   ability to provide e-mail addresses for adjunct personnel?

6       A    I don't remember that conversation.

7       Q    Let me turn your attention directly to what

8   Mr. Shoudy said.  What did Mr. Shoudy discuss in this

9   presentation?

10      A    He basically discussed his new personnel and how

11  that would impact each campus, who our representatives would

12  be at the campus that would provide support for the IT

13  function, particularly the campus.  He spoke about the

14  emergent technologies section of his new organization and I

15  remember that because I believe Dan Siok was part of that

16  group and Dan Siok was someone that we already recognized in

17  IT, would be providing a significant portion of the customer

18  service for the campus.

19      Q    He was already on the Terry Campus, wasn't he?

20      A    Yes.

21      Q    Was he in charge of the Terry Campus?

22      A    He had been in charge of Terry Campus IT.

23      Q    So he was going to be continuing in charge of Terry

24  Campus IT and take on some more duties?

1        A        It mainly focused on the customer service aspects.

2    From what I recall, emergent technologies, that particular

3    new function, there was a question about that, what that new

4    function was.

5        Q        How would you describe the relevancy of

6    Dr. Johnson's questions to the presentation?

7        A        I would describe it as very relevant since it was

8    well known that she was very focused on customer service

9    and how customer service was going to be addressed and how

10   the IT needs were going to be addressed at the campus, would

11   have been very relevant.

12       Q        How would you describe the tone of her questions?

13       A        Interested, concerned about if the level of customer

14   service would be the same at the campus.

15       Q        Was there anything about her questions that you

16   thought or appeared to you to be inappropriate in either

17   substance or tone?

18       A        No, there was not.

19       Q        Did she raise her voice to Mr. Shoudy?

20       A        No.

21       Q        Did she appear antagonistic towards him?

22       A        No.

23       Q        Did she appear supportive or unsupportive of what he

24   was doing?

1      A     I really couldn't determine whether she was

supportive or -- she was concerned about the customer

3    service aspects.

4      Q     Did she do anything to try and chastise Mr. Shoudy

5    concerning anything in his presentation?

6      A     Not that I noted.

7      Q     You said there were a lot of other questions.  Did

8    anybody else ask questions?

9      A     Yes.  I asked questions, for example.

10     Q     What did you ask questions about?

11     A     I asked questions about the calendaring system and

12    when we might be getting that.  Just basically about new

items that would be coming out.

14     Q     Like an emergent project?

15     A     Yes.  Especially about shared calendar, which is

16    something I have been looking for for some time.

17     Q     Were you concerned in any way concerning Mr. Siok's

18    new duties?

19     A     No, I was not.

20     Q     No one else asked questions?

21     A     I know Shelby Crawford had questions about the

22    support to the Corporate & Community Programs division.

23     Q     Did any of her questions either in substance or tone

24    seem appropriate or inappropriate?

1      A      They seemed appropriate because they were about how

2    are we going to get this done, if we need this help and so

3    forth.  Those were the general tone of the questions.

4      Q      Anybody else ask questions?

5      A      Zac Royston asked questions.

6      Q      What did he ask questions about?

7      A      I believe his question was about a blackboard

8    service question.  We had had some issues with blackboard

9    about that same time.  I think there were some computer

10   glitches in backboard that were causing some extra headaches

11   at that time that were being repaired or had just been

12   repaired.

13     Q      Were there any questions concerning Dan Siok and his

14   new duties?

15     A      I think the questions were more general questions.

16   Not about Dan Siok in particular.  But about who does this,

17   who do we call for that, if this happens.

18     Q      And anybody else you can recall asking questions

19   other than you, Crawford, Johnson, Royston?

20     A      I believe Mr. Houghtaling had a question but I don't

21   remember the substance of the question.  Ron Pleasanton,

22   visual communications chair.  I mean most people in the room

23   probably had a question or two.  Of course, Dr. Spampinato

24   would have had a question or two as well.

LAURETTA COOPER

1    Q    Did it appear that Mr. Shoudy was upset by all the

     questions that were being asked?

3    A    No.  He answered the questions very calmly,

4    professionally and just generally.

5    Q    Did Dr. Spampinato seem upset by the number or

6    subjects of the questions?

7    A    No, she didn't seem upset to me.

8    Q    Given that this was a department chair meeting and

9    you had an important department making a presentation, did

10   the number of questions in either tone or substance appear

11   to you to be appropriate or inappropriate, the fact that

12   there were several people asking questions?

     A    I would say that the questions were challenging.

14   Because customer service is always a question that comes out

15   with IT.  I think sometimes the perception is that not so

16   much by default of the personnel involved, but that there is

17   usually not enough hands to answer the technical questions

18   or to respond to the technical issues that faculty and staff

19   encounter.

20   Q    Following the November 19th meeting, did you hear

21   any comments, either negative or positive, about what

22   happened during the meeting?

23   A    In general, no.  I cannot think of any specific

24   comments related to that meeting.

1     Q    Were you aware that, after the first of the year, in

2    2005, that Dr. Johnson was placed on administrative leave?

3     A    Yes, I was.

4     Q    How did you learn that?

5     A    I'm trying to remember exactly how we were all told.

6    It seemed to have been almost right after the in-service.  I

7    know it was right after the in-service in the middle of the

8    year, right after Christmas.  I believe we heard it from

9    Mr. Simpson.  I can't remember exactly.

10     Q    You say you heard it.  Was there a meeting with

11    Mr. Simpson?

12     A    There was a meeting.  We did have a meeting shortly

13    after Dr. Johnson was placed on administrative leave with

14    Mr. Simpson.

15     Q    What happened during that meeting?

16     A    During that meeting, he talked about one of the main

17    focuses of the college's treating everybody with dignity and

18    respect and that he would -- and that he would do that.  And

19    if he had not treated some people with dignity and respect,

20    they should come and have a chat with him.  And basically

21    that he had every intent of treating everybody with dignity

22    and respect.

23     Q    Had you ever seen or heard of Dr. Johnson not

24    treating the staff with dignity and respect?

1      A    No, I had not.

      Q    Had you ever seen or heard examples of Mr. Simpson

3  not treating staff appropriately, say with dignity and

4  respect?

5      A    In general, no.

6      Q    Okay.  You qualified that with, in general.

7      A    I say that because sometimes from the tone of voice

8  perhaps, perhaps you would not be comfortable with a

9  response, an abruptness in response and so forth. But I

10  would say not tremendously different than any other manager

11  that I might have had.

12      Q    Did Mr. Simpson ever raise his voice to you?

      A    On an occasion or two, yes, he would have raised his

14  voice to me.

15      Q    Do you remember the subject matters of those

16  instances?

17      A    New student orientation.  I missed new student

18  orientation.  I got too involved and missed the time and I

19  was late coming to new student orientation.  He raised his

20  voice.

21      Q    Did you view it as an appropriate or inappropriate

22  means of correcting you?

23      A    I viewed it as appropriate.

24      Q    Have you ever met Dr. George?

LAURETTA COOPER

1    Q    Since November 19th of 2004, have you had

2    discussions with Dr. Johnson about any topic?

3    A    Yes.

4    Q    When did you have discussions with her subsequent to

5    November of 2004?

6    A    I have been to a couple of sorority meetings with

7    Dr. Johnson.

8    Q    Has that been during the course of 2005 and/or 2006?

9    A    Yes.

10    Q    And have you talked about her lawsuit?

11    A    Mainly about how it's going, yes.

12    Q    About how her lawsuit is going?

13    A    Um-hmm.

14    Q    And what has Dr. Johnson said about the lawsuit?

15    A    That she is doing fine.

16    Q    That she is doing fine?

17    A    Correct.  Mainly the question is how is the lawsuit,

18    how are you doing.  I'm doing fine.  Things are going well.

