1    Q.   You say, "on subsequent review we actually have

2  hard copies of some of these in the back of our pages,

3  where we actually found some."  What did you mean by

4  that?

5    A.   I believe that those were just the actual

6  computer files and they just printed them out.  And I

7  think that's what we used in our report or our work

8  papers, if you look.  But nobody could locate a complete

9  set of their reunion files.

10   Q.   Did that mean some materials had been deleted

11 from the computers?

12   A.   It meant that either they over wrote them for a

13 subsequent reunion or they deleted them.  So the only

14 thing I could find is whatever anybody had left over on

15 their computer from '99.

16   Q.   On the 2001 reunion, what work was actually done?

17 Dr. Johnson didn't attend the 2001 reunion.

18   A.   She didn't?

19   Q.   Do you know whether she did?

20   A.   No, I don't know.

21   Q.   Now, with regard to 1999 reunion --

22   A.   Mm-hmm.

23   Q.   -- Dr. Johnson made an attempt to pay for the

24 materials that were produced, didn't she?

1      A.   I saw one reimbursement for 300, approximately

2   $300.

3      Q.   Did you see the invoice?

4      A.   No, I didn't.

5              (Dwyer Deposition Exhibit 7 was marked for

6   identification.)

7      Q.   There are two documents there.  One is the check.

8   I guess you meant the payment?

9      A.   Mm-hmm.

10     Q.   You said you saw the payment.  You couldn't have

11  seen the canceled check?

12     A.   No.

13     Q.   What did you see?

14     A.   Through the Del Tech business office, they had

15  their ledger receipt that showed that there was a

16  reimbursement from Dr. Johnson.

17     Q.   Now, were you ever shown this bill?

18     A.   No.

19     Q.   Do you have any reason to doubt that that was

20  prepared by Kathy Powell?

21     A.   I can't tell who prepared this.

22     Q.   She has testified that she did prepare that.

23     A.   Okay.

24     Q.   And that Dr. Johnson told her to prepare a bill

1    and she prepared the bill and it was paid.

2        A.    Mm-hmm.

3        Q.    The amount on the bill is the same as the check.

4        A.    Okay.

5        Q.    Did you try to determine how Dr. Johnson arrived

6    at the sum to reimburse the school the amount that you

7    found on the ledger?

8        A.    I was told that it was just for supplies.  And I

9    think the description on the receipt said supplies.

10        Q.    What does the bill tell you?

11        A.    Copy supplies.

12        Q.    Copies or supplies?

13        A.    Color copies, plastic binding combs.  Paper.

14    Supplies.

15        Q.    Well, the color copies is not supplies?  That's

16    the actual copying, isn't it?

17        A.    Color copies at 38 cents a page, those are

18    copies.  So those are supplies, right?

19        Q.    Well, that's just the cost of making the color

20    copy.

21        A.    That's what they were charging for it.

22        Q.    Some of the people had trouble remembering the

23    number of copies that were actually produced for 1999,

24    didn't they?

1    A.    Yes, they did.

2    Q.    And you have no idea how many people actually

3    attended the reunion, do you?

4    A.    No, I don't.

5    Q.    So there is no hard evidence about the number of

6    copies that were actually produced, is there?

7    A.    Only an invitation list.

8    Q.    Well, many of those people didn't attend?

9    A.    But an invitation list would suggest that there

10    was materials produced for the people that are on the

11    invitation list.

12    Q.    Well, let's do this chronologically.  Well, let

13    me make this more personal.  If my daughter is going to

14    get married, I'll send out 200 invitations.

15    A.    Okay.

16    Q.    I won't have the caterer produce 200 meals, will

17    I?

18    A.    No.

19    Q.    I'll only have them produce the number of meals

20    of people that are actually coming, right?

21    A.    Yes.

22    Q.    Do you see the analogy?

23    A.    Sure.

24    Q.    You would agree with me that she probably

1   wouldn't have more books produced than people who were

2   actually coming, would she?

3        A.   No.

4        Q.   Did you make any attempt to determine how many

5   people were actually attending?

6        A.   Based on my interviews, nobody could give me that

7   answer.

8        Q.   But yet you issued a report estimating the cost

9   based upon nobody actually knowing the number?

10       A.   Correct.   I believe we issued it based on, I

11  think there was 168 people on the invitation list and we

12  used 150.

13       Q.   But you don't know whether 20 people showed up or

14  150 showed up, do you?

15       A.   No, I don't.

16       Q.   So your estimate was purely rough, wasn't it?

17       A.   Absolutely.

18       Q.   And you have no idea whether Dr. Johnson supplied

19  any of the materials for the copying that was done, do

20  you?   In other words, she went off-site to buy them and

21  brought them into the school to use?

22       A.   Such as?

23       Q.   Paper.

24       A.   Paper.   If that was the case that would have came

1   through my interviews because they would have said she

2   brought boxes of paper in, to use this.

3        Q.   Did you ask anybody whether she did?

4        A.   They never mentioned any paper coming in.

5        Q.   My question is:  Did you ask where the supplies

6   came from?

7        A.   No, I didn't.

8        Q.   You just assumed they came from the school?

9        A.   Yes.

10       Q.   Did you ask whether Dr. Johnson supplied any of

11  the materials?

12       A.   No.

13       Q.   If you had asked Dr. Johnson you might have found

14  that out, if she did, wouldn't you?

15       A.   Yes.

16       Q.   Now, in your estimate of the costs, you had no

17  knowledge of the per-page cost for black and white

18  copies, did you, when you did your calculations?

19       A.   I believe I requested that information from Jerry

20  McNesby.  I believe he gave me a -- is it 15 cents for

21  black and white?

22       Q.   Take a look at your transcript testimony.  Page

23  176.

24       A.   Okay.

1    Q.   There is some discussion there about the charges

2    for black and white copies.   Do you see that?

3    A.   On 15?

4    Q.   Yes.   Starting around line 15.

5    A.   Mm-hmm.

6    Q.   Did you make any determination whether the

7    marketing department ever actually charged for their

8    black and white copying?

9    A.   I asked that question.

10   Q.   What did they say?

11   A.   I believe they didn't charge Dr. Johnson.

12   Q.   No.  Did they actually charge anybody for black

13   and white copying?

14   A.   I didn't ask if they charged other people.   I

15   asked if they charged Dr. Johnson for the project.

16   Q.   To the extent --

17   A.   They said no.

18   Q.   Is it that they didn't charge her or she refused

19   to pay?

20   A.   Didn't ask.   The question was:   Did you charge

21   Dr. Johnson.

22   Q.   To the extent that Dr. Johnson was ever given a

23   bill, she paid it in full, didn't she, as far as you

24   know?

1      A.    This is the only bill, to my knowledge, I've

2    seen.

3      Q.    That's my question.   Every bill that Dr. Johnson

4    was given for this reunion, she paid it in full, to the

5    best of your knowledge, correct?

6      A.    This is the only bill that I was given.

7      Q.    Right.   And she paid it in full, right?

8      A.    Appears to be.

9      Q.    Okay.  So you don't know of any bill or invoice

10   she was ever given that she did not pay?

11     A.    I didn't know about this bill, so I don't know if

12   there is other bills out there.

13     Q.    Well, that was Del Tech didn't give you that as

14   part of the agreed-upon procedures, did they?

15     A.    Del Tech didn't give me the bill.   They gave me

16   the receipt that went through their books.

17     Q.    But they didn't give you the bill?

18     A.    No.

19     Q.    So putting that aside, do you know of any bills

20   that she was ever given that she refused to pay?

21     A.    No.

22     Q.    Now, the rates that you quoted, I think you

23   started to say 15 cents for black and white copies, 38

24   cents for color copies, do you know what other commercial

1  printers charge for black and white copies, for large

2  jobs?

3      A.   In 1999?

4      Q.   Yes.

5      A.   No, I don't.

6      Q.   You have no idea?

7      A.   No, I didn't know what the charges were in '99.

8      Q.   Did you attempt to find out what they were?

9      A.   The rates were used, we figured, were for Del

10  Tech, so we used the Del Tech prices if they did charge

11  anyone.

12     Q.   Let me ask you this suggestion:  If Del Tech

13  usually didn't charge people for black and white copies--

14     A.   Mm-hmm.

15     Q.   -- and you were given a figure of 15 cents, then

16  that might have just been somebody's guesstimate, right?

17     A.   Could have been, or if they did charge that was

18  an accurate number.

19     Q.   Did you ask to see any invoices to determine

20  whether that was an accurate number?

21     A.   No.

22     Q.   Now, were you aware that some of the reunion

23  materials were printed off-site?

24     A.   Yes.



1              (Dwyer Deposition Exhibit 8 was marked for

2    identification.)

3         Q.   Do you recognize what has been marked as Dwyer 8,

4    Bates stamped DTCC 1939?

5         A.   It is an e-mail to me.

6         Q.   You wrote the first e-mail, right?

7         A.   Yes.

8         Q.   What file did you send to Miss Powell?

9         A.   I believe it was this file.

10        Q.   Which is Dwyer 6?

11        A.   Yes.  It is either this one or this one.  It was

12   one of the files.

13        Q.   Dwyer 6 or?

14        A.   Or is it number 1?

15        Q.   Okay.  Mechanically, you do a print screen, and

16   then you can attach that to an e-mail?

17        A.   Oh, no, no.  You actually attach the files.

18        Q.   Oh, okay.

19        A.   I believe I sent her all the files and I asked

20   her to estimate how long it took her to do this.

21        Q.   And she told you that she cannot remember?

22        A.   For those documents she did not work on, please

23   indicate the person's name by the document.

24        Q.   And she wrote back she couldn't remember how much

1   time she spent collating them?

2        A.   As I mentioned earlier, she was waffling.  She

3   had a hard time remembering how much time she spent.

4        Q.   In fact, to the extent you thought Chris Travis

5   was a secretary that preceded Kathy Powell you were

6   incorrect because it was really somebody named Blanche

7   Spada?

8        A.   The access document was completed by Chris.

9        Q.   But it says, "Some of the documents, other than

10  the cookbook, do not even look familiar.  What I'm sure

11  is Blanche Spada did not resign until 6/15/99," which

12  means, I'm getting the implication of that that Kathy

13  Powell came in after that.

14       A.   I don't know if she did or not.  I don't know who

15  Blanche Spada is or what position she held there.

16       Q.   Do you know what the access document is?

17       A.   No.  I assume an access document would be some

18  sort of great big database.  That's what usually access

19  is.

20       Q.   In your report there were some issues about Dr.

21  Johnson asking some vacation pictures to be copied?

22       A.   Yes.

23       Q.   Did you see any documents where Dr. Johnson

24  requested the pictures to be documented -- copied?

1    A.    I saw an e-mail.

2    Q.    Let me start over.  Did you see any documents

3    that evidenced Dr. Johnson requesting the pictures be

4    printed?

5    A.    I saw an e-mail from somebody to Dr. Johnson that

6    was forwarded from Kathy Powell to request the pictures

7    be printed.

8    Q.    Do you know whether Dr. Johnson told Kathy Powell

9    to do that?

10   A.    I don't know.  I assumed it since she was her

11   administrative assistant.

12   Q.    Did you ask Kathy Powell that question?

13   A.    I believe Kathy Powell gave me a copy of that

14   e-mail.

15   Q.    That wasn't my question.  My question is:  Did

16   you ask Kathy Powell whether Dr. Johnson asked her for

17   them to be printed?

18   A.    It either came from Kathy Powell or Prudy

19   Pierson, and the answer to the question is Prudy was

20   requested to print the pictures from Kathy Powell.

21   Q.    I think you are right.  It was Prudy Pierson who

22   gave you the e-mail.

23   A.    Yes.  And why would somebody ask somebody to

24   print somebody else's vacation pictures, I believe from

David Dwyer

```
 1        Q.   Did you ever see any evidence of her payment for

 2   those banners?

 3        A.   I don't recall.

 4             (Dwyer Deposition Exhibit 10 was marked for

 5   identification.)

 6        Q.   Have you ever seen the two documents which are

 7   part of Dwyer 10?

 8        A.   No.

 9        Q.   That is, in fact, invoice for banners, isn't it?

10        A.   This came up in the interview with Fred -- the

11   guy who did the banners.

12        Q.   Fred Evins.

13        A.   No, no.  Fred didn't --

14        Q.   Pleasanton?

15        A.   Pleasanton, yes, that he did this work with the

16   students, and I believe they did it off campus and then

17   they assembled it on campus, and that he -- I believe he

18   said he was going to get reimbursed for it.  This is the

19   club, the GRID club is part of the club he was involved

20   with.

21        Q.   Dr. Johnson paid $245 for that?

22        A.   Yes.

23        Q.   This is another example of work done for the

24   family reunion which she was given an invoice, she paid
```

1    it in full?

