IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,            )
                                  )
      Plaintiff,                  )
                                  )
      v.                          )  C.A. No. 05-157 (KAJ)
                                  )
ORLANDO J. GEORGE, JR., in        )
both his official and            )
personal capacities, and         )
DELAWARE TECHNICAL AND           )
COMMUNITY COLLEGE,               )
                                  )
      Defendants.                 )

            Deposition of SUSAN H. MOLIKAN taken
pursuant to notice at the law offices of Morris James
Hitchens & Williams, LLP, 29 North State Street,
Suite 100, Dover, Delaware, beginning at 12:00 p.m., on
Thursday, May 11, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            GARY W. ABER, ESQUIRE
            ABER GOLDLUST BAKER & OVER
              702 King Street - Suite 600
              Wilmington, Delaware 19801
              for the Plaintiff

            DAVID H. WILLIAMS, ESQUIRE
            MORRIS JAMES HITCHENS & WILLIAMS, LLP
              222 Delaware Avenue - 10th Floor
              Wilmington, Delaware 19801
              for the Defendants


              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B550



1   on this X number of hours or we did this project, that it

2   would be helpful, but we weren't very well-organized.

3       Q.    Helpful in what regard?

4       A.    In providing any information that people could

5   use if they're asking for specific hours and times and

6   you can point to this and say 10 hours were spent on this

7   job.

8       Q.    Did you have an understanding that this

9   information was going to be used to attempt to justify

10  Dr. Johnson's termination?

11      A.    Yes.

12      Q.    Did that provide an extra incentive to you to

13  try and find the information?

14      A.    No.

15      Q.    As I understand it, occasionally the Marketing

16  Department -- you do work on making banners and such?

17      A.    Yes.

18      Q.    You do those for what type of events?

19      A.    College events, noncollege events.

20      Q.    Birthday parties?

21      A.    Sometimes.

22      Q.    When you say "noncollege events," what kind of

23  noncollege events?

24      A.    Well, as you suggested, birthday parties.  I

Susan H. Molikan

9

1  don't know.

2      Q.    Do you do it for any noncampus organizations?

3      A.    Noncampus organizations that college personnel

4  were involved in sometimes, yes.

5      Q.    Can you give me some examples of those

6  organizations?

7      A.    The office of Women in Higher Education

8  requested a program for an annual awards banquet that

9  they have.

10     Q.    When you do this work for noncampus

11  organizations, do you charge for your time and effort?

12     A.    No.

13     Q.    Has your department ever charged for its time

14  and effort for working for noncampus organizations?

15     A.    No.

16     Q.    When you were working on the family reunion,

17  you never could give an estimate of the number of pages

18  or the -- any way to quantify the amount of the work,

19  could you?

20     A.    No.

21     Q.    It's fair to say that you would have to

22  guesstimate what that would be?

23     A.    Yes.

24     Q.    Did anybody ever tell you that Dr. Johnson was



1    paying for it?

2        A.    No.

3        Q.    Did Kathy Powell ever indicate that she was

4    preparing an invoice?

5        A.    No.

6        Q.    Let me ask you this:  Have you done anything to

7    prepare for today's deposition?

8        A.    I spoke with Mr. Williams and I reviewed the

9    deposition that I gave previously.

10       Q.    You mean the transcript?

11       A.    Yes.

12       Q.    Am I correct that in doing this work

13   Dr. Johnson was not trying to hide anything?

14       A.    You are correct.

15       Q.    All the work was open and obvious for everybody

16   to see what was being done?

17       A.    Yes.

18       Q.    Did she ever tell you to hide anything about

19   the job?

20       A.    No.

21       Q.    Did she ever indicate that she was trying to

22   sneak this job past somebody so she wouldn't have to pay

23   for it?

24       A.    No.



1    work.

2        Q.    The question says --

3        A.    Campus organizations.

4        Q.    The question was:  "Does your shop do any work

5    for any other non-campus organizations?"

6        A.    Again, if the operative word is "campus

7    organizations," then we do work for college-wide

8    marketing which sometimes can be a fair amount.  It isn't

9    specifically related to the Terry Campus but is related

10   to Delaware Technical & Community College.  And there is

11   a difference.

12       Q.    You testified earlier you do do work for other

13   noncollege-related organizations.

14       A.    You said for noncampus organizations.

15       Q.    But the association of college women you

16   mentioned, the birthday parties, those are not

17   college-related are they?

18       A.    Those are not college-related.

19       Q.    During your interview with Mr. Dwyer did you

20   ever express to him a desire to do personal harm to

21   Dr. Johnson?

22       A.    I may have.

23       Q.    Did you express that you might want to do --

24   let me rephrase -- damage to property that belonged to

1    her?

2        A.    I may have.

3        Q.    Did you ever suggest that you might want to

4    send anonymous communications?

5        A.    I may have.

6        Q.    Have you ever sent an anonymous communication

7    to Dr. Johnson?

8        A.    No.

9              MR. ABER:  Can we mark this as Molikan 1?

10             (Molikan Deposition Exhibit No. 1 was

11   marked for identification.)

12             MR. WILLIAMS:  You don't have a copy of

13   this?

14             MR. ABER:  You can make a copy as soon as

15   we're done.

16   BY MR. ABER:

17       Q.    Let me show you what's been ~~worked~~ marked as 1, ask

18   you if you have ever seen that document before.

19       A.    Interesting.  Did I send this?  No.

20       Q.    My question was have you ever seen it.

21       A.    No, I have never seen it before.

22       Q.    Have you ever heard about that document?

23       A.    No, I have never heard about that before.

24       Q.    During your interview by Mr. Dwyer, was anybody

1    Q.    The other ones were in black and white?

2    A.    As far as I remember, yes.

3    Q.    Would you agree with me that you described your

4    relationship with Dr. Johnson as adversarial?

5    A.    Yes.

6    Q.    That was from the first time you met her, the

7    very beginning?

8    A.    Apparently so.

9    Q.    Was part of the reason that you had an

10   adversarial relationship because Dr. Johnson had replaced

11   you with another employee at one time?

12   A.    Partly.

13   Q.    You were upset because that woman was a

14   Filipino woman who you didn't think spoke good English?

15   A.    Her English is accented.

16   Q.    Did you represent to Mr. Dwyer that you would

17   try and scrounge around to find more things on

18   Dr. Johnson?

19   A.    Probably.

20   Q.    During your interview with Mr. Dwyer, did he

21   ever offer you a guarantee as to whether Dr. Johnson

22   would be returning to campus?

23   A.    Did Mr. Dwyer offer that?  No, I don't think

24   so.

1      Q.    At page 41 of the transcript, there is a long

2  answer which you conclude in the last sentence, quote,

3  Wouldn't that be horrible because everybody got rid of

4  everything that she will be back," referring to

5  Dr. Johnson.

6              Mr. Dwyer responded:  "No.  I don't think

7  you have to worry about that.  That's not going to

8  happen."

9              You stated:  "She's back?"

10             Mr. Dwyer stated:  "That's not going to

11  happen.  I already -- I said you know what's going to

12  happen when people ask me that question, they guarantee

13  that she will not be back."

14             Then you said something that someone told

15  you he said.  "You don't have to worry about that."

16             Do you remember that discussion?

17     A.    Okay.

18     Q.    Was it your belief after that interview that

19  there was no chance of Dr. Johnson returning to campus?

20     A.    That there was no chance?  I did not think

21  there was no chance that she was coming back.  I thought

22  there was always a chance that she might come back.  I

23  was hoping that she would not come back.

24     Q.    Basically, in that conversation did you view



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                )
                                      )
            Plaintiff,                )
                                      )    Civil Action
v.                                    )    No. 05-157(KAJ)
                                      )
ORLANDO J. GEORGE, JR.,               )
in both his official and personal     )
capacities, and DELAWARE              )
TECHNICAL AND COMMUNITY               )
COLLEGE,                              )
                                      )
            Defendants.               )

            Deposition of HOPE MURRAY taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street,
Dover, Delaware, beginning at 10:10 a.m., on Thursday,
January 19, 2006, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

    ALSO PRESENT:
        MARGUERITE A. JOHNSON

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B558

B558

Hope Murray

1    employed?

2        A.    I was employed -- my career with the State of

3    Delaware, which was basically the beginning of my

4    career, was from April of 1976 I started with the

5    Family Court of the State of Delaware until 1988, when

6    I became employed at Delaware Tech.

7        Q.    What did you do before you went to work for

8    Family Court?

9        A.    I sold real estate.

10       Q.    When you went to work for Delaware Technical,

11   Delaware Technical & Community College, can you give

12   me your career progression with them?

13       A.    Yes.  When I began with the college, I was

14   hired into the position that was then called assistant

15   to the president for personnel and legal affairs.  And

16   I had stayed in that position, the same position

17   essentially up until 1995, when Dr. George became

18   president and the job was reorganized somewhat and

19   retitled vice president for human resources and

20   college relations.

21       Q.    And can you give me a description of your job

22   duties?

23       A.    My responsibilities encompass the

24   administrative oversight of the human resource

1  function for the college, for the entire college,

2  oversight of college-wide marketing and public

3  relations, administrative oversight of institutional

4  advancement, as well as administrative oversight of

5  legal affairs.

6      Q.   When you say, "administrative oversight of

7  legal affairs," what do you mean?

8      A.   The chief legal counsel, the legal counsel for

9  the college reports to me.  So in terms of

10 administrative oversight, it's who he reports to in

11 terms of his leave, his evaluation, issues that I

12 would bring to him for his legal advice primarily

13 having to do with HR-related issues.

14     Q.   Where is your office located?

15     A.   It's in Dover in the office of the president on

16 the Terry Campus.

17     Q.   What is your proximity to Dr. George's main

18 office?

19     A.   In the same office suite as Dr. George.

20     Q.   Does your office adjoin his office or across

21 the hall from it?

22     A.   I'm just across the hall from him.

23     Q.   How often in a day do you see him in a normal

24 workday?



1    A.    In the current setup that we have with the

2    legal counsel, it is the legal counsel primarily who

3    decides whether he will handle the case, whether he

4    will engage the Attorney General's Office or whether

5    to engage outside counsel.

6    Q.    In the present case involving Dr. Johnson, who

7    made the decision to utilize outside counsel as

8    opposed to in-house or the Attorney General's Office?

9    A.    That was a decision that was made by Dr. George

10   and with my recommendation.

11   Q.    Okay.    What was that recommendation based upon?

12   A.    The recommendation is based upon I would say

13   the magnitude of the issue or an issue in which we

14   want to make sure that we are proceeding exactly as we

15   should.

16   Q.    And you didn't think the Attorney General's

17   Office was capable of making that decision?

18   A.    Historically we have not engaged the Attorney

19   General's Office for those types of issues.

20   Q.    Why not?

21   A.    Well, timeliness is one issue, of course, but I

22   don't know that I can answer that.

23   Q.    Is there a Deputy Attorney General that's

24   assigned to the school on a regular basis?



1   where she was disruptive or abusive?

2      A.   I can tell you that for the last several years

3   that Dr. George -- that Dr. Johnson was employed at

4   the college it was a regular occurrence and I can't

5   give you chapter and verse, but it became a pattern

6   that we experienced.

7      Q.   So if called upon to describe the abusive or

8   disruptive behavior, you could only speak, except for

9   this one incident about this database management

10  situation, you can only speak in generalities without

11  being specific?

12     A.   Without having agendas that I could go down

13  from previous meetings and I could, I'm sure I could

14  remember if I knew what the agenda items were and what

15  we were talking about.  A similar kind of thing did

16  occur related to the reorganization of the IT division

17  in the college.  There was debate and discussion in ad

18  hoc about that and, again, Dr. Johnson was very verbal

19  and I would say making disparaging remarks about some

20  of the people in that IT division.

21     Q.   Disparaging remarks as in that they weren't

22  competent or disparaging remarks in that they were

23  just mean, nasty people?

24     A.   No.   That they were not competent and why would

1    Q.    Do you think he was considering, giving fair

2  consideration to what you had to say?

3    A.    Yes.

4    Q.    Help me with it.  What is institutional

5  advancement, by the way, so I understand?

6    A.    Institutional advancement is a term that in

7  some colleges and universities is also known as

8  development, so it encompasses the fundraising branch

9  of the college.  Fundraising, friend raising, alumni

10  relations frequently falls under institutional

11  advancement, grants, securing funds through grants,

12  private giving, public grants.

