Daniel F. Simpson

1    So I went through those to determine what

2    was college related and what was not.

3    Q.    Is that where her travel folders were kept?

4    A.    No.  Kathy -- there were some folders in there

5    that were related to trips and organizations that she

6    belonged to.  But officially the travel folders were

7    kept in Cena Sweeney's office and then Kathy Powell

8    had the redundant files.  She had backup files in her

9    office.

10    So what Dr. Johnson had in that office

11    were items that were related to the trip but probably

12    wouldn't -- maybe her personal receipts or copies of

13    receipts or something, not the official files.

14    Q.    Now, you moved into her office how soon after

15    she was put on administrative leave?

16    A.    I moved into the office that Dr. Johnson had

17    been in I think the day after because I saw her on the

18    3rd day of January and then Dr. George told me she was

19    on administrative leave and told me to go to the

20    campus the next day.

21    Q.    Were there any other vacant offices in that

22    same suite that you could have used instead of her

23    office?

24    A.    Yeah.  There was one next door, but Dr. George



1    told me to go over there and assume the role of campus

2    director and to occupy that office and to park my car

3    in that parking space so people on that campus will

4    know that there was leadership there.

5        Q.    When did you first move out any of

6    Dr. Johnson's furniture?

7        A.    I don't remember exactly when that was.

8        Q.    In January?

9        A.    Probably in January, yeah.

10       Q.    When did you have the office painted?

11       A.    Months later.  I don't remember when that was.

12       Q.    So it wouldn't have been until March sometime?

13       A.    I don't remember when that was.  That was

14   after.  That was later on.  We took the --

15       Q.    I'm not asking for a precise date.  I'm trying

16   to get a framework.  You said the end of January.

17       A.    Let me try to think when that was.  That could

18   have been March.

19       Q.    Could it have been February?

20       A.    It could have been April.  No, I don't think it

21   was February.

22       Q.    When did you take down the mirrors that were in

23   the office?

24       A.    At the same time as the painting was done.  The

1    concerning any of this conduct?

2    A.    No.    I don't remember any conversations with

3    her.

4    Q.    Did you have any conversations with Dr. George

5    concerning these issues, the issues of her wrongful

6    conduct?

7    A.    No.    No.

8    Q.    Now, Hope Murray has testified that you and she

9    prepared a list of people to be interviewed by David

10   Dwyer.    Is that correct?

11   A.    I don't know if we prepared a list.    There were

12   some questions -- yeah, I guess you could say that.

13   There were questions like consistent with what's in

14   here (indicating), who they should talk to.    Yes, I

15   gave her those names.    Then I think we actually tried

16   to schedule those meetings.

17   Q.    Was there ever a written list?

18   A.    I think there was an e-mail.    I think it was an

19   e-mail.    I don't remember whether it was a written

20   list or not.    It was similar to -- I think it was the

21   same list actually that was prepared for Mr. Williams.

22   Q.    Say that again.

23   A.    I think it was the same list, same process that

24   was prepared for Mr. Williams when I was asked to --

1   who was supposed to told that they were going to be

2   interviewed.  And how that happened, I don't remember.

3      Q.   Was the purpose of the interview strictly

4   regarding the alleged misconduct of Dr. Johnson or

5   were the interviews to deal with her behavior?

6      A.   I have no idea.  I didn't sit in on the

7   interviews.

8      Q.   As you drew up the list, when you and Hope

9   Murray drew up a list of people to be interviewed --

10     A.   Again, I don't recall drawing up a list.  I

11  recall discussing names with her and she drew up a

12  list and then -- maybe she did.  I don't know.  But

13  those names that I discussed with her were the names

14  of the people that would have been related to this

15  activity (indicating).  I don't know of any other

16  behavior things.

17     Q.   As you suggested names, were the names that you

18  suggested just the ones that would support the

19  allegations of misconduct against Dr. Johnson?

20     A.   I'm sure that's the case.  I don't clearly even

21  remember the conversation.

22     Q.   Were any of the names suggested dealing with

23  her behavior on campus?

24     A.   Other than as it related to that?  No, I don't

1  think so.

2     Q.   Was there any attempt at any time to suggest in

3  drawing up this list -- you knew this was going to be

4  the basis of Mr. Dwyer's interviews, didn't you?

