**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-157-KAJ |
| | ) | |
| ORLANDO J. GEORGE, JR., in both his | ) | Trial By Jury Demanded |
| official and personal capacities, and | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

David H. Williams (#616)
dwilliams@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
Attorneys for Defendants

Dated:  August 4, 2006

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..........................................................................................................iv

STATEMENT OF FACTS ............................................................................................................ 1

ARGUMENT.................................................................................................................................11

I.     SUMMARY JUDGMENT MUST BE GRANTED WHEN THE
NON-MOVING PARTY CONCEDES, OR FAILS TO ADDRESS,
THE MOVING PARTY'S DISPOSITIVE ARGUMENTS...........................11

     A.    Johnson Ignores Arguments Fatal To Her First Amendment
Claim .............................................................................................................11

          1.    Statements Made By High Ranking Officials Typically
Are Not Of A Public Concern ...............................................11

          2.    Statements That Do Not Address Wrong-Doing, Misuse
Of Funds Or The Quality Of Education At A College
Typically Are Not Matters Of Public Concern......................11

          3.    Statements Regarding The Role Of Personnel And
Operations Are Not Matters Of A Public Concern...............12

     B.    Johnson Ignores Arguments Fatal To Her Due Process Claims.........12

          1.    Johnson Received Appropriate Notice ...................................12

          2.    Johnson Was Not Entitled To Access Witnesses
Before The Termination Hearing............................................12

          3.    Providing Johnson The Right To Cross Examine And
Present Witnesses Replaced And Exceeded Her Limited
Right To Received Affidavits.................................................12

          4.    Johnson Was Not Denied Access to Prospective
Witnesses...............................................................................14

          5.    There Is No Evidence Supporting The Claim The College
Subjected Employees To Coerced Interrogation ...................14

          6.    The Inability To Compel The Attendance Of Witnesses
At A Termination Hearing Is Not A Deprivation Of
Due Process ...........................................................................14

          7.    Johnson Ignores The Arguments Fatal To Her Procedural
Due Process Claim Relevant To The Termination
Hearing ..................................................................................14

i

C.     Johnson Ignores Arguments Fatal To Her Liberty Claim .................. 15

II.    WHEN A PUBLIC EMPLOYEE MAKES STATEMENTS PURSUANT
TO THE EMPLOYEE'S OFFICIAL DUTIES, THE EMPLOYEE IS
NOT SPEAKING AS A CITIZEN FOR FIRST AMENDMENT
PURPOSES ................................................................................................. 15

A.     Johnson's Statements Were Pursuant To Her Job Duties .................. 15

B.     The Cases Johnson Relies Upon Are Distinguishable ........................ 17

III.   ASSUMING ARGUENDO AN EMPLOYEE'S SPEECH IS
PROTECTED, THE EMPLOYEE CANNOT MAINTAIN A FIRST
AMENDMENT RETALIATION CLAIM WHEN THE EMPLOYEE'S
SPEECH COULD NOT HAVE BEEN A SUBSTANTIAL
MOTIVATING FACTOR IN THE EMPLOYMENT DECISION ................ 19

IV.   ASSUMING AN EMPLOYEE ENGAGED IN SPEECH
PROTECTED BY THE FIRST AMENDMENT, THE EMPLOYEE'S
FIRST AMENDMENT RETALIATION CLAIM FAILS IF THERE
IS NO SHOWING OF ADVERSE EMPLOYMENT ACTION .................... 22

V.    A PLAINTIFF WHO DOES NOT ALLEGE SUBSTANTIVE DUE
PROCESS VIOLATIONS IN HER COMPLAINT MAY NOT
RAISE THEM FOR THE FIRST TIME IN AN ANSWERING BRIEF ........ 23

VI.   EVEN IF A PLAINTIFF ALLEGED SUBSTANTIVE DUE PROCESS
VIOLATIONS IN HER COMPLAINT, SHE CANNOT MEET HER
BURDEN UNLESS SHE CAN SHOW THE DECISION SHOCKS
THE CONSCIENCE ..................................................................................... 23

A.     Judge Bifferato's Decision Is Overwhelmingly Supported
By The Record .................................................................................. 24

B.     Johnson Received All The Process She Was Due .............................. 25

C.     The College Did Not Wrongly Fail To Give Assurances
To Other Employees ......................................................................... 26

D.     Johnson Was Not Stigmatized In A Legally Cognizable
Manner Through Newspaper Articles And Forwarding The
Accounting Report To The State Auditor .......................................... 26

E.     Placing Johnson On Administrative Leave Did Not
Stigmatize Her .................................................................................. 27

F.     Due Process Rights Are Not Implicated During An
Investigation ..................................................................................... 28

VII.    PLACING AN EMPLOYEE ON PAID LEAVE PENDING AN
        INVESTIGATION IS NOT DISCIPLINE, AND THEREFORE IS
        NOT A DEPRIVATION OF THE AFFECTED EMPLOYEE'S
        PROPERTY RIGHTS ...................................................................................... 28

VIII.   GEORGE SHOULD BE DISMISSED ON THE BASIS OF
        OFFICIAL OR QUALIFIED IMMUNITY..................................................... 29

CONCLUSION.......................................................................................................................... 30

## Attachments

**Tab**

*Cavicchia v. Philadelphia Housing Authority,*
  2003 WL 22595210 (E.D. PA.) ................................................................................................. A

**TABLE OF AUTHORITIES**

PAGE

<u>Cases</u>

*Ambrose v. City of Robinson,*
303 F.3d 488 (3rd Cir. 2002) ........................................................................... 20

*Board of Regents v. Roth,*
408 U.S. 564 (1972).......................................................................... 13, 28

*Brooks v. Univ. of Wisconsin Board of Regents,*
406 F.3d 476 (7th Cir. 2005) ........................................................................... 11

*Cavicchia v. Philadelphia Housing Authority,*
2003 WL 22595210 (E.D. PA.) ........................................................................... 19

*Cleveland Bd. of Educ. v. Loudermill,*
470 U.S. 532 (1985).......................................................................... 12, 13

*Conley v. Gibson,*
355 U.S. 41 (1957).......................................................................... 23

*Diettoso v. Potter,*
2006 WL 197146 (D. AZ. 2006) ........................................................................... 22

*Duffy v. Bucks,*
7 F. Supp. 2d 569 (E.D. PA. 1999).......................................................................... 24, 27

*First Nat'l Bank v. City Serv. Co.,*
391 U.S. 253 (1968).......................................................................... 27

*Garcetti v. Ceballos,*
2006 WL 1458026 (U.S. May 30, 2006) ........................................... 11, 13, 16, 17, 19

*Gardetto v. Mason,*
100 F.3d 803 (10th Cir. 1996) ........................................................................... 12

*Gilbrook v. City of Westminster,*
177 F.3d 839 (9th Cir. 1999) .......................................................................... 20, 21

*Gomez v. Texas Dep't of Mental Health & Mental Retardation,*
794 F.2d 1018 (5th Cir. 1986) ........................................................................... 11

*Hailey v. City of Camden,*
2006 WL 1875402 (D. NJ. 2006) ........................................................................... 18

*Heller v. Fulare,*
371 F. Supp. 2d 743 (W.D. PA. 2005)........................................................................... 29

*Hickman v. Valley Local Sch. Dist. Bd. of Educ.,*
  619 F.2d 606 (6th Cir. 1980) ........................................................................................... 21

*Horne v. Russell County Commission,*
  379 F. Supp. 2d 1305 (N.D. AL 2005),
  *aff'd* 2006 WL 1428282 (11th Cir. 2006) ....................................................................... 22

*Kodrea v. City of Kokomo, Indiana,*
  2006 WL 1750071 (S.D. IN 2006) ............................................................................... 18, 29

*Linton v. Frederick County Bd. of County Comm'rs.,*
  964 F.2d 1436 (4th Cir. 1992) ........................................................................................... 12

*Miller v. Philadelphia,*
  174 F.3d 386 (3rd Cir. 1999) ....................................................................................... 24, 27

*Mosca v. Cole,*
  384 F. Supp. 2d 757 (D.N.J. 2005) .................................................................................... 23

