**TAB A**



Not Reported in F.Supp.2d                                                                                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Anthony CAVICCHIA, Plaintiff,
v.
PHILADELPHIA HOUSING AUTHORITY, et al.,
Defendants.
No. Civ.A. 03-0116.

Nov. 7, 2003.
Michael Pilegxgi, Philadelphia, PA, for Plaintiff.

Jessamyne M. Simon, Mark J. Foley, Melanie Mecka Kennedy, Klett, Rooney, Lieber & Schorling, Philadelphia, PA, for Defendants.

Nancy D. Wasser, Law Offices Of Nancy Wasser, Sidney L. Gold, Sidney L. Gold & Associates, PC, Philadelphia, PA, for Movants.

MEMORANDUM AND ORDER

SCHILLER, J.

*1 Plaintiff Anthony Cavicchia brings this suit under 42 U.S.C. § 1983 and the Pennsylvania Whistleblower Statute, 43 Pa. Stat. Ann. § 1423, et seq., against his former employer Defendant Philadelphia Housing Authority ("PHA") and several of its officials, Defendants Carl Greene, Michael Leithead, Jamine Bryon, and James Conlin, alleging that his termination was in retaliation for exercising his First Amendment rights and for blowing the whistle on alleged wrongdoing by PHA and its contractors. Presently before the Court are Defendants' motion for summary judgment and motion to strike Exhibit 7 of Plaintiff's memorandum of law in opposition to summary judgment. For the reasons set forth below, I grant both of Defendants' motions.

I. BACKGROUND

In 1991, Plaintiff began his employment with PHA in the position of Chief of Inspections. (Pl.'s Dep. at 91-92.) After approximately eight years and two previous transfers, Plaintiff was transferred to the position of Contracts Coordinator in the Contracts Administration Department where he remained until his termination. (Id. at 92-93.) As a Contracts Coordinator, Plaintiff's job duties included, among other things: reviewing plans and overseeing specifications; negotiating contract modifications; issuing preliminary approvals for contract modifications; reviewing and recommending bills for approval to the Contracting Officer; and maintaining the master file. (Id. at 93-94.) In sum, Plaintiff served as the Contracting Officer's "eyes and ears" to ensure that a construction job was in compliance. (Id.)

At the time of his termination, Plaintiff reported to Mr. Vernon Cooney, the Contracts Administrator Supervisor, who reported directly to Defendant James Conlin, the Contracting Officer. (Conlin Dep. at 33.) Mr. Conlin reported first to Defendant Jamine Bryon, the Assistant Executive Director of Real Estate Development, and then to Defendant Michael Leithead, the Senior Deputy Executive Director. (Id. at 7, 9-10.) Plaintiff had no direct contact with Defendant Carl Greene, the Executive Director of PHA.

Plaintiff alleges that the series of events at issue began in February 2000 and ended with Plaintiff's termination in November 2002. During this time period, Plaintiff made several reports of alleged wrongdoing that he contends were the motivating factor for his termination.

A. MLK DEMOLITION

In February or March 2000, Plaintiff reported improper crushing of debris at the Martin Luther King ("MLK") site and the sale of contaminated soil in the Philadelphia area. (Pl.'s Dep. at 137-40.) PHA had entered into a demolition contract with a contractor for the demolition of the high rise buildings on site and the removal of debris. The buildings being demolished contained lead. Accordingly, the contract specified that the contractor, Bianchi Trison ("BT"), was required to remove the debris to an approved landfill. (Id. at 161.) BT was also responsible under the contract for informing PHA if its methods of removal changed and to request testing of the debris. (Id.) In January 2000, Plaintiff noticed that the contractor, BT, was

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

crushing debris on the MLK site. (*Id.* at 134-35.) After investigating with a co-worker, Edward Marra, it was discovered that the contractor was in fact crushing debris on-site and selling it in the Philadelphia area. Believing that the crushing was improper, Plaintiff called Pennsylvania's Department of Environmental Protection ("DEP") and requested their regulations for maintaining a waste management facility in the City as he suspected that the contractors had not obtained the appropriate licenses to crush. (*Id.* at 134-37.) He did not, however, report the issue to DEP. (*Id.* at 137, 140.)

*2 Plaintiff reported his findings to the project manager, Dana Saftoiu, and to his supervisor at the time, Shelia Maxwell, who was the Contracting Officer. (*Id.*) Plaintiff learned that Ms. Saftoiu had approved the crushing of the debris and selling of it to other sites within the City after being informed that the landfill that BT had intended to use was full. (*Id.* at 137-38.) Plaintiff informed Ms. Saftoiu that there was nothing in the contract that gave the contractor the right to crush and sell the debris. (*Id.* at 138-39, 146-47.)

On February 28, 2000, tests were ordered to determine whether the debris could be crushed and used as clean fill. (*Id.* at 162-63.) While these tests were pending, a site meeting was held among Plaintiff, Ms. Saftoiu, the Director of PHA's Environmental Services Department John Peduto, the Asbestos Coordinator Michael Jayes, Ed Marra, Jerry Paladino, and the contractor with its sub-contractors. (*Id.* at 141-42.) At the meeting, Plaintiff voiced his concerns that the contractor's crushing was not in compliance with the permits and that the contractor had no air management licenses. Further, Plaintiff insisted that the contractor was violating the contract with PHA by storing and selling salvageable materials from the site. (*Id.* at 142-43.) Ms. Saftoiu contradicted him by saying that she believed that the contract permitted the contractor to crush and sell the debris. (*Id.* at 142, 146.)

In or around the same time period, Defendant Michael Leithead asked Plaintiff about the problems with the MLK site. (*Id.* at 65.) Plaintiff told Mr. Leithead that he had some concerns with the environmental and licensing issues and informed him that the contractor wanted to get paid. (*Id.* at 66.) Mr. Leithead, thereafter, "basically told [Plaintiff] 'don't hold this job up .... [g]et this job done." ' (*Id.*)

On March 14, 2000, the soil test results were returned to the PHA environmental department. The results raised concerns about the increased level of lead in the soil since the contractor had started improperly crushing and selling the debris as clean fill. On March 17, 2000, Ms. Maxwell issued a stop work order to BT, stating:

> You are hereby directed to cease all concrete crushing operations and backfilling on site, remove the equipment and/or machinery used in connection with this work from the site, and, as per the results of the applicable [soil] test(s) proceed with the disposal of the demolition debris in strict accordance with the contact specifications i.e. take the debris to the appropriate landfill.

