IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,               )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      C.A. No.  05-157 (KAJ)
                                     )
                                     )      Trial By Jury Demanded
ORLANDO J. GEORGE, JR.,              )
in both his official and personal    )
capacities, and DELAWARE             )
TECHNICAL AND COMMUNITY              )
COLLEGE,                             )
                                     )
            Defendants.              )

## PLAINTIFF'S SUR REPLY BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED:  February 28, 2007

# TABLE OF CONTENTS

**Page No.**

TABLE OF CITATIONS                                                                iv

STATEMENT OF RELEVANT FACTS                                                        1

    Dr. Johnson's Termination was Predetermined                        1

    Independent Counsel                                                2

    Johnson's Professionalism                                          3

    Alleged Concerns About Johnson's Behavior                          3

    The Interview Processes                                            5

    Accountant David Dwyer's Violation of AICPA Standards
    for "Agreed Upon Procedures".                                      7

    The Hearing Officer's Reliance Upon the CPA's Report               9

    Marketing Department as a Source of Discontent                     11

    1999 Reunion                                                       12

    Travis Typing                                                      13

    Powell's Alleged Personal Work for Johnson                         14

    Credit Card Purchases                                              15

    Del Tech Travel Policies                                           16

    West Virginia Purchases                                            17

    Wake College Trip                                                  19

    Selection of Vincent A. Bifferato, Esquire as Hearing Officer      20

ARGUMENT

I.    DR. JOHNSON ENGAGED IN SPEECH THAT WAS
      PROTECTED UNDER THE "FREE SPEECH" PROVISIONS
      OF THE FIRST AMENDMENT, WHICH SPEECH
      INVOLVED MATTERS OF PUBLIC CONCERN                      21

          A.    Public Concern                                21

          B.    Application of Garcetti v. Ceballas           22

II.   DR. JOHNSON WAS DENIED RUDIMENTARY DUE
      PROCESS BEFORE BEING TERMINATED                         26

          A.    The Termination Hearing Did Not Meet
                The Basic Requirements of Speaking
                The Truth.                                    26

          B.    Denial of Dr. Johnson's Due Process
                Property Rights.                              28

III.  DR. JOHNSON WAS DENIED CONSTITUTIONALLY
      PROTECTED LIBERTY INTEREST                              32

IV.   DEFENDANT'S CONTINUE TO ERRONEOUSLY
      ASSERT THAT THE DEFENDANT, GEORGE, IS
      ENTITLED TO QUALIFIED IMMUNITY                          33

CONCLUSION                                                    34

## TABLE OF CITATIONS

**Page No.**

Abbattiello v. Count of Kauai
       2007 WL 473680 (D. Hawaii, 20070                             24

ABF Freight Systems, Inc. v. National Labor Relations Board
       510 U.S. 317, 323, 114 S.Ct. 835
       127 L.Ed.2d 152 (1994)                                       27

Baldassarie v. New Jersey
       205 F.3d 180, 197 (3d Cir. 2001)                            21

Black v. Columbus Public Schools
       2006 WL 2385359 (S.D. Ohio 2006)                            24

Board of Regents v. State College v. Roth
       408 U.S. 564, 93 S.CT. 2701, 2709
       33 L.Ed.2d 548 (1972)                                       29, 30

Brennan v. Norton
       350 F.3d 399, 412-413 (3d Cir. 2003)                        21, 22

Brown v. Trench
       787 F.2d 167 93d Cir. 1996)                                 30

Carter v. City of Philadelphia
       989 F.2d 117, 120 93d Cir. 1993)                            29

Cheek v. City of Edwardsville, Kansas
       2006 WL 2802209 (D.Kan. 2006)                               24

Czurlanis v. Albanese
       721 F.2d 98, 103 (3d Cir. 1983)                             21

Feldman v. Philadelphia Housing Authority
       43 F.3d 823, 829 (3d Cir. 1994)                             21

Garcetti v. Ceballas
       _, U.S._, 126 S.CT. 1951
       164 L.Ed.2d 689 (2006)                                      22

Hardiman v. Kelchec
       908 F.2d 976; 1999 WL 94973 p. 2 (9th Cir. 1999)            26

Orhrbough v. University of Colorado Hospital Authority
     2006 WL 3262854 (D.Colo. 2006)                          24

Perry v. Sinderman
     408 U.S. 593, 92 S.Ct. 2694, 2699
     33 L.Ed.2d 570 (1992)                                   29, 30

Pickering v. Board of Education
     391 U.S. 563, 88 S.Ct. 1731
     20 L.Ed.2d 811 (1968)                                   23

United States v. Mandujano
     45 U.S. 564, 576-577, 96 S.Ct. 1768
     48 L.Ed.2d 212 (1976)                                   26

United States v. Norris
     300 U.S. 564, 574, 57 S.Ct. 535
     81 L.Ed.2d 808 (1937)                                   27

Yuan v. Rivera
     48 F.Supp.2d 335, 346 (S.D.N.Y. 1999)                   27

Zerman, Jr. v. City of Strongsville, Ohio
     2006 WL 2812173 (N.D. Oh. 2006)                         22, 25

## STATEMENT OF RELEVANT FACTS

## DR. JOHNSON'S TERMINATION WAS PREDETERMINED

After Dr. Johnson was put on involuntary and administrative leave, all evidence of her existence at the college was removed. Her duties were assumed by Dan Simpson (Simpson 73-74, B-69-74). Simpson moved some of Johnson's furniture out of her office, and had her office redecorated (Simpson 114, B-650; Powell 33, B-590). Not only did Dan Simpson move into her office, but he assumed her parking space (Simpson 113-114, B-649-650). The culminating action to destroy any suggestion that Johnson would be returning, was the fact that Simpson took Johnson's picture down from the conference room and put it in a closet (Simpson 115, B-651).

Dan Simpson's actions, in trying to erase any suggestion that Dr. Johnson might return was confirmed during the CPA, Dwyer's interview process. During that process he told the witnesses that he had been guaranteed that Dr. Johnson would not return.

> "(Ms. Moliken):  Wouldn't that be horrible because everybody got rid of everything that she'll be back?
>
> Mr. Dwyer:  No. I don't think you have to worry about that. That's not going to happen.
>
> Ms. Moliken:  She's back.
>
> Mr. Dwyer:  That is not going to happen. I already - - I said, you know what's going to happen when people ask me that question? **They guarantee that she will not be back here so...."**
>
> *        *        *        *
>
> Mr. Dwyer:  You don't have to worry about that."
> (Transcript: Dwyer Interviews 401, D-91)(Emphasis Added)[1]

---

[1] The existence of the voice recordings were not revealed until Dwyer's deposition, after most other depositions had already been completed (Dwyer 6), and while Dwyer states that transcripts were produced, it was only his interpretations and manual summaries

The fact that Dr. Johnson's termination had been predetermined is further evidenced by the fact that during the entire investigation, no inquiry was made to her for her version of the facts (McNesby 138-140, B-544-546).   The defendant tries to explain away this deficiency stating that the college's attorney had asked for any relevant information from Johnson's counsel, on April 11, 2006, citing a verbal statement made during the termination hearing to that effect (RB-5; C-10-11).   This request however was not made during the investigation itself, but rather was made after the investigation was completed, and one day before Dwyer's report was issued on April 12, 2006 (B-174).   This was at the same time the report had been sent to the State Auditor and the Attorney General's Office (C-11).

