## Italian Cream Cake
Louise Hunter

2 cup sugar
5 eggs, separated
1 stick butter or oleo margarine
½ cup Crisco
1 tsp Soda
2 cup flour
1 cup butter milk
1 sm. can coconut or 1 cup
1 cup pecans
1 tsp. Vanilla

Cream butter or oleo, and Crisco.  Gradually add sugar and egg yolks.  Beat well.  Add soda to butter mild.  Add buttermilk to flour.  Beat well; fold in egg whites.  Bake in three 9-inch cake pans lined on the bottom with wax paper.  Cook at 350 degrees for 20 minutes or until done.

### Icing:

1 8oz. cream cheese
1 box confectioner sugar
½ cup Crisco
1 tsp. Vanilla

## Carrot Cake
Louise Hunter

4 eggs, 1 ½ cup vegetable oil 2 cup of sugar, beat until fluffy.  Then add 2 ½ cup flour, 2 tsp. Cinnamon, 1 ½ tsp. baking soda; then, add 1 cup copped nuts, 3 cup grated carrots.  Beat all of the above until smooth.  Can be baked in 3 9-inch pans or 9 x 13 inch pan.  Use cream cheese frosting.  Bake in 350 degree oven about 20 to 25 minutes or until done.

## Sweet Potato Pie
Louise Hunter

2 cup mashed, cooked sweet potatoes
2 eggs, beaten
1 ¼ cup milk (I use condensed can milk)
¼ cup light brown sugar
½ cup sugar
¼ tsp. butter
¼ tsp. salt

45

D73

pinch of cinnamon
½ tsp. nutmeg
Pinch of cloves

Place potatoes (warm) in bowl. Add remaining ingredients and beat until smooth. Pour into graham cracker crust. Bake 10 minutes in preheated 425 degree oven, reduce heat to 300 degrees and bake for 45 to 60 minutes until firm.

**Peach Cobbler**
Louise Hunter

2 cup fresh, ripe peaches, sliced
1 ½ cup sugar
1 stick of butter
¾ cup sweet milk
2 tsp. baking powder*
Pinch of salt*
¾ cup plain flour*
½ tsp. nutmeg
*Or self-rising flour

Mix peaches with one cup sugar and set aside. In a tow quart Pyrex bowl melt the butter. Make a batter with the other ingredients and pour into bowl. Do not stir. Pour sugared peaches over batter. Do not stir. Bake in a 350 degree oven about an hour. Batter will rise to top and will be crisp and brown. Delicious served hot or warm with a dash of whipped cream or vanilla ice cream.

**Kentucky butter Rum Cake**
Louise Hunter

3 cup sifted flour
1 tsp. baking powder
1 tsp. salt
½ tsp. soda
1 cup butter or margarine
2 cup sugar
4 eggs
1 cup buttermilk
2 tsp. vanilla
1 cup sugar
¼ cup water
½ cup butter
1 tbsp. vanilla or rum extract

D74

Sift together flour, baking powder, salt and soda. Cream butter. Gradually add sugar, creaming well. Blend in unbeaten eggs, one at a time, beating well after each. Add the dry ingredients, alternating with the buttermilk.  Add the vanilla. Turn into 10" tube pan, greased on the bottom. Bake at 325 degrees for 60-65 minutes. Run spatula along edge and stem of pan. Prick cake with fork.  Pour hot sauce over cake. This sauce is made by combining 1 cup of sugar, ¼ cup of water and ½ cup butter. Heat until sugar is melted but do not boil. Add 1 tbsp. vanilla or rum extract. Cool or serve hot.  Sprinkle with powdered sugar before serving.

## Lemon Pound Cake with Orange Glaze
Louise Hunter

2 cup sugar
½ cup Crisco
1 stick margarine
6 eggs
2 cup plain flour
dash of salt
1 tsp. vanilla
1 tbsp. lemon extract

Preheat oven to 325 degrees. Cream together sugar, Crisco and margarine, add eggs, beat well, add flour, salt, vanilla and lemon extract, mix well about 3 minutes. Bake in greased and floured tube pan for 40-45 minutes. Let cool in pan about 5 minutes, the pour on glaze.
**Glaze:**
2/3 cup sugar
1/3 cup fresh orange juice
½ stick margarine

Bring ingredients to a boil, take off fire, pour over cake.

## German Chocolate Pound Cake
Louise Hunter

2 sticks butter
½ cup shortening
3 cup sugar
1 bar German chocolate, melted
5 eggs
3 cup cake flour
1 tsp. baking powder
½ tsp. salt
1 cup milk

47

D75

1 tsp. vanilla

Cream together butter and shortening.  Add sugar and melted chocolate. Add eggs, flour, baking powder, salt, milk, and vanilla. Bake in tube pan at 325 for 1 hour and 20 minutes. Allow to cool in pan.  This make a very moist, rich cake that needs no frosting other than a sprinkle of confectioner sugar.

## Heath Bar Cake
Louise Hunter

1 lb. dark brown sugar
2 cup flour
¼ lb. margarine
1 egg, slightly beaten
1 cup milk
1 tsp. each of vanilla, baking soda, and salt

Mix the brown sugar, flour and margarine as for pie crust. Take out one cup of this mixture.

Add the remaining ingredients to the brown sugar mixture, and mix with spoon until well blended. Pour into a greased 9x13 pan.  Sprinkle extra cup of dry sugar mixture over the top.

Chop 8 health bar fine pieces, and sprinkle on the top. Bake 40 minutes in 350 degrees. Serves 12.

## Hershey Cake
Louise Hunter

6 bars Hershey
2 cup sugar
1 cup butter
1 cup buttermilk
½ tsp. soda
2 ¾ cake flour
4 eggs (Beaten)
1 tsp. vanilla
Salt
1 cup chopped nuts

Melt chocolate bars.  Cream sugar and butter. Add eggs and rest of the ingredients. Bake one hour at 350 degrees in a greased stem ban.

48

D76

**Honey Cake**
Louise Hunter

4 eggs
1 cup sugar
1 cup honey
½ cup oil
2 cup coffee
3 cup flour
1 tsp. soda
2 tsp. baking powder
1 tsp. allspice

Separate the eggs. Beat the whites until thick. Mix yokes with sugar; add honey and oil. Alternate coffee with dry ingredients. Fold egg whites into batter. Bake at 350 degrees for 1 hour. Use two long loaf pans.

**Million Dollar Pie**
Peggy Johnson

1 large cool whip
1 can Eagle brand milk
½ cup lemon juice
1 cup nuts
1 lg. can crushed pineapple
1 sm./can crushed pineapple
1 graham cracker crust

Mix all ingredients well. Pour into crust; chill at least 1 hour prior to serving. Alternate fruit could be cocktail, apples, or peaches.

