88

1    transactions occurred in October 2002. Dr. Johnson left

2    the campus in January of 2005, a little over two years

3    later.

4                During those two years, did anybody other

5    than the initial inquiry attempt to do anything else to

6    reconcile those two charges in West Virginia?

7        A.   I don't think so.  I mean, not that I know of.

8        Q.   Did anybody come to you and ask for further

9    explanation?

10       A.   After -- within that two-year time?  No, I don't

11   think so.

12       Q.   And it was a normal part of your job duty to

13   review these reconciliations or travel expenses and

14   charge card receipts?

15       A.   Yes, it was.  That was part of my regular duties.

16                MR. ABER:  I need to take a break for a

17   second.

18                (A short recess was taken.)

19                MR. ABER:  Mark that.

20                (Powell Deposition Exhibit No. 11 was marked

21   for identification.)

22   BY MR. ABER:

23       Q.   I'm going to give you a copy of a document that's

24   been marked Powell 11 and ask you if you recognize that



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,               )
                                      )
            Plaintiff,                )
                                      )
v.                                    )   Civil Action
                                      )   No. 05-157(KAJ)
                                      )
ORLANDO J. GEORGE, JR.,               )
in both his official and personal )
capacities, and DELAWARE              )
TECHNICAL AND COMMUNITY               )
COLLEGE,                              )
                                      )
            Defendants.               )

            Deposition of DANIEL L. SIMPSON taken
pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 29 North State
Street, Dover, Delaware, beginning at 11:05 a.m., on
Monday, April 3, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GARY W. ABER, ESQ.
        ABER GOLDLUST BAKER & OVER
          702 King Street - Suite 600
          Wilmington, Delaware  19801
          For the Plaintiff

        DAVID H. WILLIAMS, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          For the Defendants

ALSO PRESENT:
        MARGUERITE A. JOHNSON
        BRIAN D. SHIVEY, ESQ., CHIEF LEGAL COUNSEL -
        DELAWARE TECHNICAL & COMMUNITY COLLEGE

              WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477

1    know her, the forum was not appropriate. None of that

2    should have been discussed openly because the people

3    came out of that meeting and the department chairs,

4    and I'll get to who those department chairs were as

5    part of your first question, expressed some concerns

6    about the way that Peter was treated as a new person

7    and also doubts about how the administrators within

8    the college had their act together as far as this DIET

9    reorganization was concerned.

10           So whether -- I can't tell you about the

11   appropriateness of her comments or anything. I just

12   think whatever she said there if there was questioning

13   about it, it probably should have been questioned

14   somewhere else.

15   Q.   Were you informed by Mr. Shoudy that some of

16   the comments dealt with the quality or nature of the

17   services performed by the IT department?

18   A.   Maybe. I don't remember that.

19   Q.   Would that be a legitimate area of concern by

20   the administrators, that they weren't getting the

21   service that they should?

22   A.   Sure. Sure. The whole purpose of bringing

23   Peter Shoudy aboard and the DIET reorganization was

24   really to resolve those issues. The college

1    historically never had anybody with Peter Shoudy's

2    background, so that was exactly what he was supposed

3    to do.

4       Q.    So if administrators had concerns about the

5    quality of the servcie that they were getting, it

6    would not have been inappropriate to ask Mr. Shoudy

7    about those problems, would it?

8       A.    Yes.   Under those circumstances, Mr. Aber, I

9    think it would have been.

10      Q.    Even by the department chairs?

11      A.    Oh, no.   The department chairs would have been

12   fine because that's what that was for.   But my only

13   issue with it was -- it certainly wasn't with

14   anybody's questions or any question that wanted to be

15   asked.   My issue was that was not the right place to

16   do it.

17      Q.    There have been other people who have attended

18   that meeting who did not feel that Dr. Johnson's

19   comments were antagonistic or inappropriate. Are they

20   liars?

21      A.    No.   I didn't say her, I didn't say her

22   comments were inappropriate.   I'm only saying to you

23   that what I thought was whatever she did to question

24   the reorganization was inappropriate at that place.   I



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    don't know what she said.  I wasn't there.

