## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARGUERITE A. JOHNSON )
)
)
Plaintiff, )
)
v. )        Civil Action No. 05-157-MPT
)
ORLANDO J. GEORGE, JR., and )
DELAWARE TECHNICAL AND )
COMMUNITY COLLEGE, )
)
Defendants. )

## AMENDED MEMORANDUM OPINION

Gary W. Aber, Esquire, Aber, Goldlust, Baker and Over, 702 King Street, Wilmington, Delaware 19899.  Attorney for Plaintiff.

David H. Williams, Esquire, Morris, James, Hitchens & Williams LLP, 222 Delaware Ave., Wilmington, Delaware 19899.  Attorney for Defendants.

June 11, 2007

**Thynge, U.S. Magistrate Judge**

## I. INTRODUCTION

This is an employment discrimination case. On March 15, 2005, Marguerite A. Johnson ("Johnson") filed a complaint[1] against Orlando J. George, Jr., ("George") and the Delaware Technical and Community College (the "College" or collectively, "Defendants") alleging violation of her right of free speech under the First Amendment and 42 U.S.C. § 1983. Johnson claims that her comments led to retaliatory action resulting in her wrongful termination. Johnson alleges that she was wrongfully deprived of a property interest by being placed on administrative leave from the College without a grievance procedure, and was denied her procedural due process rights in the events prior to and during a termination hearing.

In support of their motion for summary judgment, Defendants argue that Johnson's statements are not protected under the First Amendment, that paid administrative leave does not deprive her of property rights, and procedural due process was more than adequate. This is the court's determination of that motion.

## II. BACKGROUND

Delaware Technical and Community College is a state-wide institution of higher education with campuses in Wilmington, Stanton, Dover (the Terry Campus) and Georgetown. Johnson began her employment 1970 as a GED Instructor and ultimately rose to one of the top leadership positions at the College in 1994. Johnson's success over the years was attributed to her being "a tough cookie who didn't pull punches."[2]

---

[1] D.I. 1.
[2] D.I. 115 at 5.

1

Detracting from her successful record were reports of a change in Johnson's behavior.[3] In a November 26, 2002 letter to Johnson,[4] George expressed concern that her behavior was "all too frequently out of control," and asked that she either take remedial steps to correct her behavior or submit to a thorough investigation of the allegations. Ultimately, Johnson agreed to engage an outside consulting firm for counseling and behavior modification. Allegations of Johnson's abusive, contrary and disrespectful behavior to both colleagues and subordinates continued through 2004.[5]

The complaints surfaced a final time in a report to George of Johnson's antagonistic comments during a departmental meeting. The meeting took place, in part, to introduce a new campus-wide technology policy. Prior to the meeting, and in an effort to consolidate business practices, the President's Council[6] decided to reorganize the Campus Information Technology ("IT") Division. With his Vice-Presidents' advice and agreement, George established the new IT strategy and leadership program, which included a directive to strictly support and follow the new IT director and his agenda.[7] During the November 19, 2004 meeting of the Terry Campus Department Chairs, Johnson's comments "left many with the sense that [she] was unaware of the changes brought about by the reorganization."[8] It was reported to George that Johnson's questions were antagonistic and inconsistent with those of a Campus Director, and

---

[3] D.I. 108 at 3 (George first started hearing complaints about Johnson's behavior in 2002).

[4] D.I. 109 at 128 (That letter also states that George was "deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior").

[5] D.I. 108 at 6.

[6] The President's Counsel constituents were George and the six Vice-Presidents (including Johnson). During the latter half of 2005, George was the President of the College and Johnson was a Vice-President and Director of the Terry Campus.

[7] D.I. 108 at 4 (Mr. Peter Shoudy, the school's Chief Technology Officer).

[8] D.I. 109 at 33.