19    And so forth.

20    Q    Okay.  Nothing beyond those kind of generalities?

21    A    Correct.

22         MR. WILLIAMS:  I have no further questions.

23         MR. ABER:  I have one that I did forget.

24              EXAMINATION

WILCOX & FETZER LTD.
Registered Professional Reporters

B386

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
MARGUERITE A. JOHNSON,              )
                                   )
            Plaintiff,             )
                                   )   Civil Action
        vs.                        )   No. 05-157 (KAJ)
                                   )
ORLANDO J. GEORGE, JR., in both    )   CONFIDENTIAL PAGES
his official and personal capacities, )  33-37
and DELAWARE TECHNICAL AND COMMUNITY )
COLLEGE,                           )
                                   )
            Defendants             )
```

Deposition of SHELBY CRAWFORD taken pursuant
to notice at the law offices of Morris, James, Hitchens &
Williams, 29 N. State Street, Dover, Delaware, beginning at
11:56 a.m. on Friday, February 24, 2006, before Allen S.
Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER, GOLDLUST, BAKER & OVER
        702 King Street, Suite 600
        Wilmington, DE 19801
            For - Plaintiff
        DAVID H. WILLIAMS, ESQUIRE
        MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
        222 Delaware Avenue, 10th Floor
        Wilmington, DE 19801


            For - Defendants

ALSO PRESENT:

        BRIAN D. SHIREY, ESQUIRE
        MARGUERITE A. JOHNSON
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B387

1      A      I am.

2      Q      And how are you familiar with her?

3      A      She was the -- she is the former campus director to

4  the Terry Campus.

5      Q      Did you work with her on a regular basis as the

6  department chair of CCP?

7      A      There were occasions when I did work with

8  Dr. Johnson, yes.

9      Q      How would you describe her leadership skills?

10      A      She has good leadership skills.

11      Q      Professional?

12      A      Professional.

13      Q      How does she lead people?  I'll give you two

14  alternatives, by example, by intimidation?

15      A      I'm sorry.  I didn't understand the first part.

16      Q      How does she lead people?  Does she intimidate them

17  into doing what she says?  Does she set a good example or

18  what?

19      A      As would be the case in any professional setting,

20  you tell people what you would like or, you know, express

21  your desires and hope that those desires are carried out.

22  I'm not sure what you're asking.

23      Q      Okay.  One other question I forgot to ask you.

24              Before today, you were told that I had asked

SHELBY CRAWFORD

```
 1        A     Okay.

 2        Q     Do you remember her discussing customer service

 3   during that in-service program?

 4        A     What I can tell you is that I remember customer

 5   service typically coming up in a number of in-service

 6   programs.  So I can't remember that specific one.

 7        Q     How important was that to Dr. Johnson?

 8        A     It was very important.

 9        Q     Do you remember in one of these presentations where

10   she might have said that if the people in in-service were

11   not customer friendly, they can walk out to the parking lot?

12        A     I don't recall that.  But --

 3        Q     Okay.  Did you ever hear her use that phrase in a

14   threatening manner?

15        A     No.

16        Q     How would you describe Dr. Johnson's attitude

17   towards the people she supervised?

18        A     I only know about her attitude towards me.

19        Q     What was that?

20        A     It was professional.

21        Q     Have you seen her interact with other people who she

22   would have occasion to supervise at meetings and such?

23        A     Yes, on occasion.

24        Q     Did you ever see her act inappropriately towards
```

1      anybody else at these meetings?

2      A     No.

3      Q     If somebody asked you to describe Dr. Johnson's

4      attitude towards excellence, how would you describe that?

5      A     I'm not quite sure what you're asking.

6      Q     Did she expect her staff to perform their duties

7      with excellence?

8      A     I would imagine.  I can't answer that.

9      Q     Well, I mean --

10     A     About her expectations.  But I would imagine, yes.

11     Q     You have heard her discuss things at these in-

12     service presentations?

13     A     Correct.

14     Q     What was the general thrust of these in-service

15     presentations?

16     A     As I said, customer service often came up.  Taking

17     care of our constituency.  Making sure that their needs are

18     met.  Giving the community what they want, what they need.

19     Those kinds of things.

20     Q     Were you on the Del Tech campus when Dr. Johnson was

21     first appointed to be campus director?

22     A     No, I was not.

23     Q     So when you came to the campus, she was already

24     campus director?

1    A    It is now, yes.  I believe so.

2    Q    You say when you got in there, Ms. Fantini was

3    giving her presentation?

4    A    Yes.

5    Q    And after she finished, what was the next order of

6    business?

7    A    I believe at that time Mr. Shoudy, I believe, began

8    his presentation.

9    Q    Who introduced him?

10    A    I believe it was Dean Spampinato.

11    Q    What was the subject matter of his presentation?

12    A    I believe he was speaking about reorganization of

13    the department or a new -- yeah, reorganization, I believe.

14    Q    Of which department?

15    A    Computer Services.

16    Q    IT, the IT program?

17    A    Um-hmm.

18    Q    Did he make any handouts?  Did he use a film

19    presentation?

20    A    As I recall, there was a handout, although I can't

21    tell you what was on the handout.

22    Q    Okay.  I won't do that to you.

23         Did he use a Power Point presentation?

24    A    I believe he did.

1  Q Did he finish his whole presentation before there

2 were questions from the floor or were questions interspersed

3 during the presentation?

4  A I don't recall.

5  Q Or did people ask any questions about his

6 presentation?

7  A Yes.

8  Q Who asked the questions?

9  A I can't give you the names.  I know that I asked

10 questions.  There were a number of people who asked

11 questions.  I can't tell you who.

12  Q Did Dr. Johnson ask any questions?

13  A I believe she may have asked one or two.

14  Q Okay.  Did she at any time act what you felt to be

15 inappropriately toward Mr. Shoudy?

16  A Not that I recall.

17  Q Do you remember her yelling at him?

18  A Not that I recall.

19  Q Do you remember her doing anything antagonistic or

20 combative towards him?

21  A Not that I recall.

22  Q Did Mr. Shoudy seem upset by any of the questions

23 that Dr. Johnson asked?

24  A Not that I recall.

1    Q    Did now Dr., in other words, it was not Dr. then but

2    it is now Dr. Spampinato?

3    A    Correct.

4    Q    Did Dr. Spampinato appear upset by anything that

5    Dr. Johnson asked?

6    A    Not that I recall.

7    Q    Did anyone express any concern over the nature of

8    her questions?

9    A    Not that I recall.

10    Q    I don't mean precisely.  But do you remember the

11    general subject matter of her questions?

12    A    No, I don't.

13    Q    Do you have any recollection as to whether they were

14    relevant or appropriate to the subject matter of the

15    presentation?

16    A    I would assume so.  But, no, I don't recall.

17    Q    Did you ask any questions?

18    A    I did, yes.

19    Q    What did you ask questions about?

20    A    I believe I asked questions about our campus mobile

21    technology center and how whatever was going on was going to

22    affect the center.  My questions were specific to that

23    subject.

24    Q    And had you had any prior concerns with the IT

SHELBY CRAWFORD    17

1    service to the campus, IT department service to the campus?

          A    There had been a couple of issues that we were

3    trying to work out, yes.

          Q    Do you run a program called WHEELS for the school?

5         A    I do.

          Q    After Mr. Shoudy's presentation, were any of your

7    questions directed to any issues concerning that WHEELS

8    program?

9         A    Yes.

10        Q    And what is the WHEELS program?

11        A    WHEELS is a mobile training unit.  It's a 40-foot

12   bus that has laptop computers and we take that unit into the

3    community to provide training services.

14        Q    And what type of issues were you concerned about

15   that would have pertained to the IT organization?

16        A    Making sure -- it seems to me that at that time

17   there was going to be a change in the person who I would

18   normally deal with to make sure that the vehicle's

19   technology was up and running.  And I was concerned about

20   finding out who that person was and what their background

21   was and that kind of thing, whether or not they would be

22   able to assist us.

23             There were -- I also had some concerns about

24   some memory problems that we had had.  Not memory problems,

```
1    some issues we had had concerning the data that was being

2    stored on the vehicle.