2        A.    Yes, it is.

3        Q.    That's two invoices she was given for the

4    reunion, both of which she paid in full?

5        A.    Yes.

6        Q.    There are some comments in your report about that

7    she took some trips that were unreconciled.

8        A.    Yes.

9        Q.    Who normally reconciled an employee's travel?

10       A.    I believe the business office did.

11       Q.    Was it Dr. Johnson's responsibility to do her own

12   reconciling?

13       A.    It is the business office, to make sure they are

14   reconciled and get all the supporting documentation.

15       Q.    When an employee travels, what obligation do they

16   have to reconcile?

17       A.    Ten days.

18       Q.    But they are supposed to do it?

19       A.    Yes.

20       Q.    Do you know for campus directors who does that

21   process?  Is it the Campus Director themselves or their

22   secretary?

23       A.    I don't know for campus directors.  I only know

24   for Dr. Johnson that Kathy Powell was doing it.

1      Q.    She did it all?  She kept the travel files and

2  such?

3      A.    She kept everything for Dr. Johnson.

4      Q.    So what I call travel items, every time she took

5  a trip there was a folder for it where the bills and

6  receipts went, right?

7      A.    Don't know that.

8      Q.    You didn't ask to see what the process was to

9  understand the process?

10      A.    Kathy said that she would reconcile it and deal

11  with the business office, Cena Sweeney.

12      Q.    Do you know why the travels were unreconciled?

13      A.    I believe they were waiting for documentation,

14  supporting documentation, receipts.

15      Q.    Did Kathy Powell tell you that?

16      A.    I believe Cena Sweeney did, from the business

17  office.

18      Q.    Did you ever see any evidence that Cena Sweeney

19  or the business office ever communicated with Dr. Johnson

20  and Dr. Johnson refused to give them the documentation?

21      A.    They didn't communicate with Dr. Johnson.  They

22  communicated through Kathy Powell.  They were intimidated

23  by her.

24      Q.    Did they give you any examples of why they were

1     A.   I assumed.  Educational Foundation, reasonably

2  prudent man would assume that foundations would be for

3  scholarships.

4     Q.   You also have in your report some criticism of

5  the Supercard transactions by Dr. Johnson?

6     A.   Yes.

7     Q.   Now, first of all, I believe you already

8  testified that you were only asked to look at, basically,

9  one or a limited number of transactions?

10     A.   That's correct.

11     Q.   And the thousands of transactions that Dr.

12  Johnson may have done correctly, you didn't consider

13  those at all, did you?

14     A.   No, I didn't.

15     Q.   Do you understand how the Supercard transactions

16  are audited, the process from the time I, as a Del Tech

17  employee, make a charge for a book for $30, what is the

18  process to final approval?

19     A.   Before a charge is even made you are supposed to

20  have approval for that purchase of that book.

21     Q.   Well, Dr. Johnson had certain amount of

22  discretion?  Every time she went to use her Supercard she

23  didn't have to get permission, did she?

24     A.   According to the policy, you are supposed to get

1    permission.

2        Q.    Do you know whether that was followed by

3    everybody?

4        A.    I don't know if it was followed by everybody.

5        Q.    Let's say she makes the purchase.

6        A.    Mm-hmm.

7        Q.    Then what happens?

8        A.    And then it is going to come through on her

9    credit card, and whenever the credit card gets it in the

10   business office, it is supposed to be reconciled with the

11   receipt that she is supposed to submit, a form.

12       Q.    This would be the campus business office?

13       A.    Yes.  So the person who actually bought the

14   charge has got to put it on a form, with the receipt, and

15   submit it to the business office to reconcile with the

16   credit card charge.

17       Q.    And if it doesn't get done, does Mr. McNesby's

18   office have any responsibility for overseeing this

19   process?

20       A.    I believe the business office is responsible for

21   making sure it is done.  But, ultimately, Jerry McNesby

22   in the finance office is responsible for all three

23   campuses.

24       Q.    And is the business office, campus business

1   office can't get it done, then, as the saying goes, take

2   it to a higher authority?

3        A.   Which would be the Campus Director.

4        Q.   And if it doesn't get done there, can they take

5   to it a higher authority, to Mr. McNesby, you are saying,

6   has the ultimate responsibility?

7        A.   For the college, yes.

8        Q.   Let's turn our attention to the West Virginia

9   transactions.

10            (Dwyer Deposition Exhibit 12 was marked for

11  identification.)

12       Q.   There are two pages to this Bates stamped DTCC

13  0377 and 0378.  They contain two receipts and the credit

14  card slips, I guess we will call them.

15            Now, were these all provided to you as part

16  of your agreed-upon procedures?

17       A.   Yes.

18       Q.   Now, do you know where the school found any of

19  these documents?

20       A.   I believe in Dr. Johnson's desk.

21       Q.   Do you know who found them?

22       A.   Whoever cleaned out the desk.  I'm not sure who

23  it was.

24       Q.   Do you know if Dr. Johnson had a chance to clean

1   out that desk before she left school?

2       A.   I don't know that.  I assume.  I don't know.

3       Q.   On the second page, 0378, there is a receipt.  Do

4   you know what each of those items are that are on that

5   receipt?

6       A.   For $335 -- or 300?

7       Q.   Yes.

8       A.   I believe we called and asked and they told us

9   that they were pictures, a spoon and some other things,

10  yes, Indian pictures, civil war pictures.

11      Q.   Some of them have checkmarks beside them.  Do you

12  know what the checkmarks mean?

13      A.   No, I don't.

14      Q.   Okay.  The top two are not checked and the bottom

15  five are?

16      A.   Yes.

17      Q.   Do you know what the school policy is if personal

18  expenditures are combined with business expenditures on a

19  credit card?

20      A.   First of all, it is not tolerated.  You are not

21  supposed to be doing that.

22      Q.   But if it is?

23      A.   Then it is supposed to be reimbursed right away.

24      Q.   Now, in your report you state that Dr. Johnson

1    invited herself on the West Virginia trip.

2      A.   Based on the interviews, yes.

3      Q.   Who told you that?

4      A.   Dan Simpson.

5      Q.   Did you know that Dan Simpson testified at the

6    same hearing that you did that he invited Dr. Johnson?

7      A.   No, I didn't know that.

8      Q.   Do you know of any evidence that Dr. Johnson was

9    ever reminded of the missing receipts for those West

10   Virginia purchases?

11     A.   I would have to fall back on the procedures, that

12   if there was credit card charges then the business office

13   would probably ask Kathy Powell for the documentation.

14     Q.   Do you know if Kathy Powell ever said that she

15   asked Dr. Johnson and Dr. Johnson refused to provide

16   them?

17     A.   I don't know that.

18     Q.   You don't know whether she ever did or didn't?

19     A.   No.  I just know the business office, I'm sure,

20   that was their responsibility, to make sure they were

21   reconciled and would probably stay on it until they got

22   them.

23     Q.   Apparently they didn't stay on it very long

24   because they never got it reconciled, did they?

1    A.   No.  And this is, what, 2002.

2    Q.   Did the charge slips that are in I think it is

3    number 11, were those found in the desk also, the credit

4    card slips as opposed to the receipts?

5         MR. WILLIAMS:  It is number 12.

6    Q.   12, I'm sorry.

7    A.   These?

8    Q.   There is two slips on each page.  One is the

9    receipt which is from the store.

10   A.   Okay.

11   Q.   And then there is the credit card document.

12   A.   So you are referring to number 11?

13        MR. ABER:  Now you got me confused, Dave.

14        (Discussion off the record.)

15   BY MR. ABER:

16   Q.   We are talking about 12.  It is right down there

17   in front of you.

18   A.   Okay.

19   Q.   Were the credit card slips found in the desk

20   also?

21   A.   I'm not sure where they were found.  They were

22   given to us when we asked for them.

23   Q.   There is a also a comment in your report that Dr.

24   Johnson had purchased an attache case?

1     Q.   Take a look at your report, first of all.

2     A.   In the report?

3     Q.   Yes.

4     A.   Okay.   "The travel request form stated the

5   following Explanation of Travel Request:   To tour and

6   meet with administrators for Institutional Advancement

7   and Public Safety at Wake Tech."

8     Q.   Your partner, you said, called Miss Himes?

9     A.   Yes.

10    Q.   He also is the one who interviewed Miss Rabon?

11    A.   Rabon, yes.

12    Q.   In the report I believe it is suggested that Dr.

13  Johnson never got Dr. George's permission to take travel.

14  Do you know whether there was any documentary evidence

15  that Dr. George had available to him that told him about

16  her trips and travel?

17    A.   No, I don't know.

18    Q.   Were you given that, any such documentation by

19  the school, either before or after you issued the report?

20    A.   That Dr. George knew of Dr. Johnson's travel?

21    Q.   Yes.

22    A.   And all the trips she made?

23    Q.   Yes.

24    A.   No, I was not.

1    to go down there on non-business reasons.

2         Q.   But the trip that we are talking about --

3         A.   Wake Tech.

4         Q.   -- was in 2000 and --

5         A.   '2, I believe.

6         Q.   2002?

7         A.   Yes.

8         Q.   So what does the family reunion in 2001 got to do

9    with the trip later?

10        A.   Maybe I was taking the premise that she missed

11   the reunion and she went down the following year to catch

12   up with her family and friends, and I wanted to see how

13   far away Wake Tech was from where they actually held the

14   reunion.

15        Q.   How far away was it?  Was it driving distance?

16        A.   I can't tell from the map.

17        Q.   In your report at page 7 you say you attempted to

18   verify whether Dr. Johnson reimbursed the school.

19        A.   Yes.

20        Q.   We have agreed already that the two bills she was

21   given she paid in full, so you didn't mention that in the

22   report, the second reimbursement, did you?

23        A.   No, I didn't.

24        Q.   Why did you leave that out?



1    A.    The second reimbursement?

2    Q.    The one for the banners.

3    A.    I don't think I have seen this.

4    Q.    You didn't know that she was reimbursed?  Mr.

5  Pleasanton told you she had reimbursed the school for

6  that?

7    A.    I would have to recall the interview.  I would

8  have to look at it again.

9    Q.    Take a look.

10    A.    Okay.  Pleasanton, correct?

11    Q.    Yes.  It is 2078.

12    A.    He was reimbursed directly from Dr. J for the

13  banner materials.  He didn't give a bill for the labor,

14  only for the materials.

15    Q.    You didn't put that in your report, though?

16    A.    No, I didn't.

17    Q.    Why not?  That would have been evidence that she

18  was trying to reimburse the school?

19    A.    For supplies.

20    Q.    Yes.  Something favorable to her.  Why didn't you

21  put that in?

22    A.    Oh, yes.  I guess it was overlooked.

23    Q.    Did your report make any factual findings?

24    A.    Let's back up a second.  Pleasanton, if I had

David Dwyer

1      A.    No.

2      Q.    For personal work?

3      A.    Personal time, no, no we didn't.

4            MR. ABER:    Let me take a break.    We are just

5  about done.

6            (Recess taken.)

7  BY MR. ABER:

8      Q.    Let me ask you a question.    I have a CD which I'm

9  not going to mark as an exhibit, but it was given to me

10  by Del Tech.    It purports to be a copy of Dr. Johnson's

11  correspondence.    I took it to be her personal work.    Did

12  you have any hand in creating this?

13      A.    No.    I didn't have anything to do with that.

14      Q.    Did you ever do a formal interview of Mr.

15  McNesby?

16      A.    No.

17      Q.    We saw from that one exhibit he approved the per

18  diem payments.

19      A.    Yes.

20      Q.    You didn't ask him why he did it?

21      A.    No.

22      Q.    Do you think he would have approved them if it

23  would have been improper?

24      A.    No, I don't think he would have approved them if



1    it was improper.

2        Q.   So since he approved them, any suggestion in your

3    report that that was improper was contradicted by the

4    fact that he approved them?

5        A.   Could be.

6        Q.   Now, you met with Mr. Simpson originally to talk

7    about the interviews, correct?

8        A.   Interviewed him.

9        Q.   And interviewed him?

10       A.   Interviewed him.

11       Q.   After that interview did you have any other

12   contact with him?

13       A.   Maybe off and on to help arrange other interviews

14   until he left for vacation.  He was gone for two weeks, I

15   believe.

16       Q.   Did you ever discuss the substance of your

17   interview with him?

18       A.   Other interviews with other people?

19       Q.   Yes.  Did you ever say, hey, so and so said such

20   and such?