13    Q.    These comments that Dr. Johnson made about the

14  marketing department, did you ever convey her feelings

15  to the marketing department personnel?

16    A.    No.

17    Q.    So they never heard about these comments?

18    A.    Well, actually, yes, they did.

19    Q.    Where did they hear about them from?

20    A.    They heard them from her.

21    Q.    She would tell them directly?

22    A.    Yes.

23    Q.    So she wasn't going behind their back or

24  anything like that with her opinions?



1    Q.    Some things might just be so minor you would

2    say don't do it again, that's the verbal reprimand or

3    something?

4    A.    It could be a verbal reprimand.

5    Q.    Are there other actions that are deemed more

6    inappropriate that you would skip the verbal reprimand

7    and go to a written reprimand first?

8    A.    There could be.

9    Q.    And then there are other offenses where you

10    might skip the verbal reprimand, skip the written

11    reprimand and go to whatever the next level is?

12    A.    There could be a suspension, yes.

13    Q.    How long are those suspensions for?

14    A.    My recollection is three days, five days.  I

15    don't recall.  I haven't dealt with them in a while.

16    Q.    When people receive that type of discipline,

17    can they take it to a grievance?

18    A.    Yes.

19    Q.    And describe that process for me.

20    A.    The grievance process is --

21    Q.    Let's say somebody has done something

22    inappropriate and their manager says I am suspending

23    you for whatever, for doing such-and-such.

24    A.    Yes.



1    Q.    Then what happens?

2    A.    They have the right to grieve that.  They have

3    so many days, I don't recall off the top of my head if

4    it's ten or twenty days, in order to put in their

5    grievance.  The grievance, the Delaware Tech grievance

6    says that a grievance must either be of a disciplinary

7    nature, disciplinary grievance having to do with

8    disciplinary issues or having to do with contract

9    interpretation issues, policy interpretation issues.

10    Q.    What are disciplinary issues?

11    A.    Such as you just mentioned, if someone was

12    suspended and they wanted to grieve that, that would

13    be grievable under a disciplinary.

14    Q.    What makes a suspension grievable?  The fact

15    that they're not allowed to come into work?

16    A.    The grievance process, if I remember this

17    correctly, it says there either has to be a

18    misinterpretation or misapplication of college policy

19    or the individual must be monetarily adversely

20    affected by the action.

21    Q.    Run that by me again.

22    A.    I don't have the policy in front of me.

23    Q.    What was the first one?

24    A.    That there is a misinterpretation or



60

1    A.    She resigned effective a certain date.  She

2  resigned in October with an effective date of December

3  and we put her on administrative leave for that 60-day

4  period.

5    Q.    Okay.  So the administrative leave came after

6  the decision was made that she was leaving the school

7  as an employee?

8    A.    Yes.

9    Q.    That's a little bit different than what

10  happened to Dr. Johnson?

11    A.    There are a number of ways that administrative

12  leave is utilized.

13    Q.    Do you know of anybody else that was ever, do

14  you know of any other fact situations where anybody

15  else was put on indefinite administrative leave?

16    A.    There have been instances of administrative

17  leave applied when there were issues that need to be

18  looked into to see if there was a basis for

19  disciplinary action.  So if you are not sure and there

20  needs to be a further investigation so that you're not

21  applying disciplinary action without cause, you can

22  institute administrative leave and find out.

23    Q.    Can you give me an example of anybody else who

24  has been put on indefinite administrative leave?

1  employees at the Terry Campus who would be, who would

2  have knowledge and would have had the opportunity to

3  observe Dr. Johnson's behavior and a list was

4  generated of those individuals to be provided to

5  Mr. Williams.

6      Q.    Let me back up for a second.

7            A list of people, who wrote this list?

8      A.    The best that I can remember is that the list

9  was generated by looking at who would have been

10  present at the November 19th meeting, which was the

11  precipitating factor, of course, and then any other,

12  asking the campus director, the acting campus director

13  of any other individuals who would be most likely to

14  have information.

15      Q.    Who wrote the list?

16      A.    I think the list was a compilation of names

17  that I gathered from, as I said, that November 19th

18  meeting from Mr. Simpson and myself.

19      Q.    How did you determine who was at the November

20  19th meeting?

21      A.    That list was provided to me by someone.

22      Q.    So you interviewed everybody that was at the

23  meeting and then you and Mr. Simpson selected other

24  people?

1    A.    That's correct.

2    Q.    And how did you go about selecting the other

3 people?

4    A.    These would have been individuals who would

5 have had the greatest opportunity to interact with or

6 observe Dr. Johnson's behavior.

7    Q.    And why was Mr. Simpson involved in this

8 process?

9    A.    Mr. Simpson was the acting campus director and

10 he knew the individuals at the Terry Campus with whom

11 Dr. Johnson had the most interaction.

12    Q.    Does that list still exist today?

13    A.    I'm sure it does.

14    Q.    Are there working papers concerning the list?

15 Because I have never seen -- I have seen summaries of

16 interviews by some people, but I have never seen what

17 I will call a checklist or anything.

18    A.    I don't know what you have, so I wouldn't be

19 able to --

20    Q.    Okay.  Is there a folder or something that has

21 all of the product of this investigation or running

22 notes or such?

23    A.    I have no product of the investigation.

24    Q.    Okay.

1    investigation.

2        Q.   Were you present during any part of the

3    investigation of Dr. Johnson?

4        A.   I do not think so.

5        Q.   Now, as I understand it, there's two parts,

6    really two phases of the investigation of Dr. Johnson.

7    The first one started out it was going to be into the

8    nature of her conduct or behavior on campus and then

9    the focus changed to supposed alleged financial

10   irregularities.

11              Was the investigation for both phases

12   conducted by Mr. Williams or were those split up in

13   any way?  I'm talking about as far as the interviewing

14   process goes.

15       A.   No.  Mr. Williams was not involved in the

16   financial allegation investigation.  Mr. Williams was

17   involved in the behavioral investigation.

18       Q.   Did he actually conduct any interviews?

19       A.   Mr. Williams?

20       Q.   Yes.

21       A.   Yes.

22              Maybe I'm confused.

23       Q.   I'm not trying to confuse you.

24       A.   You're not confusing me.  I'm confusing myself

1    A.    Yes.

2    Q.    What was your involvement?  I'm not asking you

3    to tell me what counsel said.  Generally, what was

4    your involvement?

5    A.    It was more of a logistical nature in terms of

6    arranging for the interviews with Mr. Williams, the

7    logistics of setting up the process and those kinds of

8    things.

9    Q.    Were you involved in discussion that Mr. ~~Shyer~~ *SHIREY*

10   was not going to be the hearing officer in that

11   process?

12   A.    Well, that is a Dr. George, Mr. Williams,

13   myself type of conversation.

14   Q.    The three of you had a conversation?

15   A.    Yes.

16   Q.    And at some point it was decided that he would

17   not be used and then it was decided to use Judge

18   Bifferato as a hearing officer?

19   A.    Mm-hmm.  That's correct.

20   Q.    Were you aware of any prior relationship that

21   Del Tech had with Judge Bifferato or his law firm?

22   A.    No.

23   Q.    To your knowledge, did Del Tech ever use that

24   firm for legal services?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters
B570

1    Q.    How long have you been in charge of managing

2    legal affairs?

3    A.    Since March of 1988.

4    Q.    And prior to that time the use of outside

5    counsel you would have been aware of all of the

6    outside counsel?

7    A.    Anything that I was involved in, yes.

8    Q.    Are there any other outside counsel that your

9    school used other than Mr. Williams and Mr. Bifferato?

10   A.    I was not aware that we ever used

11   Mr. Bifferato.

12   Q.    You're sure of that?

13   A.    I know Ann Woolfolk's name from when I used to

14   work with the Attorney General's Office occasionally,

15   but I have never seen this case before so I have no

16   idea what it is.

17              MR. ABER:  Can we mark this as Murray

18   Exhibit 1, please?

19              (Murray Deposition Exhibit No. 1 was

20   marked for identification.)

21   BY MR. ABER:

22   Q.    This is a document that your attorney produced

23   to us Bates stamped DTCC2959.

24              Do you recognize this document?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,          )
                                )
    Plaintiff,                  )
                                )
    v.                          ) C.A. No. 05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR., in)
both his official and           )
personal capacities, and   )
DELAWARE TECHNICAL AND          )
COMMUNITY COLLEGE,              )
                                )
    Defendants.                 )

        Deposition of RONALD J. PLEASANTON taken
pursuant to notice at the law offices of Morris James
Hitchens & Williams, LLP, 29 North State Street,
Suite 100, Dover, Delaware, beginning at 11:20 a.m., on
Thursday, May 11, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.


APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware 19801
            for the Plaintiff

        DAVID H. WILLIAMS, ESQUIRE
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware 19801
            for the Defendants


            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com




5

1    A.    MaryWood University in Scranton.  And so I hold

2    an M.F.A. which is a terminal degree in my field.  I have

3    been teaching at Delaware Tech for 10 years.  Actually,

4    it's closer to 12, depending on how they count the

5    adjunct time and so forth.

6        Q.    Your present position at DelTech is what?

7        A.    I am the chairman of the Visual Communications

8    Department.  Visual Communications was split off about

9    five years ago.

10       Q.    Did you ever become aware of the fact that

11   Dr. Johnson in January of 2005 was put on administrative

12   leave?

13       A.    I'm sorry?

14       Q.    Have you been advised in January of 2005 or

15   learned that Dr. Johnson had been put on administrative

16   leave?

17       A.    Yes.

18       Q.    How did you learn that?

19       A.    Just sort of the rumor mill at school that had

20   taken place.  As a matter of fact, I was involved in the

21   opening ceremony, welcome-back reception, that

22   Dr. Johnson holds for the staff when they return for the

23   spring semester.  As a matter of fact, saw her heading to

24   the president's office I guess when that took place as we

6

1  left.  It was a couple days after that I guess we heard.

2      Q.    Were there any rumors as to why she was put on

3  administrative leave?

4      A.    Actually, it was kind of a puzzle to us because

5  I worked fairly closely with her on the gala that year

6  and that was just in October.  So I was kind of surprised

7  to hear it.

8      Q.    Dr. Johnson made you department chair?

9      A.    That is correct.

10     Q.    I guess as department chair you had to work

11  fairly closely with her over the next 10 years or so?

12     A.    I wouldn't say closely because there's a chain

13  of command there where I report mostly to the dean of

14  instruction.

15     Q.    That would have been at one point Dan Simpson?

16     A.    No.  It would have been Sherry Burke,

17  Nancy Magrone, Dan Simpson, and now Connie Spampinato.

18     Q.    Would you agree with me that your experience

19  with Dr. Johnson on the campus, that she was a driving

20  force in the success of that campus?

21     A.    I would agree that she was a force on the

22  campus and that the campus as a whole and everybody

23  including that place grew.

24     Q.    You would not use the term "driving force"?



7

1     A.     I would say she's a driving force.

2     Q.     You would also agree that, during your

3  experience with her while she was on campus, she never

4  directly chastised you or you never had any problems with

5  her, did you?

6     A.     Yes.

7     Q.     That is correct?

8     A.     There is one occasion that I remember where I

9  was directly involved in a sort of chastisement.

10    Q.     Was that an inappropriate method of being

11  chastised?

12    A.     I felt it was particularly harsh for what was

13  going on.

14    Q.     What was the incident?

15    A.     Dr. Houghtaling and I had sort of designed a

16  solution for the distinguished alumni display, and we

17  were supposed to work on that over the summer, and as it

18  happened, the student that was supposed to work on it·

19  ended up with mono, wasn't available to finish it, and so

20  early in the semester, like the first week back, kind of

21· blasted for it not being done and for having promised

22  delivery and not coming through on that delivery.

23         Dr. Burke told me I was wanted in

24  Dr. Johnson's office and escorted me in and warned me

8

1    that it was not -- mostly not about me, that it was about

2    Dr. Houghtaling having a problem, but I was subject to a

3    pretty good berating for not having it done and not

4    having followed through on it.

5             That was the only time that Dr. Johnson

6    directly came at me about that.

7        Q.    It was because the work that should have been

8    done had not been done?

9        A.    That's not how I saw it.

10       Q.    That's how she saw it?

11       A.    I would think that was how she saw it, yes.

12       Q.    Except for that incident, she never directly

13   criticized you or chastised you in the 10 years you were

14   department chair?

15       A.    No, she has never personally done that.

16       Q.    You did some work on this banner in June of

17   2005?