5     A.   I don't know that I knew that initially but at

6  some point I knew that, yes.

7     Q.   Was there any thought of having him interview

8  anybody that might have something positive to say

9  about Dr. Johnson?

10    A.   I don't know.  I just supplied those names.  I

11 don't know.  I didn't orchestrate that.

12    Q.   As you suggested names, did you give any

13 thought to supplying names of somebody who might have

14 something positive to say about Dr. Johnson?

15    A.   No, I didn't.  I don't know where I would have

16 found that person.

17    Q.   You mean you don't think anybody on Del Tech

18 campus would say anything positive about her?

19    A.   I really didn't want to go through the building

20 asking is there anybody who can say anything positive

21 about Dr. Johnson?

22    Q.   You couldn't think of anybody who would say

23 anything positive?

24    A.   Oh, I could have said positive things about



1    her.

2       Q.    When you were interviewed by Mr. Dwyer did you

3    say anything positive?

4       A.    I probably did.  I'm sure I did.  I'm

5    absolutely sure I did.  I said we have had positive,

6    productive encounters.

7       Q.    Just so we're clear, when this list was

8    discussed or drawn up there was no consideration to

9    Dr. Johnson's side of the facts, was there?

10      A.    I don't know.  All I know is I just gave names.

11           If you're asking me if I gave names that

12   would support her as a good leader or something, no, I

13   did not.

14      Q.    Did you give any names that might have

15   different versions than what is reflected in Simpson

16   2?

17      A.    No.  It wasn't my role.  All I wanted to do is

18   give them this and then they were going to

19   investigate.  Then they should do the investigation.

20      Q.    Who was going to do the investigation?

21      A.    I guess the auditors, Santora Baffone.

22      Q.    They weren't doing an audit, were they?

23      A.    I don't know what they were doing.  They came

24   in and asked a lot of questions.



WILCOX & FETZER LTD.
Registered Professional Reporters

1      Q.    Did Dr. Spampinato have any role in drawing up

2   the people to be interviewed?

3      A.    No.  I don't think so.  I think she probably --

4   she might have had some role in notifying people.

5      Q.    To your knowledge, Hope Murray had no

6   involvement in selecting the people to be interviewed?

7      A.    I don't know if that's true or not.  I just

8   know what I supplied.  I don't know everybody that was

9   interviewed, Mr. Aber.  I have no idea.

10      Q.    Do you know if Mr. Williams had any involvement

11   in choosing people to be interviewed?

12      A.    I don't know that either, no.

13      Q.    Do you know where the interviews took place?

14      A.    No.  I think they were over in the president's

15   office.  They weren't on the campus.  We purposely

16   didn't want them on the campus.

17      Q.    So you were interviewed in the president's

18   office?

19      A.    In the president's office building in what is

20   like a little miniconference room I think is where I

21   talked to Mr. Williams.

22      Q.    The other testimony that I had so far in this

23   case by other witnesses is it occurred in Dr. George's

24   actual office.



Daniel L. Simpson

```
 1        Q.   Do you know where they are now?

 2        A.   I'm the wrong person to ask questions like

 3   that, frankly.  But I'm sure they're stuck wherever

 4   data gets stuck in the computer system.  I'm sure

 5   they're on some data bank or something.

 6        Q.   Did you have the opportunity to review a draft

 7   of Mr. Dwyer's report before it was issued in final

 8   form?

 9        A.   I don't think so.  The state auditor's report I

10   remember seeing a draft.

11        Q.   I'm talking about Dwyer.

12        A.   I don't think so, no.

13        Q.   Who suggested forwarding Mr. Dwyer's report to

14   the state auditor?

15        A.   I have no idea.

16        Q.   Did you suggest that?

17        A.   I wouldn't have suggested that.  That would

18   have been McNesby, I'm sure.  He handles that kind of

19   stuff.

20        Q.   Did you have any involvement with the state

21   auditor at any time?

22        A.   Oh, yeah.  They were in there doing the audit,

23   yeah.

24        Q.   The state auditor came over?
```

1      A.    It would have been Jerry McNesby, Bob Hearn,

2    who was the business manager then.  I think maybe

3    Mr. Shivey may even have been there.

4      Q.    When the auditors' report came out, do you know

5    who decided to send it to the media?