*Ostad v. Oregon Health Services University,*
  327 F.3d 876 (9th Cir. 1999) ........................................................................................... 21

*Perry v. Sindermann,*
  408 U.S. 593 (1972) ............................................................................................................. 28

*Pickering v. Board of Ed. Of Township High School Dist. 205, Will City,*
  391 U.S. 563 (1968) ............................................................................................................. 22

*Rendell-Baker v. Kohn,*
  457 U.S. 803 (1982) ............................................................................................................. 26

*Robb v. City of Philadelphia,*
  733 F.2d 286 (3d Cir. 1984) ............................................................................................... 27

*Robinson v. City of Pittsburgh,*
  120 F.3d 1286 (3rd Cir. 1997) ......................................................................................... 22

*Sameric v. Philadelphia,*
  142 F.3d 582 ......................................................................................................................... 24

*Saye v. St. Vrain Valley Sch. Dist.,*
  785 F.2d 862 (10th Cir. 1986) ......................................................................................... 21

*Strahan v. Kirkland,*
  287 F.3d 821 (9th Cir. 2002) ........................................................................................... 21

*Watters v. City of Philadelphia,*
  55 F.3d 886 (3rd Cir. 1995) ............................................................................................. 15

*Wilcoxson v. Red Clay Cons. School Dist. Bd. of Ed.*,
   2006 WL 1793546 (D.. Del. 2006) ......................................................................................... 17, 18

*Wilson v. Board of Trustees of the Community College of Baltimore County*,
   333 F. Supp. 2d 392 (D. Md. 2004) ......................................................................................... 11, 17

## Statutes and Other Authorities

29 *Del. C.* § 2906 ......................................................................................................................... 27

Fed. R. Civ. Proc. 8(a) ................................................................................................................. 23

## STATEMENT OF FACTS

### Introduction

The lengthy Statement of Facts in Johnson's Answering Brief (the "Answering Brief") discusses facts which are immaterial to the claims she alleged. Johnson devotes a large part of her brief to a substantive due process claim she did not assert in the Supplemental Complaint. The College provides this counter statement of facts to highlight the reasons summary judgment is warranted.

### Johnson's Fate Was Not Pre-Determined

Johnson starts by representing to the Court that "Even before Dr. George put Dr. Johnson on administrative leave, it had been decided that she was leaving as an employee" (AB 3-4)[1] citing page 60 of the Murray deposition. Murray was not talking about Johnson. The page which precedes the portion of Murray's deposition Johnson relies upon makes it clear Murray was responding to Aber's questions concerning other employees who were placed on administrative leave. (A92).[2] Indeed, the page of Murray's deposition transcript upon which Johnson relies (B566)[3] makes it clear that Murray was talking about an employee who resigned. Johnson did not resign. Moreover, Johnson's counsel reacts to the affirmative answer that administrative leave came after the decision was made that the employee was leaving the school as an employee by stating "That's a little bit different than what happened to Dr. Johnson?" (B566).

Furthermore, George made it clear that the allegations concerning Johnson's behavior, including her behavior on November 19, 2004, were simply allegations. He made no

---

[1] The Answering Brief is cited as "(AB __)".

[2] The Appendix to the Opening Brief is cited as "(A __)".

[3] The Appendix to the Answering Brief is cited as "(B __)".

determination as to whether they were true. For this reason, George decided to hire counsel to conduct an independent investigation. (C16)[4]

### Concerns About Johnson's Behavior

Johnson characterizes George's concerns about her behavior as "unsupported suspicions." (AB 4) Johnson misses the point as to why she was initially placed on administrative leave. For at least a few years prior to 2004, George was presented with allegations concerning Johnson's behavior. At the time Johnson was placed on leave, George had not made a determination whether the allegations were true. George decided to ". . . retain outside counsel, an independent, arms-length, well-respected law firm, who would come in and do the independent investigation formally, and determine whether or not the allegations were true." (C16) Such an investigation was never conducted because, as the College notes in its Opening Brief, information concerning financial improprieties surfaced after Johnson was placed on leave (OB8)[5] Johnson was terminated because, during a two day termination hearing, the College established that Johnson engaged in financial improprieties. (B211-214) Thus, the discussion about whether George had a basis to investigate Johnson's behavior is immaterial.

In any event, Johnson misstates the key facts in suggesting George had no basis for his concerns about her behavior. To begin with, the complaint Johnson characterizes as "unrelated to DelTech business" (AB 4) included an allegation Johnson threatened that a corporation that placed students at the Terry Campus would never again have the College's support (A122-126; A142) Moreover, Johnson disregards the fact that, throughout 2004, George heard from 4 of Johnson's colleagues on the President's Council that Johnson's behavior was all too often out of control and abusive. (A4-12) Furthermore, in suggesting that numerous administrators testified that Johnson's leadership was appropriate (AB 5), Johnson disregards the testimony of the

---

[4] The Appendix to the Reply Brief is cited as "(C__)".

[5] The Opening Brief is cited as "(OB__)".

2

1433464/2

following administrators who testified Johnson engaged in inappropriate behavior: Lister (C233-234); Hearn (C248; C254-255); Simpson (C303; C324; C554-555; C558-559); Murray (C30-37); Spampinato (C8-14); Evins (C222-228); and Houghtaling (C342-345). Johnson relies upon the testimony of Yanos, Cooper, Pleasanton and Crawford. Yanos (B673), Crawford (C568), and Pleasanton (B574) had limited contact with Johnson. Cooper, upon whom Johnson places heavy reliance, concedes she had sporadic (maybe once a month) (C25-27) contact with Johnson, and a limited opportunity to observe Johnson interacting with other professional staff. (C572-573) Cooper also deflated Johnson's allegations she was denied access to witnesses, and the College coerced witnesses. Cooper, who testified at the termination hearing, and was subsequently deposed by Johnson's counsel, testified as follows:

> Q.:    Do you fee any pressure on you because you're testifying today?
>
> A.:    None at all.

(C572) Moreover, Cooper testified that, at the time Johnson was placed on paid leave, the Dean of Instructions told Cooper she may be called upon to answer questions, and that Cooper should be truthful without any fear of being concerned about any repercussions. (C570) Finally, Cooper is not aware of anyone who testified for or against Johnson at the termination hearing whose career has been affected. The only change Cooper is aware of is that Powell was laterally transferred. (C571-572)

### Johnson's Attempt To Grieve Her Placement On Paid Administrative Leave

Johnson states: "The request for a grievance was rejected, even though the head of Human Resources testified suspensions were grievable." (AB 9) Johnson ignores the inconvenient fact that the head of Human Resources testified Johnson was not suspended, but rather was placed on administrative leave with full pay and benefits. (A87-88)

**Morris, James Is Retained To Conduct The Investigation Of Johnson's Behavior**

Johnson implies Morris, James was retained by the College because George did not want an independent investigation. (AB9). Putting to the side the fact that the investigation of Johnson's behavior was never conducted, Johnson disregards George's testimony that he believes the partners of Morris, James were ethical, honest and adhered to high standards of integrity, and would, therefore, "call it as they saw it." (C45-46) Johnson also ignores the testimony of the Dean of Instruction that the interview conducted by a Morris, James lawyer started with the following introduction: "Whatever you say there is not going to be any retribution. We just want to find out, ask you some questions, get your input on occurrences at the Terry Campus. Please answer them honestly and however you recall." (C566)

**Simpson Occupies The Campus Director's Office**

When Simpson assumed the acting responsibility to run the Terry Campus, he moved a pink loveseat out of the Campus Director's Office and replaced it with additional chairs so that he could conduct meetings is the office. The office was repainted the same color. Simpson removed Johnson's picture from the wall in the room where he conducted administrative council meetings because people were sitting at meetings staring at the picture, including people who were afraid of Johnson. (C566-567)

**Simpson's Role In Providing Names Of Witnesses To Be Interviewed**

Hearn, the Terry Campus Business Manager, informed Simpson of concerns about unresolved issues concerning Johnson's dealings with the College. (C553) While Johnson states that "Simpson suggested only names of people who would support allegations of misconduct against Dr. Johnson" (AB11), the page of the transcript upon which Johnson relies for this statement reflects the fact that Simpson testified he provided names of people who are related to the activities in question. (B652)