(*Id,* Ex. 12.) BT, however, did not cease its crushing operation and removal of debris. Philadelphia Department of Licensing and Inspection ("L & I") issued another stop work order on March 23, 2000, at which time the crushing and removal ceased. (*Id.* at 167-68.)

BT sent a letter to Ms. Maxwell in April 2000, asserting that its actions were permissible under the contract. Ms. Maxwell sought Plaintiff's assistance in addressing the issues that BT had raised in its letter. Plaintiff provided Ms. Maxwell with a summary of his findings, which stated that the "contractor violated federal, state, and local environmental ordinances, local licensing ordinances, and PHA specifications in the processing and disposal of debris." (*Id.* at 149.)

*3 In March 2000, PHA also throughly investigated the incident through its police department. (*Id.* at 199.) Detective Chris Vandervort was assigned to the case and interviewed several PHA employees, including Plaintiff, the contractors, and the sub-contractors. (Vandervort V.S. ¶ ¶ 2-3, Pl.'s Dep. at 198-99.) As a result of the investigation, Ms. Saftoiu was terminated. Additionally, Mr. Marra and Nick Peduto were suspended for their failure to properly inspect the site in its early stages. (Pl.'s Dep. at 201; Vandervort V.S. ¶ 7.) Plaintiff was never reprimanded, nor was any disciplinary action taken against Plaintiff for making these reports or assisting in the internal investigation from the time the reports were made until his termination. (Pl.'s Dep. at 40-44, 201.)

B. MLK Litigation

BT subsequently filed suit against PHA alleging that payments were owed under the contract. (*Id.* at 48-50.) Plaintiff actively participated in the litigation. In July and August 2002, Plaintiff gave deposition testimony for two days on PHA's behalf, testifying,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consistently with his testimony in this case, that it was the contractor, and not PHA, who was at fault for the environmental issues and the delay at the MLK site. (Pl.'s Dep., Ex. 3, 4 at 178, 181-82, 295, 303-04; Pl.'s Dep. at 47, 144.) Thereafter, a settlement was reached between the parties. In or around November 14, 2002, Plaintiff raised objections about the settlement to Defendant Jamine Bryon. (Pl.'s Dep. at 52-53.) He believes that these objections were part of the reason for his termination. (*Id.* at 54.)

C. Raymond Rosen Soils Issue

Plaintiff also alleges that he was terminated for expressing concern over the transfer of contaminated soil from the Raymond Rosen site to the MLK site. (*Id.* at 11-12.) Sometime in 2001, Plaintiff reported these concerns to the Chief of Inspections Edward Marra, the Project Manager Brian Ward, and the Contracting Officer James Conlin. (*Id.*)

D. Temporary Electric at MLK

Plaintiff contends that he was terminated in part as a result of his investigation and reporting of problems with the temporary electric at the MLK site in or around June or March 2002. (Am.Compl.¶ 21.) He reported that the contractor did not have proper permits for the temporary electrical system that was being used by construction workers at the site. (Pl.'s Dep. at 26.) He reported this information to Defendant Vernon Cooney, his supervisor at the time, and Defendant James Conlin, the Contracting Officer. (*Id.* at 203.) At a site meeting, Plaintiff announced that he was going to recommend withholding payment to the contractor until it remedied the issues with the temporary electric. (*Id.* at 207.) Thereafter, Mr. Conlin told Plaintiff that he had decided it was not necessary to withhold payments and directed Plaintiff to work out his concerns with the project manager. (*Id.* at 24; Conlin Dep. at 64-65.)

As directed, Plaintiff emailed Cat Nguyen and Brian Ward, two of the project managers. (Pl.'s Dep. at 208.) Mr. Nguyen told Plaintiff that he should put his concerns in writing to the developer immediately. (*Id.,* Ex. 14.) Plaintiff claims that the proper permits were never issued, but he did not address the issue further with the developer or his supervisors. (*Id.* at 214.) Plaintiff was not reprimanded for reporting these problems. (*Id.* at 204.)

E. Decks at MLK

*4 In or around July 2002, Plaintiff raised an issue regarding the decks at the MLK site with his supervisor, James Conlin, Vernon Cooney, Cat Nguyen, Jerry Paladino, and Jim Wright. (*Id.* at 216-17.) The decks were being built without plans or specifications and without approval from L & I. (*Id.* at 30-31, 219-20; Am. Compl. ¶ 25) Plaintiff also informed the Army Corps of Engineers and the Philadelphia Zoning Board of Adjustments of his concerns with the decks. (*Id.* at 219-23.) Plaintiff, however, never informed anyone at PHA that he had contacted the Zoning Board regarding the decks. (*Id.*)

F. Blumberg Notice to Proceed

In or around early October 2002, Plaintiff was assigned to the Blumberg project. After reviewing the contractor's file, Plaintiff discovered that the Notice to Proceed was issued to the contractor before the proper documentation was acquired. (Pl.'s Dep. at 234-35.) Plaintiff reported to his supervisor, Defendant James Conlin, that the contractor, Dale Construction, did not have the appropriate bonding, insurance or sub-contractor documentation. (*Id.* at 232.) Mr. Conlin directed Plaintiff to obtain the required documents from the contractor. (Conlin Dep. at 98, 101, 103.)

G. Plaintiff's Treatment

Plaintiff admits that he was never reprimanded or disciplined after making his reports to PHA supervisors. (Pl.'s Dep. at 45.) He also testified during his deposition that he never had any problems or "run-ins" with the individual Defendants in this case. (*Id.* at 132.) Similarly, he stated that he was never criticized by Mr. Conlin as a result of his reports. (*Id.* at 130.) Nonetheless, Plaintiff testified that he believes that the series of reports contributed to his termination because despite his good performance evaluations, (*Id.* at 205), he "believed that [he] was the fly in the ointment," (*Id.* at 201-02).