## INDEPENDENT COUNSEL

The defendant maintains that he intended to obtain "independent, arms length" (DB-2) counsel to investigate the plaintiff.   In doing so, he retained the services of his present counsel who is representing him in this litigation.   The suggested "independent, arms length" counsel was the same attorney whom the defendant, George, had met with prior to Dr. Johnson being notified of the ultimatum to either resign or be terminated, and who the defendant, George, had already consulted concerning the situation. (George 77 & 87, D-104, 107).   Thus, the proposed independent counsel was the same counsel that was involved in the entire process leading up to, including, and after the decision was made to terminate Dr. Johnson (George 77-78, 87, 122-123, D-104, 105, 107, 108, 109). That same counsel had represented the school since 1995

that were actually produced, not the transcripts themselves (Dwyer 50, D-95). Transcripts were prepared of the copies of the recordings at the plaintiff's expense.

(George 86, D-  ). How then could  George deny that his regularly consulted counsel, who assisted him in making the decision to terminate Dr. Johnson, could do anything but help confirm what  George had already decided?

## JOHNSON'S PROFESSIONALISM

While the defendant continues to attempt to attack Dr. Johnson's professional reputation, without reference to any factual allegations concerning her conduct of college business (RB-2), they ignore Dr. Johnson's actual reputation.  She has been described as a true professional who is truthful and has integrity (T-475-476, D-143, 144).  Dr. Johnson was further described as always being focused on issues that were important to the college (T-293, D-134).  She was described as a role model for other professionals (T-294, D-135), loyal and committed to Del Tech (Id.), and with no reason to question  her truthfulness (T-297, D-136).

## ALLEGED CONCERNS ABOUT JOHNSON'S BEHAVIOR[2]

The defendant states that he had record evidence or facts to support the claim that for several years prior to 2004 George was presented with allegations concerning Johnson's behavior (RB-2).  The defendant goes on to claim that throughout 2004 George heard from Johnson's colleagues on the President's Council, consisting of other vice-presidents concerning allegations of Johnson's abusive behavior at the President's Council (RB-2).  Again, the allegations are made without any reference to any specific instance of wrongful conduct.

---

[2] Dr. Johnson's behavior was fully addressed in the plaintiff's answering brief under the heading "Dr. Johnson Was Considered a 'Tough Cookie', But a Driving Force". (AB-5-6).

One of those vice-presidents, Mr. McNesby, the vice-president of finance, who himself was a moving force in Johnson's termination, testified that he could recall no misconduct by Johnson at the President's Council meetings (McNesby 129-130, B-540-541). George acknowledged that McNesby was a part of the President's Council (George 32-33, D-100, 101). Nor did George know of any members of the President's Council who were intimidated by Johnson (George 61, B-493).     When questioned specifically, concerning Mr. McNesby, George could remember no specific incident of inappropriate behavior. (George 37, D-103)   Similarly, for Dr. Murray, the vice president of human resources, no specific incident concerning Dr. Johnson could be recalled.(Id.) Finally, with regards to Dan Simpson, who was another vice-president, and who succeeded Dr. Johnson, George could recall no specific incidents of misconduct. (George 38, D- 103).

More importantly with regards to the allegations of misconduct by Johnson, as will be argued in the "Due Process" argument portion of the brief, prior to the hearing, Dr. Johnson's counsel wrote to the defendants' counsel approximately two months before the hearing, specifically requesting prior notice of the evidence concerning the alleged "...proof of Johnson's administration by fear and intimidation". (B-86).  The next day the defendants' counsel wrote back reiterating that there would be testimony concerning Johnson's behavior, and promising to "....well in advance of the hearing we will provide you the names and prospective witnesses who will offer testimony on this issue and provide additional details concerning the anticipated nature of such testimony". (B-88)   Again approximately two weeks before the hearing, plaintiff's counsel again wrote to defendants' counsel requesting specific instances of conduct to

support the allegations of abusive and inappropriate behavior (B-93). Finally, approximately one week before the hearing plaintiff's counsel again wrote to defendants' counsel, memorializing that defense counsel had "....been unable or unwilling to provide...any specific allegations that would support (the) statements concerning administration by fear and intimidation." (B-102). Finally, on June 27, 2005 two days before the hearing, defense counsel responded to the request for specific instances, again stating only generalities concerning the allegations, but promising that the next day, the day before the hearing, affidavits required by Johnson's employment contract would be provided with detail (B-105). At that late date, the day before the hearing, any specific information concerning the abuse of conduct was being provided too late to be meaningfully analyzed.

## THE INTERVIEW PROCESSES

When Dr. Johnson had been placed on administrative leave she was directed (1) not to visit any college facility; (2) not to participate in any college functions on or off campus; (3) to collect her personnel effects, and (4) not to have contact with present or former employees concerning the investigation. (B50)

At the same time that Dr. Johnson had been banned from any contact with the college, the potential witnesses to testify against her were subjected to a cascade of multiple interviews by the college. First, Dr. Johnson's replacement, Daniel Simpson, a former Superintendent of the State Police, began to interview employees, immediately after Dr. Johnson had been placed on leave. (Simpson 86-87, 100, B-641-642, 647). Any doubt about Simpson conducting such interviews is dispelled by the summaries he prepared of those interviews (B-61). Simpson conducted these interviews at the

directive of the Vice-President of Finance, McNesby (Simpson 87-88, 105; B-642-643, 648).  While the defendant disputes the plaintiff's allegations that Simpson provided only names of persons who would support allegations (AB-11), claiming   Simpson only supplied names related to activities concerning Johnson (RB-4),   Simpson's own words revealed the truth, his true purposes:

> "Q.    As you suggested names, were the names that you suggested just the ones who would the support the allegations of misconduct against Dr. Johnson?
>
> A.    **I am sure that is the case**.  I don't clearly even remember the conversation. " (Simpson 132, B-652)[3] (Emphasis Added)

After Simpson began his interviews then Hope Murray, Vice-President of Human Relations conducted interviews of all persons who attended the IT meeting in which Johnson was allegedly disruptive (Murray 67-68, B-597-598).