**Impossible Coconut Pie**
Louise Hunter

½ cup self-rising flour
1 1/3 cup sugar
4 eggs, beaten
2 cup milk
½ cup melted butter
1 tsp. vanilla
1 (7 oz.) can flaked coconut

49

D77

Combine flour and sugar.  Add eggs, milk, butter and vanilla; mix well and stir in coconut.  Pour into a deep-dish 9-inch pie plate. Bake at 375 degrees for 30-35 minutes. Easy, no crust to for you to form it forms its own.

## Pecan Pie
Louise Hunter

1 cup white corn syrup
1 cup dark brown sugar
1/3 tsp. salt
1/3 cup melted butter
1 tsp. vanilla
3 whole eggs
1 heaping cup pecans
1 tsp. flour

Mix syrup, sugar, salt, butter and vanilla.  Add slightly beaten eggs. Pour into a 9-inch unbaked pie shell. Sprinkle pecans over filling. Bake in 350 degree oven for approximately 45 minutes. You may top with whipped cream or ice cream.

## Cold Oven Pound Cake
Louise Hunter

1 stick butter
1 cup shortening
5 eggs
3 cup sugar
3 cup cake flour
1 tsp. baking powder
½ tsp. salt
1 cup milk
2 tsp. lemon flavoring

Cream butter, sugar, and shortening.  Add eggs, the milk and flour (salt and baking powder). Beat well.  Add flavoring. Pour into greased and floured tube pan.  PLACE INTO A COLD OVEN.  Bake at 325 degrees for 1 hour and 15 minutes.

## Chocolate Pound Cake
Louise Hunter

1 cup butter
5 eggs
1 tbsp. vanilla

D78

½ tsp. baking powder
½ cup cocoa
½ cup Crisco
3 cup sugar
3 cup flour
14 tsp. salt
1 cup milk

Cream butter and Crisco.  Add sugar and cream.  Add eggs and vanilla and mix. Add milk and dry ingredients to cream mixture in 3 steps. Bake in tube pan for 1 hour and 20 minutes in 325 degree oven.

**Icing:**

½ cup cocoa
½ cup butter
1 egg
1 tsp. vanilla
1 tsp. lemon juice
1 box powdered sugar

Melt butter with cocoa and vanilla. Add small amount of powdered sugar. Add egg, beaten we.  Add lemon juice, salt and remaining sugar. Add milk as needed.  Put 1 cup black walnuts on top of cake.

**Punch Bowl Cake**
Louise Hunter

1 white or yellow cake mix
1 pkg. Vanilla pudding mix (large)
1 large can pineapple (chunk)
1 small bag coconut
1 can cherry pie filling
1 large can fruit cocktail
1 large cool whip (large size)
½ cup chopped nuts

Prepare cake mix and pudding mix according to instructions on package. Place one layer of cake in bottom of punch bowl. Cover with ½ pudding, ½ cherry pie filling, ½ pineapple (drained), ½ fruit cocktail (drained), ½ bag coconut and ½ cool whip. Place second layer of cake on top and repeat. Top with copped nuts, chill and serve.

**Bread Pudding**
Pat Hunter

3 cup bread crumbs (bread ends or leftover bread)

51

D79

¼ tsp. salt
2 cup sugar
2 cup milk
3 eggs, beaten light
1 tsp. vanilla
½ tsp. nutmeg
1 cup seedless raisins, small can of crushed pineapple or diced apples.

Put the bread crumbs into a buttered baking dish. Pour on the milk and let the crumbs soak in the mild ½ hour. Add sugar, salt beating egg and flavoring. Set the dish into pan of hot water and cook in a moderate oven until the pudding is firm and brown on top (about 35 minutes). 1 cup of seedless raisins, pineapple or diced apples may be added. Serve the pudding plain or with lemon sauce.

**Lemon Sauce**

1 cup sugar
2 tbsp. cornstarch
1 ½ cup water
½ cup lemon juice
1 tbsp. butter

Combine ingredients in the top of a double boiler; steam until clear. Remove from range and add butter

**Chocolate Pie**
Louise Hunter

2 cups sugar
2 cups flavoring
½ tsp. Salt
2 tbsp. cocoa
2 cups milk or water
4 egg yolks

Beat egg yolks slightly, add to dry ingredients, blend well. Bake in unbaked pastry shell at 350 degrees for 25 to 30 minutes.

**Old Fashion Egg Pie**
Louise Hunter

Prepare one unbroken pie shell from any good rich recipe.

Pour 1 cup sugar slowly into egg mixture. 4 large eggs, slightly beaten

52

D80

**Add:**

½ tsp. Salt
½ tsp. Almond extract
½ tsp. vanilla extract

**Add:**

2 ¼ cups ilk, scald and cold

Beat milk slowly into egg mixture, pour into pie shell and sprinkle nutmeg on top. Place on lower rack to brown slowly. Bake at 400 degrees for 25 minutes.

**Pudding Cake**
Louise Hunter

**Bottom Crust:**
2 sticks margarine
2 cup flour
2 cups chopped pecans

Mix well. Press evenly in bottom of 13x9x2 pan. Bake 25 minutes or till slightly brown on edges in 350 degree oven.  Cool

**Middle Layer #1:**
2 (8 oz.) cream cheese
2 cups powder sugar
1 (8 oz.) carton whipped topping

Mix well. Spread over crust

**Middle Layer #2:**
2 boxes chocolate instant pudding
4 cups milk

Blend well.  Let stand 5 minutes. Pour over cream cheese filling

**Top:**
1 (8 oz.) carton whipped topping

D81

1 cup chopped pecans

Spread topping over chocolate pudding. Sprinkle with nuts.  Chill

**Finger Lickin Good Cake**
Louise Hunter

1 box yellow cake mix
1 can mandarin oranges

Mix according to package directions. Mix oranges in. Bake in two grease 9 inch layer cake pans. Bake 30 to 35 minutes at 350 degrees.

**Frosting:**

1 large can pineapple, undrained
1 (9 oz.) carton Cool Whip
1 box instant vanilla pudding mix

Mix well and spread between layers and on top.

**Cream Cheese Pound Cake (Very Rich)**
Louise Hunter

¾ lb. butter
1 (8 oz.) package cream cheese
3 cups sugar
6 eggs
1 tsp. Vanilla
1 tsp. almond extract
3 cups flour

Cream together butter and cream cheese, blending in sugar with electric mixer. Add eggs one at a time and continue to blend.

Add flavorings and flour and beat until smooth and light. Pour batter into greased and floured 10-inch tube pan. Bake in preheated 325 degree oven for 1 hour and 15 minutes or until cake is golden brown and test done. (I sue Bakers Joy for my pan).

**Stacked Upside Down Cake**
Louise Hunter

D82

¾ cup butter or margarine, melted
2/3 cup firmly packed brown sugar
1 (20oz.) can sliced pineapple
2/3 cup maraschino cherries, halved
½ cup chopped pecans
1 (18 to 25 oz.) package yellow cake mix, without pudding

**Frosting:**

½ cup margarine
1 cup firmly backed brown sugar
3 tbsp. milk
2 cup powdered sugar

Combine butter or margarine and brown sugar; spread evenly into 2 greased 9-inch round cake pans. Arrange pineapple slices, cherries and pecans on top. Prepare cake mix according to directions. Pour batter into pans bake at 350 degrees for 30 to 40 minutes or until wooden pick inserted into center comes out clean. Remove from pans, cool completely on wire racks. Stack layers, pineapple side up, on serving plate. Frost.