2        Q.  So you have no reason to believe that the

3    nature of her comments was inappropriate, except the

4    subject matter?

5        A.    Yes.  If you want to count what Peter Shoudy

6    had to say to me and the department chairs and the

7    dean of instruction, yes, I do have reason to believe

8    it was, but I wasn't there.

9        Q.    So then if other people said they were not

10   inappropriate, then someone is not telling the truth?

11       A.    I don't think it's always a question of truth.

12   I think it's a question a lot times of perception.

13       Q.    Okay.  So it's an issue of fact as to whether

14   it happened or didn't happen depending on who you want

15   to believe?

16       A.    Again, I don't know if it's a question of fact.

17   A lot of times it's a question of perception.

18   Dr. Johnston may not have thought they were

19   inappropriate.

20       Q.    I'm talking about other administrators who were

21   there and have testified they didn't think it was

22   inappropriate.

23       A.    I don't know.  Again, sometimes it's not a

24   question of who is telling the truth.  It's a question

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON,       )
                             )
     Plaintiff,              )
                             )
       v.                    )   C.A. No. 05-157 (KAJ)
                             )
ORLANDO J. GEORGE, JR., in)
both his official and        )
personal capacities, and     )
DELAWARE TECHNICAL AND        )
COMMUNITY COLLEGE,            )
                             )
     Defendants.             )

          Deposition of CHRISTINE M. TRAVIS taken
pursuant to notice at the law offices of Morris James
Hitchens & Williams, LLP, 29 North State Street,
Suite 100, Dover, Delaware, beginning at 10:40 a.m., on
Thursday, May 11, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

          GARY W. ABER, ESQUIRE
          ABER GOLDLUST BAKER & OVER
            702 King Street - Suite 600
            Wilmington, Delaware 19801
            for the Plaintiff

          DAVID H. WILLIAMS, ESQUIRE
          MORRIS JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue - 10th Floor
            Wilmington, Delaware 19801
            for the Defendants


               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY

D124

1    the first time -- is when I was aware that I was called

2    for the termination hearing.

3         Q.    Do you remember when that was?

4         A.    No, sir, I don't remember.

5         Q.    Do you know what your typing speed is?

6         A.    I haven't been clocked since I was a student.

7    I really don't know.

8         Q.    When you were a student, what was your speed?

9         A.    Eighty-five words a minute.

10        Q.    Probably come down from that, hasn't it?

11        A.    For lack of use, probably.

12        Q.    Would you say it would be fair to say you can

13   type 60 words a minute?

14        A.    Possibly, yes.  I mean, I don't really know.

15        Q.    Can you type without -- I don't know what the

16   term is -- finger type without looking at the keyboard?

17        A.    Reading the document.

18        Q.    When was the last time you had a job that would

19   require you to do regular typing?

20        A.    I did regular typing in the registrar's office.

21        Q.    So you were able to maintain your skills then?

22        A.    Uh-huh.

23        Q.    In 1999 you were working as a temporary

24   secretary for Dr. Johnson.



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

D125

Page 1

1    IN THE MATTER OF:                                )

2    THE TERMINATION OF MARGUERITE JOHNSON, Ph.D.     )

3            Termination hearing in the

4    above-referenced matter taken pursuant to notice

5    before Tanya M. Congo, a Notary Public and Certified

6    Professional Reporter, in Conference Room 305 of the

7    MBNA Building at Delaware State University, Dover,

8    Delaware, on Wednesday, June 29, 2005, beginning at

9    9:35 a.m., there being present:

10   APPEARANCES:

11   BIFFERATO, GENTILOTTI & BIDEN, P.A.
     1308 Delaware Avenue
12   Wilmington, Delaware 19899
     BY:   THE HONORABLE VINCENT A. BIFFERATO, SR.
13   Hearing Officer

14   ABER, GOLDLUST, BAKER & OVER
     702 King Street, Suite 600
15   Wilmington, Delaware 19899
     BY:   GARY W. ABER, ESQUIRE
16   Attorney for Dr. Marguerite Johnson

17   MORRIS, JAMES, HITCHENS & WILLIAMS
     222 Delaware Avenue, 10th Floor
18   Wilmington, Delaware 19801
     BY:   DAVID H. WILLIAMS, ESQUIRE
19   Attorney for Delaware Technical and Community College

20

21

22

23

24

D126

1   North Carolina in 2002, did she show you anything?

2       A.   Just some photographs of while she was

3   down there of restaurants owned by Mr. Smith.