2

expressed a negative attitude toward the new IT policy and disdain for Mr. Shoudy.[9]

George, once again, suggested that an investigation be made into the allegations of improper conduct by Johnson to "get to the bottom and determine whether or not [the] incidents have any substance to them."[10] He suggested that Johnson either take an administrative leave while the investigation was ongoing, or alternately, accept an early retirement from her position. Johnson replied that neither option was acceptable.[11] On January 3, 2005, George placed Johnson on administrative leave with full pay and benefits, pending an investigation which focused on the allegations about her behavior. In a confidential memorandum, George asked that Johnson gather her personal belongings and leave at the end of that day. The memo stipulated that she neither talk to College employees to discuss the investigation, nor visit College facilities without prior permission.[12] A general announcement was issued stating that Johnson was on administrative leave and that Daniel Simpson would be acting director of the Terry Campus. Johnson subsequently filed a grievance with Human Resources, which was denied on the basis that paid administrative leave is contractually a non-disciplinary and non-grievable action,[13] because Johnson was not adversely affected by the leave.[14] On March 15, 2005, Johnson filed the present matter.

An investigation was undertaken by the College's attorney, David Williams, Esq., and an accountant from the Santora Baffone CPA Group. The investigation uncovered

---

[9] Id.
[10] D.I. 108 at 6.
[11] D.I. 116 at 49.
[12] Id. at 50.
[13] D.I. 119 at 3.
[14] D.I. 109 at 87.

that Johnson abused her position at the Terry Campus by using personnel and materials

for personal reasons, misused a College issued credit card, and was abusive toward

employees.  The CPA Group produced a report (the "Santora Report") outlining the

abuses and sent it to Johnson on April 15, 2005.  As a result of the investigation, George

determined that a pre-termination hearing was in order.  On April 26, 2005, upon the

recommendation of counsel, the College's Board of Trustees adopted new rules of

procedure for conducting termination proceedings to protect Johnson's due process

rights,[15] which afforded rights that were not included in the College's Personnel Policy

Manual.[16]  Specifically, the new rules provided:

1.  Notice of the reasons for termination.
2.  A hearing before an independent, impartial Hearing Officer.
3.  The right to confront and cross-examine witnesses testifying under oath.
4.  The creation of a stenographic record.
5.  The burden of the College to establish one or more reasons for termination by a preponderance of the evidence.
6.  The preparation of a written decision by the Hearing Officer.
7.  A binding and final decision by the Hearing Officer.[17]

On the following day, Johnson was sent notification of the College's intention to

terminate her employment which included the grounds for termination and the new

hearing procedures.

On May 11, 2005, retired Delaware Superior Court Judge Vincent Bifferato was

---

[15] D.I. 109 at 30 (George Deposition, November 30, 2005).

[16] D.I. 108 at 9 (The College's Personnel Manual afforded notice of the reasons for termination, affidavits from persons supporting termination, a hearing presided over by the College's chief legal counsel, no right to address or cross-examine witnesses at the hearing, and a final recommendation by counsel to the Vice-President).

[17] D.I. 109 at 43 (The new rules for a pre-termination hearing were to assure that a Vice-President would receive a hearing before an independent and impartial decision maker).

4

appointed as the hearing officer in the matter.[18]  On June 17, 2005, the College

identified its witnesses and on June 28, 2005, Johnson received the College's hearing

exhibits, and affidavits from witnesses.  On the following day in a two-day hearing, the

College presented 13 witnesses and 30 exhibits.  Through counsel, Johnson cross-

examined the College's witnesses.  Johnson testified on her own behalf and presented 6

witnesses and 47 exhibits.  Judge Bifferato reviewed the eight page report from the

Santora Baffone Group to determine if Johnson's actions were consistent with College

policy.  The audit conducted by Santora Baffone was in accordance with standards

established by the American Institute of Certified Public Accountants.[19]  On July 19,

2005, after reviewing the evidence presented at the hearing, including the exhibits,

Judge Bifferato issued a decision that Johnson be terminated for cause.  He found that

the College met its burden of proof by a preponderance of the evidence that "Johnson

inappropriately used College personnel and materials for personal matters" and that

"Johnson did not fully and equitably replay [sic] the College for such labor and

materials."[20]  In addition, he commented that Johnson followed a "pattern of abuse in the

use of [her] College [issued] credit card."[21]  Finally, he concluded that Johnson's actions

clearly met the requirements for termination outlined in her employment contract.[22]

Consistent with the findings of Judge Bifferato, Johnson's employment was terminated

---

[18] Bifferato was recommended by Hope Murray, head of Human Relations, and selected by George.