3        Q    What type of issues?

4        A    Loss of data.

5        Q    Is that something that you were responsible for?

6        A    Yes.

7        Q    So it was your fault the data was lost?

8        A    No.

9        Q    Okay.  Whose responsibility was it to maintain the

10   integrity of the computer data?

11       A    I was responsible for the program.  The Computer

12   Services was responsible for assisting us with maintaining

13   the technology equipment.

14       Q    Okay.  What individual was responsible for that?

15       A    At that time, there were several people.  Dan Siok

16   was one of them.  James Husfelt was one of them.  It was my

17   understanding that -- I believe James Husfelt was being

18   transferred to another unit within Computer Services.

19       Q    So then the person left to take care of this

20   program, the computer part of the program, would have been

21   Dan Siok?

22       A    He was the head of that unit at that time.  And

23   James Husfelt reported to him.

24       Q    How critical was it to this WHEELS program to
```

1    questions of Mr. Shoudy?

2      A    No.

3      Q    Do you know if she asked anybody to ask questions?

4      A    I don't know that.

5      Q    Do you know of her asking anybody to ask questions?

6      A    I do not.

7      Q    There is a gentleman who I think is the head of the

8    math department, Mr. Buckley.  Do you know him?

9      A    Okay.  Yes.

10      Q    Was he at the meeting?

11      A    I don't recall.  This says that he was there.

12      Q    Okay.  Do you remember him asking any questions?

13      A    I don't recall.

14      Q    Are you aware of the nature of the relationship he

15    has with Dr. Johnson?

16      A    No.

17      Q    Do you remember anybody else asking questions?

18      A    What I remember is that a number of people asked

19    questions.  Some more than others.  But I can't tell you

20    who.  I can't tell you what they asked or when they asked

21    it.

22      Q    The questions were asked, the general tenor of the

23    meeting, was this a let's gang up on Shoudy meeting or were

24    they appropriate questions?

1    A    I would imagine they were appropriate.  I don't

·    recall what the questions were.  But I would imagine they

3    were appropriate, yes.

4    Q    As you try to visualize the meeting, did it appear

5    that the people who were asking the questions were ganging

6    up on Mr. Shoudy?

7    A    I don't recall.  I mean there were lots of

8    questions.

9    Q    I assume you have attended enough organizational

10   meetings that sometimes they get heated and maybe people

11   become very -- can get upset during these meetings?

12   A    Correct.

ᴣ    Q    Was there anything about this meeting and the

14   presentation by Mr. Shoudy that seemed to you inappropriate

15   or out of the ordinary?

16   A    Anything about his presentation?

17   Q    Either his presentation or the questions afterwards.

18   A    No.  There were individuals who were concerned and I

19   would imagine they were asking questions based on those

20   concerns.

21   Q    Do you remember if Mr. Houghtaling asked any

22   questions?

23   A    I don't recall.

24   Q    Was there any discussion concerning Dan Siok's new

1    Q    Was Dr. Johnson involved with that incident at all?

2    Do you know?

3    A    I believe so, yes.

4    Q    How was she involved?

5    A    Well, she was a campus director.  So she oversaw,

6    you know, the entire campus.  And I believe that she may

7    have intervened to assist the customer.

8    Q    Was Mr. Simpson involved in that incident at all?

9    A    I believe so.

10   Q    How was he involved?

11   A    I believe he was in the vicinity when the issue

12   occurred.  Whatever the issue was.

     Q    And do you know, other than being in the vicinity,

14   did he interact with this person?

15   A    I wasn't there.  I don't know.

16   Q    Do you know somebody named Jeff Peck?

17   A    Yes, I do.

18   Q    Do you remember an incident or some issues

19   concerning his employment to an international task force?

20   A    His appointment to a task force?

21   Q    Yeah, or whether he was or wasn't going to be

22   appointed?

23   A    I don't.

24   Q    Do you know whether Dr. Johnson wanted him to be on

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,            )
                                  )
              Plaintiff,          )
                                  )
                                  )  Civil Action No.
v.                                )  05-157 (KAJ)
                                  )
ORLANDO J. GEORGE, JR.,           )
in both his official and          )
personal capacities, and          )
DELAWARE TECHNICAL AND            )
COMMUNITY COLLEGE,                )
                                  )
              Defendants.         )

        30(b)(6) deposition of R. RONALD DRAPER taken
pursuant to notice at the Townsend Building, 401 Federal
Street, Dover, Delaware, beginning at 9:53 p.m. on
Wednesday, May 10, 2006, before Patricia L. Shelton,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          for the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          for the Defendants

        FRANK N. BROUJOS, ESQ.
        DEPUTY ATTORNEY GENERAL
          820 N. French Street - 6th Floor
          Wilmington, Delaware  19801
          for the Office of Auditor of Accounts

ALSO PRESENT:    MARGUERITE A. JOHNSON
                 WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                 (302) 655-0477



WILCOX & FETZER LTD.
B390  Registered Professional Reporters



8

1  regards to use of the PNC card?

2     A.   Yes.

3     Q.   We'll get back to the card in a minute.

4          Now, you have a copy of the report with you.

5  Can I take a look at it for a second?

6     A.   The November 10th?

7     Q.   Yes.

8          What else did you bring with you?

9     A.   I brought the one that was dated October 20th.

10    Q.   One thing I guess I want to understand at the

11  very beginning was when you were contacted by, I guess --

12  was Mr. McNesby the first one that contacted your office?

13    A.   Yes.

14    Q.   Did he make available to you a copy of the report

15  prepared by the firm of SantoraBaffone?

16    A.   Yes, he did.

17    Q.   Can you, just in a broad sense before we get into

18  details, explain to me today what extent your office

19  relied upon SantoraBaffone's report in issuing your final

20  report?

21    A.   What we did is we reviewed that report to see

22  exactly what the issues that they found were.  They,

23  also, had done interviews of individuals within Del Tech

24  Terry Campus.  And what we did is, based upon the work

12

1  at. And then that is agreed upon between the auditor and

2  the auditee, which in this case would be Del Tech

3  Community College.

4      Q.   Do you know in that agreed-upon procedures who

5  the specified party was?

6      A.   I don't understand your question.

7      Q.   Do you understand the term -- what a specified

8  party is with regards to an agreed-upon procedures?

9      A.   Are you talking about the one that they dealt

10  with, as far as entering into the contract to perform

11  agreed-upon procedures --

12      Q.   Are you familiar with something called the

13  American Institute of Certified Public Accountants?

14      A.   Yes.

15      Q.   They have standards for agreed-upon procedures?

16      A.   Correct.

17      Q.   Those standards say that the agreed-upon

18  procedures are usually set by the specified party?

19      A.   Correct.

20      Q.   What I'm asking you, in your understanding, who

21  was the specified party?

22      A.   The specified party would be -- was Gerry McNesby

23  of Del Tech Community College, the vice president of

24  finance.

13

1    Q.    Was it your understanding that the SantoraBaffone

2    report complied with the AICPA standards for agreed-upon

3    procedures engagements?

4    A.    Yes.

5    Q.    If you were to find that the SantoraBaffone

6    report in certain respects were in violation of the AICPA

7    standards, what would that do to your reliance upon their

8    report?

9    A.    Well, as I said, what we did, we were given a

10   copy of that report and then we conducted our own review

11   of the information that they had also looked at.  We

12   revisited that information.

13            So to answer your question, it wouldn't have

14   had any bearing on our work that we did in looking at the