21       A.   If I did, I don't remember, because I believe he

22   was knowledgeable anyhow until he left.  He knew --

23       Q.   How would he know all these facts?

24       A.   I believe in the interview, I think he said that

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,       )
                             )
            Plaintiff,       )
                             )   Civil Action
        vs.                  )   No. 05-157 (KAJ)
                             )
ORLANDO J. GEORGE, JR., in both    )
his official and personal capacities, )
and DELAWARE TECHNICAL AND COMMUNITY )
COLLEGE,                     )
                             )
            Defendant        )

          Deposition of ORLANDO J. GEORGE, JR., taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 29 N. State Street, Dover, Delaware,
beginning at 1:03 p.m. on Wednesday, November 30, 2005,
before Allen S. Blank, Registered Merit Reporter and Notary
Public.

APPEARANCES:

          GARY W. ABER, ESQUIRE
          ABER, GOLDLUST, BAKER & OVER
          702 King Street, Suite 600
          Wilmington, DE 19801

               For - Plaintiff

          DAVID H. WILLIAMS, ESQUIRE
          MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue, 10th Floor
          Wilmington, DE 19801

               For - Defendants

ALSO PRESENT:

          MARGUERITE A. JOHNSON

               WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
               (302) 655-0477

Johnson Case 1:05-cv-00157-MPT    Document 117¥2    Filed 07/20/2006    Page 28 of 100 George, et al.
Orlando J. George, Jr.                      November 30, 2005                                    C.A. # 05-157

Page 18

1    else that the attitude of the Dover community to her would

2    be more than just, well, we had someone else we wanted but

3    they might have been actually antagonistic to somebody like

4    her?

5        A    Like I said, counselor, there were people that would

6    have been supportive and those who would have wished someone

7    else would have received the position and would have --

8        Q    I understand what you're saying.  It's normal.

9    There is always Tom and Dick, and people, some want Tom,

10   some want Dick?

11       A    Yeah.

12       Q    But there is some people that might not have been

13   antagonistic to her for reasons other than she might have

14   been the winning candidate.  Was there any concern by her

15   about that?

16       A    I'm not sure what you're getting at.  People that

17   didn't like her personally?

18       Q    Did she ever express any concerns that there might

19   be some racial animosity towards her?

20       A    We have had those conversations over a number of

21   years, yeah.  Um-hmm.

22       Q    And did you ever see any evidence of that in the

23   Kent County community?

24       A    Did I see it personally?  I didn't witness it.

Page 22

1    to me that one of my vice-presidents acted in a way that I

2    certainly did not approve of.

3        Q    But that involved a relationship that Dr. Johnson

4    had with somebody outside the Delaware Technical & Community

5    College community, correct?

6        A    Yes, except that this person did -- was concerned

7    and brought that up in her conversation.

8        Q    And the topic of the dispute between Dr. Johnson and

9    this other person dealt with something about Dr. Johnson's

10   sister that was unrelated to Delaware Technical & Community

11   College business?

12       A    Yes.

13       Q    All right.  So the only reason it came to your

14   attention was because a person outside the Delaware

15   Technical & Community College chose to bring it within the

16   college business, correct?

17       A    She brought it to my attention because she I believe

18   was concerned about what future impact it would have in

19   terms of whatever relationship her agency had with Delaware

20   Technical.

21       Q    Had she ever had any problems with Dr. Johnson and

22   the Delaware Technical & Community College before that

23   incident?

24       A    I would have no way of knowing that.

1     what occurred.  But I was concerned because the unacceptable

2     behavior described is strikingly similar to many anecdotal

3     reports I have received concerning your behavior.

4         Q     The letter you're referring to is the first page of

5     this exhibit that's Bates stamped DTCC384, correct?

6         A     Yes.

7         Q     That's an anonymous letter that was sent to a member

8     of the Board of Trustees?

9         A     That is correct.

10        Q     Did you ever determine who wrote that letter?

11        A     I did not.

12        Q     Did you ever do anything to verify the truth of the

13    allegations in that letter?

14        A     What I did, Mr. Aber, was I discussed this with

15    Dr. Johnson.  I discussed the subsequent incident that I had

16    described earlier with I believe her name was Graham.  And,

17    you know, told her at the time that I thought that, to the

18    extent that there were instances of abusive behavior, that

19    that needed to change, and that I hoped that she and I would

20    be able to work through that together so that I would not

21    have to discipline her or put it in her evaluation.  I

22    wanted to be able, in a professional way, to bring issues to

23    her attention in the hopes that we could work our way

24    through those together, that if I brought them to her

Page 29

1    Q    Yes.

2    A    It makes a reference to Mr. Simpson.  There is a

3    reference to Mr. Simpson in this letter from the Lancasters

4    and it mentions Simpson, it mentions Dr. Johnson.

5    Q    You're now referring to the letter from Mr. and

6    Mrs. Lancaster Bates stamped DTCC0412?

7    A    Um-hmm.  Yes.

8    Q    And Mr. Simpson referred to a gentleman who knocked

9    something off the table, then talked to him in a hostile

10   tone, correct?

11   A    It refers to a gentleman and later identifies that

12   gentleman as being Simpson.

13   Q    It identifies him as being Dean of Instruction,

14   correct?

15   A    Yeah, Dean of Instruction.

16   Q    And then for some reason, Dean Simpson, in trying to

17   explain this conduct, who did he write to to explain his

18   conduct?

19   A    He addressed the memo to me.

20   Q    Do you know why he addressed the memo to you rather

21   than his superior?

22   A    Well, I would call your attention to Exhibit 410, in

23   which Dr. Johnson makes it clear that she asked Dean Simpson

24   to provide a written accounting of the events, which he did.

Page 30

1    And she forwarded his response to me.

2        Q    She said she asked Dean Simpson to provide a written

3    response.  She didn't say she asked him to provide a written

4    response to you, though, did she?

5        A    It says his report is enclosed.

6        Q    Right.  The report is addressed to you, though,

7    isn't it?

8        A    It is addressed to me.

9        Q    Okay.  Normally when a superior asks somebody to

10   provide a written response, it is addressed to superior,

11   isn't it, not the superior's superior?

12       A    I don't know what happened after it left my --

13       Q    Am I correct that, once Mr. Simpson provided his

14   report to you, the whole matter was dropped?  I mean there

15   was no further investigation or any other actions taken?

16       A    Yes, I would -- that is accurate.  Dean Simpson's

17   comments along with Dr. Johnson's comments, I moved on.

18       Q    Was there anything Mr. Simpson told you that was

19   critical of Dr. Johnson?

20       A    In the memo?

21       Q    Anywhere concerning this incident.  First let's say

22   in the memo.

23       A    I doubt that I'll find any in here.  No.

24       Q    And I think we started down this line of questioning

Johnson
Orlando Case George, Sr.cv-00157-MPT    v.    George, et al.
Document ef-4November 30, 2005 Filed 07/20/2006    Page 33 of 100 C.A. # 05-157

Page 37

1    out what the nature of the disagreement was?

2      A      What I tried to find out was what the context of

3    Peg's behavior was.

4      Q      So whether or not behavior was justified or not, you

5    didn't inquire into?

6      A      Well, there is no justification for abusive

7    behavior, counselor.

8      Q      Unless somebody is abusive to her first.

9              Did you do anything, first of all, to inquire

10   of Mr. McNesby whether he had done anything to instigate

11   Dr. Johnson's anger?

12     A      My conversations with all of these vice-presidents

13   generally related to what happened, what was the behavior

14   and their sense that these meetings had become unproductive.

15   I heard that over and again by all four of these

16   individuals.

17     Q      Can you for Mr. McNesby -- I'll ask it again --

18   describe any specific incident that he related to you

19   concerning this inappropriate behavior?  Yes or no.

20     A      No.

21     Q      Can you for Dr. Murray relate to me any specific

22   incident that she complained to you about concerning

23   Dr. Johnson?  Yes or no.

4      A      No.

Page 38

1      Q    Can you for Dan Simpson relate to me any specific

2   instance where he complained about Dr. Johnson's behavior?

3      A    Other than that it occurred after an ad hoc meeting.

4   And you're asking for a specific, this particular incident?

5      Q    Right.

6      A    No.

7      Q    I'm asking for any specific incident.

8      A    No.

9      Q    So am I correct that, prior to November 18th, you

10  had general statements by your vice-presidents concerning

11  Dr. Johnson but you had no knowledge of any facts to back up

12  their conclusions?

13     A    And, counselor, that is correct.  And that's why I

14  did not discipline Dr. Johnson.  And that's why I decided to

15  do the investigation.  So that I could determine whether all

16  of these accusations were, in fact, true.

17             MR. ABER:  Off the record for a second.

18             (Discussion held off the record.)

19  BY MR. ABER:

20     Q    In the transcript during the hearing of Dr. Johnson,

21  at page 16, you stated that there were many sources of

22  complaints prior to November 18th.  We have now discussed

23  the two incidents where you put something in writing and the

24  complaint you received from the vice-presidents.  Are there

Orlando, George Jr.
Case 1:05-cv-00157-MPT    Document 117-2    Filed 07/20/2006    Page 35 of 100
November 30, 2005                                                    C.A. # 05-157

Page 41

1    Q    Would they have been responsible for -- I believe

2    your school has videoconferencing capabilities?

3    A    Yes.

4    Q    What else is in this IT umbrella?

5    A    Well, it would have had to do with everything

6    relating to the administrative computing system, which is

7    our whole system for, you know, keeping track of our

8    students, their enrollment, their courses, their grades, our

9    financial system.  Everything that you have to access a

10   computer for, they would have been responsible.

11   Q    Does Del Tech have a -- I'm not sure what I want to

12   call it -- computer education courses where somebody off

13   site can take a computer course, a course on the computer?

14   Maybe not a computer course.  I might live in Harrington and

15   take a course in English via the computer.

16   A    Yes.  Counsel, you can live in Texas and take a

17   course, as you say, on the computer.  It's online.

18   Q    And the operation of that system would have been

19   under this centralized IT?

20   A    The delivery system would have been.  The academic

21   component would have still been part of the instructional

22   division of the college.  The faculty and the chairs and the

23   Deans and so forth.

24   Q    But the hardware and the transmitting of that would

Johnson    v.    George, et al.
Orlando J. George, Jr.    C.A. # 05-157MPT    Document 25-3    November 30, 2005    Filed 07/20/2006    Page 36 of 100    C.A. # 05-157

Page 42

1    have been centralized in Wilmington?

2    A    Centralized in Wilmington?

3    Q    In other words, Mr. Shoudy's office.  Where was his

4    office going to be?

5    A    Dover.

6    Q    Okay.  Dover, then?

7    A    It would have -- I mean it would have been at all

8    five locations, the four campuses and the president's

9    office.  He would have been responsible for all five

10    locations.

11    Q    Right.  But where would his staff be located?

'2    A    At all five locations.

13    Q    Okay.  And were there any concerns expressed about

14    the system by any of the administrators other than

15    Dr. Johnson?

16    A    When we first started, there were many concerns that

17    were brought up.  And that's why I said earlier we went

18    through many iterations.  And I had held up the approval of

19    this until I got to a point in a meeting with all of my

20    vice-presidents where I asked specifically if anyone had any

21    objections to the current structure.  There were none.  So I

22    instructed everyone to implement that structure that I had

23    approved it.

4    Q    Would the operation of this IT system have affected

1    the way the administrators did their work?

2    A    Yeah, I mean, sure.  Everything they did would have

3    affected the administrators.

4    Q    Would the IT system have affected the way the

5    students interacted with the school?

6    A    Yes.

7    Q    And would the IT system have affected the way the

8    public outside the immediate student body would interact

9    with the school?

10    A    Sure.

11    Q    Now, the meeting itself.  What did you hear about

12    the meeting that gave you cause for concern?  We are talking

13    about I think it's the November 19th, 2004 meeting.

14    A    What did I hear?

15    Q    Yeah.  What gave rise to your concerns?

16    A    What I heard was that Dr. Johnson attended this

17    meeting and that her behavior was abusive, that there was a

18    sense that she did not approve of the whole structure and

19    what we had done, that there was a sense that, you know,

20    that she did not support what the president had approved and

21    asked everyone to implement.

22              MR. ABER:  Mark this as the next exhibit.

23              (George Deposition Exhibit No. 2 was marked for

24    identification.)

Page 44

BY MR. ABER:

Q    I have handed you a letter dated December 8th, 2004.
Is that the letter that you wrote to Dr. Johnson concerning
your concerns about the meeting?

A    Yes.

Q    First of all, who first complained to you or where
did you hear any complaints about Dr. Johnson concerning
that meeting?

A    The first instance that I had heard that something
had -- something inappropriate had occurred came from my
vice-president for academic affairs, who was Dan Simpson.

Q    And when did he tell you something?

A    It would have been sometime subsequent to the
November 19th meeting.

Q    And what did he tell you?