18       A.    No.  I think it was earlier than that.

19       Q.    Excuse me.  I'm sorry.  June of 1999.

20       A.    That sounds about right.

21       Q.    Tell me how it came to be that you were asked

22   to do that work.

23       A.    Dr. Johnson asked me to come over.  We talked

24   about her family reunion thing that she was working on

1  and that she asked if the students and I through the GRID

2  Club would be interested in making a banner for her for

3  that event.  I said that we were.  And at least one and

4  I'm thinking there might have been two students were

5  involved with me, and so we fabricated this banner.

6     We had vinyl material that we put down, the

7  lettering on the banner, the banner itself, and some

8  fabric that we were looking for -- we were actually

9  looking for a kente cloth-type solution and I went and

10 found some and Dr. Johnson went and searched for some

11 more for another additional aspect of that project.  We

12 found that material; made up the banner.  It was a very

13 nice piece.  And we presented it to her in time for her

14 to take to her meeting.

15   Q. You said two students worked on it with you?

16   A. I couldn't identify who they were at the

17 moment, but I would suspect one of them was Tammy Heash

18 because of her involvement with the GRID Club.  The other

19 one I'm not sure of.

20   Q. What is the GRID Club?

21   A. Graphic & Interior Design Students at Delaware

22 Tech.

23   Q. Was working with the banner to some extent a

24 learning experience for the students?



10

1      A.    That's how we approach all the projects that we

2  do.

3      Q.    There came a point in time where Dr. Johnson

4  paid you for that?

5      A.    She was very clear about asking for the

6  receipts and so forth to pay for it.  We provided that

7  and she paid the check to the GRID Club.

8      Q.    Did she at any time ask you to not charge her

9  for any part of that job?

10     A.    No.

11     Q.    Did she at any time suggest that you should,

12  for lack of a better term, lowball the prices?

13     A.    No.

14     Q.    As I gather what she said, it's your impression

15  that she wanted to pay full value for what she got?

16     A.    Yes.

17     Q.    Let me ask you -- I only have one copy, Dave.

18           MR. ABER:  Let's mark it as Pleasanton 1.

19           (Pleasanton Deposition Exhibit No. 1 was

20  marked for identification.)

21  BY MR. ABER:

22     Q.    This is an invoice what has been marked

23  Pleasanton 1.  The first of page of it is the invoice

24  that you gave to Dr. Johnson?

Ronald J. Pleasanton

11

1    A.    Yes.  That would be the invoice.

2    Q.    The second page would be the check which she

3 paid the GRID Club?

4    A.    Yes, I would think so.

5    Q.    Am I correct that the work that you did on this

6 banner, the time, did not interfere with your regular job

7 duties at the school?

8    A.    No.  As the adviser to the GRID Club, I felt it

9 was within the confines of doing that because the money

10 was going to the GRID Club.

11    Q.    But it didn't interfere with your regular work?

12    A.    No, it did not.

13    Q.    Dr. Johnson did not tell you to do this, she

14 asked you to do it?

15    A.    She asked if we would be willing to take it on.

16    Q.    In the time this was being done, you said two

17 students were helping.  Am I correct towards the end of

18 June -- the invoice is dated June 29th, 1999.  Towards

19 the end of June, am I correct around the end of June the

20 number of students on campus is less than during the

21 regular school year?

22    A.    That's correct.

23    Q.    What percentage of people are around compared

24 to, let's say, February/March?



12

1      A.    Five percent maybe.

2      Q.    So staff isn't as busy?

3      A.    That's correct.

4      Q.    Am I correct that in your position, that your

5  department also does other outside work for other

6  organizations --

7      A.    That is correct.

8      Q.    -- that are not on campus?

9      A.    That's correct.

10     Q.    Can you give me some examples?

11     A.    The major example would be the Heart

12  Association.  We do signs and decorations and some of the

13  print materials for the Heart Ball every year.

14     Q.    Do they pay you for that?

15     A.    No, they do not.

16     Q.    You do that for free?

17     A.    Yes.  We're reimbursed for any expenses, but

18  not paid.

19     Q.    Do those expenses go to the college or the GRID

20  Club?

21     A.    They will generally go through me since I

22  expend the money to buy the materials to do the

23  decorations with.

24     Q.    It's out of your own pocket?



1  because I guess they were meeting with the auditors or

2  the accountants, that they had discovered a deposit in

3  the GRID Club account in June of this amount and did that

4  sound like what the banner had cost and so forth.  And I

5  said it did sound familiar.  And I went to my file for

6  the GRID Club deposits, which I hadn't looked in before,

7  and found the actual internal deposit slip to our

8  internal account for the GRID Club in the amount of $245.

9      Q.    You told her it was what?  What did you tell

10  her?

11     A.    As soon as I found it, I took it to her.  They

12  have it, as far as I know.

13     Q.    Did you tell her the same thing about the

14  nature of how Dr. Johnson wanted to pay for the banner?

15     A.    I told Cena as I had told everyone from the

16  get-go that I thought it had been handled correctly and

17  she had been very adamant about making sure that I had

18  all the receipts and we were repaid.

19     Q.    The interview you had with Mr. Dwyer, did you

20  know that he was recording it?

21     A.    No.  Maybe he was.  I don't really recall.

22     Q.    I can tell you for a fact that he did record

23  it, and I have a copy of the transcript.  In that

24  recording you are discussing the Marketing Department and

1    the Marketing Department and how they work in the gala.

2    On the transcript at page 49, line 22, you state:  "We

3    were working the last minute because Marketing had did a

4    lousy job on the book."

5        A.    That's correct.

6        Q.    What did you mean by that?

7        A.    I felt that, as the Marketing Department, they

8    should have been doing more and handled more at a level

9    that I thought was more professional.  And the stuff that

10   the Marking Department presented to Ruby as the book that

11   would be shown, we were called and said this doesn't look

12   like what we want, this is lousy, what can you do.

13            So myself and Dallas Hayes, an adjunct,

14   full-time instructor in my department, and Patty Bishop,

15   who is also a full-time instructor, got very involved and

16   ate up a lot of our time that we would have done the

17   signage and some of the other pieces of the gala for.

18            So we were involved with getting the book

19   saved during a period of time when we really thought we

20   would have time to be working on the signage and the

21   other parts of the thing that we wanted to have done.

22       Q.    Was this the only time that you had had, for

23   lack of a better term I'll call, differences with the

24   Marketing Department or problems --



1    A.    I don't want to call them -- I don't have any

2  personal differences with the Marketing Department.  I

3  just don't have a lot of respect for their ability to

4  deliver at a level that that event needed to be taken to.

5    Q.    What I'm asking is:  In other cases, not that

6  event, in other times which you had had similar-type

7  problems with the Marketing Department.

8    A.    In terms of the quality of some of the work

9  that they have done and their attitude about being asked

10  to help or us being asked to help and then their response

11  back at us, no, I'm not happy with them.  This discussion

12  that we had stemmed from, I think, an area where we felt

13  like we were at the end of the gala, sort of hammered for

14  being late and not having stuff done that should have

15  been done sooner and that this lag time -- because we had

16  to spend time on the book that we had handed them, said

17  okay, we won't do that, Marketing will do that, and we

18  were sort of grilled a little bit about why wasn't this

19  stuff done and that was because we were busy doing the

20  book.

21    Q.    Let me back up for a minute.  When Dr. Johnson

22  was put on administrative leave, how did you learn about

23  that?

24    A.    You asked me the question, but it was just

1    through the grapevine.

2        Q.    Did you ever hear why she was put on

3    administrative leave?

4        A.    I do not recall.  As a matter of fact, it took

5    sometime for us to understand what it was.

6        Q.    As a department chairman, did you attend a

7    meeting on November 19th of 2004 in which Peter Shoudy

8    was the invited speaker about the IT organization?

9        A.    As a department chairman, I haven't missed a

10   department chair meeting in sometime.  So I would imagine

11   I was at that meeting, but I couldn't confirm it.

12       Q.    Do you remember if Dr. Johnson was at that

13   meeting?

14       A.    I remember Mr. Shoudy coming to a meeting and I

15   remember Dr. Johnson being there briefly.

16       Q.    Does your recollection of that meeting indicate

17   any inappropriate conduct by Dr. Johnson during that

18   meeting?

19       A.    I don't recall any inappropriate conduct on

20   anybody's part at that meeting.