6      A.    No.

7      Q.    Do you have any formal training in diagnosing

8    or recognizing mental illnesses?

9      A.    No.  Well, yes.  I suppose I do.

10     Q.    Where?

11     A.    That was part of the police training, to

12   identify people emotionally disturbed.

13     Q.    Were you trained to recognize one type of

14   mental illness from another?

15     A.    No.

16     Q.    Let me turn your attention to the West Virginia

17   trip.

18           Kathy Powell stated that she found one of

19   the receipts at issue in the travel folder that she

20   maintained.  Do you know where the other receipt was

21   found?

22     A.    You mean the invoice things themselves?

23     Q.    Yes.

24     A.    They would have been I suppose in Cena's



Daniel L. Simpson

1    folder.   I guess they were in that folder that Cena

2    had.   That is one of the reasons why it was necessary

3    to locate what Kathy Powell had and what Cena had to

4    make sure that every piece was accounted for.

5        Q.    Was there any evidence that Dr. Johnson had

6    tried to hide these receipts someplace?

7        A.    They were actually -- no.  No.  No.  No, of

8    course not.

9        Q.    Cena Sweeney testified at the termination

10   hearing that you had showed her the second receipt.

11   Where did you get the second receipt?

12       A.    That was probably the one that came from Kathy

13   Powell, I would imagine.

14       Q.    That would have been in her travel folder that

15   she maintained?

16       A.    (The witness nodded).

17       Q.    Now, the issue of I'll refer to them as the

18   sambo books that were purchased in West Virginia.

19   Now, you testified at the termination hearing you

20   never discussed those books with anybody on campus

21   until these proceedings started?

22       A.    I don't think I testified to that, did I?

23   Because I think I recall your asking me that question

24   and then I responded that I checked to see if they

ATTACH TO DEPOSITION OF: *Daniel L. Simpson*

DATE TAKEN: *April 3, 2006*

IN THE MATTER OF: *Johnson v George, Jr.*

## ERRATA SHEET

<u>INSTRUCTIONS</u>:  After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet.  <u>**Do not make any marks or notations on the transcript itself.**</u>  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address indicated below.  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|---------------------------------|
| 121 | 23 | See attached |
| 123 | 18-24 | "         " |
| 126 | 9 | "         " |
| 147 148 | 16-16 | "         " |
| 150 | 2 | "         " |
| 164 | 3 | "         " |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: **5/1/06**         *Daniel L Simpson*
                         (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
             1330 King Street
             Wilmington, DE  19801

B659

Attachment to Deposition April 3, 2006
Daniel L. Simpson

**Page 121, Line 23**
Q. Have you ever referred to Dr. Johnson as being anti-Christian?
A. Anti-Christian? No.

Change:
After considering this question, it is possible that I have referred to Dr. Johnson as anti-Christian. My response was "no" and I explained that her behavior appeared anti-Christian. Based on the incidents cited in the deposition and others that now come to mind, it is possible that I referred to her as anti-Christian.

**Page 123, Line18 thru 24**
Q. Have you ever referred to her as Manic?
Q. have you ever described her as paranoid?
A. No

Change:
After considering this question and recalling the number of times I have described Dr. Johnsons' behavior, it is likely I have used those terms to describe her behavior. I think it is also important to note that those terms would not necessarily have been stated in a derogatory manner.

**Page 126, Line 9**
Q. Did you ever suggest that Dr. Johnsons' hiring of Nancy Rockey was illegal?
A. No, I don't know anything about that.

Change:
Although I do not recall using the term "illegal" I know I have discussed the nature of Ms. Rockey's assignment. It was generally known that Ms. Rockey was placed in a counseling position in an acting position and remained in that position for several years until she became qualified.

**Pages 147 and 148 (Line 16 on Page 147 thru Line 16 on Page 148).**
Questions related to receipts from West Virginia purchases.


Change:
After reading the transcript of the deposition I believe I misunderstood the questions and context of the question. I believe the "second receipt" Mr. Aber refers to was obtained by me from the clerk in the Three Castles Antique Shop in January or February of 2004. I now remember that I obtained some receipts and a description (explanation) of the items purchased from the store clerk. I now believe this is what Mr. Aber was asking.