4

**Claim That No One Asked Johnson For Her Side Of The Story
During The Investigation**

The contention no one contacted Johnson for her version of the facts during the investigation (AB11), disregards the fact that Johnson was represented by counsel, and counsel for the College requested that Johnson's attorney provide any relevant information. Johnson's counsel did not respond to this request. (C10-11)

**The Santora Investigation And Report**

Johnson devotes several pages of the Answering Brief to an attack of the Santora Report. While there are several factual inaccuracies set forth in this attack, the fact remains Johnson was not terminated based upon the Santora Report. Johnson was terminated based on the evidence presented at the two day termination hearing. A review of the 550 page transcript of the termination hearing (C1-550) reveals the College presented 13 witnesses and 30 exhibits. Johnson presented 7 witnesses and 47 exhibits. Indeed, Aber objected to the Santora Report as hearsay except to the extent that testimony was offered at the hearing as to misconduct identified in the Report. The Santora Report served the limited purpose of providing Johnson detailed notice of the charges.[6] (C180) The Hearing Officer's decision makes it clear his determination is based upon ". . . reviewing all of the evidence presented at the hearing including exhibits." (B211)

In addition to the fact that the evidence presented at the termination hearing is the only material consideration, Johnson's discussion of the Dwyer investigation report misstates several key facts. For example, Dwyer was not limited to interviewing the list of individuals the College believes may have knowledge of Johnson's financial improprieties. (AB12) Rather, the page of the Dwyer transcript upon which Johnson relies makes it clear that each person Dwyer interviewed suggested another person who should be and was interviewed. (B421) Moreover,

---

[6] The College did not present evidence on all of the charges set forth in the Santora Report. (C3-6)

stating that ". . . there is no attempt to find the truth of the allegations, except as within the limits of the directed agreed upon procedures" (AB13), is misleading. A fair reading of the testimony upon which Johnson relies in making this statement is that Dwyer's objective was to find the facts concerning the issues he was investigating, as opposed to looking at issues outside the scope of his investigation. (B432)

### Travel Policy

The Answering Brief devotes considerable attention to the conclusion in the Santoro Report that Johnson violated the College's travel policies by failing to secure the President's approval for travel. (AB14, 15 & 20) The College presented no evidence on this issue at the termination hearing (C1-550), did not rely upon a violation of the travel policy as a basis for termination, and the Hearing Officer made no finding that a violation of the travel policy is a basis for termination. (B211-214)

### Reunion

The College's Opening Brief did not address the reunion and other issues involving Johnson's financial improprieties because Johnson has no substantive due process claim.[7] In any event, based upon the evidence presented at the termination hearing, the Hearing Officer determined that Johnson used staff at the Terry Campus to prepare a cookbook genealogy book, programs, invitations and flyers consuming thousands of dollars of personnel time and material of the College, and did not fully and completely repay the College for such labor and materials. (B212) Indeed, Johnson conceded she made no payment for the time employees spent working on the reunion. (C431)

The following employees testified at the termination hearing concerning the College's resources devoted to the reunion:

---

[7] *See* Argument V.

### Powell

Powell participated in typing a 100 page cookbook, as well as copying and binding approximately 150 copies of the cookbook, and 150 copies of a genealogy book. While some of the paper for the genealogy book was purchased by Johnson, for the most part College staff used College equipment and supplies to produce these books. (C84-89) While Powell had difficulty identifying the total number of copies and time devoted to the reunion, Powell recalls that near the end of the project she worked on the reunion for most of a week. (C89-92)

### Prudy Pierson

Pierson, a marketing department employee, also worked on the reunion for the entire week preceding the deadline for generating the reunion materials. In addition, Pierson worked on various components of the reunion prior to the last week. (C139-140) Pierson also estimated 150 copies of the voluminous materials were generated, and she described the reason why it was time consuming to do the "cut and paste" work necessary to generate the cookbook and genealogy book. Moreover, she described the tedious process involved in producing the laminated bookmarks. Pierson testified the paper, lamination and bindings were taken from the College inventory of supplies. (C141-142)

### Susan Moliken

Moliken is also a marketing department employee who spent time working on reunion materials including bookmarks, the genealogy book and design work associated with the genealogy book and the bookmarks. (C199-204) The week before the completion of the reunion project, Moliken spent most of her time working on the reunion, and prior to that sporadically spent time working on the reunion. The College work was put to the side in order to work on the reunion. (C204-206)

### Fred Evins

Evins described the work that various marketing employees performed on the reunion project. (C219-221)

**Chris Travis**

Travis testified she spent a week typing reunion materials at work. She also testified that she was working on the reunion at a desk right outside of Johnson's office, and that Johnson was aware she was doing so. (C503-5505)

**Reunion Invoice**

At Johnson's request, Powell prepared an invoice in the amount of $365.40 for the reunion reading materials. Powell described the creation of the invoice as follows: "I think I just created it off the cuff." (C96) Given the fact that the employees who worked on the reunion, were not requested to keep track of the time spent on the reunion, or the quantity of College materials used for the reunion, (C92, 95, 142 and 204), it is not surprising the invoice was created "off the cuff." In any event, the Hearing Officer found that the College met its burden proving Johnson did not pay for all the materials used in the reunion. (B212)

**Powell's Personal Work For Johnson**

Apart from the time Powell spent on the reunion project, from July of 1999 through 2004, Powell spent substantial time working on personal matters for Johnson. Powell testified that a conservative estimate is that she spent 10% of her time working on Johnson's personal matters. (C107) Such work included making personal appointments, regularly balancing Johnson's personal checkbook, and personal correspondence. (C96-106) Lister (C235-236) and Houghtaling (C346) confirmed that they observed Powell doing personal work for Johnson. Johnson attempts to justify her gross abuse of her position by extensively using Powell to perform personal work by suggesting: "There was a general custom and practice among Del Tech administrators that their secretarial staff would assist them in some personal work so that there [sic] sick time could be devoted to Del Tech matters." (AB24) In making this assertion, Johnson relies on an employee who worked for Johnson for 18 years and to whom Johnson gave an item of jewelry Johnson improperly purchased using the State's SuperCard in West Virginia in 2002.

8

(C456-458)  Finally, Johnson disregards the testimony of George (C47-48) and Simpson (C315)

that use of staff to perform personal work is not the custom and practice at the College.

### West Virginia Purchases

On a trip with Simpson and their respective spouses to West Virginia in October, 2002,

Johnson used the State SuperCard to purchase jewelry, antique Black Sambo books and pictures.

Johnson subsequently gave at least a portion of the jewelry to a friend as a gift.  (C457-458)

Johnson's use of the SuperCard was not inadvertent.  She had to call the College to get the credit

card number.  (C321)  Johnson signed a statement stating that, under no circumstances, should the

SuperCard be used for personal purchases.  (C252)  If there is a personal purchase made, the

employee is to reimburse the College within 24 hours.  (C250-251)

Johnson attempts to blame others for failing to repeatedly ask that she reimburse the

College for purchases that she should not have made in the first instance.  Business Manager

Hearn did not go to Johnson and demand receipts for the West Virginia purchases because he did

not want to be reprimanded.  Hearn made his inquiries through Powell in order to avoid a

reprimand.  (C254-255)  Sweeney, an employee in the Business Office, asked Powell for the

receipts on several occasions.  Powell responded that Johnson indicated she did not have the

receipts. (C275)  Powell testified that Sweeney would not approach Johnson directly because

Johnson made it uncomfortable for Sweeney to do so, and that Johnson thought Sweeney was

nitpicking.  (C112)  Finally, Draper, who has 36 years of experience with the State Auditor's

office, testified that ultimately the employee using the SuperCard is responsible to ensure she is

properly using the SuperCard.  (C592-593; C597)

Johnson compounded her improper use of the SuperCard to purchase the Black Sambo

books by claiming she purchased the books for the Learning Resource Center ("LRC")  located at

the Terry Campus. (C484-458)  Johnson testified that, within a week of purchasing the books in

October, 2002, she placed the books in the LRC.  (C484-486)  Johnson made it clear that these

9

antique books were purchased with Delaware Tech funds and were to be identified as such. (C489) All of this testimony was clearly refuted by Jennifer Stumpf who worked for the LRC.