H. Plaintiff's Termination

In the summer of 2002, Plaintiff began to have attendance problems. On July 23, 2002, Plaintiff received a written reprimand for being absent on July 15, 2002 without properly notifying his supervisor. (*Id.* at 245-47, Ex. 19.) Although Plaintiff disputes receiving the reprimand, he does acknowledge his absence on July 15, 2002. (*Id.* at 247, 252.) Thereafter, Plaintiff was absent for sick leave on August 19 and 30, September 11, 17, 20 and 30, and October 1, 16, 17, and 25. (*Id.* at 253-55; Pl.'s Dep.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)  
**(Cite as: 2003 WL 22595210 (E.D.Pa.))**

Page 4

Ex. 20.)

On November 18 to November 22, 2002, Plaintiff was admittedly absent for five days without having received prior verbal or written approval from his supervisor. (*Id.* at 259, 262.) Plaintiff contends that he requested vacation time during the week of November 18th, which he assumed was granted because he did not receive notification of whether it was approved or denied. (*Id.* at 259, 262-63.) At his deposition, Plaintiff testified that he submitted his request for leave the Wednesday before he was to take vacation. (*Id.* at 229-30.) He also alleges that in the twelve years that he worked at PHA, if a leave request was not explicitly rejected it was approved. (*Id.* at 229.) The Friday before his vacation, Plaintiff contends, he also mentioned to Mr. Cooney that he would be on vacation the following week. (*Id.* at 230.) In contradiction to his deposition testimony, Plaintiff's written request for vacation was dated the Monday after he returned from his vacation, November 25. During the week of November 18 to November 22, Plaintiff called his supervisor, Mr. Cooney, each day to say he was "out." (*Id.* at 254, Ex. 20.) Plaintiff stated that he called in because he had a "hunch" something was "fishy" with his vacation leave. (*Id.* at 264.)

*5 PHA's written policy requires a written request for vacation leave and express advance approval from a supervisor. Specifically, the vacation leave policy allows vacation leave to be used "if approved by the employer's supervisor," according to the following procedures:

> Employee's Responsibility. The employee must submit his request for annual vacation leave to his supervisor on the prescribed leave form. Vacation requests that are for five (5) or more days must be submitted when annual leave requests are submitted. In cases of emergency vacation leave requests, the employee must submit his/her request to his/her supervisor for consideration 24 hours in advance of the date that the vacation leave is requested.
> Supervisor's Responsibility. Supervisors are responsible for authorization of vacation leave and noting the employee's leave time on department timesheets.

(Conlin V.S.¶¶ 4, 5, Ex. B.) Under the disciplinary policy, an employee who takes vacation leave without proper request or prior approval is considered absent without leave ("AWOL"). (Conlin V.S. ¶ 6, Ex. C ¶ 12.) Similarly, employees who are AWOL for five or more days are considered to have voluntarily resigned. (*Id.*)

Mr. Cooney contacted Mr. Conlin regarding Plaintiff's AWOL status for the week of November 18th. (Conlin Dep. at 17-18.) Because of Plaintiff's previous attendance issues, Mr. Conlin in turn contacted Human Resources. (Conlin V.S. ¶ 8.) Human Resources informed Mr. Conlin of the PHA's AWOL policy. (*Id.*) Although Mr. Conlin did not have the authority to terminate Plaintiff's employment, he reviewed the recommendation of Plaintiff's first line supervisor, Mr. Cooney, which indicated that Plaintiff had time and attendance issues, and referred the issue to Human Resources. (Conlin Dep. at 17-19.) At Human Resources request, Mr. Conlin thereafter prepared the Notice of Termination for Plaintiff's discharge and submitted it to James Jones, who was the Human Resource Manager at the time. (Conlin V.S. ¶ 9.) Plaintiff was notified of his termination on November 27, 2002. (Pl.'s Dep. at 254, Ex. 20.) Plaintiff did not take any steps to have his termination reconsidered and applied for retirement benefits. (*Id.* at 266-67.)

Plaintiff's termination letter stated that he was terminated for the following reasons:

> It is noted that you have established a pattern of excessive absenteeism, recently, including the following leave dates: October 1, 16, 17 & 25, 2002; September 11, 17, 20 & 30, 2002; and August 19 and 20, 2002. Additionally, on late Thursday, November 7, 2002 you submitted a request for 1 day of vacation leave for Friday afternoon, November 8, 2002, but never obtained either verbal or written approval. From Monday, November 18, 2002 to Friday, November 22, 2002 you were absent without leave. On early Monday morning, November 18, 2002, I retrieved a voicemail message from you stating: "Vernon it's Tony and I'm out." On Tuesday morning, November 19, 2002, I retrieved another voicemail message from you stating again: "Vernon it's Tony and I'm out." On Wednesday, Thursday, and Friday mornings, November 20, 21, & 22, 2002, I retrieved additional voicemail message from you stating: "Vernon it's Wednesday morning and I'm out," "Vernon, its Thursday, these days are to be used as vacation" and "Vernon, its Friday--out again it's Tony." This behavior is unacceptable and cannot be tolerated, and you are hereby Terminated for 1) being absent without leave and never obtaining verbal or written approval for you absences on November 8, November 18, 19, 20, 21, & 22, 2002.

*6 (*Id.,* Ex. 20; *Id.* at 263-64.) Plaintiff claims that PHA treated him differently than other employees

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00157-MPT   Document 119-2   Filed 08/04/2006   Page 6 of 13

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

and that he should have been entitled to progressive discipline. One such employee, Davis Holmes, was a Contracts Coordinator also supervised by Mr. Cooney who Plaintiff testified was "absent a lot" and got the "whole laundry list of disciplinary actions before he got terminated." (Id. at 268-69.) David Holmes was ultimately terminated within one week of Plaintiff for being absent without leave one day and not obtaining verbal or written approval for his absence. (Id. at 269; Conlin V.S. ¶ 10.)

As a result of his termination, Plaintiff filed the instant action in this Court. Defendants now move for summary judgment on all of Plaintiff's claims. In opposition to Defendants' summary judgment motion, Plaintiff filed a memorandum of law with several exhibits attached. Defendants also move to strike Exhibit 7 attached to Plaintiff's opposition, asserting that the document lacks foundation and was not previously produced during discovery. Oral argument regarding these two motions was held on September 26, 2003.