After Murray did her interviews, then, the defendant's present counsel began a series of interviews, interviewing twenty (20) persons during the month of March 2005 (B-205).  Finally, the employees, after three rounds of interviews, were subjected to recorded interrogations by the outside accountant hired by the school, David Dwyer (B-182).  The persons interviewed by Dwyer were persons to whom he was directed to by the defendant, Del Tech (Dwyer 24, B-421), and selected by Dan Simpson (Dwyer 30, B-423).

At no time was Dr. Johnson, nor her counsel permitted to interview any of the potential witnesses, to be used against her during the same time period, while the

---

[3] The coercive and intimidating nature of Simpson in conducting those interviews is clearly shown by the intimidation and fear by which Simpson was viewed (b-616-616A, 674A)(AB-10, n.15).

witnesses were subjected to the four (4) rounds of interviews by the school officials or

its representative.  The  coercive effect of those repetitive interviews is obvious.

## ACCOUNTANT DAVID DWYER'S VIOLATION OF
## AICPA STANDARDS FOR "AGREED UPON PROCEDURES"

The retained Certified Public Accountant used by Del Tech, David Dwyer,

acknowledged that he used what is known as an "Agreed Upon Procedure" (Dwyer 40,

D-93 ), which were governed by the "American Institute of Certified Public Accountants

Standards" ("AICPA") standards (Dwyer 40-41, D-93, 94 ), and specifically §201.

While the defendants attack (RB-6) the claim that  there was "…no attempt to

find the truth of the allegations…" by their accountant (AB-13), it is clear that the

accountant admitted that during the investigation he was not seeking the truth.  When it

was suggested to him that the "agreed upon procedures", was used by him,  was not

intended to find the truth, the accountant responded: "Correct.  Correct" (Dwyer 55,

B432).

It is equally and abundantly clear that the hearing officer relied upon the report of

the defendant's retained Certified Public Accountant's Report (B212) in concluding that

Dr. Johnson was guilty of abusing her position (Id.)   However, the report, upon which

the hearing officer relied, was riddled with errors arising out of factual misstatements by

the accountant, unsupported factual conclusions, withheld evidence by the defendants,

and conclusions based on imaginary facts.  The inaccuracies in the CPA's report (B174)

were so grievous that they violated the professional standards (of the American Institute

of Certified Public Accountants, B-185), governing the "agreed upon procedures", which

was used by the accountant, in numerous ways:

7

1.      Positive statements about Dr. Johnson which contradicted negative statements in the report were omitted from the report (AB-13, §201.40)..[4]

2.      Relied upon subjective comments concerning Dr. Johnson (AB-13, §201.16).

3.      Distributed the report beyond the "specified parties" (AB-13, §201.06(g)).[5]

4.      Failed to include statements that contradicted the report's finding (§201.4)(Admitted by Dwyer; Dwyer 79-80, D-96, 97)

5.      Failed to disclose the custom and practice of vice-president's not requiring the president's signature for travel. (AB-14-15, §201.405)

6.      Failed to disclose that Kathy Powell estimated as little as 2% of her time and no more than 8% of her time being devoted to personal work, where the report claimed 10% of her time. (AB-15-16, §201.40).  (At the hearing the report's exaggerated 10% itself grew to 15% (T178-179,  D-130, 131) where there were no facts to support that inflated figure.)

7.      Overlooked, or was not presented evidence that Dr. Johnson had paid every bill presented to her, including bills for the reunion. (AB-16, §201.4) (Admitted by Dwyer ; Dwyer 118, D-98).

8.      Failed to describe the credit card oversight of Del Tech, which would have required reconciliation of credit card purchases by Dr. Johnson's secretary, Kathy Powell and/or timely notice provided to Dr. Johnson by the business office. (AB-18, §201.40).

---

[4]  References made as "§----" are to the American Institute of Certified Public Accountants Standards (B-185).
[5]  Dwyer had fifteen (15) copies of the report prepared for the defendant (D-12).  Clearly the intent was for a wide distribution beyond the "specified party", Del Tech.

9.    Failed to refer to the fact that it was Kathy Powell's responsibility, not Dr. Johnson's to reconcile all of Dr. Johnson's travel. (AB-18, §201.4).

10.    While criticizing Dr. Johnson's per diem expenditures, failed to mention, which he acknowledged, that the vice-president of finance had approved all such reimbursements. (AB-18-19, §201.40).

11.    Failed to obtain all relevant documentary evidence from the "specified parties" i.e. Del Tech,  which Del Tech possessed, and which Del Tech did not provide to Dwyer, consisting of invoices for reunion materials that Dr. Johnson had paid. (AB-16, §201.06(h)).

12.    Relied upon others' subjective opinions in concluding that Dr. Johnson acted inappropriately to her subordinates. (§201.16)(which violated the spirit if not the letter of §201.23, which states it is inappropriate to rely on others conclusory opinions in reporting a conclusion)(Dwyer 59, D-95A).

### THE HEARING OFFICER'S  RELIANCE UPON THE CPA'S REPORT

The hearing officer in reaching his conclusions to uphold Dr. Johnson's termination relied in large part upon the flawed CPA report.

With regards to the expense of the reunion, the hearing officer explicitly stated: "According to the CPA report, thousands of dollars in personal time and material to the college was spent on this purposes (1999 reunion)(B-212).  For all the reasons discussed herein (p. **8**, **supra**) it is clear that the hearing officer was mislead by the flawed, and factually inaccurate report of the CPA.

The second of the two items upon which the hearing officer relied was the alleged abuse of the PNC credit card (B-213).  However, except for the CPA's report of

the West Virginia credit card purchases, the college's vice-president of finance knew of no other inappropriate use of the credit card by Dr. Johnson. The vice-president of finance stated that external to the procedures of review, he knew of no instances of improper expenditures for Dr. Johnson (McNesby 162, B-547). Further, except for the credit card expenditures mentioned in the CPA's report, dealing with the West Virginia purchases, he was unaware of any other inappropriate use of the credit card by Dr. Johnson (McNesby 162-163, B-547-548)[6]

As to the conclusion by the hearing officer that Dr. Johnson's behavior was inappropriate, again, as shown earlier (p.**3**, **supra**. ), and in the due process argument, the plaintiff was "blindsided" because, contrary to the plaintiff's contract (B-129, ¶3(c)(ii)) Del Tech's Personnel Policy Manual ¶12.02(2) requiring prior notice of reasons for termination as well as "incidents and or conditions" leading to termination, and the rules and procedures enacted specifically for Dr. Johnson's termination proceedings, after the decision had been made to terminate her (B-119), Dr. Johnson was never timely provided notice of such evidence to be used against her. At no time, in violation of all of the aforesaid documents, and despite numerous letter requests asking for specifics, was Dr. Johnson provided any specific notice of the factual basis for the allegations of inappropriate conduct and "administration by fear and intimidation" until one day prior to the hearing, when it was impossible to utilize such information to prepare for the hearing.