**Turtle Cake**
Louise Hunter

1 package German chocolate cake mix
1 can Eagle Brand milk
¾ cup melted butter
1 (14 oz.) package vanilla caramels
1 package chocolate chips
¾ cup chopped nuts

Spray pan with Pam. Mix cake as directed on box until smooth. Add 1/3 cup Eagle brand milk and ¾ cup melted butter. Stir until smooth. Bake ½ of mixture in 9 ½ x 13 ½ inch pan for 15 20 minutes at 350 degrees. While cake is baking, melt caramels and rest of Eagle Brand milk in double boiler or microwave. Remove cake from oven and spread caramels over top. Sprinkle chocolate chips and nuts over. Put the remainder of cake batter over the top. Make sure to cover chocolate chips and nuts. Cook for 15 to 20 minutes or until done to touch.

**Icing for Turtle Cake:**

1 stick oleo or butter
6 tbsp. milk
1 lb. box powdered sugar
3 tbsp. cocoa
1 ½ tsp. Vanilla
½ cup chopped pecans

D83

Combine butter, milk and cocoa. Stir over low heat until smooth. Add sugar and vanilla. Heat until smooth. Stir in nuts and pour over cake while warm. Cover with foil.

**Mamie's Delicious Fried Apple Pie**

Mamie L. Smith-Chisholm

1 package dried apples
Pie crust dough (from your favorite pie crust recipe)
½ stick of butter
Sugar (sweeten to taste)
Cinnamon and vanilla to taste
Vegetable oil for frying

Cook apples with enough water to cover well-cook until tender, drain well. Mash apples well, add ½ stick of butter, sugar, cinnamon and vanilla. Mix well. Let cool.

Roll enough dough to cover the size of a medium saucer on a floured board. Place saucer over dough, cut around saucer to make a circular form. Cutting 2-3 forms at a time. Place enough apples in center of the dough to comfortable fill, allowing enough room to fold dough over apples in turnover shape. With a fork, press close the edges of each turnover. Poke the top of each pie two times with a fork.

To Fry:

Heat oil to medium heat. Fry 2-3 pies at a time (depending on the size of frying pan). Fry over medium heat to prevent burning. Turn several times until golden brown

**COLLECTION**

**OF**

**TIPS**

Prepare me to receive the bread and wine to celebrate the holy meal of your special supper. Lead me to be quiet and to think about the loving mystery of your presence. Create in my mind's eye a picture of Jesus in the room with his disciples the night before he was led to the cross. Touch me with your Spirit. Lift my guilt and give me the joy of being with Jesus. Amen

D84

**Rule 1**

Everyone at the table gets a placesetting, wither or not they intend to eat. Anyone can change their mind at the last minute, and only a careless host or hostess would be caught unprepared.

**Rule 2**

Flatware is placed evenly on either side of the plate in a manner comfortable to use by a right-handed person (sorry lefties, this one never varies). Forks go on the left, knives and spoons on the right. The cutting edge of the knife should point towards the plate. Spoons go to the outside of knives.

**Rule 3**

Place the flatware in the order it will be used, with the first utensil set furthest away from the plate. The idea is to avoid rooting around for the appropriate fork on confusing your guests.

**Setting a Table**

It may take a bit of fussing around the first few times out, but nothing impresses a guest so easily as a perfectly set table. Chalk it up to the communal nature of mankind, or synchronicity or tribalism or whatever, but a precisely set banquet of multiple settings creates a wonderful atmosphere. Even if it's just you and a guest, a placeseting helps you feel important on that special occasion when you turn off the television set and eat in the dining room

If you have placemats: set each one square to the edge of the table where each chair will be. The bottom of the placemat (the side closest to the chair) should be about an inch (2.5 cm) from the edge of the table. Although this distance may vary from occasion to occasion, every placesetting at a table or banquet should be exactly equal to every other placesetting. The dinner plate (the big one) goes dead center in the middle of the placemat, or put the bottom of the plate two inches (8 cm) from the edge of the table if you are using a tablecloth. The napkin goes lengthwise on the left side of the plate. Fold square napkins once to make them rectangles, the lay them in the same direction the utensils will go. The crease goes next to the plate. Each utensil should be about a half inch (2 cm) away from the plate and from each other. The fork goes on the left, tines up (the pointy ends), on top of the napkin: the knife goes on the right, cutting-edge towards the plate. Place the spoon next to the knife, parallel and to the right. The drinking glass goes above the knife, about two inches away from the tip.

**Formal Table Setting**

Generally, the more formal the occasion, the more courses are served, which of course means more flatware. There should be a different set of utensils for each course: salad fork, dinner fork; dinner knife, bread knife; and so on. Some special dishes such as

57

D85

oysters have special utensils. These can be served at the presentation of the food, but generally are placed on the table in order of course. When oysters are served as an appetizer for example, set the oyster fork to the right of the spoon.

Building from the basic set-up (see above), the following utensils may be added.

On the left side of the plate put the salad fork to the left of the dinner fork. On the right add a soup spoon to the outside of the dinner spoon if soup will be served. Place the soup bowl above the soup spoon and to the right. The bread plate goes to the left, about two inches above the fork. Place the butter knife across the bread plate at a diagonal, upper left to lower right. Small salad plates go to the left and a little below the bread plate.

Dessert spoons, or in some cases knife and fork, are placed about an inch above the top of the plate with the handle(s) on the right side.

The largest glass on the table is the water glass (see above for basic placement). It may be filled and iced when guests arrive or left empty to be filled at each diner's request. If wine or some other beverage is served set the appropriate glass to the right and a little down from the water glass.

## Cooking Measurement Equivalents

| | |
|---:|:---|
| 16 tablespoons = | 1 cup |
| 12 tablespoons = | ¾ cup |
| 10 tablespoon+ 2 teaspoons = | 2/3 cup |
| 8 tablespoons = | ½ cup |
| 6 tablespoons = | 3/8 cup |
| 5 tablespoon+1 teaspoon  = | 1/3 cup |
| 4 tablespoons = | ¼ cup |
| 2 tablespoon = | 1/8 cup |
| 2 tablespoon= 3 teaspoon = | 1/6 cup |
| 1 tablespoon = | 1//16 |
| 2 cups = | 1 pint |
| 2 pints= | 1 quart |
| 3 teaspoons = | 1 tablespoon |
| 48 teaspoons = | 1 cup |

## Meat, Fish, and Poultry Notes

- ♦ Baking fish on a bed of celery and onions will add to the taste as well as keep the fish from sticking.
- ♦ Coating will adhere to chicken better if it has been chilled for an hour before cooking.
- ♦ Sprinkle salt in the frying pan before adding meat and there will be less grease splattered.