4       Q.   Did you communicate with anyone at Wake

5   Technical Community College to set up meetings for

6   Dr. Johnson when she was down there?

7       A.   No.

8       Q.   You mentioned earlier that you maintained

9   her calendar.  Is that something that you normally

10  do, set up meetings for her?

11      A.   Yes.

12      Q.   Who is Bob Hearn?

13      A.   Business manager for Delaware Technical

14  and Community College Terry Campus.

15      Q.   Who is Stina Sweeney?

16      A.   She's in Accounting in the Business

17  Services office.

18      Q.   Can you explain how it works when there

19  are reimbursements or reimbursement requests for

20  travel expenses with regard to purchases with a

21  college credit card, Super Card, of items.  What was

22  the process with regards to providing receipts for

23  those kinds of items?

24      A.   After a trip was completed, we do a

D 127

1    Traveler's Reconciliation form which matches the

2    credit card expense, all the expenses involved, and

3    whether the employee owes or the college owes the

4    employee any money after the form's completed.  But

5    it's a very detailed form of every day and every

6    expense.

7        Q.   Did Bob Hearn or Stina Sweeney go directly

8    to Dr. Johnson for receipts?

9        A.   No.

10       Q.   What did they do?

11       A.   They usually went through me.  It was my

12   responsibility.

13       Q.   To your knowledge were receipts provided

14   in all cases by Dr. Johnson for purchases?

15            Do you remember some purchases in West

16   Virginia at an antique shop, for example?

17            Were there requests for receipts for

18   that?

19       A.   There was, and I think that I found one

20   but I'm not sure if it went with the credit card log

21   until later.  I think it was found later.  And, then,

22   eventually, I believe a second receipt was found, but

23   at the time we couldn't find them.

24       Q.   If Bob Hearn and/or Stina Sweeney came to

1    A.   Yes.

2    Q.   -- pertaining to the value of her time?

3    A.   Yes, we actually saw her expense report,

4    and we believe it's listed in our report.  You'll see

5    travel, air fare, parking, hotels and a rental car.

6    Q.   If you turn to Exhibit 17 and the

7    documents that follow after the first page of Exhibit

8    17 --

9    A.   Yes.

10   Q.   -- are these some of the documents you

11   reviewed?

12   A.   Yes.

13   Q.   Are these self-reported -- or these are

14   what Dr. Johnson reported --

15   A.   Correct.

16   Q.   -- with respect to the costs of the trip?

17   A.   According to our interviews, this is what

18   we received.

19        MR. WILLIAMS:  No further questions.

20             CROSS-EXAMINATION

21   BY MR. ABER:

22   Q.   The report you put together contained

23   numerous other accusations that you didn't discuss

24   today?

1    those computer screen printouts, estimate how much

2    time is devoted to preparing the document shown

3    there?

4         A.   No.

5         Q.   If you look at the K-bytes, kilobytes,

6    whatever it is?

7         A.   No, I can't determine how much time was

8    taken to create it, but I'll -- some of these

9    documents were accessed every month and she used it

10   as a template to print off different documents.

11        Q.   Now, some of the documents that are shown

12   here in Kathy Powell's personal documents, were

13   actually prepared offsite and, then, sent to Dr.

14   Johnson, weren't they?

15             In other words, they were kept in this

16   -- they could be kept in the file labeled Personal.

17   So they could be something that's generated offsite

18   and, then, sent to the computer?

19        A.   Anything's possible.  But these files were

20   taken from Kathy Powell's computer.

21        Q.   Now, how many total hours did you say

22   Kathy Powell spent on Dr. Johnson's work based on

23   your calculations?

24        A.   It fluctuated.  It went from 5 to 10 to 15

D130

1   percent.