[19] D.I. 109 at 46 (The report was reviewed by the State of Delaware Office of Auditor of Accounts. In the report, dated November 10, 2005, the Auditor concurred with the findings of the CPA Group and referred the case to the Office of Attorney General for the State of Delaware for review and any further action). D.I. 109 at 212.

[20] D.I. 116 at 109.

[21] *Id.* at 110.

[22] *Id.* at 111.

5

on July 19, 2005.

## III. LEGAL STANDARD

### Summary Judgment

A grant of summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[23] A Rule 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case."[24] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[25] To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions or conclusory allegations.[26] Even so, the nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant.[27]

### First Amendment Protection

The United States Supreme Court's decision in *Garcetti v. Ceballos*[28] addresses whether a public employee's speech is protected under the First Amendment. In prior

---

[23] *Lujan v. National Wildlife Federation*, 497 U.S. 871, 884 (1990).

[24] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[25] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[27] *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

[28] *Garcetti v. Ceballos,* 126 S. Ct. 1951 (2006).

6

opinions, the Court "identified two inquires to guide interpretation of the constitutional protections accorded to public employee speech."[29] The first requires determining if the employee was speaking "as a citizen on a matter of public concern."[30] If not, there is no motivation for retaliatory action and therefore, no cause of action.[31] The second question is whether the employer had adequate justification to restrict the speech, relating the content of the speech to the employer's interest in promoting efficiency for the public service it performs.[32] Ultimately, the burden of showing that the speech is protected rests with the employee.[33] In *Garcetti,* the Court maintains the delicate balance of interests between when an employee speaks as a citizen addressing a matter of public concern, and when an employee is "simply performing [her] job duties, [where] there is no warrant for a similar degree of scrutiny."[34] It reasons that public employees occupy trusted positions in society, and therefore, when they speak out against government policy, the speech can impair the proper performance of government functions.[35] It found that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."[36] While the dissent in *Garcetti* argued that the need for balance does not disappear "when an employee speaks on matters his job requires him to address,"[37] an employee "should not prevail on balance unless he speaks on a matter of unusual

---

[29] *Id.* at 1958 (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)).
[30] *Id.*
[31] *See Mt. Healy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).
[32] *See Garcetti,* 126 S. Ct. at 1957.
[33] *See Waters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir. 1995).
[34] *Garcetti,* 126 S. Ct. at 1961.
[35] *See Id.* at 1958.
[36] *Id.* at 1954.
[37] *Id.* at 1961.

importance and satisfies high standards of responsibility in the way he does it."[38]  Eligible
subject matter for comment would include:  "official dishonesty, deliberately
unconstitutional action, other serious wrongdoing, or threats to health and safety."[39]

Procedural Due Process

A government employee may be deprived of a property interest if not afforded
due process in termination proceedings.  The State cannot deny an expectation of
continued employment without due process of law.[40]  The Fourteenth Amendment does
not, itself, create property rights, but rather, protects rights granted employees.[41]
Property rights are determined from sources independent of the Constitution, such as, a
state law or employee contract.[42]  Prior to termination, a government employee is
generally entitled to "notice of the charges against him, an explanation of the employer's
evidence, and an opportunity to present his side of the story."[43]  Notice is sufficient if "1)
it apprises the vulnerable party of the nature of the charges and general evidence
against him, and 2) if it is timely under the particular circumstances of the case."[44]  A
simple statement providing notice of the charges and nature of the evidence is enough.[45]
The specificity required should provide the "opportunity to determine what facts, if any,
within [the plaintiff's] knowledge might be presented in mitigation of or in denial of the
charges."[46]  While advance notice is not required, "the timing and content of notice . . .