15   issues that were addressed to us by Mr. McNesby.

16   Q.    One of the sections in your report, on page 4,

17   the inappropriate use of the Del Tech employees stated

18   that you did no additional work and relied upon

19   SantoraBaffone --

20   A.    Where are you reading?

21   Q.    I'm on page 5, the last --

22   A.    Oh, you're on page 5.  Okay.

23   Q.    The section starts on page 4.

24            Down at the last full paragraph before



R. Ronald Draper

14

1    recommendation, it says, "Based upon CPA group's

2    analysis, we have not done any additional work in this

3    area."

4        A.    Okay.

5        Q.    Is that correct?

6              So at least in that area --

7        A.    That's correct.

8        Q.    -- you did no more interviews or review of

9    anything; you just relied on their report?

10       A.    We did not go beyond the work that they did, as

11   far as the personnel costs and the materials incurred

12   by... That's correct.

13       Q.    And if their review in that area was in some

14   extents in violation of the standards for an agreed-upon

15   procedures report under the AICPA, would you agree with

16   me that their figures would be inaccurate if they

17   violated those standards?

18       A.    No, I would not agree with you.

19       Q.    If --

20       A.    You would have to be specific as to what you're

21   saying they violated --

22       Q.    All right.

23       A.    -- as far as the standards.  Because even though

24   you could potentially, in some cases, violate a standard

K. Ronald Draper

23

1    Q.    Were you aware that SantoraBaffone in their

2    investigation were told that the president's office had a

3    custom and practice of not requiring the president's

4    approval for travel by campus directors?

5    A.    I was never informed of that.

6    Q.    Would that have changed your opinions in this

7    report if you had been made aware of such custom and

8    practice?

9    A.    It would have changed the -- it would have

10    changed our -- let me see.

11            We would have expanded the recommendation in

12    order for it to be -- to clearly define all employees as

13    to who should be receiving approval for travel, yes.

14    Q.    As I understand your report, this criticism was

15    directed solely to Dr. Johnson as you wrote the report?

16    A.    Yes.

17    Q.    And if you had been made aware of this custom and

18    practice, then Dr. Johnson wouldn't have been the only

19    one that was invariant to policies; it would have been

20    the entire -- other campus directors, also?

21    A.    We would have reworded and expanded the

22    recommendation to define and -- for them to define and

23    detail more specifically in their travel policy who was

24    to be covered and who was to approve.

R. Ronald Draper

28

1  campus director travel must be approved in writing by the

2  college president."

3          Now, is that different from what your

4  understanding was?

5    A.   Yes.

6    Q.   Let me show you another document, which has been

7  Bates stamped DTCC2059 by Del Tech.  And this is

8  Mr. Dwyer's summary of his interview with Mr. Hearn.

9          And if you look down in the fourth dotted

10  paragraph, midway through, there's language about,

11  referring to Mr. Hearn, quote, His impression from

12  working as accounting manager in the president's office,

13  the campus directors do not have to get presidential

14  authority for travel.

15          Did anybody tell that to the auditor's

16  office, report that to the auditor's office before it

17  issued its report?

18    A.   Would you repeat your question again?

19    Q.   Okay.  Mr. Hearn made the statement or is

20  recorded as having told Mr. Dwyer in Mr. Dwyer's summary,

21  quote, His impression from working as an accounting

22  manager in the president's office, the campus directors

23  do not have to get presidential authority to travel,

24  close quote.

R. Ronald Draper

29

1          Was that information ever conveyed to you or

2  your office when the investigation was done?

3      A.    That information was not furnished to me.

4      Q.    Do you know if that information was ever

5  furnished to anybody in the auditor's office?

6      A.    I couldn't answer that question.

7      Q.    That statement is not reflected in the report,

8  though, is it?

9      A.    No.

10      Q.    To the extent that your report states that a

11  director did not get presidential authority, you were

12  referring solely to Dr. Johnson, correct?

13      A.    Correct.

14      Q.    Though, Mr. Hearn's statement, at least in this

15  summary by Mr. Dwyer at DTCC2059, seems to infer that

16  none of the campus directors needed to get presidential

17  authority to travel because he used the word plural

18  directors, correct?

19      A.    That's what his statement says.

20      Q.    If your office had been aware of that statement,

21  would that have played a role in your report?

22      A.    Well, as our report still indicates, we even went

23  beyond just looking at only the Terry Campus, but we

24  looked at travel requests for two other directors in

R. Ronald Draper

32

1    found where there was approval.

2        Q.    If your investigators had seen the exhibits

3    marked McNesby 1 and 2, if they had been shown those or

4    had found those or had seen those, would they have been

5    able to conclude that the Owens Campus director always

6    got presidential approval?

7        A.    We wouldn't have made the statement that we made

8    there that we found that their supervisor approved travel

9    requests.   We're not saying that they -- we're saying

10   that based on the ones that we looked at.

11       Q.    But there are some that show there was not

12   approval?

13       A.    Apparently, you know, on the ones you're showing

14   me.

15       Q.    And referring to McNesby 9, the Terry Campus

16   travel policy, you agree with me it doesn't state the

17   campus director has to go to the president for approval?

18       A.    This Terry Campus travel policy does not,

19   correct.

20       Q.    Now, we started the discussion talking about

21   contradictory information would have -- under the AICPA

22   standards for agreed-upon procedures, the contradictory

23   information has to be in the final report, correct?

24       A.    I believe we said that, yes.

R. Ronald Draper

36

1      Q.    Now, under purchasing card approval, it states,

2    all -- under section B.

3      A.    Yes.

4      Q.    It states, "All SuperCard purchases are subject

5    to prior written approval by the cardholder's supervisor

6    and/or dean, director or business manager."  That's what

7    it says, isn't it?

8      A.    Yes.

9      Q.    So if the cardholder's business manager approved

10   the expenditure, that would be satisfactory, wouldn't it?

11     A.    You're taking out supervisor?

12     Q.    It says, "Cardholder's supervisor and/or dean,

13   director or business manager."  It talks in a disjunctive

14   way as any of those people.

15     A.    Yes.

16     Q.    So if the cardholder's business manager approves

17   it, that would be in compliance with their policies?

18     A.    It appears it would be, yes.

19     Q.    So if Dr. Johnson's travel expenditures had all

20   been preapproved by the business manager, her use of the

21   SuperCard on travel met this policy, didn't it?

22     A.    If preapproved, yes.

23     Q.    Now, if you turn to the second page of

24   McNesby 10, under travel card approval, section D, midway

R. Ronald Draper

37

1  through, it has, "In the event the cardholder incurs

2  expenses that are subsequently disallowed by the business

3  or fiscal office, then the cardholder must submit a check

4  reimbursing the college for the amount within 24 hours."

5         That sentence seems to imply that there will

6  be instances where personal expenses are incurred and

7  they would be disallowed by either the campus business

8  office or college fiscal office, correct?

9  A.    Yes.

10  Q.    And that would require somebody to go to the

11  cardholder who made those charges and say, hey, this was

12  an improper charge, reimburse us, correct?

13  A.    Yes.

14  Q.    And without that notification, would the employee

15  have any reason to know that the charge had been

16  disallowed?

17  A.    I don't believe so.

18  Q.    In any of the investigations done by your office,