A    He indicated to me that he had heard from some of
the department chairs and then he proceeded to express to me
what I put in that first -- that first paragraph, that
Dr. Johnson's conduct, line of questioning, was
antagonistic, inconsistent with what should be expected of a
campus director.

Q    Did Dan Simpson, was he present at the meeting?

A    I don't believe he was.

Q    Okay.  So he reported to you what departmental

Page 48

1    did you not?

2       A    Yes.

3       Q    To either resign or you would investigate?

4       A    Counselor, what I said was that based on the

5    incidents in '02, the comment from the vice-presidents and

6    this particular incident, that I was going to be forced to

7    authorize an independent investigation of all of these

8    incidents.  And that was one alternative.

9              The other alternative would be the obvious one,

10   if she did retire, that there would be no need for the

11   investigation.

12      Q    Resign, retire, they are the same?

13      A    Except I didn't quite say it the way that you just

14   did.

15      Q    But her choices were in January of 2005, the

16   beginning of January, she had two choices, to either resign/

17   retire or you were going to do an investigation, correct?

18      A    Yes.

19      Q    And when you did that investigation, she was going

20   to be excluded from the campus, correct?

21      A    I had --

22      Q    Is that correct or incorrect?

23      A    She was put on administrative leave and she was -- I

24   asked her to please remove her personal belongings from her

Johnson   Case 1:05-cv-00157-MPT    Document 11-2   Filed 07/20/2006    Page 40 of 100   A. # 05-157
Orlando J. George, Jr.                           November 30, 2005

Page 49

1    office.  So, yes, she was removed from the campus.

2       Q     She was not only removed from the campus, she was

3    told not to talk to any past employees or any present

4    employees, correct?

5       A     That is correct.

6       Q     And this is before you determined whether any of

7    these allegations were true?

8       A     That is correct.

9       Q     All right.  Now, let's back up for a second.  What

10   did John Buckley tell you that any independent observer

11   would, if they had observed the conduct, describe as

12   antagonistic, abusive or inappropriate?  I'm trying to

13   understand the nature of the conduct, not the label you put

14   on it, but exactly factually what happened.  Did she throw

15   something at Mr. Shoudy?  Did she encourage people to yell

16   at him?  What did she do?

17      A     I believe what I heard was a raised voice, an angry

18   voice.

19      Q     Saying what?

20      A     I think that got lost in the translation, which is

21   typically I think what was beginning to concern me, that if

22   there were issues relating to Dr. Johnson's behavior, that

23   they would, in fact, get in the way of perhaps what she was

24   trying to do or say.

Johnson
Orlando J. George, Jr.

Case 1:05-cv-00157-MPT    Document 117-2    Filed 07/20/2006    Page 41 of 100
November 30, 2005

George, et al.
C.A. # 05-157

Page 55

1    When you received this, had any new facts come

2  to your attention since December 8th, concerning the

3  November 19th meeting?

4    A    We would have closed for several weeks for the

5  holidays.  So everyone would have been off.  So, no, there

6  would have been no additional information.  All I was

7  waiting for was a decision from Dr. Johnson, which would

8  determine then which way I would proceed.  Whether I went

9  ahead with the investigation or not.

10    Q    Let me back up a second.

11        So the answer to my question is, between the

12  time that you asked for a written response on December 8th,

13  and the time you got a written response on January 3rd,

14  2005, no new facts came to your attention?

15    A    No.

16        MR. WILLIAMS:  I object to the form of the

17  question.  Because I'm not sure he asked for a written

18  response.  What's the basis?  Is there any foundation for

19  that?

20        MR. ABER:  Let's back up, then.

21  BY MR. ABER:

22    Q    Let's go back to the meeting in December.  Maybe I

23  did jump ahead.  Of December 8th.

4        What happened during the meeting?

Page 59

1    January 3rd?

2        A    I signed it on January 3rd.

3        Q    Well, what I'm wondering, what I'm trying to get at,

4    did you have this prepared before you met with her or did

5    you have it prepared after she informed you of her decision?

6        A    I believe this was -- January 3rd was the first day

7    back from our 16 day holiday break.  To the best of my

8    recollection, I signed it on that day.

9        Q    Tell me, as best you can recall, word for word, what

10   happened during that January 3rd meeting?

11       A    Dr. Johnson I think reiterated what she put in her

12   memo to me.  I reiterated that I had a responsibility once

13   and for all to get to the bottom of these allegations of

14   abusive behavior based on the '02 incidents, the

15   vice-presidents' comments, this particular meeting and that

16   I was going to proceed with that investigation.

17       Q    And at this point, if I had been at that meeting on

18   January 3rd and had asked, Dr. George, can you tell me

19   factually any example that my client, Dr. Johnson, was

20   guilty of saying or doing, can you describe the conduct,

21   could you do that at that point, any of it, any of these

22   allegations of misconduct?

23       A    Well, counselor, because they were allegations, I

24   can't say factually one way or the other.

Orlando J. George, Jr. Case 1:05-cv-00157-MPT    Document 2    November 30, 2005    Filed 07/20/2006    Page 43 of 100    George, et al. C.A. # 05-157

Page 60

1    Q    Just so we're clear.  You were placing her on

2    administrative leave and excluding her from the campus based

3    upon the conclusionary allegations made by other people?

4    A    It was my opinion -- the answer is yes.  It was my

5    opinion that, in order to conduct an investigation that

6    would be fair to the college and fair to Dr. Johnson, that I

7    had to do it a certain way, which included removing her from

8    the campus so that individuals would be free to testify as

9    to what they knew factually.

10    Q    Now, the people who had related all of these

11    instances up until this point of inappropriate conduct was

12    this person from off the campus concerning her sister.  So

13    she wouldn't be on the campus when you did the

14    investigation, would she?

15    A    She --

16    Q    The one back in 2002.

17    A    She wasn't a member of the campus.

18    Q    So whether Dr. Johnson was on campus or not would

19    not have intimidated her, would it?

20    A    Counselor, I can't answer that.  Because she made a

21    reference to some of our programs on the campus.

22    Q    But she wasn't on the campus, was she?

23    A    She was not.

24    Q    And then the people involved at the craft show were

Johnson
Orlando J. George, Jr.

Case 1:05-cv-00157-MPT    Document 117-2    Filed 07/20/2006    Page 44 of 100

November 30, 2005

George, et al.
C.A. # 05-157

Page 61

 1   not members of the Delaware Community College campus, were

 2   they?

 3      A    I would assume that they were not.

 4      Q    So her presence on campus wouldn't intimidate them,

 5   would it?

 6      A    I don't know the answer to that.

 7      Q    And was it your opinion that Dr. Johnson's presence

 8   on the campus would intimidate say Dan Simpson?

 9      A    I don't believe that her presence or lack of it

10   would have intimidated Dan Simpson but I have no way of

11   knowing for sure.

12      Q    Do you think it would have intimidated Larry Miller?

13      A    I don't believe so but I can't say for sure.

14      Q    And he was on a different campus altogether?

15      A    Um-hmm.

16      Q    And Mr. McNesby was on a different campus

17   altogether?

18      A    Right.

19      Q    And the other vice-president was Hope Murray, who

20   was in your office also on a different -- she was in Dover

21   but in a different office building?

22      A    Right.

23      Q    So none of the other vice-presidents came in regular

 4   day-to-day contact with her during their run of the campus,

1    hadn't looked at the manual for a while.  And I didn't press

2    the point.

3            What I'm going to do is hand you a copy of the

4    personnel policy manual.  I'm not going to mark it as an

5    exhibit.  But the document is Bates stamped beginning at

6    2203.

7            MR. WILLIAMS:  I don't know what you're going

8    to do with this.

9    BY MR. ABER:

10   Q    I'm going to ask you to look at the section on

11   leaves and find out if there is any other administrative

12   leave in there which could be viewed as involuntary?

13   A    What section are you in?

14   Q    I thought you would know this better than I.  But

15   we'll find it together, then.

16   A    Section 7?

17   Q    Yes.

18   A    Okay.  What's your question, counsel?

19   Q    At page 58 and 59 of the hearing, I asked you the

20   question, if you turn to your exhibit, at the time, it was

21   Exhibit 25, the personnel manual, I'm going to ask you some

22   questions about Section 7.  I believe the various leaves are

23   in there.  Is there anything in this manual that discusses

24   involuntary leaves of absence anywhere in that section?

Johnson Case 1:05-cv-00157-MPT    Document 117-2    Filed 07/20/2006    Page 46 of 100
Orlando J. George, Jr.
November 30, 2005
George, et al.
C.A. # 05-157

Page 74

1    Q    Were the conditions of her employment affected when

2    she was excluded from the campus?

3            MR. WILLIAMS:  And you're not asking for a

4    legal conclusion, you're asking for his understanding?

5            MR. ABER:  Yeah.

6            THE WITNESS:  I didn't change her salary, her

7    benefits.

8    BY MR. ABER:

9    Q    But she was not allowed to perform her duties, was

10   she?

11   A    And I determined that that was necessary in order

12   for me to do the investigation.

13   Q    I understand.

14   A    Okay.

15   Q    I feel like I'm getting the same speech every time I

16   ask a question.

17   A    It's not a speech, counselor, it's what I was

18   thinking at the time.

19   Q    By putting her on administrative leave, you

20   prevented her from performing her day-to-day employment

21   duties and obligations, didn't you?

22   A    That is correct.

23            (George Deposition Exhibit No. 5 was marked for

24   identification.)

Johnson Case 1:05-cv-00157-MPT    Document 117-2    Filed 07/20/2006    Page 47 of 100 George, et al.
Orlando J. George, Jr.                        November 30, 2005                              C.A. # 05-157

Page 86

1    Thursday and Friday, they may take Tuesday and Wednesday.

2    It was a holiday in the middle there somewhere.

3        Q    Let me focus on this investigation itself.

4             Mr. Williams has been an attorney that has

5    worked for Del Tech for many years, correct?

6        A    Yes.

7        Q    Do you know how long that relationship is?

8        A    I don't know exactly.

9        Q    Was he an attorney representing the college at the

10   time you became president?

11       A    Yes.

12       Q    So he was already the college attorney, the outside

13   college attorney, back around 1995?

14       A    Yes.

15       Q    Does he represent the school on anything other than

16   personnel matters?

17       A    Employment law is pretty much, yeah.

18       Q    Does his law firm represent the school on anything

19   other than employment matters?

20       A    I don't believe so.

21       Q    Is he on a regular retainer or is it an hourly

22   basis?

23       A    Hourly.

.4       Q    Does he bill you just each month one bill even if

Orlando J. George, Jr.    Case 1:05-cv-00157-MPT    Document 117-2    November 30, 2005    Filed 07/20/2006    Page 48 of 100    C.A. # 05-157

Page 145

1    Q    Did she ever discuss them with you?  Did you ever

2  hear conversations about them at any college retreats?

3    A    No, I have no recollection of that discussion.

4    Q    Perhaps during conversations with Norm Griffith?

5    A    I don't recollect any conversation about her family

6  reunion.

7    Q    You'll agree that Dr. Johnson received the maximum

8  bonuses that you had authorization to pay year after year

9  after year, correct?

10    A    Yes.

11    Q    And have you ever given someone less than maximum

12  bonus?

13    A    The bonus is on a sliding scale.  So if you earn it,

14  you get a certain percentage.

15    Q    Does everybody get the maximum allowable bonus for

16  their scale?

17    A    They get the maximum allowable based on the number

18  of years as a vice-president.

19    Q    You never reduced anybody's bonus for performance

20  issues?

21    A    They either got the bonus or they didn't get it.

22    Q    Have you ever denied anybody a bonus?

23    A    Everyone, since I have implemented the bonus system,

4  all of my vice-presidents, who have qualified, I mean you

Johnson
Orlando George, Jr. — Case 05-cv-00157-MPT   Document 2   November 30, 2005   Filed 07/20/2006   Page 49 of 100   C.A. # 05-157

Page 154

1    all of my daughters.  Yeah.

2       Q    Has Mrs. Reed or any other Del Tech staff ever been

3    involved in any of that?

4       A    No.

5       Q    You testified earlier that there was low morale on

6    the Terry campus.  What did you base that on, that

7    statement?

8              Let me rephrase it.

9              What facts did you base that on?

10      A    Well, when I looked at the Santora report and I saw

11   that their description of people -- let me get the exact

12   citation here.

13      Q    Let me back up for a second to save time.

14            Prior to this investigation, did you have any

15   reason to believe there was low morale on the Terry campus?

16      A    Again, I did not have -- I had allegations but I did

17   not have the factual information.  And that was the reason

18   why I was going to proceed with the investigation.