21       Q.    If Dr. Johnson --

22       A.    Dr. Johnson is a tough cookie, there's no doubt

23   about that, and she was asking some tough questions of

24   Mr. Shoudy, but I don't think anything was in the way of



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
MARGUERITE A. JOHNSON,          )
                                )
            Plaintiff,          )
                                )   Civil Action No.
v.                              )   05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR.,         )
in both his official and        )
personal capacities, and        )
DELAWARE TECHNICAL AND          )
COMMUNITY COLLEGE,              )
                                )
            Defendants.         )
```

Deposition of KATHLEEN R. POWELL taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street, Dover,
Delaware, beginning at 11:08 a.m., on Tuesday, March 14,
2006, before Patricia L. Shelton, Registered Professional
Reporter and Notary Public.

APPEARANCES:

       GARY W. ABER, ESQ.
       ABER GOLDLUST BAKER & OVER
         702 King Street - Suite 600
         Wilmington, Delaware  19801
         for the Plaintiff

       DAVID H. WILLIAMS, ESQ.
       MORRIS JAMES HITCHENS & WILLIAMS, LLP
         222 Delaware Avenue - 10th Floor
         Wilmington, Delaware  19801
         for the Defendants

ALSO PRESENT:

       MARGUERITE A. JOHNSON

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY

1   had doors that could be closed for privacy?

2       A.   There was one more enclosed office.  And there

3   was one like open area where an alumni coordinator sat.

4   And we always had a little workstation for our part-time

5   person.

6       Q.   The other closed office, who was in there?

7       A.   There's been several people in there.  The last

8   two people there were the resource development officer

9   individuals.

10      Q.   At the time Dr. Johnson left the campus, who was

11  occupying that office, if anybody?

12      A.   Chris McCoy.

13      Q.   And what was her job duties?

14      A.   He was the resource development officer.  Or was

15  it the new girl?

16      Q.   Was it possible at the time that she left the

17  campus in January '05 that office was vacant?

18      A.   Could be.  Could be.  I'm not sure when Chris

19  left and the new one came.

20      Q.   How would you describe Dr. Johnson's working

21  relationship with -- is it Dr. Houghtaling?

22      A.   How would I describe it?

23      Q.   Yes.  Is he Dr. Houghtaling?

24      A.   Yes.



1   Q.   Was that upgrade position put into any budgets?

2   A.   I wouldn't know that either.

3   Q.   What?

4   A.   I wouldn't know that.

5   Q.   I don't know if when Dr. Johnson would do the

6   budgetary process for the Terry Campus, would she help

7   draw up the proposed budgets?

8   A.   Pat did those forms.  I know when we put our

9   budget requests in, she even did my forms for me.   I

10  mean, I might do supply, travel, stuff like that.  But

11  she compiled all that and put it together.

12  Q.   Do you know of any situations where Dr. Johnson

13  ever had to -- I hesitate to use the word criticize, but

14  correct Dr. Houghtaling in any of his -- performance of

15  his job duties?

16  A.   I believe there were times when there was

17  displeasure due to divisions under him, whether it be

18  something output by marketing -- usually it was that more

19  so than anything.  Because his other areas were more like

20  college-wide positions where he was our appointed person.

21  But things that marketing performed.

22  Q.   Was marketing a general problem?

23  A.   I think that there was displeasure sometimes in

24  their output.  You know, whether it be errors and, you



1  know, ads or things of that nature.

2      Q.    Did you see any of these errors made?

3      A.    Sometimes.

4      Q.    And this was not something of Dr. Houghtaling's

5  imagination?  I mean, you saw these errors that happened?

6      A.    I would see or hear, or see things myself if

7  we're looking at it, of things that -- you know, whether

8  it be a typo or whether it be grammatical or things like

9  that.

10     Q.    And who would bring these errors to marketing's

11 attention?

12     A.    Sometimes she would see them and sometimes --

13     Q.    Who's "she"?

14     A.    Dr. Johnson would see them.  We would see them if

15 we're proofing something.

16              We tried to --

17     Q.    Who's "we"?

18     A.    Pat and I.

19              We would like -- everybody would pass

20 around, take a look at this.  See if it looks okay or see

21 if you see anything or something.  So it would be like a

22 proofing line where we would try to catch things before

23 they went final.  Pat was really good at it and

24 Dr. Johnson could see a mistake pretty good.



1    Q.    Did Dr. Houghtaling ever get involved in these

2  discussions about marketing?

3    A.    Discussions as to?

4    Q.    As to any errors they were making.

5    A.    Yes, he would.

6    Q.    How would he handle it?

7    A.    He would try to get it fixed before anything went

8  to final print or anything like that.

9    Q.    Sometimes were these errors discovered after

10  there was final printing?

11    A.    Sometimes.  And I could say sometimes it was the

12  printer's fault.  I can't remember who at the time was

13  doing it.  Dover Post pops into my head.  Whoever was

14  printing at the time.  Because we contracted that out.

15  And we'd find things after the fact that weren't on our

16  blue line.  And then all of a sudden, our final would

17  come out and it would have an error that we didn't send.

18    Q.    Were there any other matters that Dr. Johnson and

19  Dr. Houghtaling had disagreements over or concerns

20  expressed between the two?

21    A.    Not that I can think of right now.

22    Q.    Was there ever a time when there was an issue

23  about Dr. Houghtaling's relationship with any of the

24  students?



1      A.   It was probably like -- it wasn't like any

2   specific day.  It was over a span of maybe a month or so

3   or more.  Because the office was painted.  So it was as

4   things came across, I guess, and said, "Oh, that's hers."

5      Q.   So it took a month to get the second packing

6   completed?

7      A.   Yeah.  It was just putting things aside, you

8   know, into a box that really were personal.

9      Q.   I guess this leads me to another subject.  You

10  said the office got painted.  Why was it painted?

11     A.   Because it was moved around, rearranged.  I'm not

12  sure if they painted it or just moved stuff around.  I'm

13  trying to think.

14          Just getting it ready for a new occupant.  I

15  think any time there was ever a turnover, they do that.

16  I don't know.  I mean change of office ownership.

17     Q.   This new occupant was who?

18     A.   Mr. Simpson.

19     Q.   And when he moved into that office, what was his

20  job title?

21     A.   Maybe acting assistant.

22     Q.   So he didn't know if it was going to be

23  permanent, did he?

24     A.   No, not at the time.



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    campus, was there any correspondence that came in

2    addressed to her?

3         A.    Stuff for like memberships and, you know, stuff

4    like that.    Nothing of a personal nature.

5         Q.    I'm sorry?

6         A.    Nothing of a personal nature.

7         Q.    Well, memberships are personal to her, aren't

8    they?

9         A.    But they were like college memberships, like

10   Central Delaware Economic Development.    They're college.

11   They're not...

12        Q.    Did you tell her about any of this

13   correspondence?

14        A.    I just renewed.    I continued to renew them with

15   the college.

16        Q.    So in the six months after she left the campus,

17   there was no mail addressed to her in her individual

18   capacity, as opposed to the school?

19        A.    No.

20        Q.    Any e-mails addressed to her during that period

21   of time?

22        A.    I didn't check that.

23        Q.    Who checked her e-mails?

24        A.    After she left?



1    Q.    Yes.

2    A.    Nobody, I guess.

3    Q.    Did they just go into an empty computer?

4    A.    I don't know.  That wasn't part of my job

5    anymore, I guess, at that time.

6    Q.    Did Mr. Simpson in any way direct you as to what

7    documents to pack in the second packing?

8    A.    No.

9    Q.    And how were the -- let's say the first packing

10   documents.  How did those leave the office?  Did

11   Dr. Johnson carry them out herself?

12   A.    I believe her husband came to the college and

13   helped.

14   Q.    Did you help her carry the boxes out to her car?

15   A.    I don't think I carried anything out to the car,

16   no.

17   Q.    So it was just she and her husband that carried

18   the boxes out to her car?

19   A.    I believe so.

20   Q.    Do you know if an inventory was taken of those

21   first boxes in the first packing?

22   A.    No.  No.

23   Q.    Did you take any notice of what was in those

24   boxes?



1   A.   After the announcement was made that he would be

2   coming over.   After --

3   Q.   I'm sorry.   Speak up a little bit.

4   A.   After it was announced by Dr. George that he

5   would be filling in in an acting capacity over at the

6   Terry Campus.   And then he came in the room after that

7   announcement.   It was like a two-minute meeting.

8   Q.   Well, the EDGE announcement that I had shown you

9   a minute ago says, "Effective January 4th, Dr. Johnson is

10  on administrative leave."   Then the next paragraph says,

11  "As a result, Dan Simpson, vice president of academic

12  affairs, has been appointed acting assistant campus

13  director."

14  A.   Right.   Acting whatever.

15  Q.   That's the next day.

16  A.   Right.

17  Q.   So this meeting with the administrators and

18  Dr. George must have happened on January 4th?

19  A.   Had to.   Because that came out after.

20  Q.   And is it your recollection that Dr. Simpson did

21  not attend the meeting with George and the other

22  administrators?

23  A.   He came in after.   Like he announced it and then

24  he came in.   You know what I mean?

1           MR. ABER:  No. 1.

2                (Powell Deposition Exhibit No. 1 was marked

3      for identification.)

4      BY MR. ABER:

5         Q.   What's been marked as Powell 1, do you recognize

6      that document?

7         A.   Yes.

8         Q.   Is that the invoice that you prepared for the

9      family reunion materials?

10        A.   Yes.

11        Q.   Why did you prepare this?

12        A.   Because I was told to.

13        Q.   By whom?

14        A.   Dr. Johnson.

15        Q.   What precisely did she tell you?

16        A.   To create an invoice for some of the stuff -- or,

17     for the stuff we were doing at the time.

18        Q.   When she said "create," did she mean make

19     something up?

20                MR. WILLIAMS:  I object as to form.

21     BY MR. ABER:

22        Q.   Well, I want to understand what you meant by

23     "create."

24        A.   Just to make an invoice.



1    Q.    When Dr. Johnson asked you to put together the

2    invoice marked Powell 1, did she tell you what to include

3    and what not to include in it?

4    A.    I don't remember.

5    Q.    Do you remember her telling you to exclude

6    anything?

7    A.    No.  I don't remember that either.

8    Q.    She asked you to create an invoice to do what?

9    A.    I guess to pay for some of the items that were

10   being created.  But there was never a tracking mechanism

11   in place to begin with.

12   Q.    I understand that.  But she told you to create an

13   invoice.  And did she tell you to include just some of

14   the items as opposed to all of the items or just include

15   the items that were produced on campus?

16   A.    I don't think there was any specific criteria.

17   Q.    She just asked you to create an invoice?

18   A.    Yes.

19   Q.    And when you created the invoice, did she ask you

20   to reduce the amount that the invoice came out at?

21   A.    No.  I don't think she was -- there was nothing

22   specific like that.

23   Q.    Did she pay for the invoice?

24   A.    Yes.  I believe so.

69

1    Q.   Did she do it without question?

2    A.   Yes.

3    Q.   And I believe you had previously testified there

4  was no attempt by her to get you to low-ball the amount

5  of the invoice, was there?

6    A.   No.  She never specifically told me to do that.

7         MR. ABER:  Mark this one.

8         (Powell Deposition Exhibit No. 6 was marked

9  for identification.)

10  BY MR. ABER:

11    Q.   I'm showing you what has been marked Powell 6.

12  Do you recognize that?

13    A.   No.

14    Q.   Did you ever see that as part of the reunion

15  materials?

16    A.   I -- no.

17         MR. ABER:  Seven.

18         (Powell Deposition Exhibit No. 7 was marked

19  for identification.)

20  BY MR. ABER:

21    Q.   Let me show you what's been marked Powell 7.

22  Now, I'll tell you this is not the same, because the real

23  one was in color.

24    A.   Right.

1  finished or if we had questions or that we didn't even

2  have anything to back it up with, we didn't finish them.

3  There was a few that we just didn't finish.

4       Q.   You just put them aside and forgot about them?

5       A.   Well, it got to the point where I guess it was

6  deemed Cena was being nitpicking.  And when we -- it

7  became an awkward situation.

8       Q.   Did Dr. Johnson ever object to having to give

9  appropriate information to do these reconciliations?

10      A.   I don't think "object" would be the appropriate

11  word.  I think when Cena would start wanting things as

12  detailed and concise -- just the way Cena did things,

13  that if things didn't get done textbook or something, she

14  would -- it would just not -- I don't know how to

15  describe it.  I don't know how to describe it.

16      Q.   Did Dr. Johnson ever refuse to give information

17  that was needed to do these type of reconciliations?

18      A.   No.

19           (Powell Deposition Exhibit No. 9 was marked

20  for identification.)

21  BY MR. ABER:

22      Q.   Let me hand you a series of documents which have

23  been marked Powell 9.  The top of which is a PNC credit

24  card statement.  Turn to the second and third page.



1     A.    Mm-hmm.

2     Q.    Do you recognize the -- not the charge card, but

3  the handwritten receipts that are on the second and third

4  page?  And I mean the ones that are numbered 383607 and

5  383611.

6     A.    This one was found (indicating) --

7     Q.    Let's start again.  "This one" doesn't help.

8     A.    I'm sorry.  383607 --

9     Q.    On page 0377.

10    A.    -- was found in a folder when the auditing people

11  were here.

12    Q.    Where was that folder?

13    A.    It might have been a travel folder.

14    Q.    Where physically was that folder?

15    A.    In a lateral file.

16    Q.    Where was the lateral file?

17    A.    In the campus director's office.

18    Q.    In with other travel documents?

19    A.    Probably.

20    Q.    Did it look like there was any attempt to hide

21  the document?

22    A.    No.

23    Q.    The second page, the one dated 383611, do you

24  know where that one was located?



1    A.    Actually this one (indicating) was the one I

2    found in the travel folder.  This one (indicating) was

3    found by somebody else.

4    Q.    383611 on page 0378 was found in the travel

5    folder?

6    A.    Right.

7    Q.    And the one numbered 383607 on page 0377, where

8    was that one found?

9    A.    When they were auditing.  I think this was in a

10   state -- when the state auditors -- or, I'm not sure who

11   they were.  They were some kind of auditors who were

12   going through.

13   Q.    But do you know where it was physically located?

14   A.    No, I do not.

15   Q.    Was it found in your office or your desk?

16   A.    I don't know where it came from.

17   Q.    I mean, one day someone showed it to you; they

18   didn't tell you where it was found?

19   A.    Yeah.  "Have you ever seen this?"  And I said,

20   "No."

21   Q.    The credit card slips on both pages, pages 0377

22   and 0378, do you know where those were located?

23   A.    I'm sorry?

24   Q.    Do you know where those credit card receipts were



1    Q.    And did she have her credit card with her to make

2    those purchases?

3    A.    I don't know.

4    Q.    Do you recall her calling you from West Virginia

5    and asking you for the credit card number so she could

6    make these purchases?

7    A.    I don't know.  There were times when I did relay

8    the credit card number over the phone, because for some

9    reason or another she didn't have it with her, at a

10    different conference or something.  But I don't recall

11    specifically these particular exact purchases.

12    Q.    So it was not an uncommon practice for her to

13    call you up and ask for the credit card number?

14    A.    I would say that it didn't happen all the time,

15    no.  And if it did, it was very rare.  Because normally

16    she did have it.

17    Q.    But there were times when she didn't have it and

18    she would call you?

19    A.    If she had to.  I can recall doing that like

20    once, though.

21    Q.    One time?

22    A.    Yeah.

23    Q.    Would that have been the West Virginia trip?