**Page 150, Line 2**
Q. Did I ask Shelby Crawford about the location of the books?
A. I don't think so.

Change: I did ask Shelby Crawford. In response to a question from the Deputy Auditor, I asked several people on the campus if they had received children's books from Dr. Johnson. I could not remember if I had asked Shelby. I checked with Shelby after the deposition and I did ask her about the books.


**Page 164, Line 3**
Q. And did you play any role in the removal of the computer instructor that worked on the bus?
A. No.


Change: The decision to change the status of the Wheels Instructor required my approval and I approved the request from CCP. To that extent I did have a role in changing her status but not removing her from Wheels.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,                )
                                      )
            Plaintiff,                )
                                      )      Civil Action
v.                                    )      No. 05-157(KAJ)
                                      )
ORLANDO J. GEORGE, JR.,               )
in both his official and personal     )
capacities, and DELAWARE              )
TECHNICAL AND COMMUNITY               )
COLLEGE,                              )
                                      )
            Defendants.               )


            Deposition of CONNIE M. SPAMPINATO taken
pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 1:45 p.m. on
Thursday, January 19, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

    ALSO PRESENT:
        MARGUERITE A. JOHNSON

            WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B662

1      A.    Did I discuss this meeting with anyone else?

2      Q.    Yes.

3      A.    A few days later I was at another meeting in

4  the office of the president and passed Mr. Shoudy in

5  the hallway and personally apologized to him for

6  causing him any discomfort in the meeting that I held

7  and invited him to.

8      Q.    And after that have you discussed this meeting

9  with anybody else prior to today?

10     A.    I talked to Mr. Williams about it.

11     Q.    I'm not worried about that.

12           Well, let me ask you this:  When was your

13  conversation with Mr. Williams?

14     A.    Recently.

15     Q.    Okay.  Did Dr. Johnson direct you to hold that

16  meeting?

17     A.    No, sir.

18     Q.    Was it a regularly scheduled meeting?

19     A.    The department chairpersons meeting was

20  regularly scheduled and, as I said, I have occasion to

21  routinely invite people to the meeting to inform the

22  department chairs.  That was my idea.

23     Q.    Did anybody else ask questions of Mr. Shoudy

24  other than Dr. Johnson?



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    Yes, sir.

2      Q.    Who else did?

3      A.    A number of the department chairs asked

4    questions.  Shelby Crawford asked questions that to me

5    appeared also very challenging.  They were not

6    directly related to the organizational chart.  They

7    were more related to IT services or lack of services

8    or dissatisfaction with services on the CCP side of

9    the house.  It was off the subject of the meeting, but

10    she continued to keep on and on about challenging

11    about services and dissatisfaction.

12              And Mr. Shoudy handled those questions in

13    a professional manner.

14      Q.    You said in the bottom line of the second page

15    that he admitted -- what do you mean when you said

16    that Mr. Shoudy acknowledged that there was a

17    breakdown in communications?

18      A.    I think that that is the part in which -- I

19    can't be sure because there's no names attached.  I

20    think that is the part in which Shelby was saying that

21    she had dissatisfactions with how things were being

22    handled back and forth.  And he said that there was a

23    breakdown in the communication of the status of IT

24    requests.

1    this meeting and did I recall times where maybe there

2    was inappropriate behavior that I would feel

3    uncomfortable with and so on and so forth, very

4    similar questions to the ones that you're posing

5    today.

6        Q.    Do you remember after Dr. Johnson was placed on

7    administrative leave Mr. Simpson was appointed to take

8    her place on an acting basis, correct?

9        A.    Mm-hmm.  Yes.  Sorry.

10       Q.    Where was Dr. Simpson's office before he

11   assumed Dr. Johnson's position?

12       A.    Mr. Simpson was the vice president of academic

13   affairs, so his office was over in the office of the

14   president.

15       Q.    And when he took over Dr. Johnson's position

16   where did his office go?