Stumpf testified that the LRC is operated by, and financed by, the Department of Education. All of the books in the LRC are the property of the Department of Education. Indeed, at the time Stumpf testified at the termination hearing, the LRC was in the process of moving from the space it occupied at the College. (C509-511) When a representative of the State Auditor's Office was apparently told he would find the books at the LRC, Stumpf was "completely dumbfounded these books were in the collection." (C515) She was surprised because the collection of books in the LRC was a small collection, and she did a complete inventory of the collection every month from October, 2002 through May, 2005. She is certain the Black Sambo books were not in the LRC at the time she did any of these inventories. Moreover, the books did not bear any of the stamps or other identification the LRC routinely applied to books in its collection. The books were not discovered in a place where they would have properly been located. The books were not in the catalogue. Finally, the books were banned from being placed in a public collection. (C511-517; C521-522)

### Wake College Trip

There is substantial evidence supporting the conclusion Johnson traveled to North Carolina in 2002 at College expense for personal, rather than business, purposes. (C310-313; C577-585) The State Auditor's Office conducted an independent investigation and reached the same conclusion. (C596)

### Selection of Judge Bifferato As Hearing Officer

In a final attempt to call into question the Hearing Officer's determination, Johnson implicitly attacks the impartiality and integrity of one of the most widely respected retired judges in Delaware. (AB28-29) This effort is based upon the fact that Judge Bifferato's son represented the College in unrelated litigation before Judge Bifferato retired from the Bench. (C575)

## ARGUMENT

I.    **SUMMARY JUDGMENT MUST BE GRANTED WHEN THE NON-MOVING PARTY CONCEDES, OR FAILS TO ADDRESS, THE MOVING PARTY'S DISPOSITIVE ARGUMENTS**

A.    **Johnson Ignores Arguments Fatal To Her First Amendment Claim**

*Garcetti* is dispositive on the issue of whether Johnson's speech is protected under the First Amendment (see Argument II), but by way of further argument the Opening Brief discusses the application of pre-*Garcetti* cases supporting the conclusion there are fatal flaws in Johnson's claim her speech is protected by the First Amendment. Johnson ignores the following arguments in her Answering Brief.

1.    **Statements Made By High Ranking Officials Typically Are Not Of A Public Concern**

The Answering Brief fails to refute the argument a high ranking official's speech typically is not a matter of public concern. (OB 16) Johnson also fails to address the argument that, as one of six vice-presidents and, effectively second in command to George, she "simply was not free to cut [her] own path (let alone a path directly contrary to that elected by)" the College. *Wilson v. Board of Trustees of the Community College of Baltimore County*, 333 F. Supp. 2d 392, 397-398 (D. Md. 2004).

2.    **Statements That Do Not Address Wrong-Doing, Misuse Of Funds Or The Quality Of Education At A College Typically Are Not Matters Of Public Concern**

The Answering Brief avoids responding to the argument that Johnson's statements did not purport to bring to light wrongdoing or misuse of College funds, which tended to show speech on a matter of public concern before *Garcetti*. (OB 17) Johnson also disregards a directly analogous case holding that speech regarding a proposed reorganization was not of public concern. *See Gomez v. Texas Dep't of Mental Health & Mental Retardation*, 794 F.2d 1018, 1021-22 (5th Cir. 1986).

11

**3.    Statements Regarding The Role Of Personnel And Operations Are Not Matters Of A Public Concern**

In an effort to side-step the argument that personnel squabbles do not amount to issue of public concern, (OB 17-18) Johnson attempts to distinguish *Brooks v. Univ. of Wisconsin Board of Regents,* 406 F.3d 476, 480 (7th Cir. 2005) on grounds the dispute dealt with an "internal personnel squabble." (AB 34, n. 44)  The Opening Brief recognizes *Brooks* involves a personnel squabble over how a department should be run.  (OB 18)  The plaintiffs' statements in *Brooks,* just like Johnson's statements, regarded employees' roles and are not of public concern. *Id.* at 480; *see also Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996) (finding that statements regarding a college reorganization are not matters of public concern).

**B.    Johnson Ignores Arguments Fatal To Her Due Process Claims**

**1.    Johnson Received Appropriate Notice**

Johnson contends the termination process violated her right to due process, yet she ignores Supreme Court precedent set forth in the Opening Brief holding employees are entitled to "oral or written notice of the charges…, an explanation of the employer's evidence, and an opportunity to present his side of the story" before termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  Her arguments regarding "notice of specific charges" (AB 45-46) disregard the fact notice is sufficient if it apprises the vulnerable party of the nature of the charges and general evidence against him, and if it is timely under the particular circumstances of the case. (AB 20-21)  Finally, Johnson fails to confront the fact due process requires "only that such descriptive explanation be afforded as to permit [the plaintiff] to identify the conduct giving rise to the dismissal and thereby enable [her] to make a response." *Linton v. Frederick County Bd. of County Comm'rs*, 964 F.2d 1436, 1440 (4th Cir.1992).[8]

---

[8] Johnson's assertions (AB 45-46) regarding a contractual right to notice of specific charges are not only contrary to the standards set forth in existing law, but they are also at war with the record.  Indeed, substantial notice was provided which satisfies both her contract and the due process clause because the Santora Report, which outlined the charges against her, was incorporated by reference into the notice of termination.

2.    **Johnson Was Not Entitled To Access Witnesses Before The Termination Hearing**

In arguing the College denied Johnson access to witnesses before the termination hearing in violation of substantive due process, she ignores the cases holding there is no such right to pre-termination discovery. (OB 25-26)  Furthermore, the Answering Brief speaks of a right to interview witnesses prior to court hearings. (AB 42) This argument misses the mark because the termination hearing was not a court proceeding.   Without an underlying right to interview witnesses, there is no due process violation. *See Board of Regents v. Roth*, 408 U.S. 564 (1972).

3.    **Providing Johnson The Right To Cross Examine And Present Witnesses Replaced And Exceeded Her Limited Right To Receive Affidavits**

Johnson alleges she was deprived of affidavits in advance of the termination hearing because the affidavits were not "timely". (AB 45)  Johnson avoids addressing the College's argument refuting this contention. (OB 23-25) The Personnel Handbook is silent as to how far in advance of the termination hearing they were to be given.  Johnson therefore has no support for her assertion they were given "too late."

There is no credible dispute Johnson received a termination hearing which met and exceeded the requirements of the Due Process Clause of the 14th Amendment (See OB9-12; and *Cleveland Bd. of Ed. v. Loudermill.)*  In her Answering Brief, Johnson makes no attempt to dispute this fact.  Instead, she essentially argues she was due "different" process-not "more" process- as a result of her employment contract because the "new procedures could not eliminate [her] pre-existing contractual right to timely affidavits." (AB 45)  She cites no authority for this proposition.

She also bestows great meaning on receiving affidavits when, in the context of an evidentiary hearing with the right of cross examination, the affidavits are meaningless.  The affidavits were meaningful prior to the adoption of revised Rules of Procedure for the Conduct of Termination Hearings, because then the College was not obligated to produce witnesses at the

13

termination hearing. (A172; 177-178)   Thus, the employee facing termination was limited to receiving affidavits. By any measure, the testimony presented to Judge Bifferato, coupled with the right to cross examine and present witnesses, far exceeded the limited right to receive affidavits.