II. DISCUSSION

A. Defendants' Motion to Strike Exhibit 7

Defendants assert that Exhibit 7, an alleged memorandum from Richard Zappile, Chief of Police of PHA's Police Department to Michael Leithead, the Executive Deputy Director of PHA, should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1). Plaintiff attached the purported memorandum to his opposition to summary judgment, and asserts that it "lays out and basically says every element of this case"--the veritable "smoking-gun" document. [FN1] (Sept. 26, 2003 Tr. at 25, 27.) Plaintiff's counsel contends that the document was found on his law office doorstep, left by an anonymous source, one or two days before the filing of Plaintiff's opposition to summary judgment. In opposition to the motion to strike, Plaintiff argues the memorandum should have been produced by Defendants, and, pursuant to Federal Rule of Civil Procedure 37(c)(1), Defendants should be sanctioned.

> FN1. Despite Plaintiff's counsel's characterization, consideration of this document does not create a genuine issue of material fact that would necessitate a denial of the summary judgment motion. As discussed below, Plaintiff has failed to raise an inference sufficient to demonstrate that his alleged protected activity was the substantial or motivating factor for his termination. Plaintiff argues that this document shows that: (1) Plaintiff participated in uncovering the alleged wrongdoing by the contractors at the MLK site; (2) there would be considerable cost that would be involved in shutting down the site as a result; and (3) Mr. Leithead was aware of these facts. From this circumstantial evidence, Plaintiff suggests that a reasonable fact finder could infer that Defendants terminated Plaintiff to "cover-up" the wrongdoing. (Sept. 26, 2003 Tr. at 28.) This contention is illogical, however, because between Plaintiff's reports and his termination, PHA made a full investigation and was involved in litigation regarding the incidents with the contractor, BT. Thus, it is clear that PHA did not have a motive to terminate Plaintiff to cover-up the wrongdoing at the MLK site as at the time of Plaintiff's termination, any wrongdoing had already been brought to light. As such, it is clear that this document would not serve as circumstantial evidence of causation even if its authenticity were established.

Considering Defendants' Motion to Strike, this Court must first make a threshold determination of the document's authenticity. See 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56 .14[4][a] (3d ed. 1997) ("A motion to strike will also be granted when it challenges documentary evidence that was submitted in support of or in opposition to a summary judgment motion, but which has not been properly authenticated."); see also Dedyo v. Baker Eng'g N.Y., Inc., No. Civ.A. 96-7152, 1998 WL 3576, at *4, 1998 U.S. Dist. LEXIS 132, at *13 (S.D.N.Y. Jan. 13, 1998). If the document is authentic and should have been produced by Defendants, then it should not be excluded. See Am. Tele. & Telegraph, Co. v. Shared Communication Servs. of 1800-80 JFK Blvd., Inc., No. Civ.A. 93-3492, 1995 WL 555868, at *3, 1995 U.S. Dist. LEXIS 13706, at *6 (E.D.Pa. Sept.14, 1995) ("[A] court should not exclude evidence a party improperly withheld when the evidence supports the opposing party's case; in all other contexts, exclusion is automatic." (noting advisory committee notes to Federal Rule of Evidence 37)).

*7 The alleged author, Mr. Zappile, attests that he does not "recall ever drafting the document," and further, "believe[s] that it is highly unlikely" that he wrote it. (Zappile V.S. ¶ 2.) Similarly, Mr. Zappile did not find record of this document in his files and

Case 1:05-cv-00157-MPT    Document 119-2    Filed 08/04/2006    Page 7 of 13

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

he did not sign the document. (*Id.* ¶¶ 3-4.) Finally, Mr. Zappile asserts that this document "is not the type of memorandum that [he] typically write[s] as it is too detailed and is not in the format [his] secretary uses." (*Id.* ¶ 6.) The purported recipient of the document, Michael Leithead, also asserts that he does not recall ever receiving such a document. (Leithead V.S. ¶ 2.) In support of its authenticity, Plaintiff submits that the contents of the memorandum are very similar to a previously produced document by a different author and addressed to different recipients. (Sept. 26, 2003 Tr. at 23-26.) This argument, however, in conjunction with the statements by the document's purported author and recipient, only serve to make the nature of the purported memorandum more suspect as someone could have easily copied the previously produced document and changed the names of the author and recipient in order to create the purported memorandum.

Under the circumstances, it is not evident to the Court that this document was withheld from Plaintiff by Defendants as its authenticity remains suspect. Furthermore, the document surfaced well after discovery closed in this action. For these reasons, I grant Defendants' motion to strike Exhibit 7 from the record and do not consider it in my analysis of Defendants' summary judgment motion.

B. Defendants' Motion for Summary Judgment

1. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of identifying those portions of the record that it believes illustrates the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party has the burden of proof on a particular issue at trial, the moving party meets its burden by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the moving party meets this burden, the non-moving party must offer admissible evidence that establishes a genuine issue of material fact that should proceed to trial. See *id.* at 324; see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In order to meet this burden, the opposing party must point to specific, affirmative evidence in the record and not simply rely on mere allegations, conclusory or vague statements, or general denials in the pleadings. See *Celotex*, 477 U.S. at 324. "Such affirmative evidence-- regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance ." *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir.1989).

*8 A court may grant summary judgment if the non-moving party fails to make a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In making this determination, the non-moving party is entitled to all reasonable inferences. See *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). A court may not, however, make credibility determinations or weigh the evidence in making its determination. See *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); see also *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir.2002).