---

[6] Apparently, the hearing officer had misconstrued the evidence presented in this matter regarding the cancelled checks as being repayments for the credit card purchases. The cancelled checks were offered as evidence to show that Dr. Johnson regularly paid for purchases of personal items and any expenses attributed to her, such as cell phone usage, using checks for payment, not the PNC credit card.

Finally, from the flawed CPA report, which omitted any reference to the Del Tech travel policy and credit card policy, any description of the financial oversight of the college, the policies which anticipated and provided for the possible combining of personal purchases with college related purchases, and the reimbursement for such purchases using the business office oversight and reconciliation of such credit card usage. Thus, again, the hearing officer was mislead by the flawed CPA report as to inappropriate credit card purchases.

## MARKETING DEPARTMENT AS A SOURCE OF DISCONTENT

In order to bolster the defendant's contentions against Dr. Johnson, the defendant cites testimony from several marketing department personnel concerning work for Dr. Johnson. (RB-7) However, it must be remembered that the marketing department was a source of recurring concerns about lack of professionalism, productivity, quality and inappropriate attitudes (AB-28). As pointed out at the termination hearing, there were recurrent issues in the marketing department (T-356), concerning a lack of productivity and quality (T-357). These issues arose and were documented in the annual evaluation of Daniel Houghtaling (T-355, 356-357, D-138, 139, 140). Mr. Houghtaling had overseen the marketing department (T-341, D-137 ).

When Mr. Houghtaling received that negative evaluation, and its accompanying criticism of his manager in the marketing department he wrote a three page, single spaced typed rebuttal, with no adverse action from Dr. Johnson (T-360).[7]

---

[7] This obviously contradicts the contention that it was dangerous to "cross" Dr. Johnson and disagree with her.

### 1999 REUNION

The entire analysis by Del Tech that was presented to the hearing officer, upon which the hearing officer relied, was based upon the report by Del Tech's CPA, David Dwyer. That CPA report was fundamentally flawed, since it ignored the fact that Dr. Johnson paid each and every bill that was presented to her for the reunion, a fact which Dwyer admitted (Dwyer 81-82, 87-88, B-450-451, B-456-457). Not only did Dwyer ignore and overlook some of the payments made by Dr. Johnson (Dwyer 96, 118, B-462, 473), but Del Tech in having Dwyer perform an "Agreed Upon Procedures" analysis, failed to provide Dwyer with a copy of the invoice prepared by Powell for the reunion work. (Dwyer 81, 88, B451, 457 & B138-139). That invoice prepared by Dr. Johnson's secretary, Kathy Powell did not have anything excluded from it by Powell (Powell 68, B-595), it was not reduced in anyway by Powell (Id.), and in preparing that invoice, Dr. Johnson was charged exactly the same price that everybody else was charged (T-151-152, B-357-358). The invoice was also prepared with the assistance of a marketing department employee (T-36, B-356). Thus, there was never a request by Dr. Johnson, nor was there any low balling of the invoice (Powell 68-69, B-595-596).[8]

The CPA's cost estimates of the reunion were further flawed because they were based solely upon the number of invitations sent out, not on the number of attendees.

---

[8] It must be remembered that Del Tech's counsel had contended to the contrary that:

> "Dr. Johnson directed her clerical staff to falsify business records by creating a fictitious invoice thereby enabling Dr. Johnson to reimburse the college for color copies at a rate substantially lower than the actual cost of reproduction." (B-82).

This false statement made at the conclusion of the college's investigation, is more indicative of the fact that the college was attempting to predetermine and pre-justify Dr. Johnson's termination.

(Dwyer 84, B-453). That is, the cost estimates were made without even knowing the number of attendees (Dwyer 85, B-454). Just as nobody pays for a wedding based on the number of invitations sent out, but rather only on the number of attendees, the CPA's estimate of the cost of the reunion was based upon the number of invitations, but upon the number of attendees. Without knowing the number of attendees, the CPA would have no way of knowing whether the undisclosed invoice prepared by Powell was or was not accurate.

Similarly, the CPA's estimates as to the copying costs for the reunion where wholly fictitious or made out of "whole cloth". He had no idea what the commercial charges for copying were in 1999 (Dwyer 88-89, B-458-459), and could not have based the charges based on the marketing department charges, since the marketing department had never charged for black and white copies (T-151, B-357; McNesby 165, B-459). Dwyer admitted he had no knowledge of what the marketing department historically charged for copying (T-176, D- 131).

## TRAVIS TYPING

The defendant contends that Chris Travis, a Del Tech employee spent a week typing reunion materials at work (RB-8). What Travis actually was questioned about by Del Tech's attorney, was how much time was spent typing the cookbook for the reunion. (T-503-504, D-145, 146). To that question she responded that she spent "conservatively...about a week" (T-504, D-146) typing the cookbook, with the week consisting of a 37.5 hours (Id.).

Obviously such testimony was inaccurate since the cookbook contained 14,891 words (Aff'd George S. Johnson, ¶3, D-26). Travis has admitted that she could type

between 65/WPM and 85/WPM (Travis 12, D-125)  At that rate, it would take her between 2.91 hours (at 85 WPM) or 4.14 hours (at 60 WPM) to type the cookbook. Even if it assumed that she had to spend an equal amount of time in the arranging and preparation, the total time to type the cookbook should not have exceeded 8 hours, one day, not a full week.

### POWELL'S ALLEGED PERSONAL WORK FOR JOHNSON

The defendant attempts to dismiss the demonstrated general custom and practice among Del Tech administrators that their secretary would assist them in some personal work so they could devote their time to other Del Tech matters (AB-24).  **They** dismiss the affidavit of a thirty-three year Del Tech secretary, claiming that she was biased towards Johnson, and that Johnson had somehow bribed her.  (RB-8-9).  In doing so, the defendant ignored the fact that the secretary in question, in her affidavit, indicated that she has worked not just for Dr. Johnson, but eight (8) other Del Tech executives, and the personal work she did for them (Aff'd Patsy Walters, ¶3, B-345-346).  The defendant further ignores the sworn testimony of Nancy J. Rockey who testified that she would do such personal work as preparing dissertations, executive papers for administrator's doctoral degrees (Rockey 15-16, 20, B-615-616, B-619). Ms. Rockey also testified that the Del Tech secretarial staff would do other personal work such as pick up laundry, type personal papers, and prepare materials for classes that the administrators would teach off campus (Rockey 16, 18, B-616, B-617).

Finally, the defendant ignores the fact that at the hearing Dwyer distorted the findings of his own interviews concerning the personal work performed by Kathy Powell. His summary of Kathy Powell's interviews clearly indicate that by her account, and his

calculations, she spent only 2% to 8% of her time on any personal work (B-185). At the hearing, however, Dwyer inflated those percentage points to as much as 15% without any factual basis (T-178-179, D-130, 131), and based his calculations on a 10% figure (T-179, D-131), which in itself was an inflation of the percentages he calculated during the interviews.