58

D86

- For a juicier burger rub both sides with cold water before grilling
- Place cold water and cornstarch or flour in a jar with tight lid. Shake the jar until liquid is well mixed and lumps are gone.
- Always roast poultry breast side down so the white meat will not dry out. Turn the bird for the past portion of cooking so that it will brown well.
- Rubbing poultry with salt and lemon juice will lessen any unpleasant odor.
- Unwaxed dental floss is good for trussing poultry because it will not burn.
- If gravy is too greasy, a bit of baking soda can be added without affecting the tastes of the gravy.
- Pour pan drippings into a tall jar. The grease will rise to the top in minutes and can be removed for grease fee gravy.
- Meat loaf won't crack when baking if it's rubbed with cold water before going in the oven.
- To speed up hamburger cooking, pike a hole in their centers when shaping. This causes the center to cook quickly and the holes are gone when the hamburgers are finished cooking.
- A large roast can be carved more easily after it stands for about 30 minutes.
- To avoid odors while cooking fish, cover with browned butter and lemon juice

## Bread, Rolls, Pies, and Pastry

- Place a folded, damp towel under the bowl and it won't slip and slide while mixing.
- When fresh fruit is handy, but you don't have time to bake, just mix the filling as you normally would for pie. Line a pie pan with several layers of foil and place the filling in the pan. Wrap and freeze. When you're ready with a pie crust the filling can be placed in the crust and baked. After filling is frozen solid it can be taken out of the pan so you will be able to use the pan and the fillings will stack neater in the freezer.
- Add ½ teaspoon of sugar to the yeast when stirring it in hot the waster to dissolve. If it foams and bubbles in ten minutes you know that the yeast is alive and active.
- If the oven is turned off just when the meringue is brown, and the door is left slightly open, the pie cools slowly and prevents the meringue from splitting.
- Try substituting ground nuts in a one crust pie. Press pie shell just like you would with a graham crust.
- Use water that has been used to boil potatoes to make bread dough moister.
- If a dull-finish aluminum loaf pan is used it will brown the sides of the bread better.
- To get a dull finish on a new pan it can be baked empty in a 350 degree oven.
- Brushing frozen pies with melted butter before baking can eliminate dryness.
- Let baked bread cool on a wire rack so the bottom won't be soggy.
- Dough won't stick to your hands if it is kneaded inside a large plastic bag.
- If the television is in use, it makes a nice warm spot for dough to rise.
- Your bread will be crusty if top and sides are brushed with an egg white that has been beaten with one tablespoon of water

59

D87

### Cakes, Icings and Cookies

- Add a pinch of baking powder to powdered sugar icing will help it stay moist and not crack.
- Your frosting will look more professional if you first frost with a thin layer and let it set.  The apply a second coat of frosting
- An easy way to form drop cookies is to drop them onto the cookie sheet and then press them with the bottom of a water glass that has been dipped in sugar.
- To preserve the creamy texture of frozen cheesecake, thaw in refrigerator for 12 hours.
- Dipping the cookie cutter in slightly warm salad oil will give you a mush cleaner cut.
- A quick frosting can be made by adding a bit of chocolate syrup to prepared whipped topping.
- To cut down on cholesterol, substitute two egg whites stiffly beaten for each whole egg called for.
- Icings won't become grainy if a pinch of salt is added to the sugar.
- Use cocoa to dust baking tins so cookies and cakes won't have a floury look.
- If eggs are beaten and added slowly to batter it won't make the batter too stiff.
- Cookies will stay moist in the jar if a slice of bread is placed in the jar.
- Two tablespoons of salad oil added to cake mix keeps the mix moist, less crumbly.
- Adding a pinch of salt to chocolate dishes will enhance the flavor.
- For thinner, crispier rolled cookie try rolling the dough directly onto a greased and floured cookie sheet.  Cut the cookies out then pick up the scrap dough.
- Spaghetti is great with cake!  While waiting for icing to set, a few sticks of dry spaghetti will hold the layers in place.

**FAMILY REUNION**
**Wilmington, Delaware**
**June 25-27, 1999**

Acknowledgements

A heartfelt Thank You to my daughter, Stephanie Johnson, for recommending the idea of a family cookbook to me.  Also, I extend my deepest appreciation to my staff whose skills and creativity ensured the success of this important endeavor.

Delaware Technical & Community College
Terry Campus

**Marketing Department**
Fred Evins, Director
Susan Beck
Kathy Shelor
Prudy Pierson

D88

Stacy Stevens

**Executive Office**
Kathy Powell
Christine Travis

**Thank You!!**
Dr. Marguerite (Peggy ) M. Johnson

D89

VOLUME I OF II


TRANSCRIPT OF CD

RE:   INTERVIEWS PERFORMED BY DAVID DWYER
OF DEL TECH PERSONNEL CONCERNING
MARGUERITE JOHNSON, Ph.D.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

D90


ORIGINAL

1   got ugly with him that he could haul this stuff out

2   and say, are you sure you want to do this? I never

3   knew what was involved with it, but I'm sure there

4   were -- there were things that he felt that they were

5   worth saving. So, you know, again, he retired. So he

6   might have figured that it wasn't worth it.

7         Wouldn't that be horrible because

8   everybody got rid of everything that she'll be back?

9         MR. DWYER: No. I don't think you have to

10   worry about that. That's not going to happen.

11         MS. MOLIKEN: She's back.

12         MR. DWYER: That's not going to happen. I

13   already -- I said, you know, what's going to happen

14   when people ask me that question? They guarantee that

15   she will not be back here, so...

16         MS. MOLIKEN: (Unintelligible).

17         MR. DWYER: You don't have to worry about

18   that.

19         MS. MOLIKEN: (Unintelligible) fantasies I

20   know about doing evil things to her. And I was one of

21   them. I used to think about all of the things that I

22   could do. And one of the reasons that I didn't was,

23   you know, they would involve the school building here.

24   And anything that I did I know that there's -- the

Case 1:05-cv-00157-MHT   Document 143   Filed 02/28/2007   Page 20 of 47

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,   )
            )
   Plaintiff,   )
            )  Civil Action
v.          )  No. 05-157 (KAJ)
            )
ORLANDO J. GEORGE, JR.,  )
in both his official and personal )
capacities, and DELAWARE TECHNICAL )
AND COMMUNITY COLLEGE,  )
            )
   Defendants.  )

   Deposition of DAVID DWYER taken pursuant to notice at the law offices of Aber, Goldlust, Baker & Over, 702 King Street, Wilmington, Delaware, beginning at 1:08 p.m. on Tuesday, March 21, 2006, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

   GARY W. ABER, ESQ.
   ABER, GOLDLUST, BAKER & OVER
    702 King Street - Suite 600
    Wilmington, Delaware  19801
    for the Plaintiff

   DAVID H. WILLIAMS, ESQ.
   MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
    222 Delaware Avenue - 10th Floor
    Wilmington, Delaware  19801
    for the Defendants

ALSO PRESENT:

   MARGUERITE A. JOHNSON

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

1 A. Paid administrative leave, yes.

2 Q. She was an employee of Del Tech --

3 A. Yes.

4 Q. -- when you were doing the interviews?

5 A. Mm-hmm.

6 Q. She was involved in doing the reunion materials,

7 for instance, wasn't she?