2       Q.   Well, did you calculate her total hours

3   for --

4       A.   Yes, I have.

5       Q.   Where is that?

6       A.   I said 10 percent.

7       Q.   But where is that calculation?

8       A.   Whatever tab that was.  Here it is, 16.

9   Ten percent of her time.

10      Q.   And how many hours did you figure that to

11  be?

12      A.   Three point seven five hours a week times

13  weeks, would give you a yearly rate.

14      Q.   So you figured roughly about 200 hours a

15  year?

16      A.   If we had a calculator, probably.  Maybe a

17  little less.

18      Q.   Now, in your report, if I look at it,

19  under your Findings you say -- you keep using the

20  term, handling numerous correspondences.  What do you

21  mean when you say, handling this, handling that?

22               What do you mean when you write

23  handling?

24      A.   What tab is the report in?

1  antique shop, is it your understanding some of the

2  items were jewelry items?

3          MR. ABER:  They were what?

4  BY MR. WILLIAMS:

5      Q.  Was it your understanding that some of the

6  items purchased were jewelry?

7      A.  I don't know what the items were.  I heard

8  at one point that they were books, and at one point

9  they were some kind of display items, but I never

10  heard whether they were jewelry or not.

11      Q.  Are you aware that Dr. Johnson took a trip

12  to North Carolina in October of 2002?

13      A.  Yes.

14      Q.  The Travel Request Form that is submitted,

15  is that a representation of the business purpose of

16  that trip?

17      A.  Yes, it gives us the business reason for

18  the trip as well as it gives us a projection of all

19  of the expenses related to the trip.

20      Q.  And is that a form that comes from the

21  Business Office?

22      A.  Yeah -- well, the Business Manager --

23  there's a signature line on the bottom of that form

24  right above the Campus Director's signature where the

D132

1   Business Manager signs that I've reviewed that form

2   and that there is adequate funding in the budget to

3   cover the expenses that are cited above.

4        Q.   And if you turn to Exhibit 17 is that the

5   Travel Request Form for the trip I just described?

6        A.   Yes, it is.

7        Q.   The numbers on there that are written in

8   by hand, is that a reconciliation of the actual

9   expenses incurred in that trip?

10       A.   That looks like it's the initials of an

11  individual, Randy, who at that point worked in Dr.

12  Johnson's office, and I don't know whether he marked

13  that up prior to the trip or after the trip.  I don't

14  know when those were made.

15       Q.   In any event, apart from the value of Dr.

16  Johnson's time, is this the amount that the college

17  paid for her to go to Raleigh, North Carolina?

18       A.   This is the estimated cost before the

19  trip, based on the information that was provided or

20  obtained from her files and airline tickets or

21  whatever, the research that was done ahead of time.

22       Q.   Attached are certain, or at least some of

23  the receipts?

24       A.   Yes.

D133

1   getting that organized.  So, she served in that

2   capacity on the committee with us, and she was an

3   active part of the committee.  And I did that

4   throughout my term there.

5               What else.  I served as a member of

6   the Faculty Center.  I was a representative whatever

7   that term was, it might have been a two-year term,

8   during my eight-and-a-half years there.

9       Q.   As a member of the Faculty Center, did you

10  have to interact with her as present on campus?

11      A.   Not so much directly, but through just

12  various issues that we would work on we would know

13  what was sent forward to her, what came back from

14  her, and then I was a member of the Teacher Resource

15  Center, representative there, too.

16      Q.   Did you have an opportunity to observe her

17  interaction with other staff members at the school?

18      A.   Sure.

19      Q.   How would you describe the way she dealt

20  with people?

21      A.   I would say that she was always very

22  focused on the issues that were important to the

23  college.  She was matter of fact.  She was no

24  nonsense, and she seemed to have, from my

D134

1    perspective, always the college's best interest at

2    hand.

3         Q.   What was her major commitment?

4         A.   She could tell you in moment what this

5    college was about, what we were doing, why our

6    students were making progress.  I saw her as a role

7    model for me professionally.  I thought she was a

8    smart, astute professional woman in a very high

9    leadership position.  I found her to be able to

10   articulate very forcefully and very confidently about

11   how she represented this college.  I never had a

12   question about her loyalty, or her commitment to this

13   college growing and achieving more than it had.