---

[38] *Id.* at 1967.
[39] *Id.*
[40] *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985).
[41] *Id.*
[42] *See Board of Regents v. Roth,* 408 U.S. 564, 577 (1972).
[43] *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546 (1985).
[44] *Gniotek v. City of Philadelphia,* 808 F.2d 241, 244 (3d Cir. 1986).
[45] *See Id.*
[46] *Id.*

8

will depend on appropriate accommodation of the competing interests involved."[47]

## IV. POSITIONS OF THE PARTIES AND ANALYSIS

The College defends its conduct by arguing that Johnson's statements were made pursuant to her official duties, and she was not speaking as a citizen on a matter of concern for First Amendment purposes. It maintains that Johnson was not denied due process in the investigation and subsequent termination hearing and was not subject to adverse action as a result of having to choose between early retirement and paid administrative leave. Johnson disagrees. She contends that she was denied due process throughout her administrative leave and in her pre-termination hearing.

### Johnson's Speech as Government Employee

The College explains that Johnson was a high ranking official with a leadership position during the Terry Campus meeting for Department Chairs. It asserts that Johnson's speech projected a lack of support for the new IT director and his policies, an area within her authority as Director of the Terry Campus. It states that personnel matters and department reorganizations are areas of concern for a campus Director, and not the general citizenry.

Johnson argues it was not her job to manage, direct or control the IT department, and therefore, her comments were outside of her job responsibilities. She argues that as a Vice President, she was not required to attend every meeting on campus, nor supervise the IT department. She adds that she was not a regular attendee of Department Chair meetings and therefore, attendance was not part of her daily professional activities as Director. Johnson contends that she acted appropriately in

---

[47]*Goss v. Lopez,* 419 U.S. 565, 579 (1975).

discussing public concerns for the IT system at the meeting and was not subversive or insubordinate. In the alternative, she argues that if her comments are characterized as subversive and insubordinate, the characterization supports that she must have "acted outside of her job duties in raising those issues."[48]

In *Garcetti,* the Court concludes that when government employees speak in an official capacity and are "simply performing their job duties,"[49] they have no First Amendment right, and the court need not balance that right and an employer's prerogative to restrict it. Johnson rationalizes the *Garcetti* opinion as "narrow," of "limited scope" and "inapplicable," explaining that a government employee's speech is always protected from discipline, except, when acting within the defined limits of her job description or as part of her specific, daily professional activities. Johnson's characterization is unpersuasive. *Garcetti* explains that the "First Amendment protects a public employee's right, in *certain* circumstances, to speak as a citizen addressing matters of public concern."[50] Johnson was acting in her capacity as the Campus Director, with overall responsibility for the needs of the students and faculty of the campus when attending and participating in the Department Chair meetings, the purpose of such included review of the College IT program, as well, as other campus related matters. Johnson argues that because she did not regularly attend these meetings, that they do not fall within her employment responsibilities. Johnson's logic of how attending a faculty meeting could be described as outside of her official capacity is unpersuasive. There is no indication that the public was invited to attend or participate

---

[48] D.I. 115 at 35.
[49] *Garcetti v. Ceballos,* 126 S. Ct. 1951, 1961 (2006).
[50] *Id.* at 1957 (emphasis added).

in such meetings and there is no evidence that the meeting in question addressed matters unrelated to College issues. Following Johnson's argument to its logical conclusion means that *all* College matters are public issues. That argument eviscerates the principles of *Garcetti* because Johnson would always be addressing public concerns just by her position as a government employee.

Johnson contends that since she was not responsible for managing the IT department, her attendance was not required, nor within her employment duties.[51] Her argument is nonsensical, and contradicts Johnson's own admission of concern over the new IT strategy and its impact on campus services. In *Garcetti*, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created."[52] Johnson was responsible for the Terry Campus, and her attendance at the Chairpersons meeting is consistent with that role. Therefore, the College did not infringe Johnson's liberties by subjecting her to any resultant discipline for her conduct.