19  do you know at any time was Dr. Johnson ever notified of

20  an improper expenditure and failed to abide by this

21  policy marked McNesby 10?

22  A.    Would you repeat that again for me?

23  Q.    During your investigation, do you know if your

24  office ever found an instance where Dr. Johnson received



38

1    notice of an improper expenditure and failed to reimburse

2    the college, as required by what has been marked

3    McNesby 10?

4        A.   I'm not aware.  Again, that would be within the

5    work papers and also through the interview process that

6    was done by the audit team.

7        Q.   If that had been found out, would you have

8    expected it to be in the report?

9        A.   Yes.

10        Q.   And it's not in the report?  No instance of that

11    is put in the report, is it?

12        A.   I don't believe it is, no.

13        Q.   So that would imply that there were no instances

14    found?

15        A.   Of what we looked at, yes.

16                MR. ABER:  Mark this as Draper A for

17    identification.

18                (Draper Deposition Exhibit A was marked for

19    identification.)

20    BY MR. ABER:

21        Q.   Are you familiar with what's been marked as

22    Draper A for identification?

23        A.   That was a statewide review that our office did

24    on the SuperCard, yes.

1    Q.   If you turn to the next page, 33 --

2              MR. BROUJOS:  I'm going to have a continuing

3    objection with respect to any questions pertaining to

4    this report.  It wasn't referenced in your notice.

5    Mr. Draper has stated he hasn't had a chance to review

6    it.  He didn't participate in it; at least review it for

7    the purposes of this deposition.  So...

8              MR. ABER:  I'm just curious about timing.

9              MR. BROUJOS:  Okay.

10   BY MR. ABER:

11   Q.   No. 3 states, under weaknesses for the Terry

12   Campus, "The campus director SuperCard purchases are not

13   always reviewed and approved for accuracy or propriety."

14             What I'm curious about, this document is

15   dated June 30th, 2005.  You said that this investigation

16   was done in the fall of 2004?

17   A.   No, I did not say that.

18   Q.   Okay.  Let me go back.  When was the

19   investigation done as a result of this report?

20   A.   You mean when was the SuperCard audit done?

21   Q.   Yes.

22   A.   It was done in the fall of 2005, which would have

23   been after -- which would have been after June 30th,

24   2005.

44

1    A.    I understand what it says here, yes.

2    Q.    If a cardholder's expenses are not reviewed and

3    subsequently disallowed, can the cardholder be faulted

4    for failure to repay within 24 hours?

5    A.    The cardholder still has a responsibility to

6    ensure that they are properly using the card, yes.  And

7    there's a statement that, I believe, that employees sign

8    when they are issued a card as to -- you know, that they

9    understand how you can use the card and what may happen

10    if you fail to comply with that.

11    Q.    If you look at the third page of McNesby 10,

12    that's the document by which Dr. Johnson signed.

13    A.    Okay.

14    Q.    So she had a reasonable expectation that the

15    policy would be followed by everybody, including the

16    people who reviewed the charges, wouldn't she?

17    A.    She would have an expectation that it was going

18    to be reviewed.  But I could also say that there's an

19    expectation that the employees who sign this also have a

20    responsibility to ensure that they are properly using

21    that card when they sign this.

22    Q.    Have other state employees occasionally

23    erroneously used the card for personal purchases without

24    realizing it?

1    A.    No.    That information was referred to the

2    attorney general for them to determine whether there was

3    anything that they needed to do further than what was

4    already done.

5    Q.    But the validity of any comments made by

6    SantoraBaffone would rise and fall on the accuracy of the

7    information that they based their findings on, correct?

8    A.    Repeat that again.

9    Q.    If SantoraBaffone had reached whatever financial

10   conclusions they had based upon erroneous information,

11   then to the extent that their report was wrong, anything

12   that you said about the inappropriate use of Del Tech

13   employees would have been wrong to the same extent that

14   SantoraBaffone's report was wrong?

15   A.    Yes.

16   Q.    During your investigation with regards to any --

17   do you know what I mean by the family reunion of

18   Dr. Johnson?

19   A.    Mm-hmm.    Yes.

20   Q.    Did your office find any evidence that

21   Dr. Johnson attempted to hide any expenses associated

22   with that; you know, such as told people don't make

23   records of this or don't record this?

24   A.    Again, I'd have to refer back to the notes that



52

1    there -- I don't know any of the matters personally, but

2    that they not be discussed outside this room, any notes

3    taken, any references made on paper to those items not be

4    shared and that they be thrown out or destroyed.

5              MR. ABER:  For the record, as I sat here, I

6    noticed the board.  I sort of gathered what it was.  But

7    I made no attempt to remember anything.

8              MR. BROUJOS:  That's fine.  I would just ask

9    that you discuss that with your client as well.

10             MR. ABER:  Okay.  Give us a minute.

11             (A short recess was taken.)

12   BY MR. ABER:

13      Q.   A couple housekeeping matters here.

14               As I understand it, the final report in this

15   matter was released to the press or put on a website or

16   something?

17      A.   The policy that we have in our office is when a

18   report is finalized, it is the decision of the state

19   auditor to either -- to put it on our web, yes.

20      Q.   And that would be Mr. Wagner?

21      A.   That's Mr. Wagner, yes.

22      Q.   Do you know what governs whether it's put on the

23   web or not?

24      A.   Normally what occurs is if we are -- if we're



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,              )
                                    )
                Plaintiff,          )
                                    )      Civil Action
v.                                  )      No. 05-157 (KAJ)
                                    )
ORLANDO J. GEORGE, JR.,             )
in both his official and personal  )
capacities, and DELAWARE TECHNICAL )
AND COMMUNITY COLLEGE,              )
                                    )
                Defendants.         )

        Deposition of DAVID DWYER taken pursuant to
notice at the law offices of Aber, Goldlust, Baker &
Over, 702 King Street, Wilmington, Delaware, beginning at
1:08 p.m. on Tuesday, March 21, 2006, before Eleanor J.
Schwandt, Registered Merit Reporter and Notary Public.


APPEARANCES:

        GARY W. ABER, ESQ.
        ABER, GOLDLUST, BAKER & OVER
           702 King Street - Suite 600
           Wilmington, Delaware  19801
           for the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
           222 Delaware Avenue - 10th Floor
           Wilmington, Delaware  19801
           for the Defendants

ALSO PRESENT:

        MARGUERITE A. JOHNSON


                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

WILCOX & FETZER LTD.
B415 Registered Professional Reporters
COPY

1      Q.    What was the nature of that relationship?

2      A.    It was an internal control review at the

3    Georgetown Campus.

4      Q.    Concerning some scholarships?

5      A.    No.  You said prior to this?

6      Q.    Yes.

7      A.    No, not concerning scholarships.

8      Q.    What was that matter about?

9      A.    It was reviewing the internal fund.

10     Q.    So you had had prior business relationships with

11   Del Tech prior to this matter?

12     A.    Yes.

13     Q.    Can you tell me what they are, were?

14     A.    As I mentioned, we were doing an internal control

15   review of the internal fund at the Georgetown Campus.

16     Q.    Any other work for the school prior to this

17   investigation?

18     A.    Me personally?

19     Q.    Your firm.

20     A.    Our firm, yes.

21     Q.    What other matters did your firm have?

22     A.    We had done a fraud investigation for the Stanton

23   Campus, and some other internal control reviews at the

24   Wilmington and Stanton campuses.