19      Q    We spent some time earlier today going over the

20   allegations concerning the craft festival, what I call the

21   sister incident, for lack of a better term, and the

22   vice-presidents' complaints.  Other than those items, did

23   you have any basis prior to the investigation to believe

24   there was a low morale?

Page 155

1    A    Yes.

2    Q    What facts did you rely on?

3    A    I didn't do the investigation.  So I don't have the

4    factual information.  But it came out in the Santora report

5    that people felt intimidated and that Dr. Johnson created an

6    atmosphere of intimidation and fear.

7    Q    Doctor, let's back up for a second.

8    A    Yeah.

9    Q    I want you to draw a mental wall, put the

10   investigation on one side, put your knowledge on the other

11   side.  I'm just looking on the side prior to the

12   investigation.  Did you know of any other facts prior -- I'm

13   not asking what you found out after the investigation was

14   done.  But prior to the investigation, do you have knowledge

15   of any other facts?

16   A    No.  It was all anecdotal, Mr. Aber.

17   Q    That we discussed earlier today?

18   A    Yes.

19        MR. ABER:  I don't think I have any further

20   questions at this time pending the production of any other

21   discovery documents.

22        MR. WILLIAMS:  I have no questions.

23        We are not going to waive reading and signing.

24        (Deposition concluded at 5:38 p.m.)

```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
MARGUERITE A. JOHNSON,          )
                                )
              Plaintiff,         )
                                )    Civil Action No.
v.                              )     05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR.,         )
in both his official and        ) THIS TRANSCRIPT CONTAINS PAGES
personal capacities, and        ) WHICH HAVE BEEN DEEMED CONFIDENTIAL
DELAWARE TECHNICAL AND          ) FOR ATTORNEYS OF RECORD ONLY
COMMUNITY COLLEGE,              )
                                )
                                )
              Defendants.        )
```

Deposition of CHARLOTTE T. LISTER taken pursuant to notice at the law offices of Morris, James, Hitchens & Williams, LLP, 29 North State Street, Dover, Delaware, beginning at 1:00 p.m., on Wednesday, May 10, 2006, before Patricia L. Shelton, Registered Professional Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          for the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          for the Defendants

ALSO PRESENT:

        MARGUERITE A. JOHNSON

                WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477



B500 WILCOX & FETZER LTD.
Registered Professional Reporters



1    Q.    You just said -- I may misphrase it -- the way he

2    does certain things, you disagreed with.    What did you

3    disagree with?    Can you give me examples or describe what

4    he did that you disagreed with?

5        A.    If he chose to alter a process.

6    Q.    Would you describe his manner at times as

7    aggressive?

8        A.    I might say aggressive.    But not with a negative

9    connotation.

10    Q.    Let me bring up a specific example.    Do you

11    remember a dispute that Mr. Simpson had with an

12    Edwina Travers?

13    A.    Generally, yes.

14    Q.    And did Mr. Simpson act appropriately in dealing

15    with her, as far as the nature of his communications?

16    A.    To my knowledge, yes.

17    Q.    Did you ever witness him getting upset with

18    Ms. Travers?

19    A.    I attended a meeting that Mr. Simpson addressed

20    several concerns.

21    Q.    And did he address them in a quiet, dignified

22    manner?

23    A.    He was emphatic about making a point.

24    Q.    Did he raise his voice?



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,            )
                                  )
            Plaintiff,            )
                                  )   Civil Action No.
v.                                )   05-157 (KAJ)
                                  )
ORLANDO J. GEORGE, JR.,           )
in both his official and          )
personal capacities, and          )
DELAWARE TECHNICAL AND            )
COMMUNITY COLLEGE,                )
                                  )
            Defendants.           )

            Deposition of GERARD M. McNESBY taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street, Dover,
Delaware, beginning at 10:05 a.m., on Thursday, April 13,
2006, before Patricia L. Shelton, Registered Professional
Reporter and Notary Public.


APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
           702 King Street - Suite 600
           Wilmington, Delaware   19801
           for the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
           222 Delaware Avenue - 10th Floor
           Wilmington, Delaware   19801
           for the Defendants

ALSO PRESENT:

        BRIAN D. SHIREY, ESQ., DTCC General Counsel
        MARGUERITE A. JOHNSON
                WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477




**WILCOX & FETZER LTD.**
Registered Professional Reporters

B502  COPY

GERARD M. McNESBY,

1

2          the deponent herein, having first been

3          duly sworn on oath, was examined and

4          testified as follows:

5                    EXAMINATION

6    BY MR. ABER:

7       Q.    Mr. McNesby, have you ever given a deposition

8    like this before?

9       A.    No.

10      Q.    Ever testified in court?

11      A.    No.

12      Q.    Have you ever testified under oath?

13      A.    No.

14      Q.    You understand what that means?

15      A.    To tell the truth, yes.   Yes, I do.

16      Q.    There's various laws and such.

17               Okay.  Let me explain some basic rules.

18   I'll be asking some questions; you'll be providing

19   answers.  If my question is at all confusing to you --

20   I'm not trying to mix you up, confuse you -- just tell me

21   it's unclear, and I'll try to repeat it or explain what

22   you don't understand.

23      A.    Mm-hmm.

24      Q.    Also, a major rule you just violated.  Shakes of

1    the head don't count.  You have to give verbal answers so

2    the reporter can take it down.  All right?

3        A.    Yeah.  I was unaware you were asking me a

4    question.

5        Q.    All right.  It works a lot better, too, if you

6    let me complete my question before you jump in with an

7    answer.  And sometimes I have a tendency -- I violate

8    that rule.  If I jump in with another question before

9    you've finished your answer, let me know and I'll let you

10   finish.

11       A.    Fine.  That's fine.

12       Q.    Where do you presently reside?

13       A.    Wilmington.  822 Jasmine Drive, Wilmington,

14   Delaware.  It's the development of Woodcreek.

15       Q.    What's the zip code out there?

16       A.    19808.

17       Q.    And have you done anything to prepare for this

18   deposition today other than meet with Mr. Williams about

19   two minutes ago?

20       A.    No.  I just reviewed previous notes, previous

21   reports.

22       Q.    What notes did you review?

23       A.    There were reports that were attached to the

24   affidavit.

1    Q.    Down the hall, upstairs or...

2    A.    Down the hall and around.  It's kind of a

3   horseshoe shape.  And I'm on the furthest end.

4    Q.    Do you supervise the business managers on each

5   individual campus?

6    A.    Not immediate supervision.  I have -- I take a

7   college-wide coordination role with the business managers

8   there in terms of meeting with them monthly, making sure

9   that policies and procedures are uniform across all of

10   the campuses.

11    Q.    Who do the campus business managers report to as

12   immediate supervisor?

13    A.    The vice president slash campus directors.

14    Q.    There's a campus business manager for each of the

15   three campuses?

16    A.    Right.  There's a campus business manager for the

17   Owens Campus, for the Terry Campus.  And for the Stanton

18   Wilmington Campus there's a campus business manager and

19   assistant business manager.

20    Q.    And when you say you provide a -- advisory

21   relationship with them?

22    A.    Coordination, advisory.

23    Q.    If any of those business managers are having

24   problems that they can't resolve, where do they take

1  those problems for resolution?

2      A.   It depends on what the problem is.

3      Q.   Let's say it's with the accounting aspect, you

4  know, the financial management.

5      A.   Once again, you'd have to be more specific.

6           It depends if it's a budget issue, you know,

7  or whatever it may be.

8      Q.   What type of problems would the business managers

9  bring to you?

10     A.   Making sure that in terms of --

11     Q.   Can't think of any problems?

12     A.   No.  I could think of some.

13          A lot of them try to be proactive.  We had

14  implementation of the Banner system at the college a

15  number of years ago, which involved the collection of

16  tuition.  And we all -- not just me immediately, but all

17  the business managers as a coordinating team try to work

18  their way through issues, whether it be cash collection,

19  cash reporting or what have you there.

20          And in most instances, too, the campus

21  business manager would be overseeing the financial aid

22  process there.  And each of the campuses have their own

23  issues regarding that.  And that's what we use the

24  monthly meetings to work through.

1  Q. If they were having problems dealing with the

2 enforcement of school policies, not fiscal policies,

3 could they bring those problems to you?

4  A. They could.

5  Q. Is there any reason why they shouldn't?

6  A. No.

7  Q. Have you ever had to deal with Marguerite

8 Johnson?

9  A. Yes.

10  Q. Have you ever had any difficulties dealing with

11 her?

12  A. Not specifically, no.

13  Q. Generally?

14  A. No different than when I'm dealing with a lot of

15 campus directors regarding budget issues and fiscal

16 operations there.

17  Q. Do you feel intimidated by Dr. Johnson?

18  A. No.

19  Q. Do you feel intimidated by her office, the fact

20 that she's a campus director and vice president?

21  A. No.

22  Q. It's part of your duty to protect college assets,

23 isn't it?

24  A. Yes.

1    Q.    And do you perform regular audits of the various

2    campuses and their finances?

3    A.    I do not personally.    There are audits that are

4    conducted and run through either the state auditor's

5    office or independent CPA firms.

6    Q.    What type of financial controls are there in the

7    individual campuses to make sure the school's policies

8    are followed?

9    A.    It's starts at -- three levels:    One, the state's

10   accounting manual, Division of Accounting Manual sets the

11   general guidelines there.    Those policies and procedures

12   you will see, based upon review of the fiscal guidelines,

13   that are part of the college's fiscal guidelines.

14                And from those fiscal guidelines, each of

15   the campuses have developed their own policies and

16   procedures there for each of the campuses there.    They're

17   related to certain areas of operation to maintain a

18   strong internal control.

19   Q.    Maybe my question was bad.    What I'm trying to

20   understand is what examinations are made, what people

21   come in to examine each campuses' books, records and such

22   to make sure fiscal guidelines are followed?

23   A.    There are -- KPMG conducts --

24   Q.    What is that?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

B508

1    A.    It's a big accounting firm.

2    Q.    KP --

3    A.    KPMG.

4    Q.    Okay.

5    A.    They conduct the annual audit related to

6    financial aid and federal programs under the A133 audit

7    compliance.

8            There may be a CPA firm -- Albero & Albero

9    would be conducting an audit of the bookstores.  I use

10   SantoraBaffone.  They would conduct an internal review.

11   Q.    What do you mean by "internal review"?

12   A.    Internal review is to check and apply to make

13   sure that the internal control procedures are being

14   applied at the campuses.

15   Q.    When did they first start doing that?

16   A.    Three or four years ago, if not before.

17   Q.    Going back to either 2002 or 2003?

18   A.    Yeah.  I'm thinking probably '02, '03, somewhere

19   around there.

20   Q.    Did anybody perform that function before

21   SantoraBaffone?

22   A.    No.

23   Q.    So before SantoraBaffone, nobody checked the

24   campuses to make sure the financial guidelines were being

1    followed?

2        A.    As I understand it based on previous

3    conversations with business managers who have been here a

4    while, the state --

5        Q.    I don't mean to interrupt.  But you've been there

6    since 1998 as vice president/manager?

7        A.    Mm-hmm.

8        Q.    So you know what happened for four years or so

9    before Baffone was hired.

10       A.    Yes.

11       Q.    During those four years under your administration

12   before Baffone was hired, did anybody ever go into the

13   individual campuses to make sure the financial policies

14   were being followed?

15       A.    KPMG.  Before that would be Barbacane Thorton.

16       Q.    Who is she?

17       A.    It's a CPA firm.  Barbacane Thorton.

18       Q.    And Barbacane Thorton performed the same tasks

19   that SantoraBaffone is now performing?

20       A.    No.  The same tasks that KPMG is performing.

21       Q.    What I'm trying to find out, before

22   SantoraBaffone was hired in 2002, in the four years

23   preceding that under your administration, did anybody do

24   financial reviews of the same nature that SantoraBaffone

1   did?

2       A.    I would be looking at from my -- I did not have

3   anyone come in from the outside to do those types of

4   reviews.

5       Q.    So your office did those reviews yourself?

6       A.    We did it not on site.

7       Q.    What do you mean by "not on site"?

8       A.    I did not have staff go on site and observe that

9   compliance.

10      Q.    Well, did you do any financial reviews, paper --

11      A.    Sure.

12      Q.    When I say paper, I gather most of these records

13  are now electronic?

14      A.    There's -- we receive monthly financial reports

15  through the Delaware Financial Management System, DFMS.

16  We receive documentation regarding revenues that are

17  generated on a daily basis there.  I receive expenditure

18  requests that are processed through the DFMS system

19  there.