24    A.    I don't know.  I don't know when that was or what

84

1    Q.    The little print where it says "Dr. J"?

2    A.    Up here (indicating)?

3    Q.    No.

4    A.    That's mine.

5    Q.    Where it says "Dr. J, 150."

6    A.    That's mine.  That would have been her

7    registration.

8    Q.    And what's that say under where it says "Dr. J"?

9    A.    Instruction, instruction, instruction.

10         Obviously there was a bunch of instruction

11   individuals that went on this conference.  So I was

12   probably marking where to code off different

13   registration.  This was like the registration for the

14   conference.  So I was probably just making notes so that

15   I knew where to put off what registrations to what

16   division.

17   Q.    So this document would have come to you.  And

18   Cena would have put certain entries on them.  And you

19   would have put other entries on this document?

20   A.    Yes.

21   Q.    And this was the October 28th, 2002 statement.

22   There were two things that said "need receipts."  Did you

23   give this statement to Dr. Johnson saying you needed

24   those receipts?

85

1    A.    I don't know.

2    Q.    Do you have any recollection of doing that?

3    A.    No.  I might have asked, verbally asked.

4    Q.    Do you have any recollection of asking?

5    A.    Well, I would have asked if I didn't have a

6    receipt for it.

7    Q.    And what did Dr. Johnson tell you?

8    A.    I don't know.

9    Q.    As you sit here today, do you have a precise

10   recollection of saying to Dr. Johnson we need these two

11   receipts from October 4th and 6th?

12   A.    I always asked for receipts.

13   Q.    Did you show her this document?

14   A.    I don't know.  I mean, she --

15   Q.    Let me help you for a minute.  What I'm trying to

16   determine is if you have a precise recollection of this

17   conversation or --

18   A.    No, I don't have a precise recollection.  No, I

19   do not.

20   Q.    Your statement that you asked for it is based

21   upon your usual custom and practice of asking for them?

22   A.    Normal procedure, yeah.

23   Q.    Do you have recollection of Dr. Johnson refusing

24   to give you receipts?



1     A.    No.

2     Q.    Do you have any recollection of Dr. Johnson

3   saying Go away.  Don't bother me.  I'm not going to deal

4   with this or anything like that?

5     A.    She never told me to go away or not to bother

6   her.  But if Cena was being particular, she wouldn't be

7   very happy about it, as far as her feeling of Cena

8   nitpicking her travel.

9     Q.    Did she say Cena was acting inappropriately in

10   asking for these receipts?  I'm talking about the ones on

11   this Powell 9.

12     A.    In this particular -- no.  I can't be precise as

13   to when and when she wasn't being too picky.

14     Q.    Let me understand.  Do you understand what

15   happens to these after the accounting department deals

16   with them, where they go next?

17     A.    I don't know if they go anywhere.  I don't know

18   if they're sent across the street or not.

19     Q.    After Dr. Johnson left the campus, do you know if

20   there was any other investigation of her credit card use

21   other than these two West Virginia transactions?

22     A.    If there was any auditing of any of the other PNC

23   charges?

24     Q.    Yes.

1    A.    I don't know if -- there were folders -- or, all

2    the accounting folders, I guess, were given to

3    individuals.  So I don't know what PNC statements they

4    looked at and which ones they didn't.

5              MR. ABER:  10, please.

6              (Powell Deposition Exhibit No. 10 was marked

7    for identification.)

8    BY MR. ABER:

9    Q.    Let me show you two documents which have jointly

10   been marked as Powell 10.  Do you recognize those

11   documents?

12   A.    I don't know if I was shared copies -- given

13   copies of these or not.

14   Q.    Would it be the normal practice that you would be

15   given copies of these e-mails concerning reconciliations

16   that needed to be done?

17   A.    I don't know.  I don't see myself cc'd on them.

18   I might have been.

19   Q.    Even if they weren't sent to you e-mail, would

20   somebody maybe give you a copy?

21   A.    No.  I mean, I don't know if I got a copy of

22   these or not.  I mean, I'm aware of the ones that weren't

23   reconciled.

24   Q.    These events concerning the West Virginia



1    transactions occurred in October 2002.  Dr. Johnson left

2    the campus in January of 2005, a little over two years

3    later.

4                During those two years, did anybody other

5    than the initial inquiry attempt to do anything else to

6    reconcile those two charges in West Virginia?

7        A.    I don't think so.  I mean, not that I know of.

8        Q.    Did anybody come to you and ask for further

9    explanation?

10       A.    After -- within that two-year time?  No, I don't

11   think so.

12       Q.    And it was a normal part of your job duty to

13   review these reconciliations or travel expenses and

14   charge card receipts?

15       A.    Yes, it was.  That was part of my regular duties.

16               MR. ABER:  I need to take a break for a

17   second.

18               (A short recess was taken.)

19               MR. ABER:  Mark that.

20               (Powell Deposition Exhibit No. 11 was marked

21   for identification.)

22   BY MR. ABER:

23       Q.    I'm going to give you a copy of a document that's

24   been marked Powell 11 and ask you if you recognize that



1    Powell 11?

2         A.    Right.

3         Q.    So some time in March of 2005, you were asked to

4    go back and recreate leave time of Dr. Johnson?

5         A.    That would be my guess, yes.

6         Q.    Take a look at what has been marked as Powell 13,

7    if you would.

8         A.    Yes.

9         Q.    Now, turn to the second page, if you would, of

10   that document.

11        A.    Okay.

12        Q.    And counting up from the bottom, there's a

13   document -- the ninth up from the bottom, there's a

14   document dated April 8th, 2005.  Can you tell me what

15   that document is?

16        A.    On the second page?

17        Q.    Yeah.  Where the arrow is.

18        A.    Is that the Edward Reed thing?

19        Q.    It looks like it, yes.

20               Do you know what that is?

21        A.    Oh, okay.  No, I couldn't tell you right off the

22   top of my head.  But I would think -- Edward Reed?

23               I'm not sure what that is.

24        Q.    On the next page, if you would, the fifth entry



1    down for January 7, 2005, it says "Hayward."

2        A.    Mm-hmm.

3        Q.    Do you have any idea what that is?

4        A.    No, I don't.

5        Q.    Now, that would have been ones Dr. Simpson had

6    taken over as acting director, correct?

7        A.    Actually if it was a file that was opened, it's

8    resaved from a different version.

9        Q.    How can you tell that?

10       A.    You can't.  But I'm saying that's a possibility.

11             It will resave because it's been upgraded to

12   a different version.  Because looking at this, there's

13   like from '98, '99.  And if it was an old file that was

14   opened, it would be prompt to be saved because it was a

15   different version of Microsoft.  So it could be opened

16   and redated because -- you know what I'm saying?

17             I mean, I don't know what this Hayward is,

18   to tell you the truth, or -- what's the other one?  The

19   one further down, I guess, that's dated in March of '05.

20       Q.    Turn, if you would, to the fourth page.

21       A.    Yes.

22       Q.    And the fifth one from the bottom, March 11th of

23   2005.

24       A.    "Recommendation DVFA."

99

1    Q.   It says "WagnerBud."

2    A.   Oh, I'm sorry.

3    Q.   Fourth page.

4    A.   I see it.

5    Q.   Do you have any idea what that is?

6    A.   He did -- you know, all I know is that he's one

7  of our representative's husbands.

8    Q.   One of your representatives, you mean state

9  legislature?

10   A.   Yeah.  What is she Nancy Wagner?  It's her

11  husband's name maybe.

12   Q.   Do you know why that would be in the CD disk

13  representing Dr. Johnson's correspondence?

14   A.   No.  No, I don't, unless I were to go back and

15  look at the actual documents.

16   Q.   Now, when you were working for Dr. Johnson, how

17  many years did you work for her?

18   A.   Five and a half.

19   Q.   And during that time, you testified earlier that

20  you did some personal correspondence for her.

21   A.   Right.

22   Q.   How many times a month would you write a personal

23  letter for her?  Do you have any idea?

24   A.   I never kept count or anything.  I just did

103

1    Q.    But checking account statements have a portion on

2    them where you balance them to make sure --

3    A.    I never use that.  I don't use it on my own.

4    Q.    In the personal correspondence that you did for

5    Dr. Johnson, was any of it what I call repeat

6    correspondence?

7              There was some testimony that you made up

8    invoices for her sister's care and --

9    A.    Right.  I saw that in here.

10             Yes.

11   Q.    Was that an original document each time or did

12   you use the same form, just fill in different numbers?

13   A.    I would bring up the same form and just put in

14   new numbers or different numbers if need be.

15   Q.    So that was a fairly repetitious task?

16   A.    Once it was created, yes.

17   Q.    Did you ever have to run errands for Dr. Johnson?

18   A.    Sometimes.

19   Q.    Where?

20   A.    Like are you talking about of a personal nature?

21   Q.    Yeah.  I mean, did she say go down and buy --

22   pick up a dress for me, something at the mall or such?

23   A.    Yes.

24   Q.    She actually did that, told you to go --



104

 1    A.    No.  Not a dress, no.

 2    Q.    What kind of personal errands did she ask you to

 3  do?

 4    A.    Sometimes I dropped stuff off at her sister's,

 5  just a couple time, maybe two or three times at her

 6  sister's when her sister was down in Felton in the Felton

 7  home.  Or, I dropped off payment at like Penney's, a

 8  bill.

 9    Q.    Where do you live?

10    A.    I live in Felton.

11    Q.    So if you were going home, you might drop

12  something off for her sister?

13    A.    Yeah.  It was past -- further down, so...  Where

14  her sister was.

15    Q.    Did you consider that an inconvenience?

16    A.    I think if it bothered me too much I would have

17  probably just said I couldn't do it.

18    Q.    Did you ever have to do anything personal for

19  anybody else at the Del Tech campus?

20    A.    Like other co-workers and stuff?

21    Q.    Other administrators.

22    A.    No.

23    Q.    Do you ever remember an instance where someone

24  from the president's office told you to pick up lunch for

1    the president?

2        A.    Oh, yeah.   Well, I've -- like meet halfway, you

3    know.   Meet in the parking lot, bring lunch.

4        Q.    Whose lunch were you delivering?

5        A.    There's been -- like once or twice a year and

6    some years not at all, Jan would ask me to place an order

7    and then maybe meet her halfway in the parking lot.

8        Q.    Was that her sandwich or Dr. George's sandwich?

9        A.    She was probably getting it for Dr. George.

10       Q.    Was that normal for Dr. George to go outside his

11   office to get other people on campus to assist him?

12       A.    He didn't personally do it; his secretary did.

13       Q.    As I understand it, there are four campuses at

14   Del Tech?

15       A.    Right.

16       Q.    And they are semi-autonomous; in other words,

17   each campus works independently of the other campuses?

18       A.    Right.

19       Q.    And Dr. George's office happens to be on the

20   Terry Campus?

21       A.    Right.

22       Q.    But he doesn't actually get involved in running

23   the Terry campus --

24       A.    Right.



WILCOX & FETZER LTD.
Registered Professional Reporters

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,           )
                                 )
            Plaintiff,           )
                                 )   Civil Action No.
v.                               )    05-157 (KAJ)
                                 )
ORLANDO J. GEORGE, JR.,          )
in both his official and         )
personal capacities, and         )
DELAWARE TECHNICAL AND           )
COMMUNITY COLLEGE,               )
                                 )
            Defendants.          )

            Deposition of NANCY J. ROCKEY taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street, Dover,
Delaware, beginning at 1:42 p.m. on Friday, May 12, 2006,
before Patricia L. Shelton, Registered Professional
Reporter and Notary Public.

APPEARANCES:

         GARY W. ABER, ESQ.
         ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware  19801
            for the Plaintiff

         JAMES H. McMACKIN, ESQ.
         MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19801
            for the Defendants

ALSO PRESENT:

         MARGUERITE A. JOHNSON


              WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477

Johnson
Nancy J. Rockey    Case 1:05-cv-00157-MPT    Document 17-3    Filed 07/20/2006    Page 64 of 100
C.A. # 05-157 (KAJ)
George, et al.
May 12, 2006

Page 11

1    them were just supporters of Mr. Dabson.  Not that they

2    had anything -- I don't know if it was anything personal.

3    They just did not want anyone else to get that position.

4        Q.    And during the time that you remained

5    Dr. Johnson's secretary, which would have been about

6    another, you said, four or five years, did that attitude

7    continue during that period of time?

8        A.    Yes, sir.  Yes, sir, it did.

9        Q.    Did you see any lessening of that attitude of not

10   wanting her there while you were her secretary?

11       A.    I think that it did for some people.  Dr.

12   Johnson, I think, earned the respect of some of the

13   people on the campus once they saw what she was doing.

14       Q.    And the attitude of other people stayed the same?

15       A.    Yes, sir.

16       Q.    When she arrived on campus or became campus

17   director, were there any fiscal problems with the campus?

18       A.    I understood there was, yes, that the campus was

19   in great fiscal problems.

20       Q.    How did she go about trying to solve that

21   problem?

22       A.    Reviewed all of the financial records and had

23   others that, you know, had expert knowledge of those

24   things review them to see what the status was or, you

1    know, what condition the fiscal situation was in.

2       Q.   You were working with her in that endeavor as her

3    secretary?

4       A.   Yes, sir.

5              MR. McMACKIN:  I object to relevance on the

6    line of questioning about the fiscal condition of the

7    college.

8              MR. ABER:  Just so you understand, you can

9    ignore what he says unless somebody tells you not to

10   answer.

11             MR. McMACKIN:  You can answer even though I

12   objected.  I'm sorry.  I should have said that.

13             MR. ABER:  That's all right.

14             THE WITNESS:  I just thought I had to be

15   quiet after that.

16             MR. ABER:  No.  This is not like a

17   courtroom.  Either party --

18             THE WITNESS:  You have to excuse me because

19   I'm nervous to be here to begin with.

20             MR. ABER:  There's no reason why you should

21   be nervous.  This is not like a courtroom.  While I'm

22   asking questions, he may object.  When he asks questions,

23   I might object.  But there's no judge here to rule.

4              THE WITNESS:  Okay.

Johnson
Nancy J. Rockey    Case 1:05-cv-00157-MPT    Document 17-3    Filed 07/20/2006    Page 66 of 100
C.A. # 05-157 (KAJ)                                      George, et al.
                                                         May 12, 2006

Page 15

1    people for the way they did their job?  You know, in

2    other words, try and change the way they were doing it or

3    alter it?

4         A.   Dr. Johnson is very up front.  If she would see

5    someone acting, you know, inappropriately or what she

6    felt was inappropriately, she would tell them.  She's

7    just that, in my opinion, kind of person.  She's, you

8    know, just very up front with people.

9         Q.   Did she ever do it in a -- you know, yell or

10   scream at somebody or try to, as I said, embarrass them

11   when she did that from what you saw?

12        A.   Like I said, not in front of me.  And she did not

13   do that to me.

14        Q.   Now, while you were working for Dr. Johnson, did

15   she ever ask you to perform any personal tasks for her,

16   do any personal typing or such?

17        A.   No.  We were too busy doing just our jobs.

18        Q.   During your 21 years at the Del Tech campus, I

19   guess you got to know many other secretaries there while

20   you were working there, didn't you?

21        A.   Yes, sir.

22        Q.   During your years at the Del Tech campus, did you

23   ever know administrators near the level of Dr. Johnson or

'4   deans to ask their secretaries to do any personal work,

Johnson
Nancy J. Rockey
Case 1:05-cv-00157-MPT    Document 177-3    Filed 07/20/2006    Page 67 of 100
C.A. # 05-157 (KAJ)
George, et al.
May 12, 2006

Page 16