17       A.    He moved over to Dr. Johnson's office area.

18       Q.    Did he move into Dr. Johnson's office?

19       A.    Yes, sir.

20       Q.    And moved her furniture out?

21       A.    Well, not the day that he moved over but, yes,

22   eventually her furniture was out and he has furniture

23   in there.

24       Q.    Yes.  But I mean six months later you would



WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    A number of people were called to go over to be

2    interviewed by Mr. Williams.  And those people that

3    were on the list, I worked with Dan ~~Houghtaling~~ *Simpson* and

4    Hope Murray and there were other people that we should

5    contact to make appointments to go see Mr. Williams,

6    if that's what you're referring to.

7              We said you need to make appointments to

8    go see Mr. Williams over in the office of the

9    president.

10   Q.    But did you ever meet with them before they met

11   with Mr. Williams?

12   A.    I talked to them on the phone to tell them that

13   there were going to be meetings with Mr. Williams.

14   Q.    What did you tell them over the phone?

15   A.    To go talk to Mr. Williams.

16   Q.    You just called up and said hello, Joe, go over

17   and talk to Mr. Williams, good-by?

18   A.    "There's going to be a meeting.  We have been

19   asked to inform people to come and talk to

20   Mr. Williams concerning Dr. Johnson."

21   Q.    We're planning an awards ceremony for

22   Dr. Johnson?  What did you tell them the meeting was

23   about?

24   A.    You know, everybody on campus knew that

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,           )
                                 )
        Plaintiff,               )
                                 )
        v.                       ) C.A. No. 05-157 (KAJ)
                                 )
ORLANDO J. GEORGE, JR., in)
both his official and            )
personal capacities, and         )
DELAWARE TECHNICAL AND           )
COMMUNITY COLLEGE,               )
                                 )
        Defendants.              )

        Deposition of CHRISTINE M. TRAVIS taken
pursuant to notice at the law offices of Morris James
Hitchens & Williams, LLP, 29 North State Street,
Suite 100, Dover, Delaware, beginning at 10:40 a.m., on
Thursday, May 11, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQUIRE
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware 19801
          for the Plaintiff

        DAVID H. WILLIAMS, ESQUIRE
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware 19801
          for the Defendants


        WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com



W&F

WILCOX & FETZER LTD.

Registered Professional Reporters



COPY B667

1       A.      Okay.

2       Q.      There was an issue at the termination hearing

3   about some work you had done for Dr. Johnson for a 1999

4   family reunion.   Do you remember doing that?

5       A.      Yes, sir.

6       Q.      One issue was that she had given you a check

7   for $50.   Did I show you that check at the termination

8   hearing?

9       A.      Yes, sir, you did.

10      Q.      At that time you did not recall receiving that

11  check, correct?

12      A.      That is correct.

13      Q.      Have you ever reviewed your testimony from the

14  termination hearing?

15      A.      Yes, sir, I have.

16      Q.      When did you do that?

17      A.      When I met with him.

18      Q.      You went over your testimony?

19      A.      Yes.

20      Q.      I asked what you had done and you said you had

21  met with him.

22      A.      I met with him and we had reviewed --

23      Q.      Did you review any documents other than your

24  testimony?

1  you did for Dr. Johnson did not interfere with your other

2  work because you were able to do your other work at the

3  same time.  Do you recall that testimony?

4      A.    Uh-huh.  Yes, sir.

5      Q.    That was an accurate statement, correct?

6      A.    Yes, sir.

7      Q.    Let me back up for a second.  At the time

8  Dr. Johnson was on administrative leave, how did you

9  learn about her having to leave the campus?

10     A.    I learned about it on the portal as everybody

11  else.

12     Q.    On the what?

13     A.    The portal.  On our Web site.

14     Q.    Were you ever interviewed by anybody as part of

15  an investigation?

16     A.    No.

17     Q.    You're sure of that?

18     A.    I mean, I have spoken to people since then, but

19  I was never interviewed.  The only person I ever met with

20  was Mr. Shirey and that was for the termination hearing.