### 4.    Johnson Was Not Denied Access To Prospective Witnesses

Without pausing to address the College's demonstration that Johnson was not denied access to prospective witnesses (OB25), Johnson continues to assert such a denial occurred, and appears to re-package her contention as a substantive due process argument.  (AB 42)   Indeed, Johnson's counsel spoke extensively with witnesses before the termination hearing, the College never told Johnson or her counsel not to contact prospective witnesses, and the College provided assurances there would be no retaliation.  (C598-608)

### 5.    There Is No Evidence Supporting The Claim The College Subjected Employees To Coerced Interrogation

Johnson  fails to dispute the College's statement there is no evidence supporting this claim.  (OB 25)

### 6.    The Inability To Compel The Attendance Of Witnesses At A Termination Hearing Is Not A Deprivation Of Due Process

Johnson does not take issue with the College's argument the lack of subpoena power does not deny due process. (OB 25-26)

### 7.    Johnson Ignores The Arguments Fatal To Her Procedural Due Process Claim Relevant To The Termination Hearing

Johnson appears to retreat from the procedural due process claim she asserted with respect to the termination hearing.  (A64-65)   Johnson fails to confront the cases and arguments (OB 20-21) setting forth the standard for a procedural due process claim. By the same token, Johnson has no response to the fact that the College far exceeded the minimal due process requirements.  (OB 20-21)   In an effort to relitigate the termination proceeding, she attempts to characterize the proceeding as one-sided, unfair and flawed. (AB 41-44)   Such an argument is a

14

substantive due process claim rather than a procedural due process claim. Consequently, her

procedural due process arguments must be dismissed with respect to the termination.

### C.    Johnson Ignores Arguments Fatal To Her Liberty Claim

Johnson fails to address the arguments and cases dictating the conclusion her stigma

claim is insufficient because there was no deprivation of an employment interest. (OB 22-23)

## II.    WHEN A PUBLIC EMPLOYEE MAKES STATEMENTS PURSUANT TO THE EMPLOYEE'S OFFICIAL DUTIES, THE EMPLOYEE IS NOT SPEAKING AS A CITIZEN FOR FIRST AMENDMENT PURPOSES

The Supreme Court's holding in *Garcetti v. Ceballos*, 2006 WL 1458026 (U.S. May 30,

2006)[9] directly applies to the facts in this case and is fatal to Johnson's First Amendment claim.

The Answering Brief ineffectively attempts to escape *Garcetti's* dispositive holding by citing

post-*Garcetti* cases, and insisting these cases dictate that *Garcetti* should be construed narrowly.

Thus, Johnson invites the Court to conclude her statements were made outside of her job duties.

(AB 34-36)[10] *Garcetti* cannot, however, be applied narrowly enough to avoid the conclusion that

Johnson's November 19, 2004 statements were made pursuant to her official duties.  *See*

*Garcetti*, 2006 WL 1458026 at *10.  Furthermore, the post-*Garcetti* cases Johnson cites are not

only distinguishable, but underscore why Johnson's statements are not protected speech. Thus,

*Garcetti* dictates that the First Amendment claim asserted here must be dismissed.

### A.    Johnson's Statements Were Pursuant To Her Job Duties

Johnson was in charge of the Terry Campus.   Thus, her job responsibilities were

necessarily broader than any other Terry Campus employee. By any interpretation, narrow or

broad, of *Garcetti*, it is inarguable that the job responsibilities of the person in charge of a college

campus are necessarily broader than the job responsibilities of any lower level employee.

---

[9] Unreported cases not attached to the Opening Brief or the Answering Brief are attached hereto.

[10] Moreover, the burden of showing speech is constitutionally protected under the First Amendment is on the employee. *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3rd Cir. 1995).

15

Consequently, Johnson's statements at the November 19, 2004 meeting were made pursuant to her job responsibilities.

Undisputed evidence supports the conclusion Johnson spoke pursuant to the responsibilities she held as Vice President and Campus Director.[11] She spoke at a meeting "for Departmental Chairs and administrators to discuss reorganization of the College's technical network." (A58) This meeting was not open to the public. The IT department kept things "running smoothly" at the campus Johnson was in charge of- that is why she was concerned with the reorganization (C564-565) and, thus, why she attended the meeting. These facts make clear Johnson was participating in the meeting because it was her job to participate in the meeting.[12]

The Dean of Instruction convened the meeting to discuss the impact the IT Reorganization would have on the Terry Campus. Johnson not only thought the topic was appropriate for the department chairs, she directed the Dean to invite the rest of the administrative council. (C561-563) Yet, Johnson is now attempting to suggest the meeting fell outside the scope of her duties.

Johnson's argument that her attendance at the meeting was outside the scope of her job duties is also at war with the following statement in her Complaint: "During the course of the meeting of November 19, 2004 . . . the plaintiff, **in an effort to assist the day-to-day management of the Terry Campus, for which she had responsibility as Vice-President and Campus Director,** made inquiries as to how the reorganization system would operate and asked for various explanations." (emphasis added). (A58) Thus, prior to the effort to side-step *Garcetti*, Johnson admitted she spoke pursuant to her job duties at the meeting in question.

---

[11] While Johnson is quick to point out *Garcetti's* holding that employers cannot "restrict employees' rights by creating excessively broad job descriptions," she fails to acknowledge the inescapable conclusion the Campus Director job duties are broader than lower level employees.

[12] Johnson ignores the argument in the Opening Brief that participating in College meetings and discussing personnel matters and department reorganizations are not functions citizens undertake as part of the exercise of First Amendment freedoms.

Johnson attempts to backtrack from the admission in her Complaint by contending the IT reorganization centralized IT on a College-wide basis. Thus, Johnson reasons, because she would no longer control the IT Department, her participation in the meeting fell outside the scope of her duties. (AB34) The fact remains that Johnson participated in the meeting in her role as Campus Director, and the purpose of the meeting was to discuss the impact of the IT Reorganization on the operation of the Terry Campus.

Johnson's desperate effort to portray her participation in the November 19, 2004 meeting as outside of the scope of her job duties includes advancing a convoluted argument that the College implicitly admitted Johnson was not acting within her job duties because George indicated he received reports Johnson was subversive and insubordinate. (AB 35) Stripped to its essential element, Johnson invites the Court to conclude that her speech on a topic squarely within the scope of job duties (the impact of the Reorganization on the operation of the Campus) falls outside her job duties if she is insubordinate in that she fails to support the Reorganization.

### B.    The Cases Johnson Relies Upon Are Distinguishable

Johnson, without pausing to acknowledge her job duties are broad as the person in charge at the Terry Campus, attempts to portray her participation in the November 19, 2004 meeting as outside of the scope of her job duties by contending recent post-*Garcetti* decisions indicate *Garcetti* does not apply "unless the speech is a part of the employee's formal job duties." (AB 36) None of the cases stand for this proposition. Indeed, *Garcetti* states just the opposite- "The proper inquiry is a practical one. **Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform**, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti* at *10 (emphasis added).

Furthermore, each of the cases cited by Johnson in a futile attempt to apply *Garcetti* so narrowly her claim survives is readily distinguishable. In *Wilcoxson v. Red Clay Cons. School*

17

*Dist. Bd. of Ed.*, 2006 WL 1793546 (D. Del. 2006), the activities the plaintiff engaged in were plainly outside the scope of his duties. A teacher in *Wilcoxson* was disciplined for statements he made in a journal he kept because his colleague was repeatedly tardy or absent from work. The plaintiff feared liability if a child under his supervision suffered an injury due to a lack of oversight attributable to the absence of his colleague. Thus, the journal was maintained for protection if he was sued or disciplined after a child was injured while the colleague was absent. This activity was clearly outside the scope of his duties. He had no duty to supervise other teachers, or maintain a record to provide protection from liability. High level college administrators, on the other hand, routinely attend and speak at department meetings addressing issues which impact the College.