2. § 1983

Plaintiff brings claims under 42 U.S.C. § 1983 against the individual Defendants as well as Defendant PHA. (Am.Compl.) In order to establish a § 1983 claim against individual defendants, "a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the law of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." ' See *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995). Alternatively, a municipality may be liable if a constitutional deprivation results from an official municipal policy or custom. See *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir.2000) (citing *Monell v. N.Y City Dep't of Social Servs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); see also *Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 483 (3d Cir.2003) (discussing municipal liability under § 1983). The inquiry regarding whether a constitutional violation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00157-MPT    Document 119-2    Filed 08/04/2006    Page 8 of 13

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

has occurred as a result of acts by an individual defendant is a separate inquiry from the question of municipal liability. _Brown,_ 318 F.3d at 483 (citing _Collins v. City of Harker Heights,_ 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ( "emphasizing 'the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred" ')). As such, I discuss each separately below.

a. Retaliation under the First Amendment

In his Amended Complaint, Plaintiff asserts that the individual Defendants violated his First and Fourteenth Amendment rights by terminating him in retaliation for engaging in protect speech. (Am.Compl.¶ ¶ 35-41.) Under the First and Fourteenth Amendment, "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." _Baldassare v. New Jersey,_ 250 F.3d 188, 195 (3d Cir.2001) (citing _Renkin v. McPherson,_ 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)); _Feldman v. Phila. Hous. Auth.,_ 43 F.3d 823, 829 (3d Cir.1994); see generally _Connick v. Myers,_ 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); _Pickering v. Bd. of Educ.,_ 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (holding that "statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact the statements are directed at their nominal superiors" (citing _Garrison v. Louisiana,_ 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and _Wood v. Georgia,_ 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)).

*9 A court must evaluate a public employee's retaliation claim for engaging in protected activity under a three-step analysis. _Baldassare,_ 250 F.3d at 195 (citing _Green v. Phila. Hous. Auth .,_ 105 F.3d 882, 885 (3d Cir.1997)); **_Ambrose v. Township of Robinson,_ 303 F.3d 488, 493 (3d Cir.2002)**. First, a plaintiff must show that the activity in question is constitutionally protected. _Ambrose,_ 303 F.3d at 493 (citing _Bd. of County Comm'rs v. Umbehr,_ 518 U.S. 668, 675 (1996)). Second, a plaintiff must "demonstrate that the protected activity was a substantial or motivating factor in the alleged retaliatory action." _Green,_ 105 F.3d at 885 (citing _Swineford v. Snyder County Pa.,_ 15 F.3d 1258, 1270 (3d Cir.1994)). Third, the defendant public employer can "defeat plaintiff's claim by demonstrating 'that the same action would have been taken even in the absence of the protected conduct." ' _Id._ (quoting _Swineford,_ 15 F.3d at 1270).

i. Protected Activity

Defendants do not contest, for the purposes of this motion, that Plaintiff was engaging in "protected activity." Rather, the gravamen of their arguments on summary judgment focuses on the second and third prongs of the analysis.

ii. Causation and Same Decision

Defendants assert that Plaintiff has failed to meet his burden of showing that his protected activity was the motivating factor for his termination. Specifically, Defendants proffer that Plaintiff was terminated because he was AWOL for five consecutive days without prior approval by his supervisor. In response, Plaintiff contends that there is a genuine issue of material fact regarding causation because "the record evidence provides substantial proof that Defendants' proffered reason for terminating Plaintiff is pretext and that the real reason for his termination is that Defendants' retaliated against the Plaintiff for exercising his First Amendment right to free speech." (Pl.'s Resp. to Defs' Mot. for Summ. J. at 14.)

In arguing that Defendants' proffered reasons are pretext, Plaintiff first posits that Defendants' grounds for termination are ambiguous. Plaintiff argues that while Defendants now contend that Plaintiff was terminated for being AWOL for five days without his supervisor's prior approval, the termination letter states that Plaintiff was terminated because of excessive absenteeism. (Pl.'s Memo. of Law in Opp'n to Defs.' Mot. for Summ. J. at 14; Pl.'s Dep, Ex. 20 (Termination Letter).) Second, Plaintiff argues that Defendants' reasons are pretextual because: (1) PHA's disciplinary policy is discretionary; and (2) Plaintiff should have been entitled to progressive discipline. (Pl.'s Memo. of Law in Opp'n to Summ. J. at 14-15.)

A plaintiff may survive summary judgment by discrediting an employer's proffered reason for termination. [FN2] _Fuentes v. Perskie,_ 32 F.3d 759, 764 (3d Cir.1994). In order to discredit the employer's proffered reason, however, the Third Circuit has held that:

> FN2. Pretext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims. _See Feldman v. Phila. Hous. Auth.,_ 43 F.3d 823, 831 (3d Cir.1994) (discussing pretext in determining causation in First Amendment retaliation claim); see also _Azzaro v. County of Allegheny,_ 110

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00157-MPT   Document 119-2   Filed 08/04/2006   Page 9 of 13

Not Reported in F.Supp.2d                                                                                                   Page 8
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

F.3d 968, 981 (3d Cir.1997) (holding that Title VII causation standards are relevant in evaluating causation under First Amendment); *Zappan v. Pa. Bd. of Prob. & Parole,* No. Civ.A. 00-1409, 2002 U.S. Dist. LEXIS 23424, at *33, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002) (discussing same); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1990); *Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996) (same).

*10 [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.
*Keller v. Orix Credit Alliance, Inc.* 130 F.3d 1101, 1108 (3d Cir.1997) (citing *Fuentes,* 32 F.3d at 765). As such, "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [plaintiff's protected activity]." *Id.* (citing *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996)).

In the present case, Plaintiff has failed to demonstrate inconsistency or ambiguity in Defendants' proffered reasons for termination. As explicitly detailed in the termination letter, Defendants stated that Plaintiff was terminated for "a pattern of excessive absenteeism," including five consecutive days on which Plaintiff was absent without prior approval. As Plaintiff concedes, his termination was discretionary, and as an at-will employee, Plaintiff was not necessarily entitled to progressive discipline. (Pl.'s Memo. of Law in Opp'n to Summ. J. at 14-15.) The recommended discipline for AWOL infractions of five or more days under the PHA disciplinary policy is voluntary resignation. (Conlin V.S. ¶ 6, Ex. C ¶ 12.) While PHA could have afforded Plaintiff a more lenient, progressive discipline, it is not the province of this Court to pass judgment on the prudence of Defendants' decision. *Keller,* 130 F.3d at 1108. Thus, I do not find the proffered reasons for termination to be ambiguous or inconsistent such that a reasonable factfinder would disbelieve them.