## CREDIT CARD PURCHASES

The defendant attacks (RB-9) the claims by Dr. Johnson that any un-reimbursed credit card purchases were a result and failure of a financial oversight by the Terri Campus business office (AB-22-23). Specifically the approximate three (3) year old credit purchases related to the West Virginia expenses. There was no evidence that Dr. Johnson was ever contacted about those purchases, and it was admitted that Dr. Johnson had a reasonable expectation of a review of all credit card purchases by the business office (Draper 44, B-412). It was also admitted by Del Tech's investigating CPA that the business office had failed in it's obligation to do a proper reconciliation. (Dwyer 107-108, B-469-470). Nor did Dr. Johnson's secretary, Kathy Powell have any recollection of anyone ever approaching her about the PNC credit card purchases (Powell 84-86, B-601-603), and Ms. Powell also acknowledged that Dr. Johnson had never refused to give her proper receipts (Powell 85-86, B-602-603). This failure by the business office to do a proper reconciliation and to notify Dr. Johnson, sometime before three years had past, of these one or two credit card charges was obviously the expectation of Dr. Johnson since the Del Tech travel and credit card policies provided for reimbursement and/or possible personal use of the credit card by college employees (Dwyer 108, B-468; McNesby 67, B-124; Draper 36-37, B-408-409). Once again, this

information was omitted from Del Tech's CPA in writing his report, upon which the hearing officer relied.[9]

## DEL TECH TRAVEL POLICIES

The defendant argues that the college presented no evidence at the termination hearing concerning travel policies nor relied upon the violation of travel policies for the basis of her termination.  In making such a contention the defendant ignores that it:

--Questioned Kathy Powell about Dr. Johnson's travel expenses (T-110-111, D-127, 128)

--The school retained a CPA about Dr. Johnson's travel expenses (T-170, D-129)

--Hearn, the Terry Campus Business Manager was questioned as to how the travel request forms were violated concerning the Wake College trip (T-256-257, D- )

--Dr. Johnson was questioned as to how her Wake College trip failed to conform to the travel policies  and travel request forms (T-441-442, D- )

Obviously the use of this questioning concerning Dr. Johnson's alleged violations of travel policies was used to "poison the well" concerning Dr. Johnson. However, as is more formerly set out in the plaintiff's answering brief (AB-14-15), that Dr. Johnson did not violate the travel policies since it was a custom and practice ignored by the defendant's accountant, which allowed campus vice-presidents to travel without presidential approval (AB-14-15).

---

[9] The defendant continues to assert that Hearn, the head of the Terry Campus business office was afraid to approach Dr. Johnson because he feared a reprimand (RB-9). However, such a position ignores the fact that Hearn never complained to his immediate superior, the vice president of financial affairs, McNesby concerning Dr. Johnson (McNesby 20, B-515).  In such a situation, if employees had any difficulty enforcing the school's policies, they should have approached McNesby, and he had no difficulties nor felt intimidated by Dr. Johnson (Id.).

## WEST VIRGINIA PURCHASES

The defendant attempts to argue that the use of the PNC credit card by Dr. Johnson, while visiting West Virginia, antique Black Sambo books with the credit card. Putting aside the fact that these credit card purchases, allegedly unaccounted for, were only two out of thousands of purchases that Dr. Johnson made with the PNC credit card, none of which were questioned to her, and the fact that these purchases lay unreconciled within the Terry Campus financial oversight system for years (Plaintiff's Answering Brief, pp. 22-24), they were entirely appropriate.

As initially explained, during the West Virginia trip by Dr. Johnson, accompanied by Dan Simpson, attempted to make purchases with her own American Express card, which was not accepted, and she then called the campus and asked her secretary, Kathy Powell, for her PNC card number (Powell 82, B602). If Johnson had been notified as to any question concerning those charges they would have been handled in the normal course of the Terry Campus financial oversight department (Plaintiff's Answering Brief pp. 26-27). This is true, since the receipts were found with all the other travel documents, located in the campus director's office. (Powell 78-79, 80-81; D-111, 112, 113, 114). There had never been any attempt to hide these receipts from a proper accounting (Powell 78, D-111 ).[10]

---

[10] Defendant attempts to argue, without any reference to the record, that a clerk in the business office, Sweeney asked Powell for the receipts on several occasions. However, as Powell testified, Johnson never refused to give her receipts (Powell 85-86, D-116, 117), and she would have, as a part of Powell's regular job duties, reconciled all travel expenses and credit card receipts (Powell 88; D-119). Powell admitted that Johnson never refused to respond to Powell's inquiries concerning receipts (Powell 86; D-117), and she had no recollection of the credit card statement ever actually being

The defendant continues to attempt to delegitimize the purchase of these books by Dr. Johnson by attempting to demonstrate that contrary to Dr. Johnson's assertion, the antique books purchased for the Del Tech Learning Resource Center ("LRC") were never given to the LRC (Defendant's Reply Brief-9-10). The defendant claims that a clerk in the LRC, Stumpf, had "**inventoried**" the LRC "small collection" (RB-10) and that the books were never found at the LRC. However, rather than inventory the books, Stumpf testified that she merely "**shelf read**" (T-516; D-147) the contents of the LRC library. The LRC has represented that it has 10,000 "cataloged items" or as it terms it 10,000 items on its shelves (D-14). Given the fact that the LRC has over 10,000 volumes, a simple shelf read would not suggest the ability to have total knowledge of the presence of each and every volume.

The defendant further contends that the absence of the books from the LRC is demonstrated by Stumpf's testimony that the books were "banned" and accompanied by Dan Simpson's assertion (C-317) that the books had been pulled from distribution(RB-10; C-514). The defendant's accounting expert David Dwyer, also erroneously asserted that the books had been pulled from distribution (T-317). Obviously, such a claim is incorrect. A simple computer search shows that the "Little Black Sambo" books are readily available throughout all the libraries in Delaware. Specifically, they are contained at the Delaware Technical and Community College Wilmington Campus (D-15) throughout New Castle County libraries (Appoquinimink, Bear, Brandywine

---

given to her and she never asked Dr. Johnson for a receipt (Powell 84-85, D-114, 116 ). While the business office had internally made an inquiry concerning these charges, Powell was never copied on the inquiry (Powell 87, D-118), and after 2002 for the next three years, there were no attempts to reconcile the charges for the West Virginia trip (Powell 88, D- 118)

Hundred, Claymont, Delaware City, Elsmere, Newark Public Library) (D-17-20) as well as throughout the libraries of Kent and Sussex counties (Dover Public Library, Milton Public Library, Frankford Public Library, Greenwood Public Library, Millsboro Public Library, Delmar Public Library, Laurel Public Library, Georgetown Public Library (D-21-22 ), as well as the Wilmington Public Library (D-23)   The books are also readily available for purchase from Amazon. com (D-25)[11]

### WAKE COLLEGE TRIP

The attack by the auditor on the business related trip by Dr. Johnson to Wake Technical Community College in Raleigh North Carolina, was based on the mis-perceived policy that Dr. Johnson was required to obtain the defendant, president George's permission for all travel (B-179).   As shown in the opening brief, such a conclusion ignored the existing custom and practice that campus directors/vice-presidents did not need to obtain permission for travel (AB-14-15).  The other fact upon which the auditor relied was the casual remark by an officer of Wake Tech that Dr. Johnson had stated that she was "...in town visiting family." (B-179).