8 A. She was leading it, yes.

9 Q. Did you make any determination, any determination

10 in your mind whether her information would have any

11 meaningful input to your understanding of the entire

12 situation?

13 A. No.

14 Q. Did you consider interviewing her at all?

15 A. No.

16 Q. Didn't even occur to you to do it?

17 A. No.

18 Q. Now, the process that you have used, this, it is

19 called agreed-upon procedures --

20 A. Correct.

21 Q. -- is that a technical term?

22 A. Yes, it is.

23 Q. Is that something that is recognized by the

24 American Institute of CPAs?



D93

1    A.   Yes, it is.

2    Q.   What standard covers that?

3    A.   Attestation standards.

4    Q.   What is that?  Section 201?

5    A.   I believe so.  I'm not sure of the number.  It

6  has a separate attestation standard.

7    Q.   Now, let's talk for a minute about the materials

8  you reviewed.  You went through Kathy Powell's computer

9  files that she transferred to you, correct?

10   A.   Yes.

11   Q.   Was anything added or deleted from those files as

12  they existed in her computer?

13   A.   I didn't look at her computer.  She gave me the

14  files.  So I can't answer whether they were added or

15  deleted.

16   Q.   Did you look at Dr. Johnson's computer files to

17  see what was on there?

18   A.   No, I didn't.

19   Q.   So you don't know if some of the things that were

20  on Kathy Powell's computer might originally have been on

21  Dr. Johnson's computer and then merged over into Kathy

22  Powell's, do you?

23   A.   No, I don't know that.

24   Q.   So some of the things that were in the, quote,



1    Q.   Whose decision was it not to bring those things?

2    A.   Number one, it was a clarification on the voice

3 recordings because we sent you the manual transcripts of

4 what they were.

5    Q.   You did not send me transcripts.  You sent me

6 your interpretation of the transcripts.

7    A.   Yes, that's correct.

8    Q.   Okay.  So you decided not to bring the

9 recordings?

10    A.   No, it wasn't clarified whether to bring them or

11 not.

12    Q.   Did you ask for clarification?

13    A.   No, I didn't.

14    Q.   You just assumed you didn't have to?

15    A.   No, I didn't do that.  I would have provided if

16 you asked for it.

17    Q.   Well, I said records --

18         MR. WILLIAMS:  You are arguing with the

19 witness about what you requested, and he has already

20 answered your question.

21    Q.   I asked for your working papers, didn't I?

22    A.   Yes.

23    Q.   You didn't bring those, did you?

24    A.   There might have been one or two that I forgot.



1     A.   Yes, it was.

2     Q.   And the AICPA standards state that an agreed-upon

3 procedures examination should not distribute the findings

4 outside the specified party, should it?

5     A.   Correct.

6     Q.   Part of the AICPA standards is that you are not

7 to have, your findings are not to be subjective in any

8 nature, are they?

9     A.   That's right.

10     Q.   So your interpretation that Dr. Johnson was

11 intimidating was a subjective finding, wasn't it?

12     A.   No, it wasn't.

13     Q.   Did you mean that to be a fact or were you just

14 reciting what other people told you?

15     A.   I recited what other people told me, majority of

16 other people told me that.

17     Q.   Did Dan Simpson say he felt intimidated by Dr.

18 Johnson?

19     A.   No, he didn't.

20     Q.   The people who said that they felt intimidated by

21 Dr. Johnson were the people basically from the marketing

22 department, weren't they?

23     A.   No.  There were other people as well.

24     Q.   I said most of them were from the marketing



D95A

Case 1:05-cv-00157-MPT    Document 14-53    Filed 02/28/2007    Page 25 of 47

1  thereafter, she said it was a mess and it took her

2  forever to clean it up.

3      Q.  How long was "forever"?

4      A.  Longer than a short little bit.

5      Q.  Longer than an hour?

6      A.  I can't answer that question.

7      Q.  If she gave it to her every month did it take

8  five minute?  Ten minutes?  20 minutes?  What, do you

9  know?

10     A.  No, I don't.

11     Q.  To the extent that Miss Powell told you that the

12  personal work took 2 to 8 percent, that would contradict

13  your 10 percent that you put in your report, wouldn't it?

14     A.  Yes.

15     Q.  And Section 201.4 of the AICPA standard would

16  require that to be in your report, wouldn't it, that

17  contradictory statement?

18     A.  As I mentioned earlier, it is just not

19  documented, our discussion where she determined that it

20  was 10 percent.

21     Q.  But there is documentary evidence to contradict

22  that 10 percent, isn't there?

23     A.  Yes.

24     Q.  And you did not include that in your report, did

D96

1    you?

2        A.   No, I didn't.

3        Q.   That would violate the standard, wouldn't it?

4        A.   Yes.

5        Q.   Now, with regard to the family reunion work, did

6    you find any evidence on family reunion prior to 1999?

7        A.   No.

8        Q.   In reviewing the family reunion materials, did

9    you review any of the hard copies of that family reunion

10   material?

11       A.   I believe all the hard copies were gone.  The

12   only thing that I would review were the files, computer

13   files that they would print out after the fact.  If you

14   are talking about a completed set, no, I never had a

15   completed set.

16       Q.   What I'm curious about, in your testimony at the

17   hearing you testified at page 157 -- I'll make it easier.

18   Let me hand you a copy of your transcript.

19       A.   Okay.

20           MR. ABER:  Sorry, David, I just made one.

21           MR. WILLIAMS:  That's okay.

22       Q.   Page 157 at line 12.  You can look at the rest of

23   it.

24       A.   Mm-hmm.

1    A.   The second reimbursement?

2    Q.   The one for the banners.

3    A.   I don't think I have seen this.

4    Q.   You didn't know that she was reimbursed?  Mr.

5 Pleasanton told you she had reimbursed the school for

6 that?

7    A.   I would have to recall the interview.  I would

8 have to look at it again.

9    Q.   Take a look.

10    A.   Okay.  Pleasanton, correct?

11    Q.   Yes.  It is 2078.

12    A.   He was reimbursed directly from Dr. J for the

13 banner materials.  He didn't give a bill for the labor,

14 only for the materials.

15    Q.   You didn't put that in your report, though?

16    A.   No, I didn't.

17    Q.   Why not?  That would have been evidence that she

18 was trying to reimburse the school?

19    A.   For supplies.

20    Q.   Yes.  Something favorable to her.  Why didn't you

21 put that in?