14        Q.   How would you describe the way she

15   interacted with other staff members; appropriately or

16   inappropriately?

17        A.   I saw her appropriately.  I saw her in

18   meetings.  I saw her when she addressed the faculty.

19   As I said, I was a member of the Diversity Committee.

20   I saw her work with us to formulate ideas, and some

21   programs that we put on campus.  I was part of the

22   study circles that first came to the campus, which I

23   know she orchestrated.

24        Q.   What's a study circle?

1   mission.  She would speak about who she was, and what

2   she represented.  I had no reason to not, I mean, I

3   have no question of her truthfulness or lack of.

4                    MR. ABER:  Thank you.  I have no other

5   questions.

6                    CROSS-EXAMINATION

7   BY MR. WILLIAMS:

8        Q.   Would it be fair to say that you wouldn't

9   be involved in the financial fiscal operation of the

10  campus, handling of reimbursements, use of super

11  card, travel, that kind of thing?

12       A.   As a faculty member, I did take trips.

13       Q.   My question is, you weren't involved in

14  the administration of the fiscal operation.  You

15  described interactions with Dr. Johnson, would it be

16  fair to say you didn't work side by side with Dr.

17  Johnson every day?

18       A.   That's correct.

19                    MR. WILLIAMS:  Thank you.  I have no

20  other questions.

21                    REDIRECT EXAMINATION

22  BY MR. ABER:

23       Q.   When you took trips, did you use a credit

24  card?

D136

1  leave.

2            DANIEL HOUGHTALING, having been duly

3  sworn according to law, was examined and testified as

4  follows:

5                  DIRECT EXAMINATION

6  BY MR. WILLIAMS:

7       Q.   Mr. Houghtaling, we're so far along in

8  this hearing that I think we know what your position

9  is, but would you tell us what position you hold, and

10  very briefly your responsibilities in that position?

11       A.   For the last twelve to thirteen years I've

12  served as the Assistant Dean of Instructors.  I've

13  overseen areas of marketing, planning, institutional

14  advancement, throw of audio/visual computer

15  information, and other assigned duties and tasks as

16  they come up.

17       Q.   In your tenure there when did Dr. Johnson

18  arrive?

19       A.   '94, '95.

20       Q.   That's when she was named as Campus

21  Director?

22       A.   Yes, it was '95.

23       Q.   Was she at the Terry Campus prior to that?

24       A.   No.

1    fair?

2        A.   No, no, I didn't.  There was one that came

3    to mind that I think pretty much, it upset me to a

4    point where I called the President's office and said,

5    why is this happening to me.

6        Q.   When you are not happy with your

7    supervisor's evaluation of you, there is a means for

8    you to register that disagreement, isn't there?

9        A.   There is a process in place, yes.

10       Q.   Describe that process for me.

11       A.   Well, I guess you could file a grievance,

12   and go through the grievance process.

13       Q.   There's a simpler process connected with

14   your evaluation, isn't there?

15       A.   You can do a written response, yes.

16       Q.   Let me show you a document and ask you if

17   you recognize that document.  It's a copy of your

18   evaluation July, 2002 through June, 2003.

19       A.   What time period did you say?

20       Q.   It says on the front July 1st 2002 to June

21   30th 2003.  Do you recognize that?

22       A.   Yes.

23       Q.   Did you like your review that Dr. Johnson

24   gave you?

1       A.   No.

2       Q.   And how did you respond to it?  You didn't

3  disagree with it, though, did you?

4       A.   No, I didn't.  I called the President's

5  office.  I talked to people over there.  I expressed

6  my opinion, and just from previous years how things

7  were handled, it wasn't worth the rebuttal.  I had my

8  years in, and was thinking about retiring.

9       Q.   Take a look at this document.  I'm showing

10  you the July 1st 2003 through June 30th 2004.  That's

11  your most recent evaluation, isn't it?