Johnson's Speech as a Matter of Public Concern

The College maintains that Johnson's statements do not address any misuse of College funds or allegations of wrong-doing, and therefore were not a matter of public concern. It contends that Johnson's statements regarded personnel and operational matters or "personnel squabbles," are not matters of public interest and do not meet the definition of speech protected by the First Amendment. It submits that a dispute over departmental reorganization is, in essence, a power struggle between departments.

---

[51] D.I. 115 at 34.
[52] *Garcetti,* 126 S. Ct. at 1960.

11

Assuming such speech is protected, it argues that Johnson's speech was not a basis of Judge Bifferato's decision and not a motivating factor in the decision to terminate her employment.

Johnson argues that the subject matter of the meeting was one of public concern. She states that the IT department affected how the administrators, students and the outside public would interact with the school, and therefore automatically is a matter of public concern. Johnson admits that she had previous issues with the IT department and that her statements were relevant to how that department offered service to the Terry Campus.[53] Finally, in an affidavit dated July 17, 2006, Johnson suggests that the College offered off-campus interactive computerized classes through the IT department and as a result, her comments dealt with issues related to the public.[54]

Criticism of the College's IT strategy and leadership is not the type of speech protected by the First Amendment according to *Garcetti* and its progeny. The structure and function of the IT department are issues for the College faculty, staff and students, but such communications are not matters of *public* concern. *Garcetti* explains that "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity" and a supervisor's communications must be "accurate, demonstrate sound judgment, and promote the employer's mission."[55] Johnson's comments at the Directors meeting did not "promote the employer's mission" because they questioned an agreed upon policy set forth by the College. If Johnson's superiors thought her comments were "inflammatory or misguided, they had the authority to take

---

[53] D.I. 115 at 8.
[54] D.I. 116 at 334.
[55] *Garcetti,* 126 S. Ct. at 1960.

proper corrective action."[56]  In his role as president of the College and Johnson's

superior, George generated consensus regarding the new IT strategy, hired a program

manager, and specifically called for the Vice Presidents to support the new policies.

Johnson's comments were critical of the program, failed to promote the College's

mission, and were subject to corrective measures.  Even if the court balances Johnson's

right to express her opinions with the College's needs, her comments are not protected

speech.  Her criticisms did not address nor were directed to "official dishonesty,

deliberately unconstitutional action, other serious wrongdoing, or threats to health and

safety."[57]  Simply, Johnson's statements expressed her disapproval for George's choice

of an IT director and his programs.  Speech directed to internal personnel and

operational matters is not protected by the First Amendment.

In conclusion, Johnson acted in her role as director of the Terry Campus by her

attendance and participation in the meeting of faculty chairpersons.  She spoke on

certain issues as director of the Campus.  Her comments projected her dissatisfaction

with the College's choice in leadership and the IT strategy.  Her speech did not target

matters of public concern.  Therefore, no genuine issue of material fact exists.

Johnson's comments during the Campus Chairperson's meeting do not fall within any

First Amendment protection.

Procedural Due Process

The College contends that the hearing procedures afforded Johnson exceeded

the minimal due process required by the Due Process Clause of the 14th Amendment

and under her employment contract.  First, it explains that since Johnson was

---

[56] Id.
[57] Id.

suspended with pay, she was not being disciplined, nor was she denied a property or liberty interest and therefore, no process was mandated before placing her on leave. It also states that she received advance notice of the charges against her in the Santora Report.[58] Witnesses were identified by the College on June 17, 2005, eleven days before the hearing. Johnson was provided with over one thousand pages of documents, in addition to the exhibits the College planned to rely on at the hearing. The College maintains that the process was both fair and adequate because Judge Bifferato was appointed as the hearing officer, and the College Trustees agreed to be bound by his decision.