```
 1   other small matter or an assortment of other small

 2   matters?

 3        A.   My involvement has only been with the Georgetown

 4   internal control review, up to that date.

 5        Q.   I'm talking about the firm.

 6        A.   Yes.  And up to that date my partner had handled

 7   a lot of these smaller matters, such as the cafeteria

 8   review, cash receipts.

 9        Q.   Who is your partner?

10        A.   John D'Agostino.

11        Q.   I understand based on prior depositions in this

12   matter that someone related to, George's daughter works

13   for your firm?

14        A.   That's correct.

15        Q.   Where does she work?

16        A.   She works as a staff accountant in our firm.

17        Q.   What office?

18        A.   We only have one office.  In our main office.

19        Q.   Okay, I'm sorry.  Was she involved in any way

20   with this matter?

21        A.   No.

22        Q.   What is her last name?

23        A.   The last name is McHone, M-C capital H-O-N-E.

24        Q.   Can you explain to me what the purpose of the
```

1   initial engagement letter is?

2      A.   The purpose, this is an agreement upon procedures

3   engagement letter, so we want to make sure that we are on

4   the same page of what procedures they want us to look at,

5   specifically, and have us come back with our findings

6   and, also, the purpose is to make sure that we agree on

7   the payment for our services.

8      Q.   Okay.  What is meant by an agreed procedures?

9      A.   Agreed upon.

10     Q.   Agreed-upon procedures, is it called review?

11     A.   No, no.  It is agreed-upon procedures.

12     Q.   Okay.  Is that an audit?

13     A.   No, it is not.

14     Q.   Why is it not an audit?

15     A.   An audit is where you look at the accounting and

16  attest that the financial transactions are correct and

17  according to GAAP, and you give an opinion to that.

18     Q.   What is an agreed-upon procedure?

19     A.   Agreed-upon procedures is, it is an engagement

20  where two parties agree that you are going to do specific

21  procedures and come up with your findings.

22     Q.   One of the parties is you and your firm, correct?

23     A.   Correct.

24     Q.   The other is the specified party?

1     A.    Correct.

2     Q.    Who are the specified parties in this matter?

3     A.    In this case it would have been Del Tech.

4     Q.    Who specified these services to be rendered?

5     A.    At this point in time it would be Jerry McNesby.

6     Q.    So Mr. McNesby told you what he wanted you to do?

7     A.    Exactly.

8     Q.    Did you have any suggestions to expand upon what

9 he suggested be done?

10    A.    What do you mean by that?

11    Q.    Let's say he told you he wanted you to, for

12 instance, interview Kathy Powell in regard to her

13 performance of non-college activities performed during

14 normal college business hours.

15    A.    Right.

16    Q.    Well, what was the purpose of doing that

17 interview?

18    A.    They wanted to see if Kathy was spending a lot of

19 her time doing personal business.

20    Q.    Why couldn't they just ask her and have her tell

21 them?  What I'm trying --

22    A.    I can't answer for him.

23    Q.    Well, what did you add to the process that could

24 not have been done by Mr. McNesby asking the same

1       A.   Are you trying to say that you think I should

2  have expanded?

3       Q.   I'm not saying whether you should or shouldn't.

4  I'm asking:  Did you at any time do anything like I just

5  asked you?

6       A.   Maybe explain it better.  I'm not sure what you

7  are trying to say.

8       Q.   Well, you have told me that Mr. McNesby gave you

9  these five agreed-upon procedures?

10      A.   Yes.

11      Q.   Did you at any time say to Mr. McNesby or anybody

12  else at Del Tech, these five procedures are too limiting

13  or they don't give me enough information to analyze

14  whatever you are looking at, I think I have to go beyond

15  that and do something else?

16      A.   No, I never said that to them.  I didn't say that

17  to them.

18      Q.   You never tried to expand upon your original five

19  agreed-upon procedures?

20      A.   We are limited to what we have here.

21      Q.   That doesn't answer my question.  Did you at any

22  time try to expand the five agreed-upon procedures listed

23  in the initial retention letter of March 22nd?

24      A.   No.

1    Q.  Did everybody say they were fearful of Dr.

2  Johnson?  I don't see anything in the report of anybody

3  saying anything positive about her.  So did anybody say

4  anything positive about her?

5    A.  In the interviews there might have been one

6  person who said that -- they might have said something

7  positive about Dr. Johnson.

8    Q.  I guess this is a question I'll ask at some

9  point.  Did you ever suggest that you should get Dr.

10  Johnson's point of view on whether she was intimidating?

11    A.  It wasn't part of the engagement.

12    Q.  Okay.  Did you speak to anybody about whether Dr.

13  Johnson was intimidating on the campus other than the

14  people that Del Tech told you to talk to?

15    A.  No.

16    Q.  So the people you interviewed were pre-selected

17  by Del Tech?

18    A.  The people I interviewed, according to the

19  engagement letter, were Kathy Powell and certain Del Tech

20  employees, and the list got expanded as I talked to the

21  people about who I should interview.

22    Q.  What names were added?  Who expanded the list?

23    A.  Each person I talked to would add another person.

24    Q.  Did they say -- okay.



David Dwyer

1      A.    No, no.

2      Q.    Joan Erhart, in fact, her interview was fairly

3  positive of Dr. Johnson?

4      A.    That's the one, yes.

5      Q.    And Fred.  And Susan Moliken wasn't on the

6  original list?

7      A.    No, she wasn't.

8      Q.    Well, the initial procedures, it doesn't list

9  anybody to be interviewed other than Kathy Powell, does

10  it?

11     A.    I believe it says in number 2, "We will interview

12  certain other Del Tech employees to determine their

13  participation."

14     Q.    Do you have a list of those Del Tech employees?

15     A.    As I said, I was told to start with Dan Simpson

16  and Dan Houghtaling.

17     Q.    And they would tell you who to interview?

18     A.    According to Dan's interview, I believe, there

19  should be additional people listed here I should talk to.

20          "People we should talk to regarding the

21  family reunion," on the first page, halfway, right in the

22  middle, "Dan Houghtaling, Kathy Powell, Cena Sweeney, Bob

23  Hearn, Randy Palmateir."  They are all listed there.

24     Q.    He read off the people, he is reading from the

1    A.    Yes.

2    Q.    Does your report of April 12th mention or contain

3    anything from the Joan Erhart interview?

4    A.    Not to my knowledge.

5    Q.    Okay.  And Mr. Evins did not suggest you

6    interview Kathy Powell?

7    A.    No.

8    Q.    So is it fair to say that most of the people that

9    you interviewed were people who were selected by Dan

10   Simpson then?

11   A.    Correct.

12   Q.    Other than the one positive interview that you

13   got, the only person you have been able to identify now

14   that was not identified by management for you to

15   interview was Joan Erhart, correct?

16   A.    I would have to look at the list of interviews

17   because I think there was ten or 12.

18   Q.    They are all right in front you.

19   A.    Okay.  Christine Travis, Peg Prouse.

20   Q.    Okay.  Peg Prouse was the head librarian.  Who

21   suggested that you interview her?

22   A.    Nobody.  I did it on my own accord.

23   Q.    And Christine Travis, who suggested you interview

24   her?

1    A.    Nobody.  I did that on my own accord.

2    Q.    Where did you get her name?

3    A.    Her name popped up repeatedly through the

4 interviews.

5    Q.    Which interviews?

6    A.    I believe Kathy Powell had mentioned her and said

7 that she was doing the job before Kathy was.

8          At this time I'm not sure which interview it

9 was that told me to talk to Christine Travis.

10    Q.    So then with that modification would it be fair

11 to say that a good majority of the people you interviewed

12 were people that were suggested to you by Dan Simpson?

13    A.    Correct.

14    Q.    Did you seek out to interview anybody who would

15 have a positive statement to make about Dr. Johnson?

16    A.    That wasn't part of the engagement letter.

17    Q.    So the answer to my question is no, you did not?

18    A.    No, that wasn't the procedure.

19    Q.    I'm having trouble understanding.  Your procedure

20 was not to seek out people that had anything positive.

21 Was it then your procedure to seek out things from people

22 who would have something negative to say about Dr.

23 Johnson?

24    A.    No, that's not correct either.

1    A.   That's correct.

2    Q.   And with the agreed-upon procedures there is no

3  attempt to find the truth of the matter other than within

4  the limits of the agreed-upon procedures?

5    A.   Which set out to find the facts.

6    Q.   Within the limits of what you are told to do?

7    A.   Correct.  Correct.

8    Q.   For instance, in an agreed-upon procedure, if the

9  specified party knows a fact that might contradict the