20              I don't go through every expenditure at the

21  college.  I kind of have a benchmark in terms of payment

22  vouchers of $2,500 there.  I review any of the new hire

23  forms that come through to make sure that we have the

24  positions approved there.  So there was a number of

1  different kinds of reviews taking place both externally

2  from the CPA firms and -- outside CPA firms --

3     Q.   I'm talking about in the four years before

4  Baffone was hired.

5     A.   They were providing those reviews before that.

6  And also --

7     Q.   You said that your personal limit was $2,500,

8  expenditure limit was $2,500.  For smaller expenditures,

9  did your staff review those expenditures?

10    A.   Yes.

11    Q.   When I say "you," I don't mean you personally.

12 I'm talking about you or your staff.  Okay?

13    A.   I understand.

14    Q.   So before SantoraBaffone was hired, you or your

15 staff were reviewing expenditures of the individual

16 campuses to make sure they were proper and policies were

17 followed?

18    A.   That's true.

19    Q.   And then after 2002 or so, in addition to any

20 reviews you or your staff would do, then SantoraBaffone

21 would also do individual reviews by looking at the

22 records and going on campus?

23    A.   That's true.

24    Q.   Prior to November 19th, 2004, did you ever have

1  occasion to learn of or know of any financial

2  irregularities associated with Dr. Johnson?

3    A.    No.

4    Q.    And that's even with all the supervision that was

5  going on that we just talked about?

6    A.    Yes.

7    Q.    Now, turning specifically to the Terry Campus,

8  the business manager on that campus is Bob Hearn,

9  correct?

10   A.    Currently he is not.  Currently Bob is the acting

11  business manager at the Owens Campus.  The current

12  business manager is Chris Hudson, who is the acting

13  business manager at the Terry Campus presently.

14   Q.    Mr. Hearn transferred some time after the hearing

15  which occurred in July of 2005 concerning Dr. Johnson,

16  correct?

17   A.    I don't know when the exact date of that hearing

18  was.  But Bob Hearn was transferred to the Owens Campus

19  during the last quarter of 2005.

20   Q.    You say he's acting business manager.  Why only

21  acting?

22   A.    Personnel go through a probationary period there.

23  And what took place was that the business manager at the

24  Owens Campus became the acting assistant vice president

1  for institutional advancement.  Bob lives in Sussex

2  County.  Existing employees have that first chance of

3  being transferred.  Bob took the job as the acting Owens

4  Campus business manager.

5      Q.    When was Mr. Hearn hired by Del Tech as business

6  manager?

7      A.    I don't know.  I don't know that date

8  specifically.

9      Q.    Did you have a role in his assuming the position

10  of business manager?

11     A.    I believe that I had a positive recommendation

12  for him.

13     Q.    You made a recommendation or you received one?

14     A.    I believe that Dr. Johnson and I talked.  And I

15  believe Dr. Johnson asked me what I thought of him.  And

16  I had a positive recommendation for Bob.

17     Q.    Do you know what his position was before he was

18  business manager for the Terry Campus?

19     A.    He was the financial services manager in my

20  office.

21     Q.    So he worked for you?

22     A.    He worked -- yes.  He was supervised by my

23  assistant vice president for finance at the time.

24     Q.    Did you recommend him to Dr. Johnson?

2

1    A.    I provided a positive recommendation.

2    Q.    No.  What I'm asking, did you make him known to

3  Dr. Johnson before she knew that he was interested in the

4  job?

5    A.    No.

6    Q.    Did he approach Dr. Johnson on his own?

7    A.    I don't know.  That's something --

8    Q.    So other than saying he's a good worker, giving

9  him a good recommendation, did you ever, before you gave

10  that positive recommendation, ever suggest that she look

11  to hire him as business manager?

12    A.    I don't recall specifically that happening.

13    Q.    Do you know if Mr. Hearn has any previous

14  relationship with Dan Simpson?

15    A.    Not that I'm aware of.

16    Q.    Did Mr. Hearn ever complain to you about

17  Dr. Johnson?

18    A.    Not that I can recall.

19    Q.    Did he ever suggest that Dr. Johnson was impeding

20  his duties as business manager?

21    A.    Not that I can recall.

22    Q.    Did he ever advise you that he could not approach

23  Dr. Johnson for one reason or another?

24    A.    Not that I can recall.

1   I needed to get those confirmed.  And I did that by

2   bringing in an independent outside CPA firm to confirm

3   those allegations.

4           Once those -- in that case, it was

5   SantoraBaffone.  In this case, it was also

6   SantoraBaffone.  Brought them in.  They confirmed the

7   allegations.  Because of the nature of the allegations

8   being confirmed, it was incumbent upon them to turn their

9   findings over to the attorney general's office, who then

10  referred us to the state auditor's office.

11          Those two -- these two situations follow a

12  similar path.  I brought in a CPA firm to confirm to make

13  sure that any of these allegations that were coming

14  forward were validated.

15      Q.   My question to you was, are you the one that told

16  SantoraBaffone what the agreed procedures would be?

17      A.   No.

18      Q.   Who told them what the agreed procedures would

19  be?

20      A.   They came back and proposed what the agreed --

21  they determined what the agreed-upon procedures would be.

22      Q.   So they suggested the agreed-upon procedures, not

23  you?

24      A.   That's true.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B516

1    Q.    Did you expand on their suggestions?

2    A.    No.

3    Q.    Did you at any time suggest, Well, if you do only

4    what you suggested, you may not get a full picture;

5    perhaps you should talk to so and so or so and so to get

6    a more completed picture?

7    A.    No.  As I did in the Wilmington --

8    Q.    Sir --

9    A.    -- Wilmington campus situation, these were

10    specific allegations that were brought to me.  Okay.  In

11    this case, there were certain incidents of the use or

12    misuse of personnel, the expenditures of unallowable

13    expenses on the SuperCard and the suspicious trip taken

14    to North Carolina.  Those six or seven items were brought

15    to my attention.  And I contacted SantoraBaffone and laid

16    out what those six or seven instances were.  And I wanted

17    independent confirmation that they were for real.

18    Q.    Did SantoraBaffone ever suggest that perhaps they

19    should talk to Dr. Johnson about these allegations?

20    A.    Not that I'm aware of.

21    Q.    Did you ever think that it would be appropriate

22    for them to talk to Dr. Johnson, find out her side of the

23    story?

24    A.    I'm not aware that they didn't try to contact

1   her.

2      Q.   That was not my --

3            MR. ABER:  Can you read back my question,

4   please?

5            (The reporter read back as instructed.)

6   BY MR. ABER:

7      Q.   You're pausing.  Why?

8      A.   No.  I'm trying to get a sense of what my

9   thinking would be back then.  And the answer would be, at

10  that point in time, based on agreed-upon procedures --

11  it's their engagement.  What I think, you know, to me is

12  irrelevant.  That is the firm who has taken the

13  information from me.  They make the determination on how

14  they're going about confirming those allegations.

15     Q.   Confirming them?

16     A.   Pardon me?

17     Q.   Confirming them or finding out whether they were

18  true or not?

19     A.   That's why I'm saying they're allegations.  At

20  this point during this engagement, they were simply

21  allegations to me.

22     Q.   And it's your testimony today under oath that

23  they never suggested interviewing Dr. Johnson and you

24  never thought it was appropriate?

1    Q.    Okay.  Well --

2    A.    Is there a subsequent travel request form here?

3    Q.    No.  I mean, this is --

4    A.    This is a final document?

5    Q.    What I did is I asked the college to produce to

6  me the travel documents for Dr. Kavel.  And this is what

7  was produced, among others.

8    A.    I just can't tell from this whether Dr. George

9  signed it or not.

10             MR. ABER:  Mark this McNesby 2.

11             (McNesby Deposition Exhibit No. 2 was marked

12  for identification.)

13  BY MR. ABER:

14    Q.    Now, is that the same type of document, travel

15  request form for the Owens Campus?

16    A.    Yes.

17    Q.    Who is --

18    A.    With the exception that this travel request is to

19  a Dr. Barbara Ridgely as the vice president/campus

20  director, which is her incorrect title.

21    Q.    What was her title?

22    A.    At that point in time, her title was the campus

23  business manager.  Whereas, the previous travel request

24  was a travel request from Dr. Kavel to Kr. Kavel.

1    Q.    Is there any indication on this form that

2  Dr. George as president approved or disapproved this

3  travel request?

4    A.    As in the previous travel request, this was

5  submitted on February 14th of '01 for a trip that was

6  almost two months later for the same conference at a

7  different location.  So I don't know if this is the final

8  travel request form.  There's no line for Dr. George's

9  signature on this.

10                MR. ABER:  Mark this McNesby 3.

11                (McNesby Deposition Exhibit No. 3 was marked

12  for identification.)

13  BY MR. ABER:

14    Q.    Do you recognize this document, which has been

15  marked McNesby 3?

16                And just for the record, so we're clear for

17  the record, McNesby 1 is Bates stamped DTCC2953.

18  McNesby 2 is 2962 and this is 2963.

19                Do you recognize what this document is?

20    A.    Oh, I'm sorry.  I'm sorry.

21                Yes.

22    Q.    It's another travel request form?

23    A.    Yes.

24    Q.    Is it different than the ones marked McNesby 1

1    and 2?

2        A.    In terms of who it's from is not.  But who it's

3    to, in this case, it's to Dr. George as president there.

4    I cannot tell -- there's...

5        Q.    There is a line on this form for Dr. George's

6    signature, isn't there?

7        A.    There is.

8              The one difference that you'll see here is

9    that the previous two requests were for Dr. Kavel.  In

10   this case under the name, it says Delaware Tech and CCID

11   staff development trip.  So this could have been for

12   himself or for a group.

13             Once again, in this case here, there's a

14   line that is for the president.

15       Q.    Well, if it was just for his staff, it wouldn't

16   have to be approved by Dr. George, would it?  He could

17   approve it?

18       A.    Who is "he"?

19       Q.    Tim Kavel.

20       A.    If this was just for his staff, if his staff was

21   submitting a travel request form, Dr. Kavel as their

22   supervisor could sign off on it.

23       Q.    There would be no need for Dr. George to approve

24   it, would there?

1      A.    In that case, no.  For the Owens staff...

2      Q.    So the implication is this request would have

3  covered, in McNesby 3, Dr. Kavel's travel, too, wouldn't

4  it?

5      A.    I can't tell from this document.  Because it says

6  Delaware Tech and CCID staff development trip.  And I

7  don't know who the CCID staff that were a part of this.

8  But Dr. Kavel has approved it, as Dr. George.

9      Q.    Does that suggest to you that as of April 2002,

10  there might have been a change in procedures?

11      A.    The best of my knowledge, there's never been a

12  change in procedures in terms of the supervisor signing

13  off on travel requests for out-of-state travel.  And,

14  once again, as confirmed in the state auditor's report,

15  this practice of travel requests being signed off on by

16  the supervisors is unchanged.  Two of the three campus

17  directors were doing it there.  And...

18            So there's never been a change in my mind.

19      Q.    But you have evidence here of at least two trips

20  by Dr. Kavel that appear not to have Dr. George's

21  approval.

22      A.    Once again, the difference between the beginning

23  of this trip and when this was submitted was two months.

24  That doesn't -- what happens in the two-month time

period, there may be a subsequent travel request that has Dr. George's approval on it or a memo from Dr. George approving it. I cannot tell from this document.

Q. Assuming that these are the only requests for the two trips, McNesby 1 and 2, if you assume these are the only documents regarding the travel of Dr. Kavel reflected in those documents, is there any indication that Dr. George approved it in writing?

A. Well, both of these are unusual. I'm not sure --

Q. That --

A. Let me finish.

Q. Can you answer my question before you -- then you can expound upon it.

Is there any indication that Dr. George ever approved these two trips, McNesby 1 and 2, in writing?

A. Based on a review of these documents, the answer is no. Dr. George's --

Q. Then you want to make an explanation.

A. Well, the travel requests are unusual why the campus director is sending a travel request to the campus business manager and the campus business manager is not even -- signature isn't even on here. And the second is why would a --

Q. That only happened in one --

1    Q.    Well, up at the top in the title, it says Terry

2    Campus?

3    A.    I'm sorry.  Yes.

4    Q.    It provides a little more detailed information

5    than the ones used for the Owens Campus, doesn't it?  It

6    itemizes the estimated cost in detail?

7    A.    In terms of information?

8    Q.    Yes.

9    A.    Both of them provide the total estimated cost for

10    the trip.

11    Q.    But the Terry Campus one breaks it down to its

12    component parts?

13    A.    It does break it down into its component parts.

14    But there's no -- one has a justification; the other has

15    an explanation.  There's a justification on the Owens

16    versus an explanation.

17    Q.    Does this form have anyplace for Dr. George to

18    sign it?

19    A.    There's not a specific line for the president on

20    here.