```
 1    like type a personal letter, run a personal errand, that
 2    kind of thing?
 3        A.    I was asked to do that for previous employers.
 4        Q.    I'll get to that in a minute.
 5        A.    Now, my mind went off somewhere.
 6        Q.    Did you know other secretaries to be asked to do
 7    personal work?
 8        A.    Yes, sir.  Yes.
 9        Q.    What type of personal work would administrators
10    ask other secretaries to do that you witnessed?
11        A.    Some administrators were working on their
12    dissertations or executive position papers for a
13    doctorate degree and their secretaries would do typing.
14    They would -- that's about the main thing.  Or, maybe
15    type papers for someone who was pursuing -- you know,
16    taking classes.
17        Q.    Now, you started to mention what you had been
18    asked to do personally.  Had you ever been asked to do
19    noncollege-related work, personal work for any executives
20    you worked for?
21        A.    Yes, sir.
22        Q.    Who asked you to do that type of work?
23        A.    Do I have to say?
`4        Q.    Understand, you are protected.
```

Johnson
Nancy J. Rockey

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 68 of 100

C.A. # 05-157 (KAJ)

George, et al.
May 12, 2006

Page 17

1                    MR. ABER:  You'll agree that --

2                    MR. McMACKIN:  There's a confidentiality

3    stipulation in place, right?

4                    MR. ABER:  Yes.  If we mention another

5    employee, let's put that part under seal.

6                    MR. McMACKIN:  That's fine.

7                    MR. ABER:  That means nobody outside this

8    litigation would know about it.

9                    THE WITNESS:  Okay.  I feel more comfortable

10   with that.

11                   MR. ABER:  Okay.  That's something I should

12   have done anyway.

13                   (Whereupon, page 18 was deemed confidential

14   and placed under seal.)

15

16                            -   -   -   -   -

17

18

19

20

21

22

23

24

Johnson
Nancy J. Rockey

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 69 of 100

C.A. # 05-157 (KAJ)

George, et al.
May 12, 2006

1    BY MR. ABER:

2        Q.    Who was that?

3        A.    I would do things for Dr. ~~~~ . Dr.

4    Murray.    **REDACTED**

5        Q.    What type of things did you do for her?

6        A.    Pick up her laundry.

7        Q.    Anything else?

8        A.    Type papers for her doctorate degree.

9        Q.    Anything else?

10       A.    Type letters.

11       Q.    Personal letters?

12       A.    Yes, occasionally.

13       Q.    Anything else?

14       A.    It was mainly things for her classes.

15       Q.    That she taught at campus or taught off campus?

16       A.    No.   Classes that she was taking at the

17    University of Delaware for her doctorate.

18       Q.    Oh, for her classes?

19       A.    Yes, sir.    **REDACTED**

20       Q.    I understood Dr.        also teaches at, I think,

21    Wilmington College, off campus?

22       A.    She may.   I'm not aware of that.

23       Q.    But you didn't do any work for that?

4        A.    No, sir.

Page 19

1        Q.    During the time you worked at Del Tech in what I

2    call administrative support functions, was there any

3    announced prohibition against secretaries doing personal

4    work for the administrators for whom they work?

5        A.    Not that I'm aware of.

6        Q.    If I were to ask you to describe the school's

7    attitude towards administrators asking secretaries to do

8    some personal work, what would you describe that attitude

9    as?

10              MR. McMACKIN:  Can you repeat that for me,

11    please?

12              Or, could you read it back?

13              MR. ABER:  I'll repeat the question.

14    BY MR. ABER:

15        Q.    While you worked there, you said you had seen

16    other secretaries do personal work and you had done some.

17    What was the general attitude around Del Tech as to the

18    propriety of secretaries doing small personal tasks for

19    the administrators for whom they worked?

20              MR. McMACKIN:  Objection.

21        A.    I never thought anything about it myself.  I

22    didn't mind doing those things.

23        Q.    Did those things interfere with your day-to-day

`4    job duties for Del Tech?

Johnson Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 71 of 100
Nancy J. Rockey                        C.A. # 05-157 (KAJ)                    George, et al.
                                                                             May 12, 2006

Page 20

1      A.    Not really, no.  I just worked them in, sometimes

2  while I was out for my lunch or...

3      Q.    Did anybody else ever complain about the personal

4  work they had to do for the administrators they were

5  working for?

6      A.    Not that I'm aware of, no.

7      Q.    But you realized from time to time these other

8  secretaries were being asked to do personal work for the

9  administration for whom they were assigned?

10     A.    I was aware of that.

11     Q.    Now, when did you first become aware of

12 Dr. Johnson having been put on administrative leave?

13     A.    The day of our inservice.

14     Q.    The first day back in January?

15     A.    First day back in January, we attended inservice

16 in the morning.  And the next day, I found out

17 Dr. Johnson was gone.  Her office was empty.  And I

18 didn't know anything.  The employees -- we didn't know

19 what had happened.  We were like...  We didn't know what

20 had happened.

21     Q.    Did you ever learn what had happened?

22     A.    I did days later.  It was quite awhile before the

23 word was -- got out that she had left.

24     Q.    First of all, what did you learn about the reason

Johnson   Case 1:05-cv-00157-MPT   Document 117-3   Filed 07/20/2006   Page 72 of 100
Nancy J. Rockey                    C.A. # 05-157 (KAJ)                George, et al.
                                                                      May 12, 2006

Page 33

1   Q.   That is my question, correct.

2        Did anybody ever tell you that she yelled,

3   that Dr. Johnson yelled at them?

4   A.   I heard rumors of that, yes.  I didn't witness it

5   myself.  But, like I said, her voice would elevate when

6   she became upset or excited.  So I don't know -- since I

7   wasn't there, I couldn't say whether it was yelling or

8   just her regular tone of voice.

9   Q.   Did anybody ever tell you that she berated them?

10  A.   No.

11       MR. McMACKIN:  I have no other questions.

12  BY MR. ABER:

13  Q.   One question.

14       While you worked there, did you ever witness

15  or know of any...  Of the nature of the relationship

16  Dr. Johnson had with the marketing department?

17  A.   No.  I don't understand the question.

18  Q.   That was an obscure way to put it.

19       Did she have any difficulties or problems

20  with the marketing department?

21  A.   She had a lot of problems with the marketing

22  department from the very beginning in that the

23  publications would be sent down to her and I would -- we

4   would proof them.  And there was always lots of mistakes;

Johnson
Nancy J. Rockey

Case 1:05-cv-00157-MPT    Document 147-3    Filed 07/20/2006    Page 73 of 100

C.A. # 05-157 (KAJ)

George, et al.
May 12, 2006

Page 34

1    I mean, grammatical errors and punctuation errors and...

2            So she would correct them and send them

3    back.  And then they'd come back down for final approval

4    again and there would still be mistakes in them.  So

5    there was -- if I remember correctly, there were problems

6    in getting things done in a timely manner.  Things like

7    that I remember.

8    Q.    Did this create tension between her office and

9    the marketing department, personnel of the marketing

10   department?

11   A.    The -- yes.  Yes.

12           Because the person that was doing it was an

13   English instructor.  And we couldn't understand why the

14   things she was creating had so many errors in it when she

15   was actually teaching English part time.  So that was a

16   difficult thing to deal with on a day-to-day basis.  It

17   became frustrating.

18   Q.    Did that continue right along until you left

19   working for Dr. Johnson?

20   A.    Yes, sir.

21   Q.    Did anybody in the marketing department ever

22   complain to you about Dr. Johnson?

23   A.    Yes, sir.

4    Q.    How did they view her?

Johnson
Nancy J. Rockey

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 74 of 100

George, et al.
C.A. # 05-157 (KAJ)
May 12, 2006

Page 35