21     Q.    We have reason to believe, based upon some

22  statements, that a person from the accounting firm

23  Santora Baffone named David Dwyer interviewed you by

24  telephone.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,          )
                                )
    Plaintiff,                  )
                                )
    v.                          )   C.A. No. 05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR., in)
both his official and           )
personal capacities, and        )
DELAWARE TECHNICAL AND          )
COMMUNITY COLLEGE,              )
                                )
    Defendants.                 )

            Deposition of RUTH CALHOUN YANOS taken
pursuant to notice at the law offices of Morris James
Hitchens & Williams, LLP, 29 North State Street,
Suite 100, Dover, Delaware, beginning at 9:40 a.m., on
Thursday, May 11, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            GARY W. ABER, ESQUIRE
            ABER GOLDLUST BAKER & OVER
              702 King Street - Suite 600
              Wilmington, Delaware 19801
              for the Plaintiff

            DAVID H. WILLIAMS, ESQUIRE
            MORRIS JAMES HITCHENS & WILLIAMS, LLP
              222 Delaware Avenue - 10th Floor
              Wilmington, Delaware 19801
              for the Defendants


                  WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters



B671

1   have been a nursing supervisor and I have been at

2   Delaware Tech since January of 1990.  Originally came as

3   a faculty member and was a department chairman from fall

4   of 1975 until January 1st of this year.

5        Q.     As a department chair, what are your

6   responsibilities?

7        A.     They were to oversee the Nursing Department and

8   the faculty and the students of that department.  Also to

9   help out with anything in the college itself on campus or

10  committees that I may have sat on college-wide.

11       Q.     Let me turn your attention to a meeting that

12  was held on November 19th, 2004, with a Peter Shoudy.  Do

13  you remember that meeting?  You were shown as an

14  attendant.  It was concerning the computer

15  reorganization.

16       A.     I remember that there was a meeting with

17  Peter Shoudy.  Lots of details I probably don't remember

18  because IT is not one of my strong points.

19       Q.     Nor mine.

20              Do you remember Dr. Johnson being present

21  at that meeting?

22       A.     No.  I don't remember who exactly was present

23  at that meeting.

24       Q.     Do you remember anything about that meeting



WILCOX & FETZER LTD.
Registered Professional Reporters

1    unusual?

2        A.    Not that I can think of.

3        Q.    Do you remember any questioning of Mr. Shoudy

4    about how the IT Department was being run?

5        A.    I remember we were being -- and I don't know

6    for sure.   There were several IT meetings.   I know one IT

7    meeting we were told that there was reorganization.

8    That's about what I remember from an IT meeting.

9        Q.    I'm talking about one where Mr. Shoudy was the

10   speaker.

11       A.    No, I really could not tell you absolutely.

12       Q.    Do you remember any meetings in which

13   Dr. Johnson was present and acted inappropriately?

14       A.    No, I do not.

15       Q.    Have you had to deal with Dr. Johnson on a

16   regular basis?

17       A.    Not on a regular basis, but during the 17 years

18   that I have been at Delaware Tech, we have talked from

19   time to time and had meetings, but not on -- I would not

20   say on a routine basis.

21       Q.    Who would be your immediate supervisor as the

22   department chair?

23       A.    My immediate supervisor is the dean of

24   instruction as the department chair.

9

1    her try to suggest that there was a certain right way to

2    do something and a wrong way?

3        A.    I don't know that I remember.

4        Q.    Do you remember her making reference to the

5    parking lot?

6        A.    Yes, I do.

7        Q.    What was that reference?

8        A.    In a very, and I think very, joking manner, it

9    was a reference in that people that did not act

10   appropriately would be taken to the parking lot.  I

11   thought it was as a very joking manner.

12       Q.    Did you ever view that as a direct threat?

13       A.    Oh, absolutely not.

14       Q.    Did anybody on the campus communicate to you

15   they felt threatened by that statement?

16            MR. WILLIAMS:  I object.  Calls for

17   speculation.

18   BY MR. ABER:

19       Q.    My question is:  Did anybody communicate to

20   you, say that they thought that that was a threat?

21       A.    No.

22       Q.    Did other people ever express an opinion about

23   that comment?

24       A.    Yes.

13

1    to -- what position did you assume?

2        A.    I'm faculty member, an instructor.

3        Q.    Was that change a voluntary change on your

4    part?

5                MR. WILLIAMS:  Objection.  Relevance.  I

6    have a continuing objection to this line of questioning.