The second case cited by Johnson is *Kodrea v. City of Kokomo, Indiana*, 2006 WL 1750071 (S.D. IN 2006). *Kodrea* involves alleged retaliation against an employee for reporting theft of township funds. The Court holds "Kodrea may have acted as a concerned citizen," *id.* at 8, but, because nothing in his job description required him to monitor or report misconduct, and it was not clear whether he was responsible for any oversight, the case was remanded for further findings regarding the scope of the claimant's job duties. There is no such dispute here. Johnson admits she was assisting "in the day-to-day management of the Terry Campus, for which she had responsibility as Vice-President and Campus Director." (A58)

Finally, Johnson cites *Hailey v. City of Camden* for the proposition that speech not within one's job duties remains protected after *Garcetti*. 2006 WL 1875402 (D. NJ. 2006). This proposition is not in dispute, but the facts of *Hailey* are readily distinguishable. In *Hailey*, the claimant firefighters alleged retaliation for statements made at a city council meeting they attended on their own accord, and for statements made to the press. The Court finds the conduct to be outside the scope of a firefighter's activity, noting the "defendants have pointed to no testimony even suggesting that attending City Council meetings and speaking with newspapers was a part of the plaintiffs official duties." *Id.* at \*16. In sharp contrast, in addition to the

18

admission in the Supplemental Complaint, the record here confirms Johnson's attendance at the meeting was a part of her job duties in addressing concerns about the quality of IT services Terry Campus students and administrators were receiving. (B485-486; 635-636; C561-563)

In short, the undisputed facts demonstrate Johnson's speech is not protected because it was made pursuant to her responsibilities as the Vice President and Campus Director. The First Amendment claim therefore fails. *See Garcetti,* 2006 WL at *10 ("Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.").

**III.    ASSUMING ARGUENDO AN EMPLOYEE'S SPEECH IS PROTECTED, THE EMPLOYEE CANNOT MAINTAIN A FIRST AMENDMENT RETALIATION CLAIM WHEN THE EMPLOYEE'S SPEECH COULD NOT HAVE BEEN A SUBSTANTIAL MOTIVATING FACTOR IN THE EMPLOYMENT DECISION**

Johnson attempts to portray George's alleged improper retaliation as a "taint" on Judge Bifferato's decision to terminate her. (AB38-39) She argues George's alleged improper retaliation set forth a chain of events that ultimately resulted in her termination. In support, she cites to a number of cases from outside this Circuit. Her "chain of events" theory is not the law in this Circuit, and the cases she cites are readily distinguishable.

*Cavicchia v. Philadelphia Housing Authority* is dispositive on Johnson's "chain of events" theory. 2003 WL 22595210 (E.D. PA.). In *Cavicchia,* the plaintiff alleged, *inter alia*, his termination was retaliatory for exercising his First Amendment rights. The plaintiff was never reprimanded, criticized or disciplined after engaging in protected activity. Nonetheless, he alleged his protected activity contributed to his termination because despite his good performance evaluations, he "believed that [he] was the fly in the ointment" and the attendance issue was a pretext. *Id*. at *4. When the plaintiff began to have attendance issues, his immediate supervisor (Cooney), to whom he had previously made numerous reports of wrongdoing (which constituted his protected activity) recommended the plaintiff's termination to another defendant (Conlin, also to whom Cavicchia had previously made reports of wrongdoing). Conlin did not have the

19

authority to terminate Cavicchia's employment, but he reviewed the recommendation of Cooney, and referred the issue to human resources. Conlin thereafter prepared the notice of termination for Cavicchia's discharge.    The Court rejects the suggestion that Cavicchia's termination was retaliation for protected activity, holding:

> While Mr. Conlin recommended termination [...] he did not have the authority to make the termination decision on his own. Termination decisions at PHA are made by Human Resources with the concurrence of the Senior Deputy Executive Director. Thus, Plaintiff's termination was made by James Jones and approved by Michael Leithead. Furthermore, James Jones attested that he was not aware of Plaintiff's complaints at the time of the termination decision.

*Id.* at *10.  (Internal citations omitted).  The identical situation is present here.  In each instance, the person or persons with an alleged "motive to retaliate" put the termination proceedings "in motion."   In each instance, the ultimate decision maker was unaware of the protected activity.   Indeed, Judge Bifferato was unaware of Johnson's statements, just as the ultimate decision makers in *Cavicchia*, Jones and Leithead, were unaware of the conduct.  As set forth in the Opening Brief, there was no evidence presented at the termination hearing concerning Johnson's November 19, 2004 speech, except her counsel's statements.  Judge Bifferato knew no further details, and could not have been motivated by consideration of speech of which he was not aware. *See Ambrose v. City of Robinson*, 303 F.3d 488, 493 (3rd Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.").

The cases Johnson cites in support of her "chain of events" theory are also distinguishable.   *Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) is cited for the proposition that "a party who sets in motion a retaliatory sequence of events cannot shield themselves...where the ultimate decision maker is not acting for retaliatory purposes." (AB 38) Importantly, the *Gilbrook* court holds this inquiry to be fact specific, and

> "We do not hold that a final decision-maker who lacks any improper motive *never* can absolve a subordinate of liability for

> his or her retaliatory acts, any more than we hold that such a decision-maker *always* can absolve the subordinate. Indeed, we express no opinion as to what the result should be, as a matter of law, if the facts showed that the final decision-maker made a wholly independent, legitimate decision to discharge the plaintiff, uninfluenced by the retaliatory motives of a subordinate."

*Id.* at 855. Judge Bifferato's decision fits squarely in the paradigm contemplated by *Gilbrook*. He independently found grounds to support termination following a lengthy hearing which contained substantial evidence supporting the termination.

The cases Johnson cites to show how *Gilbrook's* "fact specific inquiry" is applied actually favor the College's position. Indeed, each of the cases Johnson cites contain a critical element absent from the instant matter - the "ill-intentioned" person who had a motive to retaliate against the plaintiff provided the basis for the "untainted" person's decision.[13] *See Ostad v. Oregon Health Services University*, 327 F.3d 876, 883 (9th Cir. 1999) (the decision maker had no expertise of its own and relied substantially on the testimony of the alleged retaliator in arriving at its decision to terminate the plaintiff) (citing *Gilbrook*); *Hickman v. Valley Local Sch. Dist. Bd. of Educ.*, 619 F.2d 606, 610 (6th Cir.1980) (finding the decision maker made its decision to not renew an employment contract on the basis of the recommendations of two persons with allegedly retaliatory motives and "The evidence does not demonstrate that the [decision maker] was insulated from the principal's or superintendent's reasoning or that the [decision maker] reached its decision on the basis of independent, intervening factors"); *Saye v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862, 867-68 (10th Cir.1986) (remanded to determine what the decision maker knew about the plaintiff's protected activity). In other words, *Gilbrook* insulates Johnson from summary judgment if George's testimony was the sole testimony upon which Judge Bifferato relied in arriving at his decision to terminate Johnson. Judge Bifferato's findings were based on

---

[13] Johnson's citation to *Strahan v. Kirkland*, 287 F.3d 821 (9th Cir. 2002) is inapposite. The Court affirmed summary judgment **against the plaintiff** because the decision maker was not tainted by the allegedly improper motivations of the initial investigator.

testimony of witnesses other than George. Indeed, George had no first information on Johnson's financial improprieties. (21-73)

**IV.    ASSUMING AN EMPLOYEE ENGAGED IN SPEECH PROTECTED BY THE FIRST AMENDMENT, THE EMPLOYEE'S FIRST AMENDMENT RETALIATION CLAIM FAILS IF THERE IS NO SHOWING OF ADVERSE EMPLOYMENT ACTION[14]**

Johnson contends the standard for adverse action in First Amendment cases is "much lower" (AB 36) and "easier" (AB 37) than the standard for adverse employment action set forth in the Opening Brief. Importantly, none of the cases she cites stand for the proposition that the standard under the First Amendment for showing adverse employment action is any "lower" or "easier" than it is under Title VII. Rather, the cases Johnson cites for the First Amendment threshold stand for the unnovel proposition that employment decisions other than ultimate employment decisions can be adverse action. This is a widely recognized Title VII standard as well. *See, e.g. Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997) (Under Title VII, adverse employment action is "conduct other than discharge or refusal to rehire [which] alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'"). Therefore, Johnson has not shown how the adverse employment action standard is different in First Amendment claims as compared to Title VII claims. Nor has she attempted to tackle the cases set forth in the Opening Brief which hold that a suspension with pay does not amount to adverse action.[15] (OB 19-20)   Therefore, she cannot meet her burden of showing

---

[14] Johnson discusses the element of the *Pickering* balancing test concerning disruption. It is not addressed in the College's briefs because her speech did not address a matter of public concern, and, therefore, the inquiry never reaches a discussion of disruption. *See Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968)

[15] Johnson sets forth cases from outside the Circuit holding a suspension with pay is adverse employment action. (AB 36-38) The suspension in *Diettoso v. Potter* was found to be adverse employment action, but the suspension there was for nine months, resulting in missed economic opportunities to accrue bonuses. 2006 WL 197146 (D. AZ. 2006). The suspension here was shorter and there is no such allegation of a missed opportunity to accrue a bonus as a result. The *Horne v. Russell County Commission* case involved a finding that a suspension with pay for 90

22

adverse employment action, and summary judgment must be granted. *Mosca v. Cole*, 384 F. Supp. 2d 757, 768 (D.N.J. 2005) (granting defendant summary judgment when plaintiff could not show a connection between protected activity and adverse employment action).