Even if Plaintiff could prove that Defendants' proffered reasons for termination were pretextual, Plaintiff fails to provide a scintilla of evidence, whether circumstantial or direct, that his protected activity was a substantial or motivating factor in his termination. *Baldassare,* 250 F.3d at 195. First, "for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose,* 303 F.3d at 493 (citing *Allen v. Iranon,* 283 F.3d 1070, 1076 (9th Cir.2002)).

Plaintiff testified that he did not know if any of the individual Defendants were involved in terminating him. (Pl.'s Dep. at 60-61.) While Mr. Conlin recommended termination to James Jones, the Human Resource Manager, he did not have the authority to make the termination decision on his own. (Conlin V.S. ¶¶ 8-11.) Termination decisions at PHA are made by Human Resources with the concurrence of the Senior Deputy Executive Director. (Jones V.S. ¶ 6.) Thus, Plaintiff's termination was made by James Jones and approved by Michael Leithead. Furthermore, James Jones attested that he was not aware of Plaintiff's complaints at the time of the termination decision. (*Id.*)

*11 While Mr. Leithead also testified that he was not aware that Mr. Cavicchia came forward with concerns about the MLK site or other complaints prior to the commencement of this lawsuit, (Leithead Dep. at 198), Plaintiff testified that he and Mr. Leithead had a conversation regarding his concerns at the MLK site approximately two and a half years prior to his termination. (Pl.'s Dep. at 65.) Generally, "the temporal proximity between the employee's protected activity and the adverse employment action ... is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action." ' *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997) (citing *Zanders v. Nat'l R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990) and *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989)); *see also Ambrose,* 303 F.3d at 494 (holding that "suggestive timing" is relevant to causation in First Amendment retaliation cases). In the present case, the temporal proximity factor has the opposite effect. A two and a half year gap between this conversation and Plaintiff's termination is too attenuated for a reasonable factfinder to conclude, without any other evidence, that the conversation was a substantial or motivating factor in Plaintiff's termination. *Farrell v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00157-MPT    Document 119-2    Filed 08/04/2006    Page 10 of 13

Not Reported in F.Supp.2d                                                                                     Page 9
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

_Planters Lifesavers Co.,_ 206 F.3d 271, 280 (3d Cir.2000) ("[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive,' ... nineteen months was too attenuated to create a genuine issue of fact.") (citing _Krouse v. American Sterilizer Co.,_ 126 F.3d 494, 503 (3d Cir.1997); cf. _Jalil,_ 873 F.2d at 701 (reversing grant of summary judgment because plaintiff established causation for the purposes of his prima facie case merely by showing discharge occurred only two days after employer received notice of plaintiff's EEOC claim).

Plaintiff argues that the attenuated timing can be explained by the fact that Defendant PHA needed to retain Plaintiff in order for him to testify in the on-going litigation between PHA and BT. (Sept. 26, 2003 Tr. at 4, 24.) Plaintiff contends that PHA could not and would not terminate his employment prior to the date of his termination because he was the only witness for the litigation. (_Id._ at 5.) This argument, however, is not supported by the record. In fact, while Plaintiff may have indeed been the key witness in the BT litigation, this suggestion goes against the inference that Defendants wanted to get rid of Plaintiff in order to "cover-up" the issues he had been reporting. Additionally, Plaintiff was twice deposed in the summer of 2002 and thus, Defendants had his testimony and could call him as a witness regardless of his employment with them.

Alternatively, where there is a lack of temporal proximity, Plaintiff could come forward with "circumstantial evidence of a 'pattern of antagonism' following the protected conduct [which could] also give rise to the inference [of retaliation]." _Kachmar,_ 109 F.3d at 177 (citing _Waddell v. Small Tube Prods., Inc.,_ 799 F.2d 69, 73 (3d Cir.1986)). In this case, however, there is no evidence in the record that Plaintiff was otherwise retaliated against, reprimanded in any way, or treated poorly during the over two-year period that he made his reports to his supervisors. In his deposition, he admitted that there were no incidences of reprimand or direct or indirect retaliation. (Pl.'s Dep. at 13-31, 201, 204, 208, 228.) Rather, Plaintiff relies on the mere assertion that he "believe[s] that [he] was the fly in the ointment." (_Id._ at 202, 230-31). See _Blanding v. Pennsylvania State Police,_ 811 F.Supp. 1084, 1095 (E.D.Pa.1992) (holding that plaintiff's deposition testimony that he "felt that [defendant's] style of interrogation was a result of [defendant's] feelings of racial prejudice," and plaintiff's claim that defendant "included false facts in [a report] with discriminatory intent," were insufficient to overcome defendants' non-discriminatory reasons for their actions); see also _Akins v. Deptford Township,_ No. Civ.A. 92-0610, 1993 WL 147343, at *7 n. 2, 1993 U.S. Dist. LEXIS 6211, at * 10 n. 2 (D.N.J. May 3, 1993) (citing _Blanding,_ 811 F.Supp. at 1095); cf. _Jackson v. Univ. of Pittsburgh,_ 826 F.2d 230, 236 (3d Cir.1987) (holding that plaintiff's deposition testimony contained circumstantial and direct evidence--not simply accusations and speculation-from which fact finder could reasonably infer that defendants' reasons for termination were pretextual).