The affidavits filed in connection with the Answering Brief show that the visit between Dr. Johnson and her family did not occur (B-43), and that physically, given the auto rental mileage, a visit to her relatives in Raleigh North Carolina could not have occurred (B-334). As a result, there is an obvious factual dispute which must be viewed in a light most favorable to Dr. Johnson.

---

[11]  The suggestion that the "Little Black Sambo" books were banned might be attributable to the fact that wherever Ms. Stumpf researched, the name "Little Black Sambo", the result was accompanied by the letters "BAN" which would be the first three letters of the author, Helen Bannerman's last name. (See D-18), which Stumpf probably misinterpreted as meaning "banned".

## SELECTION OF VINCENT A. BIFFERATO, ESQUIRE AS HEARING OFFICER

The defendant attempts to imply that the demonstration of a potential conflict of interest between the hearing officer's law firm and Del Tech was an attempt to attack "...the impartiality and integrity of one of the most widely respected retired judges in Delaware." (RB-10). It must be made absolutely clear, that the raising of this issue did not at any time call into question Judge Bifferato's impartiality or integrity. Rather, it demonstrates the extent to which Del Tech ignored any attempt to not only be fair and impartial, but to make sure that there was no appearance of impartiality. As demonstrated in the Answering Brief (AB-28-29) the Vice-President of Human Resources, Murray, was involved in all past legal affairs with Del Tech. She should have well known that the hearing officer's law firm represented the defendant, Del Tech on five (5) different occasions (B-208-209). Further, the selection of the hearing officer was made unilaterally despite the request of Dr. Johnson's counsel to be consulted before the hearing officer was selected (B-86). That request was ignored (B-88).

## ARGUMENT

I.    DR. JOHNSON ENGAGED IN SPEECH THAT WAS PROTECTED UNDER THE "FREE SPEECH" PROVISIONS OF THE FIRST AMENDMENT, WHICH SPEACH INVOLVED MATTERS OF PUBLIC CONCERN.

A.    **Public Concern:** The defendants attempt to argue that Dr. Johnson's speech was not a matter of public concern. Defendants' arguments fail, on both legal and factual basis. First, factually, as conceded by the defendant, George, that the operation of the "IT" Department effected how administrators, students and the outside public would interact with the school (George 42-43, B-45-46). Peter Shoudy, the speaker to whom questions were addressed at the meeting further conceded that the questions dealt with matters that would concern the public (Shoudy 27, 56, 58, B-625, 626, 627). Dan Simpson, Dr. Johnson's successor, likewise conceded that the quality and nature of "IT" services were matters of legitimate public concern and appropriate for discussion (Simpson 60-61, B-635-636)(See also: Plaintiff's Answering Brief, pp. 7-9).

Moreover, speech by a public employee is considered a matter of public concern when it relates to their employment, and does not relate to a matter of personal interest. Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983); Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829 (3d Cir. 1994). No one has suggested in this matter that Dr. Johnson's questions concerning the operation of the "IT" Department was of personal interest to her.

The Third Circuit Court of Appeals has emphasized that a test as to whether or not matters of public concern is not the speaker's motive, Brennan v. Norton, 350 F.3d 399, 412-413 (3d Cir. 2003), but rather focused on "...the value of the speech itself." Baldassarie v. New Jersey, 205 F.3d 180, 197 (3d Cir. 2001), cited with approval:

Brennan v. Norton, supra, at p. 413. Thus, the defendants' suggestion that matters with public concern must deal only with wrongdoing and misuse of funds (RB-11) is fundamentally incorrect. While the defendants attempt to argue that the plaintiff's statements involved employees roles, such a characterization of the inquiry was incorrect. As George himself admitted, Dr. Johnson's speech dealt with how the "IT" Department affected administrators, students, and the outside public's interaction with the school (George 42-43, B-485-486). Thus, the inquiry by Dr. Johnson, concerning how the "IT" Department would operate, did not deal with employee's roles, but rather how that department would serve the public need.

**B.     Application of Garcetti v. Ceballas:**     The defendants attempt to apply the recent decision by the U.S. Supreme Court in Garcetti v. Ceballas, _, U.S.__, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) to this case. It must be remembered at the onset that Garcetti has been interpreted by the lower courts narrowly, so as to remove the First Amendment's protection of a public employee's speech, only in cases where the employee's official job duties require that the claimed protected speech be made. Erman Jr. v. City of Strongsville, Ohio, 2006 WL 2812173 (N.D.Ohio 2006)(holding that Garcetti applies only if the employee's speech was required by his or her job).

The defendants describe Dr. Johnson's attendance at the Campus Department Chair Meeting on February 19, 2004, which served as the basis for her involuntary administrative leave, as improper, since she was not a regular attendee of such meetings. George's letter to Johnson, notes that since she was not a regular attendee, her purpose must have been to "...confront and attach Mr. Shoudy.", the now head of the "IT" Department (B-46). The clear implication from the contention (B-46) was that

her attendance at such department meetings was not a part of her regular job duties. Further evidence that the defendants did not consider her attendance at the meeting and questioning part of her regular job duties, was that her attendance and comments were characterized as "subversive" and "insubordinate" (B-46-47)[12].   Simpson further denied the meeting as an inappropriate forum for Dr. Johnson's comments (Simpson 59-60, D-120, 121), that the question should have been made elsewhere (Simpson 60, D-121), and that the meeting was "...not the right place..." for such questions. (Simpson 62, D-123). The contrast, in demonstrating Garcetti,  where the prosecutor's speech, which the Supreme Court found not to have Constitutional protection, was precisely what he was hired to do, to evaluate cases for prosecution.

It is difficult to equate actions which are characterized as insubordinate and subversive to the daily job duties of the prosecutor in Garcetti.  If Dr. Johnson's actions were so outside her expected job duties, as to be deemed irregular, subversive, and insubordinate, then obviously, Garcetti does not apply to her since she was not performing her regular job duties.  As such, the protection afforded her under the First Amendment is not removed.  The appropriate analysis remains to be under Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 811 (1968). A person's title does not govern a Garcetti analysis.