22    A.   Oh, yes.  I guess it was overlooked.

23    Q.   Did your report make any factual findings?

24    A.   Let's back up a second.  Pleasanton, if I had



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,               )
                                     )
                Plaintiff,           )
                                     )   Civil Action
            vs.                      )   No. 05-157 (KAJ)
                                     )
ORLANDO J. GEORGE, JR., in both      )
his official and personal capacities,)
and DELAWARE TECHNICAL AND COMMUNITY )
COLLEGE,                             )
                                     )
                Defendant            )

      Deposition of ORLANDO J. GEORGE, JR., taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 29 N. State Street, Dover, Delaware,
beginning at 1:03 p.m. on Wednesday, November 30, 2005,
before Allen S. Blank, Registered Merit Reporter and Notary
Public.

APPEARANCES:

      GARY W. ABER, ESQUIRE
      ABER, GOLDLUST, BAKER & OVER
      702 King Street, Suite 600
      Wilmington, DE 19801

         For - Plaintiff

      DAVID H. WILLIAMS, ESQUIRE
      MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
      222 Delaware Avenue, 10th Floor
      Wilmington, DE 19801

         For - Defendants

ALSO PRESENT:

      MARGUERITE A. JOHNSON

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477

Johnson
Orlando J. George, Jr.

November 30, 2005

George, et al.
C.A. # 05-157

Page 32

```
1     A     Okay.  Sorry.

2     Q     Who else?

3     A     Larry Miller.

4     Q     Miller and McNesby I got.

5     A     Okay.  Hope Murray and Dan Simpson.

6     Q     And who are the other vice-presidents?

7     A     One of them would have been Dr. Johnson.  And the

8    sixth one would have been Dr. Ileana Smith, a new

9    vice-president.

10    Q     Let me just understand the job.  Dr. Miller was

11   Dr. Johnson's counterpart for the New Castle campus?

12    A     Mr. Miller, yes, that is correct.

13    Q     Dr. Smith was her counterpart for the Sussex campus?

14    A     Correct.

15    Q     Dr. Murray -- is it Dr. Murray or Ms. Murray?

16    A     Dr. Murray.

17    Q     She works in your office, is your assistant?

18    A     She is vice-president for human resources and

19   college relations.

20    Q     And works in your office?

21    A     Yes.

22    Q     So works day-to-day contact with you, I guess?

23    A     Not necessarily.

24    Q     Okay.
```

```
 1      A     But has college-wide responsibility.

 2      Q     Is it Mr. McNesby?

 3      A     Mr. McNesby.

 4      Q     He is the financial --

 5      A     Vice-president for finance.

 6      Q     -- boss?

 7      A     Correct.  Again, college-wide responsibility.

 8      Q     And Dan Simpson at this time was what?

 9      A     He was vice-president for academic affairs.  That

10    also is in my office and also has state-wide responsibility.

11      Q     I'm just curious.  What does the vice-president for

12    academic affairs do?

13      A     Like a provost for a university.

14      Q     What's that do?

15      A     They are the chief academic officer for the

16    institution.  All of the degrees and programs and courses

17    and so forth come under their review.

18      Q     And Mr. Simpson's education was what?

19      A     He is currently working on his doctorate.  I believe

20    his course work is done.  He has to write his dissertation.

21      Q     Does he have a master's degree?

22      A     Um-hmm.  Yes.

23      Q     In what?

 4      A     I don't know.
```

Johnson
Orlando J. George, Jr.    November 30, 2005    George, et al.
Case 1:05-cv-00157-MPT    Document 14-53    Filed 02/28/2007    Page 31 of 47
C.A. # 05-157

Page 37

1    out what the nature of the disagreement was?

2    A    What I tried to find out was what the context of

3    Peg's behavior was.

4    Q    So whether or not behavior was justified or not, you

5    didn't inquire into?

6    A    Well, there is no justification for abusive

7    behavior, counselor.

8    Q    Unless somebody is abusive to her first.

9         Did you do anything, first of all, to inquire

10    of Mr. McNesby whether he had done anything to instigate

11    Dr. Johnson's anger?

12    A    My conversations with all of these vice-presidents

13    generally related to what happened, what was the behavior

14    and their sense that these meetings had become unproductive.

15    I heard that over and again by all four of these

16    individuals.

17    Q    Can you for Mr. McNesby -- I'll ask it again --

18    describe any specific incident that he related to you

19    concerning this inappropriate behavior?  Yes or no.

20    A    No.

21    Q    Can you for Dr. Murray relate to me any specific

22    incident that she complained to you about concerning

23    Dr. Johnson?  Yes or no.

24    A    No.

1    Q    Can you for Dan Simpson relate to me any specific

2    instance where he complained about Dr. Johnson's behavior?

3    A    Other than that it occurred after an ad hoc meeting.

4    And you're asking for a specific, this particular incident?

5    Q    Right.

6    A    No.

7    Q    I'm asking for any specific incident.

8    A    No.

9    Q    So am I correct that, prior to November 18th, you

10   had general statements by your vice-presidents concerning

11   Dr. Johnson but you had no knowledge of any facts to back up

12   their conclusions?

13   A    And, counselor, that is correct.  And that's why I

14   did not discipline Dr. Johnson.  And that's why I decided to

15   do the investigation.  So that I could determine whether all

16   of these accusations were, in fact, true.

17           MR. ABER:  Off the record for a second.

18           (Discussion held off the record.)

19   BY MR. ABER:

20   Q    In the transcript during the hearing of Dr. Johnson,

21   at page 16, you stated that there were many sources of

22   complaints prior to November 18th.  We have now discussed

23   the two incidents where you put something in writing and the

24   complaint you received from the vice-presidents.  Are there

Johnson
Orlando J. George, Jr.
Case 1:05-cv-00157-MPT   Document 14-53   Filed 02/28/2007   Page 33 of 47 George, et al.
November 30, 2005
C.A. # 05-157

Page 77

 1    discuss this upcoming investigation with any present

 2    employee.  But you also told her she couldn't talk to former

 3    employees.

 4              Did you feel that was within your power to tell

 5    her she couldn't talk to people who were not employed by the

 6    school?

 7    A    All of this was done under advice of counsel.

 8    Q    So you felt that was appropriate?

 9    A    I did.

10    Q    So you had consulted legal counsel before the

11    January 3rd meeting?

12    A    Yes.

13    Q    And who was that legal counsel?

14    A    Dave Williams.

15    Q    So you had approached Mr. Williams -- just so I

16    understand the sequence.  I'm not asking what he said.  But

17    before you met with Dr. Johnson on January 3rd when she was

18    going to deliver you her response, you had already discussed

19    the matter with legal counsel?

20    A    I had approached --

21    Q    You had already met with legal counsel.  Excuse me.

22    A    Yeah.  I'm not quite sure what you want me to say.

23    Q    I'm not asking what you said.  I don't want to know

24    what passed between you.