12      A.   Yes.

13      Q.   Turn to page, down at the bottom where it

14  says 2795, lower right-hand corner.  Turn to that

15  page.  What was the major goal that was listed for

16  you on that, goal number one?

17      A.   Work with the Vice-President and Campus

18  Director to address and resolve recurrent issues in

19  the Marketing Department.

20      Q.   Who was the Vice-President and Campus

21  Director at that time?

22      A.   Dr. Johnson.

23      Q.   What were the recurring issues in the

24  Marketing Department that she wanted resolved?

1        A.    Well, that would be a good question.

2        Q.    Let's turn to section five, the overall

3    performance review.  What's the first sentence say?

4        A.    Performance of your principal

5    accountability is very capable this past year, such

6    as oversight for implementation of the new planning

7    process and structure assisting in the expansion of

8    the budget hearings to ensure greater participation,

9    and identifying developing enhancements through the

10   course schedule.

11       Q.    If you skip a paragraph, in the third

12   paragraph what does Dr. Johnson write?

13       A.    However, I continue to be disappointed in

14   the lack of improvement shown in staff performance,

15   productivity, and quality in the marketing and grant

16   writing areas under your supervision.  In some

17   instances your excuses rather than corrective actions

18   have made conditions worse.

19       Q.    Is that the type of goal that you

20   addressed as goal number one in recurring problems in

21   the Marketing Department?  Does that refresh your

22   recollection?

23       A.    There was an ongoing problem with the

24   Marketing Department from day one.  There was a

1    I don't remember exactly. But she used this, put it

2    at the top, and then I think there was a line at the

3    bottom. Maybe there was a logo, and then maybe the

4    date was at the bottom, and it was about this big.

5          Q.   The trip to Wake in October of 2002, you

6    testified that you contacted Carol Himes in advance

7    and arranged for an appointment with her?

8          A.   That's correct.

9          Q.   And I assume that you had a particular day

10   and time arranged before you went down there?

11         A.   Yes.

12         Q.   You had nothing arranged with Jane Rabon?

13         A.   No, because it was indicated when I called

14   her office that she would not be available; that I

15   could stop by, and pick up materials.

16         Q.   They could have sent the materials in the

17   mail, couldn't they?

18         A.   They could, but if I was going there to

19   meet the security, and they're right down the hall,

20   then I could just pick up the materials.

21         Q.   Your travel request form contains a

22   representation as to the business purpose of that

23   trip, does it not?

24         A.   Yes.

```
 1            Q.   And it talks about touring and meeting

 2    with administrators for institutional

 3    advancement/development.  That would have been Jane

 4    Rabon?

 5            A.   That's correct.

 6            Q.   You didn't do that?

 7            A.   I met with Mrs. Himes, Mrs. Gregory.  I

 8    stopped at her office, Mrs. Rabon.  I picked up

 9    materials.  And I did have a tour.

10            Q.   And who provided that tour?

11            A.   Well, I went to Student Services, and I

12    said is it okay for me to walk around, look at

13    security, go in the cafeteria, talk to students, go

14    in the different buildings, and ask questions about

15    how they feel about security, walk around the

16    grounds, and they said fine.

17            Q.   Kathy Powell testified that she kept your

18    calendar and made all of your appointments, including

19    personal appointments.  Do you recall that testimony?

20            A.   I heard her say that.

21            Q.   She also testified that she had nothing to

22    do with setting up any appointments down at Wake

23    Community College, and wasn't aware of any such

24    thing.
```

1      A.   No, sir.

2      Q.   Have you ever seen her treat another

3  employee inappropriately?

4      A.   No.

5      Q.   What are the expectations she puts on

6  employees?

7      A.   She likes a job well done, and she likes

8  for the college to be represented in a very positive

9  manner, and our jobs reflect that.  She liked us to

10  be flexible as a part of working at Terry Campus to

11  be flexible.

12      Q.   What do you mean by flexible?

13      A.   Flexible meaning that you can work in any

14  department, or any time you're called upon to render

15  service that is for the betterment of our community

16  and the college, you should be able to do that,

17  because we are educational professionals.