Johnson proposes that she has a constitutionally protected property interest in her employment and that the unfair nature of the proceedings denied her due process.[59] She contends that the College denied her due process rights by placing her on administrative leave without the right to a grievance procedure, and that the College's actions stigmatized her and damaged her professional reputation. She argues that her paid administrative leave was a disciplinary action, and a grievance procedure was guaranteed by her employment contract. Johnson complains that she was also denied the right to speak to College employees while the investigation was underway, and therefore, the investigation was generally unfair to her. She contends that the investigation and the Santora Report was "riddled with errors, omissions and contradictory facts" implying that the College manipulated the decision making process, resulting in a decision that was "intrinsically flawed."[60] Johnson alleges that she was

---

[58] The Santora Report included a detailed explanation of the allegations of improper conduct and misuse of College funds.
[59] D.I. 115 at 41.
[60] D.I. 115 at 42.

unable to refute the testimony against her because the College refused to "provide specifics concerning such testimony."[61]  She also reasons that changes made by Defendants to the pre-termination hearing process did not eliminate the College's prior contractual obligation to provide her with affidavits from witnesses.  Finally, she claims her procedural due process rights were violated because she did not receive a description of the evidence to be used to prove her abuse of employees.

Johnson's contention, that she was deprived of a property interest as a result of the College's termination procedure, is unsubstantiated.  The court recognizes that Johnson has a property interest in her continued employment and turns to the issue of what process Johnson is due.  The United States Supreme Court in *Cleveland Bd. of Educ. v. Loudermill,* states that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."[62]  While the hearing "need not be elaborate," it must provide the "determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."[63]  The adequacy of the hearing is dependant on the importance of the property interest being denied and the property right to one's livelihood is extremely important.[64]  If post-termination proceedings are non-existent, then a more elaborate pre-termination hearing is required.[65]

Although "advance notice is not a per se requirement of due process,"[66] Johnson

---

[61] *Id.* at 44.
[62] 470 U.S. 532, 538 (1985).
[63] *Id.* at 545.
[64] See *Hameli v. Nazario,* 1994 WL 827787, *4 (D. Del. Sept. 2, 1994).
[65] *Id.*
[66] *Morton v. Beyer,* 822 F.2d 364, 369 (3d Cir. 1987).

received ample notice of the charges and had a reasonable opportunity to prepare a response.  Johnson was aware that her activities were under investigation more than six months prior to the hearing.  Two and a half months prior to the hearing, Johnson received the Santora Report which outlined the allegations of financial abuse which were the basis for her dismissal.  Two weeks before the hearing, the College provided notice of the witnesses it was going to call, and days before, the College offered all of the materials and demonstratives used at the hearing.  Therefore, notice was sufficient as it provided the nature of the charges and the evidence against her, and was timely under the circumstances of the case.

Prior to April 2005, the College did not have guidelines for conducting a pre-termination hearing for a Campus Vice-President.  The College's Board of Trustees approved the new guidelines to insure that both parties would be represented fairly and due process procedures were followed.  During the two day hearing, Johnson was provided an opportunity to respond to the charges against her.  The Constitution requires a proceeding to be "appropriate under the circumstances; [but] it does not require confrontation and cross examination in every proceeding."[67]  The purpose of such a proceeding is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."[68]  At the pre-termination hearing Johnson could call and cross-examine witnesses and present evidence.  Johnson was represented by counsel, and she was able to test the truthfulness of the accusations against her.  Johnson testified on her own behalf and proffered 6 witnesses and 47 exhibits.  Retired Superior Court Judge Bifferato, whose

---

[67] *Hameli v. Nazario*, 1994 WL 827787, *6 (D. Del. Sept. 2, 1994).
[68] *Doherty v. Delaware*, 424 F. Supp. 2d 729, 734 (D. Del. 2006).

16

decision in the matter was final, reviewed all of the material presented. He found that

there were reasonable grounds to believe that the charges against Johnson were true

and supported her dismissal. In his report, the Judge determined that the College met

its burden of proof by a preponderance of the evidence that "Johnson inappropriately

used College personnel and materials for personal matters" and portrayed a "pattern of

abuse in the use of [her] College [issued] credit card."[69] He concluded that Johnson's

actions clearly met the requirements for termination outlined in her employment

contract.[70] In conclusion, the hearing procedures afforded Johnson the due process

provided by her employment contract and under the 14th Amendment.