10  agreed-upon procedures, and they don't tell you those

11  facts, then whatever you report after doing your

12  agreed-upon procedures might not be accurate to the

13  extent it doesn't have the facts that weren't made known

14  to you?

15    A.   That could happen.

16    Q.   Now, when you do an agreed-upon procedure are you

17  supposed to offer any opinions?

18    A.   No.  You are supposed to report --

19    Q.   Facts?

20    A.   Correct.

21    Q.   Nothing more, nothing less?

22    A.   Right.

23    Q.   Did your report have any opinions?

24    A.   I believe our report had procedures we performed

1    assertions they were making?

2        A.   Del Tech didn't give us the facts.  We went out

3    and found our own facts, number one.

4        Q.   They told you where to look for the facts?

5        A.   Yes, who to talk to and which trips to look at

6    and which purchases to look at.

7        Q.   Now, according to the AICPA standards, and I

8    think as stated in your letter, your report is not to be

9    used by anybody other than the specified parties,

10   correct?

11       A.   Correct.

12       Q.   So it should not be distributed to anybody else,

13   should it?

14       A.   Correct.

15       Q.   Would not giving it to the state auditor's office

16   be a violation of the AICPA standards?

17       A.   Based on our findings and the recommendations we

18   talked about earlier, we thought it was appropriate that

19   it should be given to them.

20       Q.   That's a violation of the standards, though,

21   isn't it?

22            MR. WILLIAMS:  Are you asking him for a

23   legal conclusion?

24            MR. ABER:  He said his report was pursuant

1    A.   Yes, it was.

2    Q.   And the AICPA standards state that an agreed-upon

3  procedures examination should not distribute the findings

4  outside the specified party, should it?

5    A.   Correct.

6    Q.   Part of the AICPA standards is that you are not

7  to have, your findings are not to be subjective in any

8  nature, are they?

9    A.   That's right.

10   Q.   So your interpretation that Dr. Johnson was

11 intimidating was a subjective finding, wasn't it?

12   A.   No, it wasn't.

13   Q.   Did you mean that to be a fact or were you just

14 reciting what other people told you?

15   A.   I recited what other people told me, majority of

16 other people told me that.

17   Q.   Did Dan Simpson say he felt intimidated by Dr.

18 Johnson?

19   A.   No, he didn't.

20   Q.   The people who said that they felt intimidated by

21 Dr. Johnson were the people basically from the marketing

22 department, weren't they?

23   A.   No.   There were other people as well.

24   Q.   I said most of them were from the marketing



1    department, weren't they?

2        A.    The majority of people I talked to were from the

3    marketing department.

4        Q.    How many employees are there in the Del Tech

5    Terry Campus?

6        A.    I can't answer that.  I don't know.

7        Q.    Did you speak to anybody outside of the Del Tech

8    management and the marketing department, or former

9    marketing department employees?

10       A.    Kathy Powell is not in marketing.

11       Q.    Well, she was part of the management?

12       A.    She is an administrative assistant.  She is not

13   management.  Is she?

14       Q.    She works in that department.  Okay.  The

15   management or the manager's staff --

16       A.    Mm-hmm.

17       Q.    -- or the marketing department?

18       A.    Fred Evins.  Is he considered marketing?

19       Q.    I think so.  He did the banners I think.

20       A.    Correct.  He has some other title.  It is not

21   really marketing.

22       Q.    You would agree with me there are a lot of other

23   people that Dr. Johnson worked with on a daily basis

24   other than the people you interviewed?

David Dwyer

1    A.    Oh, absolutely.

2    Q.    Did you make any attempt to determine whether

3    they felt that she was intimidating?

4    A.    No, I did not.

5    Q.    To the extent that the agreed-upon procedures do

6    not reflect accurately the facts as they existed, that's

7    not your responsibility, is it?

8    A.    What kind of question is that?  Say that again.

9    Q.    Okay.  The responsibility for the sufficiency of

10    the agreed-upon procedures in deriving the true facts of

11    the situation, is that your responsibility?

12    A.    Yes.

13    Q.    Or someone else's?

14    A.    That's ours.

15    Q.    Okay.  As I read the AICPA standards, the

16    sufficiency of the procedure is the responsibility of the

17    specified party.

18    A.    Del Tech in that case.

19    Q.    I was trying to give you an out and you didn't

20    take it.  So, in other words, if the procedures do not

21    accurately reflect the true situation, that's Del Tech's

22    fault, not yours?

23    A.    Yes.

24    Q.    Now, if you come upon any materials that



1   contradict the goal, the stated purpose of the

2   agreed-upon procedures, they should be included in your

3   final report, shouldn't they?

4       A.   Yes.

5       Q.   Were they?

6       A.   That's assuming I found any.

7       Q.   Well, you found Miss Erhart spoke positively

8   about Dr. Johnson, didn't she?

9       A.   The intent wasn't to see whether they liked her

10  or disliked her.

11      Q.   You made the comment that some employees found

12  her intimidating?

13      A.   Correct.

14      Q.   Miss Erhart did not, did she?

15      A.   No, she didn't.

16      Q.   Did you include that in your report?

17      A.   No, I didn't.

18      Q.   One of the things about the report was the fact

19  that Dr. Johnson had not gotten Dr. George's approval for

20  her travel, rather, right?

21      A.   Correct.

22      Q.   Did you find any contradicting evidence to that,

23  on that issue, as to what the custom and practice was at

24  Del Tech?

1      A.    The practice was to get approval for your trip

2   before you traveled.

3      Q.    Well, the policy requires an employee to get the

4   supervisor's opinion, or approval?

5      A.    Approval.

6      Q.    Has to be okayed by the Campus Director?

7      A.    Correct.

8      Q.    Now, Dr. Johnson is the Campus Director?

9      A.    Yes.

10     Q.    Her supervisor would be Dr. George?

11     A.    Yes.

12     Q.    During your investigation did you find, come upon

13   any information to indicate whether it was the custom and

14   practice for campus directors to require the approval of

15   Dr. George for their travel?

16     A.    We did not find anything that was customary for

17   her to get approval.

18     Q.    If you had, you should have included that in your

19   report, shouldn't you?

20     A.    Yes.

21     Q.    And to the extent that you didn't include it then

22   you ignored this AICPA standard, correct?

23     A.    The policy states that she is supposed to get

24   approval from her supervisor.

1  Q. I'll ask again. During your investigation did

2  you find anything to indicate there was a custom and

3  practice that campus directors did not have to get the

4  approval of Dr. George?

5  A. No, we didn't find anything that was customary

6  practice.

7  Q. Did you find any evidence that might suggest that

8  there was such a practice?

9  A. She didn't get it approved.

10  Q. I'm not asking what she did. Did you find in any

11  of your investigation that there was a policy, custom,

12  informal policy or practice that campus directors did not

13  have to get Dr. George's approval?

14  A. We found no policy that campus directors didn't

15  have to get approval. The policy was that they had to.

16  Q. I'm not asking about policy. I'm asking about

17  custom and practice. Did you find anything of that in

18  your investigation?

19  A. You are asking the question for Del Tech. We

20  were looking at a minute population of Dr. Johnson's

21  expense reports, so I can't answer that, if it was

22  reasonable and customary for Del Tech.

23  Q. Dr. Johnson would be governed by the custom and

24  practices of Del Tech, wouldn't she?

1    A.    No.

2    Q.    If you had found such information should it have

3  been in your report?

4    A.    Yes.

5    Q.    If there is a custom and practice that no campus

6  director needs to get the president's approval, then that

7  would apply to Dr. Johnson equally because she is one of

8  the several campus directors, isn't she?

9    A.    Yes.

10    Q.    Turn to your interview summaries, would you?

11    A.    Okay.

12    Q.    Take a look at Bob Hearn's summary.  It is page--

13    A.    I got it.

14    Q.    -- 2079.

15    A.    Yes.

16    Q.    Look at the fourth bullet point, about midway

17  through, talks about Dr. Johnson's travel?

18    A.    Mm-hmm.

19    Q.    Mr. Hearn's or your summary of Mr. Hearn's

20  statement is that his impression from working as an

21  accounting manager in the president's office -- that

22  would be Dr. Johnson's supervisor's office, correct?

23    A.    Yes.

24    Q.    -- is that the campus directors do not have to



1   get presidential authority to travel.  Did you include

2   that statement or allude to that in your report?

3       A.   No, I didn't.

4       Q.   Did you do anything to follow up on that to try

5   and find out whether it was true or accurate?