21    Q.    Just as in 2 for the Owens campus did not?

22          Just as McNesby 1 and 2 did not?

23    A.    McNesby 1 and 2 did not have a line for

24    Dr. George.

1    A.    I'm still reading the e-mail.

2    Q.    I'm focusing on that part where it says --

3             MR. WILLIAMS:  If he wants to read the

4    document, he has every opportunity to do that.

5             Take your time.

6             MR. ABER:  I'm just trying to save a few

7    minutes.

8             THE WITNESS:  The first part is actually

9    related to the second part, if you read the third item

10   down, in terms of receipts for Three Castle Antiques'

11   purchases on October 4th and October 6th for Dr. Johnson.

12            So in terms of Cena being able to reconcile

13   what is due to or from Dr. Johnson plays into that

14   $726.10 worth of receipts that have not been

15   substantiated for business use.  So I think that's --

16   BY MR. ABER:

17   Q.    We'll get back later to the PNC issues.

18            But concerning the part of this McNesby 6

19   that refers to the unreconciled travel, what should

20   Mr. Hearn have done concerning that?

21   A.    He should have taken the combination of the

22   information that was up top and the travel below and

23   talked it -- brought it to Dr. Johnson's attention.

24   Because in this state without those kind of receipts,

42

1   especially in that magnitude --

2       Q.   You're talking about the PNC receipts?

3       A.   I'm talking about he $726 receipt.

4            And I can't tell you, you know, the amount

5   due to or from for the six trips that were taken that are

6   listed here.

7       Q.   My question is, given the fact that Cena Sweeney

8   is telling Bob Hearn that there are several trips that

9   are not reconciled, what should Mr. Hearn have done to

10  get those trips reconciled?

11      A.   Talked with Dr. Johnson.

12      Q.   And if Dr. Johnson would not talk to him about

13  it or, for some reason, he felt he couldn't talk to

14  Dr. Johnson, what should he have done?

15      A.   He should have approached me on it.

16      Q.   Did he ever approach you about these issues in

17  2003?

18      A.   Not that I can recall.

19      Q.   If he had, what would you have done?

20      A.   I can't speculate on what I would have done.

21      Q.   Well, if one of your business managers approached

22  you today and said the campus director has run up some

23  bills; she won't talk to me about it; I can't talk to

24  her; I'm scared to talk to her, what would you do?

1      A.   I would have reviewed the entire situation and

2   then sat down with Dr. Johnson.

3      Q.   I didn't say Dr. Johnson specifically.  I said a

4   campus director.

5      A.   I'm sorry.  I thought in this situation you were

6   talking about what I should be doing.

7      Q.   I was trying to determine the general procedures

8   where a business manager does not, cannot and will not

9   talk to a campus director about issues with the campus

10  director.  It should then be brought to you and you would

11  examine it and you would talk to the campus director?

12     A.   I've never had that situation happen.

13     Q.   To your knowledge, did Dr. Johnson ever refuse to

14  deal with the issues in McNesby 6 when they were brought

15  to her?

16     A.   I can't tell from...

17     Q.   I said to your knowledge.  Do you have any

18  knowledge of her refusing to deal with them?

19     A.   I have no knowledge.  The answer is yes.

20     Q.   The answer is, no, you do not have any knowledge?

21     A.   I'm sorry.  I do not have any knowledge.

22     Q.   Now, you said you were made aware that

23  Dr. Johnson had made a personal trip to North Carolina.

24  And you told SantoraBaffone you wanted that verified or

1      So in this one, it talks about five trips --

2  of Dr. Johnson's five trips, plus Dan Houghtaling.   In

3  this, it appears to be six trips.   And I'm trying to...

4      Q.   Okay.   There's a similarity in subject matter

5  between 6 and 7, isn't there?

6      A.   Well, in terms of travel needs to be reconciled

7  in 6.   But on 7, it talks about specifically PNC items

8  there.   So it's --

9      Q.   Six says, "The following items are pending

10  concerning PNC credits."   They're both talking about PNC,

11  aren't they?

12      A.   I can't tell from item 6 because it says, "The

13  following travel needs to be reconciled."   So it can be,

14  you know, a combination of PNC --

15      Q.   Where does 6 say anything about reconciling?

16      A.   In the middle it says, "The travel needs to be

17  reconciled."

18      Q.   All right.   Okay.

19          Would you agree with me or disagree with me

20  that on two occasions Cena Sweeney brought to Bob Hearn's

21  attention the Three Castle Antique issues:   On

22  January 14th and again on March 5th?

23      A.   That the college needed receipts from Dr. Johnson

24  for the Three Castle Antiques.

1    Q.    That's twice it was brought to his attention

2    several months apart by Cena Sweeney?

3    A.    That's true, yes.

4    Q.    And, also, Cena Sweeney twice brought to

5    Bob Hearn's attention the need to reconcile certain

6    trips?

7    A.    Well, in one case, it was the trips themselves.

8    In the other, it was PNC items.  And there's a

9    difference.

10    Q.    Now let me hand you McNesby 8.

11          Now, is McNesby 8 pretty much identical to

12    McNesby 7?

13    A.    Seven?

14          In 7, Dan Houghtaling's was removed.

15    Q.    In 8?

16    A.    Eight.

17    Q.    Other than that, is it virtually identical?

18    A.    It looks substantially the same.

19    Q.    So, again, following the e-mails to Mr. Hearn by

20    Cena Sweeney on January 14th, another one on March 5th,

21    she again contacts him on April 3rd concerning these

22    issues that need to be answered?

23    A.    On three separate occasions, yes.

24    Q.    And it's your testimony that Bob Hearn never

1    approached you about having difficulty getting answers to

2    these issues?

3        A.    Not that I can recall.

4        Q.    Do you know whether or not Dr. Johnson's travel

5    folders were ever reviewed to determine whether she was

6    given an opportunity to reconcile her trips before she

7    was exiled from the campus?

8        A.    I'm not sure what you mean "exiled."

9        Q.    Well, Dr. George told her leave the campus and

10    take all her personal belongings with her on January 3rd,

11    2004.  You're aware of that, aren't you?

12        A.    I'm not aware of what Dr. George told

13    Dr. Johnson.

14        Q.    You didn't see the memo that said she was put on

15    administrative leave?

16        A.    Memo?

17        Q.    Yes.  Or any e-mail or whatever.

18              Do you remember a written message sent

19    campus-wide or school-wide that Dr. Johnson was on

20    administrative leave on January 4th, I think it is, 2005?

21        A.    I can't recall specifically.  Probably.

22        Q.    You learned that Dr. Johnson had been put on

23    administrative leave?

24        A.    Administrative leave, not exiled from the campus.

57

1  BY MR. ABER:

2      Q.    Mr. McNesby, just to back up a second, the

3  meeting you had in February with Mr. Shirey and

4  Mr. Williams and Mr. Simpson, try and visualize that

5  meeting, if you would.

6              Did you review any documents?

7      A.    Not that I can recall.

8      Q.    I don't have them with me.  Mr. Simpson had

9  authored summaries of some initial inquiries he made.  I

10 called them interviews; he called them discussions.  Did

11 you see those at all?

12     A.    I don't recall seeing the documents.

13     Q.    Did he have them with him and refer to them

14 during the meeting?

15     A.    He may have had a folder on the desk there.  But

16 I really don't remember looking at any of that

17 documentation.

18     Q.    Turn, if you would, to your affidavit, please.

19 You have it in front of you.

20     A.    It's right here (indicating).

21     Q.    Turn to your letter which is attached to the

22 affidavit dated November 4th, 2005.

23     A.    November 4th, yes.

24     Q.    Now, was Ron Draper the one at the state

1    signature, you know, even if it's logged in after the

2    fact that the supervisor seen it, along with the business

3    manager.  And there are lines provided.

4        Q.    There are times that the card will be used when

5    both college expenses will be incurred and personal

6    expenses will be incurred, correct or incorrect?

7        A.    There are --

8        Q.    Are there?

9        A.    -- or there have been?

10        Q.    Yes.

11        A.    There have been.  It's strongly discouraged.  But

12    when those situations do happen, I think the guidelines

13    provide for reimbursement or prior approval on those,

14    also.  And that's especially important if those are going

15    to happen.

16                MR. ABER:  This will be 9.

17                (McNesby Deposition Exhibit No. 9 was marked

18    for identification.)

19    BY MR. ABER:

20        Q.    Is Exhibit 9 the Terry Campus travel policy?

21        A.    It is the written portion there.  I believe

22    there's attachments.  So it's incomplete.

23        Q.    Would this have to have been approved by

24    somebody?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters
B532

1    BY MR. ABER:

2       Q.   Do you recognize what has been marked as

3    McNesby 10?

4       A.   It's a portion of the SuperCard guidelines.

5       Q.   On the second page Bates stamped DTCC2137, it

6    talks about travel card approval.  It talks about the use

7    of the SuperCard.  And then it says, "In the event the

8    cardholder incurs expenses that are subsequently

9    disallowed by the business or fiscal office, then the

10   cardholder must submit a check reimbursing the college

11   for that amount within 24 hours."  That's part of the

12   policy?

13      A.   Yes.

14      Q.   How is the cardholder to know that an expense has

15   been disallowed by the business -- or, is the fiscal

16   office your office?

17      A.   I have a fiscal office in my office.  But the

18   campus business office has the primary responsibility.

19      Q.   It says, "By the business or fiscal office."

20      A.   Oh, I'm sorry.  Yes.

21      Q.   It says either the business managers or your

22   office?

23      A.   That's true.

24      Q.   How is the cardholder to be -- how are they to

1    learn that an incur expense has been disallowed?

2        A.    Notification from the business or fiscal office.

3        Q.    Verbally or in writing?

4        A.    Either way.

5        Q.    Do you have any knowledge that Dr. Johnson was

6    informed that any of her SuperCard purchases had been

7    disallowed?

8        A.    Based on what I've seen in the e-mails was that

9    at that point in time, they didn't even have the receipts

10   to make a determination whether or not the expenses were

11   allowable or not allowable.  So when I look at these

12   e-mails and I apply it to this (indicating) there, you

13   know, I'm not sure -- I don't think that they're -- that

14   the Three Castle Antiques was determined to be allowable,

15   a disallowable because they couldn't get the receipts to

16   determine whether they were business related.

17       Q.    If the business office or fiscal office cannot

18   get the receipts for whatever reason, should they then

19   disallow the expense and so notify the cardholder?

20       A.    They should approach the cardholder and request

21   the receipts.

22       Q.    And if the cardholder doesn't give them the

23   receipts, should they then disallow them and notify --

24       A.    It should be considered a personal expense,

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters
B534

1  especially when you're looking at someone making

2  purchases at an antique store in excess of $700.

3     Q.   So once the business or fiscal office fails to

4  get a receipt, then they should then disallow the

5  expense?

6     A.   After a certain -- yes.  Yes.

7     Q.   And once they have disallowed the expense, how is

8  the employee supposed to be notified?

9     A.   From the business office.  But either verbally or

10 in writing.

11    Q.   And if the cardholder does not reimburse within

12 24 hours, what happens next?  What's the business office

13 to do?

14    A.   Well, the business office -- I mean, once again,

15 it says any misuse of the SuperCard is grounds for

16 discipline, up to and including termination of

17 employment.  And it's a very difficult situation you have

18 here when you have a business manager reporting to the

19 person who is not complying with the SuperCard

20 guidelines, and the same person that I look to to help me

21 enforce those guidelines.

22    Q.   Do you know of any evidence that indicated that

23 Dr. Johnson intended to hide any of her SuperCard

24 purchases and not provide receipts?

96

1   A.   We have president's council that is usually one

2   team.   There is -- you know, one year the president's

3   council was -- you know, participated in answering

4   questions.

5   Q.   Have you ever seen Dr. George react when a vice

6   president got a wrong answer?

7   A.   Didn't notice either -- I mean, see him react?

8   Yes, I've seen him react.

9   Q.   How did he react?

10   A.   Wrong answer or right answer, did you say?

11        They're both substantially the same.   And it

12   would be joking and kidding.   But then everyone around

13   the table is competitive and we want to win.

14   Q.   Do you remember the reorganization of the IT

15   department, for lack of a better term?

16   A.   Yeah, I do.

17   Q.   How did that come about?

18   A.   Over a number of years of president's council

19   being frustrated about the fragmented way that technology

20   was being addressed throughout the college.   And that

21   came about to try to get a uniformed system of the

22   administration of technology under one umbrella.

23   Q.   Do you remember when it was finally approved or

24   set to go in effect?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B536

1    A.    I don't know the exact date when.

2    Q.    And I didn't ask when.  But you remember it

3 happening?

4    A.    Oh, yes, I do.

5    Q.    And you're a member of the president's council?

6    A.    I am a member, yes.

7    Q.    When it came up for approval, who voted against

8 it?