```
 1      A.    Picky, particular --

 2      Q.    Did you ever --

 3      A.    -- slave driver.  I don't know.

 4      Q.    Any of the comments or criticisms she ever made

 5   of the marketing department's work -- you said that you

 6   would proofread them first and you would see some of the

 7   errors.  Did you ever find any of her criticisms or

 8   comments about the marketing department to be

 9   inappropriate or unfounded?

10      A.    No, sir.  They were justified.

11      Q.    Have you ever heard any rumors concerning

12   Mr. Simpson being abusive?

13      A.    Yes.

14            MR. McMACKIN:  Asked and answered.

15            MR. ABER:  What?

16            MR. McMACKIN:  Didn't you ask that?

17            MR. ABER:  I don't think, no.  I said just

18   to her.

19   BY MR. ABER:

20      Q.    What kind of rumors did you hear?

21      A.    That he -- this is the truth.  I have to say it.

22   He flies off.  Like we had an awards ceremony when he was

23   department chair for criminal justice.  And the ladies

24   who organized and prepared for the ceremony ordered
```

Johnson
Nancy J. Rockey

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 75 of 100
George, et al.
C.A. # 05-157 (KAJ)
May 12, 2006

Page 36

1    plaques for his students.  And he didn't like them.  And

2    he totally went off on them.  And he said his students

3    deserve better than that.  And he made the ladies feel

4    very bad.

5        Q.    I wasn't asking for specific examples.  I'm

6    asking -- let me rephrase it.

7              Are you familiar with Mr. Simpson's

8    reputation on campus as to whether or not he can be

9    abusive?

10             MR. McMACKIN:  I'm going to object on

11   relevance to the line of questioning regarding

12   Mr. Simpson.

13       A.    There are rumors on campus.

14       Q.    My question is, are you familiar with that

15   reputation?

16       A.    Yes, sir, I am.

17       Q.    Now the next question -- it's just the formal way

18   I have to ask them.

19       A.    Oh, okay.

20       Q.    The next question is, what is that reputation?

21       A.    That he goes off.  That he gets upset and...

22       Q.    Is that generally well-known on the campus?

23       A.    It is now, yes, sir.

4        Q.    You say "now."  What do you mean?

Johnson
Peter D. Shoudy

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 76 of 100

C.A. # 05-157 (KAJ)

George, et al.
February 15, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                    )
                                          )
                Plaintiff,                )
                                          )   Civil Action
        vs.                               )   No. 05-157 (KAJ)
                                          )
ORLANDO J. GEORGE, JR., in both           )
his official and personal capacities,     )
and DELAWARE TECHNICAL AND COMMUNITY      )
COLLEGE,                                  )
                                          )
                Defendants                )

              Deposition of PETER D. SHOUDY taken pursuant
to notice at the law offices of Morris, James, Hitchens &
Williams, 29 N. State Street, Dover, Delaware, beginning at
1:35 p.m. on Wednesday, February 15, 2006, before Allen S.
Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER, GOLDLUST, BAKER & OVER
        702 King Street, Suite 600
        Wilmington, DE 19801

                For - Plaintiff

        DAVID H. WILLIAMS, ESQUIRE
        MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
        222 Delaware Avenue, 10th Floor
        Wilmington, DE 19801

                For - Defendants

ALSO PRESENT:

        MARGUERITE A. JOHNSON

                WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801

                (302) 655-0477

Johnson
Peter D. Shoudy

Case 1:05-cv-00157-MPT    Document 117-3    Filed 07/20/2006    Page 77 of 100
C.A. # 05-157 (KAJ)

George, et al.
February 15, 2006

Page 27

1   been prepared by Celeste Schwartz that outlined what were

2   strengths and weaknesses college-wide at each of the

3   campuses.  I certainly talked to my boss.

4           But in answer to your question, I talked to the

5   campus directors as well as a number of other people.

6   Q    So that means you did, to answer my question, you

7   did talk to Dr. Johnson about the quality of the Kent campus

8   IT operations?

9   A    And other people on the Terry campus as well.  Yes,

10  I did.

11  Q    Did any of those other people express concerns about

12  the Kent County operation?

13  A    As I said, there were concerns expressed on each

14  campus about different areas.

15  Q    What were the concerns that were expressed by the

16  members of Dr. Johnson's administrative council about the IT

17  operation?

18  A    I think there were two major areas.  One was

19  certainly in the area of customer service.  The

20  responsiveness of the organization, how quickly they would

21  do particular tasks.  You know, nobody wants to wait.  And

22  so they felt that it was taking too long to get certain

23  pieces of work done, certain requests.  We call them work

24  orders, if you will.  There was some concern about that.

Page 56

1    the meeting with not -- not with that spirit.  And this was

2    a note from John Buckley to reaffirm that he thought we were

3    doing a good job and that they were very supportive.  And so

4    this was to Dan saying basically there were other people

5    that were there for the same reason as I thought that I was

6    there.

7        Q    The other people had concerns about public service,

8    correct?

9        A    Customer service, correct.

10       Q    Customer service.  Excuse me.

11            And that's a legitimate thing to be concerned

12   about, isn't it?

13       A    Absolutely.

14       Q    You just didn't expect that to be a subject of

15   conversation when you went to the meeting?

16       A    Well, the people that were -- one, the invitees in

17   the meeting that I was invited to, which was the department

18   chairs.  The department chairs, again, from what I recall,

19   the image that was left in my mind, did not ask questions or

20   did not pursue a line of inquiry that was critical of

21   customer service.  They asked questions how were you going

22   to address issues in the future.  Different than --

23       Q    That's a legitimate question, isn't it?

4        A    Sure.  That's what I said.  And that is -- how is

Johnson
Peter D. Cheely :05-cv-00157-MPT    Document #05-137 (KAJ) Filed 07/20/2006    Page 79 of 100
v.                                                                George, et al.
February 15, 2006

Page 58

1    A    I think that is a Kathy Riley and she is

2    Dr. Spampinato's secretary.

3    Q    Okay.  And she sent a notice about the departmental

4    chair meeting and that you were going to be there out to all

5    the deans and directors?

6    A    Yes.  It appears that she did.  Um-hmm.

7    Q    Did you know that that had been done then?

8    A    No.  As you can see, my name is not on the

9    distribution of this e-mail.

10   Q    I didn't know if you were told or not.

11        All right.  So when you came to the meeting,

12   it's your testimony that you did not think customer service

13   was going to be discussed?

14   A    I expected the questions to be about the

15   reorganization and how we would be providing service in the

16   future, yes.

17   Q    Did you come thinking that there might be questions

18   about customer service?

19   A    Oh, I certainly did.  I certainly did.

20   Q    And that's a legitimate thing for people who

21   attended the meeting, either as department chairs or as

22   invited people, to be concerned about?

23   A    I think that that's a fair statement, yes.

24   Q    Okay.  Kathy Powell.  She is now you said works in

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,               )
                                     )
          Plaintiff,                 )
                                     )     Civil Action
v.                                   )     No. 05-157(KAJ)
                                     )
ORLANDO J. GEORGE, JR.,              )
in both his official and personal    )
capacities, and DELAWARE             )
TECHNICAL AND COMMUNITY              )
COLLEGE,                             )
                                     )
          Defendants.                )

          Deposition of DANIEL L. SIMPSON taken
pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 11:05 a.m., on
Monday, April 3, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          GARY W. ABER, ESQ.
          ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware  19801
            For the Plaintiff

          DAVID H. WILLIAMS, ESQ.
          MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19801
            For the Defendants

ALSO PRESENT:
          MARGUERITE A. JOHNSON
          BRIAN D. SHIVEY, ESQ., CHIEF LEGAL COUNSEL -
          DELAWARE TECHNICAL & COMMUNITY COLLEGE

                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

1    Q.    You would agree that if your work hadn't been

2    satisfactory you would not have gotten the bonus?

3    A.    I don't know that much about how the bonus

4    process works.  I'm the wrong guy to ask that question

5    to because I didn't know I was getting a bonus until I

6    got it.

7    Q.    You never got any bonuses as vice president for

8    academic affairs?

9    A.    No.  This was my first one ever because I was

10    only the vice president of academic affairs for part

11    of the year and then I was over in the campus for part

12    of the year, so I had two duties during the course of

13    that year which would be a bonus year, I guess.

14    Q.    As dean of instruction you never got a bonus?

15    A.    No.

16    Q.    When you were a police officer were part of

17    your duties interrogating individuals?

18    A.    Sure.

19    Q.    And you were trained in that process?

20    A.    I was at one time.

21    Q.    How many years did you spend interrogating

22    people?

23    A.    Geez, I like to refer to it as interviews.

24    Q.    It depends on which side of the table you're



1    on.

2        A.    That's right.  Let's see.  How many years did I

3    do that?

4                I didn't it as many as most cops because I

5    spent five years in the academy.  Probably in some

6    capacity or another maybe ten years in the early

7    tenure of my career.

8        Q.    What are the theories and processes of you call

9    it interviews, I call it interrogation?  Were you

10   taught certain theories of how to go about that?

11       A.    Yeah, we were then.  And I don't think it's

12   anywhere the same now.  I think it's more science now

13   than it was when -- I go back to 1967 and in 1967

14   there was very little science involved.

15               Now they talk about psychology and

16   verbal --

17       Q.    What were you taught there?  What process were

18   you taught to use?

19       A.    To take, to ask questions, to change the

20   question, change the question and look for the same

21   outcomes, try to find people, trick people or trip

22   them up on what they're saying and the usual kind of

23   thing, whatever they taught in 1967.

24       Q.    That's what I am trying to find out.



1    Q.   What do you mean by "long after"?

2    A.   That meeting was on the 19th of November, if

3 you're talking about the one with Peter Shoudy and the

4 department chairs, and then the telephone conference

5 call we had with ad hoc which was that afternoon, that

6 was on the 19th.  That was a Friday.

7    Q.   Wait a second.  You mean the ad hoc committee,

8 what I call the vice presidents --

9    A.   Vice presidents, I understand, yes.

10    Q.   It was on the afternoon before the meeting or

11 the day after the meeting?

12    A.   No. It was the same day.  The meeting, the

13 meeting that Peter Shoudy attended on the Terry Campus

14 was in the morning.  In the afternoon there was an ad

15 hoc telephone conference call.  So actually in my mind

16 there're two meetings.

17    Q.   Did you discuss the meeting with Dr. Johnson

18 during the ad hoc meeting?

19    A.   No.  There was reference to it because when we

20 were talking about --

21    Q.   We will get to it in a minute.  I'm just asking

22 a simple question.

23          Did you discuss --

24    A.   In terms of discussion, no.



1    Q.    When was the first time you discussed the

2    events of that meeting with Dr. George?

3    A.    Not probably until sometime in December

4    because, I know that because the meeting was on the

5    19th and that night or the early morning on the 20th I

6    was admitted to the hospital and I was in the hospital

7    until I got out for Thanksgiving.

8              And then the day after Thanksgiving was a

9    holiday.  The following week I was in and out of the

10   office.  I don't recall having any conversations with

11   Dr. George at all until one of the full days that I

12   came back to work and that would have been sometime in

13   December, earlier part of December.

14   Q.    What was the nature of that discussion?

15   A.    Well, I went into his office and it started out

16   with him asking me about my health and how I was doing

17   and so forth and should I be there for full days and

18   so forth.

19             And then the conversation shifted to

20   generally how are things going and where are we

21   getting, the DIET reorganization, which is the IT

22   people problem, and how that was going?  And I told

23   him then that there were still issues; that even

24   though everybody on ad hoc had voted to move ahead

Daniel Simpson

1    Q.    Who was?

2    A.    Connie Spampinato.  And when Peter told me what

3    happened, he told me --

4    Q.    Wait a second.  You said you first --

5    A.    You asked me who.

6    Q.    You said Spampinato.

7    A.    I'm getting to who.

8    Q.    I want them in chronological order.

9    A.    All right. I don't know.  I would have to think

10    about it, what the chronology was.  I don't know if I

11    can give you a chronology.  I can tell you who they

12    were.

13    Q.    Who was the first person you talked to?

14    A.    Probably Peter.  I'm sure it was Peter.

15    Q.    Right after the meeting?

16    A.    Yeah.

17    Q.    The same day?

18    A.    Yes.

19    Q.    What did he tell you?

20    A.    He told me that he went over to address the

21    department chairs on the campus like he had done the

22    other campuses to tell them about the reorganization

23    and what the plans were and so forth and that

24    Dr. Johnson and some other administrative people were

1    there at the meeting.  And he used the word ambush,

2    that it was like an ambush, that he felt that what

3    should have been a positive thing he had to struggle

4    to keep it on a positive note because the questions

5    and the comments from Dr. Johnson became very

6    negative.

7              And my concern was and my questions to him

8    were based on what were her questions about?  What

9    were her comments about?  Because I know Dr. Johnson.

10   I worked for her.

11             And he told me that basically they were

12   comments about and questions that would lead somebody

13   to believe that Dr. Johnson was completely unfamiliar

14   with the reorganization and at what was taking place

15   there and her focus was also on one position with Dan

16   Siok, who was at the Terry Campus.  That's what made

17   me feel that that was inappropriate because as a vice

18   president she doesn't have to get that kind of

19   information at a meeting with department chairs, that

20   that's what ad hoc does and that's what president's

21   council does.

22             So I thought that regardless of what her