7                MR. ABER:  You can ignore his objections.

8        A.    It puts me in a very bad position.

9        Q.    Let me explain to you, Dr. Yanos, this is a

10   lawsuit involving Dr. Johnson's complaint of violations.

11   Under both case law and/or statute, no one can retaliate

12   against you for anything you say here.  If you speak the

13   truth, it would be a violation of the law for anyone to

14   take any adverse action against you for anything you say

15   here.

16       A.    Okay.  That greatly concerns me.

17       Q.    Why would that greatly concern you?

18       A.    Because I am still a faculty member at Delaware

19   Tech and my relationship with Dan Simpson has never been

20   very good except when we were both department chairs.

21       Q.    Do you have reason to believe that statements

22   you make here today might be the basis for some

23   retaliation against you?

24       A.    I would hope not.

1    Q.    Have you ever seen anybody at the school

2    retaliate against other employees for making statements

3    about personal matters?

4    A.    I can't say that anything that I saw was a

5    retaliation, no.

6    Q.    I think that you just stated that your change

7    of position from chairman of Department of Nursing to

8    faculty member was not a voluntary one?

9    A.    It was involuntary.

10    Q.    Has anyone tried to portray it as a voluntary

11    one?

12    A.    Yes.

13    Q.    Who?

14    A.    Dan Simpson.

15    Q.    Have you ever had a dispute with him over

16    whether it was voluntary or involuntary?

17    A.    Yes, I have.

18    Q.    What was the nature of that dispute?

19    A.    I was told that it was going to be portrayed as

20    voluntary and that I had to write a letter stating that I

21    had resigned.  When I attempted to speak to

22    Charlotte Lister and take time to make sure that I was

23    protecting my legal rights, Dan Simpson came in my office

24    and was screaming and yelling at me at the top of his

Ruth Calhoun Yancey

15

1   lungs, cursing me and threatening to physically throw me

2   off the campus.

3       Q.    Have you heard any other discussions on campus

4   concerning an investigation of Dr. Johnson?

5       A.    No.

6       Q.    The discussion you just mentioned about

7   Mr. Simpson, was anybody present?

8       A.    No.  It occurred in my office.

9       Q.    Did you ever discuss it with any other

10  officials of DelTech?

11      A.    No.  I was scared to.  I was frightened.

12      Q.    Were you aware that members of the Marketing

13  Department were interviewed by an accounting firm or CPA?

14      A.    No.

15      Q.    At any time during any meetings which you may

16  have attended, have you ever seen Dr. Johnson act

17  disrespectful to people who were addressing those

18  meetings?

19      A.    I can't say that I have, no.

20            MR. ABER:  Thank you.  I have no other

21  questions.

22            MR. WILLIAMS:  I may have no questions.

23  Let me take a short break.

24            MR. WILLIAMS:  I have no questions.

VOLUME I OF II


TRANSCRIPT OF CD

RE:   INTERVIEWS PERFORMED BY DAVID DWYER
OF DEL TECH PERSONNEL CONCERNING
MARGUERITE JOHNSON, Ph.D.


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477


WILCOX & FETZER LTD.
Registered Professional Reporters

B677

ORIGINAL

1   children's book character, and remember the

2   restaurants called Sambo's?

3           MR. DWYER:  Mm-hmm.

4           MR. SIMPSON:  They (unintelligible) chain.

5   But the little story about Sambo was that he was

6   being -- one of them he was being chased by tigers,

7   and he ran around the tree and he ran around so fast

8   that the tigers turned to butter.  Little children's

9   nursery rhymes.

10          MR. DWYER:  Right.

11          MR. SIMPSON:  He went through the sixties.

12  People thought -- folks didn't recognize them for what

13  they were.  Thought that were racist, and so they --

14  bingo, they just disappeared.  They didn't reprint

15  them or anything like that.  It was the end of *Little*

16  *Black Sambo*.  So depending on what version of the

17  printing you could find, they were worth considerable

18  money.  And collectors of those things are principally

19  African Americans.

20          MR. DWYER:  Did she buy those on the super

21  card?

22          MR. SIMPSON:  Those are on the super card.

23          And that was somewhere in the pile of

24  stuff (unintelligible) the sales receipts.