## V.    A PLAINTIFF WHO DOES NOT ALLEGE SUBSTANTIVE DUE PROCESS VIOLATIONS IN HER COMPLAINT MAY NOT RAISE THEM FOR THE FIRST TIME IN AN ANSWERING BRIEF

The Answering Brief attempts to paint the termination hearing as "unfair." (AB 41-44) The argument in support of this position can only be read as a jumbled argument of substantive due process and procedural due process. As set forth in Argument section VI, *infra*, Johnson cannot meet the high standard required to plead a substantive due process violation. More importantly, however, her complaint does not mention substantive due process. Her failure to plead substantive due process is fatal to her claim. *See Conley v. Gibson*, 355 U.S. 41 at 47 (1957) (stating a complaint must give the defendant "fair notice of what the plaintiff's claim is.") quoting Fed. R. Civ. Proc. 8(a) ("A pleading which sets forth a claim for relief...shall contain...(2) a short and plain statement of the claim... and (3) a demand for judgment for the relief the pleader seeks."). On this basis alone, her substantive due process claim should be dismissed.

## VI.    EVEN IF A PLAINTIFF ALLEGED SUBSTANTIVE DUE PROCESS VIOLATIONS IN HER COMPLAINT, SHE CANNOT MEET HER BURDEN UNLESS SHE CAN SHOW THE DECISION SHOCKS THE CONSCIENCE

Johnson alleges in her Answering Brief that the College denied her substantive due process by (i) not affording "fair" procedural due process (AB 41), (ii) denying access to witnesses before the termination hearing (AB 42), (iii) not assuring other employees they would be free from retaliation for testifying, *id.* (iv) presenting an invalid report from the accounting firm, *id.* (v) concealing relevant information from the ultimate decision maker, *id.* (vi)

---

days was discipline, but the finding of discipline was also based upon a finding of evidence in the record that there was to be a "hanging" of the plaintiff. 379 F. Supp. 2d 1305 (N.D. AL 2005).

stigmatizing her through newspaper articles and forwarding the accounting report to the State Auditor, (AB 48) and (vii) stigmatizing her by placing her on administrative leave.[16] (AB 48) Johnson cannot approach meeting this burden. To the contrary, substantial evidence offered at the termination hearing supports Judge Bifferato's findings. (B211-214; Statement of Facts, pp. 5- 9). To allege a violation of substantive due process, a plaintiff must allege that government action was so "ill conceived or malicious that is shocks the conscience." *Miller v. Philadelphia*, 174 F.3d 368 (3rd Cir. 1999). Moreover, the conduct must be arbitrary or capricious. *Duffy v. Bucks*, 7 F. Supp. 2d 569 (E.D.PA 1999). This is an extraordinarily high standard. An error of law is insufficient, *Sameric v. Philadelphia*, 142 F.3d 582, as is negligence. Miller, 174 F.3d at 375. The existence of disputed facts is insufficient unless such facts are material. Fed. R. Civ. P. 56(c). Johnson cannot approach the required showing. (See Statements of Facts, pp. 5-9)

Johnson attempts to brief as a substantive due process claim what is pled as a procedural due process claim. She does so in retreat apparently because the arguments set forth in the Opening Brief show the futility of her procedural process claim. She switches gears now by arguing that the process she was afforded "shocks the conscience." (AB 41) This explains why it is obvious to the reader that the Opening Brief and the Answering Brief are like two ships passing in the night.

### A.    Judge Bifferato's Decision Is Overwhelmingly Supported By The Record

Johnson goes to great lengths to protest the "fairness" of the termination hearing. (AB 41-44) Importantly, it is irrelevant whether Judge Bifferato's decision to terminate her was correct. The only thing that matters for purposes of a substantive due process claim is whether the decision shocks the conscience or was arbitrary or capricious. *See, eg. Miller v. Philadelphia*, 174 F.3d 368 (3rd Cir.1999). She cannot meet this standard. (See Statement of Facts, pp. 5-9).

---

[16] To the extent Johnson ignores in her Answering Brief arguments relevant to each of these seven claims, the claims are refuted in Argument section I, *supra*.

Johnson's argument Judge Bifferato's decision rests upon "two pillars" also fails. (AB 42-44)  The entire foundation of her "first premise" is a flaw she perceives in the Santora Report.[17]  The inconvenient facts are that Judge Bifferato's decision was not based on the Santora Report.  Rather, the decision was based on witnesses and exhibits presented at the hearing. (B211; Statement of Facts, p. 5-9).  Johnson's desperation to manufacture a due process claim is revealed by the effort to imply one of Delaware's most widely respected retired judges was less than impartial because his son represented the College defending an unrelated claim before Judge Bifferato retired from the bench.  The College met and exceeded its obligation to give Johnson due process in designating such an experienced and distinguished hearing officer.

### B.      Johnson Received All The Process She Was Due

The process Johnson received is a far cry from process that shocks the conscience, and she distorts the record in an attempt to survive summary judgment.

Johnson argues she could not prepare adequately for the termination hearing, yet the record shows the College identified its witnesses, provided well over 1,000 pages of documents requested by Johnson's counsel, and provided copies of the College's termination hearing exhibits (OB25) all before the termination hearing.   Johnson distorts the significance of the Santora Report by ignoring the fact that Judge Bifferato's decision was based on the testimony and exhibits presented at the hearing.  The record shows, however, the report merely served a notice function, and was not a basis of termination. (A46-A53)  It was not something relied upon in prosecuting her termination.  The termination was proven independently of the Santora Report,

---

[17] Johnson attempts to convince the Court the Santoro Report was the basis for Judge Bifferato's termination decision, when the termination was proven wholly independently of any reliance upon the report for anything other than to show that Johnson received notice (when the Santoro Report was incorporated by reference into the notice of termination) of the charges.  Her argument with respect to a purported "flaw" in the Santoro Report essentially contends that, while she misappropriated College resources, Dwyer incorrectly concluded the magnitude of the misappropriation.   Notably, Judge Bifferato found cause for termination based upon misappropriation of thousands of dollars of personal time and material of the College. (B212)  Whether Johnson's misappropriation was in the amount of $1,000, $2,000 or $15,000 is immaterial.  In all events, there was cause to terminate.

before a well respected retired Judge who sat on the bench in Delaware for over 30 years. The College presented thirteen different witnesses and 30 exhibits. Johnson was represented by experienced counsel who cross-examined the College's witnesses, presented seven witnesses, including Johnson's own testimony, and offered 47 exhibits at a two day hearing which was transcribed by a court reporter generating 550 pages of testimony. (Statement of Facts, pp. 5-9)

In short, Johnson received extensive and fair process which falls well short of a showing that the decision shocks the conscience or was arbitrary and capricious. Moreover, Johnson received far more process than was due under her contract and the termination procedures in place prior to the adoption of revised termination procedures on April 26, 2005 (See Argument I, B).

C.    **The College Did Not Wrongly Fail To Give Assurances To Other Employees**

Johnson contends the College violated her right to substantive due process by not assuring witnesses they would not be retaliated against for testifying on her behalf. Even assuming she had a right to pre-hearing access, the College took reasonable steps to afford such access. (OB25 and C598-608) Indeed if the College provided the College-wide "broadcast" approach Johnson insisted on, she would have been further "stigmatized."