*12 To the contrary, there is evidence that Plaintiff received positive performance evaluation during his tenure at PHA. (Pl.'s Dep. at 205-06.) Specifically, one month after he reported the temporary electric issue at the MLK site, on July 22, 2002, he received a good performance review that noted that he had "attentiveness to safety considerations." (_Id._, Ex. 6.) Additionally, Plaintiff admits that he never had any "run-ins" with the individual Defendants, including Mr. Leithead, a decisionmaker in Plaintiff's termination. Thus, considering the evidence as a whole, I find that because Plaintiff has failed to show that Defendants' reasons for termination were pretextual and has not come forward with any affirmative evidence to raise the inference of retaliation, summary judgment is warranted on the First Amendment claim against the individual Defendants. See _S.E.C. v. Hughes Capital Corp.,_ 124 F.3d 449, 455-56 (3d. Cir.1997) (holding plaintiff's assertions, in light of substantial evidence to the contrary, do not create triable issue of fact); _Kachmar,_ 109 F.3d at 177 ("[A] court must look at the evidence, as a whole, to determine whether it may suffice to raise the inference [of retaliation.]" (internal citations omitted)); _Big Apple BMW, Inc. v. BMW of North America, Inc.,_ 974 F.2d 1358, 1363 (3d Cir.1991) (holding that "an opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence"); cf. _EEOC v.. L.B. Foster,_ 123 F.3d 746, 753-55 (3d Cir.1997) (holding plaintiff established prima facie case of retaliation based on temporal proximity between events plus inconsistencies in defendant's testimony); _Woodson v. Scott Paper Co.,_ 109 F.3d 913, 921 (3d Cir.1997) (holding plaintiff established casual link of retaliation because intervening pattern of antagonism was so strong that it overcame lack of temporal proximity).

b. Municipal Liability

In Count Three of Plaintiff's Amended Complaint, he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleges that Defendant PHA as a matter of policy, practice or custom: (1) retaliated against individuals who reported wrongdoing or exercised their First Amendment rights; (2) failed "to adequately discipline, train or otherwise direct its officials concerning rights of employees;" (3) failed to "properly sanction or discipline its officials ... for violations of the constitutional rights of its employees;" (4) failed "to sanction or discipline its officials ... who were aware of and subsequently concealed violations of the constitutional rights of its employees by other officials;" and (5) allowed the individual Defendants "to obstruct and interfere with investigations and audits in an effort to prolong, frustrate or conceal legitimate audit activities ... where instances of fraud, waste or inefficiency were in the process of being investigated or audited." (Am.Com pl.¶ ¶ 48-59.) A municipality may be liable if a constitutional violation was caused by action taken pursuant to a municipal policy or custom. *Monell,* 436 U.S. at 380. A policy is shown when "a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990) (citations omitted)). A "custom" is defined as "such practices of state officials so permanent and well-settled as to virtually constitute law." *Id.* Alternatively, "under certain circumstances," a municipality may be liable when the policy in question concerns a failure to train or supervise municipal employees. *Brown,* 318 F.3d at 483 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir.1999) (citing *City of Canton,* 489 U.S. at 388). In these circumstances, however, "liability under ... § 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter,* 181 F.3d at 357 (citing *City of Canton,* 489 U.S. at 388).

*13 In this case, as discussed previously, Plaintiff has failed to show an underlying constitutional violation by the individual Defendants. Although Plaintiff has not met his burden in this regard, this Circuit has held that "it is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable." *Brown,* 318 F.3d at 483 (citing *Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3d Cir.1994)). "However, there still must be a violation of the plaintiff's constitutional rights." *Id. (citing*

*Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Thus, in order for Plaintiff to show municipal liability, Plaintiff must not only demonstrate that PHA "adopted with deliberate indifference a policy [or custom] of inadequate training" or supervision, but also that there is a direct causal link between the policy or custom and a constitutional violation. *Id.* (citing *Canton,* 489 U.S. at 386); *see also Beck,* 89 F.3d at 971. Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations," *Berg v. County of Allegheny,* 219 F.3d 261, 276 (2000) (citing *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)), and the need for more or different training is "obvious and inadequacy is very likely to result in violation of constitutional rights," *Carter,* 181 F.3d at 357 (holding that for municipality's failure to train or supervise to amount to deliberate indifference, municipal policymakers must know that employees will confront particular situation, situation involves difficult choice or history of employees mishandling, and wrong choice by employee will frequently cause deprivation of constitutional rights) (citing *Canton,* 489 U.S. at 389 and *Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir.1992)).

Plaintiff has failed to demonstrate municipal liability because he has not come forward with any affirmative evidence regarding a municipal policy or custom of inadequate training or supervision or the deliberate indifference of officials at PHA in adopting any such policy or custom. Nothing in the record suggests that there was a pattern of violations or a need for different training that was so obvious that a violation of employee's rights was likely to occur. At best, Plaintiff presents equivocal deposition testimony of Plaintiff and other former employees of PHA asserting their belief that they were terminated or forced to resign in retaliation for expressing concerns about the MLK site.

Plaintiff had not presented sufficient evidence to substantiate his *Monell* claim. The deposition testimony of these employees does not articulate any specific policy or custom on the part of any specific officials at PHA. Plaintiff testified that several employees were terminated, forced to resign, or otherwise reprimanded for "blowing the whistle." (Pl.'s Dep. at 274-77.) Edward Marra, an employee who was allegedly retaliated against for reports that he made, testified that Ms. Dana Saftoiu "was fired" but did not know the reason for her termination

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00157-MPT    Document 119-2    Filed 08/04/2006    Page 12 of 13

Not Reported in F.Supp.2d                                                                                              Page 11
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

(Marra Dep. at 78.) Similarly, with regard to his suspension, he testified that he thought raising issues about the MLK site "was part of it." (*Id.* at 79.) Mr. Michael Jayes, another former employee of the PHA, testified that he believed he was "retaliated in some way for [his] involvement with the MLK site." (Jayes Dep. at 54.) Additionally, Mr. Gerald Paladino testified that he did not know if his suspension was in connection with an investigation regarding the MLK site. (Paladino Dep. at 46.) He also testified that he did not know if Dana Saftoiu was terminated as a result of the investigation conducted regarding the MLK site. He stated: "I know [Ms. Saftoiu] was terminated but I can only assume it was because of the investigation. I don't know that for a fact." (Paladino Dep. at 50-51.)

*14 Speculation and conclusory assertions are not enough to establish that PHA had a policy or practice of retaliating against it employees for speaking out on matters of public concern in violation of the First Amendment. *Monell,* 436 U.S. at 694 (holding that plaintiff is required to show that alleged violation, e.g. retaliation, was inflicted because of the execution of a government's policy or custom, whether made by its lawmakers or by those whose acts or edicts can fairly be said to represent official policy). Moreover, Plaintiff has failed to show the requisite knowledge on the part of PHA officials in order to prove that they were deliberately indifferent to these employees' rights. *Kneipp,* 95 F.3d at 1213 ("[A] prerequisite to establishing liability in either situation is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom.") (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) and *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990)).