The defendant's suggestion that Dr. Johnson's title, Vice-President/Director of Terry Campus incorporates every statement she makes concerning the Terry Campus as a part of her required job duties, and thus subject to the Garcetti rule is inapplicable.

---

[12] The defendant cites to ¶26 of the Complaint (B-5) to support a claim that attendance at the meeting was part of Dr. Johnson's job duties.  However in the answer in response to ¶26, the defendant denies the plaintiff was in attendance as a part of her day-to-day management of the Terry Campus (B-18).

A person's title does not require a <u>Garcetti</u> analysis.  While the defendant assumes that since Dr. Johnson was Vice-President/Campus Director for Terry Campus, her title denotes a job responsibility for attending every meeting, such an interpretation is too broad.  In <u>Orhrbough v. University of Colorado Hospital Authority</u>, 2006 WL 3262854 (D.Colo. 2006) the Court warned against making a <u>Garcetti</u> analysis based on the "mere title of the plaintiff's position.", recognizing that the <u>Garcetti</u> Court "...specifically cautioned against applying such a facile analysis." (denying defendant's motion to dismiss based on <u>Garcetti</u>).

Nor is the mere fact that Dr. Johnson was a high ranking official of Del Tech bring her speech within the application of Garcetti.  Here, Dr. Johnson had been relieved of any responsibility for the "IT" reorganized department.  Thus, she had no responsibility for supervising the "IT" Department.  Thus, as in <u>Black v. Columbus Public Schools</u>, 2006 WL 2385359 (S.D.Ohio 2006) there is no objective evidence to demonstrate that Dr. Johnson's job duties included the supervision of the "IT" Department (holding that an assistant principle's job duties did not include reporting misconduct of the principle).  See also: <u>Cheek v. City of Edwardsville, Kansas</u>, 2006 WL 2802209 (D.Kan. 2006) (holding a police major's employment duties did not include reporting the official misconduct of city officials).  More recently in <u>Abbattiello v. County of Kauai</u>, 2007 WL 473680 (D. Hawaii, 2007) the Court held that a formal job description does not describe an official's day-to-day job duties.  There the Court held that the formal job description would bear little resemblance to the duties an employee is actually expected to perform.  This case, since Dr. Johnson had been divested of any control or supervisory duties

over the "IT" Department by its centralization, offering comments or criticism of that department was no longer a part of her "actual job duties".

The claim by the defendants, that Dr. Johnson should not have attended the meeting, and that her comments were in appropriate clearly flies in the face that the application of <u>Garcetti</u> occurs only where the employee's speech "...was required by his or her job..." <u>Zerman v. City of Strongsville, Ohio</u>, supra. at n. 9.

## II.   DR. JOHNSON WAS DENIED RUDIMENTARY DUE PROCESS BEFORE BEING TERMINATED

**A.**   <u>**The Termination Hearing Did Not Meet The Basic Requirements of Speaking the Truth**</u>: The assemblance of due process requires that a termination hearing, such as reportedly afforded to Dr. Johnson be characterized by an attempt to seek the truth, and all evidence presented must be truthful.  The presenting of false evidence is a "flagrant front" to the truth seeking process.  <u>United States v. Mandujano</u>, 45 U.S. 564, 576-577, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976).  It is clear that in reaching the decision that Dr. Johnson had expended "...thousands of dollars of personal time and material of the college..." (B-212) the hearing officer relied most exclusively on the CPA's report (See: p. **9, supra**.)  However, as demonstrated earlier, at p. **7, supra**, the CPA report was riddled with omitted information, inaccurate information and flawed by the failure by the defendants to provide the relevant information.  Not only did the report violate the professional standards of the CPA, in at least twelve (12) different ways (p. **8, supra**).  Not only were the professional standards of the witness upon whom the hearing officer relied, violated, but that witness also testified that his report was not an attempt nor was it intended to find the truth of the allegations against Dr. Johnson (Dwyer 55, B-432).  The defendant's response to the adequacy of the termination hearing given to Dr. Johnson is merely that she "...received all the process she was due." (RB-25).  In making such a statement, the defendant ignored the rudimentary requirements of due process, or as one Court stated:

> "(Defendant's)" argument elevates form over substance.
> **An employee has been denied due process even if (she) has a benefit of 100 hearings, if the parties to the hearing conspire to supply false evidence."** <u>Hardiman v. Kelchec</u>, 908 F.2d 976; 1999 WL 94973 p. 2 (9th Cir. 1999) (holding that there

was insufficient evidence of false evidence) (Emphasis Added).

Proffering an expert's report and testimony as to the ultimate fact, whether Dr. Johnson abused her office, while such report is riddled with false statements, omitted evidence, and violations of professional standards, is clearly the presentation of false evidence to the hearing officer.    Such false evidence in a formal proceeding is "intolerable" ABF Freight System, Inc. v. National Labor Relations Board, 510 U.S. 317, 323, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994).  It has long been recognized that in any proceeding, whether it be a judicial proceeding or an administrative proceeding, the use of false evidence "...well may affect the dearest concerns of the parties before a tribunal." United States v. Norris, 300 U.S. 564, 574, 57 S.Ct. 535, 81 L.Ed.2d 808 (1937).  This rule has been applied to claims of denial of procedural due process. Yuan v. Rivera, 48 F.Supp.2d 335, 346 (S.D.N.Y. 1999).

Not only was the CPA expert's report premised on false evidence, but the defendant further presented false arguments to the hearing officer concerning alleged credit card abuse.   The defendant attempted to characterize the West Virginia purchases as credit card abuse, while knowing full well that the school had in place financial oversight systems which should have resolved these differences more than three (3) years prior to the hearing.  The defendant also knew full well the school travel policy and the credit card policy anticipated personal credit card purchases which might be combined with school purchases.  The school failed to describe to the hearing officer its oversight policies which would have, pursuant to the credit card policy (B-125) allowed the repayment of any disallowed purchases within the normal course of

business, rather than waiting three (3) years to use it as a trumped up means of obtaining the dismissal of an employee.

When an impartial observer attempts to initialize the entire hearing, given the omitted evidence, the false evidence, and the incomplete evidence presented to the hearing officer, it cannot be disputed that Dr. Johnson was denied a fundamentally fair termination hearing.

**B.    Denial of Dr. Johnson's Due Process Property Rights**:  The hearing officer's findings were based in large part on the defendants' contention "...that Dr. Johnson was inappropriate to many of its employees." Such a finding was based on evidence which Dr. Johnson had no prior notice.

The plaintiff, Dr. Johnson, was denied any meaningful notice of the nature of the evidence to be presented against her in support of the allegation of "...proof of Johnson's administration by fear and intimidation..." (Defense Counsel's letter of April 27, 2005; B-84-85), which was stated to "...constitute the final notice of termination...". This lack of appropriate notification was in violation of the following:

> ---Dr. Johnson's Contract of Employment, which required that any notice of termination "...should be supported by affidavits of person(s) having having knowledge of such cause..." (B-129, ¶3(c)(ii).