1    A    You don't want to know?

2    Q    No.  I want to know that you met with them at least

3    concerning the situation.

4    A    I most certainly did.  Because from the very

5    beginning, counselor, I wanted to make sure that anything I

6    did was done properly and within, you know, all legal

7    parameters, personnel policy parameters, employment law

8    parameters.  So, yes, regardless of what direction we would

9    have ended up going, I felt like I needed advice of counsel

10   to make sure that I did and said the proper things.

11   Q    You have an in-house attorney, don't you?

12   A    I do.

13   Q    Brian Shirey?

14   A    Yes.

15   Q    Hope Murray, is she legally trained?

16   A    She is not a lawyer.

17   Q    Okay.  I have seen her title say vice-president for

18   legal affairs.

19   A    No, sir.  She is vice-president for college

20   relations and human resources.

21   Q    Going back to my original question.  It is your

22   belief that you had the authority to tell Dr. Johnson not to

23   talk to non employees?

24   A    Yes.

Johnson
Orlando J. George, Jr.                                                                                  George, et al.
November 30, 2005
C.A. # 05-157

Case 1:05-cv-00157-MPT   Document 114-3   Filed 02/28/2007   Page 35 of 47

Page 86

1    Thursday and Friday, they may take Tuesday and Wednesday.

2    It was a holiday in the middle there somewhere.

3        Q    Let me focus on this investigation itself.

4            Mr. Williams has been an attorney that has

5    worked for Del Tech for many years, correct?

6        A    Yes.

7        Q    Do you know how long that relationship is?

8        A    I don't know exactly.

9        Q    Was he an attorney representing the college at the

10   time you became president?

11       A    Yes.

12       Q    So he was already the college attorney, the outside

13   college attorney, back around 1995?

14       A    Yes.

15       Q    Does he represent the school on anything other than

16   personnel matters?

17       A    Employment law is pretty much, yeah.

18       Q    Does his law firm represent the school on anything

19   other than employment matters?

20       A    I don't believe so.

21       Q    Is he on a regular retainer or is it an hourly

22   basis?

23       A    Hourly.

24       Q    Does he bill you just each month one bill even if

1    it's for ten different things or are the bills ever

2    segregated by the incident upon which he is working?  For

3    instance, if there are two cases he is involved in, Jones

4    and Smith, do you get two separate bills for them or would

5    it be one bill with the work sort of intertwined?

6        A    I don't see those bills, Mr. Aber.  They are

7    reviewed by my HR and finance people before they are

8    processed.

9        Q    But it is your testimony that Mr. Williams became

10   involved in this matter concerning Dr. Johnson before the

11   January 3rd meeting you had with Dr. Johnson?

12       A    Yes.

13       Q    Was there anybody else from his firm that has been

14   involved in this process, in this matter?

15       A    My contact has been with Mr. Williams.

16       Q    Have you had any contact with any other attorneys in

17   that firm?

18       A    My contact has been with Mr. Williams.

19       Q    I understand that.  So you have discussed this issue

20   with no other attorneys in his firm?

21       A    No.

22            (George Deposition Exhibit No. 6 was marked for

23   identification.)

4    BY MR. ABER:

```
 1    A    I'm not a lawyer, Mr. Aber.  I rely on counsel.

 2    Q    Is that a fair way, the way I put it?

 3    A    It's fairer to say it the way I said it.

 4    Q    But you can't tell me what was deemed to be

 5    inadequate with the old rules?

 6    A    I rely on advice of counsel.

 7    Q    Does that mean you can't tell me what was deemed to

 8    be inadequate about the old rules?  I'm just trying to find

 9    out why they weren't used other than this intuitive feeling

10    they didn't apply?

11    A    No, there wasn't an intuitive feeling.  I was told

12    directly by counsel that these would not be sufficient to

13    protect due process rights.  That was enough for me.  I

14    don't need to be an expert on the law.  I need to make sure

15    that the policies and procedures of the Board were done

16    under advice of counsel.

17    Q    Did you believe Mr. Shirey could have been an

18    independent and impartial hearing officer?

19    A    I think that at a certain point, Mr. Shirey was

20    brought into the discussions with Mr. Williams and with

21    Dr. Murray.  So I don't know that he could have served as a

22    fair and impartial observer having been part of those

23    conversations.  And that's probably the reason why we needed

 4    these new rules of procedure.
```

1          (George Deposition Exhibit No. 16 was marked

2    for identification.)

3    BY MR. ABER:

4        Q    George 16 is a letter to Vincent A. Bifferato, Sr.,

5    of the firm of Bifferato, Gentilotti & Biden, basically

6    asking him to act as a hearing officer in this matter,

7    correct?

8        A    Yes.

9        Q    He had been contacted prior to May 11th, 2005?  Do

10   you know?

11       A    I have no knowledge of our contacts.

12       Q    You testified I believe at your hearing that this

13   entire process was being conducted by the committee here, by

14   Hope Murray, Mr. Williams and Mr. Shirey now at this point?

15       A    They would have -- the three of them would have been

16   involved in all of the decisions.

17       Q    And why would Judge Bifferato, Vincent Bifferato,

18   have been chosen as the hearing officer?

19       A    That was a recommendation that counsel came up with.

20   That came from counsel.

21          (George Deposition Exhibit No. 17 was marked

22   for identification.)

23   BY MR. ABER:

24       Q    This is a letter from me to Mr. Williams.  And it

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,          )
                                )
          Plaintiff,            )
                                )
v.                              )   Civil Action No.
                                )   05-157 (KAJ)
                                )
ORLANDO J. GEORGE, JR.,         )
in both his official and        )
personal capacities, and        )
DELAWARE TECHNICAL AND          )
COMMUNITY COLLEGE,              )
                                )
          Defendants.           )

          Deposition of KATHLEEN R. POWELL taken pursuant
to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 29 North State Street, Dover,
Delaware, beginning at 11:08 a.m., on Tuesday, March 14,
2006, before Patricia L. Shelton, Registered Professional
Reporter and Notary Public.

APPEARANCES:

          GARY W. ABER, ESQ.
          ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware  19801
            for the Plaintiff

          DAVID H. WILLIAMS, ESQ.
          MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19801
            for the Defendants

ALSO PRESENT:

          MARGUERITE A. JOHNSON

                WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters


COPY   D110

1     A.    Mm-hmm.

2     Q.    Do you recognize the -- not the charge card, but

3 the handwritten receipts that are on the second and third

4 page? And I mean the ones that are numbered 383607 and

5 383611.

6     A.    This one was found (indicating) --

7     Q.    Let's start again. "This one" doesn't help.

8     A.    I'm sorry. 383607 --

9     Q.    On page 0377.

10     A.    -- was found in a folder when the auditing people

11 were here.

12     Q.    Where was that folder?

13     A.    It might have been a travel folder.

14     Q.    Where physically was that folder?

15     A.    In a lateral file.

16     Q.    Where was the lateral file?

17     A.    In the campus director's office.

18     Q.    In with other travel documents?

19     A.    Probably.

20     Q.    Did it look like there was any attempt to hide

21 the document?