18      Q.   Do you have knowledge of Dr. Johnson's

19  reputation at Delaware Technical Community College

20  community for truthfulness and honesty?

21      A.   Yes.

22      Q.   What is that reputation?

23      A.   Her truth and honesty is a part that,

24  again, that she is a truly professional person, and

D143

1  in order to have that kind of status you have to be

2  truthful, you have to have integrity, otherwise you

3  cannot function in a capacity as hers, or none of us

4  can if we're not truthful and honest about what we do

5  and what we say and what we represent.

6       Q.   So, the people in the Delaware Technical

7  Community College community, generally their opinion

8  of her with regard to her honesty and integrity is

9  what?

10      A.   I feel that it is very high.

11           MR. ABER:  Thank you.  I have nothing

12  else.

13           MR. WILLIAMS:  No questions.

14           JUDGE BIFFERATO:  Thank you very much

15  Ms. Johnson.  You may leave.  Thank you.

16           DR. MARGUERITE JOHNSON, having

17  previously been duly sworn, testified further as

18  follows:

19           CROSS-EXAMINATION (Continued:)

20  BY MR. WILLIAMS:

21      Q.   Dr. Johnson, I just have a couple

22  additional areas of questions, the first of which is

23  the purchases in West Virginia at the Three Castles

24  Antiques store.  Is it accurate that you made two

D144

1          MR. WILLIAMS:  Yes.

2          CHRISTINE TRAVIS, having been duly

3  sworn according to law, was examined and testified as

4  follows:

5                    DIRECT EXAMINATION

6  BY MR. WILLIAMS:

7       Q.   Christine, you're employed by Delaware

8  Tech?

9       A.   Yes, I am.

10      Q.   In what capacity.

11      A.   I'm Student Record's Assistant.

12      Q.   Back in June of 1999 were you working for

13  Delaware Tech?

14      A.   Yes, I was.

15      Q.   In what capacity?

16      A.   Employed full time.

17      Q.   In what position?

18      A.   As a secretary.

19      Q.   Did you work in the Campus Director's

20  office at Terry?

21      A.   Yes.

22      Q.   Did you spend time doing the typing input

23  for a cookbook that was connected with Dr. Johnson's

24  family reunion?

```
1          A.    Yes, sir.

2          Q.    What is your best estimate in total of how

3    much time you spent doing that?

4          A.    Conservatively I'd say about a week.

5          Q.    About a week worth of time?

6          A.    Conservatively, yes.

7          Q.    And that would be, you were at a

8    thirty-seven-and-a-half hour work week?

9          A.    Yes, sir.

10         Q.    In addition to working on it at work, did

11   you also work on it at home?

12         A.    I did take it home once, yes.

13         Q.    And how much time did you spend working on

14   it at home?

15         A.    That I could not tell you.  I do not

16   remember.

17         Q.    Was it just one evening basically?

18         A.    Yes, it was.

19         Q.    I believe that Dr. Johnson wrote you a

20   check for Fifty Dollars; do you recall that?

21         A.    No, sir, I don't.

22         Q.    You don't remember one way or the other if

23   she could have?

24         A.    She could have.  Honestly I don't
```

D146

1    of have an idea of what grade level.  We stamp the

2    back of the book sometimes.  The book is even stamped

3    here with Learning Resource Center Dover so that we

4    can identify it.  These books, I shelf read the first

5    of every month.  These books were not on the shelf.

6         Q.    What does that mean?

7         A.    Shelf reading is I go through each shelf,

8    and I just look and make sure that all the books are

9    in order.

10        Q.    When did you most recently do that in

11   connection with this visit from the State Auditor's

12   Office?

13        A.    The last time I actually had shelf read

14   the books before he came was the first week in May.

15        Q.    And are you certain that they weren't

16   there when you did that?

17        A.    Yes.

18        Q.    When the books were discovered, were they

19   in a place where you would expect to find them,

20   assuming that they were books that you could purchase

21   and were appropriate to the Learning Resource Center?

22        A.    No.  Had the Resource Center acquired

23   those books we would have placed them in our

24   Literature Section, not in early childhood.