Substantive Due Process

Johnson claims that her substantive process rights were denied because the

termination hearing did not "meet the basic requirements of speaking the truth."[71] She

primarily focuses on the Santora Report, claiming that because it is "riddled with errors"

and "not designed to seek the truth," Judge Bifferato's decision is intrinsically flawed and

unfair.[72] Johnson links her substantive due process argument to a violation of

procedural due process by claiming that she was stigmatized by negative newspaper

_____

[69] D.I. 116 at 213.

[70] Id. at 214.

[71] Johnson argues, essentially for the first time in a lengthy surreply brief of thirty-four pages that the evidence at the pre-termination hearing was false and incomplete. In her fifty page answering brief (in excess of the page limitation authorized under the court's local rules), she alludes to a possible substantive due process claim. No where in her original or amended complaints is a substantive due process claim raised. Further, those complaints are absent of any allegations of fraud, which under the Federal Rules of Civil Procedure ("FRCP"), specifically Rule 9, are to be pled with specificity. Therefore, no notice of a substantive due process claim was provided. Johnson points to no discovery directed to such a claim.

The primary evidence Johnson alleges as false is the Santora Report, a document she possessed for over two and a half months before the pre-termination hearing. Johnson cross-examined the investigator and author, David Dwyer, during that hearing.

Johnson knew or should have known of a substantive due process claim before this action was filed. Johnson's back door amendment to the pleadings is inconsistent with FRCP and the Local Rules of Civil Practice and Procedure of this court.

[72] D.I. 115 at 42.

17

articles about the investigation and dismissal.[73]  Johnson also suggests that Judge

Bifferato may have been biased because of an alleged conflict of interest.[74]

To support a violation of substantive due process, government action must be so

"ill conceived or malicious that it shocks the conscience"[75] or "arbitrary or irrational,"[76]

exceeding negligence and indifference to "reach a level of gross negligence."[77]  "The

exact degree of wrongfulness necessary to reach the 'conscience-shocking' level

depends upon the circumstances of a particular case."[78]  In a substantive due process

matter, a properly supported motion for summary judgment will require the nonmovant to

produce some (more than a "scintilla") evidence in support of his position.[79]

The College's decision to terminate Johnson's employment cannot be described

as malicious, arbitrary or irrational.  Johnson was placed on paid administrative leave.

She was not arbitrarily dismissed for her alleged behavior.  Johnson was provided with a

pre-termination hearing.  The evidence proffered at the hearing supports Judge

Bifferato's findings.  Johnson argues that the Santora Report was false because it

focuses on her abuses of College policy and not her merit-worthy behavior.[80]  She

claims that the procedure set forth by the College, limited the review, and therefore,

---

[73] *Id.* at 48.

[74] The firm with whom Judge Bifferato is associated as senior counsel represented the College in four matters which arose in the 1994-1996 time frame, nine to eleven years before the Johnson pre-termination hearing and four to six years before Judge Bifferato retired from the bench in April 2000. *See* www.courts.delaware.gov.  The only reported matter ended in 1999, six years before the pre-termination hearing.  Obviously, Judge Bifferato was not involved with the firm before his retirement.  Moreover, a member of the firm served as a mediator in 2004 in a case in which the College was one of four of parties, which suggests that the firm was not representing and had not recently represented the College.  Clearly, Judge Bifferato never represented any party in the present matter.  Johnson never states that Judge Bifferato was biased:  rather, she suggests that the selection process was partial.

[75] *Miller v. Philadelphia,* 174 F.3d 368, 374 (3d Cir. 1999).

[76] *Duffy v. Bucks,* 7 F. Supp. 2d 569, 576 (E.D. PA 1999).

[77] *Miller,* 174 F.3d at 376.

[78] *Id.*

[79] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[80] D.I. 115 at 14.

rendered the analysis inaccurate. The investigation was to determine whether Johnson had violated College policy. The Santora Report determined that she had by converting College resources for her personal use. Johnson had over two months to prepare to rebut the charges and to counter the report. She had the opportunity to present facts and evidence at the hearing to address the alleged inaccuracies. An independent hearing officer determined the charges were founded.

Finally, Johnson's argument that a denial of procedural due process directly results in a violation of substantive due process is a misinterpretation of case law.[81] Substantive due process violations must be supported with facts that Defendants acted "arbitrarily or irrationally" in a way that would "shock the conscience" of the court. Implying that Johnson might have been stigmatized by the College's actions does not meet this burden. Nothing Johnson has presented rises to the level of a substantive due process claim.

As a result, Johnson fails to state a viable substantive due process claim.

Qualified Immunity

Defendants assert that the doctrine of qualified immunity requires dismissal of the case against George since his conduct in performing his discretionary duties did not violate Johnson's statutory or Constitutional rights. Defendants contend that George is protected from civil liability, as long as, he did not knowingly violate Johnson's

---

[81] Johnson's answer brief states: "In addition, the Court had found that in addition to the termination (on procedural due process) was without basis and fact. Accordingly, a violation of the substantive due process has also been established." *Morris v. Bd. of Edu. Of Laurel Sch. Dist.*, 401 F. Supp. 188, 211 (D. Del. 1975). The facts in *Morris* are clearly distinguishable. There, the court held that the defendant breached the plaintiff's contract and violated her 14th Amendment rights because it denied her the opportunity to be heard and failed to advise her of the charges (which the court determined were unfounded). As a result, the plaintiff's procedural and substantive due process rights were determined to be violated.

Constitutional rights. They note that "Johnson has not sufficiently alleged a violation of even colorable constitutional or statutory rights, much less 'clearly established' ones."[82]

Johnson concludes that if her "First Amendment rights were violated, it follows that those rights were clearly established [and] the defendant does not have qualified immunity."[83] Johnson contends that George would have reasonably known, because he had the advice of his attorneys, that denying her a grievance procedure and subjecting her to administrative leave would be a violation of the First Amendment.

Generally, government officials are protected from civil liability when their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known."[84] "The question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights."[85] The issue of qualified immunity requires a "careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)."[86] When public officials, however, "invoke administrative processes for a legitimate purpose, they are acting in conformity with the Constitution and cannot be violating 'clearly established' law (because they are not violating the law at all)."[87]

Based upon a careful review of the facts, Defendants have established that George's conduct did not violate Johnson's clearly established rights. First, George

---

[82] D.I. 108 at 27 (citing *Kodrea v. City of Kokomo, Indiana*, 2006 WL 1750071, at *12 (S.D. Ind. 2006)).

[83] D.I. 115 at 48.

[84] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[85] *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996) (emphasis in original)(citing *Anderson v. Creighton*, 483 U.S. 635 (1987)).

[86] *Id.* at 122.

[87] *Id.* at 125.

20

acted to preserve Johnson's due process rights during the investigation and pre-termination hearing. George admitted that "it was counsel's advice to me as president that in order to protect Dr. Johnson's due process rights, that I should ask the Board of Trustees to adopt these rules of procedure."[88] Instead of clearly violating Johnson's rights, George sought and applied counsel's recommendations to preserve Johnson's property interest and due process rights. George provided Johnson with notice of the charges against her and an opportunity to be heard. He supported the College Board's approval of the revised hearing process that focused on providing Johnson with a fair and impartial hearing. George authorized the appointment of an independent hearing officer, whose recommendation would be final. Finally, George had a legitimate purpose in placing Johnson on administrative leave and proceeding with a the pre-termination hearing. Johnson was forewarned that her behavior would lead to an investigation of allegations of abuse. George ordered the investigation which required the temporary removal of Johnson from her position. The resultant report and findings of abuse directed the termination proceeding. These actions were not improper, nor infringe clearly established rights. As a result, the doctrine of qualified immunity applies to George.

## V. CONCLUSION

For the reasons stated above, the College's motion for summary judgment is GRANTED. An appropriate order consistent with this memorandum will follow.

---

[88] D.I. 109 at 31.