6       A.   No, I didn't.

7       Q.   Did you ask Dr. George whether that was true?

8       A.   No, I didn't.

9       Q.   You would agree with me that Section 201.4 of the

10  AICPA standards require any materials that contradict the

11  agreed-upon procedures should be included in the report?

12      A.   Yes.

13      Q.   In your report you mention certain employees

14  mentioned intimidation and coercion by Dr. Johnson,

15  correct?

16      A.   Yes.

17      Q.   Did you report or did you record any specific

18  instances, other than this general subjective feeling of

19  theirs?

20      A.   I would have to rehash the interviews.  But just

21  from memory, I believe a common saying by Dr. Johnson is

22  that "you are going to go to the parking lot."

23      Q.   Do you know how often she said that or under what

24  circumstances she did?

1    A.   I don't know how often.  I do not know under what

2    circumstances.

3    Q.   Other than that, do you have any specific

4    instances to support those subjective comments?

5    A.   It was just repeatedly through the interviews so

6    that's what I --

7    Q.   So you have no facts to support those subjective

8    comments, correct?

9    A.   What kind of fact would it be?

10   Q.   One day she yelled and screamed and told me to go

11   home, or something like that.  On this day, one day I

12   gave her a report and she tore it up and threw the paper

13   and sent me home.  Any specific instance.

14   A.   Besides the parking lot comment she would also

15   use that "you are incompetent and I'm going to replace

16   you."

17   Q.   Did she have the power to replace anybody?

18   A.   I can't answer that.

19   Q.   Do you know whether Del Tech policies allow the

20   Campus Director to unilaterally fire anybody?

21   A.   No, I don't know that.

22   Q.   Okay.  If she didn't have that power then that

23   would be a meaningless statement, wouldn't it?

24   A.   Yes, it would.

1     Q.   Now, your initial engagement letter, which has

2  been marked Exhibit 3 --

3     A.   Okay.

4     Q.  -- states that you are going to look at these

5  agreed-upon procedures for violation of laws and

6  policies, correct?

7     A.   Mm-hmm.  Yes.

8     Q.   Now, your final report refers to some Del Tech

9  policies that you thought were violated?

10     A.   Yes.

11     Q.   Does your final report indicate any laws were

12  violated?

13     A.   No, it doesn't.

14     Q.   That means you didn't find any evidence of laws

15  being violated, did you?

16     A.   That was not part of -- well, it says we are

17  supposed to look at laws, but, no, we didn't see any

18  laws.

19     Q.   Now, what policy did you find violated by Dr.

20  Johnson?  You mentioned the travel policy?

21     A.   Correct.

22     Q.   What other one?

23     A.   Did we mention them in here, in the policy

24  manual?  I believe the policy manual relating to the

David Dwyer

1  employee's workday and also what kind of duties they are

2  supposed to do at work.

3       Q.   That's policy 11. --

4       A.   -- 11 in the Policy Manual and Section 6.01.

5       Q.   The 11.11, that deals with outside employment,

6  doesn't it?

7       A.   Yes, it does.

8       Q.   Okay.  There is no evidence Dr. Johnson had

9  outside employment?

10      A.   No.

11      Q.   Was there any evidence that anything she asked

12 Kathy Powell to do interfered with Kathy Powell's

13 day-to-day duties so that she couldn't do other work that

14 needed to get done?

15      A.   She asked Kathy Powell to do some personal things

16 in nature, so I can't answer whether Kathy Powell had

17 enough time in her day to finish her Del Tech

18 responsibility.

19      Q.   Standard 11.11 says that anything you do should

20 not interfere with the day-to-day work of Del Tech,

21 correct?

22      A.   Right.

23      Q.   So in order to violate that policy you would have

24 to determine whether or not the tasks she asked Kathy



1    Powell to do interfered with her day-to-day work for Del

2    Tech, wouldn't you?

3        A.   Right.

4        Q.   Did you make that determination?

5        A.   No, I didn't.

6        Q.   So you can't say whether that policy was violated

7    or not, can you?

8        A.   No, I can't.

9        Q.   Any of the other work that was attributed to Dr.

10   Johnson, did you make any determination whether any of

11   that other work contributed to Dr. Johnson's request

12   interfered with any of the Del Tech's day-to-day

13   operations?

14       A.   No, I didn't.

15       Q.   So in the same regard, you can't determine

16   whether any of those requests attributed to Dr. Powell

17   violated the policy?

18       A.   In the sense that what she was asked to do, what

19   she asked the people to do were in addition to their

20   normal duties.

21       Q.   But without determining whether it interfered

22   with their day-to-day work, you can't say whether any

23   policies were violated, can you?

24       A.   No.



1          MR. ABER:  Let me take a two minute break.

2          (Recess taken.)

3   BY MR. ABER:

4      Q.   In your report you have some discussion of the

5   personal work that Kathy Powell did.  How did you

6   quantify the amount of time spent by her on that work?

7      A.   Through discussions with her.

8      Q.   Tell me exactly what you did and how you reached

9   that.  Did you go through the computer and look at the

10  personal work?

11          I'm not sure, the directory I gave you, is

12  that the one that said "Personal Work"?

13     A.   It has everything.  These are the files that

14  Kathy gave me.

15     Q.   There is two sets.  I didn't know if I gave you

16  both sets.

17     A.   It is the same thing.

18     Q.   Let's mark the other one so we have both on the

19  record.

20          (Dwyer Deposition Exhibit 6 was marked for

21  identification.)

22     Q.   The other one is the one marked "Reunion."  I'm

23  not sure if that's supposed to be part of the personal

24  work or not.  But did you go through the items that are



1    listed on there to try and say, well, it took five

2    minutes to do this, ten minutes to do that, 20 minutes to

3    do this, six minutes to do this?

4        A.   No, I didn't use that approach.  I used the

5    approach that based on the files that you saw here, as

6    well as some of the services she provided, I listed I

7    believe balancing the checkbook and some other things --

8        Q.   I understand.

9        A.   -- that really, aren't really files, they are

10   services she would perform either weekly or monthly, to

11   give me a rough estimate of how long it took her to do

12   her things.

13       Q.   And this is Kathy Powell's rough estimate?

14       A.   Yes.

15       Q.   What was the rough estimate she gave you?

16       A.   She wouldn't pin herself down on anything.

17       Q.   Well, your report says 10 percent?

18       A.   Right.

19       Q.   How did you arrive at that?

20       A.   Just based on discussions with her.  And she

21   finally agreed to, you know, say, she says it could be

22   anywhere from a day, she says some days it was days, some

23   days it was hours.  She couldn't really come up with an

24   idea.  She would not commit to anything.  She was very

1  thereafter, she said it was a mess and it took her

2  forever to clean it up.

3      Q.   How long was "forever"?

4      A.   Longer than a short little bit.

5      Q.   Longer than an hour?

6      A.   I can't answer that question.

7      Q.   If she gave it to her every month did it take

8  five minute?  Ten minutes?  20 minutes?  What, do you

9  know?

10     A.   No, I don't.

11     Q.   To the extent that Miss Powell told you that the

12 personal work took 2 to 8 percent, that would contradict

13 your 10 percent that you put in your report, wouldn't it?

14     A.   Yes.

15     Q.   And Section 201.4 of the AICPA standard would

16 require that to be in your report, wouldn't it, that

17 contradictory statement?

18     A.   As I mentioned earlier, it is just not

19 documented, our discussion where she determined that it

20 was 10 percent.

21     Q.   But there is documentary evidence to contradict

22 that 10 percent, isn't there?

23     A.   Yes.

24     Q.   And you did not include that in your report, did



1   you?

2       A.   No, I didn't.

3       Q.   That would violate the standard, wouldn't it?

4       A.   Yes.

5       Q.   Now, with regard to the family reunion work, did

6   you find any evidence on family reunion prior to 1999?

7       A.   No.

8       Q.   In reviewing the family reunion materials, did

9   you review any of the hard copies of that family reunion

10  material?

11      A.   I believe all the hard copies were gone.  The

12  only thing that I would review were the files, computer

13  files that they would print out after the fact.  If you

14  are talking about a completed set, no, I never had a

15  completed set.

16      Q.   What I'm curious about, in your testimony at the

17  hearing you testified at page 157 -- I'll make it easier.

18  Let me hand you a copy of your transcript.

19      A.   Okay.

20           MR. ABER:  Sorry, David, I just made one.

21           MR. WILLIAMS:  That's okay.

22      Q.   Page 157 at line 12.  You can look at the rest of

23  it.

24      A.   Mm-hmm.