9    A.    No one.

10    Q.    Who voted for it?

11    A.    Everyone that was at the meeting.

12    Q.    How was the vote done?

13    A.    Similar to the way we do every other type of

14 major initiative, in terms of people expressing whether

15 something should go forward or not.

16    Q.    Did anybody express reservations in the

17 organization?

18    A.    Not when, you know, the final vote was done.  I

19 mean, quite frankly, I had concerns about it earlier on

20 before it was approved and, you know, may have been

21 deferred because I was concerned about the staffing, how

22 it was going to effect the budget.  And then by the time

23 the final vote had taken place, I mean, I was well

24 satisfied that it was thought out.

1    in conducting, whether you want to call in an inquiry

2    or -- I don't want to get hung up with semantics.  I call

3    it investigation -- of Dr. Johnson after she was put on

4    administrative leave?

5        A.    Was there --

6        Q.    Was Hope Murray involved in the investigation?

7        A.    I didn't get involved until mid-February.  Like I

8    said, I wasn't aware of Hope's involvement.  I'm assuming

9    that, you know, if someone is -- regardless, if an

10   employee is put on administrative leave, in her position

11   with the college as director of human relations, she

12   would have some involvement.  To what it was, I don't

13   know.

14       Q.    I didn't ask you about her involvement and her

15   being placed on administrative leave.  I asked were you

16   aware that she was involved in the actual investigation

17   after Dr. Johnson was put on administrative leave?

18       A.    Not that I can recall that somebody came up and

19   told me that.

20       Q.    Are you aware whether Dan Simpson was involved in

21   any investigation of Dr. Johnson after she was put on

22   administrative leave?

23       A.    Not that I'm aware of.  In terms of his

24   involvement, only from the standpoint that he would be

1   acting assistant campus director.

2       Q.   Did you ever ask, tell or suggest to him that he

3   should have interviews or discussions with anybody to

4   find out more information?

5       A.   No.

6       Q.   So if he testified you did, he's not telling the

7   truth?

8       A.   I don't know.  Your question was did I instruct

9   Dan Simpson --

10      Q.   Suggest, instruct, whatever word you want to use.

11      A.   Instruct Dan -- I instructed Dan Simpson?

12      Q.   Did you tell -- did you verbally say anything to

13  Dan Simpson that would suggest to him that he should

14  interview people and get more information on Dr. Johnson?

15      A.   That Dan Simpson should interview people?

16      Q.   Yes.  I'm trying to avoid a label.

17      A.   I don't recall suggesting that to Dan Simpson at

18  all.

19      Q.   So if he testified to that, he's lying about

20  that, too?

21      A.   You'd have to ask Dan Simpson.

22      Q.   I know what he said.

23      A.   I don't know what Dan Simpson said.  I don't

24  recall --

129

1    accreditation a critical event to the school?

2        A.    Yes.

3        Q.    And there was a deadline that this report had to

4    be done by?

5        A.    I would assume so.  I don't know.

6        Q.    And Dr. Johnson was complaining that her staff

7    was not getting the report done in time to meet that

8    deadline?

9        A.    It was getting -- you know, getting the report

10    done, you know, not in the manner that she wanted and had

11    to go back and rewrite the whole thing herself.

12        Q.    Any other instances of Dr. Johnson acting

13    improperly during the ad hoc meetings?

14        A.    I can't think of specifically, but, you know,

15    over the years, you know, whether it be raising her voice

16    or, you know...

17        Q.    She has a loud voice by nature, doesn't she?

18        A.    I don't know what you mean by that.

19        Q.    Well, you seem to be a nice, quiet, soft-spoken

20    gentleman.  Was her voice louder than yours?

21        A.    Depends on -- I don't know if her voice is

22    louder.  I'm not a professional.

23        Q.    Do you know of any misconduct by Dr. Johnson

24    during the president's council meetings?

1    A.    During the president's council meetings?

2    Q.    Yes.

3    A.    Not that I can recall.

4    Q.    Who suggested SantoraBaffone be hired?

5    A.    For this engagement?

6    Q.    Yes.

7    A.    I did.

8    Q.    And who contacted them?

9    A.    I did.

10    Q.    And you're the one who approved their hiring?

11    A.    Yes, sir.

12    Q.    Who identified the employees that they were to

13    interview?

14    A.    I don't know who identified them because I wasn't

15    part of that discussion.

16    Q.    Who was a part of that discussion?

17    A.    I wasn't part of it.  I don't know who was in on

18    the discussion because I wasn't --

19    Q.    So when you hired them and when you discussed the

20    agreed-to procedures, they were sent off and you had no

21    knowledge of who they were going to interview?

22    A.    I did have -- I believe as part of the

23    agreed-upon procedures, the name Kathy Powell was part of

24    that, that they would be interviewing her.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B541

1  suggested go to the attorney general's office in this

2  case?

3     A.   No.  That's why you see in the letter that the

4  report is going to the attorney general's office.

5     Q.   In the SantoraBaffone report?

6     A.   In the SantoraBaffone report, yeah.

7                 And we went to the attorney general's

8  office.  And then we met with the state auditor's office.

9     Q.   How many times did you meet with the state

10  auditor?

11     A.   I know we had an entrance conference with them in

12  April.  According to this report, I mean, Ron Draper and

13  Ed Watson.  I think there was a follow-up meeting with

14  the auditors who were going to be on the engagement

15  there.

16                 Once the engagement was nearing the end,

17  they let us review a copy of the draft report and answer

18  any questions.  And I believe it was three times.

19     Q.   During this entire process with SantoraBaffone

20  and the state auditor, do you know of any instance where

21  Dr. Johnson was offered the opportunity to explain

22  anything concerning the subject matter of these

23  investigations?

24     A.   I believe that there was a discussion at the





1    suggested go to the attorney general's office in this

2    case?

3    A.    No.    That's why you see in the letter that the

4    report is going to the attorney general's office.

5    Q.    In the SantoraBaffone report?

6    A.    In the SantoraBaffone report, yeah.

7    And we went to the attorney general's

8    office.  And then we met with the state auditor's office.

9    Q.    How many times did you meet with the state

10   auditor?

11   A.    I know we had an entrance conference with them in

12   April.  According to this report, I mean, Ron Draper and

13   Ed Watson.  I think there was a follow-up meeting with

14   the auditors who were going to be on the engagement

15   there.

16   Once the engagement was nearing the end,

17   they let us review a copy of the draft report and answer

18   any questions.  And I believe it was three times.

19   Q.    During this entire process with SantoraBaffone

20   and the state auditor, do you know of any instance where

21   Dr. Johnson was offered the opportunity to explain

22   anything concerning the subject matter of these

23   investigations?

24   A.    I believe that there was a discussion at the



1    meeting that I talked about in terms of we looked at the

2    draft.

3        Q.    The draft of what?

4        A.    The state auditor's report.

5              And some discussion took place with, I

6    believe, George Eilers.  And he had contacted, I believe

7    it was you.  Or someone from the state auditor's office

8    had contacted you regarding the matter.  And I can't

9    recall what the sum and substance of the conversation

10   that you had with the state auditor's office was, if you

11   had one.

12       Q.    Prior to the state auditor getting involved and

13   prior to the final version of the SantoraBaffone report,

14   do you know of any instance where Dr. Johnson was going

15   to be contacted for her version of these facts?

16       A.    I wasn't aware of that.

17       Q.    So that didn't happen?

18       A.    Not that I'm aware of.

19       Q.    Was there any discussion about doing that?

20       A.    Not that I can recall.

21       Q.    Was there any discussion about seeing who she

22   might think should be interviewed to give her version of

23   the facts?

24       A.    Not that I recall.  Not that I can recall.

1    Q.   Do you know what I mean by ex parte?

2    A.   No.

3    Q.   This was a one-sided investigation; she had no

4  input, no chance to challenge, no chance to explain?

5    A.   It wasn't an investigation.  Okay.  If you're

6  talking about the CPA, it was simply a confirmation of

7  allegations.  You're talking about the CPA report?

8    Q.   I'm talking about from January 4th, 2005 until

9  the final SantoraBaffone report was issued, did

10  Dr. Johnson have an opportunity at any time to explain

11  her version of the allegations or suggest people to be

12  interviewed to explain her version?

13    A.   Unless the state auditor's office --

14    Q.   Before the state auditor got involved.  I'm using

15  a fine point.  Let me repeat this.  Pay attention.

16    A.   This is before the state auditor's office?

17    Q.   From the point of January 4th, 2005, the day that

18  it was announced that she was put on administrative

19  leave, until the final version of the SantoraBaffone

20  report came out, did anybody suggest let's see what

21  Dr. Johnson has to say about this?

22    A.   Not that I'm aware of.

23    Q.   Did anybody contact Dr. Johnson to get her

24  version of the facts?



1   A.   Not that I'm aware of.

2   Q.   Did anybody suggest asking Dr. Johnson who she

3   thinks should be interviewed to get her version of the

4   facts?

5   A.   Not that I'm aware of.

6   Q.   Did anybody interview anybody other than those

7   suggested by Mr. Simpson, yourself or Dan Dwyer

8   concerning these facts?

9   A.   One is, I didn't suggest they interview anyone.

10  Q.   Did anybody --

11  A.   Two is, I didn't have a list of people who were

12  suggested to be interviewed, with the exception of

13  Kathy Powell.

14  Q.   There has been testimony that there was such a

15  list.

16  A.   Well, you're asking me to confirm a list that

17  I've never seen.

18  Q.   Who attended the meetings with the auditor other

19  than yourself?

20  A.   There were two meetings with the auditor.  I

21  believe Brian Shirey...

22          I can go right to here.  On April 18th, as

23  part of this, myself, Brian Shirey, Ron Draper and

24  Ed Watson from the state auditor's office.  Ron Draper

1    A.   I don't know what Roberts retirement means.

2    Q.   I thought it said restaurant.  I'm sorry.

3         Just so I understand, if a person goes over

4    their per diem -- you know, I'll say it's $25 a day for

5    meals or whatever and they run $30, they should then

6    write a check to the school and reimburse the school for

7    it?

8    A.   Or that amount will be deducted from any other

9    reimbursement that they have.

10   Q.   During your years as finance director, did you

11   ever know of Dr. Johnson having to repay the school

12   monies that she improperly spent that was not expected --

13   you know, not allowed by the rules?

14        These are a series of checks which she's

15   either given money to the school or reimbursed the

16   school.  During your years as vice president for finance,

17   do you know of any instance of Dr. Johnson having to

18   reimburse the school for improper expenditures that she

19   made?

20   A.   External to the procedures review?

21   Q.   Yes.

22   A.   Beyond those instances, I wasn't aware of any,

23   no.

24   Q.   What about within the review procedures?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B547

1      A.    Well, within those -- in terms of based on the

2   Santora report.

3      Q.    Other than the things mentioned in the Santora

4   report, in the four or five, six years before that

5   report?

6      A.    Not that I'm aware of.

7            MR. ABER:  Give me two or three minutes.  I

8   may be almost done.

9            (A short recess was taken.)

10  BY MR. ABER:

11     Q.    Just a couple more questions.

12           During the investigation of Dr. Johnson, in

13  the SantoraBaffone report, there's an involved

14  calculation of what Dr. Johnson's expenses were

15  concerning her reunion.

16     A.    Right.

17     Q.    And one of the things is a calculation of copies

18  or a cost to copy everything.

19     A.    Right.

20     Q.    Did you have any role in determining what the

21  price per copy was?

22     A.    I think I -- and I can't remember who I talked

23  with.  But somebody sent me or made me a copy of what the

24  prices were back then in terms of one-sided, two-sided

1    A.    I believe so.

2    Q.    Does the marketing department generally serve --

3 in addition to the school, do projects for the public?

4    A.    Not that I'm aware of.

5    Q.    Do they generally bill the public for materials?

6    A.    Not that I'm aware of.

7    Q.    Do you know of any other instances where an

8 employee has had copies done for which they were billed?

9    A.    Not that I'm aware of.

10    Q.    So this would be the only time you have

11 experience that the marketing department put a price on

12 their per page copying charge?

13    A.    Not that I'm aware of.  I mean, I think this is

14 the only one that I'm aware that somebody billed somebody

15 for a job.

16    Q.    Your answer is not phrased to answer my question.

17         This is the only instance that you know of

18 where a marketing department has been asked to put a

19 price per page for copying, as far as you know?

20    A.    As far as I know, that's all I can recall.

21    Q.    And you have no knowledge on what the department

22 based that estimate on?

23    A.    The per copy charges that I talked about earlier?

24    Q.    Yes.

**W&F**

WILCOX & FETZER LTD.