23   comments were or how they would be accurately or

24   inaccurately interpreted by somebody who didn't really



1    know her, the forum was not appropriate.  None of that

2    should have been discussed openly because the people

3    came out of that meeting and the department chairs,

4    and I'll get to who those department chairs were as

5    part of your first question, expressed some concerns

6    about the way that Peter was treated as a new person

7    and also doubts about how the administrators within

8    the college had their act together as far as this DIET

9    reorganization was concerned.

10              So whether -- I can't tell you about the

11   appropriateness of her comments or anything.  I just

12   think whatever she said there if there was questioning

13   about it, it probably should have been questioned

14   somewhere else.

15   Q.    Were you informed by Mr. Shoudy that some of

16   the comments dealt with the quality or nature of the

17   services performed by the IT department?

18   A.    Maybe.  I don't remember that.

19   Q.    Would that be a legitimate area of concern by

20   the administrators, that they weren't getting the

21   service that they should?

22   A.    Sure.  Sure.  The whole purpose of bringing

23   Peter Shoudy aboard and the DIET reorganization was

24   really to resolve those issues.  The college



Daniel L. Simpson                      61

1    historically never had anybody with Peter Shoudy's

2    background, so that was exactly what he was supposed

3    to do.

4        Q.    So if administrators had concerns about the

5    quality of the servcie that they were getting, it

6    would not have been inappropriate to ask Mr. Shoudy

7    about those problems, would it?

8        A.    Yes.   Under those circumstances, Mr. Aber, I

9    think it would have been.

10       Q.    Even by the department chairs?

11       A.    Oh, no.   The department chairs would have been

12   fine because that's what that was for.   But my only

13   issue with it was -- it certainly wasn't with

14   anybody's questions or any question that wanted to be

15   asked.   My issue was that was not the right place to

16   do it.

17       Q.    There have been other people who have attended

18   that meeting who did not feel that Dr. Johnson's

19   comments were antagonistic or inappropriate. Are they

20   liars?

21       A.    No.   I didn't say her, I didn't say her

22   comments were inappropriate.   I'm only saying to you

23   that what I thought was whatever she did to question

24   the reorganization was inappropriate at that place.   I



Daniel L. Simpson

1    A.    Yeah.   Probably.   But I can't remember who it

2    was.

3    Q.    Did you call doctor, I guess it's

4    Dr. Spampinato, or did she call you?

5    A.    No.   I think I called her and she wasn't

6    available and she called me back.   And I called her to

7    ask her what happened at the meeting.

8    Q.    Did you evidence any upsetness with her?

9    A.    Yes.   Actually, I did.   Actually, I evidenced

10   being upset with her and then apologized to her

11   because I understood that she probably wasn't in

12   control of that meeting after Dr. Johnson arrived.

13   Q.    And then after you spoke with Dr. Spampinato

14   and Mr. Buckley, did you ever contact Dr. Johnson and

15   ask for an explanation?

16   A.    No.   We had the ad hoc conversation.   That was

17   the only conversation I had with her and then, again,

18   I was in the hospital and at home.

19   Q.    Well, when did these calls come from Buckley

20   and --

21   A.    The same day, between the two meetings.

22   Q.    And what was discussed during the ad hoc

23   meeting?

24   A.    You know, there was --

Daniel L. Simpson

 1    the meeting, but I do recall him saying, "I heard,

 2    yes, I know, I heard." So he had some knowledge.  It

 3    appeared to me he had some knowledge of it before he

 4    talked to me.

 5        Q.   Did you discuss what was said or done in any

 6    more detail?

 7        A.   Yes.

 8        Q.   What else did you discuss with him?

 9        A.   Basically what I just told you.  I told him I

10    talked with Peter.  I told him I talked to Connie

11    Spampinato and then I told him about the ad hoc

12    conversation, the general air and tone of the ad hoc

13    conversation was not positive.

14        Q.   By Dr. Johnson?

15        A.   Yes.

16        Q.   Let me give you a copy of what has been marked

17    previously as George Exhibit No. 2.  Have you ever

18    seen this letter before?

19        A.   No.

20        Q.   I'm sorry?

21        A.   No.

22        Q.   Did you ever suggest to Dr. George that

23    Dr. Johnson's behavior was subversive?

24        A.   Yes.  I may have done that because that's a

Daniel J. Simpson

1      other corner.

2          Q.   So it's just a matter of a few steps for one of

3      you to go in the other office?

4          A.   Physically a few steps, yes.  But there's a lot

5      more to getting into Dr. George's office than a few

6      steps.

7          Q.   You mean you just can't stick your head in

8      and --

9          A.   No.  When he's there his door is closed and

10     he's working away and you have to schedule time to get

11     in there.

12              Now, sometimes he would pop his head in as

13     he's walking by and say how are you doing or

14     something.

15         Q.   Prior to Dr. Johnson being placed on

16     administrative leave, did you have any discussion with

17     anybody concerning assuming her position?

18         A.   No.  No.  Mm-mm.

19         Q.   First of all, how did you learn that she was

20     placed on administrative leave?

21         A.   On January 3rd when we came back to work I

22     actually saw Dr. Johnson and was speaking to her about

23     my health issues.  She told me she had some health

24     issues, that they thought she had a heart attack.



1      Then I went down to a meeting in my office

2   and I had one meeting and then I had another meeting

3   that was immediately after that and during that

4   meeting Dr. George interrupted the meeting on the

5   intercom and asked me to come to his office.  And I

6   went in and that's when he told me he wanted me to go

7   across the street to the Terry Campus and assume the

8   responsibilities of acting assistant campus director,

9   that Dr. Johnson was on administrative leave.

10      My response to him was "Is she okay?  Is

11   she sick?  She told me they thought she had a heart

12   attack."  And he said, "No, no, she's not sick."

13   Q.   Did he tell you why she was on administrative

14   leave?

15   A.   No.  No.  He said she was on administrative

16   leave.  I didn't ask him any questions.  I figured if

17   he wanted to tell me something he would.  He looked,

18   frankly, like a very troubled man, like he just did

19   something that he really felt bad about doing.

20   Q.   During your first meeting with the Terry Campus

21   administrators what did you tell them about your

22   assuming the position?

23   A.   I told -- actually, I didn't have to tell them

24   a whole lot because they knew that Dr. Johnson was on



1    A.    No.    That was generally it, that she mistreated

2    him and --

3    Q.    Who else came over?

4    A.    Debbie Poore came in.    She works over in the

5    admission section.    She came in.    She told me what a

6    change it was; that Dr. Johnson had contributed to a

7    negative air on the campus.    There were others.

8    Q.    Anybody else?

9    A.    I don't want this to sound like I'm trying to

10   be a smart aleck or anything, Mr. Aber, but you asked

11   me the question and probably most of the people on the

12   campus made some comment or another.

13   Q.    And they just all approached you on their own?

14   A.    Mm-hmm.

15        MR. ABER:    Would you mark that as the next

16   exhibit, please?

17        (Simpson Deposition Exhibit No. 2 was

18   marked for identification.)

19   BY MR. ABER:

20   Q.    I've handed you a series of documents.    I ask

21   you if you recognize these.

22   A.    (Reviewing document)    These look like, this

23   looks like a response that I think I did this and sent

24   it to McNesby.

**W&F**

1    Q.    So you prepared these four pages?

2    A.    Yeah.  I think I did.  I think this was mine.

3    Q.    When did you prepare those pages?

4    A.    I don't know.  It would have been in January,

5    January or early February or something I would guess,

6    probably.

7    Q.    Why did you prepare those papers?

8    A.    I think this was done so that I could respond

9    to McNesby on what was, what were the issues there.  I

10   think this might have been before, this might have

11   been before -- I can't say for sure -- Santora

12   Baffone, but it was when McNesby first started asking

13   questions about it.

14   Q.    Was his inquiry --

15   A.    I think this was McNesby.  It doesn't say, but

16   I did this.  I remember this.

17   Q.    What is the number of the exhibit down there?

18   A.    Here (indicating).

19   Q.    Thank you.

20         Did Mr. McNesby ask you for something in

21   writing or was this a verbal request?

22   A.    I don't know.  I think this went to McNesby.

23   It might have even been to Mr. Williams.  I'm not

24   positive.  But somebody asked --



1    Q.    I'm going to assume it wasn't to Mr. Williams

2    since he produced it to me.

3    A.    I don't know.  All right.  Maybe it was

4    McNesby, I guess.

5    Q.    Was McNesby's request in writing?

6    A.    No.  I think everything I get from McNesby --

7    sometimes it's e-mail but usually it's a telephone

8    conversation.

9    Q.    So this was a response to a verbal request?

10    A.    It's a request from somebody.  I assume it's

11    McNesby.

12    Q.    What was the nature of the request?

13    A.    This appears to be what, this appears to be

14    consistent with what Cena, Cena Sweeney and Bob Hearn

15    produced.

16    Q.    Let's go through the page Bates stamped

17    DTCC0036.  This is called Dr. Johnson's Travel (1).

18    This seems to be applying to some trip other than the

19    Wake College trip, which is the subject I believe of

20    Travel (2).

21         When you wrote there is no indication of

22    prior approval by Dr. George of any of Dr. Johnson's

23    trips, were you aware of any custom or practice at the

24    Del Tech College that vice presidents didn't need

1    approval?

2       A.    No.  I think they do.  I do.

3       Q.    Did you ever discuss that issue with Mr. Hearn?

4       A.    Did I discuss whether or not vice presidents

5    need approval?

6       Q.    Yes.

7       A.    I don't recall discussing that with him.

8       Q.    The forms that were used for approval of trips,

9    was there a place on them for Dr. George's approval?

10      A.    You know, Mr. Aber, I have seen two different,

11   two different kinds of forms.  Some have a spot for

12   approval and some don't.  And I don't remember whether

13   these were -- the only one I remember seeing anything

14   on was -- I would have to read this to refresh my

15   memory.  But there was one that was around the time

16   that, I think maybe December or November, but anyway,

17   just before Dr. Johnson went on administrative leave

18   where Dr. George wrote across it denied or not

19   approved or something like that.

20      Q.    Other than that form, have you ever seen one

21   that required Dr. George's approval for vice

22   presidential travel?

23      A.    Did I see one that required that?

24      Q.    Yes.



1    a conversation, I have had conversations with her but,

2    no, I didn't interview her.  She was my secretary.

3        Q.    Turn to the next page.  After the first

4    paragraph there's a sentence above the first bullet

5    mark, read that sentence.

6        A.    Which one are you on now?

7        Q.    I'm on Dr. Johnson Resources (1).

8        A.    Which one?

9        Q.    Excuse me.

10        A.    I don't think these are in the same sequence as

11    yours.

12               MR. ABER:  Can I see yours for a minute,

13    Dave?

14               There's something wrong here.

15    BY MR. ABER:

16        Q.    Yours are out of order.

17        A.    Yes. I was having trouble following you when

18    you were going through that.

19        Q.    Turn to the one labeled Bates stamp DTCC0047

20    labeled Dr. Johnson's Resources (1).  That's your top

21    page.

22        A.    This one, okay.

23        Q.    After the first full paragraph, read the next

24    sentence.

1    A.    "Interviews with Kathy Powell and Marketing

2    Department staff revealed the following."

3    Q.    Here you write you did interview Kathy Powell.

4    A.    Well, unfortunately that's my police kind of

5    structure for writing most anything.  Conversations

6    would be probably a civilian word.

7    Q.    You also write that you interviewed the

8    marketing department?

9    A.    Yes.

10    Q.    Why did you interview the marketing department?

11    A.    Because there was the issue concerning the

12    family reunion.

13    Q.    Who brought that issue up?

14    A.    Kathy Powell and Cena.

15    Q.    What did she suggest to you?

16    A.    Well, let me back up a little bit and give you

17    the full details on this.

18    Q.    No.  Answer my question, please.

19         Did she suggest issues with the family

20    reunion?

21    A.    Yes.  Yes.

22    Q.    When did she do that?

23    A.    She did it in response to a question from me.

24    Q.    What was that question?



1    that just went to Dr. Johnson.  I didn't want to be

2    involved in it.

3        Q.    Was that the end of it?

4        A.    No.  Because those issues came up.

5        Q.    When did they come up?

6        A.    They came up during the Santora Baffone audit.

7    They came up with the state auditors.  So I repeated

8    just like I am here today to them what I knew about

9    that.

10       Q.    When did you interview the marketing people?

11       A.    I talked to the marketing people -- I don't

12   know.  Sometime in January, I guess.

13       Q.    Why did you talk to the marketing people?

14       A.    I talked to the marketing people --

15       Q.    Why did you interview them as you wrote here?

16       A.    I talked to the marketing people because the

17   issue had come up about the extent of the resources on

18   that campus that were utilized for that family

19   reunion.

20       Q.    And how did that issue come up?

21       A.    That issue came up with Cena, with Bob and with

22   Kathy Powell.

23       Q.    What did Kathy Powell, how did it come up with

24   Kathy Powell?

1    basically were the results of the investigation that

2    you conducted as a result of Mr. McNesby's inquiry?

3      A.    They were as a result of an inquiry, yes, and I

4    think they went to Mr. McNesby, yes.

5      Q.    So Mr. McNesby made a request to you to try to

6    find out some information.  You conducted an

7    investigation and then prepared these and returned

8    them to him?

9      A.    Right.

10              MR. WILLIAMS:  Mr. Aber, is it your

11    handwriting on DTCC0371?

12              MR. ABER:  Yes.  On the lower right that

13    is my handwriting.  You got the wrong copy.

14    BY MR. ABER:

15      Q.    Did you discuss Dr. Johnson at any time with

16    any person who was not a Del Tech employee concerning

17    this January-February time frame?

18      A.    Yes.  My wife.

19      Q.    Anybody else?

20      A.    No.  I don't think so.

21      Q.    Did your wife have any need to know that

22    information?

23      A.    Yeah.  My wife knew Dr. Johnson.

24      Q.    I mean for business purposes, did she have any



**WILCOX & FETZER LTD.**
Registered Professional Reporters