D.    **Johnson Was Not Stigmatized In A Legally Cognizable Manner Through Newspaper Articles And Forwarding The Accounting Report To The State Auditor**

Johnson alleges she was denied substantive due process because she was stigmatized through newspaper articles and forwarding the Santora Report to the State Auditor. These claims fail because they are at odds with the facts in this case and controlling law.

Her argument with respect to the newspaper articles fails because she cannot point to any facts in the record showing the College is responsible for the articles. Indeed, in both news stories cited in the Answering Brief (B56-57), Brian Shirey, the College's in-house counsel, was contacted by the news paper and in each case he refused to comment. The articles are thus purely private action (by the newspapers) and her claim fails for lack of state action. *See Rendell-Baker*

*v. Kohn*, 457 U.S. 830, 837-38, (1982) (citing, *inter alia, Civil Rights Cases*, 109 U.S. 3, 11, (1883)).

Johnson also alleges she was stigmatized when the accounting report was forwarded to the State Auditor. This argument fails because the State Auditor's office has a statutory duty to audit the College, 29 *Del. C.* § 2906.[18] As the State Auditor's audit is a mandatory exercise of accounting oversight, it is beyond credulity to suggest forwarding to the auditor relevant documentation is a stigmatizing event.

Furthermore, with respect to the "stigma" created by both the newspaper and the State Auditor, she alleges no actual stigma and points to no actual stigma in the record. On this basis alone, her claims should fail.

The substantive due process claims fail for additional compelling reasons. Her argument confuses substantive due process and a liberty interest. In order to allege a deprivation of a liberty interest which amounts to a substantive due process violation, Johnson must first establish a deprivation of a right, and then she must meet the high burden of establishing that the deprivation shocks the conscience and was intentional or arbitrary and capricious. *See Robb v. City of Philadelphia,* 733 F.2d 286, 293- 294 (3rd Cir. 1984); *Miller v. Philadelphia*, 174 F.3d 368 (3rd Cir. 1999); *Duffy v. Bucks*, 7 F. Supp. 2d 569 (E.D.PA 1998). She cannot establish, as set forth above, that she was deprived of a liberty interest in the first instance. Furthermore, she sets forth no evidence suggesting the deprivation shocks the conscience.

### E. Placing Johnson On Administrative Leave Did Not Stigmatize Her

In her substantive due process argument, Johnson makes another stigma argument- that placing her on leave "clearly left her stigmatized." (AB 48) Again, she cannot establish a

---

[18] The State Auditor investigated, found Johnson engaged in financial improprieties, and recommended to the Attorney General that there be a further investigation. Ron Draper testified, contrary to Johnson's claim (AB 20-21), that with the exception of the cost of personnel and materials, the State Auditor team conducted an independent investigation, including looking at additional documents and interviewing witnesses. (C587-591; C595-596)

deprivation of the underlying liberty interest here to state a claim. She offers no support or authority for this one-sentence throwaway argument. Her only citation to the record is to B348-349. The documents located in the record at pages B348-349 are two self-serving letters (addressed to her counsel) which do not even address administrative leave or show any actual stigma. Rather, the letters deal with the effect of **termination - not administrative leave -** on hypothetical future job prospects. Johnson presents no evidence of actual stigma, only hypothetical stigma involving future job prospects. Consequently, Johnson cannot meet her burden, because Johnson must offer evidence supporting her claim in order to defeat summary judgment, which she fails to do. *See First Nat'l Bank v. City Serv., Co.*, 391 U.S. 253, 289-90 (1968) (A non-moving party is not entitled "to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegation, . . ."). In all events, Johnson failed to produce evidence she suffered a stigma as a result of being placed on paid leave. (A101-106; 110-112)

<strong>F.    Due Process Rights Are Not Implicated During An Investigation</strong>

Johnson contends "A fundamental denial of due process was the nature of the investigation." (AB 41) She cites no authority for this novel proposition. Indeed, there is no constitutional requirement of substantive or procedural due process unless a person has been deprived of a property or liberty interest. *See Board of Regents v. Roth*, 408 U.S. 564 (1972); *Perry v. Sindermann*, 408 U.S. 593 (1972). Consequently, until there is a deprivation (i.e., when an investigation results in discipline), there can be no due process violation.

**VII.    PLACING AN EMPLOYEE ON PAID LEAVE PENDING AN INVESTIGATION IS NOT DISCIPLINE, AND THEREFORE IS NOT A DEPRIVATION OF THE AFFECTED EMPLOYEE'S PROPERTY RIGHTS**

Johnson claims she was deprived of a protected property interest when she was "placed on administrative leave without recourse, without a hearing, and without the right to a grievance procedure." (A65) In her Answering Brief, she accuses the College of elevating form over

28

substance and refers to the College Personnel Handbook suggesting the College should have allowed her to grieve her administrative leave. Her claim fails for two reasons.

First, Johnson ignores the cases holding the College was free to suspend her with pay without depriving her of a protected property right. (OB 21-22) Second, she mischaracterizes the nature of the administrative leave by a misleading reference to the Personnel Handbook. The Personnel Handbook identifies different measures of discipline, including suspensions with pay. However, she was not disciplined when she was placed on paid administrative leave pending an investigation to determine if there would be discipline. The difference between a disciplinary paid suspension and being placed on paid administrative leave while there is an investigation is significant. Because there was no discipline, there was no right to grieve the paid administrative leave while the investigation was ongoing, and her claim fails.

## VIII.    GEORGE SHOULD BE DISMISSED ON THE BASIS OF OFFICIAL OR QUALIFIED IMMUNITY

Johnson's effort to salvage a claim against George is unavailing. With respect to her First Amendment claim, she cites *Kodrea* for the proposition that "If this Court concludes Dr. Johnson's First Amendment rights were violated it follows that those rights were "clearly established" and the defendant does not have qualified immunity. 2006 WL 1750071. First, *Kodrea* does not stand for this proposition. Indeed, there is no authority for this argument and it is not the law that every violation of First Amendment rights abrogates immunity because, naturally, not every violation of the First Amendment freedoms is a "clear" violation. Secondly, the *Kodrea* plaintiff-employee spoke on a matter involving "time abuse or the misuse of funds", which clearly is a matter of public concern, unlike the speech involved here which dealt with a non-public matter.[19]  (sections IA(1),(2) and (3))

---

[19] Johnson also cites *Heller v. Fulare*, 371 F. Supp. 2d 743 (W.D. Pa. 2005) in support of her qualified immunity argument. Notably, *Heller* was decided at the motion to dismiss stage before there was a record showing whether there was a clear violation of the plaintiff's constitutional rights.

With respect to her due process claim, Johnson contends she had a "clear" right to grieve her administrative leave.  However, not only is such a right not clear, but, as set forth in Argument VI, because her administrative leave was not discipline (it was part of an investigation) she was not entitled to grieve.

### CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of the College and George on all counts.[20]

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

David H. Williams (#616)
dwilliams@morrisjames.com
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
Attorneys for Defendants

Dated:  August 4, 2006

---

[20] Contrary to the statement in Johnson's conclusion, it is contradicted whether her speech was a motivating factor in her termination.  In fact, her termination was based upon a finding by an independent hearing officer that she engaged in the misappropriation of College resources.  Her termination was not caused by her speech.

30

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARGUERITE A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-157-KAJ |
| | ) | |
| ORLANDO J. GEORGE, JR., in both his | ) | Trial By Jury Demanded |
| official and personal capacities, and | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATE OF SERVICE

I, David H. Williams, hereby certify that on August 4, 2006, I electronically filed the

attached **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the

following:

>      Gary W. Aber, Esquire
>      Aber, Goldlust, Baker & Over
>      702 King Street, Suite 600
>      Wilmington, DE  19899-1675


>      MORRIS, JAMES, HITCHENS &  WILLIAMS LLP


>      James A. McMahon (#4284) for David H. Williams
>      David H. Williams (#616)
>      222 Delaware Avenue
>      P.O. Box 2306
>      Wilmington, DE  19899
>      (302) 888-6900
>      dwilliams@morrisjames.com
>      Attorneys for Defendants

Dated:  August 4, 2006