Lastly, Plaintiff stated in his deposition testimony that "there are policies and procedures that are kept secret, such as [the] disciplinary policy [and] the manager's manual [regarding] ... calling out sick." (Pl.'s Dep. at 285.) Plaintiff admitted, however, that he never asked for a copy of the disciplinary policy but had obtained a copy of the manager's manual when he requested it. (*Id.* at 285-86.) At a minimum, taking Plaintiff's testimony and the underlying allegations as true, Plaintiff fails to demonstrate that this custom caused him some constitutional injury, as he ultimately had access to the procedures that he requested, or that the need for more or different training is "obvious and inadequacy is very likely to result in violation of constitutional rights." *Carter,* 181 F.3d at 357; *see also Monell,* 436 U.S. at 691 (holding municipality can be sued directly under section 1983 where action pursuant to municipal policy or custom causes constitutional tort). Thus, because Plaintiff has failed to demonstrate a specific policy or custom that caused him constitutional injury or that the need for training was so obvious due to the likely violation of constitutional rights, he has also failed to establish independent municipal liability against Defendant PHA.

3. Whistleblower Act

In Count Four of Plaintiff's Amended Complaint, Plaintiff alleges that he was discharged in retaliation for blowing the whistle on the PHA, its employees, or its contractors. The Whistleblower Statute, 43 Pa. Stat. Ann. § 1423(a), states that:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

*15 43 PA. STAT. ANN. § 1423(a). Two requirements must be met for a plaintiff to prove a prima facie case of retaliatory termination and receive protection under the Whistleblower Statute: (1) wrongdoing; and (2) a causal connection between the report of wrongdoing and dismissal. *Golaschevsky v. Commonwealth Dept. of Environmental Protection,* 554 Pa. 157, 720 A.2d 757, 759 (Pa.1998).

Just as Plaintiff failed to meet the casual connection prong of his First Amendment retaliation claim, he also fails to meet the equivalent prong under the more stringent state law standard. Under Pennsylvania law, in order to show a causal connection, a plaintiff must "show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed." *Id.* at 163, 720 A.2d 757 (quoting *Gray v. Hafer,* 168 Pa.Cmwlth. 613, 651 A.2d 221, 225 (Pa.Commw.Ct.1995)). Vague and inconclusive circumstantial evidence is not enough. *Id.* As discussed above, Plaintiff admits that he was never reprimanded or disciplined in the two and one-half year period that he made his alleged reports to supervisors and merely asserts that he believed he

Case 1:05-cv-00157-MPT   Document 119-2   Filed 08/04/2006   Page 13 of 13

Not Reported in F.Supp.2d                                                                                     Page 12
Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)
(Cite as: 2003 WL 22595210 (E.D.Pa.))

was the "fly in the ointment." This evidence is insufficient to meet his burden of showing a casual connection between Plaintiff's reports of wrongdoing and his ultimate termination under the Pennsylvania Whistleblower Statute.

Even if a prima facie case could be made by Plaintiff, the burden would then shift to defendant to establish there were separate and legitimate reasons for the termination. *Golaschevsky v. Commonwealth Dept. of Environmental Protection,* 683 A.2d 1299, 1305 (Pa.Super.Ct.1996), *aff'd,* 554 Pa. 157, 720 A.2d 757 (Pa.1998). If defendant meets this burden, the plaintiff must then demonstrate that the defendant's reason was pretextual. *Id.* As discussed above, Defendants have established that Plaintiff was terminated due to his excessive absenteeism including his five day AWOL episode, and Plaintiff failed to prove that this reason was pretextual. Thus, Defendants are similarly entitled to summary judgment on this claim. An appropriate Order follows.

*ORDER*
AND NOW, this 7th day of November, 2003, upon consideration of Defendants Philadelphia Housing Authority, Carl Greene, Michael Leithead, Jamine Bryon, and James Conlin's Motion to for Summary Judgment, Defendants' Motion to Strike Exhibit 7, Plaintiff's responses, all replies thereto, following oral argument thereon, and for the foregoing reasons, it is hereby ORDERED that:
1. Defendants Philadelphia Housing Authority, Carl Greene, Michael Leithead, Jamine Bryon, and James Conlin's Motion to Strike Exhibit 7 (Document No. 49) is GRANTED.
2. Defendants Philadelphia Housing Authority, Carl Greene, Michael Leithead, Jamine Bryon, and James Conlin's Motion for Summary Judgment (Document No. 35) is GRANTED.
*16 3. Judgment is entered in favor of the Defendants and against Plaintiff.
4. The Clerk of Court is directed to close this case for statistical purposes.

Not Reported in F.Supp.2d, 2003 WL 22595210 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23906433 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Summary Judgment (Aug. 8, 2003)Original Image of this Document (PDF)

• 2003 WL 23906427 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Michael Pileggi's Request for a Protective Order (Jul. 29, 2003)Original Image of this Document (PDF)

• 2003 WL 23906422 (Trial Motion, Memorandum and Affidavit) Edward Marra and Gerald Paladino's Motion for a Protective Order and for Sanctions (Jul. 21, 2003)Original Image of this Document (PDF)

• 2003 WL 23906415 (Trial Pleading) Defendant's Answer to Amended Complaint (Jun. 23, 2003)Original Image of this Document (PDF)

• 2003 WL 23906408 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Apr. 24, 2003)Original Image of this Document (PDF)

• 2003 WL 23906399 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss (Mar. 21, 2003)Original Image of this Document (PDF)

• 2:03cv00116 (Docket) (Jan. 10, 2003)

• 2003 WL 23906435 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Motion for Summary Judgment (2003)Original Image of this Document (PDF)

• 2003 WL 23906439 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Exhibit to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (2003)Original Image of this Document (PDF)

• 2003 WL 23906444 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Plaintiff's Sur-Reply Brief in Opposition to Defendants' Motion for Summary Judgment (2003)Original Image of this Document (PDF)

• 2003 WL 23906450 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum of Law Addressing the Issues Raised at Oral Argument (2003)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.