> ---The Del Tech Personnel Policy Manual, requiring that the employee to be terminated "...must be notified in writing that the termination of employment is being considered and the reason **(incidents and/or conditions)** that led to the proposed action...". (B-117, ¶12.02(2). (Emphasis Added)

> ---The specially enacted "Rules and Procedures for Conduct of Termination Proceedings involving a Vice-President, Campus Director" (enacted specifically for the termination of Dr. Johnson) requires that the notice of termination will state the reasons for the termination.  It is questionable whether the college had the ability to rewrite the rules for Dr. Johnson's termination which, while the pre-existing rules may not

have envisioned the termination of a vice-president, nevertheless provided certain due process guarantees as to notice and reasons for the termination, which could not be taken away by the ex parte enactment of new rules specifically for Dr. Johnson's hearing. There can be no question that these rules were specially enacted for Dr. Johnson, since the were enacted by the College Board of Trustees on April 26, 2005 (B-84), the day before the Notice of Termination itself was sent (Id.)

It is axiomatic that Dr. Johnson had a "property interest" in the processes provided for her termination as contained in her written contract, Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1992), as well as a "property interest" in the "policies and practices of the institution." Sinderman, at 92 S.Ct. 2700. See also Carter v. City of Philadelphia, 989 F.2d 117, 120 (3d Cir. 1993)(holding that a government employee can claim a property interest or entitlement in either a governmental policy or a mutual explicit understanding i.e. contract between the government employer and employee).

The defendant attempts to dismiss this "Black Letter Law" by stating that due process is satisfied if the employee is given "...the nature of the charges and general evidence against him (her)..." (RB-12). Such an argument might be appropriate if the employee did not have a reasonable expectation, by virtue of a written contract, public rule and/or general policy that leads to such a reasonable expectation. An employee has a property interest protected by the Constitution's due process clause protecting property, where there is a clear implied promise of the claimed right. Board of Regents of State College v. Roth, 408 U.S. 564, 93 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

> "Property interests of course, are not created by the Constitution. Rather, they are created and dimensions are defined by using rules or understandings that stem from an independent source, such as state

29

law - - rules or understandings that secure certain benefits to support claims of entitlement to those benefits. " Board of Regents of State College v. Roth, supra, at 93 S.Ct. 2709.

In Board of Regents the Court found that no such policy existed. However, issued simultaneously with Board of Regents was Perry v. Sinderman, supra. In Sinderman, the Court found a property interest, which was not founded upon statute, rule or regulation, but, as with Dr. Johnson but was founded in a written contract, which would be clear evidence of a formal understanding. Sinderman, supra, at 92 S.Ct. 2699. Further, the Court found that there might well be a legitimate claim of a property interest in light of "policies and practices of the institution". (Id. at 92 S.Ct. 2700). The Third Circuit Court of Appeals has recognized that personnel policies, such as those adopted by Del Tech gave state employees a constitutionally protected property interest. Brown v. Trench, 787 F.2d 167 (3d Cir. 1996).

It is clear that the hearing officer acknowledged the "...contention of the college that Dr. Johnson was inappropriately and abusive to many of its employees." (B-212). Given the fact that this was a "lynch pin" for the hearing officer's decision it was critical that Dr. Johnson had a property interest in being notified in an effective time period prior to the hearing of those allegations, and evidence to support those allegations (including the "affidavits of person(s) having knowledge of such (facts)). Dr. Johnson was denied the due process of such notification. Not only was Dr. Johnson denied those affidavits until the last moment, but the denial of those affidavits came after numerous attempts to obtain that information. (B-86,93,102).

Defendant's only response to this argument is that the "...Personnel Handbook is silent as to how far in advance of the termination they have to be given". (RB-13). Such

30

a response is disingenuous, since obviously such affidavits and information must be provided in a reasonable time prior to the hearing, so as to allow a meaningful response, on the defense's argument. This argument allows such information, could have been provided ten (10) minutes prior to the hearing and still satisfied the contractual obligation, a ridiculous result.

### III.    DR. JOHNSON WAS DENIED A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST.

The defendant attempts to argue that Dr. Johnson was denied any liberty interest, because she suffered only stigma to her reputation (RB-15).   However, the defendant ignores the fact that not only Dr. Johnson's reputation affected (B-348) but, she was denied her employment for a period of approximately six (6) months (January 2005 through July 2005), when she was not permitted to work, and all evidence of her relationship to Delaware Technical and Community College was removed by the defendants.  In addition, the defendants' actions resulted in significant newspaper publicity destroying Dr. Johnson's reputation and, to date, preventing her from obtaining any full time administrative educational employment, equivalent to her prior position at Del Tech.

### IV.    DEFENDANTS CONTINUE TO ERRONEOUSLY ASSERT THAT THE DEFENDANT, GEORGE, IS ENTITLED TO QUALIFIED IMMUNITY.

The defendant's brief ignores the fact that the answer did not assert that affirmative defense (AB-48, n.61).  Nor do the defendants confront Dr. Johnson's right to a grievance hearing at the time she was granted a suspension.  It must be remembered that Del Tech's personnel policies specifically provided that discipline was subject to a grievance procedure.  The defendants' argument that being placed on administrative leave, with pay, was not discipline, flies in the face of the language of the personnel policy.  the personnel policy specifically provides:

> "The corrective or disciplinary action may be a verbal warning, written reprimand, **suspension with or without pay**, demotion reassignment, or termination of employment. (Del Tech Personnel Handbook, §12.01, B-116).

Further, the policy goes on to state that if an employee disagrees with a "suspension with or without pay" they could demand, within twenty (20) working days, a disciplinary grievance procedure. (Del Tech Personnel Handbook, §XII. 3; B-117).

The defendants only argument is that administrative leave with pay, is somehow a different animal than suspension with pay.  Again, the defendant elevates form over substance.  There is no difference between "suspension with pay" and "administrative leave with pay".  The only possible difference is that the later of the former is for a definite period of time, and the later is indefinite.  If a definite period of suspension with pay is grievable, clearly and indefinite leave with pay is equally grievable.

In light of the clear requirements of Del Tech's Personnel Handbook,  the advice of not one but two attorneys, the defendant George clearly should have known that Dr. Johnson's rights were being violated, and he is not entitled to official immunity.

## CONCLUSION

For the reasons stated herein, and Dr. Johnson's Answering Brief, the Defendant's Motion for Summary Judgment should be denied in all respects.


Respectfully Submitted,


_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
ABER, GOLDLUST, BAKER & OVER
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
302-472-4900
Attorney for Plaintiff

DATED:  February 28, 2007