22     A.    No.

23     Q.    The second page, the one dated 383611, do you

24 know where that one was located?



1     A.    Actually this one (indicating) was the one I

2  found in the travel folder.  This one (indicating) was

3  found by somebody else.

4     Q.    383611 on page 0378 was found in the travel

5  folder?

6     A.    Right.

7     Q.    And the one numbered 383607 on page 0377, where

8  was that one found?

9     A.    When they were auditing.  I think this was in a

10  state -- when the state auditors -- or, I'm not sure who

11  they were.  They were some kind of auditors who were

12  going through.

13     Q.    But do you know where it was physically located?

14     A.    No, I do not.

15     Q.    Was it found in your office or your desk?

16     A.    I don't know where it came from.

17     Q.    I mean, one day someone showed it to you; they

18  didn't tell you where it was found?

19     A.    Yeah.  "Have you ever seen this?"  And I said,

20  "No."

21     Q.    The credit card slips on both pages, pages 0377

22  and 0378, do you know where those were located?

23     A.    I'm sorry?

24     Q.    Do you know where those credit card receipts were



D112

1    located?

2              Do you understand what I mean by "credit

3    card receipts"?

4      A.    No.  I mean, I don't remember how these were

5    found.  But when the reimbursement was done -- I'm sorry.

6    The credit card log was done, I didn't have them.  They

7    weren't in my possession.

8      Q.    Let's back up for a second.

9      A.    Yes.

10     Q.    You told us where the numbered handwritten

11   receipts were found -- or, one of them was found in a

12   travel folder.

13     A.    Right.

14     Q.    And that's the one shown on page 0378.

15     A.    Right.

16     Q.    Now, underneath that on that same page is a

17   photocopy of a credit card sales slip.

18     A.    Right.

19     Q.    Do you know where that sales slip was found?

20     A.    No.

21     Q.    When was the first time you ever saw that

22   document?

23     A.    When they were auditing.

24     Q.    Somebody showed it to you?



1    A.    I think I might have found one in a travel

2   folder, this one (indicating).

3    Q.    You mean the sales slip was also in the travel

4   folder?

5    A.    Together.

6    Q.    With the little receipt above it?

7    A.    Maybe.  I don't know.

8    Q.    Turn back to the second page then Bates stamped

9   0377.

10    A.    Yes.

11    Q.    That also has a little handwritten sales receipt.

12    A.    This one (indicating)?

13    Q.    Yeah.

14              No.  No.  No.  The numbered one, 383607.

15    A.    Right.

16    Q.    Do you know where that one was found?

17    A.    No.

18    Q.    On that same page is a credit card sales --

19   labeled sales slip copy.  Do you know where that was

20   found?

21    A.    I don't know.

22    Q.    Do you have any recollection of when Dr. Johnson

23   purchased those items?

24    A.    I'll say in West Virginia.



**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    The little print where it says "Dr. J"?

2    A.    Up here (indicating)?

3    Q.    No.

4    A.    That's mine.

5    Q.    Where it says "Dr. J, 150."

6    A.    That's mine.  That would have been her

7    registration.

8    Q.    And what's that say under where it says "Dr. J"?

9    A.    Instruction, instruction, instruction.

10            Obviously there was a bunch of instruction

11    individuals that went on this conference.  So I was

12    probably marking where to code off different

13    registration.  This was like the registration for the

14    conference.  So I was probably just making notes so that

15    I knew where to put off what registrations to what

16    division.

17    Q.    So this document would have come to you.  And

18    Cena would have put certain entries on them.  And you

19    would have put other entries on this document?

20    A.    Yes.

21    Q.    And this was the October 28th, 2002 statement.

22    There were two things that said "need receipts."  Did you

23    give this statement to Dr. Johnson saying you needed

24    those receipts?

1    A.    I don't know.

2    Q.    Do you have any recollection of doing that?

3    A.    No.  I might have asked, verbally asked.

4    Q.    Do you have any recollection of asking?

5    A.    Well, I would have asked if I didn't have a

6 receipt for it.

7    Q.    And what did Dr. Johnson tell you?

8    A.    I don't know.

9    Q.    As you sit here today, do you have a precise

10 recollection of saying to Dr. Johnson we need these two

11 receipts from October 4th and 6th?

12    A.    I always asked for receipts.

13    Q.    Did you show her this document?

14    A.    I don't know.  I mean, she --

15    Q.    Let me help you for a minute.  What I'm trying to

16 determine is if you have a precise recollection of this

17 conversation or --

18    A.    No, I don't have a precise recollection.  No, I

19 do not.

20    Q.    Your statement that you asked for it is based

21 upon your usual custom and practice of asking for them?

22    A.    Normal procedure, yeah.

23    Q.    Do you have recollection of Dr. Johnson refusing

24 to give you receipts?



1    A.   No.

2    Q.   Do you have any recollection of Dr. Johnson

3 saying Go away.  Don't bother me.  I'm not going to deal

4 with this or anything like that?

5    A.   She never told me to go away or not to bother

6 her.  But if Cena was being particular, she wouldn't be

7 very happy about it, as far as her feeling of Cena

8 nitpicking her travel.

9    Q.   Did she say Cena was acting inappropriately in

10 asking for these receipts?  I'm talking about the ones on

11 this Powell 9.

12    A.   In this particular -- no.  I can't be precise as

13 to when and when she wasn't being too picky.

14    Q.   Let me understand.  Do you understand what

15 happens to these after the accounting department deals

16 with them, where they go next?

17    A.   I don't know if they go anywhere.  I don't know

18 if they're sent across the street or not.

19    Q.   After Dr. Johnson left the campus, do you know if

20 there was any other investigation of her credit card use

21 other than these two West Virginia transactions?

22    A.   If there was any auditing of any of the other PNC

23 charges?

24    Q.   Yes.



1    A.   I don't know if -- there were folders -- or, all

2    the accounting folders, I guess, were given to

3    individuals.  So I don't know what PNC statements they

4    looked at and which ones they didn't.

5              MR. ABER:  10, please.

6              (Powell Deposition Exhibit No. 10 was marked

7    for identification.)

8    BY MR. ABER:

9    Q.   Let me show you two documents which have jointly

10   been marked as Powell 10.  Do you recognize those

11   documents?

12   A.   I don't know if I was shared copies -- given

13   copies of these or not.

14   Q.   Would it be the normal practice that you would be

15   given copies of these e-mails concerning reconciliations

16   that needed to be done?

17   A.   I don't know.  I don't see myself cc'd on them.

18   I might have been.

19   Q.   Even if they weren't sent to you e-mail, would

20   somebody maybe give you a copy?

21   A.   No.  I mean, I don't know if I got a copy of

22   these or not.  I mean, I'm aware of the ones that weren't

23   reconciled.

24   Q.   These events concerning the West Virginia



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters